1   Michael D. Bonanno, Attorney (DC Bar No. 998208)
    Soyoung Choe, Attorney (MD Bar, No Numbers Assigned)
2   Aaron Comenetz, Attorney (DC Bar No. 479572)
    Peter K. Huston, Attorney (CA Bar No. 150058)
3   Ihan Kim, Attorney (NY Bar, No Numbers Assigned)
    Claude F. Scott, Jr., Attorney (DC Bar No. 414906)
4   Adam T. Severt, Attorney (MD Bar, No Numbers Assigned)
    United States Department of Justice, Antitrust Division
5   450 Fifth Street, NW, Suite 7100
    Washington, DC 20530
6   Telephone: (202) 532-4791
    Facsimile: (202) 616-8544
7   E-mail: michael.bonanno@usdoj.gov

8   [Additional counsel listed on signature page]

9   Attorneys for Plaintiff United States of America

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | Case No.: 13 0133 |
| v. | |
| BAZAARVOICE, INC. | |
| *Defendant.* | |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to obtain equitable relief remedying the June 2012 acquisition of PowerReviews, Inc. ("PowerReviews") by Defendant Bazaarvoice, Inc. ("Bazaarvoice"). The United States alleges as follows:

FILED

2013 JAN 10 A 11: 07

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1

**INTRODUCTION**

2  1.  Many retailers and manufacturers purchase product ratings and reviews platforms

3 ("PRR platforms") to collect and display consumer-generated product ratings and reviews online.

4 Bazaarvoice provides the market-leading PRR platform, and PowerReviews was its closest

5 competitor. No other PRR platform competitor has a significant number of PRR platform

6 customers in the United States. By acquiring PowerReviews, Bazaarvoice eliminated its most

7 significant rival and effectively insulated itself from meaningful competition.

8  2.  The acquisition of PowerReviews was a calculated move by Bazaarvoice that was

9 intended to eliminate competition. Bazaarvoice's senior executives spent more than a year

10 considering whether buying PowerReviews would reduce pricing pressure and diminish

11 competition in the marketplace. As a result of their extensive deliberations, the company's

12 business documents are saturated with evidence that Bazaarvoice believed the acquisition of

13 PowerReviews would eliminate its most significant competitive threat and stem price

14 competition.

15  3.  In April 2011, Brant Barton, one of Bazaarvoice's co-founders, outlined the

16 benefits of the acquisition in an e-mail to senior Bazaarvoice executives. He noted that acquiring

17 PowerReviews would "[e]liminat[e] [Bazaarvoice's] primary competitor" and provide "relief

18 from [] price erosion." He also discussed the absence of competitive alternatives for customers,

19 concluding that Bazaarvoice would "retain an extremely high percentage of [PowerReviews]

20 customers," because available alternatives for disgruntled customers were "scarce" and "low-

21 quality."

22  4.  On May 4, 2011, Brett Hurt, Bazaarvoice's Chief Executive Officer, supported

23 Barton's analysis and advocated the company's pursuit of PowerReviews in an e-mail to the

1   Bazaarvoice board of directors. According to Hurt, the acquisition of PowerReviews was an

2   opportunity to "tak[e] out [Bazaarvoice's] only competitor, who . . . suppress[ed] [Bazaarvoice]

3   price points []by as much as 15% . . . ."

4       5.      Two days later, Barton, Hurt, and Stephen Collins, Bazaarvoice's Chief Financial

5   Officer, met with senior PowerReviews executives to discuss the potential acquisition. In his

6   notes from the meeting, Barton wrote that the transaction would enable the combined company

7   to "avoid margin erosion" caused by "tactical 'knife-fighting' over competitive deals." He later

8   prepared a presentation for Bazaarvoice's board of directors in which he claimed the transaction

9   would "[e]liminate [Bazaarvoice's] primary competitor" and "reduc[e] comparative pricing

10  pressure."

11      6.      In October 2011, Collins e-mailed other senior Bazaarvoice executives to provide

12  his perspective regarding the potential acquisition. He recommended that Bazaarvoice continue

13  its pursuit of PowerReviews because he feared price competition with PowerReviews would

14  impair the long-term value of Bazaarvoice's business. Collins believed that Bazaarvoice had

15  "literally, no other competitors," and he expected "pricing accretion" from the combination of

16  the two firms. In November 2012, Stephen Collins replaced Brett Hurt as Bazaarvoice's Chief

17  Executive Officer.

18      7.      In November 2011, Hurt sought permission from Bazaarvoice board members to

19  continue exploring a potential deal with PowerReviews, observing that Bazaarvoice would have

20  "[n]o meaningful direct competitor" after acquiring PowerReviews, thereby reducing "pricing

21  dilution."

22      8.      In December 2011, Collins and Barton met with PowerReviews representatives

23  again. Following the meeting, Collins prepared a memorandum for Bazaarvoice's board of

1  directors to outline the expected benefits of the acquisition.  He wrote that the acquisition of

2  PowerReviews would (1) "eliminat[e] feature driven one-upmanship and tactical competition;"

3  (2) "[c]reate[] significant competitive barriers to entry;" (3) "eliminate the cost in time and

4  money to take [PowerReviews'] accounts;" and (4) "reduce [Bazaarvoice's] risk of account

5  losses as [PowerReviews] compete[d] for survival."

6       9.     In May 2012, Bazaarvoice executives completed their due diligence for the

7  acquisition.  To support their recommendation to proceed with the acquisition of PowerReviews,

8  they prepared a 73-page memorandum for the company's board of directors.  In this

9  memorandum, the executives touted the transaction's dampening effect on competition,

10  concluding the acquisition would "block[] entry by competitors" and "ensure [Bazaarvoice's]

11  retail business [was] protected from direct competition and premature price erosion."

12       10.    Bazaarvoice's acquisition of PowerReviews closed on June 12, 2012.  The

13  purchase price, including cash and non-cash consideration, was approximately $168.2 million.

14  **THE DEFENDANT AND THE TRANSACTION**

15       11.    Bazaarvoice is a publicly traded Delaware corporation and is headquartered in

16  Austin, Texas.  During its 2012 fiscal year, Bazaarvoice earned approximately $106.1 million in

17  revenue.

18       12.    PowerReviews was a privately held Delaware corporation.  Before the

19  transaction, PowerReviews was headquartered in San Francisco, California.  During the 2011

20  calendar year, the company earned approximately $11.5 million in revenue.

21  **JURISDICTION**

22       13.    The United States brings this action under Section 15 of the Clayton Act, 15

23  U.S.C. § 25, to restrain Bazaarvoice's violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

1   14.   This Court has subject matter jurisdiction over this action under Section 15 of the

2   Clayton Act, 15 U.S.C. §§ 4 and 25, and 28 U.S.C. §§ 1345 and 1331. This Court also has

3   subject matter jurisdiction under 28 U.S.C. § 1337, as Bazaarvoice is engaged in a regular,

4   continuous, and substantial flow of interstate commerce and activities substantially affecting

5   interstate commerce. Bazaarvoice sells PRR platforms throughout the United States.

6   15.   This Court has personal jurisdiction over the Defendant. Bazaarvoice transacts

7   business and is found within the Northern District of California.

8                                          **VENUE**

9   16.   Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28

10  U.S.C. § 1391(b) and (c).

11                           **INTRADISTRICT ASSIGNMENT**

12  17.   Assignment to the San Francisco Division is proper because this action arose in

13  San Francisco County. A substantial part of the events that gave rise to the claim occurred in

14  San Francisco, and PowerReviews' headquarters and principal place of business was located in

15  San Francisco before the transaction. Bazaarvoice continues to use PowerReviews' former

16  headquarters as its San Francisco office.

17                                   **PRR PLATFORMS**

18  18.   PRR platforms enable manufacturers and retailers to collect, organize, and display

19  consumer-generated product ratings and reviews online. Consumer-generated product ratings

20  and reviews ("ratings and reviews") represent feedback from consumers regarding their

21  experiences with a product. These submissions are displayed on a retailer's or manufacturer's

22  website, allowing other consumers to read feedback from previous buyers before making a

23  purchasing decision. PRR platforms can range from simple software solutions a company has

Complaint – Page 5

1  developed with internal resources to sophisticated commercial platforms offering a combination
2  of software, moderation services, and data analytics tools.

3      19.    Ratings and reviews are a popular feature for retailers and manufacturers to
4  display on their websites. Ratings and reviews can provide highly relevant, product-specific
5  information on a retailer's or manufacturer's website near the time of purchase. The additional
6  information provided by ratings and reviews can increase sales, decrease product returns, and
7  attract more consumers to a retailer's or manufacturer's website. Ratings and reviews also can
8  provide valuable data about consumer preferences and behavior, which retailers and
9  manufacturers can use to make inventory purchasing or product design decisions.

10      20.    Ratings and reviews may also benefit a retailer or manufacturer by boosting a
11  product's ranking on a search engine results page. Internet search engine algorithms generally
12  assign higher rankings to websites with fresh and unique content. Ratings and reviews are
13  frequently updated, and this content is highly tailored to the retailer's or manufacturer's product
14  catalog. Accordingly, when ratings and reviews are indexed by a search engine, the underlying
15  product pages will likely receive a higher ranking on a search engine results page.

16      21.    From a consumer's perspective, ratings and reviews are useful because they can
17  provide authentic information regarding another consumer's experience with a particular
18  product. Feedback from other consumers can help a prospective buyer make a more informed
19  purchasing decision. Product ratings and reviews often provide information that is not easily
20  ascertainable when shopping online (*e.g.*, quality of construction, fit, durability).

21      22.    The software component of a PRR platform provides the user interface and
22  review form for the collection and display of ratings and reviews. Most review forms prompt
23  consumers to rate a product on a five-star scale and offer consumers an option to write an open-

1   ended comment about their experience with the product. Other forms also allow consumers to

2   rate products along several dimensions (*e.g.*, product appearance, ease of assembly, value).

3       23.     In addition to the technology components of their respective platforms, some PRR

4   platform providers also provide moderation services. After a consumer submits a review, the

5   PRR platform provider applies software algorithms to scan the submission for inappropriate or

6   fraudulent content. After the automated scan, a human moderator examines each submission to

7   ensure it complies with a particular client's moderation standards. These moderation standards

8   may vary between clients. For example, some clients may prefer not to display references to

9   their competitors on their websites.

10       24.     After moderation, the PRR platform publishes approved submissions in a display

11   interface on a client's website. Many PRR platforms display a summary of a product's rating

12   and review information and allow consumers to view individual reviews for more detailed

13   information. The review summary may display the number of reviews, the product's average

14   overall rating, a review distribution histogram, or information related to particular product

15   attributes. The display interface may also allow consumers to filter reviews according to their

16   interests.

17       25.     Sophisticated PRR platforms allow manufacturers to share, or "syndicate," ratings

18   and reviews with their retail partners. Through the syndication network, retailers can display

19   reviews that were originally collected by a product's manufacturer. Syndication helps retailers

20   obtain more content than they could independently. Manufacturers and retailers both benefit

21   from the ability to display more reviews at the point of sale. Syndication between a

22   manufacturer and a retailer using different PRR platforms is possible, but requires expensive,

23   customized integration work to connect the platforms.

1      26.      Some PRR platforms also include analytics software that manufacturers and
2 retailers use to analyze information collected from ratings and reviews. With these tools,
3 manufacturers and retailers can track and analyze real-time consumer sentiment. Manufacturers
4 and retailers can use this information to identify product design defects, make product design
5 decisions, or identify consumers for targeted marketing efforts.

6      27.      PRR platforms are sold by Bazaarvoice and other commercial suppliers in direct
7 sales processes that require a significant amount of time and negotiation. Prices are individually
8 negotiated, and each customer's price is independent of the prices that other customers receive.
9 Arbitrage, or indirect purchasing from other customers, is not possible because customers cannot
10 re-sell PRR platforms that they have purchased from a commercial supplier. Accordingly,
11 customers commonly receive different prices, even when purchasing similar products and
12 services.

13      28.      PRR platform providers negotiate prices in light of each customer's demand
14 characteristics, taking into account competitive alternatives. Bazaarvoice calls this method of
15 setting prices "value-based" pricing, meaning "the more value the [client] perceives, the higher
16 [Bazaarvoice's] price point." During the sales process, it is typical for a salesperson to ask the
17 prospective customer to divulge detailed information related to its business, which may include
18 information related to (1) annual volume of online sales; (2) product return rates; (3) historic
19 conversion rates; (4) e-commerce vendor relationships; or (5) project budgets. This process
20 enables the PRR platform provider to assess the prospect's willingness to pay for a PRR
21 platform. After acquiring as much information as possible about the prospect, the PRR platform
22 provider offers a price that aligns closely with its perception of the prospect's willingness to pay
23 for its product.

1       29.     Throughout the course of the sales process, a salesperson will also ask whether a

2  prospective customer is considering other competitive alternatives. In most cases, the presence

3  of competition is relatively transparent. Prospects routinely reveal the identity of competitors

4  during negotiations and may even reveal the terms of competitive offers to improve their

5  bargaining position. Accordingly, suppliers adjust their pricing to account for other competitive

6  offers, depending on the nature of the threat posed by the competition.

7                     **RELEVANT MARKET**

8       30.     PRR platforms used by retailers and manufacturers are a relevant product market

9  and "line of commerce" within the meaning of Section 7 of the Clayton Act.

10      31.     The United States is a relevant geographic market. PowerReviews was routinely

11  the only significant competitive threat that Bazaarvoice faced in U.S.-based sales opportunities.

12  As a result of the transaction, Bazaarvoice will be able to profitably impose targeted price

13  increases on retailers and manufacturers based in the United States.

14  **ELIMINATION OF HEAD-TO-HEAD COMPETITION BETWEEN BAZAARVOICE**

15      **AND POWERREVIEWS WILL HARM RETAILERS AND MANUFACTURERS**

16  **A.**     **Bazaarvoice's acquisition of PowerReviews eliminated the company's closest**

17         **competitor and is likely to substantially lessen competition.**

18      32.     Before the acquisition, Bazaarvoice was the leading commercial supplier of PRR

19  platforms, and PowerReviews was its closest competitor by a wide margin. Bazaarvoice's

20  former CEO acknowledged that "PowerReviews is [Bazaarvoice's] biggest competitor," and the

21  company's decision to acquire PowerReviews was bolstered by its current CEO's belief that

22  there are "literally, no other competitors" in the market. Through the removal of its most

23  significant rival, Bazaarvoice acquired the ability to profitably raise the price of its platform

1   above pre-merger levels. In fact, Bazaarvoice's current CEO pressed for the company to acquire

2   PowerReviews because he anticipated "pricing accretion" due to the consolidation of the two

3   firms.

4        33.     Prospective customers routinely played Bazaarvoice and PowerReviews against

5   each other during negotiations. Consequently, a Bazaarvoice "playbook" for competing with

6   PowerReviews mandated that "[p]ricing only [be] delivered when [the customer's] BATNA and

7   ZOPA have been clearly identified." BATNA and ZOPA are acronyms which stand for "best

8   alternative to negotiated agreement" and "zone of possible agreement." For many manufacturers

9   and retailers, PowerReviews was the best alternative to a negotiated agreement with

10   Bazaarvoice. Accordingly, competitive pressure from PowerReviews frequently forced

11   Bazaarvoice to offer substantial price discounts.

12       34.     Other commercial suppliers of PRR platforms are not sufficiently close substitutes

13   to Bazaarvoice's platform to prevent a significant post-merger price increase. PowerReviews

14   was the most substantial restraint on Bazaarvoice's conduct in the United States before the

15   merger, and no other competitor was a comparable rival. Bazaarvoice now faces virtually the

16   same competitive landscape of "scarce" and "low quality" alternatives that Brant Barton

17   identified in April 2011.

18       35.     The absence of other meaningful competitors also has been recognized by both

19   industry analysts and PowerReviews' former CEO, Pehr Luedtke, in calling the PRR platform

20   market a "duopoly." Erin Defossé, Bazaarvoice's Vice President of Strategy, has agreed that

21   "[t]here really isn't a market . . . to understand (as it relates [to ratings and reviews]), it is

22   [Bazaarvoice] or PowerReviews." Additionally, PowerReviews' CEO, Ken Comée, and

23   PowerReviews' Chief Financial Officer, Keith Adams, acknowledged that the combination of

1 | Bazaarvoice and PowerReviews would create a "[m]onopoly in the market" when evaluating the
2 | anticipated benefits of the acquisition.

3 |     36.    The commanding position occupied by Bazaarvoice and PowerReviews is also
4 | readily apparent from their combined market share in the Internet Retailer 500 ("IR 500"), which
5 | is an annual ranking of the 500 largest internet retailers in North America according to online
6 | sales revenue. Bazaarvoice regularly tracks its IR 500 market position, and company executives
7 | considered the impact that the acquisition of PowerReviews would have on Bazaarvoice's IR
8 | 500 market share. For example, in the diligence memorandum prepared for the company's board
9 | of directors, Bazaarvoice executives wrote, "[PowerReviews'] customer base includes 86 IR 500
10 | retailers who have resisted becoming Bazaarvoice customers despite significant attempts to
11 | displace [PowerReviews] from these accounts" and noted that the acquisition of PowerReviews
12 | would "immediately increase the IR 500 penetration of Bazaarvoice by 49%." Within the IR
13 | 500, more than 350 retailers collect and display ratings and reviews. Approximately 70% of
14 | these firms use a PRR platform provided by Bazaarvoice or PowerReviews. Most of the
15 | remaining websites use in-house PRR solutions.

16 |     37.    In addition to purchasing a PRR platform from a commercial supplier, a retailer or
17 | manufacturer seeking to include ratings and reviews on its website may elect to develop an in-
18 | house PRR solution. For many retailers and manufacturers, however, it is impractical and cost-
19 | prohibitive to build an internal solution that can satisfy their business requirements.
20 | Accordingly, the acquisition particularly harms retailers and manufacturers for which an in-
21 | house solution is not an economically viable alternative.

22 |     38.    For many retailers and manufacturers, in-house PRR solutions are not sufficiently
23 | close substitutes to Bazaarvoice's platform to impede a post-merger price increase by

1  Bazaarvoice. It would be prohibitively expensive for many customers to develop a PRR solution
2  with functionality comparable to the features offered by Bazaarvoice, and it would be difficult to
3  maintain the same pace of innovation. Moreover, it would be very complex and expensive for a
4  customer to perform the same level of moderation. In-house solutions are only a viable option
5  for customers that are not interested in the full feature set offered by Bazaarvoice (including
6  moderation and syndication services), or customers that are willing to invest heavily in ongoing
7  platform development to maintain the software and create new features.

8      39.    Bazaarvoice is able to use information obtained during the sales process to
9  determine whether an in-house PRR solution is an economically viable alternative for a
10 particular customer. Accordingly, in light of the merger, it will be a profit-maximizing strategy
11 for Bazaarvoice to impose targeted price increases on customers that do not consider in-house
12 solutions to be a viable alternative. Faced with an anticompetitive post-merger price increase,
13 these customers would not develop an in-house solution or abandon ratings and reviews
14 altogether.

15     40.    Other social commerce products, including community platforms, forums, and
16 question and answer ("Q&A") platforms, are also not substitutes for PRR platforms. These other
17 social commerce products do not collect the same type of structured, product-level data
18 associated with ratings and reviews. Because PRR platforms and other social commerce
19 products serve different purposes, retailers and manufacturers routinely use PRR platforms in
20 combination with one or more other social commerce products.

21     41.    As a result of Bazaarvoice's acquisition of PowerReviews, customers will lose
22 critical negotiating leverage. The elimination of PowerReviews has significantly enhanced
23 Bazaarvoice's ability and incentive to obtain more favorable contract terms. Accordingly, many

1   retailers and manufacturers will now obtain less favorable prices and contract terms than

2   Bazaarvoice and PowerReviews would have offered separately absent the merger.

3   **B.**     **PowerReviews' "scorched earth approach to pricing" applied significant pressure to**

4        **Bazaarvoice in competitive deals.**

5       42.     Price competition with Bazaarvoice was a core component of PowerReviews'

6   business strategy. PowerReviews positioned itself as a low-price alternative to Bazaarvoice and

7   aggressively pursued Bazaarvoice's largest clients. The company set an internal goal to "[b]e in

8   every deal [Bazaarvoice] is in," and encouraged price competition by building a "cost structure

9   to support price compression." As a result of price competition between Bazaarvoice and

10   PowerReviews, manufacturers and retailers obtained substantial discounts—sometimes in excess

11   of 60%.

12       43.     PowerReviews' aggressive approach to pricing frequently forced Bazaarvoice to

13   defend its more expensive list prices. Responding to competitive pressure from PowerReviews

14   in July 2011, Bazaarvoice's Vice President of Retail Sales warned, "[PowerReviews] has been

15   VERY active in almost all of our deals from small to large" (emphasis in original). He claimed

16   that PowerReviews had adopted a "scorched earth approach to pricing," which "force[d] all of

17   [Bazaarvoice's] current prospects and customers to at least understand how and why there is

18   such a [difference] in price."

19       44.     If a prospective customer was unwilling to pay a premium over the

20   PowerReviews price, Bazaarvoice often responded with substantial price discounts. Bazaarvoice

21   frequently matched the PowerReviews price or offered a more favorable price than

22   PowerReviews. Tony Capasso, a Vice President of Sales for Bazaarvoice, described this trend in

23   a 2011 e-mail regarding an apparel manufacturer's consideration of PowerReviews: "[L]ate

1  adopters see us as the stronger brand but struggle to justify 2X-3X greater costs for a solution
2  that looks somewhat the same. Even when we do show differences some [prospects] don't put
3  enough stock in those differences to justify the price [difference]. We may need to battle on
4  price in this case . . . ." Bazaarvoice ultimately offered to match the price that PowerReviews
5  had offered the apparel retailer, which represented a substantial discount from its initial proposal.

6      45.    Even if PowerReviews was unable to win a customer's business, its low prices set
7  the bar for negotiations and compressed Bazaarvoice's margins. Bazaarvoice employees viewed
8  PowerReviews as "an ankle-biter that cause[d] price pressure in deals," and acknowledged that
9  many customers brought PowerReviews into negotiations as a "lever to knock [Bazaarvoice]
10 down on price."

11     46.    PowerReviews also pursued Bazaarvoice's installed customer base. In some
12 cases, PowerReviews convinced Bazaarvoice customers to switch platforms. In other cases, an
13 offer from PowerReviews provided additional leverage for the customer to negotiate more
14 favorable terms from Bazaarvoice. In 2011, Alan Godfrey, Bazaarvoice's General Manager of
15 North American Retail, described this competitive dynamic as a "full frontal assault" by
16 PowerReviews that was "successfully penetrating the [executive] ranks of [Bazaarvoice's]
17 anchor clients and convincing them to evaluate alternatives, or at least, negotiate [Bazaarvoice]
18 to lower price points."

19     47.    PowerReviews' efforts to target existing Bazaarvoice customers did not go
20 unnoticed. In July 2011, PowerReviews convinced a large electronics retailer to reevaluate its
21 relationship with Bazaarvoice. Afterwards, Mike Svatek, Bazaarvoice's Chief Strategy Officer,
22 expressed concern that Bazaarvoice was "seeing new competitive pressure" from PowerReviews
23 through an "aggressive blitz campaign." Svatek believed Bazaarvoice needed to "eradicate"

1  PowerReviews, and he proposed a counterattack on the PowerReviews base.  He advocated an

2  "aggressive" approach to "unseat" PowerReviews from three of its largest accounts.

3      48.      It was common for Bazaarvoice to pursue PowerReviews customers in this

4  fashion.  For example, in response to a PowerReviews campaign targeting Bazaarvoice's

5  manufacturing clients, Bazaarvoice put into motion a plan to "steal one or more major

6  [PowerReviews] clients . . . by offering them something they can't refuse."  This strategy was

7  intended to send a signal to PowerReviews that Bazaarvoice was willing "to absorb some pain in

8  return for handing [PowerReviews] major client losses."  In at least two cases, Bazaarvoice

9  offered to provide its PRR platform to large PowerReviews customers for free.

10      49.      Before the acquisition, a number of manufacturers and retailers switched between

11  the Bazaarvoice and PowerReviews platforms.  Many times these switches were spurred by

12  aggressive offers that were intended to displace the incumbent PRR platform provider.  As a

13  result of the acquisition, however, Bazaarvoice will no longer need to "absorb some pain" to

14  attract PowerReviews clients to the Bazaarvoice platform or retain customers in the face of lower

15  prices from PowerReviews.  When recommending the transaction to the company's board of

16  directors, Bazaarvoice executives noted that the transaction would enable Bazaarvoice to acquire

17  large PowerReviews customers that had "resisted becoming Bazaarvoice customers despite

18  significant attempts to displace [PowerReviews]."  Absent the transaction, they believed it was

19  "unlikely that [Bazaarvoice could] attract these retailers to [its] platform in the foreseeable future

20  nor [sic] without significant cost."

21  **C.      Bazaaarvoice and PowerReviews engaged in "feature driven one-upmanship,"**

22      **which drove both firms to innovate and develop new PRR platform features.**

23

1        50.    As PowerReviews and Bazaarvoice grappled to differentiate their product

2 offerings, they developed new features and improved the functionality offered by their respective

3 platforms. Pehr Luedtke, PowerReviews' former CEO, described the pattern of innovation

4 competition between Bazaarvoice and PowerReviews in a 2010 e-mail to a large consumer

5 products retailer: "[T]here are a lot of similarities between Bazaar[v]oice and PowerReviews

6 when it comes to features . . . we have constantly traded places in terms of who leads and who

7 fast follows." Feature-driven competition between Bazaarvoice and PowerReviews hastened the

8 pace of innovation and made ratings and reviews an increasingly attractive proposition for

9 manufacturers and retailers.

10        51.    For example, PowerReviews began offering an "in-line SEO solution" in January

11 2009. This was the first PRR platform feature to allow ratings and reviews to be indexed by

12 search engines directly from the product webpage, rather than a separate website designed for

13 search engine optimization. PowerReviews positioned its SEO feature as a best-in-class offering

14 and targeted the shortcomings of Bazaarvoice's SEO offering during sales calls. Bazaarvoice

15 quickly responded by developing comparable functionality.

16        52.    Bazaarvoice, on the other hand, was the first company to create a review

17 syndication network that connected manufacturers and retailers. PowerReviews responded by

18 creating a similar review syndication feature for its clients. PowerReviews eventually pushed the

19 envelope even further, aggressively marketing an "open" content syndication platform that

20 facilitated syndication between manufacturers that were not PowerReviews clients and retailers

21 using the PowerReviews platform. When PowerReviews announced its open syndication

22 network, it invited all Bazaarvoice manufacturing clients to try its syndication service for free for

23 twelve months.

1      53.    Bazaarvoice's manufacturing clients began to ask Bazaarvoice to syndicate their

2  reviews to retail partners on the PowerReviews platform. Bazaarvoice initially resisted, in an

3  attempt to maintain its "closed" syndication platform. In communicating this approach to

4  Bazaarvoice's sales leadership team, Michael Osborne, Bazaarvoice's Chief Revenue Officer

5  wrote, "[T]ell all of your teams . . . that we do not support syndication outside of our network –

6  and if we get requests for it, escalate to the top immediately. There's a new competitive battle

7  coming." Internally, Bazaarvoice acknowledged that it was "making a strategic choice not to

8  create a custom (and safe) version of [the content] feed for retailers outside of [the Bazaarvoice]

9  network."

10      54.    Finally, Bazaarvoice relented to customer pressure and began developing a new

11  offering to syndicate content to PowerReviews' retailers. In an internal announcement, Erin

12  Defossé, Bazaarvoice's Head of Product Strategy, acknowledged that this move was in response

13  to PowerReviews' open syndication network. Brett Hurt was optimistic about his company's

14  new approach, stating, "I cannot wait until we turn the tables on PowerReviews with their

15  aggressive push. Our strategy is going to rock them and put them on their heels." He pushed for

16  Bazaarvoice to execute on its plan to "destroy" PowerReviews, urging "[PowerReviews] is not

17  waiting for us . . . . I want to aim a big bazooka in their direction."

18  **D.    The anticompetitive effects of the transaction will not be counteracted by entry,**

19          **repositioning, or merger-specific efficiencies.**

20      55.    Entry or expansion by other firms is unlikely to alleviate the competitive harm

21  caused by the transaction. Since its founding, Bazaarvoice has been the largest commercial

22  provider of PRR platforms, and PowerReviews was its closest competitor. Other providers exist,

23

1  but they have struggled to win customers and gain market share. Bazaarvoice's competitive

2  position is protected by substantial barriers to entry.

3      56.    Bazaarvoice's syndication network is a formidable barrier to entry in the market

4  for PRR platforms. As more manufacturers purchase Bazaarvoice's PRR platform, the

5  Bazaarvoice network becomes more valuable to retailers because it will allow them to gain

6  access to a greater volume of ratings and reviews. Similarly, as more retailers purchase

7  Bazaarvoice's PRR platform, the Bazaarvoice network becomes more valuable for

8  manufacturers because it will allow them to syndicate content to a greater number of retail

9  outlets. The feedback between manufacturers and retailers creates a network effect that is a

10  significant and durable competitive advantage for Bazaarvoice.

11      57.    Bazaarvoice has acknowledged the importance of its syndication network as a

12  substantial barrier to entry that protects its dominant position. Before its initial public offering in

13  February 2012, Bazaarvoice prepared a document for an investor roadshow in which it explained

14  the "powerful network economies" created by linking retailers to manufacturers. Bazaarvoice

15  claimed that it competes in a "winner-take-all" market, and identified its "ability to leverage the

16  data" from its customer base as "a key barrier [to] entry." During investor roadshows, the

17  company boasted, "[A]ny company entering the market would have to start from the beginning

18  by securing all of the retail clients," which would be difficult because most of the largest retail

19  clients are already using the Bazaarvoice platform. Since its IPO, Bazaarvoice's SEC filings

20  have continued to identify "powerful network effects" from syndication as a "competitive

21  strength[ ] [that] differentiate[s] [Bazaarvoice] from [] competitors and serve[s] as [a] barrier to

22  entry."

23

1       58.    The acquisition of PowerReviews will extend the reach of Bazaarvoice's network

2  and deprive its remaining competitors of the scale that is necessary to truly compete. Even

3  before the acquisition, the company boasted to potential investors, "[T]he power of

4  [Bazaarvoice's] network effect and significant advantage on a global scale is starting to crowd

5  out competition." As Stephen Collins predicted in October 2011, Bazaarvoice's acquisition of

6  PowerReviews threatens to "tip the scales in [Bazaarvoice's] permanent favor on the network

7  front." During its diligence process for the transaction, Bazaarvoice anticipated that the

8  assimilation of major PowerReviews retailers into the Bazaarvoice network would "further

9  increase[] . . . switching costs" and "deepen[] [its] protective moat."

10       59.    Bazaarvoice cannot demonstrate merger-specific efficiencies sufficient to

11  counteract the acquisition's anticompetitive effects.

12  **CAUSE OF ACTION**

13  **(Violation of Section 7 of the Clayton Act by Bazaarvoice)**

14       60.    The United States realleges and incorporates paragraphs 1 through 59 as if set

15  forth fully herein.

16       61.    Bazaarvoice's acquisition of PowerReviews is likely to substantially lessen

17  competition in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15

18  U.S.C. § 18.

19       62.    Among other things, the transaction has had the following anticompetitive effects:

20       (a)    Significant head-to-head competition between Bazaarvoice and PowerReviews

21  has been extinguished;

22       (b)    Bazaarvoice has significantly reduced incentives to discount prices, increase the

23  quality of its services, or invest in innovation;

1    (c)    Prices will likely increase to levels above those that would have prevailed absent

2  the transaction, forcing retailers and manufacturers to pay higher prices for PRR platforms; and

3    (d)    Quality and innovation for PRR platforms will likely be less than the levels that

4  would have prevailed absent the transaction.

5                              **REQUEST FOR RELIEF**

6    63.    The United States requests that:

7    (a)    Bazaarvoice's acquisition of PowerReviews be adjudged to violate Section 7 of

8  the Clayton Act, 15 U.S.C. § 18;

9    (b)    the Court order Bazaarvoice to divest assets, whether possessed originally by

10  PowerReviews, Bazaarvoice, or both, sufficient to create a separate, distinct, and viable

11  competing business that can replace PowerReviews' competitive significance in the marketplace;

12    (c)    the United States be awarded the costs of this action; and

13    (d)    the United States be awarded any other equitable relief the Court deems just and

14  proper.

15

16

17

18

19

20

21

22

23

1 | Dated:  January 10, 2013

2 | For Plaintiff United States:

3

4 | William J. Baer

5 | Assistant Attorney General

6

7 | Leslie C. Overton

8 | Deputy Assistant Attorney General

9

10 | Patricia A. Brink

11 | Director of Civil Enforcement

12

13 | Mark W. Ryan

14 | Director of Litigation

15

16 | Joseph Matelis

17 | Chief Counsel for Innovation

18

19

20 | James J. Tierney, Chief
Networks & Technology Enforcement Section

21

22

23 | N. Scott Sacks. Acting Assistant Chief
Networks & Technology Enforcement Section

Michael D. Bonanno (DC Bar No. 998208)
United States Department of Justice
Networks & Technology Enforcement Section
450 Fifth Street, NW, Suite 7100
Washington, DC 20530
Telephone: (202) 532-4791
Fax: (202) 616-8544
E-mail: michael.bonanno@usdoj.gov

Soyoung Choe (MD Bar, No Numbers Assigned)
Aaron Comenetz (DC Bar No. 479572)
Peter K. Huston (CA Bar No. 150058)
Ihan Kim (NY Bar, No Numbers Assigned)
Claude F. Scott, Jr. (DC Bar No. 414906)
Adam T. Severt (MD Bar, No Number Assigned)

Attorneys for the United States

Melinda L. Haag (CA Bar No. 132612)
United States Attorney
By Alex G. Tse (CA Bar No. 152348)
Office of the United States Attorney
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7200
Facsimile: (415) 436-7234
E-mail: alex.tse@usdoj.gov