**Volume 3**

**Pages 396 - 591**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. C 13-00133 WHO
                               )
BAZAARVOICE, INC.,             )
                               )
          Defendant.           )
_____)
                          San Francisco, California
                          Wednesday, September 25, 2013

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff:
                     U.S. DEPARTMENT OF JUSTICE
                     Antitrust Division
                     450 Golden Gate Avenue - Room 10-0101
                     P. O. Box 36046
                     San Francisco, California  94102
                BY:  **PETER K. HUSTON, ASSISTANT CHIEF**


                     U.S. DEPARTMENT OF JUSTICE
                     Antitrust Division
                     450 Fifth Street, NW - Suite 7100
                     Washington, D.C. 20530
                BY:  **MICHAEL D. BONANNO, TRIAL ATTORNEY**
                     **ADAM T. SEVERT, TRIAL ATTORNEY**
                     **ROBERT A. LEPORE, TRIAL ATTORNEY**
                     **AARON HOAG, TRIAL ATTORNEY**
                     **LISA ANNE SCANLON, TRIAL ATTORNEY**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

1   **APPEARANCES**:   (CONTINUED)

2   For the Plaintiff:

                             U.S. DEPARTMENT OF JUSTICE
3                            Antitrust Division
                             950 Pennsylvania Avenue, NW - Rm. 3214
4                            Washington, D.C. 20530
                     BY:    **DAVID I. GELFAND, DEPUTY ATTY. GENERAL**
5
    For Defendant:
6                            WILSON, SONSINI, GOODRICH & ROSATI
                             650 Page Mill Road
7                            Palo Alto, California  94304
                     BY:    **BORIS FELDMAN, ATTORNEY AT LAW**
8                           **DOMINIQUE-CHANTALE ALEPIN, ATTORNEY AT**
                               **LAW**
9                           **DYLAN J. LIDDIARD, ATTORNEY AT LAW**

10                           WILSON, SONSINI, GOODRICH & ROSATI
                             1700 K Street, NW - 5th Floor
11                           Washington, D.C.  20006
                     BY:    **SCOTT A. SHER, ATTORNEY AT LAW**
12                          **ANDREA A. MURINO, ATTORNEY AT LAW**

13                           WILSON, SONSINI, GOODRICH & ROSATI
                             1301 Avenue of the Americas - 40th Fl.
14                           New York, New York 10019
                     BY:    **CHUL PAK, MEMBER OF FIRM**
15                          **JONATHAN M. JACOBSON, MEMBER OF FIRM**

16                           BAZAARVOICE, INC.
                             3900 N. Capital of Texas Highway
17                             Suite 300
                             Austin, Texas  78746
18                   BY:    **BRYAN BARKSDALE, GENERAL COUNSEL**
                            **KIN GILL, DEPUTY GENERAL COUNSEL**
19

20

21

22

23

24

25

# I N D E X

Wednesday, September 25, 2013

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **LUEDTKE, PEHR (RECALLED)** | | |
| Redirect Examination by Mr. Bonanno | 402 | 3 |
| Recross-Examination by Mr. Feldman | 437 | 3 |
| Further Redirect Examination by Mr. Bonanno | 439 | 3 |
| | | |
| **CUNNINGHAM, JACQUELINE** | | |
| (SWORN) | 446 | 3 |
| Direct Examination by Ms. Scanlon | 446 | 3 |
| Cross Examination by Mr. Liddiard | 462 | 3 |
| Redirect Examination by Ms. Scanlon | 470 | 3 |
| | | |
| **DEFOSSÉ, ERIN** | | |
| (SWORN) | 471 | 3 |
| Direct Examination by Mr. Bonanno | 472 | 3 |
| Cross-Examination by Mr. Feldman | 520 | 3 |
| Redirect Examination by Mr. Bonanno | 547 | 3 |
| | | |
| **WALTZINGER, JR., GEORGE WILLIAM** | | |
| By Videotaped Deposition | 557 | 3 |

# E X H I B I T S

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| GX28 | | 556 | 3 |
| GX29 | | 556 | 3 |
| GX32 | | 556 | 3 |
| GX256 | | 434 | 3 |
| GX271 | | 415 | 3 |
| GX440 | | 459 | 3 |
| GX444 | | 455 | 3 |
| GX797 | | 426 | 3 |

1

**I N D E X**

2

**E X H I B I T S**

3  **PLAINTIFF'S EXHIBITS**          **IDEN**   **EVID**   **VOL.**

4   GX1196                                    457      3

5   GX1204                                    432      3

6   GX1213                          405      415      3

7   GX1214                          474      477      3

8   GX1215              **E X H I B I T S**   516      556      3

9  **DEFENDANT'S EXHIBITS**         **IDEN**   **EVID**   **VOL.**

10  DX1851                                    438      3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>Wednesday - September 25, 2013</u>                    <u>8:00 a.m.</u>

2                      P R O C E E D I N G S

3                        ---o0o---

4          THE COURT:  Good morning, everybody.  Please be

5    seated.

6       So I understand we have some scheduling issues to discuss.

7          MR. JACOBSON:  Yes.  I don't think it's a major

8    complication, Your Honor; but the Government's case has been

9    going, I think, a little faster than they had anticipated and

10   they have elected to put on a rebuttal case, which, of course,

11   is their right.

12      So the upshot of that is that we may have a little white

13   space in tomorrow's hearing.  We'll try to avoid that, both

14   sides will try to avoid that; but the upshot also is that

15   because there's so many nonparty witnesses who have

16   date-certain commitments, that to ensure completion of the

17   trial, we may need some time in the afternoon of the last

18   Thursday.

19      Now, on the Court's calendar we know there's a change of

20   plea that day.  There did not appear to be anything else on the

21   calendar.  We could certainly go after the change of plea if

22   that is something that is available to the Court.

23         THE COURT:  Sure.  And which are we talking about,

24   Thursday in the third week or Thursday --

25         MR. JACOBSON:  Yes, the very last week.

PROCEEDINGS

```
1            THE COURT:  Yes.  I can be -- I'm flexible.  Thursdays
2     right now are relatively short in the afternoon, so we could
3     come back at 2:30 or something like that.
4            MR. JACOBSON:  We will do -- both sides will do our
5     best to avoid that and proceed on the basis that we've been
6     proceeding on; but if necessary, we would like to reserve that
7     time.
8            THE COURT:  Absolutely.  And, you know, if there's --
9     if the case is going a little quicker and we need flexibility
10    with witnesses, that's fine.
11           MR. JACOBSON:  Thank you, Your Honor.
12           MR. BONANNO:  Good morning, Your Honor.
13           THE COURT:  Mr. Bonanno.
14           MR. BONANNO:  The United States calls Mr. Luedtke back
15    to the stand.
16           MR. FELDMAN:  They're fetching him.  He was in
17    storage.
18           THE COURT:  Okay.
19                   (Pause in proceedings.)
20                        PEHR LUEDTKE,
21    called as a witness for the Plaintiff, having been previously
22    duly sworn, testified further as follows:
23           THE WITNESS:  Good morning.
24           MR. BONANNO:  Good morning.
25           THE WITNESS:  Good morning, Your Honor.
```

1          THE COURT:  Mr. Luedtke.

2                    (Pause in proceedings.)

3          THE COURT:  Please proceed.

4          MR. BONANNO:  Thank you.

5                    **REDIRECT EXAMINATION**

6    BY MR. BONANNO:

7    Q.   Good morning, Mr. Luedtke.

8    A.   Good morning.

9    Q.   I'd like to start this morning with an exhibit that your

10   counsel showed you yesterday during his examination.  It's

11   Defense Exhibit 1865.  We're going to go to page 5.

12        Seth, can you please put that on the screen?

13   A.   (Witness examines document.)

14   Q.   One more page I think, Seth.

15        Now, Mr. Luedtke, during your counsel's examination

16   yesterday, you talked about this slide something called the

17   "Hype Cycle"; is that right?

18   A.   Correct.

19   Q.   And we talked about the trough of disillusionment; is that

20   right?

21   A.   Correct.

22   Q.   And we also talked about the slope of enlightenment.

23        And this Hype Cycle, you testified yesterday, is something

24   that's created by Gartner, the analyst firm; is that right?

25   A.   Yes.

LUEDTKE - REDIRECT / BONANNO

1  Q.   And you testified that Gartner is a well-known analyst for

2  technology for enterprises; correct?

3  A.   Correct.  Yeah.

4  Q.   So Gartner issues reports analyzing technologies that

5  businesses use; is that right?

6  A.   Correct.

7  Q.   Did PowerReviews pay a subscription fee to purchase access

8  to these Gartner reports?

9  A.   I believe at this time we did, yes.

10  Q.   And you read these Gartner reports when you were CEO of

11  PowerReviews?

12  A.   Yes.

13  Q.   And you considered this Gartner Hype Cycle when you were

14  in merger discussions with PowerReviews -- or, excuse me.

15  Strike that.

16       You considered the Hype Cycle when you were in merger

17  discussions with Bazaarvoice; is that right?

18  A.   Yeah.  As we discussed yesterday, we used this sort of as

19  a way to think about a rationale for combination, and this was

20  sort of a nice grounding principle we could both discuss.

21  Q.   Now, I believe you testified yesterday that you saw the

22  merger as an opportunity to move out of the trough of

23  disillusionment and into the area of the curve entitled "Slope

24  of Enlightenment"; is that right?

25  A.   Yeah.  Specifically I think what we talked about was we

1  had started to go down from the -- slope down from the peak of

2  inflated expectations on that downward slope towards the trough

3  of disillusionment.  We never talked about whether or not we

4  were in the trough of disillusionment from my recollection.  We

5  just used this as that we were on that downslope.

6  **Q.**  Okay.

7  **A.**  And the point of the merger or one of the benefits of

8  combination was to move, you know, to the right pretty quickly

9  and avoid parts of the trough of disillusionment.

10  **Q.**  Oh, I see.  So you wanted to skip past the trough of

11  disillusionment and onto the slope of enlightenment; is that

12  right?

13  **A.**  We wanted to move from the downward slope to the upward

14  slope.

15  **Q.**  And the downward slope on the Hype Cycle at the top,

16  that's the field that's labeled "Competition"; right?

17  **A.**  Yeah.  Yes.

18  **Q.**  So you wanted to skip past the stage of the Hype Cycle

19  labeled "Competition" and onto the slope of enlightenment; is

20  that right?

21  **A.**  Well, specifically we wanted to avoid this period, as

22  Gartner explains it, of intense competition and occasionally

23  price compression and lots of other people coming into the

24  marketplace and move towards the slope of enlightenment where

25  we thought, at least at the time, we could access these larger

1    budgets in advertising and social and analytics.  And that was

2    sort of the framework for this discussion.

3              **MR. BONANNO:**  Your Honor, may I approach the witness?

4              **THE COURT:**  Certainly.

5                        (Pause in proceedings.)

6              **MR. BONANNO:**  Your Honor, the document that's been

7    handed up to the Court and to the witness was provided by the

8    defense.  It was originally Defense Exhibit 1850, but it hasn't

9    been offered yet, so we're going to give it a Government

10   Exhibit Number, 1213.

11         (Plaintiff's Exhibit GX1213 marked for identification)

12             **MR. BONANNO:**  Seth, can you put it on the screen?

13   **Q.**   Now, Mr. Luedtke, the title of this document reads, "Hype

14   Cycle for Business Use of Social Technologies, 2011."  Do you

15   see that, sir?

16   **A.**   Uh-huh.

17   **Q.**   And this was a report that was published by Gartner;

18   correct?

19   **A.**   Correct.

20   **Q.**   And this is the same Gartner that came up with the Hype

21   Cycle that appeared on the last exhibit we were looking at;

22   correct?

23   **A.**   Correct.

24   **Q.**   Okay.  And this report was published in August of 2011?

25   **A.**   Correct.

1    **Q.**    Okay.  I'd like to turn first to page 6.

2    **A.**    (Witness examines document.)

3    **Q.**    Are you there, Mr. Luedtke?

4    **A.**    Yeah, uh-huh.

5    **Q.**    Mr. Luedtke, is this the Hype Cycle that appeared in the

6    last exhibit in the PowerReviews Board of Directors

7    presentation that we were looking at?

8    **A.**    Just for clarity, what we just looked at was not a Board

9    of Directors presentation.

10   **Q.**    Oh, I'm sorry.

11   **A.**    It was the documents we reviewed in Austin.

12   **Q.**    Okay.  Is this Hype Cycle the same diagram that was on

13   that slide?

14   **A.**    It's the same curve, yeah, without all the companies.

15   **Q.**    Okay.  I'd like to turn to page 57, please.

16   **A.**    (Witness examines document.)

17   **Q.**    Are you there, Mr. Luedtke?

18   **A.**    Uh-huh.

19   **Q.**    And there's a section entitled "Community Reviews."  Do

20   you see that?

21   **A.**    Yeah.

22   **Q.**    In the definition section the report reads:  (reading)

23          "Community review technologies allow the retailer to

24       capture customer opinions of products and services that

25       are sold by the retailer.  The implementations typically

LUEDTKE - REDIRECT / BONANNO

1        allow for ratings such as 1 to 5 stars as well as reviews

2        where the customer describes his or her opinion of the

3        product by tagging the product with a set of suggested

4        attributes.  This is done by a moderated platform where

5        moderation happens either manually or automatically by

6        business rules and filters that are applied."

7        Did I read that correctly?

8   A.   Correct.  Yes.

9   Q.   This is the Gartner description of product

10  ratings-and-reviews platforms; correct?

11  A.   Well, specifically it's their description of community

12  reviews, but I think it refers to product reviews from the

13  wording here.

14  Q.   I'm sorry?

15  A.   It -- they call it "Community Reviews."  It is essentially

16  a description of ratings and reviews as we would define it.

17  Q.   So the PowerReviews rating-and-reviews product would fall

18  into the Gartner community reviews category?

19  A.   Yes.  Exactly.

20  Q.   Okay.  I'd like to flip back now to page 6, and I'm going

21  to direct your attention, Mr. Luedtke -- it's a little bit

22  small on the screen.

23       Seth, can we blow up the "slope of enlightenment" on the

24  right-hand side there?

25       We're going to look at the third dot from the left.

1    **A.**    Uh-huh.

2    **Q.**    That reads "Community Reviews"; right?

3    **A.**    Uh-huh.

4    **Q.**    So Gartner considered product ratings and reviews in

5    August of 2011 to have already past the trough of

6    disillusionment; isn't that right?

7              **MR. FELDMAN:** Objection. No foundation.

8              **THE WITNESS:** From --

9              **THE COURT:** It's overruled. He can speak to his

10   understanding of the graph.

11             **THE WITNESS:** Yeah. That's what this articulates.

12   That was Gartner's impression of their industry, yes.

13   **BY MR. BONANNO:**

14   **Q.**    And you had testified yesterday that when you met with

15   Bazaarvoice representatives in December of 2011 at Menlo

16   Ventures, you discussed the impact that the elimination of

17   competitive discounting would have on the operations of the two

18   firms; correct?

19   **A.**    It was one of the things we discussed in the context of

20   the combination.

21   **Q.**    And that was four months after this report was published;

22   correct?

23   **A.**    Four months, yeah.

24   **Q.**    Mr. Luedtke, Gartner also issued another report that

25   predated this one in which it concluded that PowerReviews and

1   Bazaarvoice competed in a duopoly; isn't that right?

2   **A.**   I remember those words, yes.

3        **MR. BONANNO:**  Okay.  Your Honor, may I approach the

4   witness?

5        **THE COURT:**  Yes.

6              (Pause in proceedings.)

7        **MR. BONANNO:**  Seth, can we put up GX271 on the screen,

8   please?

9   **Q.**   Mr. Luedtke, I'll direct your attention to the top of

10  Exhibit 271, the cover email.  This is an email that you

11  received from Nadim Hossain in July of 2011; is that right?

12  **A.**   That's correct.

13  **Q.**   And Mr. Hossain was the PowerReviews VP of marketing;

14  correct?

15  **A.**   Yes, that's correct.

16  **Q.**   Go ahead and turn to, I believe the actual report starts

17  on page 3.

18  **A.**   (Witness examines document.)

19  **Q.**   Mr. Luedtke, this is a Gartner report analyzing

20  PowerReviews that was published in May of 2011; is that right?

21  **A.**   Yes, that's correct.

22  **Q.**   And this is the same Gartner that created the Hype Cycle

23  that you discussed with Bazaarvoice when you met to have merger

24  discussions; is that right?

25  **A.**   Uh-huh.

LUEDTKE - REDIRECT / BONANNO

1  Q.   The same Hype Cycle that you discussed yesterday during

2  your counsel's examination?

3  A.   That's correct.

4  Q.   Okay.  Mr. Luedtke, I'd like you to turn to page 10 of the

5  report.

6       Seth, I think it's page 12 in the overall exhibit.

7  A.   (Witness examines document.)

8  Q.   And I'll focus your attention, sir, on the bottom of the

9  page under "Recommendations."

10  A.   (Witness examines document.)

11  Q.   Are you there, Mr. Luedtke?

12  A.   I am, yeah.

13  Q.   I believe this is the second sentence of the paragraph

14  with a bullet point that reads:  (reading)

15       "The market can largely be considered a duopoly with

16       the market being split between Bazaarvoice and

17       PowerReviews."

18       Did I read that correctly?

19  A.   Yes.

20  Q.   And this was a statement made in the Gartner report;

21  correct?

22  A.   Correct.

23  Q.   Mr. Luedtke, Gartner also issued a report discussing

24  Bazaarvoice and PowerReviews after the transaction; didn't it?

25  A.   I don't remember; but if -- I don't remember that; but if

1    they did, I'd love to see it.  I don't remember.

2             MR. BONANNO:  Okay.  Your Honor, may I approach?

3             THE COURT:  Yes.

4             MR. BONANNO:  Seth, can we please put GX646 on the

5    screen?  And we can skip past the cover email.  I believe we

6    can go to page 3 of the document.

7             THE WITNESS:  (Witness examines document.)

8    BY MR. BONANNO:

9    Q.   Mr. Luedtke, this is a Gartner report issued after the

10   transaction; correct?

11   A.   Yeah.  The reason why I paused earlier, the way Gartner

12   does it, they have reports.  This is a report (indicating).

13   This is actually a note (indicating).  So you can see at the

14   top it's a research note that they say.  That's -- I apologize

15   for my confusion.

16   Q.   I see.  So this is a Gartner research note --

17   A.   Correct.

18   Q.   -- that was published after the acquisition?

19   A.   That's exactly right.

20   Q.   Did you also read Gartner research notes when you were CEO

21   of PowerReviews?

22   A.   When I was CEO, I don't recall reading this one, but I may

23   have.

24   Q.   But you read other ones like this?

25   A.   Absolutely, yes.

1   Q.   Sir, I'd like you to turn to the second page of the report

2   and I'll direct your attention to the second sentence of the

3   second full paragraph, and the report reads:  (reading)

4        "There is considerable overlap between the two

5        companies' product review capability; thus, Gartner

6        believes the main purpose of this deal is taking

7        Bazaarvoice's main competitor out of the market and

8        creating another offering targeting a new audience of

9        small and midsize businesses."

10  Did I read that correctly, sir?

11  A.   Yes.

12  Q.   I direct your attention, sir, under "Recommendations" on

13  the same page, the second bullet point, which reads:  (reading)

14        "Current and Prospective PowerReviews Customers:

15        Prepare for potential migration to Bazaarvoice products

16        and potential price increases based on Bazaarvoice's need

17        to cover the cost of this transition and historically

18        higher-priced offerings."

19  Did I read that correctly, sir?

20  A.   Yes.

21  Q.   And this was a Gartner research note published by the same

22  Gartner that created the Hype Cycle you used to discuss the

23  impact of competitive discounting when you met with Bazaarvoice

24  to discuss a potential merger; correct?

25  A.   Correct.

1    **Q.**   Now, Mr. Luedtke, Bazaarvoice's price was historically

2    higher than PowerReviews'; correct?

3    **A.**   That is correct.

4         **MR. BONANNO:**   Your Honor, at this time I'd like to

5    offer GX1213, GX271, and GX646 into evidence.

6         **THE COURT:**   Any objection?

7         **MR. FELDMAN:**   Yes, absolutely, Your Honor.   We

8    objected when these were designated before.

9         The reports are both hearsay and they did not establish

10   base.   They did not authenticate them.   And, more importantly,

11   they contain hearsay and the views within them are hearsay.

12   They could have deposed the authors, they're listed there, and

13   they didn't.

14        So although I had no objection to asking the witness his

15   views on them, they can't be admitted into evidence.

16        **MR. BONANNO:**   Your Honor, yesterday counsel walked the

17   witness through the witness' use of the Gartner Hype Cycle in

18   analyzing the merger.   He opened the door to the discussion of

19   these reports, and I think we've established a foundation for

20   their admission.

21        **THE COURT:**   Well, let's take them one at a time.

22        The foundation for 1213, which is the report, is what?

23        **MR. BONANNO:**   Well, I don't understand the objection

24   to 1213 because it was a defense exhibit that was going to be

25   offered; but I think that Mr. Luedtke established that he

1    reviewed these reports.

2         And if I'm understanding counsel correctly, it's a hearsay

3    objection that's being made, and the reports really aren't

4    being offered for their truth.  They're being offered as these

5    are the reports and what Gartner said at the time, and

6    Mr. Luedtke has testified that he reviewed these reports when

7    he was CEO.

8         **MR. FELDMAN:**  What he just said, the words fit

9    together in a sentence but they made no sense.  He said,

10   "They're not being offered for the truth of the reports.

11   They're just being offered for what Gartner said."

12        Well, that is the truth of the reports.  He's offering

13   them because he wants into evidence the views of some Gartner

14   analyst on the market and on the merger, and he absolutely

15   could have taken their deposition and tried to build a record.

16        But to put in -- and this is no different than the

17   analyst's report yesterday from BMO where when we objected,

18   counsel withdrew the document.

19        It's not a question of did he look at it.  A witness can

20   look at something and have referred to it, but that doesn't

21   cure the hearsay nature of the document.

22        **THE COURT:**  Well, I'm going to overrule that objection

23   and allow this for the limited purpose that Mr. Bonanno

24   described because this witness did look at it.  It does help

25   explain the chart that -- the slough [sic] of disillusionment,

LUEDTKE - REDIRECT / BONANNO

1   which I was quite interested in yesterday.  So I'm going to

2   allow that one.

3          (Plaintiff's Exhibit GX1213 received in evidence)

4          **THE COURT:**  646 -- or, no.  271.  I'm sorry.  271 was

5   attached, it looks like, to an email to Mr. Luedtke; is that

6   correct?

7          **MR. BONANNO:**  That's right, Your Honor.

8          **THE COURT:**  So I'm going to allow that, again, for the

9   same purpose.

10         (Plaintiff's Exhibit GX271 received in evidence)

11         **THE COURT:**  And then 646.  I have a different problem

12  with 646 because I think Mr. Luedtke said that he didn't know

13  whether he had looked at it before, and I'm not sure who the

14  "to" and the "from" is on this.  So I have a concern about

15  admitting this document.

16         **MR. BONANNO:**  Your Honor, I would also like to raise

17  that by stipulation the parties have stipulated away any

18  hearsay objection for documents that have been produced.  It's

19  only for good cause shown under the stipulation that you can

20  object to the admission of exhibits that have been produced by

21  either side pursuant to either a document request or subpoena

22  in this matter.

23         **MR. FELDMAN:**  That was to get around routine business

24  records objections so we didn't waste your time where things

25  came from the files.  They're not offering it to show that

1    someone within PowerReviews or Bazaarvoice had the document.

2    They're offering it because they want the substance of what

3    Gartner said to be into evidence.

4         **THE COURT:**  I understand what your concern is,

5    Mr. Feldman; but -- so I'm -- and I'll go back and look at the

6    stipulation, but with 646 I still don't see the foundation for

7    it coming in with this witness.

8         **MR. BONANNO:**  Well, I think the foundation would be

9    that Mr. Luedtke had testified that he considered these types

10   of materials when he was CEO and he reviewed them.

11        This came from the Bazaarvoice files of the company, as

12   the cover email clearly indicates, and it's just like the other

13   reports, not being offered for the truth so much as this is

14   what Gartner said and what Gartner thought based on its view of

15   the market.

16        **THE COURT:**  I don't think there's an adequate

17   foundation for this document, so I'm not going to allow this

18   one in.  I will look at the hearsay issue that you raised and I

19   can -- but at the moment these are admitted.

20        **MR. FELDMAN:**  Thank you, Your Honor.

21        **MR. BONANNO:**  Thank you, Your Honor.

22   **Q.**   Mr. Luedtke, during your examination yesterday by your

23   counsel, I recall that he also asked you some questions about

24   your use of the word "duopoly."  Do you remember those?

25   **A.**   I do.

1   Q.   And you had testified that you used the word "duopoly"

2   because Bazaarvoice was number one and PowerReviews was number

3   two; correct?

4   A.   I think I testified that I used it as a sort of

5   simplifying phrase to describe that there were two major sort

6   of players in the outsource rating-and-reviews market and it

7   benefited my company to sort of draft off the number one.

8   Q.   And during your tenure as CEO of PowerReviews, was it your

9   understanding that Bazaarvoice was the number one provider of

10  outsource ratings and reviews in the IR500?

11  A.   As defined by the Internet 500, they had the most clients,

12  yes, and they were also -- from what all of the data suggested

13  to me, they were a much larger company in terms of revenue.

14  Q.   And based on that same metric, looking at the IR500,

15  PowerReviews was the number two provider; correct?

16  A.   That's correct.

17  Q.   All right, Mr. Luedtke, I'd like to turn to Defense

18  Exhibit 513 which your counsel showed you yesterday.

19       Seth, can you please put that on the screen?

20       We're just going to focus on this first slide.

21  A.   (Witness examines document.)  All right.  I've got it.

22  Q.   Got it, Mr. Luedtke?

23  A.   Yeah, I've got it.

24  Q.   Okay.  I believe you testified during counsel's

25  examination yesterday that you prepared this slide sometime in

LUEDTKE - REDIRECT / BONANNO

1   April of 2012; right?

2   A.   Yeah.  It was April -- May, April 2012.  March, April, May

3   2012.  I don't remember the specific time.  You probably have

4   it on email as to when I sent it, so....

5   Q.   Okay.  Well, let's look at the second bullet point that

6   lists a number of companies, and I'd like to just walk through

7   them.

8       I think we're all well familiar with Bazaarvoice, so we'll

9   skip over that one for now.

10      Lithium.  Mr. Luedtke, what's your understanding of how

11  many ratings-and-reviews customers Lithium has today?

12  A.   I don't know.

13  Q.   What about Gigya, how many ratings-and-reviews customers

14  do they have today?

15  A.   Again, as I discussed yesterday, I don't know.

16  Q.   And Badgeville actually doesn't have any

17  ratings-and-reviews customers; do they?

18  A.   They don't offer that service.

19  Q.   And I also see that eCommerce platforms are listed there?

20  A.   Uh-huh.

21  Q.   Mr. Luedtke, isn't it right that PowerReviews Express

22  offered additional functionality beyond that that's offered by

23  eCommerce platforms with their native ratings-and-reviews

24  functionality?

25  A.   I'm sorry.  Beyond?  I don't understand.  Beyond what?

1    Q.    So some eCommerce platforms have some limited ratings and

2    reviews; is that right?

3    A.    Many eCommerce platforms have a basic sort of stars and

4    text box offering that companies can use as their

5    ratings-and-reviews solution.

6    Q.    Uh-huh.  And isn't it true that PowerReviews Express

7    offered additional functionality beyond that a customer could

8    get from this native eCommerce platform functionality?

9    A.    Beyond what the eCommerce platforms offered, yeah.  Yes,

10   we did.

11   Q.    And the PowerReviews Enterprise platform had even more

12   features than PowerReviews Express; right?

13   A.    Correct.

14   Q.    And PowerReviews Express was the PowerReviews product that

15   was focused on small retailers; correct?

16   A.    Yeah.  It was -- specifically it was a self-serve product

17   which required no implement -- like no implementation.  It was

18   paid on a monthly basis primarily with a credit card.

19   Q.    So the retailer could just sign up with a credit card from

20   the PowerReviews Web site; right?

21   A.    PowerReviewsExpress.com Web site, correct.

22   Q.    And the price was a hundred bucks a month?

23   A.    There were tiers.  You know, my memory is not good enough

24   to remember exactly what it was, but we had tiers that I think

25   went up to probably around that.

LUEDTKE - REDIRECT / BONANNO

1    Q.    So it was much less expensive than PowerReviews Enterprise

2    platform; right?

3    A.    Typically, yes.

4    Q.    Now, when discussing Defense Exhibit 513 yesterday in

5    response to your counsel's questioning, I believe you also

6    testified about how PowerReviews was adding additional features

7    to its product at this time; is that right?

8    A.    We had already announced, I think by the time when this

9    document was done, a significant -- we had announced our

10   Essential Social Suite that we discussed yesterday.

11   Q.    And, Mr. Luedtke, ratings and reviews were still the

12   foundation of the Essential Social Suite; isn't that right?

13   A.    Tell me more what you mean by "foundation."  It was one

14   of -- it was our core product.  It was what we were known for

15   in the marketplace.  So I think in that regard, yes, it was

16   probably the foundation.

17   Q.    So the PowerReviews core product was the

18   ratings-and-reviews product?

19   A.    As defined by number of implementations in the

20   marketplace, yes, it was, because that was our history.

21   Q.    Almost all PowerReviews' clients purchased the company's

22   ratings-and-reviews product?

23   A.    Yes.   Correct.

24   Q.    Now, Mr. Luedtke, I believe during yesterday's examination

25   with your counsel, you'd also testified about a "blue ocean"

1    strategy.  Do you remember that?

2    **A.**    I do.

3    **Q.**    And you said that this strategy was to focus less on

4    competing directly with Bazaarvoice and move down to the

5    midmarket; is that right?

6    **A.**    I think specifically what I testified yesterday is I

7    talked about "blue ocean" being finding untapped demand in new

8    market spaces, and "red ocean" as comparison is, like, existing

9    product with existing suppliers.

10        The product strategy that we sort of formed based on that,

11   you know, that book was to go to sell the Social Suite

12   primarily to the midmarket's chief marketing officer.

13   **Q.**    If you go in your binder, Mr. Luedtke, to Government

14   Exhibit 245.

15        And, Seth, could you put that on the screen?

16   **A.**    (Witness examines document.)

17   **Q.**    Okay.  Looking at that first page of Government

18   Exhibit 245, Mr. Luedtke, this is an email that you sent to

19   Andy Chen in August of 2011; is that correct?

20   **A.**    Correct.

21   **Q.**    And Mr. Chen was a cofounder of PowerReviews; right?

22   **A.**    That's correct.

23   **Q.**    And he was an executive at PowerReviews at the time you

24   sent this email?

25   **A.**    Yes, he was.

1    **Q.**    Okay.  Let's turn to the next page.

2          And, Seth, can you zoom in at the top?

3          Mr. Luedtke, this is a set of notes you prepared for a

4    meeting of the PowerReviews management in 2011; correct?

5    **A.**    Correct.

6    **Q.**    It was August 2011; right?

7    **A.**    August 2011, yes.

8    **Q.**    Okay.  I'd like to look at item 9b.

9          Seth, can you scroll down a little bit?  And maybe it's on

10   the next page.  My apologies.

11         And you wrote:  (reading)

12             "We need to play our own game (find our own 'blue

13         ocean'), through the following ways."

14         And there's a number of bullet points.  Is that the "blue

15   ocean" strategy you were testifying about yesterday?

16   **A.**    I don't mean to pause.  The bullets i, ii, iii, iv, were

17   not actually the products -- the specific product strategy that

18   we embarked on.  These were my thoughts, which is why I say not

19   to be shared with the larger team because the whole purpose was

20   a discussion where we could actually align as a team on a new

21   product strategy.  These were some thoughts that I had going in

22   as potential options.  We actually shied away from several.

23   **Q.**    But that's the same "blue ocean" concept that you

24   discussed yesterday?

25   **A.**    Yes.  Yes.  That's correct.

1   Q.   Okay.  I'd like to turn back to page 2 of your notes, and

2   we can look at item 2ai; and, you know, item 2 it looks like

3   you're outlining the PowerReviews strategy for the SaaS

4   business in 2011; is that right?

5   A.   Yes, that's correct.

6   Q.   And if we look at subbullet a, subbullet i, you wrote:

7   (reading)

8           "Break our competitor's network effect with brands."

9        Did I read that correctly?

10  A.   Yes, you did.

11  Q.   You were referring to Bazaarvoice's network effect?

12  A.   Correct.

13  Q.   If we look down at number 4, subbullet bi, you wrote:

14  (reading)

15          "Competitive network effect stronger than

16      anticipated."

17      Did I read that correctly?

18  A.   Yes.

19  Q.   And you were referring to the Bazaarvoice network effect

20  again?

21  A.   Correct.

22  Q.   So is it accurate to say that this was your assessment

23  towards the end of the year that it was harder to break the

24  Bazaarvoice network effect than you anticipated?

25  A.   Yes, it was.

1    Q.    So, in fact, sir, isn't it true that your "blue ocean"

2    strategy was driven by your inability to break through the

3    Bazaarvoice network effect?

4    A.    In part.   It was also in part, as I think we discussed

5    yesterday, in part this recognition from the marketplace that

6    this, you know, wave of social market that we were dealing with

7    was difficult, ambiguous, and they needed somebody to help

8    figure it out and they also needed integration across multiple

9    product offerings.

10        So in part, yes, it was very hard to compete with, as we

11   talk about, with Bazaarvoice on their network effect and their

12   syndication model.   There were other factors clearly that went

13   into, you know, our "blue ocean" strategy.

14   Q.    And the "blue ocean" strategy, if I understand it

15   correctly, was to add additional features and to shift the

16   focus on the midmarket chief marketing officer.   Is that what

17   you've testified?

18   A.    Yes.   The best articulation was that board deck that we

19   went through yesterday where I think that was pretty much

20   exactly how we articulated it.

21   Q.    But despite this "blue ocean" strategy, PowerReviews

22   continued to compete with Bazaarvoice; correct?

23   A.    Yes, we did.

24   Q.    And, in fact, immediately before the merger, PowerReviews

25   was competing with Bazaarvoice in many accounts; isn't that

1   right?

2   **A.**   Correct.

3          **MR. BONANNO:**   Your Honor, may I approach the witness?

4          **THE COURT:**  Yes.

5                    (Pause in proceedings.)

6          **MR. BONANNO:**   Seth, can you please put Government

7   Exhibit 797 on the screen?

8   **Q.**   Mr. Luedtke, I'll direct your attention to the email at

9   the bottom of the first page of Government Exhibit 797.  This

10  is an email from Nadim Hossain to Ken Comêe in May of 2012; is

11  that right?

12  **A.**   Yes.

13  **Q.**   And Mr. Hossain is outlining some business metrics that he

14  would like to share with the press; is that right?

15  **A.**   Let me read this.  I haven't seen this, so....

16      (Witness examines document.)  Yeah, that's what it appears

17  to discuss.

18  **Q.**   Okay.  I want to focus your attention on the very last

19  line of the page where Mr. Hossain writes that he "would like

20  to share strength and enterprise plus BV competitive, 30 new

21  enterprise clients, many of these were competitive with BV."

22      Did I read that correctly?

23  **A.**   Yep.

24  **Q.**   Do you have any reason to believe that's not true?

25  **A.**   I have no reason to believe that's not true.

1   Q.   Okay.  I'd like to move up to Mr. Comêe's reply.  At this

2   time Mr. Comêe would have been CEO of PowerReviews; correct?

3   A.   That's correct.

4   Q.   The second bullet point of Mr. Comêe's email reads:

5   (reading)

6           "Number one competitor (BV) recently IPO's - endorsing

7       social eCommerce."

8       Did I read that correctly?

9   A.   Correct.

10  Q.   And you also thought that Bazaarvoice was PowerReviews

11  number one competitor; correct?

12  A.   I did.

13          MR. BONANNO:  Your Honor, Government Exhibit 797 has

14  not yet been admitted into evidence, and I'd like to offer it

15  at this time.

16          THE COURT:  Any objections?

17          MR. FELDMAN:  No objection, Your Honor.

18          THE COURT:  It's admitted.

19      (Plaintiff's Exhibit GX797 received in evidence)

20  BY MR. BONANNO:

21  Q.   So despite the fact that this "blue ocean" strategy had

22  called for PowerReviews to move to the midmarket, didn't

23  PowerReviews continue to pursue existing Bazaarvoice customers

24  as well?

25  A.   Yeah, we did.  Can I -- one thing I think is important to

LUEDTKE - REDIRECT / BONANNO

1    describe here.

2         We embarked on the strategy in August of 2011 and

3    discussed the products that we were going to develop.  It takes

4    awhile to build these products.  We launched the products I

5    think it was February, the date is in my head, February 27th of

6    2012.

7         So through August and up to February, we didn't have those

8    products in the market.  We knew we were building them, and we

9    were all very motivated and excited about the products we were

10   building; but we had to build them.  We had a -- you know, we

11   continued to compete as we had competed in the past because we

12   didn't have these products in the market yet.

13        And the quarter, that quarter results that we're talking

14   about here, are in arrears not -- you know, we didn't have

15   these products in market so we hadn't actually had the chance

16   to compete with Badgeville and Gigya and all those other guys,

17   because we didn't have the products in market.

18   Q.   So Government Exhibit 797, just looking back at this, this

19   is an email that was written in May of 2012; right?

20   A.   Correct.

21   Q.   So that's several months after the February 2012 release

22   of the new PowerReviews products?

23   A.   Yeah, but I think it's discussing -- you tell me if I'm

24   wrong here because I can probably take a look, but I think it's

25   discussing the quarter January, February, March and we would

1    have only had the products in market for one of those months in

2    that quarter.

3    **Q.**    Mr. Luedtke, this email is written in May; correct?

4    **A.**    Correct.

5    **Q.**    And even after the introduction of these new products in

6    February, PowerReviews continued offering its

7    ratings-and-reviews product?

8    **A.**    Yes, we did.

9           **MR. BONANNO:**  Your Honor, may I approach the witness?

10          **THE COURT:**  Yes.

11                        (Pause in proceedings.)

12          **MR. BONANNO:**  Seth, can we please put Government

13   Exhibit 1204 on the screen, please?

14       Mr. Luedtke, you can turn to the very last page of the

15   document to see the envelope information for the emails.

16       And I apologize, Seth.  Can you take that off the screen

17   for a moment?

18       Your Honor, this exhibit was not on our exhibit list, and

19   I just want to give defense counsel a chance to review and make

20   sure there's no confidentiality concerns.  I apologize for

21   publishing that before.

22                        (Pause in proceedings.)

23          **MS. ALEPIN:**  It will take me a minute.

24          **MR. BONANNO:**  We can do the questioning without --

25          **MS. ALEPIN:**  Can you proceed with him?

1           **MR. BONANNO:**  I apologize.

2           **THE COURT:**  Okay.  That's all right.

3           **MR. BONANNO:**  I'll keep it generic.

4   **Q.**   Mr. Luedtke, this is a series of emails, an email

5   discussion, that you were involved in in March of 2012; is that

6   right?

7   **A.**   That's correct, February and March.

8   **Q.**   Okay.  And I'd like to direct your attention to the first

9   email on the page from Ms. Peggy McGrath in March of 2012.  Do

10  you see that, sir?

11  **A.**   I do.

12  **Q.**   Ms. McGrath was a salesperson at PowerReviews?

13  **A.**   She was.

14  **Q.**   Okay.

15          **MR. FELDMAN:**  Excuse me, Your Honor.  My expert tells

16  me that there is some confidential information here that were

17  Clorox here, they might object to.  So you probably want to be

18  careful not to flash it.

19          **THE COURT:**  Okay.  That's fine.

20          **MR. BONANNO:**  Okay.  We'll keep it down.  Thank you,

21  Mr. Feldman.

22          **MR. FELDMAN:**  You're welcome.

23  **BY MR. BONANNO:**

24  **Q.**   I'll direct your attention, Mr. Luedtke, to the second

25  paragraph, the last sentence.  Ms. McGrath conveys her

1    impressions from meeting with an individual who believes that

2    his company was being raked over the coals on price by BV and

3    saw a potential opportunity to reduce his company's costs by

4    moving to PowerReviews.  Is that a fair paraphrase of that

5    sentence?

6    **A.**    Yes.

7    **Q.**    And if you read the email just below this, Mr. Morris'

8    email, I'll just direct you to the last sentence of his first

9    paragraph.  The client that Ms. McGrath was referring to is a

10   large Bazaarvoice retailer; correct?

11   **A.**    Correct.

12   **Q.**    So in March of 2012, PowerReviews was in active

13   discussions with a large Bazaarvoice retailer about potentially

14   switching from Bazaarvoice to PowerReviews; correct?

15   **A.**    Let me read this.

16          (Witness examines document.)  Yes.

17   **Q.**    Okay.

18   **A.**    Yes, that's correct.

19   **Q.**    You can set that aside, Mr. Luedtke.

20          At the time that PowerReviews decided to embark on this

21   "blue ocean" strategy, it also had many large retail clients;

22   is that right?

23   **A.**    PowerReviews did?

24   **Q.**    Yes.

25   **A.**    Yes, we did.

LUEDTKE - REDIRECT / BONANNO

1   **Q.**   And large retail clients like Staples; right?

2   **A.**   Correct.

3   **Q.**   And PowerReviews intended to continue servicing large

4   retail clients like Staples?

5   **A.**   Correct.

6   **Q.**   And provide them with ratings and reviews?

7   **A.**   Correct.

8   **Q.**   In fact, Mr. Luedtke, just before the merger, you

9   personally made a commitment to Staples that PowerReviews

10  wouldn't raise the Staples price for a year; isn't that right?

11  **A.**   We had conversations about our contract, that's correct.

12         **MR. BONANNO:**  Your Honor, may I approach the witness?

13  May I approach the witness?

14         **THE COURT:**  Yes.  Yes.

15                  (Pause in proceedings.)

16         **MR. BONANNO:**  Your Honor, this document also is not in

17  evidence, so I will give counsel a chance to review it for any

18  confidentiality concerns.

19                  (Pause in proceedings.)

20         **THE COURT:**  Are you going to introduce the prior

21  document?

22         **MR. BONANNO:**  Yes, I am, Your Honor.

23         **THE COURT:**  Then do you want to give it a number?

24         **MR. BONANNO:**  Sure.  I'll offer the previous document,

25  Government Exhibit 1204, into evidence.

1          **MR. FELDMAN:**  Objection.  Hearsay within hearsay.  It

2   purports to relate what a customer, potential customer, said

3   when that customer was available to them and, in fact, was

4   deposed by them.  And, so, this account of what the customer

5   said is hearsay within hearsay.

6      I don't object to the admission of the document.  I object

7   to the consideration of hearsay within hearsay.  There's no

8   exception.  They're not a party.

9          **MR. BONANNO:**  Your Honor, I think we're back to the

10  stipulation between the parties to admit into evidence unless

11  there's good cause shown regarding problems with authenticity

12  or some other item that would tend to indicate the document

13  itself is unreliable.

14     This was produced from Bazaarvoice's own files pursuant to

15  a document request in this litigation.

16         **MR. FELDMAN:**  We didn't stipulate away the Federal

17  Rules of Evidence.

18         **THE COURT:**  I'm going to admit the document, and I

19  will take your hearsay objections as I review the document

20  later on.

21         **MR. FELDMAN:**  Thank you.

22     (Plaintiff's Exhibit GX1204 received in evidence)

23         **MR. BONANNO:**  We'll just proceed without publishing

24  Government Exhibit 256 for now.

25     Seth, please don't put it on the screen.

1    Q.    Mr. Luedtke, I'll direct your attention to the -- well,

2    let's go to the first page.  This is an email conversation that

3    you had with an individual at Staples; correct?

4    A.    Staples, yes.

5    Q.    And the very last email on the bottom of the first page is

6    an email that you sent to an individual at Staples; correct?

7    A.    That's correct.

8    Q.    Okay.  And if we turn the page, sir, I'd like to focus

9    your attention on the second full paragraph, the second

10   sentence.  I'll keep it in generalities since we're not

11   publishing.

12       But you make a commitment to Staples not to change their

13   price for a year; correct?

14   A.    The details are actually important.  Can I read them out?

15   Like, I don't know, again, with confidentiality here if I can.

16   Because there's particulars of this and the specific words are

17   actually important.

18           MR. FELDMAN:  As long as you don't mention pricing, we

19   think it's okay.

20           THE WITNESS:  Yeah, okay.  So can you ask your

21   question again?

22   BY MR. BONANNO:

23   Q.    Sure.  You committed to Staples not to raise their price

24   for a year; correct?

25   A.    I committed to -- I suggested to Staples that we extend

1    those services, which is the -- it refers to the full scope of

2    services that Staples is using, we would not raise those for a

3    year.

4            **MR. BONANNO:**  Okay.  Your Honor, I offer Government

5    Exhibit 256 into evidence.

6            **MR. FELDMAN:**  No objection, Your Honor.

7            **THE COURT:**  It's admitted.

8        (Plaintiff's Exhibit GX256 received in evidence)

9    **BY MR. BONANNO:**

10   **Q.**   So if the merger hadn't happened, Mr. Luedtke,

11   PowerReviews would have continued servicing Staples; correct?

12   **A.**   We would have, yes.

13   **Q.**   Now, Mr. Luedtke, despite the "blue ocean" strategy, you

14   intended to continue servicing Staples and your other large

15   retail clients; correct?

16   **A.**   They're not contradictory.  The "blue ocean" strategy

17   provided us an opportunity to actually expand the scope of the

18   service that we would provide to those same retailers.

19   **Q.**   Now, Mr. Luedtke, isn't it true that after the merger,

20   Bazaarvoice went back on your commitment not to raise Staples'

21   price for a year?

22   **A.**   I don't believe that's correct.

23           **MR. BONANNO:**  Your Honor, may I approach the witness?

24           **THE COURT:**  Yes.

25           **THE WITNESS:**  And that's why the particulars of this

LUEDTKE - REDIRECT / BONANNO

```
 1    email are important.
 2                    (Pause in proceedings.)
 3          MR. BONANNO:  Seth, can you please put up Government
 4    Exhibit 257?
 5    Q.   We're going to focus on the email at the bottom,
 6    Mr. Luedtke.  This is an email from a Staples representative to
 7    you; correct?
 8    A.   That's correct.
 9    Q.   Okay.  And this was an email that was written in July of
10    2012; correct?
11    A.   Correct.
12    Q.   At the time you received this email, you were aware that
13    the Department of Justice was investigating the acquisition of
14    PowerReviews by Bazaarvoice; correct?
15    A.   I believe I was, yes.
16    Q.   I'd like to focus your attention, sir, on the second
17    sentence -- actually, starting with the first sentence of
18    Mr. Tilzer's email:  (reading)
19            "When you told me about the merger with BV, I thought
20        to myself this will head in one of two directions.  Either
21        we're going to get an amazing capabilities over time once
22        the products got integrated, et cetera, or you guys would
23        try to exploit the combining the number one and number two
24        players with unreasonable pricing along the lines of the
25        antitrust considerations you read in the press.  I am
```

1       hopefully [sic] the former path is what we'll get to, but

2       I'm sensing we are going down the later path from what

3       I've heard from the progression of the negotiation -

4       inclusive of 2X increase in the core cost of the core PR

5       service to Staples.com with zero added value provided to

6       us."

7       Did I read that correctly, sir?

8  A.   Yes.

9  Q.   You can set that aside, Mr. Luedtke.

10      You recall, Mr. Luedtke, during your counsel's examination

11 yesterday, he asked you a question about a PowerReviews slide

12 that had the Target logo on it?  Do you remember the slide with

13 the Target logo?

14 A.   Yep.

15 Q.   And he asked you who provided ratings and reviews to

16 Target; correct?

17 A.   Yes.  Correct.

18 Q.   And you said Pluck provided ratings and reviews to Target;

19 right?

20 A.   Correct.

21 Q.   Now, isn't it true, Mr. Luedtke, that just during its most

22 recent earnings call with analysts, Bazaarvoice announced that

23 Target would, in fact, be switching from Pluck to Bazaarvoice?

24 A.   Yes.

25 Q.   During counsel's questioning yesterday, you also discussed

1   that PowerReviews had a few financial hiccups during late in

2   your tenure as CEO; correct?

3   **A.**   Correct.

4   **Q.**   And you testified, I believe, that in the year before the

5   transaction, PowerReviews had somewhere between 11 and

6   $12 million in revenue; is that right?

7   **A.**   Correct.  Correct.

8   **Q.**   Mr. Luedtke, at the time the transaction closed when

9   Bazaarvoice bought PowerReviews, the purchase price was in

10   excess of $160 million; correct?

11   **A.**   Correct.

12          **MR. BONANNO:**  I have no further questions, Your Honor.

13          **THE COURT:**  Mr. Feldman, please proceed.

14                         <u>**RECROSS-EXAMINATION**</u>

15   BY MR. FELDMAN:

16   **Q.**   You're probably too young to remember Paul Harvey, but he

17   used to have a show called "The Rest of the Story."  So could

18   you give us the rest of the story on the Staples?  Mr. Bonanno

19   gave you an angry email --

20   **A.**   Sure.

21   **Q.**   -- accusing you of playing the board game Monopoly.  What

22   happened to Staples after that?

23   **A.**   So Brian Tilzer, who's our main client, emailed me about

24   something that he heard from his team about increasing the

25   price.  I subsequently explain in an email all the incremental

1    value, all the additional services that we were providing to

2    him, and they were significant; and also I explained how they

3    were pricing at a discount to what we would normally go to the

4    market with.

5         And I don't remember specifically if he actually sent me

6    an email back, but we signed that contract and he said,

7    "Great," and we moved on.

8    Q.    I'm going to hand you a document, Defendant's 1851.

9    A.    Ah, here it is.  Thanks for the note.  It's a very helpful

10   synopsis.  That's what it says.

11   Q.    Wait.  Let me hand it up to His Honor.

12        Do you recognize Exhibit 1851?

13   A.    Yes, I do.

14   Q.    What is it?

15   A.    It's the -- it's what I just discussed, my explanation of

16   what he was getting additional in terms of value, sort of in

17   response to the email that he had sent to me.

18            MR. FELDMAN:  We've redacted the pricing data here,

19   Your Honor.  I move its admission into evidence.

20            MR. BONANNO:  No objection, Your Honor.

21            THE COURT:  It's admitted.

22        (Defendant's Exhibit DX1851 received in evidence)

23   BY MR. FELDMAN:

24   Q.    I just want to ask you about one sentence on page 2.  This

25   is postmerger; right?

LUEDTKE - FURTHER REDIRECT / BONANNO

1   **A.**   Postmerger, yes.

2   **Q.**   Yeah.  On page 2, quote:  (reading)

3       "The bundled pricing for these services represents a

4       significant discount to our off-the-shelf pricing,

5       particularly considering the size of the Advantage

6       business and the number of additional languages we will be

7       supporting," closed quote.

8       You wrote that?

9   **A.**   I did.

10  **Q.**   What does it mean?

11  **A.**   It means we were giving them a discount.  We were adding

12  all these services on page 1 -- 1, 2, 3, 4, 5, 6 -- which

13  actually were a lot of the services that we provided with our

14  new Essential Social Suite; and we were -- and that sort of in

15  total, because he was taking a lot of them, represented sort of

16  a volume discount for what he was buying.

17          **MR. FELDMAN:**  Thank you.  No further questions.

18                  **FURTHER REDIRECT EXAMINATION**

19  **BY MR. BONANNO:**

20  **Q.**   I just have one follow-up question for you, Mr. Luedtke.

21  Sitting here today, can you say with certainty that the

22  PowerReviews price wouldn't have been lower if Bazaarvoice and

23  PowerReviews were competing instead of having merged at the

24  time of those negotiations?

25  **A.**   Let's see... No, I can't.  I can't say that with

 1   certainty.

 2          **MR. BONANNO:**  Nothing further, Your Honor.

 3          **THE COURT:**  Mr. Luedtke, I have a couple of questions

 4   unless, Mr. Feldman?

 5          **MR. FELDMAN:**  No, thank you, Your Honor.

 6          **THE COURT:**  Yesterday there was an Exhibit 255, which

 7   you don't have to look for unless you can't remember it, but it

 8   says -- it started with, "It will validate the space," in

 9   talking about the Bazaarvoice IPO and another thing.  It talked

10   about some other things that counsel was interested in.  What

11   did that mean?

12          **THE WITNESS:**  It sort of would -- what I meant by

13   that, it would bring, like, financial market recognition, a

14   validation that a company could successfully go public on the

15   market.

16          **THE COURT:**  And what was the space?

17          **THE WITNESS:**  I was talking about sort of social

18   broadly.  Remember we talked yesterday about this, like, very

19   ambiguous thing called social SEOs were dealing with?  It would

20   basically be a way for the financial market to validate that

21   there's a company playing in this area that has done well

22   enough and is successful enough and is credible enough to go

23   public on the public markets.

24          **THE COURT:**  And at the time of that document, which I

25   think was February of 2011 --

1          THE WITNESS:  Yeah, roughly.

2          THE COURT:  -- was the space you were referring to the

3     ratings and reviews because that was the business you were in

4     or was it something else?

5          THE WITNESS:  No.  It was social.  That's what we were

6     talking about, the social, social commerce space.

7          THE COURT:  Then in Exhibit 513, which we've been

8     looking at, first of all, what's Badgeville?  What did they do?

9          THE WITNESS:  Yeah.  Badgeville is a company that

10    does -- they call it gamification.  So essentially what they do

11    is they provide a software that provides game dynamics to

12    driving commerce.

13         So let me give you an example.  You come on a site and you

14    write, this is from my perspective, you write a review.  You

15    might get five points for writing a review, and you move up

16    like a little leader board; and then you buy a product, and you

17    might move further up a leader board.

18         It's -- you know, how Zynga has sort of done a really good

19    job of, like, providing these game dynamics, they basically

20    took Zynga's game dynamics and applied it to software.

21         THE COURT:  So you list them and Bazaarvoice and

22    Lithium and Gigya as the strongest near to our competition.  At

23    the time that you developed this competitive summary, did you

24    consider Amazon to be a competitor?

25         THE WITNESS:  Amazon was a competitor in that it was

1    the biggest competitor of our customer base.  So we looked at

2    them for, like, product innovation.  Because they didn't

3    provide -- they weren't a software company in the context of,

4    like, going out and selling software to retailers, we didn't --

5    we didn't run up to them -- run into them in deals.

6              THE COURT:  And as of the spring of 2012, what

7    percentage of your -- of PowerReviews' revenues came from

8    retailers?

9              THE WITNESS:  Upwards probably 90 percent.  Of our --

10   so remember we still had a little Buzzillions business there.

11   So if you take that out and just look at our total services

12   business, it was vast, 80-90 percent.

13             THE COURT:  And still you were developing this new

14   suite of products, but it was still ratings-and-reviews

15   generated?

16             THE WITNESS:  Yes.  Yes.  Exactly right.

17             THE COURT:  Yesterday I thought I heard you say at the

18   end of your testimony that syndication wasn't important for the

19   retailers, and I think earlier in your testimony you said that

20   it's very important for the brands.

21             THE WITNESS:  Yeah.

22             THE COURT:  Are both of those -- am I right about both

23   of those things?

24             THE WITNESS:  I think maybe it's a little -- I mean,

25   maybe it's in the extreme fashion, but it was more important

1    for the brands than it was for the retailers.

2          THE COURT:  And why was -- was it unimportant to the

3    retailers?

4          THE WITNESS:  No.  It was -- it was a net -- retailers

5    want more content.  So to the extent they can get it from the

6    brands, fantastic.  More content, more SEOs, as we talked about

7    yesterday, more conversion, that's great.

8          Brands, though, it was more important for brands because

9    brands didn't have a lot of visits coming to their sites, so

10   they -- and they didn't often -- not -- at least at the time,

11   it's changing now, they didn't sell their products on their

12   site so they couldn't -- they couldn't take advantage of some

13   of the conversion benefits of ratings and reviews.  That's why

14   it was -- that's why they wanted their content to go out to the

15   retailers to whom they sold all their products.

16         THE COURT:  As of this time, I don't know whether you

17   know the answer to this question, but did Amazon have a

18   ratings-and-review product that they were using internally?

19         THE WITNESS:  For Amazon?

20         THE COURT:  For Amazon, yes.

21         THE WITNESS:  On Amazon, absolutely.  Yeah.  Yeah.

22   And the inspiration, I think, for both these companies was that

23   Amazon had this great review product and we could actually

24   democratize it for the rest of retail.

25         THE COURT:  PowerReviews dealt with retailers.  Was

1   there a barrier to working in advertising or financial

2   services?  Not a barrier to entry, but just what were the

3   reasons why you weren't going after those?

4           **THE WITNESS:**  Financial services -- the problem with

5   financial services, there's two real big ones.  One is, they

6   didn't actually sell a lot on their site, so it was part of the

7   value that we were able to give to retailers, because our --

8   the reason why our product works so well with retailers,

9   retailers had an email address of the person that they -- who

10  bought on the site, and a great vehicle for us to generate all

11  this content was actually to email that person.  That's how we

12  generated the vast majority of our content.

13          It was different for financial services because I guess if

14  you sign up for a credit card, you get your email; but the

15  volume wasn't as big as it was for retailers.  Does that make

16  sense?  So, like, the frequency of transactions.  That was one

17  problem.

18          The second problem was there were a lot of sort of rules

19  and regulations for putting software on financial services

20  sites.  I forget what -- I forget what it was called.  HIPPA is

21  the equivalent in the healthcare industry.  You had to be HIPPA

22  compliant.  And there were the same things -- I think it was

23  SaaS -- I don't know.  I forget exactly what it was, but there

24  was some cost that we had to incur to sort of be, what was it,

25  sort of validated or approved, I guess, to provide our software

1   on some financial services sites.  And as a small startup, we,

2   for our reasons, chose not to invest there.

3          THE COURT:  And how about advertising?

4          THE WITNESS:  Tell me -- actually, putting our --

5   putting our services on advertising sites?

6          THE COURT:  Yes.  Well, it's been described earlier

7   that there were -- in the ways that you look at the customer

8   bases, there's retailers and then there's advertisers and then

9   there's financial services.  If you didn't think about it that

10  way, then you don't need to answer, of course.

11         THE WITNESS:  No, we didn't think about advertisers as

12  a vertical.  I think we thought about retailers.  We thought

13  about manufacturers.  We thought about automotive.  We thought

14  about financial services.  We thought about healthcare.

15      Advertisers, as sort of at least as we thought about it,

16  were people who put advertising across all those sites.  So

17  they were providers of services for all of those -- all those

18  verticals.

19         THE COURT:  Okay.  And as you said, you focused solely

20  on the retailers primarily?

21         THE WITNESS:  That's where our primary -- that's where

22  our core base was.

23         THE COURT:  Thanks very much.

24         THE WITNESS:  Thank you.  All set?  Okay, thanks.

25         THE COURT:  Thanks very much, Mr. Luedtke.

```
 1              THE WITNESS:  Thank you.

 2                        (Witness excused.)

 3              MS. SCANLON:  Good morning, Your Honor.  I'm Lisa

 4   Scanlon for the United States.

 5              THE COURT:  Ms. Scanlon.

 6              MS. SCANLON:  At this time we call Jacqueline

 7   Cunningham.

 8                    JACQUELINE CUNNINGHAM,

 9   called as a witness for the Plaintiff, having been duly sworn,

10   testified as follows:

11              THE WITNESS:  I do.

12              THE CLERK:  Be seated.

13        Please state your full name and spell your last name.

14              THE WITNESS:  Jacqueline Cunningham,

15   C-U-N-N-I-N-G-H-A-M.

16                    DIRECT EXAMINATION

17   BY MS. SCANLON:

18   Q.   Good morning, Ms. Cunningham.

19   A.   Good morning.

20   Q.   We met a few minutes ago earlier this morning, but I'm

21   Lisa Scanlon for the United States.

22        Where do you work, Ms. Cunningham?

23   A.   BJ's Wholesale Club in Massachusetts.

24   Q.   Okay.  What is BJ's business?

25   A.   BJ's is a retail company.  It's a wholesale club.  We buy
```

CUNNINGHAM - DIRECT / SCANLON

1    products, food and general merchandise, to resell to the

2    public.

3    Q.   Does BJ's have retail stores where it sells these

4    products?

5    A.   Yes.

6    Q.   And just about how many stores does BJ's have?

7    A.   200.

8    Q.   Where are those stores located?

9    A.   East Coast.

10   Q.   East Coast of the United States?

11   A.   East Coast of the United States, yes.

12   Q.   Does BJ's also have a Web site where it sells products?

13   A.   Yes.

14   Q.   What is that Web site called?

15   A.   Bjs.com.

16   Q.   And, Ms. Cunningham, what is your position at BJ's?

17   A.   I'm the vice president of eCommerce.

18   Q.   How long have you had that position?

19   A.   A little less than five years now.

20   Q.   Could you tell us what your responsibilities are as the

21   vice president of eCommerce at BJ's?

22   A.   I'm responsible for the management of the Web site, the

23   marketing of the Web site, site operations, which includes

24   ensuring that products are available for sale on the Web site,

25   that the inventory is available, pricing is set, et cetera.

CUNNINGHAM - DIRECT / SCANLON

1    Q.    Okay.  And you mentioned Web site management.  Would you

2    explain a little bit more what that is?

3    A.    So it is our responsibility to ensure that the Web site is

4    up and running 24 hours a day, seven days a week; that we --

5    all of the, I call it IT, all of the IT processes are working

6    properly.

7          We're also responsible for ensuring that the right

8    products are up on the Web site, that we're promoting the right

9    products in a seasonally appropriate manner, that we're

10   marketing those out into other sites as we deem it's

11   appropriate to continue to sell those products.

12   Q.    Ms. Cunningham, do you know what product ratings and

13   reviews are?

14   A.    Yes.

15   Q.    Would you state your understanding of product ratings and

16   reviews?

17   A.    So product ratings and reviews are pieces of content that

18   come to us from our customers after they have purchased a

19   product telling us about their experience with the product,

20   whether they liked it or didn't like it, how it worked, did it

21   meet their expectations.

22   Q.    And based on your answer, I take it there are ratings and

23   reviews on Bjs.com?

24   A.    That is correct.

25   Q.    And how long has BJ's had ratings and reviews on its Web

CUNNINGHAM - DIRECT / SCANLON

1   site?

2   **A.**   We launched them when we relaunched the Web site in I

3   believe it was October of 2010.

4   **Q.**   Now, in your role as vice president of eCommerce, do you

5   have any responsibilities relating to ratings and reviews?

6   **A.**   Yes.

7   **Q.**   What are those responsibilities?

8   **A.**   It is our responsibility to publish the reviews that our

9   members, our customers, we call them members, it's our

10  responsibility to publish them to the Web site in a timely

11  manner, and also to audit them to ensure that the content is

12  not objectionable to our members.

13  **Q.**   Now, back in 2010 were you involved in the decision to add

14  ratings and reviews to Bjs.com?

15  **A.**   Yes.

16  **Q.**   And what was your role in that decision?

17  **A.**   It was our responsibility to identify potential partners

18  that could bring that functionality to our Web site and to

19  determine what the best course of action was to enable that

20  functionality on our Web site.

21  **Q.**   And you said "our."  Did you mean the eCommerce group

22  within BJ's?

23  **A.**   Yes.  As well as the IT team, yeah.

24  **Q.**   What was your specific responsibility in regards to the

25  decision to add ratings and reviews?

1   **A.**   It was our -- it was my responsibility, my and my team's

2   responsibility, to determine what partners out there in the

3   marketplace we could work with to bring that functionality to

4   the Web site, to review internally whether we could build it

5   and host it ourselves, and then make the best decision for the

6   business.

7   **Q.**   Okay.  To your knowledge, why did BJ's incorporate ratings

8   and reviews on Bjs.com?

9   **A.**   It is -- it has been well -- it is well known and it has

10  been documented in the industry that reviews help sell product,

11  that customers are more comfortable making decisions about

12  product when they see content from other customers.

13  **Q.**   Okay.  And just a moment ago you mentioned looking at

14  whether BJ's should build ratings and reviews in-house.  Was

15  that a consideration that BJ's made back in 2010?

16  **A.**   Yep.  Yes.

17  **Q.**   And you were involved in that decision?

18  **A.**   Yes.

19  **Q.**   Okay.  What did BJ's ultimately decide about building an

20  internal ratings-and-reviews product?

21  **A.**   We were not going to do it.

22  **Q.**   And do you know why?

23  **A.**   We didn't have the time or the talent or the resources.

24        **MS. SCANLON:**  May we approach, Your Honor?

25        **THE COURT:**  Yes.

1   BY MS. SCANLON:

2   Q.   So, Ms. Cunningham, you're going to receive a binder that

3   has some documents in it, and I'm going to ask you to turn to

4   the tab for Government Exhibit 445.

5   A.   (Witness examines document.)

6        MS. SCANLON:   Your Honor, Government Exhibit 445 has

7   been admitted pursuant to the stipulation between the parties.

8        THE COURT:   Thank you.

9   BY MS. SCANLON:

10  Q.   Do you have that document, Ms. Cunningham?

11  A.   Yes.

12  Q.   Okay.  If you would turn to the second page near the top,

13  there's an email from Mario Protano.  Do you see that?

14  A.   Yes.

15  Q.   Do you know who Mr. Protano is?

16  A.   Yes.

17  Q.   And who is he?

18  A.   He's the assistant vice president of eCommerce for BJ's.

19  Q.   So he reports to you?

20  A.   Yes, he does.

21  Q.   And was he involved in BJ's evaluation of

22  ratings-and-reviews providers?

23  A.   Yes, he was.

24  Q.   What was his role in that process?

25  A.   He worked with me to -- in fact, he did a lot of the

1   footwork to determine what third-party partners we could

2   potentially look at.  He also worked with the IT team when we

3   had conversations about considering whether to build it

4   in-house or not.

5   **Q.**   And I think you said he was involved in a lot of the

6   footwork.  Does that mean he did a lot of the actual back and

7   forth with companies and evaluation?

8   **A.**   Yes.

9   **Q.**   Did he keep you involved in that process as it went along?

10  **A.**   Yes, he did.

11  **Q.**   And Mr. Protano's email is to Mark Kole.  Do you know who

12  Mr. Kole is?

13  **A.**   He works for Bazaarvoice.

14  **Q.**   And I also believe it's copied to Ms. Rosen at Snowflake

15  Rosen.  Do you know who she is?

16  **A.**   Yes.  She was a sales -- I'm not quite sure of her title,

17  but she was a sales representative that we met with.

18  **Q.**   And what -- for Bazaarvoice?

19  **A.**   For Bazaarvoice, yes.

20  **Q.**   Thank you.

21      Looking at the text of Mr. Protano's email, he wrote:

22  (reading)

23          "Mark/Snowflake:

24          "BJ's is now ready to begin discussions implementing

25      consumer reviews into our new websphere platform scheduled

1          to go live in July.  We would like you to present to us

2          why Bazaarvoice is a better option over PowerReviews."

3          Do you see where I am?

4     A.   Yes, I do.

5     Q.   Okay.  In 2009 was BJ's considering Bazaarvoice as a

6     ratings-and-review vendor?

7     A.   Yes.

8     Q.   Was BJ's also considering PowerReviews?

9     A.   Yes.

10    Q.   Do you know how BJ's identified PowerReviews and

11    Bazaarvoice as potential ratings-and-reviews providers?

12    A.   They were known in the industry.  I had had experience

13    with PowerReviews in a prior position.  Bazaarvoice --

14    Bazaarvoice is well known in the industry, so they were known

15    to us.

16         We also did research in *Internet Retailer Top 500*.  It's

17    an annual book that comes out that tells us who the top 500

18    eCommerce sites are and some of the service providers that they

19    may use --

20    Q.   Thank you.

21    A.   -- on those sites.

22    Q.   I'd like you to now turn to Government Exhibit 444.

23    A.   (Witness examines document.)

24    Q.   Government Exhibit 444 appears to be a couple of emails.

25    The bottom email appears to be an email from Snowflake Rosen to

1    Mr. Protano; is that right?

2    **A.**    Yes.

3    **Q.**    And the subject is Ms. Rosen's email from November 10,

4    2009, "Bazaarvoice Agenda Request for Friday's Meeting."

5          Do you know whether Bazaarvoice held a presentation for

6    BJ's?

7    **A.**    Yes, it did.

8    **Q.**    And do you know whether in the presentation they provided

9    information about their ratings-and-review product?

10   **A.**    Yes, they did.

11   **Q.**    Did you attend any Bazaarvoice presentation to BJ's?

12   **A.**    Yes, I did.

13   **Q.**    If you look at Mr. Protano's email back to Ms. Rosen,

14   which is just above that.  Are you there?

15   **A.**    Yes.

16   **Q.**    Okay.

17         Mr. Protano wrote:  (reading)

18             "As best as possible, please focus on the

19         ratings-and-reviews functionality."

20         So was the ratings-and-reviews functionality the focus for

21   BJ's in its evaluation?

22   **A.**    Yes.

23             **MS. SCANLON:**  Your Honor, Government Exhibit 444 is

24   not in evidence.  I would like to offer it at this time.

25             **THE COURT:**  Any objection?

1          **MR. LIDDIARD:**  No objection.

2          **THE COURT:**  It's admitted.

3          (Plaintiff's Exhibit GX444 received in evidence)

4          **MS. SCANLON:**  Thank you.

5    **Q.**   Did PowerReviews also make a representation to BJ's about

6    its products features and capabilities?

7    **A.**   Yes, they did.

8    **Q.**   Did you attend a PowerReviews presentation at BJ's?

9    **A.**   Yes, I did.

10   **Q.**   Did BJ's evaluate any other ratings-and-review providers

11   during this time period?

12   **A.**   There was another provider whose name escapes me, and I --

13   I simply can't remember it.  They were early on in our

14   considerations, though.

15   **Q.**   Do you know whether that firm made a presentation to BJ's

16   about its product features and capabilities?

17   **A.**   I don't believe they made a live presentation.  We vetted

18   them out of the process pretty early on.

19   **Q.**   And do you know why BJ's vetted that firm out of the

20   process?

21   **A.**   To the best of my recollection, it was because they didn't

22   have the integration and functionality that we needed at the

23   time.

24   **Q.**   During the evaluation process for a ratings-and-review

25   provider, did BJ's receive pricing proposals from Bazaarvoice

1   and PowerReviews?

2   **A.**   Yes, we did.

3   **Q.**   I want to ask you to turn to what's been marked as

4   Government Exhibit 1196.

5   **A.**   (Witness examines document.)

6   **Q.**   Do you see 1196?

7   **A.**   Yes.

8   **Q.**   Okay.  And what is this document?

9   **A.**   Competitive conversation.

10  **Q.**   It appears to be an email from Ms. Rosen to you and

11  Mr. Protano; is that correct?

12  **A.**   Yes.

13  **Q.**   And it was sent December 14, 2009?

14  **A.**   Yes.

15  **Q.**   Now, Ms. Rosen wrote in her email:  (reading)

16          "Jackie and Mario:

17          "I had a good call with Jason this afternoon.  We got

18      into the details on a range of competitive differentiators

19      between us and PowerReviews that I'd really love to

20      discuss directly with the two of you."

21      In the second sentence I just read, what did you

22  understand "competitive differentiators between us and

23  PowerReviews" to mean?

24  **A.**   Bazaarvoice, if I'm reading this correctly, Bazaarvoice

25  offered a broader suite of capabilities than PowerReviews did

 1   at the time.

 2   Q.   And Ms. Rosen wrote in the second paragraph of her email

 3   to you and Mr. Protano:  (reading)

 4            "I understand we're in a place where the proposals

 5        show a Delta in cost."

 6        What did you understand that statement to mean?

 7   A.   That they were more expensive at the time.  Their proposal

 8   was more expensive than their competition.

 9   Q.   And you mean Bazaarvoice was more expensive?

10   A.   Yes.

11   Q.   And she continues in that paragraph to say:  (reading)

12            "This is not surprising to me as it is SOP in this

13        situation."

14        What did you understand that statement to mean?

15   A.   I understand the statement to mean that they were more

16   expensive because they did have a broader suite of capabilities

17   to offer us than what we were getting from the competition.

18   Q.   From what PowerReviews was offering?

19   A.   Yes.

20            MS. SCANLON:  Okay.  Your Honor, Government

21   Exhibit 1196 is not in evidence.  I would like to offer it at

22   this time.

23            MR. LIDDIARD:  No objection.

24            THE COURT:  It's admitted.

25        (Plaintiff's Exhibit GX1196 received in evidence)

1    BY MS. SCANLON:

2    Q.   So, Ms. Cunningham, we now turn to what's been marked as

3    Government Exhibit 440.

4    A.   (Witness examines document.)  Got it.

5    Q.   This appears to be another email from Ms. Rosen to

6    Mr. Protano and others; is that correct?

7    A.   Yes.

8    Q.   And in December 19th, 2009?

9    A.   Yes.

10   Q.   Okay.  And the title of this is -- the subject line is

11   "Bazaarvoice Revised Proposal"; is that right?

12   A.   Correct.

13   Q.   Do you know whether BJ's received more than one pricing

14   proposal from Bazaarvoice?

15   A.   Yes, we did.

16   Q.   And do you know if the prices changed from proposal to

17   proposal?

18   A.   Yes, they did.

19   Q.   Do you know how they changed?

20   A.   They went down.

21   Q.   Do you have a sense of how much they went down?

22   A.   From proposal to proposal, no, not off the top of my head.

23        MS. SCANLON:  Your Honor, Government Exhibit 440 is

24   not in evidence.  I'd like to offer it at this time.

25        MR. LIDDIARD:  No objection.

1          **THE COURT:**  Admitted.

2          (Plaintiff's Exhibit GX440 received in evidence)

3    **BY MS. SCANLON:**

4    **Q.**   One more document for you, Ms. Cunningham.  Would you turn

5    to Government Exhibit 432?

6    **A.**   (Witness examines document.)

7    **Q.**   Okay.  So, Ms. Cunningham, 432 appears to be an email from

8    Pehr Luedtke to Mr. Protano and Jason Leboeuf; is that right?

9    **A.**   Yes.

10   **Q.**   Do you know who Mr. Luedtke is?

11   **A.**   He works for PowerReviews.  I don't know his title

12   specifically.

13   **Q.**   Okay.  But he was a PowerReviews employee at the time?

14   **A.**   He was the CEO at the time, yes.

15   **Q.**   And I'd like you to look at the heading where it says

16   "Commercial Proposition," please.

17   **A.**   Yes.

18   **Q.**   Mr. Luedtke wrote:  (reading)

19          "I want to reiterate my offer from yesterday's call

20          because I realize that price was an important factor to

21          your decision."

22          Was price an important factor to BJ's in choosing a

23   ratings-and-review provider?

24   **A.**   Yes.

25   **Q.**   And he continues:  (reading)

CUNNINGHAM - DIRECT / SCANLON

1           "I'm authorizing John to package this as a three-year

2      contract with the first year completely free."

3      Now, do you know whether BJ's received more than one

4 pricing proposal from PowerReviews?

5 A.   Yes.

6 Q.   And do you know whether the prices changed from proposal

7 to proposal?

8 A.   Yes.

9 Q.   And do you know in what direction they changed?

10 A.   They got better.

11 Q.   Pardon?

12 A.   They went down.  They got better.

13 Q.   Thank you.

14      At the end of its evaluation process, did BJ's determine

15 whether Bazaarvoice met BJ's technical requirements as a

16 ratings-and-review provider?

17 A.   Yes.

18 Q.   And did BJ's determine whether PowerReviews met its

19 technical requirements as a ratings-and-review provider?

20 A.   Yes.

21 Q.   And did BJ's select one of those companies to provide

22 ratings and reviews?

23 A.   Yes.

24 Q.   Which company?

25 A.   PowerReviews.

1   Q.   Now, moving on from the vendor-selection process, I just

2   want to ask you a few questions about social media.

3   A.   Sure.

4   Q.   You can close your binder.

5        Does BJ's have a Facebook page?

6   A.   Yes.

7   Q.   All right.  In your position as vice president of

8   eCommerce at BJ's, have you ever considered dropping ratings

9   and reviews and relying solely on Facebook?

10  A.   No.

11  Q.   Why not?

12  A.   They provide two different services to our members.

13  Reviews provide information about -- specifically about

14  products and products that have been purchased by our members.

15  Social media is a forum for our members to communicate back and

16  forth with each other and with the company.

17  Q.   Now, does BJ's have a Twitter account?

18  A.   Yes.

19  Q.   Okay.  And same question.  As your position as

20  vice president of eCommerce at BJ's, have you ever considered

21  dropping ratings and reviews and relying solely on Twitter?

22  A.   No.

23  Q.   And why not?

24  A.   Same reasons.

25  Q.   And does BJ's have a Pinterest page?

1    A.    Yes.  Very new, yes.

2    Q.    And as a vice president of eCommerce at BJ's, have you

3    ever considered dropping ratings and reviews and relying on

4    Pinterest instead?

5    A.    No.

6    Q.    Same reason?

7    A.    Same reason.

8          MS. SCANLON:  Nothing further, Your Honor.

9          THE COURT:  Okay.

10   Mr. Liddiard?

11         MR. LIDDIARD:  Thank you.  If I may have a moment,

12   Your Honor.

13         THE COURT:  Absolutely.

14   Actually, why don't we take our ten-minute morning break.

15              (Recess taken at 9:23 a.m.)

16         THE COURT:  Mr. Liddiard, go ahead.

17         MR. LIDDIARD:  Thank you.

18                    **CROSS EXAMINATION**

19   BY MR. LIDDIARD

20   Q.    Good morning, Ms. Cunningham.

21   A.    Good morning.

22   Q.    The last time we met, I believe, was a few months ago in

23   June, in your neck of the woods, correct?

24   A.    Correct.

25   Q.    How are you doing this morning?

CUNNINGHAM - CROSS / LIDDIARD

1    **A.**    Good.

2    **Q.**    And thank you for making the trip.

3          Is BJ's a privately held company today?

4    **A.**    Yes.

5    **Q.**    And BJ's went from a public company to a private company

6    sometime in 2011.  Is that correct?

7    **A.**    Correct.

8    **Q.**    And does BJ's disclose its financial information to the

9    public?

10   **A.**    No.

11   **Q.**    And it doesn't disclose what its Web revenues are.  Is

12   that correct?

13   **A.**    Correct.

14   **Q.**    And have you heard of a company that publishes the

15   *Internet Retailer 500*?

16   **A.**    Yes.

17   **Q.**    And has BJ's, to your knowledge, provided the *Internet*

18   *Retailer 500* its online Web sales data?

19   **A.**    No.

20   **Q.**    Do you have any idea where the *Internet Retailer 500* would

21   get that information?

22   **A.**    It is my understanding that they make estimates for

23   companies such as ourselves that do not provide that data to

24   them.

25   **Q.**    And, Ms. Cunningham, you have worked for BJ's for

1    approximately five years?

2    **A.**    Correct.

3    **Q.**    And you're the vice president of eCommerce, correct?

4    **A.**    Correct.

5    **Q.**    And in your role as the vice president of eCommerce for

6    BJ's, I take it from time to time you engage with different

7    vendors of eCommerce products and services, correct?

8    **A.**    Correct.

9    **Q.**    And they're trying to sell you different items, correct?

10   **A.**    Correct.

11   **Q.**    And would that include software vendors such as vendors

12   that provide rating and review products?

13   **A.**    Yes.

14   **Q.**    And would it be fair to say that if BJ's became unhappy

15   with the services or products that are provided, for example,

16   by a software vendor, that you would sever that relationship?

17   **A.**    Yes.

18   **Q.**    And, for example, if there is an agreement that BJ's had

19   in place with that particular software vendor you, as the vice

20   president of eCommerce, would not renew the agreement?

21   **A.**    Correct.

22   **Q.**    And if I understood correctly from your earlier testimony,

23   shortly after you joined BJ's in 2009 you initiated a process

24   of selecting a vendor for ratings and reviews.  Is that

25   correct?

CUNNINGHAM - CROSS / LIDDIARD

1  **A.**   Correct.

2  **Q.**   And in that process I think -- I believe you testified

3  that you identified, initially, three vendors.  One dropped out

4  of the process fairly early, and the two remaining were

5  PowerReviews and Bazaarvoice.  Is that correct?

6  **A.**   Correct.

7  **Q.**   And in addition to considering those three vendors in the

8  initial process back in 2009 and 2010, BJ's was also

9  considering, at that time, whether to build an internal rating

10  and review solution.  Is that correct?

11  **A.**   Correct.

12  **Q.**   And by March of 2010, BJ's had selected PowerReviews as

13  its vendor for ratings and reviews.  Is that correct?

14  **A.**   Correct.

15  **Q.**   Thereabouts?

16  **A.**   Correct.  Sorry, yes.

17  **Q.**   And BJ's, at that time, decided that it didn't want

18  syndication, correct?

19  **A.**   Correct.

20  **Q.**   And BJ's also decided at that time that it was going to do

21  the moderation or, I think, maybe your words were the auditing

22  of reviews internally.  Is that correct?

23  **A.**   We do do second-level moderation, yes.  Our partner does a

24  first-level moderation before they come to us.

25  **Q.**   What's the difference between a first level and a second

CUNNINGHAM - CROSS / LIDDIARD

 1   level?

 2   **A.**   So our partners will take a look at the reviews that come

 3   in for our product, to ensure that there's no objectionable

 4   language, et cetera.   And then they send them to us.   We'll

 5   look at them just to make sure that the reviews that we -- that

 6   have been submitted are actually for the products that they

 7   represent.

 8   **Q.**   And I believe in your deposition your testimony was that

 9   moderation was fairly simple, right?

10   **A.**   Correct.

11   **Q.**   And in the April 2010 time period, BJ's entered into a

12   three-year agreement with PowerReviews.   Is that correct?

13   **A.**   Correct.

14   **Q.**   And I take it that if BJ's had become dissatisfied with

15   its rating and reviews provider it would consider other

16   vendors.   Fair to say?

17   **A.**   Correct.

18   **Q.**   And, in fact, if BJ's became unsatisfied with the services

19   that it was receiving under the PowerReviews agreement, it

20   would not extend that agreement, correct?

21   **A.**   Correct.

22   **Q.**   And so when the PowerReviews agreement came up for

23   expiration earlier this year, BJ's renewed that agreement,

24   correct?

25   **A.**   Correct.

CUNNINGHAM - CROSS / LIDDIARD

1   Q.   And as we sit here today or as you sit here today BJ's is

2   still receiving ratings and reviews functionality with respect

3   to the PowerReviews product.  Is that correct?

4   A.   Correct.

5   Q.   And has prices changed in any way?

6   A.   Not -- no.

7   Q.   And are you satisfied with the services that BJ's is

8   receiving with respect to ratings and reviews today?

9   A.   They're acceptable, yes.

10  Q.   And when the agreement was renewed this year -- you're

11  aware that Bazaarvoice acquired PowerReviews back in the summer

12  of 2012.  Is that correct?

13  A.   Correct.

14  Q.   And would it be fair to say that, in your opinion as the

15  vice president of eCommerce for BJ's, you're not concerned

16  about that acquisition, are you?

17  A.   We discussed it and decided to renew.

18  Q.   In your view, has BJ's been harmed by the acquisition of

19  PowerReviews by Bazaarvoice?

20  A.   No.

21  Q.   Going back to a discussion about in-house and BJ's

22  consideration back in 2009, 2010, and its consideration of

23  going -- building an in-house solution, did BJ's, at that point

24  in time, try to estimate how much it would cost BJ's to build

25  that functionality in-house?

CUNNINGHAM - CROSS / LIDDIARD

1   A.   Excuse me.  It is my understanding that our IT team did

2   attempt to make that estimate.  I don't recall the number.

3   Q.   And since that time back in 2009 or early 2010, has BJ's

4   considered or looked at whether it could build its own in-house

5   solution?

6   A.   No.

7   Q.   And, Ms. Cunningham, when the agreement comes up for

8   renewal or is set to expire sometime in April of 2014, at that

9   particular time if you decide not to renew the agreement would

10  you consider and go in and look at who the other providers of

11  rating and review functionality are in the marketplace?

12  A.   Yes.

13  Q.   And is it fair to say that you haven't done that since

14  signing the agreement with PowerReviews back in 2010?

15  A.   It is fair to say we have not.  But we will go through a

16  formal bid process this year for that functionality, so we will

17  be doing that, yes.

18  Q.   And BJ's has never syndicated content.  Is that correct?

19  A.   Correct.

20  Q.   And when the term "syndication" is used with respect to

21  ratings and reviews, what do you understand it to mean?

22  A.   It means that we have the ability to take content, in this

23  case reviews from other sources, and syndicate them and use

24  them on our website.

25  Q.   And I take it since BJ's has never syndicated reviews it's

CUNNINGHAM - CROSS / LIDDIARD

1    not an important feature to a company such as BJ's.  Is that

2    correct?

3    **A.**   We determined, when we launched our reviews, that it was

4    not important because as we are a wholesale club a lot of

5    products that we sell are unique to the wholesale industry in

6    the market.  So a comparison between, you know, us and our

7    competitors would not necessarily be relevant.  So they

8    wouldn't have a lot of reviews for products that we sold

9    through our website.  So it's not considered to be that

10   important to us.

11   **Q.**   In fact, if I recall your deposition testimony correctly,

12   one of the reasons why you decided not to want syndication for

13   the BJ's.com website was because BJ's wanted to go out to its

14   members and obtain reviews directly from its members.  Is that

15   correct?

16   **A.**   Correct.

17   **Q.**   Ms. Cunningham, do you have any responsibility for BJ's

18   Facebook or Twitter pages?

19   **A.**   No.

20   **Q.**   Do you know if BJ's maintains a Twitter, Pinterest,

21   Facebook pages in order to try to drive awareness of its

22   products?

23   **A.**   Yes.

24   **Q.**   And does BJ's engage in those marketing efforts in the

25   hope that it would lead to additional sales of BJ products?

1          MS. SCANLON:  Objection.  Foundation.

2          THE COURT:  You can answer with respect to BJ's.

3          THE WITNESS:  Okay.  It is my understanding -- again,

4   I don't manage it.  It is my understanding that our objective

5   with Facebook, Twitter, et cetera, is to develop a more engaged

6   relationship with our members, thus resulting in more sales.

7   Not specific to product.

8          MR. LIDDIARD:  Thank you.  No further questions.

9          THE COURT:  Ms. Scanlon.

10                    REDIRECT EXAMINATION

11  BY MS. SCANLON

12  Q.   Ms. Cunningham, just a few additional questions.

13       You were just asked about moderation --

14  A.   Yeah.

15  Q.   -- do you recall that?  And you described using a partner

16  for first-level moderation.  Is that correct?  Who is that

17  partner?

18  A.   PowerReviews.

19  Q.   And did BJ's choose not to do that first level of

20  moderation itself?

21  A.   Yes.

22  Q.   You were also asked about going in-house with your ratings

23  and reviews?

24  A.   Yes.

25  Q.   If BJ's was renewing today or looking at a ratings and

1  reviews provider today would you recommend building in-house?

2  **A.**   We would review it as part of the process.  I would not

3  recommend it.

4  **Q.**   Why not?

5  **A.**   We have the same constraints that we had when we had

6  originally built the website; limited resources, limited

7  capital, et cetera.  I would not believe that it would be the

8  best ROI solution for us.

9         **MS. SCANLON:**  Nothing further, Your Honor.

10         **THE COURT:**  Mr. Liddiard?

11      Ms. Cunningham, thank you very much.

12      **MR. BONANNO:**  Your Honor, the United States calls

13  Mr. Erin Defossé to the stand.

14                **ERIN DEFOSSÉ**,

15  called as a witness for the Plaintiff, having been duly sworn,

16  testified as follows:

17         **THE WITNESS:**  I do.

18         **THE CLERK:**  Be seated.

19      Please state your full name and spell your last name.

20         **THE WITNESS:**  My name is Erin Michael Defossé.  Last

21  name is spelled D-e-f-o-s-s-é.

22         **MR. BONANNO:**  Your Honor, before I begin my

23  examination may I approach the witness?

24         **THE COURT:**  Yes.

25         **MR. BONANNO:**  May I proceed?

1          **THE COURT:**  Please.

2                    **DIRECT EXAMINATION**

3    **BY MR. BONANNO**

4    **Q.**   Good morning, Mr. Defossé.

5          The last time we met you were employed by Bazaarvoice as a

6    vice president of strategy.  Is that right?

7    **A.**   That's right.

8    **Q.**   And that was at your deposition?

9    **A.**   Yes.

10   **Q.**   Are you still a vice president of strategy at Bazaarvoice?

11   **A.**   Yes, I am.

12   **Q.**   You've worked at Bazaarvoice since 2010, correct?

13   **A.**   Correct.

14   **Q.**   And from March 2010 until early of 2013, you oversaw

15   Bazaarvoice's product strategy team, right?

16   **A.**   That's right.

17   **Q.**   And there was a competitive analysis group within that

18   product strategy team that you oversaw, correct?

19   **A.**   That's right.

20   **Q.**   The competitive analysis group responded to inquiries from

21   Bazaarvoice salespersons in the field about competition?

22   **A.**   Yes.

23   **Q.**   Mr. Defossé, when did you first learn that the Department

24   of Justice was investigating Bazaarvoice's acquisition of

25   PowerReviews?

1   **A.**   Ooh.  Uh, it must have been -- I mean, I actually haven't

2   thought about that.  It must have been -- it was during one of

3   the public statements that -- made internally in the company

4   maybe within the last year, early -- you know, nine months ago,

5   six months ago.

6   **Q.**   Mr. Defossé, in your role as VP of product strategy did

7   you ever read reports that were published by a company called

8   Gartner Group?

9   **A.**   Yes.

10  **Q.**   And did you review these reports to learn what Gartner saw

11  the landscape for social technologies to look like?

12  **A.**   Uhm, I on occasion would.  Or some of the people on my

13  team might have read those.  So I didn't read them all for

14  sure.

15  **Q.**   And, to the best of your understanding, did persons at

16  Bazaarvoice interact with Gartner to give Gartner a better

17  understanding of Bazaarvoice's products?

18  **A.**   I don't recall specifically who, but my understanding was

19  that we had conversations with Gartner and a number of other

20  analysts in the industry.

21          **MR. BONANNO:**  Your Honor, may I approach the witness?

22          **THE COURT:**  Certainly.

23          **MR. BONANNO:**  Your Honor, this document has not yet

24  been admitted into evidence.  We're going to give it the

25  exhibit number Government Exhibit 1214.

DEFOSSE - DIRECT / BONANNO

1          (Plaintiff's Exhibit 1214 marked for identification)

2    **BY MR. BONANNO**

3    **Q.**   Mr. Defossé, this is an email that you received from a

4    Mr. David Milam in July of 2012, correct?

5    **A.**   Yes.

6    **Q.**   And this was just after Bazaarvoice acquired PowerReviews,

7    right?

8    **A.**   It appears so.  Yeah, that's right.

9    **Q.**   Okay.  And the subject line reads:

10         "Time sensitive reply requested Gartner first take on

11         Bazaarvoice acquisition of PowerReviews."

12         Did I read that correctly?

13   **A.**   Yes, you did.

14   **Q.**   Sir, I'd like you to turn to the third page of the

15   document.  I believe this was an attachment to the email chain

16   that you received?

17   **A.**   Uh-huh.

18   **Q.**   Sir, this is a draft copy of the Gartner report -- excuse

19   me, strike that.  This is a draft copy of the Gartner note that

20   was published regarding Bazaarvoice's acquisition of

21   PowerReviews, correct?

22   **A.**   Uhm, based on the title of the document it appears so,

23   yes.

24   **Q.**   So Gartner actually provided Bazaarvoice with a draft copy

25   of its note on the PowerReviews acquisition before publishing

1    it more broadly, correct?

2              **MR. FELDMAN:**  Objection.  No foundation.

3              **THE WITNESS:**  I don't know specifically how this

4    came --

5              **THE COURT:**  He can answer this question, as he is.

6              **THE WITNESS:**  I'm sorry.

7              **THE COURT:**  Would you repeat your answer.

8              **THE WITNESS:**  I don't quite know how this came into

9    our possession, but it was in the email.

10   **BY MR. BONANNO**

11   **Q.**   Now, if we turn back to the second page of the document,

12   the second page of the cover email, rather, the email at the

13   bottom of the page, there's an email from a Ms. Sherry

14   Fairchok.  And at the bottom of the email her title is, Project

15   Manager Writing Department Research Operations Gartner.

16        Did I read that correctly?

17   **A.**   Uh-huh.

18   **Q.**   Mr. Defossé, I'd like you to turn past the draft version

19   of the Gartner note, to the second -- I'm sorry, the third to

20   last page of this whole document.

21   **A.**   The third to the last is this?

22   **Q.**   Yes, the Gartner note that reads at the top:

23        "PowerReviews' buy sets up Bazaarvoice for social CRM

24        market expansion."

25   **A.**   Uh-huh.

1    **Q.**    Do you see that page, sir?

2    **A.**    Yes.

3    **Q.**    And you received this email containing the Gartner note

4    regarding the acquisition of PowerReviews by Bazaarvoice,

5    correct?

6    **A.**    I mean, I received the email.  I don't specifically recall

7    the details of the -- of the attachments, but, yeah.

8    **Q.**    Do you have any reason to believe you did not receive this

9    email?

10   **A.**    No.  No, I don't.

11          **MR. BONANNO:**  Your Honor, the attachment, the Gartner

12   note, is the same as Government Exhibit 646.  I would now like

13   to offer Government Exhibit 1214 into evidence.

14          **THE COURT:**  Is there any objection to 1214?

15          **MR. FELDMAN:**  Absolutely no foundation.  He hasn't

16   established that the witness read that.  He asked him if he

17   received the email.

18      And, in any event, it's hearsay within hearsay.  To get

19   the statements within that document into evidence he should

20   have deposed the author, Mr. Sarner.

21          **THE COURT:**  Your objection is overruled.  There's an

22   adequate foundation for this.

23      I understand your hearsay objection.  And they're not

24   offered for the truth of what Gartner says, but they are

25   offered for the fact that they were received by Mr. Defossé.

1          **MR. BONANNO:**  Thank you, Your Honor.

2          **THE COURT:**  So they're in.

3          (Plaintiff's Exhibit GX1214 received in evidence)

4    **BY MR. BONANNO**

5    **Q.**   All right.  Mr. Defossé, I would like to step back and

6    change subjects a little bit.  You can set aside the exhibit

7    1214.

8          I would like to talk to you about syndication.

9    Syndication is the service that Bazaarvoice provides to its

10   clients, that allows brands to publish their reviews on a

11   retail partner's website, correct?

12   **A.**   Correct.

13   **Q.**   When you first joined the company, Bazaarvoice only

14   syndicated reviews collected by its brand clients to its own

15   retail clients, correct?

16   **A.**   That was my understanding, but I didn't have direct

17   involvement in that product so I couldn't say for certainty if

18   that's the case.

19   **Q.**   But you weren't aware of any instance where that was not

20   the case?

21   **A.**   I was not aware of that, of any other instance.

22   **Q.**   And Bazaarvoice's technology was originally designed to

23   only facilitate the sharing of reviews from its own brand

24   clients to its own retail clients, correct?

25   **A.**   The syndication product was designed to do that.  However,

1    we routinely gave brands and others access to the reviews to do

2    with it what they wanted.  So the syndication product you're

3    correct.

4    Q.   So for Bazaarvoice's syndication product it was designed

5    solely to allow Bazaarvoice's brand clients to share their

6    reviews with Bazaarvoice's retail clients, correct?

7    A.   That was my understanding, yes.

8    Q.   Okay.  Mr. Defossé, I would like you to turn to Government

9    Exhibit 24.  It should be in your binder in front of you.

10        MR. BONANNO:  And, Seth, can we zoom in on the top of

11   the document, please.  Thank you.

12   BY MR. BONANNO

13   Q.   Mr. Defossé, this is an email conversation you had with

14   Bazaarvoice employees in January of 2011, correct?

15   A.   Yes.

16   Q.   And the subject line reads:

17        "PowerReviews talking to BV clients about

18        syndication."

19        Did I read that correctly?

20   A.   Yes, you did.

21   Q.   I would like you to turn to the second page of this

22   document.  And we're going to focus on the email, Mr. Glass's

23   email in the middle.

24        Mr. Defossé, Mr. Glass was a member of the Bazaarvoice

25   sales organization, correct?

1    **A.**    I believe so, yes.

2    **Q.**    He was a manager in the sales organization?

3    **A.**    I don't recall his title, but I believe he was in

4    management, yes.

5    **Q.**    And Mr. Glass writes:

6            "I want to make everyone aware that PowerReviews is

7        actively going after BV clients and telling them they can

8        syndicate BV reviews to PR clients."

9        Did I read that correctly, sir?

10   **A.**    Yes, you did.

11   **Q.**    So at this time Bazaarvoice was aware that PowerReviews

12   was approaching Bazaarvoice's brand clients and offering to

13   syndicate Bazaarvoice reviews to PowerReviews' retail clients,

14   correct?

15   **A.**    Well, I -- I was made aware of it, and Bill and his

16   leadership were.  I'm not sure who else in the company was, but

17   we were aware of it.

18   **Q.**    Are you aware of any other provider of ratings and reviews

19   in January 2011, or before, that was approaching Bazaarvoice's

20   brand clients and offering to syndicate Bazaarvoice reviews to

21   non-Bazaarvoice retailers?

22   **A.**    No, I'm not aware.

23   **Q.**    And before January 2011, are you aware of any efforts by

24   Bazaarvoice to syndicate Bazaarvoice reviews from Bazaarvoice's

25   brand clients to non-Bazaarvoice retailers?

1   **A.**   I'm not aware of any.

2   **Q.**   Now, at some point during your tenure as VP of product

3   strategy at Bazaarvoice, you did become involved in a project

4   to create a service to allow Bazaarvoice's manufacturing

5   clients to share their reviews with non-Bazaarvoice retailers,

6   correct?

7   **A.**   Yes.

8   **Q.**   Mr. Defossé, I would like you to turn to Government

9   Exhibit 28, please.  It should be in your binder as well.

10          **MR. BONANNO:**  Savannah, we can zoom in on the top of

11   the email to start.

12   **BY MR. BONANNO**

13   **Q.**   Mr. Defossé, this is an email that you sent to Jordan

14   Yeats in June of 2011, correct?

15   **A.**   That's right.

16   **Q.**   And Mr. Yeats was a member of the Bazaarvoice client

17   success team.  Is that right?

18   **A.**   That's correct.

19   **Q.**   The client success team managed Bazaarvoice's

20   relationships with its clients after a sale was made, correct?

21   **A.**   That's right.

22          **MR. BONANNO:**  Zoom out a little bit, Savannah, please.

23   And maybe zoom in right around where -- the subject line, "What

24   is all the fuss about?"  You can zoom in on the whole

25   paragraph.  Thank you.

1    BY MR. BONANNO

2    Q.   So, Mr. Defossé, this is a series of talking points that

3    you planned to send to the Bazaarvoice sales and client

4    services organizations, correct?

5    A.   That is correct, yeah.

6    Q.   So in this paragraph you wrote:

7            "As you may have heard, PowerReviews is now making a

8        push with our client and prospect retailers claiming they

9        can syndicate content in from Bazaarvoice client

10       manufacturers."

11       Did I read that correctly?

12   A.   Yes, you did.

13   Q.   Okay.  I'd like to focus your attention --

14           MR. BONANNO:  Savannah, if we can pull out again and

15   focus in on, "What are we doing now?"  At the very bottom of

16   this email.

17   BY MR. BONANNO

18   Q.   Mr. Defossé, I'll focus your attention on the second

19   sentence, where you wrote:

20           "As such, we have convened a cross-functional team led

21       by product strategy that is formulating a new package

22       offering for syndicating content to non-Bazaarvoice

23       retailers."

24       Did I read that correctly?

25   A.   Yes, you did.

1    Q.    So you were referring to the development of a service to

2    allow Bazaarvoice's brand clients to send their reviews to

3    non-Bazaarvoice retailers, correct?

4    A.    Yeah.  Specifically, just to be clear, we were -- my role

5    was to envision what a service like that could look like, not

6    to actually develop a service.  That would have been the job of

7    product management.

8    Q.    At the time you wrote this email, no other company besides

9    PowerReviews was approaching Bazaarvoice's brand clients and

10   offering to syndicate Bazaarvoice reviews to non-Bazaarvoice

11   retailers, correct?

12   A.    Well, I can't say that for sure.  It had not been brought

13   to my attention.

14   Q.    You are not aware of any other company?

15   A.    Not that were brought to my attention, that I knew of.

16   Q.    Mr. Defossé, I'd like you to turn to Government Exhibit 29

17   in your binder, please.

18         Mr. Defossé, do you recall seeing the PowerReviews Open

19   Social Commerce press release when you were VP of product

20   strategy overseeing the competitive analysis group at

21   Bazaarvoice?

22   A.    Yes, I do.

23   Q.    And you understood that PowerReviews was announcing its

24   service that would allow Bazaarvoice's brands to syndicate

25   their reviews to non-Bazaarvoice retailers?

DEFOSSÉ - DIRECT / BONANNO

1   **A.**   Yes.

2   **Q.**   All right.  Mr. Defossé, I'd like you to turn to

3   Government Exhibit 30.

4          **MR. BONANNO:**  Savannah, can we please zoom in on the

5   envelope information at the top.

6   **BY MR. BONANNO**

7   **Q.**   Mr. Defossé, this is an email that you sent in July of

8   2011, correct?

9   **A.**   That's correct.

10  **Q.**   And the subject line reads:

11         "Urgent:  Combating PowerReviews Open Social Commerce

12     Network."

13     Did I read that correctly?

14  **A.**   Yes.

15  **Q.**   And you marked the importance as high, correct?

16  **A.**   That's correct.

17  **Q.**   This was an email that you sent to the Bazaarvoice sales

18  and client services team?

19  **A.**   Yes.

20  **Q.**   In the first sentence of your email you wrote:

21         "This week PowerReviews announced their Open Social

22     Commerce Network."

23     Did I read that correctly?

24  **A.**   Yes, you did.

25  **Q.**   And you were referring to the PowerReviews press release

1    we just looked at, correct?

2    **A.**    Yes.

3    **Q.**    I'd like you to turn to page 4 of this document.

4           **MR. BONANNO:**  Savannah, go to page 4, please.  Zoom in

5    so we can see the cover slide.

6    **BY MR. BONANNO**

7    **Q.**    This is the cover slide of a presentation that reads:

8           "Syndication to non-BV network retailers."

9    Did I read that correctly?

10   **A.**    Yes.

11   **Q.**    Mr. Defossé, you were involved in the creation of this

12   presentation, correct?

13   **A.**    Yes, I was.

14   **Q.**    I would like you to turn to the next page, please, sir.

15   It reads, "Competitive landscape" at the top.

16   Do you see that?

17   **A.**    Uh-huh.

18   **Q.**    There's a bullet point that reads, "PowerReviews," and

19   then underneath:

20          "Launched their Open Social Commerce Network."

21   Did I read that correctly?

22   **A.**    Yes, you did.

23   **Q.**    This is the same PowerReviews press release -- strike

24   that.

25   The Open Social Commerce Network is the same Open Social

1   Commerce Network that was referenced in the press release we

2   just looked at a moment ago, correct?

3   **A.**   Yes, that's correct.

4   **Q.**   If we look under the risk section on this page, the first

5   bullet point reads:

6         "We know of at least three BV manus that have signed

7         agreements with PR."

8   Did I read that correctly?

9   **A.**   Yes.

10  **Q.**   This refers to three Bazaarvoice manufacturing clients

11  that had signed agreements with PowerReviews to "allow them to

12  send our Bazaarvoice reviews to PowerReviews retailers,"

13  correct?

14  **A.**   That's correct.

15  **Q.**   The final bullet point reads:

16        "Losing control of the network diminishes one of our

17        competitive advantage."

18  Did I read that correctly?

19  **A.**   Yes, you did.

20  **Q.**   So at this time Bazaarvoice was concerned that

21  PowerReviews would use these syndication relationships to

22  potentially displace Bazaarvoice from its brand clients,

23  correct?

24  **A.**   Well, I wouldn't necessarily put it like that.  I would

25  say that we were concerned anytime PowerReviews or any other

1    competitor was knocking on the door of our clients,

2    particularly talking to our direct relationships with those

3    clients.  So we wanted to make sure that they did make inroads

4    there.

5    **Q.**   Mr. Defossé, I would like you to turn to the last tab in

6    your binder.  It should be your deposition transcript.

7    **A.**   Yeah.

8    **Q.**   Do you see that, sir?  And I would like you to turn,

9    please, to page 202, starting on line 25.

10        **MR. BONANNO:**  Savannah, can we bring that up, please.

11   **BY MR. BONANNO**

12   **Q.**   Are you there, sir?

13   **A.**   Uh-huh.

14   **Q.**   The question was asked:

15        "Was there concern at the time, within Bazaarvoice,

16       that PowerReviews signing syndication agreements with

17       Bazaarvoice manufacturers would diminish the value of the

18       Bazaarvoice network to its clients?

19       **"A.**   So my recollection at the time of the discussions,

20       the concern was that by -- by PowerReviews establishing

21       client contractual relationships with our -- with our

22       brand clients, that they would by definition be

23       penetrating our clients and attempt" them to sell them --

24       excuse me -- "attempt to sell them more products and

25       services and potentially try to displace us from those

1        brands."

2        Did I read that correctly, sir?

3   A.   Yes.

4   Q.   You personally recognized that PowerReviews intended to

5   use these syndication relationships to start a dialogue with

6   Bazaarvoice's clients about purchasing other products from

7   PowerReviews, correct?

8   A.   That was my concern.  And I would have assumed so, yes.

9   Q.   The PowerReviews Open Social Commerce Network press

10  release accelerated Bazaarvoice's efforts to develop this

11  service to syndicate Bazaarvoice reviews to non-Bazaarvoice

12  retailers, correct?

13  A.   Well, we had already been working on this since the

14  beginning of the year, if not earlier.  And when we saw this

15  press release it became clear that we had to start

16  communicating to our clients that what we were working on is

17  something that we could provide.

18       So in that sense it did accelerate our communications with

19  clients, for sure, because we had to respond to all their

20  inquiries.

21  Q.   You felt a sense of urgency to response to the

22  PowerReviews press release.  Is that fair to say?

23  A.   I felt an urgency to respond to the inquiries from the

24  clients that were asking about it, because we were being

25  flooded with questions from our clients.

DEFOSSE - DIRECT / BONANNO

1  **Q.**   So when PowerReviews announced its Open Social Commerce

2  Network, Bazaarvoice was flooded with inquiries about the

3  service that PowerReviews is offering, right?

4  **A.**   And I want to just characterize "flooded."  I personally

5  was getting a number of emails, and it was just hard for me to

6  manage all of them.  It was, you know, in the tens or, you

7  know, that sort of number.

8  **Q.**   I'd like you to turn to Government Exhibit 32, please.

9          **MR. BONANNO:**  And, Savannah, can we please zoom in on

10  the second email in the document.

11  **BY MR. BONANNO**

12  **Q.**   Mr. Defossé, this is an email that you sent to the

13  Bazaarvoice executive team in August of 2011, correct?

14  **A.**   Uhm, yes.

15  **Q.**   And the subject line reads:

16          "Update:  End-of-day update on syndication and PR's

17      latest move."

18      Did I read that correctly, sir?

19  **A.**   Yes, you did.

20  **Q.**   "PR" refers to PowerReviews?

21  **A.**   Yes.

22  **Q.**   And the executive team email moniker that appears in the

23  "to" field, that was the Bazaarvoice executive team?

24  **A.**   Yes, that would be it.

25  **Q.**   So this would be all C-level executives?

1    A.    Yeah.  That was my understanding, yes.

2    Q.    And C-level means chief executive officer?

3    A.    CEO, chief marketing officer, chief revenue officer, and

4    so forth, yeah.

5    Q.    All of the executive positions that start with a C?

6    A.    That's right, yeah.

7          MR. BONANNO:  I would like to zoom out, Savannah,

8    please, and then focus in on the first paragraph, first

9    sentence of Mr. Defossé's email.

10   BY MR. BONANNO

11   Q.    Mr. Defossé, you wrote:

12         "There has been a lot of conversation about how we are

13         responding to PowerReviews' recent press release and more

14         generally how we plan to broadly attack them in the market

15         going forward."

16         Did I read that correctly?

17   A.    That's right.

18   Q.    At the time that you wrote this email to the executive

19   team in August of 2011, there was no other ratings and reviews

20   provider, that you are aware of, approaching Bazaarvoice's

21   brand clients and offering to syndicate their Bazaarvoice

22   reviews to non-Bazaarvoice retailers, correct?

23   A.    Not that I'm aware of, correct.

24   Q.    And if we look at what you wrote, "how we plan to attack

25   them in the market going forward," that refers to the project

DEFOSSE - DIRECT / BONANNO

1    Menlogeddon, correct?

2    **A.**    I don't recall specifically that is what I meant here.  I

3    know what I meant is that we were putting together a program to

4    respond to the inquiries from clients around asking about open

5    syndication network, and how we were going to train the

6    salespeople to answer questions about that, because our sales

7    team didn't knowhow to answer that.

8         I don't know specifically if that was referring to

9    Menlogeddon.

10   **Q.**    You are familiar with the Menlogeddon project, though?

11   **A.**    Yes, I am.

12   **Q.**    And Project Menlogeddon was an initiative at Bazaarvoice

13   to come up with a single, coherent strategy for competing with

14   PowerReviews, correct?

15   **A.**    Uhm, yes.

16   **Q.**    You were the team lead for project Menlogeddon?

17   **A.**    Yes, I was.

18   **Q.**    And the project Menlogeddon team had responsibilities for

19   coordinating Bazaarvoice's response and marketing activities to

20   respond to inquiries regarding the PowerReviews Open Social

21   Commerce Network, correct?

22   **A.**    It was one of the things that we were working on, yes.

23   **Q.**    Mr. Defossé, you were involved in the creation of a

24   project Menlogeddon presentation that was given at an all-hands

25   meeting of the Bazaarvoice sales organization, correct?

DEFOSSE - DIRECT / BONANNO

1   **A.**   That's right.

2   **Q.**   An all-hands meeting is a meeting that brings a division

3   of the company together for informational purposes?

4   **A.**   That's correct.

5   **Q.**   Mr. Defossé, I would like you to turn to Government

6   Exhibit 34, please.

7        **MR. BONANNO:**  Savannah, can we please zoom in on the

8   top.  Thank you.

9   **BY MR. BONANNO**

10  **Q.**   Mr. Defossé, this is an email that you sent to the product

11  strategy team on August 4th, 2011, correct?

12  **A.**   That's right.

13  **Q.**   This is just a few days after the email that we had just

14  looked at, that you sent to the Bazaarvoice executive team,

15  correct?

16  **A.**   Yes, three days after that.

17  **Q.**   I would like you to turn, please, to the second page of

18  this document.

19        Mr. Defossé, this is the Menlogeddon presentation you gave

20  at the all-hands meeting, correct?

21  **A.**   That's correct.

22  **Q.**   And you helped create this presentation?

23  **A.**   Yes, I did.

24  **Q.**   Can you please turn to the next page.  That's the

25  PowerReviews logo?

DEFOSSE - DIRECT / BONANNO

1    **A.**   That is or was, I think.

2    **Q.**   Let's turn to the next page, please.

3          **MR. BONANNO:**   Can we zoom in, Savannah, so we can get

4    a little bit better view of the slide.

5    **BY MR. BONANNO**

6    **Q.**   At the top this reads, "Competitive Threat," correct?

7    **A.**   That's right.

8    **Q.**   This refers to the competitive threat posed by

9    PowerReviews.  Is that correct?

10   **A.**   That's correct.

11         **MR. BONANNO:**   Savannah, can we slide down so we can

12   see the speaker notes for the slide, please.

13   **BY MR. BONANNO**

14   **Q.**   The first bullet point reads:

15         "Aggressively going after our existing customer base."

16   Did I read that correctly?

17   **A.**   Yes, you did.

18   **Q.**   And underneath that it says:

19         "Open syndication network?

20   **A.**   That's right.

21   **Q.**   That refers to the PowerReviews open syndication network?

22   **A.**   Yes.

23   **Q.**   That was announced with the press release in July?

24   **A.**   That's right.

25   **Q.**   At the -- the third bullet point, under "Aggressively

1    going after our existing customer base" it reads:

2            "Creating distraction and potential revenue erosion."

3

4        This refers to PowerReviews creating a distraction and

5    potential revenue erosion for Bazaarvoice, correct?

6    **A.**   Yes.  Generally, yeah.

7    **Q.**   There's another bullet point that reads:

8            "Disrupting our new client sales efforts."

9        Do you see that, sir?

10   **A.**   Yes.

11   **Q.**   Underneath:

12           "Slowing down sales" and "Lowering price floors."

13       Do you see that?

14   **A.**   Yes.

15   **Q.**   This refers to PowerReviews slowing down sales and

16   lowering price floors?

17   **A.**   It referred to -- yeah -- well, let me parse that out.

18       So, they were slowing down sales because they were

19   communicating with all of our clients, so we had to respond to

20   that.

21       And at the time they were -- because we were competing for

22   the same clients that historically we had not competed against

23   in the SMB space we were trying to figure out how to get our

24   pricing methodology to work with the smaller clients and so we

25   had to put together a pricing mechanism to do that.  That's

1    what that referred to.

2    **Q.**   And the last bullet point reads:

3         "Have won a handful of deals that we wanted."

4        This refers to deals that PowerReviews was winning that

5    Bazaarvoice was wanting to win, right?

6    **A.**   Yes, that's right.

7    **Q.**   I'd like you to turn to page 7, please.  Actually, I'm

8    sorry, page 6.

9         **MR. BONANNO:**  That's the right one.  Sorry, Savannah.

10   We can zoom in on the slide.

11   **BY MR. BONANNO**

12   **Q.**   The slide is entitled "Our response."  This is the

13   Bazaarvoice response to PowerReviews, correct?

14   **A.**   That's correct.

15   **Q.**   And I'd like to turn to the next page, please.  And you

16   had just mentioned, sir, that the reason there was price

17   erosion was that Bazaarvoice was competing for small businesses

18   that it hadn't traditionally gone after, right?

19        **MR. FELDMAN:**  Objection.  Mischaracterizes the

20   testimony.

21        **THE COURT:**  You can correct.

22        **THE WITNESS:**  Should I answer?

23        **THE COURT:**  Yes, go ahead.

24        **THE WITNESS:**  Thank you, Your Honor.

25        No, that's not what I said.  What I said was that the --

1    going back to the -- let me make sure I got this right, the --

2    you said "price erosion."

3        What I said was that we were concerned that by them

4    getting into our clients we may -- they may steal one of our

5    clients, or that they may sell them something and, therefore,

6    create price ero- -- that it would reduce our overall revenue,

7    so it would be revenue erosion for us.

8    **BY MR. BONANNO**

9    **Q.**   Mr. Defossé, I thought you said something about price

10   erosion for small businesses.

11   **A.**   Yeah, but I didn't say "price erosion."

12       What I said was that what was happening at the time was

13   that we were -- we were getting ready -- you know, we were

14   actually looking at potentially doing an IPO.  And the sales

15   team was looking at whether we wanted to go into the SMB space,

16   which is the space that, generally, PowerReviews had dominated.

17   Or it had a lot of number of customers in.

18       And we -- our sales team wasn't equipped to do the pricing

19   for those small clients, and we had to basically help 'em come

20   up with a pricing -- set a price-setting policy to address

21   that.  So it was not an erosion issue.  It was just like we

22   didn't know how to exactly price those opportunities.

23           **MR. BONANNO:**   Savannah, can you zoom in on the slide,

24   please.

25

DEFOSSÉ - DIRECT / BONANNO

1  BY MR. BONANNO

2  Q.  Mr. Defossé, which one of those clients is a small

3  business?

4  A.  Uhm, these are all large customers, which is unrelated to

5  my previous comment.

6  Q.  I'm sorry?

7  A.  Fair.  These are all large customers.

8  Q.  These are all large Bazaarvoice clients?

9  A.  Yes.

10  Q.  And these are large Bazaarvoice that PowerReviews was

11  approaching at the time, right?

12  A.  That's correct.

13  Q.  And in response, Bazaarvoice wanted to immediately hold

14  QBRs with key clients.  Is that right?

15  A.  That's right.

16  Q.  "QBR" standings for quarterly business review?

17  A.  That's correct.

18  Q.  In response to PowerReviews approaching these large

19  clients, Bazaarvoice also wanted to enable new syndication

20  vehicles to defend its network, right?

21  A.  Yeah, that's what it says there, yeah.

22  Q.  And that refers to the syndication service that we've been

23  discussing, that would allow Bazaarvoice's brand clients to

24  syndicate their reviews to non-Bazaarvoice retailers, right?

25  A.  That was my understanding, yes.

DEFOSSÉ - DIRECT / BONANNO

1    **Q.**   The last bullet point reads:

2              "Go on offense with Smart SEO."

3         Do you see that, sir?

4    **A.**   Yes, I do.

5    **Q.**   And Smart SEO refers to the SEO product that Bazaarvoice

6    released to close a competitive gap with PowerReviews, correct?

7    **A.**   I don't agree with that statement.  That's a product that

8    we released earlier on, well before this, that had nothing to

9    do with the competitive gap with PowerReviews.

10   **Q.**   Okay.  I would like you to turn to Exhibit 941, please, in

11   your binder.

12   **A.**   I'm sorry, what was the --

13   **Q.**   941.

14   **A.**   941.

15             **MR. BONANNO:**  Savannah, can we please zoom in on the

16   top email.

17   **BY MR. BONANNO**

18   **Q.**   Mr. Defossé, this is an email that you sent in January of

19   2011, correct?

20   **A.**   That's correct.

21   **Q.**   And the subject line reads:

22             "Announcing Bazaarvoice Smart SEO."

23        Is that right?

24   **A.**   Yes.

25   **Q.**   I would like to focus your attention, for a moment, on the

DEFOSSÉ - DIRECT / BONANNO

1  email just below yours.  It's an email from a Mr. Mat Thompson.

2  Do you see that, sir?

3  **A.**   Yes, I do.

4  **Q.**   He writes:

5       "Why is Smart SEO any different/better than PR?"

6       Did I read that correctly?

7  **A.**   Yeah.

8  **Q.**   And this refers to PowerReviews, correct?

9  **A.**   "PR" is PowerReviews, yes.

10      **MR. BONANNO:**  Savannah, can we go back up to

11  Mr. Defossé's email.

12  **BY MR. BONANNO**

13  **Q.**   I would like to direct your attention, sir, to the second

14  paragraph in your email, second to last sentence, that reads:

15       "We took their idea of embedding the HTML into the

16       page so it could be crawled, but also figured out how to

17       make the content fully dynamic and not static like

18       theirs."

19       Did I read that correctly?

20  **A.**   Yes, you did.

21  **Q.**   When you said you "took their idea," you're referring to

22  taking PowerReviews' idea, right?

23  **A.**   In the context of this email, yes, that's what I said.

24  **Q.**   And then the third paragraph of this email you wrote:

25       "All this said, technically speaking, the SEO value

1      alone is actually about the same between us and PR now."

2      Did I read that correctly?

3  **A.**   Yes.

4  **Q.**   Before Bazaarvoice released Smart SEO, isn't it true that

5  PowerReviews had a superior SEO solution in the marketplace?

6  **A.**   I don't agree with that, no.

7  **Q.**   So what did you mean when you said the SEO value alone is

8  about the same now, after releasing Smart SEO between,

9  Bazaarvoice and PowerReviews?

10  **A.**   I just meant that at that moment in time, we had the same

11  SEO value.  The previous solution we had had the same SEO value

12  as well.

13  **Q.**   So Smart SEO didn't change the SEO value offered by

14  Bazaarvoice?

15  **A.**   Specifically around SEO, no.  We actually had other

16  advantages in the market, but specifically around crawlability

17  it was the same.

18  **Q.**   You took their idea of embedding HTML into the page.  What

19  do you mean you "took their idea"?

20  **A.**   So I -- you know, I wasn't involved in the development of

21  Smart SEO specifically.

22      What I was doing there is I was essentially explaining to

23  the salesperson that in the past, when we had started the

24  company, all of our content was living in the cloud, and that

25  by definition it wasn't crawlable.

1            (Reporter interrupts.)

2      **A.**    I'm sorry, let me start over.

3            When we started the company, all of our content lived in

4      the cloud.  And, by definition, wasn't -- the way we rendered

5      it on the page was, by definition, not SEO searchable.  But, so

6      was -- you know, almost anyone else's was the same way.

7            In fact, our clients back then did not want our content on

8      their product pages because they felt that it was actually a

9      distraction to their SEO optimization efforts.

10           A few years later, the -- Google changed the way in which

11     they looked at pages.  And they gave a lot of value to

12     something called "dynamic content" on pages.

13           At that point, our clients asked us, this time, to

14     actually include the content inside the page.  And we went and

15     did that.  And that was before Smart SEO.  That was something

16     we called Search Voice Inline, which was a previous version.

17     We did that at their request.  And from that moment on we had

18     the same SEO value of any other SEO solution out there,

19     including PowerReviews.  And that was well before Smart SEO.

20     **Q.**    So you took the PowerReviews ideas of putting the HTML on

21     the page?

22     **A.**    Well, I mean, I didn't -- I had no involvement in the

23     development of that product.  That was a figure of speech

24     there.  I don't know how the product development team was

25     looking at that.  I had no involvement in the development of

1    that.

2    **Q.**   To the best of your understanding at the time you wrote

3    this email, isn't it true that the PowerReviews ratings and

4    reviews were embedded in the page and could be indexed by

5    Google?

6    **A.**   At that time, yes.

7    **Q.**   I'd like you to go back to Government Exhibit 34, please,

8    Mr. Defossé.

9    **A.**   What was the number again?

10   **Q.**   34.  We're going to go to page 8, please.

11        This is a slide labeled "Surgically Strike."  Do you see

12   that, sir?

13   **A.**   Yes.

14   **Q.**   And the first bullet reads, in the speaker notes:

15        "Proactively go after their top customers."

16        Did I read that correctly?

17   **A.**   That's correct.

18   **Q.**   So Bazaarvoice, as a part of Project Menlogeddon, was

19   going to go on offense and pursue PowerReviews' top customers

20   and try to get them to switch to the Bazaarvoice platform,

21   correct?

22   **A.**   That's correct.

23   **Q.**   Mr. Defossé, at the time that you created this

24   presentation, this project Menlogeddon presentation, Pluck

25   existed, correct?

DEFOSSÉ - DIRECT / BONANNO

1    **A.**    Yes.

2    **Q.**    And Lithium existed?

3    **A.**    Yes.

4    **Q.**    Gigya existed?

5    **A.**    I believe so, yes.

6    **Q.**    And Viewpoints existed?

7    **A.**    I believe -- I believe so, yes.

8    **Q.**    And at the time you created this Project Menlogeddon

9    presentation, there were retailers and manufacturers that had

10   built ratings and reviews platforms with in-house resources

11   too, right?

12   **A.**    Yes, that's right.

13   **Q.**    At the time you wrote -- strike that.

14        At the time you created this Project Menlogeddon

15   presentation, Facebook was also in existence, correct?

16   **A.**    Yes.

17   **Q.**    And Twitter?

18   **A.**    Yes.

19   **Q.**    I'd like you to turn to Government Exhibit 40, please.

20        **MR. BONANNO:**  Savannah, can we please zoom in on the

21   envelope information, please.  Thank you.

22   **BY MR. BONANNO**

23   **Q.**    Mr. Defossé, this is an email that you wrote to the

24   Bazaarvoice executive team in September of 2011, correct?

25   **A.**    That's correct.

1  Q.   You wrote that you're sending them the BV challenge

2  program -- strike that -- "the BV challenge program that the

3  Menlogeddon team is intent on launching against PR."

4       Do you see that, sir?

5  A.   Yes, I do.

6  Q.   "PR" refers to PowerReviews?

7  A.   Yes.

8  Q.   Can you turn to the next page, please.  I'm sorry, if you

9  turn to page 9, it will be the color version of the

10 presentation.

11      This is a BV challenge presentation that you prepared,

12 sir?

13 A.   Yes, it is.

14 Q.   And you presented this to the Bazaarvoice executive team,

15 correct?

16 A.   Yes, I did.

17 Q.   This was the Menlogeddon team's plan to go after

18 PowerReviews' clients, correct?

19 A.   It was part of the plan, yes.

20 Q.   Turn to the next page.  Mr. Defossé, this was the

21 Bazaarvoice plan to take it to PowerReviews, right?

22 A.   That's what it says there, yes.

23 Q.   Let's turn to page 12, please.  Should just be a few pages

24 out.  I'll read.

25           "BV targets and goals."

DEFOSSE - DIRECT / BONANNO

1          Do you see that, sir?

2   A.    Yeah.

3   Q.    So these were the goals of the BV challenge, right?

4   A.    Correct.

5   Q.    I'm sorry?

6   A.    Yes, correct.

7   Q.    Bazaarvoice was targeting "18 marquee and strategic

8   steals."

9          Do you see that, sir?

10  A.    Uh-huh.

11  Q.    Does that mean you had identified 18 marquee and strategic

12  PowerReviews clients that Bazaarvoice was going to pursue?

13  A.    That's correct.

14  Q.    Under the bullet point that reads, "What will we get in

15  return?" the subbullet reads:

16          "Steal a client or two, expect low win rate because of

17      switching costs."

18          Do you see that, sir?

19  A.    Yes, I see that.

20  Q.    Switching costs are the costs that the client must incur

21  to switch ratings and reviews providers, correct?

22  A.    Cost, effort, time, yes.

23  Q.    So it would be difficult to win PowerReviews clients

24  because of switching costs, right?

25  A.    So what I meant here is that we expected a low win rate

 1   because it was unclear to us what the switching costs were

 2   going to be at each of the clients.

 3   **Q.**   But you did write:

 4            "Steal a client or two but expect a low win rate

 5        because of switching costs"?

 6   **A.**   That's what I wrote, yeah.

 7   **Q.**   Please turn to Government Exhibit 35.  The second email on

 8   this page, Mr. Defossé this is an email that you wrote to the

 9   Bazaarvoice executive team in August of 2011, correct?

10   **A.**   Uh-huh.

11   **Q.**   Subject line reads:

12            "Menlogeddon update for the week of August 15, 2011."

13        Do you see that?

14   **A.**   Yes, I do.

15   **Q.**   So you were sending regular updates to the executive team

16   for the project Menlogeddon, correct?

17   **A.**   That's correct.

18   **Q.**   I'd like to focus your attention to the second sentence of

19   your email, that reads:

20            "Attached is the detailed project tracker if you want

21        to see the details."

22        Do you see that, sir?

23   **A.**   Yes, I do.

24   **Q.**   I'd like you to turn in the document just past the page

25   that reads, "Document produced in native."

1  **A.**    Uh-huh.

2  **Q.**    And I apologize, it's a spreadsheet that doesn't print

3  well.  So we'll try to zoom in and make it a little bit easier

4  to read.

5        **MR. BONANNO:**  Savannah, can you please zoom in on the

6  very top of the page.

7  **BY MR. BONANNO**

8  **Q.**    Mr. Defossé, this is the activity tracker for Project

9  Menlogeddon, correct?

10  **A.**    That's correct.

11  **Q.**    You were responsible for creating this project tracker?

12  **A.**    Yes.

13  **Q.**    And as the team lead for Project Menlogeddon, you used

14  this project tracker to make sure your team members followed

15  through on the various activities for the initiative?

16  **A.**    That's correct.

17  **Q.**    As VP of product strategy, you never created a similar

18  project tracker for any other competitor except for

19  PowerReviews, right?

20  **A.**    Actually, we did one about a year and a half earlier, for

21  both Lithium and a company called RightNow.  It was a joint

22  project tracker for both of those.

23  **Q.**    I'd like you to turn back to your deposition, the last tab

24  in your binder.  We've going to go to page 260, starting at

25  line 25.  We're going to start at line 25 and go on to page

1      261.

2          Are you there, sir?

3   A.   Which line, again?

4   Q.   The question actually starts on page 260, line 25, but

5   doesn't actually become fully articulated until page 261.  So

6   if we -- actually, we'll start on 261, line 1:

7          "Did you, in your role as vice president of product

8          strategy, when you had responsibility for responding to

9          competitive inquiries from the field, ever create a

10         detailed project level tracker similar to that depicted in

11         Government Exhibit 35, regarding any other competitor

12         besides PowerReviews?"

13         After the question was re-read, you answered at line 1:

14         "Yeah, I don't recall having done that."

15         Did I read that correctly, sir?

16  A.   Yes, you did.

17  Q.   I'd like you to please turn back to the project tracker in

18  Government Exhibit 35, the slide of the Excel sheet we were

19  looking at.

20  A.   Uh-huh.

21  Q.   There's a couple of entries that -- excuse me.  The first

22  bullet point reads, "Protect network."

23         Do you see that, sir?

24  A.   Yes, I do.

25  Q.   And then to the right, under "Protect our Syndication

1    Network" reads:

2         "Build marketing collateral/training for new

3    syndication approach both into and out of BV, the entire

4    solution."

5    Did I read that correctly?

6    A.   That's correct.

7    Q.   This refers to the development of a solution by

8    Bazaarvoice that would allow Bazaarvoice's manufacturing

9    clients to share their ratings and reviews with non-Bazaarvoice

10   retailers, correct?

11   A.   That's correct.

12   Q.   Okay.  I'd like you to please turn to Government Exhibit

13   37.

14        Mr. Defossé, this is another update that you sent to the

15   executive team for project Menlogeddon, correct?

16   A.   Yes, that's correct.

17   Q.   I'd like you to please turn to the attached project

18   tracker, the third page of the tracker.  I'd like to direct

19   your attention, sir, to the bottom of the page, the entries

20   that start with "Decision Tree."

21   A.   Uh-huh.

22   Q.   Do you see that, sir?

23   A.   Yes, I do.

24   Q.   I'd like to direct you to the third entry under Decision

25   Tree.

1              **MR. BONANNO:**  Up one, Savannah.

2    **BY MR. BONANNO**

3    **Q.**  Do you see that, sir?

4    **A.**  Yes, I do.

5    **Q.**  And it reads:

6              "PR is currently in 80% of our sales pipeline - all

7         sorts of different levels."

8         Did I read that correctly?

9    **A.**  Yes, you did.

10   **Q.**  "PR" refers to PowerReviews?

11   **A.**  Yes, that's correct.

12   **Q.**  Mr. Defossé, after Bazaarvoice acquired PowerReviews, for

13   some period of time you maintained responsibility for

14   responding to competitive inquiries from the field, correct?

15   **A.**  That's right.

16   **Q.**  After Bazaarvoice acquired PowerReviews, isn't it true

17   that there was no other competitor that was in 80 percent of

18   Bazaarvoice's sales opportunities?

19   **A.**  Well, I actually wouldn't know that for certain because I

20   didn't maintain the stats on what the salespeople were

21   recording.  In fact, they were particularly bad at recording

22   who was in their sales pipeline.  So I can't answer that for

23   certain.  But no one brought that number to my attention for

24   sure.

25   **Q.**  Mr. Defossé, I'd like you to turn to Government Exhibit

DEFOSSÉ - DIRECT / BONANNO

1    39, please.  And I'd like you to turn, please --

2              MR. BONANNO:  Well, first of all, if we can turn the

3    page, Savannah, and get the envelope information.

4    BY MR. BONANNO

5    Q.   This is an email that you received, right, Mr. Defossé?

6    A.   Which email is that?

7    Q.   I believe your name is listed --

8    A.   Yeah, my name is there, yeah.

9    Q.   So you received this email, right?

10   A.   I don't know what this email is, but that looks like the

11   cover -- which email are you referring to?  I may have lost

12   track of where we are.

13   Q.   We're in Government Exhibit 39.

14   A.   Is this the cover for page 1, that was sent from Tony

15   Capasso?

16   Q.   That's correct.

17   A.   Okay, yeah.  Yes, I received that.

18   Q.   I'd like you to turn to page 2 of Government Exhibit 39.

19             MR. BONANNO:  Savannah, can you please just zoom in at

20   the very top of the page.

21   BY MR. BONANNO

22   Q.   Mr. Defossé, this is a list of PowerReviews clients that

23   Bazaarvoice was targeting with project Menlogeddon, correct?

24   A.   Uhm, yes, that's correct.

25   Q.   Please turn to page 9.  It will be in the colored slides

DEFOSSE - DIRECT / BONANNO

1   in the back of the attachment.  It reads at the top:

2          "This is your team - PR competitive strategy

3      overview."

4   A.   Uh-huh.

5   Q.   Do you see that, sir?

6   A.   Yes, I do.

7   Q.   This was prepared as part of project Menlogeddon, correct?

8   A.   Yes, it was.

9   Q.   I'd like you to turn to page 11.  That's entitled at the

10  top, "Defining Competitive Landscape with PR."

11         Do you see that, sir?

12  A.   Yes, I do.

13  Q.   Bazaarvoice had segmented PowerReviews' customers it was

14  pursuing into these categories, correct?

15  A.   Can you repeat the question.

16  Q.   Bazaarvoice had segmented the PowerReviews customers it

17  was pursuing into these categories, correct?

18  A.   I believe this is how the sales team did it, yes.

19  Q.   And if we look in each of the categories -- let's start in

20  the upper left, "PR marquee customers," there's a bullet point

21  that reads:

22          "Mostly IR100 accounts."

23         Do you see that, sir?

24  A.   Yes, that's correct.

25  Q.   "IR" refers to the *Internet Retailer*?

DEFOSSE - DIRECT / BONANNO

1   **A.**   Yes.

2   **Q.**   So this refers to the *Internet Retailer* publication --

3   **A.**   Yes.

4   **Q.**   -- which publishes the list, the *Internet Retailer 500*,

5   correct?

6   **A.**   Yes.

7   **Q.**   Again, if we look to the right, "PR strategic customers,"

8   the first bullet point reads:

9          "PR customers in the IR500 and/or strategic to BV in

10         the respective sub-vertical."

11         Again, sir, this refers to PowerReviews' customers in the

12  *Internet Retailer 500* that Bazaarvoice was pursuing as a part

13  of project Menlogeddon, correct?

14  **A.**   Yes.

15  **Q.**   If we look down in the bottom right, in the quadrant

16  labeled "PR competitive new business," the second bullet point

17  reads:

18         "Most likely IR500 with strategic value in

19         sub-vertical."

20         Did I read that correctly?

21  **A.**   That's correct.

22  **Q.**   And, again, this refers to clients of PowerReviews in the

23  *Internet Retailer 500* index that Bazaarvoice was pursuing as a

24  part of the Project Menlogeddon strategy, correct?

25         **MR. FELDMAN:**  Objection.  I think you misspoke.  You

1    said "clients of PowerReviews."  The bullet says --

2              **MR. BONANNO:**  I'll strike the question.

3              **THE COURT:**  Can you re-ask, please.

4              **MR. BONANNO:**  Sure.  I think I did misspeak.  Thank

5    you, Counsel.

6    **BY MR. BONANNO**

7    **Q.**   These are clients that both Bazaarvoice and PowerReviews

8    were pursuing in the *Internet Retailer 500*, correct?

9    **A.**   As defined here, yes.

10   **Q.**   I'd like you to turn two more pages, please, to the slide

11   that's labeled "Competitive Decision Tree."  Do you see that,

12   sir?

13   **A.**   Yes.

14   **Q.**   At the very top -- well, strike that.  There's kind of

15   four -- it's a waterfall, four different segments, right?

16   **A.**   Uh-huh, yes.

17   **Q.**   And these labels are the same labels we just looked at in

18   the quadrants, correct?

19   **A.**   That's correct.

20   **Q.**   In the very top are "PR marquee customers," correct?

21   **A.**   That's right.

22   **Q.**   And the first bullet point reads:

23            "Win at all costs."

24        Did I read that correctly?

25   **A.**   Yes.

1   Q.   So these were the PowerReviews customers that Bazaarvoice

2   was going after and was willing to win at all costs, right?

3   A.   I mean, that's what the slide says, yes.

4   Q.   So Bazaarvoice was willing to do whatever it took to win

5   those accounts, right?

6   A.   I actually don't know if that's -- first of all, I didn't

7   prepare this slide.  I don't know what exactly is meant by "win

8   at all costs."  This is the salesperson's perspective:  Look,

9   we're going to do everything we can to win these accounts.

10       So I don't know what was meant or if there was approval

11  beyond the sales team of what "costs" meant.

12       I just wanted to clarify that, so.

13  Q.   Sir, sitting here today, are you aware of any Viewpoints

14  customers that Bazaarvoice is trying to win at all costs?

15  A.   In this -- at that timeframe?  No.

16  Q.   Let my re-ask the question.  I think we talked past one

17  another there.

18       As we sit here today, are you aware of any Viewpoints

19  customer that Bazaarvoice is trying to win at all costs?

20  A.   Since I'm no longer involved in that, I wouldn't know, no.

21  Q.   Based on your experience in the industry, do you have any

22  understanding as to whether Viewpoints has any ratings and

23  reviews clients today?

24  A.   I haven't followed them in a couple of years, so I don't

25  know.

DEFOSSÉ - DIRECT / BONANNO

1    Q.   That would even go back to your tenure when you were VP of

2    project strategy?

3    A.   Well, when I joined the company, they had Sears.  And I

4    know that was something that we were very interested in, but

5    that's all knew.

6    Q.   As we sit here today, you don't know whether they're still

7    servicing Sears or not?

8    A.   My understanding is that they're not.

9    Q.   Are you aware of any other Viewpoints customers?

10   A.   No, I'm not aware.

11   Q.   Mr. Defossé, when PowerReviews first started approaching

12   Bazaarvoice's brand clients and trying to get them to send

13   their reviews to PowerReviews' retailers, Bazaarvoice tried to

14   stop that, right?

15   A.   Tried to stop it in what way?

16   Q.   Tried to stop PowerReviews from sending Bazaarvoice's

17   manufacturers' reviews to PowerReviews' retail clients, right?

18   A.   Well, PowerReviews couldn't do that.  It was the clients

19   were doing that.  So PowerReviews wasn't taking the content.

20   It was the clients sending the content to the retailers.

21        So we weren't stopping PowerReviews from anything.  It was

22   a brand would choose to send their data to a retailer.  And

23   they could do that.  That was well within our contracts, and

24   they did it from time to time.

25        We didn't want them to do that because we felt we had a

1    better solution for it, but we didn't stop PowerReviews from

2    doing anything.

3    **Q.**    So Bazaarvoice never did anything to inhibit PowerReviews'

4    ability to provide this service to Bazaarvoice's brand clients?

5    **A.**    Oh, it was out of our control to inhibit them.  The brands

6    could give them the content, PowerReviews, without anything.

7    There were some occasions where PowerReviews wanted us to enter

8    into contracts with them to do it, and we certainly didn't want

9    to do that.

10            **MR. BONANNO:**  Your Honor, may I approach the witness?

11            **THE COURT:**  Yes.

12   **BY MR. BONANNO**

13   **Q.**   Mr. Defossé --

14            **MR. BONANNO:**  And, Your Honor, this exhibit has not

15   been admitted into evidence yet.  It's going to be labeled

16   Government Exhibit 1215.

17        (Plaintiff's Exhibit 1215 marked for identification)

18   **BY MR. BONANNO**

19   **Q.**   Mr. Defossé, this is an email chain that you participated

20   in in April of 2012, correct?

21   **A.**    Yes, that's correct.

22   **Q.**   And this was just before the merger, right?

23   **A.**    Yeah, sounds about right, yeah.

24   **Q.**    In the middle there's an email from Mr. Bill Glass.  Do

25   you see that, sir?

```
 1   A.    Yes, I do.

 2   Q.    And you wrote -- strike that.  Let me wait one second.

 3         MR. FELDMAN:  I think there's stuff in here that the

 4   customer involved might be unhappy about with pricing

 5   information.  So I don't think you want to flash it.

 6         MR. BONANNO:  We haven't put it on the screen.

 7         MR. FELDMAN:  I think you want to be careful on the

 8   data because if they were here they would be squawking.

 9         THE COURT:  Thank you, Mr. Feldman.

10   BY MR. BONANNO

11   Q.    So turning back to Mr. Glass's email, he's describing a

12   delay strategy to slow down the process for allowing a

13   Bazaarvoice brand client to syndicate content to a PowerReviews

14   retail client.  Isn't that right?

15   A.    My understanding is, as I read this, is that we had been

16   asked to sign some agreements for us to send content to the

17   retailer, and we definitely wanted to review those very

18   carefully and redline them.

19   Q.    So when you received this email referring to a delay

20   tactic with a heavy set of redlines, you didn't interpret that

21   to mean we should inhibit syndication from our clients to

22   PowerReviews' retailers?

23   A.    So, no, that's not how I interpret it at all, actually.

24         I mean, the reality of the matter in this particular case,

25   P&G had complete contractual ability to send content to a
```

DEFOSSE - DIRECT / BONANNO

1    drugstore or whoever they wanted to.

2        The issue here was that PowerReviews wanted us to sign an

3    agreement with them and P&G giving -- essentially giving

4    PowerReviews contractual relationship with P&G, who was our

5    customer, and we didn't agree with that.

6        So we wanted to make sure that we poured through that

7    contract in every way, to make sure our interests in those

8    clients were protected.

9    **Q.**  So how does that align with this being a delay strategy?

10   **A.**  Well, we wanted -- we didn't want to have PowerReviews

11   signing an agreement with P&G, and we wanted to convince P&G

12   they should let us do the syndication rather than PowerReviews

13   because it's our client.  And, again, P&G could have said no to

14   us, and they could have gone directly with PowerReviews and

15   giving them the content.  But we didn't want to be party to a

16   contract where we weren't even going to get paid, and we were

17   going to have to do a lot of work and have potential legal

18   exposure because of the fact we were participating in the

19   syndication, and we wanted to make sure that we -- that we

20   covered all our bases with that, to make sure that we weren't

21   exposed.

22   **Q.**  Mr. Defossé, how did that provide value to your client,

23   that strategy?

24   **A.**  So, our position all along on syndication is that a client

25   has always been able to take their data that we provide, that

1   we collect on their behalf, and they can syndicate it on their

2   own to whoever they want.  That is without using our

3   syndication product.  We've always believed that our

4   syndication product was better than them doing that because we

5   could do things for them that they couldn't do on their own.

6        In this particular case, they wanted us to essentially

7   send them -- to send raw data to PowerReviews, contractually

8   sign up to do that.  They'd essentially not be able to use our

9   product, in order to ensure the quality of the reviews once

10  they showed up on the retailer page.  And we were concerned

11  that that was actually going to be detrimental to P&G.

12       For example, we send reviews for a bar of soap, and they

13  show up on the page for shampoo.  And then we -- since we had

14  no control over how PowerReviews was going to put them on

15  there, we could end up being liable for that mistake.  And we

16  didn't want to be part of that.

17       And we told P&G that we felt that the best solution was to

18  go entirely with our solution and not with PowerReviews.  Now,

19  they could have chosen to ignore us and gone directly to

20  PowerReviews and given them the content.  They had all the

21  rights to do that.

22  Q.   So let me just back up and make sure I have the sequence

23  of events straight.  A Bazaarvoice client approached you and

24  asked you to sign this agreement with PowerReviews, to enable

25  syndication, correct?

1    A.    Yes.

2    Q.    And in response you sent the contract as a part of a delay

3    tactic through a set of heavy legal redlines, correct?

4    A.    Okay.  Can you repeat that question?

5    Q.    In response to this request from your client, you went

6    into a delay tactic with a heavy set of legal redlines,

7    correct?

8    A.    That's what I said there, yes.

9          MR. BONANNO:  I have no further questions right now,

10   Your Honor.

11         THE COURT:  Why don't we take our next break here, for

12   ten minutes.  And I'm going to want to stop very close to

13   1:00 o'clock today, so keep that in mind.

14         MR. FELDMAN:  So from the standpoint of this witness,

15   it will take me well under an hour.

16         THE COURT:  Okay.  Great.

17              (Recess taken at 10:55 a.m.)

18         (Proceedings resumed at 11:05 a.m.)

19                    **CROSS-EXAMINATION**

20   BY MR. FELDMAN:

21   Q.    Good morning, Mr. Defossé.  I guess given all the military

22   imagery, I should be grateful you didn't come dressed in camo.

23         I handed up to the judge and to you a bio.  Could you just

24   start -- let's start with your educational background before

25   work.

DEFOSSÉ - CROSS / FELDMAN

1   **A.**   So I have an undergraduate degree in aerospace engineering

2   from the University of Texas, which I received in 1993.

3        I then proceeded to get a Master's in aeronautics and

4   astronautics from Stanford just around the corner here, which I

5   got in 1995.

6        And then I received an MBA from the University of Texas in

7   1998.

8   **Q.**   And then could you give us your job background briefly?

9   **A.**   Yeah.  So my first job out of college was working at

10  NASA's Jet Propulsion Laboratory in Pasadena, California, which

11  is the part of NASA responsible for all their robotic space

12  missions, the Rover on Mars, all that sort of stuff, and it was

13  my dream job even from when I was a kid.  So I got that.  I

14  started working there in 1991, and was there on and off through

15  1996.  I say "on and off" because I did my Master's in between

16  my tenure there.

17  **Q.**   You're going to make the reporter's fingers fall off.

18  **A.**   I'm sorry.

19  **Q.**   Can you slow down?

20  **A.**   I will go slower.

21       After I left the Jet Propulsion Laboratory and I was

22  getting my MBA, I finalized my MBA; but during that time, I

23  started a company while I was getting my graduate degree, a

24  company called Isochron.

25  **Q.**   How do you spell it?

DEFOSSÉ - CROSS / FELDMAN

1    A.    I-S-O-C-H-R-O-N.

2         And I was one of the two cofounders and the chief

3    technology officer of that company.  I was there for roughly

4    seven years in that capacity.

5         And after I left Isochron, the company was sold to a group

6    of investors and I left shortly thereafter, about a year after

7    that.

8         And after trying to figure out what I was going to do

9    next, I ended up going to work at a technology incubator based

10   in Austin, Texas, a nonprofit technology incubator that helps

11   startup companies write their business plans, go and raise

12   venture capital, and so forth.  I was there around five years.

13        When my tenure there ended, I -- I did a little bit of

14   consulting for a software company.  I was their acting chief

15   product officer, a company called Edioma with an E,

16   E-D-I-O-M-A, and it was a company developing mobile

17   applications for the Hispanic market in the United States.

18   Actually all over Latin America, which was a natural for me

19   because I grew up in Mexico and I spoke Spanish, and I knew all

20   the cultural topics that needed to go into the product.

21        So I was there for about a year and a half doing

22   consulting work; and as I was doing that, my next job, so to

23   speak, was to start an elementary school.  So I decided that I

24   wanted my kids to go to a school that had a certain set of

25   things that I wanted them to have:  Multilingual education,

DEFOSSÉ - CROSS / FELDMAN

1    international curriculum, and things like that.  I couldn't

2    find it in my community, so I started an elementary school.  So

3    I was doing that for about a year and a half nonprofit, unpaid.

4        And, you know, at some point in time after we got that

5    started, it's grown very successfully, and then -- but I needed

6    a job after awhile doing that, and I ended up at Bazaarvoice.

7    **Q.**   So did you take the elementary school public or sell it to

8    IBM?

9    **A.**   Yeah.

10   **Q.**   Only kidding.

11       What is your title at Bazaarvoice?

12   **A.**   Yeah.  I'm the vice president of strategy.

13   **Q.**   Has that pretty much been your job the whole time there?

14   **A.**   Yeah.  I mean, there's been some changes in the role,

15   particularly after Mike Svatek, who was my -- who hired me as

16   director of product strategy.  I started -- the role went

17   through some changes during the time he was there, but pretty

18   much did about the same thing.

19       And then with Mike's departure, it's, again, transformed.

20   It's changed a little bit.  For example, I no longer have

21   responsibility for the whole competitive analysis.  That's now

22   within product marketing.

23   **Q.**   Try to keep your voice up and slow for our friend here.

24   **A.**   Yes.

25   **Q.**   As head of strategy for the company, are you familiar with

DEFOSSÉ - CROSS / FELDMAN

1   the term "social commerce"?

2   **A.**   Yes, I am.

3   **Q.**   In the last few years, two, three years, how would you say

4   that the options available to chief marketing officers at

5   eCommerce companies have changed with respect to social

6   commerce?

7   **A.**   Well, I mean, the social commerce market has really

8   exploded, I mean, from a few years ago where there was not much

9   available till now.  Probably hundreds of companies that

10  provide a variety of solutions.

11      And, so, there's plenty of things that chief marketing

12  officers are looking at.  For example, you know, some of the

13  better known things are, of course, Facebook and Twitter, which

14  were big -- big aspects of the social commerce -- social in

15  general that are now also playing a part in social commerce.

16      There have been companies that have actually been created

17  to serve or, indeed, to work with Facebook and Twitter.  Some

18  of those companies have been bought by some of the larger

19  companies around, like Salesforce and Oracle.  So there's a lot

20  of change and a lot of growth and a lot of -- I mean, literally

21  every month or so it's new companies with new capabilities

22  pitching to CMOs and others.

23  **Q.**   I'm going to hand to you an exhibit that the Government

24  marked.  It's GX18, one eight.  Have you seen that document

25  before?

DEFOSSÉ - CROSS / FELDMAN

1   **A.**    Yes, I have.

2   **Q.**    Can you give us context for what it is?

3   **A.**    So as part of my responsibility overseeing the competitive

4   analysis, one of the things that we wanted to do was always

5   reach out to our salespeople who were in the field talking to

6   customers and find out, you know, who are all these companies

7   that they were seeing in this competitive landscape that, like

8   I said, every few months there was a new company showing up.

9         And, so, I'd asked -- and we, I think -- I believe I did

10  this a couple times, but in this email I had asked one of

11  the -- one of the people -- one of the key members that works

12  for me to issue a survey out to the Sales Team asking them,

13  like:  What competitors are you currently seeing in the market?

14  Are you finding them in -- you know, bidding against you for a

15  new opportunity?  Are you finding that they're potentially not

16  bidding against you directly but they are -- they're bidding

17  for some of the budget that your potential client has to spend?

18  And essentially give us information on that.

19  **Q.**    So I want to ask you about exactly that sentence.  You

20  wrote -- this went to Yun Du, is that Mr. Yun Du or Ms. Yun Du?

21  **A.**    Mister.

22  **Q.**    Okay.  You wrote Mr. Yun Du, quote:  (reading)

23         "I would try to get the respondents to differentiate

24         between direct competitors (bidding for the exact same

25         business and capability set) versus wallet competitors

1       (bidding for the same wallet with a different solution)."

2       What were you talking about?

3  **A.**   So we were trying to figure out how to categorize

4  competitors because there were so many new companies coming

5  into being and so many different solutions that on one extreme

6  were companies that had a product that was exactly like our

7  ratings-and-reviews feature, for example, or exactly like our

8  Q & A solution, or exactly like our stories.  By the way, none

9  of them were exactly the same all the time but, you know, very

10  similar functionality.

11      On the other side, there were companies that may have had

12  a completely different way to address social commerce and our

13  clients were actually considering should we do a Q & A

14  solution, should we do a review solution, or should we use

15  their new way of doing this.

16      So we were trying to get -- create buckets and allow the

17  Sales Team to tell us with more specificity, is this new --

18  does this new client have a ratings-and-reviews functionality

19  or is it something new that we haven't seen that they're also

20  vying for the business.

21  **Q.**   Does Amazon affect your business?

22  **A.**   Very much so.

23  **Q.**   How?

24  **A.**   Well, I mean, Amazon, first of all, essentially created

25  the concept of reviews or commercialized the concept of

DEFOSSÉ - CROSS / FELDMAN

1    reviews.  Most consumers today at one point when they're going

2    to buy anything online end up looking at Amazon, the reviews

3    that are there and, in addition, to potentially the reviews

4    that we host for our clients on their Web sites.

5        The other big, you know, factor that Amazon has in our

6    business is that, I mean, they're competing directly with our

7    retail customers.  So there have been incidences where Amazon

8    decides to go into a new industry area or a new products --

9    product area and category, and immediately impact the revenues

10   of retailers.

11       And the reason they can do that is because they have a

12   direct model.  You know, you go online to buy.  You don't have

13   to have stores.  And, so, all of our retailers are always very

14   concerned about Amazon coming into their categories because

15   they know that it will take revenue away from them.

16   **Q.**   Have you heard of something called Amazon Webstores?

17   **A.**   Yes, I have.

18   **Q.**   Can you explain what that is?

19   **A.**   Yeah.  So Amazon has a product that allows retailers to

20   embed review functionality, as well as some other checkout,

21   like, you know, pay -- pay now and leave your credit card, the

22   checkout process, into their pages and use that functionality.

23   **Q.**   So if a company doesn't want to use Bazaarvoice for

24   ratings and reviews, do you understand it to be an option for

25   them to go use Amazon Webstore and get ratings and reviews via

DEFOSSÉ - CROSS / FELDMAN

1    that?

2    **A.**   Depending on the customer, yes.  It may not work for all

3    of them, but certainly it's an option for customers.

4    **Q.**   To what extent, if any, do you view in-house development

5    of ratings-and-reviews software as an alternative to your

6    product?

7    **A.**   Well, in every, that I am aware of, in every survey that

8    we did, like the one I'm -- that we were pointing out in the

9    email, other than our -- other than our prospects just not

10   wanting reviews, the single biggest factor or one of the single

11   biggest factors why they ended up not buying our product was

12   because they decided to build it themselves.  So it's a big

13   competitor, if you will.

14   **Q.**   Do you remember Mr. Bonanno asked you about ViewPoint and

15   Sears?

16   **A.**   Yes, I do.

17   **Q.**   And you told him that -- I think you told him that you

18   thought Sears was no longer a customer of ViewPoint; is that

19   right?

20   **A.**   That's correct.

21   **Q.**   Where did they move to?

22   **A.**   My --

23             **MR. BONANNO:**  Objection.  Foundation.

24   **BY MR. FELDMAN:**

25   **Q.**   Do you know where Sears moved their ratings and reviews

DEFOSSÉ - CROSS / FELDMAN

1    to?

2    **A.**    My understanding is they built their own solution.

3    **Q.**    Okay.  Thank you.

4        I want to turn to competition prior to the acquisition.

5    What segments of companies did Bazaarvoice target for its

6    ratings-and-review products?

7    **A.**    So, you know, at a very high level, we divided the world

8    into brands and retailers; and then within those, we would

9    generally divide them up into, you know, big companies and

10   small companies:  Enterprise, we use the word "enterprise," and

11   SMB, and commercial.  You know, three different tiers.

12       And then within brands and retailers, we'd have industry

13   areas like travel or clothing or electronics.  But at the --

14   you know, how we organize ourselves for many years in the

15   company was around saying do you have brands, retailers, small

16   companies, large companies.

17   **Q.**    And in those different segments you described, prior to

18   the acquisition, what would you say PowerReviews' competitive

19   presence was in the different segments?

20   **A.**    Yeah.  So my understanding was that they had a lot of

21   presence in the small and commercial, what we call commercial,

22   which is intermediate size retail space.  They had a few

23   enterprise retail customers, large retail customers, only a

24   handful.

25       And by comparison, we had a lot of clients that were both

1    in brands, which they didn't generally have, as well as many

2    large enterprise and commercial retail clients.

3    **Q.**    Okay.  I'm going to hand up to you a document the

4    Government marked.  I think it may have even made it into the

5    Complaint and onto Reuters, GX540.

6    **A.**    (Witness examines document.)

7    **Q.**    Are you familiar with the document?

8    **A.**    Yes, I am.

9    **Q.**    Did you write the front part?

10   **A.**    Yes, I did.

11   **Q.**    The subject line is "BBY Feedback on RFI."  What does that

12   mean?

13   **A.**    BBY is the ticker symbol for Best Buy retailer, and RFI is

14   a request for information; and, so, we were responding to an

15   RFI that BBY had issued to us.

16   **Q.**    So before I ask you about some of your colorful language

17   here, can you give us the context of what was going on with

18   Best Buy in July of '11?

19   **A.**    Yeah.  So, you know, this is the summer of '11 and, so,

20   the context for all that was, this is all around the same time

21   that PowerReviews had issued their open social commerce

22   release.

23       A few -- you know, starting a few months back, their chief

24   marketing officer, Cathy Halligan, had -- my understanding was

25   that she had taken it upon herself to leverage her previous

1  position at Walmart and her Rolodex from that position to call

2  all of our top clients directly; and she could do that because

3  she had their direct contact information, they knew who she

4  were -- who she was, and essentially, you know, ask them to

5  reconsider, you know, their decision to be with Bazaarvoice and

6  to consider PowerReviews.

7       Other things that were happening were that we had just

8  finished our -- a few months before we had finished our annual

9  customer summit, and PowerReviews had -- this is industry

10  lingo -- they had hijacked our Twitter handle, which is the --

11  when people at a conference start talking about the conference

12  and we issue information about the conference, generally it

13  comes from us; but if someone hijacks your handle, they can

14  essentially write information to all the attendees of the

15  conference and pretend that they are you.

16       And, so, there was just a lot of, you know, competitive,

17  you know, I guess angst or just, you know, we were upset about

18  all this.

19       And they contacted Best Buy, and then Best Buy -- well,

20  she contacted Best Buy and had convinced our prime -- the GM

21  that was responsible for our account, for our relationship with

22  Best Buy, to issue an RFI essentially, you know, our

23  understanding was, for us to reexplain our relationship to them

24  and what our products were.

25  Q.   And how did it play -- I'm going to get to this in a

1    minute --

2    **A.**    Yeah.

3    **Q.**    -- but what happened in that process?  Did you meet with

4    them?  Did you keep the business, lose the business?  What

5    happened?

6    **A.**    Yeah.  So we got the RFI, and actually Best Buy had asked

7    us, you know, like, "What do you think we should be asking in

8    the RFI," which was interesting.

9         And we went through that process, you know, answered all.

10   We had a team of five to ten people that were responsible for

11   answering the various questions in the RFI; and then flew a

12   team, including myself, it must have been about a dozen people,

13   to Minneapolis where Best Buy is headquartered.  It was myself,

14   Aaron Nelson who at the time was the chief marketing officer at

15   Bazaarvoice, our head of our labs team; and, you know, anyway a

16   number of people flew up there.

17        And we spent the day talking to Best Buy and essentially

18   telling them about what our road map was.  That was -- most of

19   the conversation was about what new products we were developing

20   and, you know, what we were developing.

21        And at the end of that day, I mean, I didn't hear anything

22   else.  Essentially we -- the business stayed with Bazaarvoice

23   and we continued on the relationship with them, so....

24   **Q.**    Okay.  Now let me turn to your document, and I'm going to

25   read you a few sentences, and then you can talk about them.

DEFOSSÉ - CROSS / FELDMAN

```
 1   Quote:  (reading)

 2           "I was actually talking about that today in reaction

 3       to the BBY RFI and their apparent need to 'better

 4       understand the social commerce market' given that they

 5       haven't done it proactively in at least the four years

 6       plus that they've been with us," closed quote.

 7       What did you mean by that?

 8   A.   You mean that or the entire --

 9   Q.   That sentence.  What did you --

10   A.   That specific sentence?

11   Q.   Yeah.

12   A.   Okay.  So in the communication that we got from Best Buy

13   in their RFI, what they had told us they wanted to hear from us

14   was that they, quote, "better want to understand the social

15   commerce market."  So that's essentially what they told us.

16       And, however, my -- my read on the questions they were

17   asking us had nothing to do with social commerce market.  It

18   had to do they just wanted to know what our product and feature

19   road maps was for our ratings and reviews and QA products.

20   Q.   Okay.  You then go on to say, quote:  (reading)

21           "My take is that there really isn't a market for them

22       to understand (as it relates R & R), it is us or

23       PowerReviews and in the game of big clients, we win.  Here

24       is why:

25           "One, elephants don't mate with bunny rabbits."
```

1      And then you go into that.  (reading)

2          "And, two, our product vision and strategy is an

3      enterprise strategy.  PR's is a software tool strategy,"

4      closed quote.

5      Can you disaggregate all that?  For example, what did you

6      mean by, "... there isn't really a market for them to

7      understand... it is us or PowerReviews"?

8  **A.**   Yeah.  Well, to be honest, I was actually a little bit

9  upset at this whole RFI that got sent out to us because it

10 seemed a little bit disingenuous that they were asking us to do

11 all this work to better understand the social commerce market

12 when it was clear from the questions that what they really were

13 asking us to do is basically compare ourselves to PowerReviews,

14 because that was motivated -- in my understanding was that this

15 whole thing was motivated off of Cathy Halligan making a call

16 into our customer.

17     So what I meant by "there isn't a market for them to

18 understand" is it didn't seem to me that they had any interest

19 or were really looking to understand social commerce.  They

20 just wanted us to explain to them how our features compared to

21 PowerReviews.  So that's what I meant by that part.

22     Do you want me to continue on with the --

23 **Q.**   Yeah.  What did you mean by "it is us or PowerReviews"?

24 **A.**   Well, it was clear to us, and we knew from our

25 relationships with Best Buy, that this whole exercise had been

1    motivated by Cathy Halligan calling and asking us to compare

2    ourselves against them.  So it was obvious to everyone that

3    really this wasn't a social commerce market understanding

4    exercise.  They just wanted to do a comparison between us two;

5    and we were the only, as far as I knew, the only people that

6    that they were even contacting for the RFI.

7    **Q.**  What did you mean, "In the game of big clients, we win"?

8    **A.**  So, as I mentioned earlier, you know, we -- we tended to

9    service large clients and PowerReviews tended to serve smaller

10   clients.  And the reason that we ended up -- the market ended

11   up looking like that, I mean, the industry kind worked like

12   that, is because we -- we designed our product to be very

13   customizable for very large clients; whereas, the PowerReviews

14   solution was more of a turnkey offering for smaller clients.

15        And not only that, because there was a lot of

16   customization, it also meant that we needed to have a pretty

17   significant client support team that would be working with

18   these large clients, and it was addressing all sorts of things:

19   Day-to-day issues with the software, customizations that they

20   wanted made, just a lot of handholding with these very large

21   clients that wanted -- you know, we used to say that all of our

22   large clients wanted to be pixel perfect; that they wanted

23   everything to be exactly the way it wanted to.  And, so, we

24   have to spend a lot of time and effort doing that.

25        So we -- we had -- the company -- or we have a company, we

1  had built a company around being able to service large clients,

2  and we felt that we were better able to do that than

3  PowerReviews could.

4      And in my experience dealing with clients of that size,

5  clients wanted to deal with a company that was the size of

6  Bazaarvoice because they knew that we had all the client

7  support people, all the technical support people, all the, you

8  know, engineers that if we need -- that we had all the

9  engineers if we needed to fix something that got broken.

10  Q.   Okay.  Thank you.

11      Down in the middle you go off on, "Joint Strike Fighter.

12  Kill Bin Laden."  What's that all about?

13  A.   Well, you know, the Bazaarvoice -- I mean, actually pretty

14  much all sales teams in software are full of male bravado, and

15  this is kind of how it is; and just typical salesmen love that

16  sort of talk.  When you talk about you're going to fly the

17  Starship Enterprise with the phasers turned on, they love that

18  conversation.  So --

19  Q.   I hate to disillusion you, but sometimes bravado is even

20  known among litigators, not just salespeople.

21  A.   Okay.

22  Q.   When you said, "It is us or PowerReviews," did you mean

23  there were no other companies from which a customer could buy

24  ratings-and-reviews software?

25  A.   No, that's not what I meant.

DEFOSSÉ - CROSS / FELDMAN

1   Q.   Okay.  Let me hand you Government Exhibit 837.

2   A.   (Witness examines document.)

3   Q.   Have you seen that before?

4   A.   Yes, I have.

5   Q.   In the middle there's an email to you from Mr. Yun Du, as

6   we've established, called "Battle Cards for our Top

7   Competitors" --

8   A.   Yes.

9   Q.   -- and they list a bunch at the bottom.  Was it your

10  understanding that those companies were relevant to the

11  competitive environment for Bazaarvoice as of October '11?

12  A.   Yes, absolutely.  That's correct.

13  Q.   Why were you preparing -- what are battle cards for

14  competitors?

15  A.   So as part of the competitive analysis team, one of the

16  things that we did is that we would maintain a document or

17  multiple documents that would describe the capabilities and the

18  background of each of the companies that we deem to be

19  competitive; and we would, you know, on some basis update

20  those, you know, if there was a press release issued by -- by

21  that company, and so forth.

22       And these battle cards were then made available to the

23  Sales Team and the client support team in case they were in a

24  call with a customer and the customer said, "Oh, I'm looking at

25  this other solution.  What do you know about it?"  And the

DEFOSSÉ - CROSS / FELDMAN

1   salesperson could quickly reference it and have the information

2   they needed to be -- appear intelligent and make

3   recommendations.

4   **Q.**   Thank you.

5        Back to Menlogeddon.  Did Menlogeddon involve product

6   innovation on your part or was it a different type of

7   initiative?

8   **A.**   So the major thrust behind Menlogeddon was -- were two

9   things.  One, we wanted to make sure that none of our marquee

10  clients, none of our top clients or big clients that

11  Cathy Halligan had called actually ended up -- you know, we

12  ended up losing them.  Because we were preparing for an IPO and

13  we felt it would look very bad if all of a sudden in the middle

14  of the IPO road show, Home Depot were to go to PowerReviews.

15  So we were very concerned about that.

16       So that was the number one priority was we've got to

17  defend all of our clients.  That's why we issued QVRs and just

18  make sure that all of our existing clients are happy.

19       The second major element was to ensure that the

20  Sales Team, as they were going into these competitive new

21  client situations that I think were referenced in one of the

22  segments that were brought up earlier, that they had the right

23  tools to be able to sell into that client segment.

24       Because most of our -- because what they were doing at

25  that time included selling into the small retailer space, we

DEFOSSÉ - CROSS / FELDMAN

1    needed to give them essentially new tools to be able to do that

2    because we historically hadn't -- I mean, we mainly serviced

3    larger clients historically.  So that was the second thing.

4        And then the third thing was, indeed, to dispel any

5    concerns that our client had about this open syndication

6    network.

7    **Q.**   The folks at Bazaarvoice seemed to have very passionate

8    feelings about PowerReviews in 2011.  Why do you think that

9    was?

10   **A.**   I think it was the combination of all these things

11   happening at the same time.  You know, we show up at our

12   conference and all of a sudden all of our clients are getting,

13   you know, misinformation from PowerReviews in the middle of

14   our, you know, retail -- of our client conference.

15       All of a sudden we start getting, you know, emails from

16   our -- many of our large clients saying, "Hey, you know, I've

17   been contacted by the CMO at PowerReviews and we should talk."

18       Anything -- anything like that is -- you know, puts the

19   client success team in any company will make them paranoid

20   because their job is to maintain those accounts.

21       So there was a lot of talk about that; and, yeah, so there

22   was just a lot of marketing, a lot of press, and a lot of

23   things happening.

24   **Q.**   Would you say that in 2011 PowerReviews was successful in

25   getting under your skin?

1   **A.**    Absolutely.

2   **Q.**    Were they successful in stripping away any major

3   customers?

4   **A.**    Not that I'm aware of.

5   **Q.**    Okay.  I want to talk about In-Line SEO and regular SEO.

6   I know you're a rocket scientist, but I want you to bring it

7   down a notch.

8        Could you explain the differences between how Bazaarvoice

9   handled search engine optimization and PowerReviews did?

10        **MR. BONANNO:**  Objection.  Foundation.

11  BY MR. FELDMAN:

12  **Q.**    Are you familiar with how Bazaarvoice handled search

13  engine optimization?

14  **A.**    Yes, I am.

15  **Q.**    Are you familiar with how PowerReviews claimed to handle

16  search engine optimization?

17  **A.**    Yes, I am.

18  **Q.**    What were the differences?

19  **A.**    So -- yeah.  So I'm going to try to be as, you know, not

20  as technical and try to put it in normal terms.

21        The way in which our products were built were completely

22  different.  We built our solution with the idea that we wanted

23  to host all the software on our servers, and PowerReviews built

24  their solution with the idea that they were going to be sending

25  data to the servers of their clients that would then show their

1    reviews.  So that's sort of the big picture, hosted versus

2    nonhosted, was kind of like -- and there's some nuances there,

3    but essentially that's the big picture.

4        So when SEO became all of a sudden an important topic for

5    our clients, the first thing that they asked -- and what I mean

6    by "SEO," I mean In-Line SEO and I'll explain that in a

7    second -- we had to figure out how do we actually allow review

8    content that is being hosted by us to be seen by Google.

9        And the issue there is that when Google goes onto a Web

10   site of one of our customers, if we were hosting the reviews on

11   our Web site, Google can't see those reviews.  This is how

12   technically -- you know, this is how it used to work.

13       Our clients had historically actually not wanted us to put

14   the reviews on their pages because in the 2005-2006 time frame,

15   there was a lot of companies that had spent a lot of time doing

16   something called SEO optimization; and what that means is that

17   they were tailoring the pages that they had for their products

18   and putting in the right words that they felt were the words

19   that Google was going to pick up, and it was going to use to

20   give them a high ranking.

21       However, I think it was 2008 or 2009, I don't remember the

22   exact date, Google did a change in the way in which they ranked

23   pages and they now said, "Well, in addition to being optimized,

24   you have to have fresh and dynamic content on your page."  That

25   led to this whole In-Line SEO topic.  Which the question was:

DEFOSSÉ - CROSS / FELDMAN

1    If we need to have dynamic content on the page, why don't we

2    put reviews on the page?  Because those are the pieces of

3    content that are always changing and, therefore, Google was

4    going to like that.

5        Okay.  So we got that request from our clients, and we

6    developed a solution called SVI, SearchVoice Inline, which what

7    it did essentially was it took the reviews that we were

8    collecting, we would ship them, we would electronically ship

9    the files of the reviews, the reviews, the review content, to

10   our client and then they would include those reviews in their

11   Web pages, in their product pages.

12       When a consumer would show up and see the page, what would

13   happen is that we have software that would determine, "Are you

14   a human reading this or are you Google reading it?"  If you

15   were a human reading it, then what we would do is we would go

16   back to our servers and we would show the consumer the most

17   recent reviews.

18       And we felt that that was a big advantage over the way

19   PowerReviews did it, because we could get the In-Line SEO

20   component, Google could see now the reviews, but we would also

21   give the consumer the most recent reviews; and we innovated

22   that with something called SVI, which was the predecessor to

23   Smart SEO.

24       What PowerReviews was doing all along was doing only the

25   part where you take the reviews, ship them to the client, and

DEFOSSÉ - CROSS / FELDMAN

1   then they are integrated onto the Web site.  And they did that

2   because that's essentially how their technology worked to begin

3   with; whereas, ours was cloud based.

4   **Q.**   Where PowerReviews was talking about its In-Line SEO

5   advantages in 2011, was it your understanding that anything had

6   changed about their product or it was the same as it had been

7   before?

8   **A.**   I wasn't aware of any new innovations in their products.

9   The only thing that I was aware of is that, and this goes back

10  to the irritation factor with PowerReviews, is that for some

11  reason they kept claiming that our product didn't do

12  In-Line SEO, which was factually incorrect.

13  **Q.**   Did you innovate at any point in SEO in response to

14  customer requests?

15  **A.**   Always.

16  **Q.**   Was there something different between the U.S. and Europe?

17  **A.**   Yes, actually, and that's what led to the innovations

18  around Smart SEO, which was the follow-on product to SVI.

19  **Q.**   What was the difference?

20  **A.**   So when we came up with SVI, what we were doing is we were

21  taking these reviews, shipping them to the client, and then the

22  client was putting them out to their pages; and they were

23  putting them out to their pages inside a piece of code called

24  the NoScript block.  It's a technical issue, but it's a legacy

25  thing actually back from the early '90s.

DEFOSSÉ - CROSS / FELDMAN

1   **Q.**   NoScript block?

2   **A.**   NoScript.  Yeah.  N-O-S-C-R-I-P-T.

3        And that worked perfectly fine.  We had actually talked to

4   Google about that to make sure that when we developed the

5   solution, that that was going to be technically okay with them;

6   and they gave us the green light and said, "No problem."

7        However, in Europe, for some reason that we still don't

8   understand clearly, our clients in Europe felt that having the

9   content in the NoScript block was actually detrimental to their

10  search rankings, and this stemmed -- my understanding was it

11  stemmed from the fact that European retailers actually believed

12  that Google was favoring U.S. search rankings ahead of European

13  search rankings when people did searches; and one of their

14  mythologies around that was it had to do with this NoScript

15  thing.

16       So we started getting feedback from clients in Europe

17  saying, "Hey, we don't like the way your NoScript -- they way

18  you're doing it with NoScript."  We never had that feedback, at

19  least I'm not aware of, that feedback coming from anyone in

20  North America.

21       And we went and we hired a consultancy in London, two

22  consultancies, one in London and one in the U.S., to review our

23  solution just so we could have a third-party validation that

24  NoScript -- our NoScript solution worked fine.  And, in fact,

25  they essentially concluded the same thing that we had

1  concluded, that it worked.

2      However, we realized that even -- no amount of consultancy

3  was going to erase the skepticism that Europeans had around

4  search rankings.  So we went ahead and decided that we needed

5  to get rid of the NoScript piece and come out with a new

6  solution, with a new name that completely erased the whole

7  concept from NoScript from our European customers' minds and we

8  innovated Smart SEO.

9      That wasn't the only thing that we did with Smart SEO,

10  there were some other advantages, but that was one of the major

11  ones.

12  Q.  Are you able to give an estimate of how much development

13  time it took to develop Smart SEO?

14  A.  You know, I'm not intimately familiar with that, but I

15  know that we have one product manager devoted to SEO; and, you

16  know, my guess is that it must have been a few months with a

17  couple engineers.  I don't -- I can't say authoritatively.

18  Q.  And was that innovation of SmartSense SEO a result of

19  customer request or of competition with PowerReviews?

20  A.  Well, Smart SEO, and then as it relates to NoScript, for

21  sure was because of customer -- direct customer request.

22  Q.  Okay.  My last topic for you is syndication of reviews,

23  which Mr. Bonanno asked you about, and he used GX30.  I wasn't

24  going to use it so I don't have copies.  I'm going to give you

25  your book back.

546

1    **A.**    (Witness examines document.)

2    **Q.**    Do you remember he talked to you about some press release

3    from PowerReviews in 2011 about a new free open syndication

4    initiative?

5    **A.**    Yeah.

6    **Q.**    And then he showed you this email from you to the Sales

7    and CS Teams, and at the beginning you said, quote:   (reading)

8              "This week PowerReviews announced their Open Social

9         Commerce Network.   We want to provide you with a set of

10        tools to address and clarify the misleading information

11        that is being shared with our clients," closed quote.

12        What did you mean?

13   **A.**    So at the time that PowerReviews made this announcement,

14   they also simultaneously sent emails to many of our client

15   contacts and announcing the fact that they wanted to do this,

16   that it was going to be for free; that, you know, it was as

17   good or better than ours, so on and so forth.

18        And what we wanted our sales reps and our client services

19   support team to understand was that, you know, I felt this was

20   just all a marketing exercise that PowerReviews was engaging

21   in, and we needed to make sure that we dispelled any notions

22   that they could do this for free; that it was easy; that, you

23   know, they were going to get the same service that we had,

24   which we felt was misleading to our clients.

25   **Q.**    Was it your sense from following PowerReviews that their

1   open syndication initiative was a technological advance or a

2   marketing program?

3   **A.**   As far as I could tell, basically it was a marketing and

4   pricing approach.

5   **Q.**   In response to PowerReviews' open syndication initiative,

6   did Bazaarvoice commercialize any new product feature?

7   **A.**   We didn't commercialize anything in the traditional sense

8   of commercialization where you go through a complete

9   development process, you involve marketing and release it and

10   do announcements, no, we didn't do that.

11          **MR. FELDMAN:**   Okay.   Thank you.   No further questions.

12          **THE COURT:**   Mr. Bonanno.

13          **MR. BONANNO:**   May I proceed?

14          **THE COURT:**   Yes.

15                         <u>**REDIRECT EXAMINATION**</u>

16   **BY MR. BONANNO:**

17   **Q.**   Mr. Defossé, I'd like to start with the question that

18   counsel asked you about the Amazon Webstore.   Do you remember

19   that line of questioning?

20   **A.**   Uh-huh.

21   **Q.**   And I think it would be helpful if we step back.   And

22   eCommerce platform is the technology that a retailer uses to

23   sell products online; right?

24   **A.**   That's correct.

25   **Q.**   So an eCommerce platform provides the shopping cart

DEFOSSÉ - REDIRECT / BONANNO

1    functionality; right?

2    A.    Generally, yes.

3    Q.    And eCommerce platform also provides order management

4    functionality?

5    A.    It depends on the eCommerce platform but, yeah, some of

6    them do that.

7    Q.    Is it fair to say at a generic level that an eCommerce

8    platform is the foundation technology to sell products online?

9    A.    Yeah.  It's the core component, yes.

10   Q.    And Amazon Webstore is an eCommerce platform offered by

11   Amazon; correct?

12   A.    Yes, that's correct.

13   Q.    And there's a number of other eCommerce platforms in the

14   market today; correct?

15   A.    Yes.

16   Q.    GSI?

17   A.    Yes.

18   Q.    Volusion?  I believe it's spelled V-O-L-U-S-I-O-N.

19   A.    Yes.

20   Q.    There's a number of other eCommerce platforms in the

21   market; correct?

22   A.    That's right.

23   Q.    And Bazaarvoice customers have, that sell products online,

24   have eCommerce platforms; correct?

25   A.    If they sell online, yes.

DEFOSSÉ - REDIRECT / BONANNO

1   **Q.**   So Bazaarvoice's products are purchased by a customer and

2   integrate with the eCommerce platform; correct?

3   **A.**   The -- I wouldn't say that in all -- you know, I don't

4   want to respond in the affirmative to integrated, but they are

5   used at the same time.  In some cases, they are integrated.  In

6   some cases, they may not be.

7   **Q.**   And, so, Amazon provides an eCommerce platform called

8   Amazon Webstore; correct?

9   **A.**   That's my understanding, yes.

10  **Q.**   And this Amazon Webstore platform has some built-in

11  ratings-and-reviews functionality; correct?

12  **A.**   Yes.

13  **Q.**   There are also other eCommerce platforms that have similar

14  functionality; correct?

15  **A.**   Yes.

16  **Q.**   And Bazaarvoice sells its products to customers that use

17  eCommerce platforms that may have built-in ratings-and-reviews

18  functionality; correct?

19  **A.**   That may have, yes.

20  **Q.**   Okay.  Isn't it true, sir, that Bazaarvoice offers a

21  ratings-and-reviews product that customers on Amazon Webstore

22  can choose to purchase?

23  **A.**   So I don't know the answer to that.  I know that we have a

24  relationship with Webstores to market our solution to the

25  Webstore customers, but I don't know exactly what the offering

1    to those customers is.  So I'm not the person to ask.

2            MR. BONANNO:  Your Honor, I'd like to put up on the

3    screen GX20.  I only have one copy in hard copy that I'll hand

4    up to the Court, and maybe we can put it on the screen for the

5    witness.  I didn't expect this to come up, so I don't have any

6    other copies right now.

7            THE COURT:  All right.

8            MR. FELDMAN:  What number?

9            MR. BONANNO:  GX20.  And we'll put it on the screen.

10           THE COURT:  Just wait for a moment.

11           MR. BONANNO:  Yes.

12           THE COURT:  Is this a document that's been stipulated?

13           MR. BONANNO:  I'm not quite sure.  Let me check on it.

14           MS. ALEPIN:  There's copies.

15           MR. BONANNO:  There's copies over there?

16           MR. BENDER:  It has been stipulated.

17           MR. HUSTON:  It has, yes, Your Honor.

18           THE COURT:  Defendants, are you ready to proceed with

19   this?

20           MR. FELDMAN:  Yes, Your Honor.  Thank you.

21   BY MR. BONANNO:

22   Q.   All right.  Mr. Defossé, this is a "how the deal was done"

23   email; correct?

24   A.   Yes.

25   Q.   And, Savannah, can we please focus in on the lower email?

DEFOSSÉ - REDIRECT / BONANNO

1      Do you see the line that reads, "Amazon Webstore is a

2  leader in SMB eCommerce"?

3  **A.**   Yes.

4  **Q.**   This means that Amazon Webstore is an eCommerce platform

5  that's used by small retailers; correct?

6  **A.**   Small-medium businesses, yes.

7  **Q.**   Okay.  And this is a "how the deal was done" email that is

8  announcing an agreement that would allow the Bazaarvoice I

9  believe it's the Express product to be sold to customers using

10  Amazon Webstore; correct?

11  **A.**   That's correct.

12  **Q.**   Okay.  Isn't it also true, sir, that the only customers

13  who can use the ratings-and-reviews functionality that is

14  available through Amazon Webstore are customers that are using

15  Amazon Webstore as their eCommerce platform?

16         **MR. FELDMAN:**  Objection.  No foundation.

17         **THE WITNESS:**  I actually don't know the answer to

18  that.  I don't know if eCommerce component is a requirement or

19  not.

20  **BY MR. BONANNO:**

21  **Q.**   So as we sit here today, you're not aware of Amazon

22  providing ratings-and-reviews functionality to any customer

23  that is not already purchasing the Amazon Webstore eCommerce

24  platform; correct?

25  **A.**   I just have no knowledge of who they sell to and who may

1    or may not be using certain aspects of that product.

2    **Q.**   As we sit here today, sir, do you have any understanding

3    of who owns the data that is associated with ratings and

4    reviews that are collected through the Amazon Webstore

5    eCommerce platform?

6    **A.**   Like I said, I'm not familiar with the details behind

7    Amazon Webstore.

8    **Q.**   I'd like to turn to a document your counsel used during

9    his questioning, GX837.

10   **A.**   (Witness examines document.)

11   **Q.**   Do you have that document, sir?

12   **A.**   Yes, I do.

13   **Q.**   Okay.  And I'd like you to please turn to the page that

14   reads "Buddy Media Battle Card."

15   **A.**   Uh-huh, yes.

16   **Q.**   Do you see that?

17       And focus right below positioning statement where there's

18   a sentence that reads:  (reading)

19          "Buddy Media is a complementary solution to BV and we

20       have many mutual clients."

21       Did I read that correctly, sir?

22   **A.**   That's correct.

23   **Q.**   When you use the term "complementary" on these battle

24   cards, that means that the company that's listed provided

25   features and functionality that enhanced the value of the

1   products provided by Bazaarvoice; correct?

2   **A.**   No, that's not what I mean by that.

3   **Q.**   Mr. Defossé, I'd like you to turn to your deposition,

4   please, I believe it was the last exhibit in your binder,

5   page 114:21 -- starting at line 21, I apologize, through 115:4.

6   **A.**   (Witness examines document.)

7   **Q.**   Are you there, sir?

8   **A.**   115, yes.

9   **Q.**   Yes.  Sorry.  Starting at 114, line 21.

10  **A.**   Oh, okay.

11  **Q.**   You were asked the question:   (reading)

12      "**Q.**   So when you say 'the overall solution was more

13      complementary than competitive,' what do you mean by

14      'complementary' there?

15      "**A.**   So by 'complementary' again, I mean that it has

16      features and functionality that add to or enhance

17      capability -- have enhanced -- enhanced value compared to

18      what the Bazaarvoice platform offers."

19      Did I read that correctly?

20  **A.**   Yes, you did.

21          **MR. FELDMAN:**   Objection.  He omitted 114, line 4 until

22  line 21, which addresses the same subject matter.

23          **THE COURT:**   All right.  That's received.  Thank you.

24  BY MR. BONANNO:

25  **Q.**   Let's turn and talk about the Best Buy RFI that counsel

1    asked you about.  Do you remember that line of questioning,

2    sir?

3    **A.**    Yeah.  I've got it right here.

4    **Q.**    You had mentioned that after Best Buy issued the RFI,

5    Bazaarvoice scrambled to gather information to respond;

6    correct?

7    **A.**    Well, I didn't say "scrambled," but we gathered

8    information.

9    **Q.**    And Best Buy wanted the information that you provided;

10   right?

11   **A.**    I believe so, yes.

12   **Q.**    And you testified that you thought they wanted the

13   information in order to compare Bazaarvoice and PowerReviews;

14   correct?

15   **A.**    That's correct.

16   **Q.**    So they were comparing the products and services offered

17   by the two companies; correct?

18   **A.**    That was my assumption, yes.

19   **Q.**    They wanted that information in order to compare the two

20   firms?

21   **A.**    That's what I assumed, yes.

22   **Q.**    Bazaarvoice wanted to keep Best Buy as a customer; right?

23   **A.**    Yes, no question.

24   **Q.**    So Bazaarvoice provided the information that Best Buy

25   wanted so it could conduct its analysis of Bazaarvoice and

1    PowerReviews; correct?

2    **A.**    Yeah.  I mean, we responded to the RFI, which we assumed

3    was going to be compared, correct.

4    **Q.**    And you knew you were competing against PowerReviews;

5    correct?

6    **A.**    That was our assumption, yes.

7    **Q.**    I'd like to turn to Government Exhibit 18, which counsel

8    questioned you about, please.

9    **A.**    (Witness examines document.)

10   **Q.**    In this email you were seeking responses to a survey from

11   Bazaarvoice salespersons regarding competition they were seeing

12   in the field; correct?

13   **A.**    That's correct.

14   **Q.**    Sir, when you oversaw the product strategy team,

15   Bazaarvoice's sales personnel recorded competition they were

16   encountering in particular accounts in the company's sales

17   force database; correct?

18   **A.**    They were told to record the competition in the sales

19   force database.

20   **Q.**    And are you aware of any policy, during your tenure as the

21   vice president of the product strategy team, in which

22   Bazaarvoice salespersons were instructed only to record the

23   presence of PowerReviews in competitive sales opportunities?

24   **A.**    I don't recall if that happened or not.  I don't remember

25   that.

1    **MR. BONANNO:**  Your Honor, I don't have any further

2    questions for the witness at this time.

3        The one thing I wanted to raise was I neglected to move

4    several exhibits into evidence during Mr. Defossé's examination

5    that I'd like to offer into evidence now.

6        **THE COURT:**  Okay.

7        **MR. BONANNO:**  Government Exhibit 28 --

8        **MR. FELDMAN:**  Wait.  Wait.

9        **MS. ALEPIN:**  Wait.

10                 (Pause in proceedings.)

11       **MR. FELDMAN:**  No objection, Your Honor.

12       **THE COURT:**  Okay.  Admitted.

13      (Plaintiff's Exhibit GX28 received in evidence)

14       **MR. BONANNO:**  Government Exhibit 29.

15       **MR. FELDMAN:**  No objection.

16      (Plaintiff's Exhibit GX29 received in evidence)

17       **MR. BONANNO:**  Government Exhibit 32.

18       **MR. FELDMAN:**  No objection.

19      (Plaintiff's Exhibit GX32 received in evidence)

20       **MR. BONANNO:**  And Government Exhibit 1215.

21       **MR. FELDMAN:**  No objection to it being admitted into

22    evidence, but there are confidentiality issues for that client.

23       **THE COURT:**  Okay.  It's admitted.

24      (Plaintiff's Exhibit GX1215 received in evidence)

25       **MR. BONANNO:**  No further questions, Your Honor.

1      **THE COURT:**  Thank you very much.  You may step down.

2      **THE WITNESS:**  Thank you, Your Honor.

3                    (Witness excused.)

4                    (Pause in proceedings.)

5      **MS. SCANLON:**  So, Your Honor, with your permission, we

6  would like to offer some video testimony at this time.

7      **THE COURT:**  Very well.

8      **MS. SCANLON:**  It's George Waltzinger, the

9  vice president of corporate development at Bed Bath & Beyond.

10      **MR. FELDMAN:**  Your Honor, just for the record, we've

11  made objections under Federal Rule of Evidence 602 to this

12  testimony on foundation grounds.  I have no problem with them

13  showing it.  I just don't want to waive those objections, which

14  Your Honor will need to rule on at some point.

15      **THE COURT:**  All right.  I will deal with those at some

16  point.  Thank you.

17      **MR. FELDMAN:**  Thank you.

18      **THE COURT:**  Okay.  I think we're ready, Ms. Scanlon.

19      **MS. SCANLON:**  Thank you.

20                (Videotaped was played as follows:)

21     "Q.  Good afternoon.  My name is Travis Chapman, and I

22        represent the plaintiff, the United States, in this

23        matter.  I appreciate you taking the time for us today.

24        "Would you please state your full name for the record?

25     "A.  George William Waltzinger, Junior.

1    "Q.  And what's your business address?

2    "A.  650 Liberty Avenue, Union, New Jersey.

3    "Q.  Where are you currently employed?

4    "A.  I'm currently employed at Bed Bath & Beyond.

5    "Q.  How long have you been with Bed Bath & Beyond?

6    "A.  Over 22 years.

7    "Q.  What's your current title?

8    "A.  Vice president corporate development and president of

9    Harmon stores.

10   "Q.  How long have you held the title of vice president of

11   corporate development?

12   "A.  I have held that for at least 10 years.

13   "Q.  Yeah.  Can you just kind of give me an overview of

14   what your job is?

15   "A.  I head up the Harmon Division, which is a health and

16   beauty company, and I oversee the eCommerce -- eCommerce

17   platforms for Bed Bath & Beyond, and also get involved in

18   a lot of the strategic things within the organization.

19   "Q.  And Bed Bath & Beyond, what is the company?  What

20   does it do?

21   "A.  Bed Bath & Beyond is a specialty store which sells

22   home and -- home furnishing products.  We have multiple

23   divisions which comprise the universe of Bed

24   Bath & Beyond.  We have Bed Bath & Beyond.  We have Cost

25   Plus World Market.  We have Harmon, which is a health and

1    beauty company.  We have Buy Buy Baby and then the parent

2    Bed Bath & Beyond.

3    ▪Q.  You mentioned that you head up eCommerce for the

4    company; is that correct?

5    ▪A.  Correct.

6    ▪Q.  What -- in terms of your responsibilities, what does

7    that entail?

8    ▪A.  Multiple responsibilities.  Basically all the

9    responsibility for the eCommerce as far as Bed

10   Bath & Beyond is concerned reports up through me, and I'm

11   fully responsible for that concept.

12   ▪Q.  In terms of the eCommerce for Bed Bath & Beyond, what

13   Web sites does that represent?

14   ▪A.  We have BedBathandBeyond.com.  We have

15   BedBathandBeyond.ca which is our Canadian Web site.  And

16   we have something called the Beyond Store, which is an

17   in-store version of our Web site used by our stores.

18   ▪Q.  You also mentioned that Bed Bath & Beyond has a store

19   called Buy Buy Baby?

20   ▪A.  Correct.

21   ▪Q.  Does Buy Buy Baby have a Web site?

22   ▪A.  Yes, it does.

23   ▪Q.  Are you responsible for that Web site?

24   ▪A.  Yes.

25   ▪Q.  What is that Web site?

1    "A.   It's Buybuybaby.com.

2    "Q.   I'm handing you what's been marked as Government

3    Exhibit 561.

4         "I'll represent that I visited BedBathandBeyond.com

5    several days ago and found a page for a coffee maker and

6    printed out a screen shot of that page which resulted in

7    Exhibit 561.  Will you please take a look at it?

8    "A.   Uh-huh.

9    "Q.   To the best of your knowledge, does Exhibit 561

10   reflect what a typical product page on Bed Bath & Beyond's

11   Web site looks like?

12   "A.   Yes.

13   "Q.   You also mentioned that Bed Bath & Beyond sells

14   through Buybuybaby.com.  Does Exhibit 561 reflect the

15   general layout of a typical product page on

16   Buybuybaby.com?

17   "A.   We just relaunched our Buy Buy Baby Web site on

18   Wednesday, so it is similar but not identical.  Similar

19   layout.

20   "Q.   Looking at Exhibit 561, do you see where there's some

21   customer ratings or reviews?

22   "A.   Yes.

23   "Q.   Is ratings and reviews a feature that is generally

24   available on the pages of products for sale on

25   BedBathandBeyond.com?

1    "A.   Yes.

2    "Q.   Is ratings and reviews a feature that is also

3    generally available on the pages of products for sale on

4    Buybuybaby.com?

5    "A.   Yes.

6    "Q.   When were ratings and reviews added to

7    BedBathandBeyond.com?

8    "A.   2009.

9    "Q.   When were they added to Buybuybaby.com?

10   "A.   I'm not sure.

11   "Q.   Do you know if they were before or after Bed

12   Bath & Beyond?

13   "A.   Subsequent to Bed Bath & Beyond.

14   "Q.   Were you involved in the decision to add a ratings

15   and reviews to the company's Web site?

16   "A.   I was involved in the decision-making.

17   "Q.   Can you describe your role in that decision?

18   "A.   I was one of the final decision-makers whether to put

19   ratings and reviews onto Bed Bath & Beyond.

20   "Q.   You mentioned you were one of the final

21   decision-makers.  Who else was involved in making that

22   decision?

23   "A.   It was a group of people.  I was the ultimate

24   decision-maker.

25   "Q.   Why did Bed Bath & Beyond add ratings and reviews to

WALTZINGER - VIDEOTAPED TESTIMONY

1    its Web site?

2    **A.**  We thought it would improve conversion.

3    **Q.**  Looking at it in 2009, was there any competitive

4    implication to Bed Bath & Beyond not having ratings or

5    reviews on its Web site?

6    **A.**  The competitive environment had -- the competitive

7    environment in 2009 had most -- had ratings and reviews,

8    so we wanted to be similar to them as well.

9    **Q.**  Did you feel that Bed Bath & Beyond was at a

10   competitive disadvantage without ratings and reviews on

11   its Web site?

12   **A.**  Yes.

13   **Q.**  Did Bed Bath & Beyond consider building a

14   ratings-and-reviews solution internally?

15   **A.**  After 2009, no.

16   **Q.**  Why not?

17   **A.**  There were players out there that we thought could

18   actually perform the service better than we could

19   internally develop.

20   **Q.**  Why didn't you believe that you could internally

21   develop a system like the others had?

22   **A.**  The cost of -- basically the cost of developing a

23   system like this would have been significant and the

24   economics would show you that the third party would do it

25   as well, if not better, and more economically.

1    "Q.  When you considered whether or not to build a system

2    in-house, did you consider the ongoing maintenance cost of

3    such a system?

4    "A.  Yes.

5    "Q.  How did that factor into your decision, if at all?

6    "A.  We made a decision based upon looking at all those

7    factors, the capital, the ongoing expense, and also the

8    ability to keep up with what was in the marketplace, and

9    made the conclusion that the third party made the most

10   economical and best prudent decision for our company.

11   "Q.  When Bed Bath & Beyond made the decision to find a

12   third party to supply ratings and reviews, did the company

13   issue a request for a proposal?

14   "A.  We issued something called a BRD, business

15   requirements document, to multiple third-party providers.

16   "Q.  Who did you issue a BRD to?

17   "A.  I don't recall the exact number or names.

18   "Q.  Do you recall the names of the companies that

19   responded to your BRD?

20   "A.  I know -- I know two that did.  PowerReviews and also

21   Bazaarvoice.

22   "Q.  Do you recall the name of any other company that

23   responded to the BRD?

24   "A.  I do not.

25   "Q.  Was any other company, besides PowerReviews and

1      Bazaarvoice, seriously considered to supply

2      ratings-and-reviews functionality to Bed Bath & Beyond's

3      Web sites?

4          "MR. BRADLEY:  In 2009?

5      "Q.  In 2009.

6      "A.  We came to the conclusion the two primary players

7      that we would determine that could satisfy our needs were

8      PowerReviews and Bazaarvoice, the key players.

9      "Q.  In 2009, were Bazaarvoice and PowerReviews each aware

10     that the other was bidding for your business?

11     "A.  I believe so.

12     "Q.  Why do you believe so?

13     "A.  There was a competitive bidding process going on

14     during that time.

15     "Q.  You mentioned a competitive bidding process.  Can you

16     describe that to me?

17     "A.  It's what we call a business requirement document.

18     We would have actually put that out saying, 'Here is what

19     our requirements are and what our needs are,' and ask

20     different third parties to bid on that proposal.

21     "Q.  And both PowerReviews and Bazaarvoice bid on that

22     proposal?

23     "A.  I believe so, yes.

24     "Q.  Looking specifically at PowerReviews, did Bed

25     Bath & Beyond negotiate with PowerReviews beyond that

1       initial submission?

2       "A.   PowerReviews and Bazaarvoice were the final two that

3       we chose to move forward with, and we came to the

4       conclusion that Bazaarvoice was -- was the ultimate

5       winner.

6       "Q.   Before you made the decision to go with Bazaarvoice,

7       did you have any discussions with PowerReviews beyond the

8       initial submission?

9       "A.   I did not.

10      "Q.   Did Bed Bath & Beyond?

11      "A.   I believe so.

12      "Q.   Why do you believe so?

13      "A.   There was a negotiation going back and forth

14      understanding the functionality, understanding the

15      pricing, understanding that the management teams would be

16      there to support our teams, and I was part of the

17      decision-making.

18      "Q.   Thank you.

19          "In the summer of 2012, did Bazaarvoice offer to renew

20      its contract with Bed Bath & Beyond?

21      "A.   They didn't offer that directly to me.

22      "Q.   But did they offer to renew their contract with the

23      company?

24      "A.   There was contract negotiations during -- during the

25      summer.

1    "Q.  Were those contract negotiations related to renewing

2    the contract between Bazaarvoice and Bed Bath & Beyond?

3    "A.  Correct.

4    "Q.  Did Bazaarvoice attempt to raise Bed Bath & Beyond's

5    price at that time?

6    "A.  The initial proposal was much high -- was higher than

7    the original amount.

8    "Q.  How much higher was Bazaarvoice's initial proposal?

9    "A.  From a pure dollars perspective increase-wise it was

10   in excess of 30 -- from a dollars perspective, it was an

11   increase of 33 percent.

12   "Q.  To your knowledge, did the proposal include any

13   increased functionality for Bed Bath & Beyond?

14   "A.  That proposal, no, except for the ability -- there

15   was some unlimited -- there was not a cap -- there was not

16   a cap on it when it came to the number of reviews we could

17   have on our site.

18   "Q.  Had there previously been a cap?

19   "A.  Correct.

20   "Q.  Was that a change that Bed Bath & Beyond requested?

21   "A.  I think it was mutually negotiated.

22   "Q.  Sure.  You said that there was a change to the

23   proposal.  Did that going to unlimited reviews account for

24   the 35 percent proposed price increase?

25   "A.  We did not -- we did not believe so.

1   **Q.**  Why not?

2   **A.**  We ended up settling on a much lower amount.

3   **Q.**  What did you end up settling at?

4   **A.**  We ended up settling closer to 11 percent.

5   **Q.**  So Bed Bath & Beyond renewed their contract with

6   Bazaarvoice paying an 11 percent price increase?

7   **A.**  According to our calculations, correct.

8   **Q.**  Do you recall when that contract was signed?

9   **A.**  In the fall of 2012.

10  **Q.**  In light of the initial proposed price increase, did

11  Bed Bath & Beyond seriously consider any other vendors in

12  2012?

13  **A.**  At that time, no.

14  **Q.**  Why not?

15  **A.**  Bazaarvoice was a very good partner; and we figured

16  if we could stay with them, that would be the easiest

17  course for us as long as the economics made sense.

18  **Q.**  Why would staying with Bazaarvoice be the easiest

19  course?

20  **A.**  The cost of moving from one platform to another, the

21  intellectual capital to do so, on our IT side to do so,

22  and the potential of economic costs for hardware and

23  software.  So it was an economics -- economic decision and

24  also their service level has been -- was very good.

25  **Q.**  Did Bed Bath & Beyond consider dropping ratings

1    reviews altogether because of the proposed price increase?

2    **A.**   No.

3    **Q.**   Why not?

4    **A.**   The power of the reviews since we've had them on our

5    site since 2009 has shown a -- a very nice benefit to our

6    consumer.

7    **Q.**   What types of benefits has it shown?

8    **A.**   It shows impartial views of products that aren't

9    biased by a third party or the company.

10   **Q.**   Based on your experience, do customers find them

11   valuable?

12   **A.**   My personal experience, yes, I do.

13   **Q.**   If Bed Bath & Beyond were to drop ratings and

14   reviews, would you be at a competitive disadvantage?

15   **A.**   Yes.

16   **Q.**   Why do you say that?

17   **A.**   My previous testimony about it being industry

18   standard and the ability for a customer getting an

19   unbiased opinion on the product relates to ultimate sales

20   and a better experience on our site.

21   **Q.**   You spoke earlier about the fact that Bazaarvoice and

22   PowerReviews were the ones that came back; but, to your

23   knowledge, is it possible that other ratings-and-reviews

24   providers did respond to the BRD to Bed Bath & Beyond?

25   **A.**   I would think other people did respond.  The team

1    came to the conclusion that there were only two players

2    that could satisfy a retailer of our size and that we

3    would feel comfortable with, and the other players were

4    deemed unacceptable to our organization.

5    "Q.  So you don't know whether PowerReviews satisfied --

6    offered all the functionality needed by Bed Bath & Beyond

7    in 2009?

8    "A.  I keep on telling you the same thing over and over

9    again.  PowerReviews and Bazaarvoice were similarly

10   situated when it came to the service level they provided,

11   and it came down to economics, some service-level

12   differences, and the team they were putting on to support

13   us.  No other player -- no other player satisfied us the

14   way those two players did back in 2009.

15   "Q.  And did you discuss why it was that Bazaarvoice was

16   proposing an incremental increase in fees in 2012?

17   "A.  Yeah, that was discussed.

18   "Q.  Okay.  And what was -- what did you discuss about

19   that?

20   "A.  We discussed that it was unfathomable that someone

21   would actually increase our rate based upon a growth rate

22   of 33 percent when the actual structure, the

23   implementation cost, and the cost of maintaining what we

24   had built would in no way near cost 33 percent.

25   "Q.  And how did you come to that conclusion that it would

 1      not cost 33 percent?

 2      "A.  If you looked at what -- the services of what was

 3      provided, you are looking at the hosting cost, server

 4      cost, and you're looking at software costs.  Software

 5      costs were already -- already installed and developed;

 6      hardware costs, inflation actually has gone down; and the

 7      labor cost in order to support us, inflation is 2 to

 8      3 percent for labor rates.  We didn't understand why if we

 9      had a 33 percent increase, you are quoting here as far as

10      ratings and reviews, why there would be a corresponding

11      33 percent in increased costs.

12      "Q.  Have you done an estimate of what the costs would be

13      of moving from one platform to another in 2012?

14      "A.  We always look at every project on an individual

15      basis, and the intellectual capital used to do this

16      project or something else, the added value of the same

17      provider to do a similar -- similar type thing would not

18      be our top priority.  Our top priority would be doing

19      something that would actually help service our customers.

20      If we already -- we already have something that does that

21      already, we would not want to do that.

22          "The intellectual capital would be from the IT side

23      and from the business side and from the eCommerce

24      operations side, which would be something that we wouldn't

25      think would be a large benefit for the organization if we

1    already had provided that and it worked well.

2    **Q.**  So, in your opinion, would an internal

3    ratings-and-reviews system be possible for Bed

4    Bath & Beyond?

5    **A.**  I would say the economics to do that versus doing

6    what we're doing currently right now would be challenging

7    for us.

8    **Q.**  And what are those economics?

9    **A.**  Well, looking at one of your exhibits, we came to the

10   conclusion that it was less than $192,000 a year.  So I

11   think doing something internally would cost probably in

12   excess of that and maintaining it -- maintaining it.

13   **Q.**  What is the expertise, in your mind, of Bazaarvoice

14   for ratings and reviews?

15   **A.**  I think Bazaarvoice and PowerReviews were the two

16   players who really understand that industry very well and

17   have seen their clients do pretty well.

18   **Q.**  So how is it that you come to the conclusion that

19   Bazaarvoice has an expertise in ratings and reviews?

20   **A.**  We have come to the conclusion that those,

21   PowerReviews and Bazaarvoice, were the two primary

22   third-party providers and that's the conclusion we came

23   to.  And you can challenge that if you want, but

24   ultimately that's the conclusion that the -- that the team

25   came up with and that's why we went with them.

1    ▪Q.   Since 2009, have you canvassed the market to see if

2    there were any other ratings-and-reviews providers out

3    there?

4    ▪A.   I have not.

5    ▪Q.   Has anyone on your team?

6    ▪A.   I'm sure someone on our team -- people on our team

7    have done that.

8    ▪Q.   Have they presented to you on that?

9    ▪A.   The team came to the conclusion when we were talking

10   about the Bazaarvoice contract that there were only two

11   players that we would still feel comfortable with.  That

12   was PowerReviews and Bazaarvoice.  So we decided that

13   Bazaarvoice was the incumbent.  We wanted to stay with

14   them and try to move ahead.

15   ▪Q.   So let's go back to that in 2012.  In 2012, your team

16   presented to you saying that there were still only two

17   providers, PowerReviews and Bazaarvoice; is that what

18   your -- is that your testimony?

19   ▪A.   There were still two players at that point in time

20   2003.  In the summer of 2012, they are considered one

21   player now, which was not good.  And we went down the path

22   of saying, 'Oh, we have an incumbent here.  Let's try --

23   let's try and negotiate with this incumbent.  We have been

24   happy with their services, been happy with their service

25   team.  Let's go down that path.'

1    "Q.  So wouldn't it be -- wouldn't it be in your best

2    interest to use the presence of a competitive alternative

3    to Bazaarvoice to obtain a lower price?

4    "A.  You would always like to have competition out there.

5    It helps out the marketplace.  And if you only have one

6    competitor out there that you can use as a viable

7    solution, that's not a good position for the company to be

8    in.

9    "Q.  How have you come to the conclusion that Bazaarvoice

10   is only -- is the only viable solution for your

11   ratings-and-reviews needs?

12   "A.  In 2009, we went through an RFP.  We came to the

13   conclusion then.  In 2012, we had discussions about who

14   the players were, and we came to the conclusion that since

15   Bazaarvoice was a Tier 1 player who could help -- help

16   provide us with the service level we expected and their

17   price seemed fair, we'd move ahead with them.

18   "Q.  And in 2012 you said you discussed the players.  Did

19   you discuss Pluck?

20   "A.  I never said -- I said there wasn't -- in this

21   conversation that we -- we've -- Pluck, I've never really

22   seen nor heard of them, so I'm not sure where you're -- I

23   mean, my team might have heard of them, and they probably

24   came to the conclusion they wouldn't be able to satisfy

25   us.  And they came to the conclusion that the two players

 1     that could have were Bazaarvoice and PowerReviews.  That's

 2     the conclusion that the team came up with.  You can argue

 3     the conclusion is wrong, but that's the conclusion that

 4     they came up.

 5     "Q.  So are you sure -- are you -- how did you come to the

 6     conclusion that the PowerReviews could service your needs

 7     in 2012?

 8     "A.  In 2009 we came to that conclusion that PowerReviews

 9     and Bazaarvoice could service our needs.  We had a team of

10     people that keep up within the industry of what's going on

11     there.  We came to the conclusion those are the two

12     players that can still service us.  The other players were

13     deemed not sufficient either by their size or their

14     ability or their team they could put in place or how long

15     they had been in business.  We -- we stake our reputation

16     with our customers -- we would stake our reputation of our

17     customers with an inferior product or possibly an inferior

18     product."

19          MS. SCANLON:  Your Honor, I believe defendants have a

20     portion of the video they want to play as well.

21          THE COURT:  Excellent.

22          (Videotaped was played as follows:)

23     "Q.  Did both Bazaarvoice and PowerReviews meet your

24     technical requirements for ratings-and-reviews

25     functionality?

1    "A.   I don't recall the specifics.

2    "Q.   Did each of the initial proposals have a price?

3    "A.   I don't recall.

4    "Q.   And to your knowledge, did PowerReviews adjust the

5    price that they had initially offered to Bed Bath & Beyond

6    for their services?

7    "A.   I don't recall.

8    "Q.   Turning to Bazaarvoice, do you know if Bazaarvoice

9    adjusted the price over the course of the negotiations?

10   "A.   I don't recall specifics.

11   "Q.   Do you know if Bed Bath & Beyond discussed the offer

12   they had from PowerReviews with Bazaarvoice in the course

13   of the negotiations?

14   "A.   I -- I don't know.

15   "Q.   At that time did you investigate any other potential

16   alternatives to Bazaarvoice for ratings and reviews?

17   "A.   We were trying to work exclusively with Bazaarvoice.

18   "Q.   Did you discuss Bazaarvoice's acquisition of

19   PowerReviews during your conversation with the Department

20   of Justice?

21   "A.   I don't recall specifics about that, about the

22   acquisition, no.

23   "Q.   And what did you discuss specifically concerning

24   PowerReviews?

25   "A.   During that conversation, we discussed the -- the

1    idea of whether we thought that there were multiple

2    players out and why we concluded about Bazaarvoice; and we

3    concluded back -- we went back to 2009 when we went

4    through the BRD, that we thought there were -- we put an

5    RFP out for multiple players, and we only came back with

6    two, PowerReviews and Bazaarvoice.  And that was the

7    conclusion we had come to again in 2012, and since

8    Bazaarvoice was the incumbent and we wanted to stay with

9    that incumbent.

10   "Q.  Okay.  And when you say in 2012 you had come to that

11   same conclusion, what did you do to make yourself familiar

12   with whether there were other ratings-and-review providers

13   out there in August of 2012?

14   "A.  Me personally, I did not.  My -- my staff had done

15   that.

16   "Q.  Did they present to you about a company by the name

17   of Pluck?

18   "A.  No.

19   "Q.  Did they present to you about the -- about a company

20   named Reevoo?

21   "A.  No.

22   "Q.  So are you -- and did they present to you about a

23   company named Gigya?

24   "A.  No.

25   "Q.  Are you familiar with the capabilities offered by any

 1     of those companies?

 2     **A.**  I am not.

 3     **Q.**  What were the technical requirements that were in

 4     that BRD?

 5     **A.**  I don't have specific knowledge of that.

 6     **Q.**  Was syndication a requirement that was in the initial

 7     BRD?

 8     **A.**  In 2009?

 9     **Q.**  Yes.

10     **A.**  I don't know.

11     **Q.**  You don't know or no?

12     **A.**  I don't know.

13     **Q.**  Okay.  How about custom -- a custom implementation,

14     is that something that was in the BRD?

15     **A.**  I don't know.

16     **Q.**  So in 2009, do you know if syndication was something

17     that PowerReviews offered?

18     **A.**  I don't recall the specifics of that negotiation or

19     that thought process --

20     **Q.**  Okay.  Do you know --

21     **A.**  -- in 2009.

22     **Q.**  -- if a custom implementation was something that

23     PowerReviews offered in 2009?

24     **A.**  I think you asked that question before, and the

25     answer was I am not sure.

1    "Q.  Are you aware if there were differences in the

2    functionality offered by PowerReviews and Bazaarvoice in

3    2009?  I'm sorry.

4    "A.  I was not involved in the details of -- of that.

5    "Q.  Okay.  Are you aware if PowerReviews offered all the

6    functionality that Bed Bath & Beyond did in 2009?

7    "A.  I was not involved in the details of that.

8    "Q.  So can you describe for me the differences between

9    Bazaarvoice and PowerReviews' services in 2009?

10   "A.  No.

11   "Q.  Did you sit in on any meetings with PowerReviews

12   concerning their functionality?

13   "A.  I don't recall.

14   "Q.  Did you meet with PowerReviews at any time in 2009?

15   "A.  I don't recall.

16   "Q.  Today if you were selecting a ratings-and-review

17   provider, would syndication be something that would be

18   necessary for the providers to offer for Bed Bath & Beyond

19   to go with that specific provider?

20   "A.  Currently I believe syndication is offered by

21   Bazaarvoice, and we've elected not to -- not to use that.

22   "Q.  Okay.  So, to your knowledge, Bed Bath & Beyond does

23   not employ any -- does not receive syndicated reviews from

24   its manufacturers?

25   "A.  That is correct.

1    "Q.  And has Bazaarvoice done any custom implementation

2    for Bed Bath & Beyond?

3    "A.  I don't know.

4    "Q.  Okay.  Is it possible that they have?

5    "A.  I'm sure -- anything is possible, sure.

6    "Q.  After Bazaarvoice provided the initial RFP, they

7    responded to the initial RFP, do you know if Bazaarvoice

8    was told that PowerReviews was also competing for Bed

9    Bath & Beyond's business?

10   "A.  I don't know if they were specifically told.

11   "Q.  Have you discussed whether it's possible to syndicate

12   reviews with manufacturers?

13   "A.  We've had internal discussions and chosen not to do

14   that.

15   "Q.  In 2009, did you estimate the costs, the initial

16   costs, for building an internal ratings-and-reviews

17   solution?

18   "A.  2009, no.

19   "Q.  Did you estimate the ongoing costs for building an

20   internal ratings-and-reviews solution?

21   "A.  We came to the conclusion that a third party would be

22   the best solution for us based upon the initial

23   conversations that we had with some of these players.

24   "Q.  Did you do a cost of -- did you do an estimate of the

25   ongoing costs for an internal build in 2009?

1    "A.  I don't remember the exact analysis which we put

2    together.

3    "Q.  Did any engineers participate in the process of

4    estimating -- of determining whether Bed Bath & Beyond

5    could implement an internal ratings-and-reviews solution?

6    "A.  I don't know.

7    "Q.  And when did you do that estimate of how much it

8    would cost for an internal build?

9    "A.  The cost of any implementation is significant; and we

10   came to the conclusion that if the system is already built

11   and we're very happy with it, we already have established

12   since 2009, that was a system that we would have -- we'd

13   want to stay with.

14   "Q.  Okay.  When you say 'significant,' how much are

15   you --

16   "A.  I told you we didn't do that specific analysis.  We

17   didn't think we had to because we were happy with what

18   the -- ultimately what we ended up with was Bazaarvoice

19   and the cost.

20   "Q.  Have you analyzed technically what Bazaarvoice

21   provides to you?

22   "A.  I have not.

23   "Q.  Have you attended any eCommerce trade shows in the

24   last two years?

25   "A.  Yes.

1    "Q.  Which ones have you attended?

2    "A.  I don't recall.

3    "Q.  ETail West?

4    "A.  Etail -- I don't -- I have done numerous ones.  I

5    don't recall the exact ones.

6    "Q.  Okay.  And at those trade shows, did you encounter

7    any rating-and-reviews providers?

8    "A.  I don't recall.

9    "Q.  Since 2009, have you canvassed the market to see if

10   there were any other ratings-and-reviews providers out

11   there?

12   "A.  I have not.  I'm sure someone on our team -- people

13   on our team have done that.

14   "Q.  Do you know if they met with any other

15   ratings-and-reviews providers to explore the functionality

16   offered by them?

17   "A.  I don't know that specifically.

18   "Q.  Okay.  Do you know if they met with Pluck?

19   "A.  I don't know.

20   "Q.  Do you know if they evaluated Pluck's products?

21   "A.  I don't know that.

22   "Q.  Have you ever met with Gigya?

23   "A.  I don't know.

24   "Q.  Do you know if they evaluated Gigya's product?

25   "A.  I don't know.

1    "Q.   So do you keep abreast of other providers in the

2    ratings-and-reviews sphere?

3    "A.   I personally do not.  I have a team of people that

4    do.

5    "Q.   And do you ever use the threat of an alternative to

6    get a better deal from your vendor?

7    "A.   I wouldn't categorize it as a threat; but I think

8    people know that if you put out for an RFP, that more than

9    one person is going to be bidding on this.  And the idea

10   of having more than one person in the market is better for

11   competition.

12   "Q.   Did you tell Bazaarvoice in 2012 that you were

13   putting a contract out for an RFP?

14   "A.   I don't recall.  We didn't send it out for an RFP --

15   "Q.   Okay.

16   "A.   -- I don't believe.

17   "Q.   And in 2012, were there differences in the offerings

18   between PowerReviews and Bazaarvoice that you were aware

19   of?

20   "A.   I am not aware of the details of what the -- what the

21   differences are, what the functionality is.

22   "Q.   So did you evaluate PowerReviews' product in 2012?

23   "A.   We came to the conclusion it would be easier for us

24   organizationally if we were happy with Bazaarvoice, we

25   would -- we'd like to stay with them.  They were the

1    incumbent.  They satisfied our needs as far as service

2    level, all the things we talked about.

3        "The price originally, which was a 33 percent

4    increase, seemed unjustified.  After going back and forth

5    with them, we came to the conclusion of an approximately a

6    11 percent increase.  And that's what we came to the

7    conclusion with.

8    "Q.  And how did you -- let's talk about that back and

9    forth with Bazaarvoice to get from 33 to 11.  What -- what

10   did you tell Bazaarvoice in order to get the price down

11   from 33 to 11?

12   "A.  I never had direct contact with Bazaarvoice.

13   "Q.  Did you use the presence of competitive alternatives

14   to get the price down from 33 to 11?

15   "A.  I did not have direct conversations with Bazaarvoice.

16   "Q.  Okay.  So is it possible that someone mentioned

17   competitive alternatives in negotiating the price with

18   Bazaarvoice?

19   "A.  You are asking me to speculate.  I have a tough time

20   speculating.  I know that's what you want to hear, but I

21   can't tell you that because I don't know -- I don't have

22   that fact.

23   "Q.  In the summer of 2012, did Bazaarvoice offer to renew

24   its contract with Bed Bath & Beyond?

25   "A.  They didn't offer that directly to me.

1  "Q.  But did they offer to renew their contract with the

2  company?

3  "A.  There was contract negotiations during -- during the

4  summer.

5  "Q.  Were those contract negotiations related to renewing

6  the contract between Bazaarvoice and Bed Bath & Beyond?

7  "A.  Correct.

8  "Q.  Did Bazaarvoice attempt to raise Bed Bath & Beyond's

9  price at that time?

10  "A.  The initial proposal was much higher -- was higher

11  than the original amount.

12  "Q.  How much higher was Bazaarvoice's initial proposal?

13  "A.  From a pure dollars perspective increase-wise, it was

14  in excess of -- from a dollars perspective, it was an

15  increase of 33 percent.

16  "Q.  To your knowledge, did the proposal include any

17  increased functionality for Bed Bath & Beyond?

18  "A.  That proposal, no, except for the ability there was

19  some unlimited -- there was not a cap -- there was not a

20  cap on it when it came to the number of reviews we could

21  have on our site.

22  "Q.  Had there previously been a cap?

23  "A.  Correct.

24  "Q.  Was that a change that Bed Bath & Beyond requested?

25  "A.  I think it was mutually negotiated.

1    "Q.   You said that there was a change to the proposal.

2    Did that going to unlimited reviews account for the

3    35 percent proposed price increase?

4    "A.   We did not -- we did not believe so.

5    "Q.   Why not?

6    "A.   We ended up settling at a much lower amount.

7    "Q.   What did you end up settling at?

8    "A.   We ended up settling closer to 11 percent according

9    to our calculations.

10   "Q.   So Bed Bath & Beyond renewed their contract with

11   Bazaarvoice paying an 11 percent price increase?

12   "A.   According to our calculations, correct.

13   "Q.   Do you know -- does Bazaarvoice perform moderation

14   services for Bed Bath & Beyond?

15   "A.   Yes.

16   "Q.   Okay.  So if Bed Bath & Beyond has more reviews, will

17   it cost Bazaarvoice more to moderate those reviews?

18   "A.   There should be an incremental cost, but not a

19   33 percent cost.

20   "Q.   So what would, in your mind, be if there was a, let's

21   say, 33 percent increase in volume of reviews that

22   Bazaarvoice had to moderate, what would your --

23   "A.   We ultimately settled at 11 percent.  We thought that

24   was still high, but we wanted to get the thing going and

25   move forward so we settled on 11 percent.  So we went from

1    33 percent down to 11 percent.

2    ▪Q.  Okay.  And at 11 percent is there some cap on the

3    number of ratings and reviews that Bed Bath and -- that

4    Bazaarvoice will be moderating for Bed Bath & Beyond?

5    ▪A.  I don't believe so.

6    ▪Q.  Okay.  So it's possible that Bed Bath & Beyond could

7    per review, per moderating review, obtain a lower price

8    with it's new contract?

9    ▪A.  There's part of the business negotiations, which we

10   talked about earlier, where the idea of getting an

11   unlimited amount came out during that discussion --

12   unlimited amount of reviews came out during that

13   negotiations.

14   ▪Q.  Okay.  So let's say that Bed Bath & Beyond's volume

15   growth year over year increases 50 percent.  Given an

16   11 percent price increase, does that mean that per review

17   Bed Bath & Beyond would be getting a better price?

18   ▪A.  I don't know the economic model for Bazaarvoice; but

19   ultimately they came to the conclusion, knowing the risks

20   of that versus the risks of being even lower, they came to

21   the conclusion that 11 percent was appropriate for them

22   and that's what we settled upon.

23   ▪Q.  Are you aware of what the moderation costs are per

24   review for Bazaarvoice?

25   ▪A.  Not specifically, no.

 1          "Q.  Okay.  So you don't know whether an increase in

 2     volume growth year over year leads to increased costs or

 3     what increased costs would be for Bazaarvoice?

 4          "A.  I don't have insight to the Bazaarvoice model.

 5          "Q.  Do you know if Bazaarvoice incurred any fees for

 6     launching Canada for the first time for Bed Bath & Beyond?

 7          "A.  I don't know.

 8          "Q.  And do you know if that was factored into the price

 9     that was offered by Bazaarvoice in 192,000?

10          "A.  I don't know.

11          "Q.  And before when you said that there were no increased

12     services, are you aware if the Canada implementation would

13     have been an increase -- would have been additional

14     service?

15          "A.  I don't know."

16          MS. SCANLON:  Your Honor, with your permission, we

17     have one additional short segment and then we'll be finished.

18          THE COURT:  Okay.

19          MS. SCANLON:  Thank you.

20               (Videotaped was played as follows:)

21          "Q.  Okay.  And what did you discuss specifically

22     concerning PowerReviews?

23          "A.  During that conversation, we discussed the -- the

24     idea of whether we thought that there were multiple

25     players out and why we concluded about Bazaarvoice; and we

 1     concluded back -- we went back to 2009 when we went

 2     through the BRD, that we thought there were -- we put an

 3     RFP out for multiple players, and we only came back with

 4     two, PowerReviews and Bazaarvoice.  And that was the

 5     conclusion we had come to again in 2012, and since

 6     Bazaarvoice was the incumbent and we wanted to stay with

 7     that incumbent.

 8     "Q.  Okay.  And when you say in 2012 you had come to that

 9     same conclusion, what did you do to make yourself familiar

10     with whether there were other ratings-and-review providers

11     out there in August of 2012?

12     "A.  Me personally, I did not.  My -- my staff had done

13     that.

14     "Q.  Okay.  And did they present to you about whether

15     there were other options out there in the market?

16     "A.  What I was told was that the two players still out

17     there were still -- once again, were PowerReviews and

18     Bazaarvoice, and Bazaarvoice was the incumbent and it was

19     in our best interest to work with those guys and try to

20     get a contract done.

21     "Q.  So can you describe for me the differences between

22     Bazaarvoice and PowerReviews' services in 2009?

23     "A.  No.

24     "Q.  Okay.  So how was it you can come to the conclusion

25     that they offered similar services?

1    "A.  We put out -- like I described before, we put out a

2    BRD, business requirement document; and that business

3    requirement document laid out each one of those factors,

4    the pluses and minuses.  And we came to the conclusion,

5    after having that for multiple players, that PowerReviews

6    and Bazaarvoice were the two that potentially could meet

7    our needs, and we went into further negotiations at that

8    time.  And we ultimately came to the conclusion that

9    Bazaarvoice was the right player for us.

10   "Q.  So if Bed Bath & Beyond has more reviews, will it

11   cost Bazaarvoice more to moderate those reviews?

12   "A.  There should be an incremental cost but not a

13   33 percent cost.

14   "Q.  Well, what would the -- what would your estimate of

15   the incremental costs, then, be per review, per volume of

16   review increase?

17   "A.  I wouldn't know that; but looking at the things that

18   were provided to us, that was a fraction of what was being

19   provided.  And if they say rate increased based upon that,

20   it seemed preposterous to us.

21   "Q.  And when did you do that estimate of how much it

22   would cost for an internal build?

23   "A.  The cost of any implementation is significant; and we

24   came to the conclusion that if the system is already built

25   that we're very happy with, we already have established

1    since 2009, that was the system we would have -- we'd want

2    to stay with.

3    "Q.  Okay.  When you say 'significant,' how much are

4    you --

5    "A.  I told you we didn't do that specific analysis.  We

6    didn't think we had to because we were happy with what

7    the -- ultimately what we ended up with was Bazaarvoice

8    and the cost.

9    "Q.  So how is it that the economics are such that a

10   third-party provider is better than an internal analysis

11   if you haven't done a cost estimate?

12   "A.  The cost of having a third party versus the cost of

13   trying to hire a third party to develop it for us, we -- I

14   would think, looking at the economics of which we were

15   shown here, that it would be more expensive to go down a

16   third party.  And I would think that a lot of

17   Bazaarvoice's customers would think the same thing or they

18   wouldn't be doing it as well.

19   "Q.  Okay.  Have you analyzed technically what Bazaarvoice

20   provides to you?

21   "A.  I have not.

22   "Q.  Has someone on your team analyzed it for you and

23   reported that analysis to you?

24   "A.  There's no analysis of -- there is a summarization of

25   the functionality which Bazaarvoice currently has and

1        offers; and some we take advantage of, some of them we

2        don't.  And, so, we have, as an organization, we have an

3        understanding -- we have an understanding of that."

4            **MS. SCANLON:**  Thank you, Your Honor.

5            **THE COURT:**  Okay, Ms. Scanlon.

6        So we are quarter to 1:00.  Do you have 15 minutes or

7   should we break for the day and come back tomorrow at 8:00?

8   What's your pleasure?

9            **MR. HUSTON:**  Your Honor, I think it probably makes

10  sense to break for the day.

11           **THE COURT:**  Okay.

12           **MR. FELDMAN:**  Thank you, Your Honor.

13           **THE COURT:**  That's what we'll do.  See you tomorrow at

14  8:00.

15           **MR. FELDMAN:**  Thank you.

16               (Proceedings adjourned at 12:43 p.m.)

17                       ---oOo---

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTERS**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Wednesday, September 25, 2013

8

9

10

11     _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15     _____

16          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

17

18

19

20

21

22

23

24

25