Volume 4

Pages 592 - 738

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )
                              )
  VS.                         )      NO. C 13-00133 WHO
                              )
BAZAARVOICE, INC.,            )
                              )
          Defendant.          )
_____)
                              San Francisco, California
                              Thursday, September 26, 2013

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:
For Plaintiff:

                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Golden Gate Avenue - Room 10-0101
                    P. O. Box 36046
                    San Francisco, California  94102
              BY:   **PETER K. HUSTON, ASSISTANT CHIEF**


                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Fifth Street, NW - Suite 7100
                    Washington, D.C. 20530
              BY:   **MICHAEL D. BONANNO, TRIAL ATTORNEY**
                    **ADAM T. SEVERT, TRIAL ATTORNEY**
                    **ROBERT A. LEPORE, TRIAL ATTORNEY**
                    **AARON HOAG, TRIAL ATTORNEY**
                    **LISA ANNE SCANLON, TRIAL ATTORNEY**


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

1    **APPEARANCES**:   (CONTINUED)

2    For the Plaintiff:

3                                 U.S. DEPARTMENT OF JUSTICE
                                  Antitrust Division
                                  950 Pennsylvania Avenue, NW - Rm. 3214
4                                 Washington, D.C. 20530
                             BY:  **DAVID I. GELFAND, DEPUTY ATTY. GENERAL**
5

6    For Defendant:
                                  WILSON, SONSINI, GOODRICH & ROSATI
                                  650 Page Mill Road
7                                 Palo Alto, California  94304
                             BY:  **BORIS FELDMAN, ATTORNEY AT LAW**
8                                 **DOMINIQUE-CHANTALE ALEPIN, ATTORNEY AT
                                     LAW**
9                                 **DYLAN J. LIDDIARD, ATTORNEY AT LAW**

10                                WILSON, SONSINI, GOODRICH & ROSATI
                                  1700 K Street, NW - 5th Floor
11                                Washington, D.C.  20006
                             BY:  **SCOTT A. SHER, ATTORNEY AT LAW**
12                                **ANDREA A. MURINO, ATTORNEY AT LAW**
                                  **FRANKLIN RUBINSTEIN, ATTORNEY AT LAW**
13
                                  WILSON, SONSINI, GOODRICH & ROSATI
14                                1301 Avenue of the Americas - 40th Fl.
                                  New York, New York 10019
15                           BY:  **CHUL PAK, MEMBER OF FIRM**
                                  **JONATHAN M. JACOBSON, MEMBER OF FIRM**
16
                                  BAZAARVOICE, INC.
17                                3900 N. Capital of Texas Highway
                                    Suite 300
18                                Austin, Texas  78746
                             BY:  **BRYAN BARKSDALE, GENERAL COUNSEL**
19                                **KIN GILL, DEPUTY GENERAL COUNSEL**

20

21

22

23

24

25

## I N D E X

Thursday, September 26, 2013

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|

**TARKOWSKI, ALAN**

| By Videotaped Testimony | 598 | 4 |

**BARTON, BRANTLEY SIKES**

| (SWORN) | 624 | 4 |
| Direct Examination by Mr. Severt | 624 | 4 |
| Cross-Examination by Mr. Pak | 654 | 4 |
| Redirect Examination by Mr. Severt | 680 | 4 |
| Recross-Examination by Mr. Pak | 687 | 4 |

**OSBORNE, MICHAEL ROBERT**

| (SWORN) | 690 | 4 |
| Direct Examination by Mr. Bonanno | 690 | 4 |
| Cross Examination by Mr. Feldman | 721 | 4 |
| Redirect Examination by Mr. Bonanno | 730 | 4 |
| Recross Examination by Mr. Feldman | 734 | 4 |

## E X H I B I T S

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| GX202 | | 723 | 4 |
| GX210 | | 714 | 4 |
| GX219 | | 716 | 4 |
| GX220 | | 717 | 4 |
| GX513 | | 652 | 4 |
| GX524 | | 652 | 4 |
| GX1220 | 711 | 712 | 4 |

## E X H I B I T S

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| DX252 | | 680 | 4 |

1

**I N D E X**

2

**E X H I B I T S**

3

| **DEFENDANT'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| DX441 | | 680 | 4 |
| DX564 | | 680 | 4 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **Thursday - September 26, 2013**                          **8:01 a.m.**

2                        **P R O C E E D I N G S**

3                            ---oOo---

4         **THE COURT:**  Good morning, everybody.

5      (Counsel greet the Court)

6         **THE COURT:**  Please be seated.

7      Mr. Huston.

8       **MR. HUSTON:**  Your Honor, I wanted to give you a sense

9    of where we're headed today.  We're going to start with another

10   short video.  And I know our direct portion that we're going to

11   be putting in is approximately 13 minutes.  And then I know we

12   have about a minute and a half of redirect.  I'm not exactly

13   sure how long their side is.  But that's where we're going to

14   start.

15      And then we were going to put on the stand, live,

16   Mr. Barton.

17      And the other issues I wanted to raise, we have two other

18   videos to play today.  And that is of Reevoo and Pluck, which

19   is the demand media company.

20      Now, these videos are subject to some confidentiality

21   issues.  My understanding is that Pluck has filed something in

22   response to the Court's order.  And Reevoo, I don't know if

23   they filed anything new but they did file something earlier.

24      So the issue there is whether it gets played in open court

25   or not.  We could certainly, towards the end of the day, after

1    we have our live witnesses today, just go ahead and use this

2    courtroom as chambers, if you will, and excuse some people if

3    you wanted to handle it that way.  Or if Your Honor was

4    prepared to rule then I think we could plow ahead and play it

5    in open court.  Either way, but I wanted to tee that up for

6    Your Honor.

7            THE COURT:  Okay.  Well, I think with those, because I

8    haven't looked at them before, what we spoke about on Friday

9    was that I'd look at them in camera and then make rules based

10   on that.  That still would be my preference.

11           MR. HUSTON:  Okay.

12           THE COURT:  I don't want to watch them in open court

13   or in the courtroom because those proceedings in the courtroom

14   ought to be open.

15       So I think I would take them back and watch them on my own

16   screen.

17           MR. HUSTON:  Okay.  If that's your preference, Your

18   Honor, we can cut those to a DVD.  And I suspect we could have

19   those by midday.  So that's what we'll do then.

20           MR. FELDMAN:  Counsel, and you're calling Mr. Osborne

21   today?

22           MR. HUSTON:  Yes, yes.

23           MR. FELDMAN:  Okay.

24           MR. JACOBSON:  Your Honor, just to be clear, the

25   videos that are going into evidence in camera will count

TARKOWSKI - VIDEOTAPED TESTIMONY

 1  against each side's time, however, correct?

 2          **THE COURT:**  Yes.  Yes.

 3          **MR. JACOBSON:**  Thank you.

 4          **MR. HUSTON:**  Okay.  With that, Your Honor, I think we

 5  can go ahead and play our section of the video.

 6          **THE COURT:**  Great.

 7          **MR. HUSTON:**  And this is of the witness representative

 8  from the firm Gigya.

 9      (Videotape was played as follows:)

10      "Q.  Excellent.  Can you just tell me your name.

11      "A.  Alan Tarkowski.

12      "Q.  And, Mr. Tarkowski, who is your current employer?

13      "A.  Gigya.

14      "Q.  And what is your title at Gigya?

15      "A.  Vice president of sales.

16      "Q.  And how long have you held the position of vice

17      president of sales?

18      "A.  Twenty-three months.

19      "Q.  And before that you were working at Gigya?

20      "A.  I was.

21      "Q.  And what was your position at Gigya before that?

22      "A.  Director of sales.

23      "Q.  And how long did you hold that position?

24      "A.  Seven months.

25      "Q.  And prior to that did you hold any position at Gigya?

TARKOWSKI - VIDEOTAPED TESTIMONY

1    **A.**   I have not, no.

2    **Q.**   Can you tell me what your responsibilities are as

3    vice president of sales at Gigya.

4    **A.**   My responsibilities are to sell Gigya's product.

5    **Q.**   Excellent.  Can you tell me what -- what is the

6    business that Gigya is engaged in?

7    **A.**   Gigya provides social infrastructure for businesses.

8    **Q.**   How do you explain the value of ratings and reviews

9    to a prospective customer?

10   **A.**   I explain the value of ratings and reviews to a

11   prospective customer as their consumer audience being able

12   to provide real consumer feedback on a particular product

13   that -- or service -- that other consumers can then

14   consume, read, and potentially and hopefully influence

15   other consumers to buy that product.  It also gives a

16   channel of feedback from the consumer audience to the

17   retailer or brand, whoever has deployed the technology.

18   **Q.**   You talked earlier about your comments tool; do you

19   recall that?

20   **A.**   Yes.

21   **Q.**   Given that you sell ratings and reviews, why do you

22   also sell a comments tool?

23   **A.**   A comments tool can be more applicable to an

24   organization.  For example, a media and publishing

25   website, say, a news-oriented website, is better suited to

 1    use comments so that consumers can engage in the

 2    conversation by adding their comments, versus rating and

 3    reviewing a conversation, which doesn't necessarily make

 4    sense.

 5         "MR. COMENETZ:  Can you mark this, please.  This will

 6    be Government Exhibit 461.

 7    "Q.  The court reporter has handed you a list that was

 8    produced by your counsel in response to the subpoena.  It

 9    has a list of Gigya's ratings and reviews clients.  Would

10    you take a minute and look through it.

11    "A.  Yep.

12    "Q.  Sir, are you aware of any additional clients for

13    ratings and reviews services from Gigya?

14    "A.  I am not.

15    "Q.  Some of the companies listed here are not based in

16    the United States; is that correct?

17    "A.  That is correct, yes.

18    "Q.  Are you able to identify for me which companies are

19    based in the United States?

20    "A.  I can identify a few, yes.

21    "Q.  And which are those?

22    "A.  Starting from the top, CBS Interactive, Laughlin

23    Constable, Meredith Corp., Clorox Company,

24    Pacific Sunwear, Party Earth, McCormick & Company, and New

25    Era Portfolio.

1      "Q.  Sir, the court reporter has handed you what's been

2      marked Government Exhibit 465.  Please take a minute to

3      look through it, and let me know when you're done.

4          "For the record, this is a multipage document Bates

5      numbered Gigya082626.  The first page is titled 'SaaS

6      interview with CEO of Gigya,' and it's dated November 28,

7      2012.

8      "A.  Okay.

9      "Q.  Have you seen this document before?

10     "A.  No.

11     "Q.  Now, you testified that Mr. -- that Patrick Salyer is

12     the CEO of Gigya, correct?

13     "A.  Correct.

14     "Q.  And what is your understanding of his

15     responsibilities as CEO?

16     "A.  Patrick's responsibilities as CEO is to lead the

17     organization, to -- to help provide support for to

18     executive management in the organization, and to help us

19     as an organization work together to grow the business.

20     "Q.  And is Mr. Salyer ultimately responsible for

21     strategy?

22     "A.  I don't know.

23     "Q.  So this document appears to be an interview with

24     Mr. Salyer, conducted by Needham & Company on November 28,

25     2012.

1          "Before you saw this document, were you aware that

2      Mr. Salyer had been interviewed by Needham & Company in

3      November of last year?

4      "A.  No.

5      "Q.  Could I ask you to look at the page that's labeled

6      '82632.  Well, actually, if -- so if -- if we'd start

7      on -- on the -- the -- the previous page.  This is '82631.

8          "At the bottom of the page there is a question to

9      Mr. Salyer which states:

10         "'How do you compare yourself to some larger

11     enterprise social companies like Jive, Bazaarvoice, and to

12     some extent Salesforce.com?  Do any of these companies

13     competitively overlap with what you're up to?'

14         "Do you see that?

15     "A.  Yes.

16     "Q.  Okay.  And if we -- if we skip the first paragraph

17     there, which is at the bottom of '82631, and we go to the

18     second paragraph of his response, Mr. Salyer's response,

19     which is at the top of page '81632, it states:

20         "'We view our technology as complementary to Jive as

21     we are going after different markets.  They're primarily

22     focused on socializing the enterprise.  Bazaarvoice is

23     focused within one-point solutions specifically so we do

24     have a bit of overlap, but we don't really see them as a

25     competitor.  In fact, we have a lot of joint clients with

1    Bazaarvoice and see them more as a partner.'

2         "Do you see that?

3    "A.  Yes.

4    "Q.  All right.  Sir, are you familiar with Bazaarvoice's

5    use of syndication to disseminate reviews?

6    "A.  Yes, I am.

7    "Q.  Now, syndication is not a service that -- that Gigya

8    offers, correct?

9    "A.  That's correct.

10   "Q.  So Gigya is not syndicating reviews from brands to

11   retailers?

12   "A.  That's right.

13   "Q.  And Gigya is not syndicating reviews from retailers

14   to brands, correct?

15   "A.  No, we are not.

16   "Q.  All right.  Sir, the court reporter has handed you

17   what's been marked Government Exhibit 466.  Please take a

18   minute and look through it and let me know when you're

19   done.

20        "This is an email chain, and it's labeled

21   Gigya061136.

22        "So you are one of the -- the recipients of this

23   email chain, correct?

24   "A.  I am one of the recipients of this email chain, yes.

25   "Q.  If I could ask you to look at the beginning of the

1    chain, which is on the reverse side of the page.  There's

2    an email there from Shaun Navarro to Marisa Sires.  Who is

3    Sean Navarro?

4    **A.**  Shaun Navarro was a salesperson on my team, who is no

5    longer with the company.

6    **Q.**  And Marisa Sires is the director of product

7    marketing; is that right?

8    **A.**  That's right, yes.

9    **Q.**  On November 12, 2012, at 9:43 a.m., Mr. Navarro wrote

10    to Marisa:

11        'Just FYI, I spoke with Husqvarna.  They are currently

12    using Bazaarvoice for ratings and reviews and are paying

13    300,000.  The reason they are using Bazaarvoice is because

14    they syndicate ratings and reviews out to their network of

15    retailers.  They said if Gigya could provide this

16    capability, they would absolutely entertain switching over

17    to Gigya.'

18        "Do you see that?

19  **A.**  Yes.

20  **Q.**  And then if you look at the -- at the most recent email in

21  the chain, from Patrick Salyer to yourself, Mr. Salyer is

22  commenting on the situation with Husqvarna because you had

23  forwarded the previous chain to him, correct?

24    **A.**  That's correct, yes.

25    **Q.**  And to you on November 12, 2012, Mr. Salyer said:

1          'Tough one for us to do because it requires a network.

2     Very smart of BV.'

3          "What did you understand him to mean by that?

4     "A.  I understood that Patrick was saying that Bazaarvoice

5     made a choice to build a network, a syndication network,

6     as part of their ratings and reviews product.

7     "Q.  And what did you understand Mr. Salyer to mean when

8     he said 'tough one for us'?

9     "A.  I don't know, other than we don't have a network.

10    "Q.  And Mr. Salyer also wrote:

11         'Very smart of BV.'

12         "What did you understand him to mean by that?

13    "A.  I understand him to have thought that that was a good

14    decision of theirs to build into their product offering.

15    "Q.  Turning back to Government Exhibit No. 463, which was

16    the interview between Salyer and Needham.  Mr. Salyer had

17    stated that:

18         'Bazaarvoice is focused within one-point solutions

19    specifically, so we do have a bit of overlap' -- oh, I'm

20    sorry, 465; I apologize -- 'so we do have a bit of

21    overlap, but we do not really see them as a competitor.'

22         "Do you agree with Mr. Salyer's statement?

23    "A.  I -- I disagree when we are selling the ratings and

24    reviews product head to head.  In that regard, I see them

25    as a competitor.  But, generally, I don't see them as a

TARKOWSKI - VIDEOTAPED TESTIMONY

1    competitor.

2    "Q.  Why not?

3    "A.  Because ratings and reviews represents such a small

4    fraction of what we do."

5         MR. RUBINSTEIN:  Your Honor, we have a segment to play

6    in response.  And if I may I approach, I have a couple of

7    documents for you to view while we watch.

8         THE COURT:  Certainly.

9         MR. FELDMAN:  I don't know if you've met previously.

10   This is my colleague.

11        MR. RUBINSTEIN:  Frank Rubinstein.  Thank you, Your

12   Honor.

13        THE COURT:  I was suspecting he was on your side.

14   (Laughter)

15   (Video played as follows:)

16   "Q.  And what does the term 'social commerce' mean to you?

17   "A.  Social commerce means allowing a website audience to

18   be able to engage with that website in some way, shape or

19   form.

20   "Q.  And does Gigya provide social commerce functionality?

21   "A.  Gigya does provide social commerce functionality,

22   yes.

23   "Q.  Who do you consider Gigya's competitors to be in the

24   social commerce industry?

25   "A.  I consider organizations like Facebook, Google,

1    Twitter, Janrain, 8thBridge, Social Annex, Bazaarvoice,

2    Reevoo, Life Fire, Discuss, as competitors of ours.

3    "Q.   Was -- was that an exhaustive list or was that just a

4    representative list?

5    "A.   That was a representative list.

6    "Q.   Are you familiar with the term 'user-generated

7    content'?

8    "A.   Yes, I am.

9    "Q.   And can you tell me what you understand by the term

10   'user-generated content'?

11   "A.   Yes.   My understanding of 'user-generated content' is

12   content that was created by a website audience or visitors

13   to a website.

14   "Q.   And does Gigya provide tools that enable the creation

15   of user-generated content?

16   "A.   Yes, we do.

17   "Q.   What sort of tools do you provide that facilitate the

18   creation of user-generated content?

19   "A.   Gigya provides plug-ins, website plug-ins, that allow

20   a user to comment on a website, to rate and review

21   products or services on a website, to chat on a website,

22   to share content from a website, as well as to see what

23   others are doing on that website.

24   "Q.   You had mentioned from a user perspective that

25   ratings and reviews from -- from your perspective is a

TARKOWSKI - VIDEOTAPED TESTIMONY

1    tool that is used to enable consumers to leave feedback on

2    a website, correct?

3    **A.**   That's right.  That's right.

4    **Q.**   Do you offer any other functionality other than

5    ratings and reviews that allows for similar feedback to be

6    placed on a website?

7    **A.**   We do.  Gigya's Comments plug-in.

8    **Q.**   And can you tell me what Gigya's Comments plug-in is.

9    **A.**   Yeah.  It's simply a website plug-in that allows a

10   user to share a comment on a Web page.

11   **Q.**   Okay.  And from the business perspective, you stated

12   that ratings and reviews allows for feedback to be

13   provided to the -- to the website about the products that

14   it sells, correct?

15   **A.**   That is a way to interpret a rating and review for

16   business use, yes.

17   **Q.**   Okay.  And do you have -- does Gigya offer any other

18   functionality that enables for feedback to be provided to

19   the eCommerce website?

20   **A.**   We do through reporting and analytics.

21   **Q.**   Can you -- can you describe what you mean by

22   'reporting and analytics'?

23   **A.**   Reporting and analytics is technology that allows a

24   website owner or operator to understand what their

25   audience is doing on that website; so how they perhaps use

1    technologies or view products, or the length of time with

2    which they spend on a page, the number of Web pages that

3    they view.

4    "Q.  Does offer a social suite?

5    "A.  Yes, we do.

6    "Q.  And can you explain what a social suite is.

7    "A.  I can.  A social suite is a series of website

8    plug-ins that allows users to engage on that website.

9    "Q.  And what are the tools or features or functionality

10   that is included in Gigya's social suite?

11   "A.  A Social log-in, which permits a user to log-in or

12   register on that website with a social identity; for

13   example, their Facebook identity.

14       "Sharing, which allows a user to share content from

15   that website out to their social feeds; for example, their

16   Facebook feed.

17       "The Comments plug-in, which allows users to leave

18   comments on a website.

19       "A Ratings and Reviews plug-in that allows users to

20   rate and/or review products and services on a website.

21       "Gigya's Activity Feed that allows users to see what

22   others are doing on that website.

23       "Gigya's Chat plug-in that allows users to chat

24   amongst themselves on a website.

25       "And Gigya's gamification technology that allows for

1    a -- an onsite loyalty program for users to be able to

2    earn status access power stuff as a result of their

3    engagement on that website.

4    "Q.  Why does Gigya offer all of these applications as

5    part of a single social suite?

6    "A.  As part of market need, as well as differentiation in

7    the marketplace of our product versus others.

8    "Q.  Can you please describe for me what you mean by

9    'market need.'

10   "A.  Our audience, our target audience, marketers, tend to

11   want to single source technology purchases with one vendor

12   versus multiple vendors.  So with our suite approach,

13   we've gone to market allowing that to -- allowing that

14   product to be available and to differentiate from

15   competitors.

16   "Q.  And this may seem simple to you, but why -- why do

17   your customers want a single vendor as opposed to multiple

18   inventors to deal with?

19   "A.  That's a -- it's -- marketers want a single vendor

20   because it's easier to manage one relationship from a

21   vendor management standpoint, as well as from a website

22   developer standpoint, in only needing to utilize one set

23   of website code versus trying to utilize multiple

24   different company website code bases.

25   "Q.  And, again, this might seem -- I apologize if it

TARKOWSKI - VIDEOTAPED TESTIMONY

1    seems simple and obvious, but why -- why is it

2    advantageous for a website developer to use code from only

3    one vendor as opposed to from multiple vendors?

4    ▪A.  It's more efficient to use code from one vendor

5    because all the -- these technologies work together

6    seamlessly already; whereas, individual technologies

7    oftentimes require additional work to make them -- to make

8    multiple technologies work together or talk together

9    seamlessly.

10    ▪Q.  Did you find that Gigya's ability to offer a complete

11    social suite to customers to be advantageous in sales

12    opportunities with customers?

13    ▪A.  I did and do.

14    ▪Q.  Why?

15    ▪A.  For the reasons I stated before.

16    ▪Q.  Do you believe that the ability to offer a social

17    suite has enabled Gigya to win business?

18    ▪A.  I do.

19    ▪Q.  Do you believe that the ability to offer a social

20    suite has helped Gigya win business against Bazaarvoice?

21    ▪A.  I do.

22    ▪Q.  In the context of ratings and reviews, what is your

23    understanding of the term "moderation"?

24    ▪A.  Moderation represents the ability to edit, delete, or

25    permit a rating or review to be -- to be managed in that

1    manner.

2    "Q.  Does Gigya offer moderation services?

3    "A.  Yes.

4    "Q.  Do many of Gigya's customers request moderation

5    services?

6    "A.  Gigya offers moderation technology.  We do not offer

7    through Gigya human moderation.  We have a partner that

8    provides that service.

9    "Q.  What partner provides that service?

10   "A.  EModeration is the name of the company.

11   "Q.  Does eModeration -- to the best of your knowledge,

12   does eModeration have an exclusive arrangement with Gigya,

13   or does it moderate -- does it have an exclusive

14   arrangement with Gigya?

15   "A.  No.

16   "Q.  Does eModeration perform, to the best of your

17   knowledge, moderation services for other vendors?

18   "A.  Yes.

19   "Q.  Does Gigya offer search engine optimization in

20   connection with its ratings and reviews product?

21   "A.  Gigya offers a search-friendly ratings and reviews

22   technology.

23   "Q.  Can you describe for me what you mean by 'search

24   friendly ratings and reviews technology.'

25   "A.  Search friendly means that Gigya's ratings and

1    reviews, when deployed on a client website, may be indexed

2    by the search engine providers.

3    "Q.  In connection with its ratings and reviews product,

4    you previously mentioned analytics.  Can you please

5    describe for me Gigya's analytics capabilities?

6    "A.  Gigya's analytics provides data, both quantitative

7    and qualitative data, around the engagement that users

8    have with the Gigya plug-ins, including ratings and

9    reviews deployed on the website.

10   "Q.  And why would a customer purchase Gigya's social

11   analytics functionality?

12   "A.  So they can better understand what users are doing on

13   their websites and make decisions from that data.

14   "Q.  You've just been handed Defendants Exhibit No. 564,

15   which I will represent to you is an email from Rooly

16   Eliezerov to Tom O'Neill.

17        "To start, can I ask, who is Rooly Eliezerov?

18   "A.  Rooly Eliezerov was our president and cofounder.

19   "Q.  'Regarding comparison to BV, we will be stronger on

20   the social side, social side to write a review, more

21   sophisticated sharing options, see what your friends

22   wrote, et cetera.  And they have niche features that we

23   don't have but we think are mostly not important.  And if

24   there is something important to the client and makes

25   sense, we can add it.'

1           "Do you agree with Mr. Eliezerov's statement?

2       "A.  Yes.

3       "Q.  And do you believe that this statement accurately

4   reflects your competitive differentiation with

5   Bazaarvoice?

6       "A.  I do.

7       "Q.  Why is it significant that -- that Bazaarvoice is

8   only a point solution for ratings and reviews?

9       "A.  We at Gigya feel that our social suite is more

10  powerful than a single-point solution.

11      "Q.  The next point says:

12          'BV relies on the site's own authentication system;

13  whereas Gigya provides authentication and can tie together

14  all access points and data stores, e.g. gamification and

15  user management.'

16          "Can you describe to me what that statement means?

17      "A.  Bazaarvoice requires that you log-in to Bazaarvoice

18  to be able to rate or review a product.

19          "Gigya provides a -- an authentication platform that

20  once you are already logged in to the website, you can

21  rate and review the product.  You can be participating

22  within gamification of that website experience and conduct

23  other points of engagement or activities on that website.

24  And it can all be tied to a user's record that we're

25  storing or that we can store within a user management

1   database product we offer.

2   ▪Q.  Do you believe that the single point of

3   authentication offered by Gigya is a competitive advantage

4   against Bazaarvoice?

5   ▪A.  Yes.

6   ▪Q.  I've just handed you what has been marked as

7   Defendant's Exhibit No. 566, which I'll represent to you

8   is an internal email between Patrick Salyer and Victor

9   White, dated May 25, 2012.

10      "Can you please tell me, who is Patrick Salyer?

11  ▪A.  Patrick Salyer is Gigya's CEO.

12  ▪Q.  Mr. White, in the -- in the -- towards the top of the

13  page, writes to Mr. Salyer:

14      'Cool.  Thanks for your take.  On the business side, I

15  don't see their acquisition as harmful to us either

16  because PR focuses on the long tail anyways.'

17      "To the extent that you know of, does the term

18  'acquisition' refer to the acquisition of PowerReviews by

19  Bazaarvoice?

20  ▪A.  Yes, it refers to the acquisition of PowerReviews by

21  Bazaarvoice.

22  ▪Q.  And what do you believe it means that 'PR focuses on

23  the long tail anyways'?

24  ▪A.  I believe that means PowerReviews focuses on small

25  businesses; otherwise referred to here by Victor as the

1    "long tail."

2    "Q.  Do you believe that the market is big?

3    "A.  Yes.

4    "Q.  And when you say "the market," are -- what are you

5    referring to the market as?

6    "A.  I'm referring to the market as websites that could

7    use and afford to pay for Gigya's technology.

8    "Q.  Let's break it down.  How many -- how many customers

9    do you believe, or potential customers do you believe are

10   available in the market?

11   "A.  Thousands.

12   "Q.  When -- when -- and do you believe that of those

13   thousands of customers, that those are customers who

14   potentially could deploy ratings and reviews technology?

15   "A.  Yes.

16   "Q.  When you say "thousands," do you mean more than

17   2,000?

18   "A.  Yes.

19   "Q.  Do you mean more than 5,000?

20   "A.  Yes.

21   "Q.  Do you mean more than 10,000?

22   "A.  Perhaps.

23   "Q.  In addition to brands and to retailers, does Gigya

24   sell any of its social suite technology to other sorts of

25   companies?

TARKOWSKI - VIDEOTAPED TESTIMONY

1    "A.   Yes.

2    "Q.   What other sorts of companies does Gigya offer its

3    technology to?

4    "A.   We offer -- we offer our technology to any company

5    who would like to purchase it.  We focus our sales efforts

6    on particular industry verticals that include media,

7    publishers, retail, eCommerce, travel hospitality and

8    brands.

9    "Q.   You mentioned travel hospitality.  Can you describe

10   for me what you mean by travel hospitality?

11   "A.   Sure.  Hotels, airlines, online booking engines where

12   people can book flights, hotels, those sorts of

13   organizations.

14   "Q.   Does Gigya believe that hotels have a need for

15   ratings and reviews technology?

16   "A.   Yes.

17   "Q.   And does Gigya believe that airlines have a need for

18   ratings and reviews technology?

19   "A.   Yes.

20   "Q.   Why do airlines need a ratings and reviews

21   technology?

22   "A.   To allow for their customer base to rate and review

23   service, perhaps flights, flight schedules, flight

24   seating, flight entertainment, anything relevant to an

25   airline's business and the service that they provide a

1    consumer audience.

2    **Q.**  Okay.  Thank you.  And apologies, but going back and

3    asking you the same questions about hotels.  Why do you

4    believe that hotels need ratings and reviews technology?

5    **A.**  So that consumers can rate the experience they've had

6    in a hotel, whether it be customer service, whether it be

7    room, whether it be dining, entertainment, booking, price,

8    quality, any facet that makes up a hotel operator's

9    business.

10   **Q.**  Do you believe -- does Gigya believe that booking

11   engines have a need for ratings and reviews technology?

12   **A.**  Yes.

13   **Q.**  Does Gigya offer ratings and reviews to its

14   entertainment vertical customers?

15   **A.**  Yes.

16   **Q.**  Do you believe that entertainment customers have a

17   need for ratings and reviews technology?

18   **A.**  Yes.

19   **Q.**  Why?

20   **A.**  I believe that entertainment businesses would like

21   consumers to have a platform to rate or review the

22   entertainment that they provide.

23   **Q.**  Can you tell me, what is PacSun?

24   **A.**  PacSun is Pacific Sunwear, a multi-channel retailer,

25   as far as I know.

1    "Q.  And does Gigya offer to Pacific Sun its ratings and

2    reviews technology?

3    "A.  Yes.

4    "Q.  Are you aware of whether or not Pacific Sunwear

5    considered alternatives other than Gigya for technology

6    deployment?

7    "A.  I believe they did consider alternatives.

8    "Q.  Do you know what alternatives that they considered?

9    "A.  I do recall that they considered Bazaarvoice

10   specifically as a ratings and reviews alternative.

11   "Q.  Does Gigya sell its social suite functionality to

12   customers outside of the United States?

13   "A.  Yes.

14   "Q.  Where outside of the United States does Gigya sell

15   its social suite functionality?

16   "A.  In many countries.

17   "Q.  Does Gigya offer ratings and reviews technology to

18   customers outside of the United States?

19   "A.  Yes.

20   "Q.  Does Gigya intend to continue to sell ratings and

21   reviews technology to customers outside of the

22   United States?

23   "A.  Yes.

24   "Q.  Do you have an estimate as to the number of non-U.S.

25   customers with whom Gigya has relationships?

TARKOWSKI - VIDEOTAPED TESTIMONY

 1    **"A.** An estimate would be 200 companies.

 2    **"Q.** And that's 200 -- that's 200 companies out of how

 3    many customers does Gigya have?

 4    **"A.** About 600.

 5    **"Q.** Is the provision of your social suite technology

 6    outside of the United States different from the provision

 7    of ratings and reviews technol- -- or social suite

 8    technology in the United States?

 9    **"A.** It is not different.

10    **"Q.** Is the provision of ratings and reviews technology

11    outside of the United States different from the provision

12    of ratings and reviews technology inside the

13    United States?

14    **"A.** No.

15    **"Q.** Does Gigya -- does Gigya sell its social suite of

16    products to automobile makers?

17    **"A.** Yes.

18    **"Q.** Does Gigya currently have any automobile customer

19    clients?

20    **"A.** Yes.

21    **"Q.** Does Gigya offer automobile makers ratings and

22    reviews technology?

23    **"A.** Yes.

24    **"Q.** Do you -- why does Gigya offer ratings and reviews

25    technology to automobile makers?

1    "A.  Because we feel that Gigya's ratings and reviews

2    technology can add value to auto makers' businesses.

3    "Q.  Does Gigya engage in research and development?

4    "A.  Yes.

5    "Q.  Does Gigya engage in research and development as it

6    relates to ratings and reviews technology?

7    "A.  Yes.

8    "Q.  Why does Gigya invest in research and development for

9    ratings and reviews technology?

10   "A.  To continue the innovation of our product and the

11   services to meet the needs of the market.

12   "Q.  Does Gigya intend to continue to invest in research

13   and development in ratings and reviews technology?

14   "A.  As far as I know, yes.

15   "Q.  Why is Gigya going to continue to invest in research

16   and development for ratings and reviews technology?

17   "A.  Did you say 'why'?

18   "Q.  Yes.

19   "A.  To continue to meet the needs of our clients and

20   potentially keep up or provide a better service than our

21   competitors.

22   "Q.  Do you think that Gigya is well situated to compete

23   aggressively for ratings and reviews business going

24   forward?

25   "A.  Yes.

1      "Q.  Why?  Why is Gigya positioned to compete aggressively

2      for ratings and reviews customers going forward?

3      "A.  Because we offer a very competitive ratings and

4      reviews product."

5            MR. RUBINSTEIN:  Your Honor, before they play the last

6      rebuttal, I wanted to note that due to different DX numbers

7      being marked similarly, we gave you something that we need to

8      supplement with the right exhibits.  I just wanted to let you

9      know that was coming.

10           THE COURT:  Good.

11           MR. RUBINSTEIN:  We can replace the one you have if

12     you didn't take notes on it.  If you did then we'll just

13     provide --

14           THE COURT:  Just give me separate ones.  That will be

15     fine.

16           MR. RUBINSTEIN:  Okay.  We'll do that.

17           THE COURT:  Thanks very much.

18        (Video played as follows:)

19      "Q.  Do you believe that the ability to offer a social

20      suite has enabled Gigya to win business?

21      "A.  I do.

22      "Q.  Do you believe that the ability to offer a social

23      suite has helped Gigya win business against Bazaarvoice?

24      "A.  I do.

25      "Q.  Can you give me some examples of where Gigya was --

1    where the ability to offer a social suite has enabled

2    Gigya to win business against Bazaarvoice?

3    ▪A.   I don't recall.

4    ▪Q.   Between last year and this year, have you seen an

5    increase in the adoption of social suites versus the

6    adoption of point solutions?

7    ▪A.   I don't have data to appropriately answer that

8    question.

9    ▪Q.   Do you believe that, going forward over the course of

10   the next year, that more customers will adopt a social

11   suite as opposed to point solutions?

12   ▪A.   I don't know.

13   ▪Q.   Let's break it down.  How many -- how many customers

14   do you believe -- or potential customers do you believe

15   are available in the market?

16   ▪A.   Thousands.

17   ▪Q.   When -- when -- and do you believe that of those

18   thousands of customers, that those are customers who

19   potentially could deploy ratings and reviews technology?

20   ▪A.   Yes.

21   ▪Q.   When you say 'thousands,' do you mean more than

22   2,000?

23   ▪A.   Yes.

24   ▪Q.   Do you mean more than 10,000?

25   ▪A.   Perhaps.

1        "Q.  How many customers do you believe are in the market

2        to purchase the ratings and reviews technology?

3        "A.  I don't know."

4        (Video concluded.)

5            MR. SEVERT:  Good morning, Your Honor, Adam Severt for

6    the United States.  At this time the United States calls

7    Mr. Brant Barton to the stand.

8            THE COURT:  Do you have one of those handy exhibit

9    binders for me?

10                       **BRANTLEY SIKES BARTON**,

11   called as a witness for the Plaintiff, having been duly sworn,

12   testified as follows:

13            THE WITNESS:  I do.

14            THE CLERK:  Be seated.

15        State your full name and spell your last name, please.

16            THE WITNESS:  Full name is Brantley Sikes Barton.  And

17   the last name is B-a-r-t-o-n.  B-r-a-n-t-l-e-y.  Middle name

18   S-i-k-e-s.

19            MR. SEVERT:  Your Honor, may I approach the witness?

20            THE COURT:  Yes.

21                       **DIRECT EXAMINATION**

22   BY MR. SEVERT

23   Q.  Mr. Barton, I've handed you a binder.  We may refer to it

24   during your examination.  I'll let you know at that time.

25   A.  Sure.

1   Q.   Mr. Barton, you were a cofounder of Bazaarvoice, right?

2   A.   That's correct.

3   Q.   And Mr. Brett Hurt was the other cofounder?

4   A.   That's correct.

5   Q.   And you founded the company in 2005?

6   A.   Correct.

7   Q.   And you worked for Bazaarvoice from its founding until

8   December 31st, 2012?

9   A.   Correct.

10  Q.   And during those seven and a half years or so at

11  Bazaarvoice you held a number of different positions, right?

12  A.   That's correct.

13  Q.   Your first position at Bazaarvoice you were vice president

14  of client services, right?

15  A.   Yes.

16  Q.   Then in 2006 you became vice president of business

17  development, right?

18  A.   Yes.

19  Q.   Then in 2009 you became chief innovation officer, right?

20  A.   Correct.

21  Q.   And part of your responsibilities as chief innovation

22  officer at Bazaarvoice was to think about Bazaarvoice five, ten

23  years into the future?

24  A.   That's right.

25  Q.   Then, sir, in late 2011 you became general manager of

BARTON - DIRECT / SEVERT

1   Bazaarvoice's media solutions business.  Is that right?

2   **A.**    That's right.

3   **Q.**    And in your position as vice president of business

4   development, and also in your position as chief innovation

5   officer, you had responsibility for analyzing potential mergers

6   and acquisitions, right?

7   **A.**    That is correct.

8   **Q.**    Then beginning in January 1st of this year, you became a

9   paid advisor to Bazaarvoice?

10  **A.**    Correct.

11  **Q.**    And, sir, are you still a paid advisor to Bazaarvoice?

12  **A.**    I am not.

13  **Q.**    And when did that relationship end?

14  **A.**    August 31st.

15  **Q.**    Of this year?

16  **A.**    Of this year.

17  **Q.**    And you still own a little under half a million

18  Bazaarvoice shares of stock?

19  **A.**    Yes.

20  **Q.**    And about a hundred thousand stock options?

21  **A.**    Yes.

22  **Q.**    So, sir, I want to just for a few minutes talk to you

23  about the founding of Bazaarvoice.

24       You attribute Bazaarvoice's success, at least in part, to

25  the timing of when the company launched its ratings and reviews

1    product, right?

2    **A.**    I think that was one factor, yes.

3    **Q.**    And at that time, in 2005, companies were beginning to

4    become willing to experiment with ratings and reviews?

5    **A.**    That's a trend that we were beginning to see, yes.

6    **Q.**    And, in fact, you thought companies that were using blogs

7    at the time were good candidates to also buy ratings and

8    reviews?

9    **A.**    I thought that if they used blogs, if they were

10   comfortable -- well, if they used blogs where they allowed

11   their own consumers to comment and contribute content then, in

12   theory, they would be comfortable with allowing viewers to

13   share opinions about products.  So I saw a correlation.

14   **Q.**    So if a company was allowing users to participate in their

15   blog site you saw that as a positive in terms of being able to

16   sell them a ratings and reviews product?

17   **A.**    Generally.

18   **Q.**    And at the same time, back in 2005, most companies did not

19   yet have ratings and reviews on their website?

20   **A.**    Most of the companies that I had had prior experience

21   working with, particularly U.S. retailers, did not.  There were

22   a few -- there were a handful that did, but it's fair to say

23   that most did not at that point, to my knowledge.

24   **Q.**    Okay.  All right, sir.  Why don't we turn to GX524.  It

25   should be in your binder.

1    A.    Uh-huh.

2    Q.    And GX524 is an email exchange between yourself and

3    Mr. Osborne.  Is that right?

4    A.    Yes.

5    Q.    And Mr. Osborne was the chief revenue officer of

6    Bazaarvoice?

7    A.    At this time, he had moved into a role called chief

8    customer advocate, which is in his email signature there at the

9    top.

10   Q.    Okay.  And the time being August of 2012?

11   A.    Yes.

12   Q.    And this email exchange begins with a discussion of

13   Starbucks' investment in Square?

14   A.    Yes.

15   Q.    And then if we turn and look to your email in the middle

16   of the page --

17          MR. SEVERT:  Savannah, could you zoom in on that,

18   please.

19   BY MR. SEVERT:

20   Q.    -- you compare the ratings and reviews market to

21   opportunities in other markets, right?

22   A.    I'm -- I'm drawing a comparison between the ratings and

23   reviews business and the businesses that other large Internet

24   companies created.

25   Q.    Okay.  Well, let's read a bit of it.  I'm on the third to

1    last line:

2           "But the biggest issue is that your first

3       breakthrough product has to have a large enough market for

4       you to become a multi-billion-dollar company.  Operating

5       systems, search-based advertising, social networking,

6       sales force automation ... all of those markets are

7       massive.  R&R is not."

8       Did I read that correctly, sir?

9    A.   You did.

10   Q.   And so you didn't, at the time, view the ratings and

11   reviews opportunity for Bazaarvoice to be large enough to make

12   Bazaarvoice a multi-billion-dollar company?

13   A.   I did not.

14   Q.   And then if we take a look at Mr. Osborne's reply -- it

15   should be right above your email -- Mr. Osborne writes:

16          "Yep I get it."

17      Do you see that?

18   A.   Uh-huh.

19   Q.   And then he goes on to say:

20          "R&R just wasn't more than 250 to 350 million in size,

21      ever."

22      Did I read that correctly?

23   A.   You did.

24   Q.   So Mr. Osborne agreed with your assessment, and he

25   estimated the market to be, the ratings and reviews, to be

1  between 250 and $350 million in size?

2  **A.**   That's what he's indicating there, yes.

3  **Q.**   Okay.  So here in this email, when you and Mr. Osborne

4  were looking at the ratings and reviews opportunity for

5  Bazaarvoice, you didn't include in this discussion the market

6  opportunity available to other social media products, right?

7  **A.**   We didn't explicitly mention that, no.

8  **Q.**   And had you included those other products, the market

9  opportunity would have been much, much larger, right?

10  **A.**   Yes.

11  **Q.**   Okay.  Sir, you can put aside that document.

12       And, sir, just going back to the founding and expansion of

13  Bazaarvoice, at some point in time Bazaarvoice decided to

14  expand internationally, right?

15  **A.**   That's correct.

16  **Q.**   Bazaarvoice never considered running its international

17  expansion out of Austin, Texas, correct?

18  **A.**   Can you repeat that question.

19  **Q.**   Sure.  Bazaarvoice, to the best of your knowledge, never

20  considered running its international expansion solely out of

21  Austin, Texas?

22  **A.**   I don't really know.  I think when we contemplated going

23  into different countries to serve customers there, because

24  there was a significant service element to our business and we

25  had customers and, of course, their shoppers in different time

1    zones, I felt that we wanted to provide the best service that

2    we possibly could to those customers.  And we would make the

3    determination based on the country if it was necessary to put

4    someone in that country.

5    **Q.**   But Bazaarvoice never considered not opening any foreign

6    offices, right?

7    **A.**   I don't think we ever contemplated that we would never

8    open a non-U.S. office.  I think we had ambitions from the

9    beginning of the company to grow our business and have global

10   offices, have offices outside of the U.S.

11   **Q.**   And that was because, sir, having someone in country would

12   help your international expansion succeed, right?

13   **A.**   Well, it would help customers in that country succeed, so,

14   yes.

15   **Q.**   You thought opening international offices was the logical

16   thing to do?

17   **A.**   It depended on the country.  I can't make that statement

18   broadly.  It depended on the market.  Certainly, in markets

19   where we felt we would be well-equipped to service clients

20   locally that made sense.

21        In markets where -- or countries, rather, where maybe we

22   didn't have as much confidence in our ability to do that

23   because of language or cultural issues, maybe we didn't.

24        But those were debated on a case-by-case basis.

25   **Q.**   And the first place Bazaarvoice decided to expand was into

 1   United Kingdom, right?

 2   **A.**   Yes.

 3   **Q.**   And the first thing Bazaarvoice did in its expansion into

 4   United Kingdom was to hire a salesperson based in the

 5   United Kingdom, right.

 6   **A.**   We did.

 7   **Q.**   And since expanding into United Kingdom, Bazaarvoice

 8   opened offices in other countries as well, right?

 9   **A.**   Correct.

10   **Q.**   Bazaarvoice has an office in Germany?

11   **A.**   Correct.

12   **Q.**   The Netherlands?

13   **A.**   I believe so.

14   **Q.**   Sweden?

15   **A.**   I believe so.  My information is a little dated, but I

16   believe so, yes.

17   **Q.**   Sir, would it refresh your recollection if I were to

18   provide you a printout from Bazaarvoice's About Us website that

19   lists the international offices?

20   **A.**   Sure.

21        **MR. SEVERT:**  May I approach the witness, Your Honor?

22   **BY MR. SEVERT**

23   **Q.**   Sir, you can put that aside.

24        Did that document refresh your recollection as to whether

25   Bazaarvoice, indeed, has an office in Sweden?

1   **A.**   Yes.

2   **Q.**   And does Bazaarvoice have an office in Sweden?

3   **A.**   In Sweden, yes.

4   **Q.**   And France?

5   **A.**   Yes.

6   **Q.**   Australia?

7   **A.**   Yes.

8   **Q.**   Singapore?

9   **A.**   I don't see Singapore listed.

10  **Q.**   Okay.  Sir, I want to talk to you about the period of time

11  before PowerReviews was acquired by Bazaarvoice.  And during

12  that time PowerReviews was the company Bazaarvoice most

13  frequently faced when selling ratings and reviews in the

14  United States, right?

15  **A.**   I would say that's true, yes.

16  **Q.**   In fact, you thought PowerReviews was disruptive, right?

17  **A.**   Any competitor is disruptive so, yes, I considered them

18  potentially disruptive to our business.

19  **Q.**   And Bazaarvoice typically used defensive tactics against

20  PowerReviews, right?

21  **A.**   I -- could you clarify what you mean by "defensive"?  I

22  think that if you mean did we react primarily to things that

23  PowerReviews did in the marketplace, we did, indeed, do that.

24       But we also innovated on our own, and I think we also

25  forced PowerReviews and other competitors to react to us.

1    Q.    Okay.  Why don't we take a look at GX522.

2          **MR. SEVERT:**  And, Your Honor, GX522 is already in

3    evidence as part of the party stipulation.

4          **THE COURT:**  Do I have that somewhere?

5          **MR. SEVERT:**  It should be in your binder.

6    **BY MR. SEVERT**

7    Q.    So GX522 is an email chain between yourself, Mr. Hurt,

8    Mr. Collins, Mr. Svatek, about the prospect of PowerReviews

9    buying 500friends, right?

10   A.    That is right.

11   Q.    And, to be clear, PowerReviews did not end up buying

12   500friends?

13   A.    That's correct.

14   Q.    And Mr. Svatek was the chief strategy officer at

15   Bazaarvoice?

16   A.    I believe that was his title at the time.

17   Q.    Why don't we start on the third page of this email, in the

18   middle of the page.  And there's an email from you right there.

19         And in talking about the potential acquisition of the

20   company 500friends by Bazaarvoice, you write in the middle of

21   the paragraph:

22         "The main implication of this, in my opinion, is that

23         PowerReviews isn't going down without a fight and that we

24         need to use offensive tactics against them rather than

25         defensive tactics, which has been the norm for us (the

1        Facebook announcement this week is a rare exception)."

2        Did I read that correctly?

3   **A.**   You did.

4   **Q.**   And then let's take a look on page 2 of this email, where

5   Mr. Collins replies to you.  Do you see that?

6   **A.**   Right, I do, yes.

7   **Q.**   And let's --

8        **MR. SEVERT:**  Savannah, let's first do the top.

9   **BY MR. SEVERT**

10  **Q.**   So this is from Mr. Collins, responding to your email,

11  right?

12  **A.**   Yes.

13  **Q.**   And Mr. Collins begins his email, he writes:

14       "According to the *Internet Retailer*, PR has 78 IR500

15       clients with combined retail sales of $17 billion.  We

16       have 136 and 54 billion in retail sales."

17       Did I read that correctly?

18  **A.**   Yes.

19  **Q.**   So here Mr. Collins references the number of ratings and

20  reviews customers PowerReviews has within the IR500, right?

21  **A.**   Yes.

22  **Q.**   And then he does the same for Bazaarvoice, correct?

23  **A.**   Yes.

24  **Q.**   And then Mr. Collins also references the combined sales of

25  its IR500 customers, right?

1   **A.**   Yes.

2   **Q.**   And he does the same for Bazaarvoice?

3   **A.**   Yes.

4   **Q.**   Okay.  Mr. Collins goes on to say:

5          "The combination would produce a truly massive

6       audience for us and would definitely tip the scales in our

7       permanent favor on the network front."

8       Did I read that correctly?

9   **A.**   Yes.

10  **Q.**   And by "network front" that refers to syndication, right?

11  **A.**   I don't take that to mean syndication exclusively.  His

12  mention of a massive audience, this is late 2011, we were

13  already experimenting with our media business, which I was

14  leading.

15      So I don't think his -- his reference to "network" refers

16  exclusively to syndication.  I think he's also referring to the

17  audience of consumers that we would be able to reach through

18  our media business as well.

19  **Q.**   But you agree that, in part, he is referring to

20  syndication?

21  **A.**   In part, I believe he is referring to syndication.

22  **Q.**   Then he goes on to say:

23          "How long and how much money would it cost for us to

24      acquire 78 more IR500 clients?"

25      And, again, Mr. Collins refers to the IR500?

1    **A.**    Correct.

2    **Q.**    He goes on to say:

3           "How long and how much money would it cost us to

4     develop a viable SMB solution that makes economic success

5     and sign up hundreds of those clients?"

6     And "SMB" means small medium business?

7    **A.**    Yes.

8    **Q.**    And then he says:

9           "How much longer does it take us to win deals because

10    they are out there, and how much does the price

11    competition impair our long-term value as a company?"

12    And in that sentence when he says "us" he's referring to

13    Bazaarvoice?

14   **A.**    Yes, I believe so.

15   **Q.**    (Reading:)

16          "Just because we've won to date does not mean we

17    cannot be outflanked by a hungry competitor who is forced

18    to be more innovative ... faster, and forced to develop a

19    more compelling economic model ... faster."

20    And the "hungry competitor" he is referring to is

21    PowerReviews, right?

22   **A.**    In the context, yes, I believe so.

23   **Q.**    He goes on to say:

24          "Are we nimble enough?  A smaller PR may be more

25    agile, and we all understand how legacy software burdens

1        can inhibit more mature software companies from being

2        innovative.  We may not be in a mature market, and while

3        we are a young company we are behaving like a legacy

4        player?"

5        Did I read all that correctly, sir?

6  **A.**   You did.

7  **Q.**   And then going down the email.

8       **MR. SEVERT:**  Savannah, if you could pull up ...

9  **BY MR. SEVERT**

10  **Q.**  Mr. Collins then lists a number of reasons why owning

11  Bazaarvoice would provide more -- I'm sorry, let me start over.

12      Mr. Collins lists reasons why owning PowerReviews would

13  provide more valuation to Bazaarvoice than simply adding

14  PowerReviews' revenues to Bazaarvoice's revenues, right?

15  **A.**   Yes.

16  **Q.**  Okay.  And let's read some of these.  So, number one, he

17  says:

18        "Literally, no other competitors."

19      Right?

20  **A.**   Yes.

21  **Q.**  Second he says:

22        "Our share of the IR500 would move close to 50 percent

23        in absolute terms and higher in retail sales coverage."

24      So in that statement he's again referring to, here, share

25  within the IR500?

```
 1   A.   Correct.

 2   Q.   And then going down to number 7, Mr. Collins writes:

 3           "Pricing accretion due to combination."

 4        And in that statement Mr. Collins has conceded that as a

 5   result of this merger customers are going to pay a higher

 6   price, right?

 7   A.   I don't interpret it as such.

 8   Q.   Number 8 he says:

 9           "Faster sales cycles."

10        Did I read that correctly?

11   A.   Yes.

12   Q.   And then number 9 he says:

13           "Help us focus 100 percent on our strategy without the

14        whipsaw effect of reacting to a feisty competitor."

15        And the "feisty competitor" is PowerReviews, right?

16   A.   Yes.

17   Q.   And you agreed with Mr. Collins' logic in this email,

18   right?

19   A.   Not all of it.

20   Q.   Well, let's turn to your response on the first page, the

21   very top.  So I guess it's a response later in the thread.  And

22   you write:

23           "I agree with Stephen's logic.  Even if one or two

24        items from his Top 10 are off the market by a bit.  If PR

25        continues their disruptive ways, they could do us even
```

1          more harm once we're public because it gets exponentially

2          more painful to absorb a big competitor shock - such as

3          losing one of our marquee companies - as a public versus

4          private company.  I also wouldn't characterize them as a

5          "lame" competitor.  If they were, we wouldn't spend so

6          much time, across many functions and people, determining

7          how to respond to their tactics."

8          Did I read that correctly, sir?

9   **A.**    You did.

10  **Q.**    All right.  I want to talk to you just for a moment about

11  Facebook.

12          And you're not aware of any customers that Bazaarvoice

13  lost to Facebook, right?

14  **A.**    I'm not aware of any sales cycles where that was a

15  mutually exclusive decision.  Meaning, the customer was going

16  to decide exclusively we're going to work with Bazaarvoice or

17  Facebook.

18          In our relationship with Facebook, I would describe it as

19  cooptition.  There were clients of ours that, I would estimate,

20  all of our clients had some relationship with Facebook.  They

21  had some presence on Facebook social network.

22          So it's hard to point to any one client that we lost as a

23  result of their work with Facebook.  What I think Facebook

24  impacted was the business opportunity that we had with that

25  client, because I think of it in terms of a fixed budget for

1    social media, social marketing spend.

2        As Facebook became a larger player in the marketplace they

3    commanded a larger share of that budget.  And, by definition, I

4    view that as competitive with our efforts to build a large

5    company of our own.

6    **Q.**   So we can agree that you're not aware of a situation where

7    Bazaarvoice lost a customer to Facebook because of a mutually

8    exclusive choice the customer was making?

9    **A.**   Yes, that's correct.

10   **Q.**   And the same would be true with Google, correct?

11   **A.**   That is correct, for the same reasons.

12   **Q.**   All right.  I want to shift gears a little bit and talk to

13   you about the PowerReviews acquisition, and the time leading up

14   to that, and your involvement in that decision process.

15       And as we discussed before, you had merger and acquisition

16   responsibility for much of your time at Bazaarvoice, right?

17   **A.**   When -- in my role of VP of business development, my

18   primary responsibility was to build and manage and support our

19   partner network.

20       That partner network was comprised of companies that

21   offered complementary solutions to our solution, that worked

22   with our clients, where we needed to do technical integrations

23   and support those technical integrations for the customers.

24       In some cases, those partners had -- you could call them

25   competing offerings.  For example, eCommerce platforms.  We

1    called many of the eCommerce platforms partners.  We relied on

2    them for implementing our solution for our customers.

3        But in some of those cases they offered their own

4    competing products.  As part of that, I was in a position to

5    look at the market and think about which companies we might

6    want to one day acquire.  But I wouldn't say it was my

7    primary -- at that point in time, we weren't thinking very

8    diligently about making an acquisition, while I was VP of

9    business development.

10   Q.   Then as you became chief innovation officer you

11   additionally had merger and acquisition responsibility, right?

12   A.   That's right.  In that role my main responsibility was to

13   think about the future of the company, think -- try to think

14   beyond the one- to two-year timeframe that we typically thought

15   about in terms of running the company day-to-day.  And it was

16   my duty, in that role, to propose ideas to the management team

17   for how we could grow as a company.

18   Q.   And you became chief innovation officer in 2009?

19   A.   I think in late 2009.

20   Q.   Okay.  And sometime around the third year of the company,

21   the 2008 timeframe, you first began to consider the possibility

22   of Bazaarvoice acquiring PowerReviews, right?

23   A.   It was around that time that discussion started to happen.

24   Q.   And you continued to think about the possibility of

25   acquiring PowerReviews for a number of years following that,

643

BARTON - DIRECT / SEVERT

1    right?

2    **A.**    Yeah.   It was something that we would occasionally discuss

3    throughout that period.

4    **Q.**    And then in early 2011, the thinking regarding potentially

5    acquiring PowerReviews became more active, right?

6    **A.**    Uhm, at beginning of 2011, in my role, again, as chief

7    innovation officer, I kind of wanted to bring some closure to

8    that discussion.   I wanted to, you know, engage the management

9    team in a debate over whether that was something that we

10   seriously thought was an opportunity that made sense or not.

11   **Q.**    Okay.   And then during this time period you decided to tee

12   up this discussion, to make a list of the pros and cons of

13   acquiring PowerReviews, right?

14   **A.**    I did.

15   **Q.**    All right.   I'd like you to turn, sir, to GX513.   It

16   should be in your binder.   And GX513 is an email from you in

17   April 2011.

18        And, I apologize, you have to go to the third page of the

19   email to see to whom you sent the email.   It's the way it was

20   produced to us.   I apologize.

21        And we can see on the third page that you sent this email

22   to Brett Hurt, right?

23   **A.**    Yes.

24   **Q.**    Stephen Collins?

25   **A.**    Yes.

BARTON - DIRECT / SEVERT

1   **Q.**   And Mike Svatek, who we've talked about, right?

2   **A.**   Yes.

3   **Q.**   And Heather Brunner?  And Ms. Brunner, was the COO at the

4   time?

5   **A.**   Yes.

6   **Q.**   And Michael Osborne, who we've talked about, right?

7   **A.**   Yes.

8   **Q.**   And Bryan Barksdale?

9   **A.**   Yes.

10  **Q.**   And Bryan Barksdale was the general counsel, right?

11  **A.**   Correct.

12  **Q.**   Let's go back to the first page and look at your email.

13         And in crafting this email, before you sent it you

14  consulted with others at Bazaarvoice, right?

15  **A.**   I did.

16  **Q.**   You sought input from Mr. Collins, right?

17  **A.**   I did.

18  **Q.**   And you sought input from Mr. Svatek?

19  **A.**   I did.

20  **Q.**   You sought input from Mr. Osborne?

21  **A.**   Yes.

22  **Q.**   And you sought input from Mr. Hurt, right?

23  **A.**   Yes.

24  **Q.**   And then you wrote this email that synthesized a

25  comprehensive set of things to consider with respect to the

1   potential acquisition of PowerReviews, right?

2   A.   Yes.

3   Q.   And although this email was influenced by the

4   conversations you had with Mr. Hurt and Mr. Collins,

5   Mr. Osborne, Mr. Svatek, this represented your view or your

6   synthesis of the topics to consider?

7   A.   It was my synthesis of things that I thought would be, you

8   know, important to consider if we were going to contemplate an

9   acquisition.

10  Q.   Okay.

11  A.   And some of those, as you point out, were things that had

12  come up in prior conversations with other members of the

13  management team when we would talk about this more informally.

14  So, yes.

15  Q.   Okay.  And when you wrote this email you thought that it

16  might be sent to the board of directors, right?

17  A.   I thought it was possible, yes.

18  Q.   And, indeed, the email was sent to at least some members

19  of the board of directors, right?

20  A.   I believe so, yes.

21  Q.   Well, let's take a look at the email.  So if we start on

22  the paragraph that begins "second."

23          MR. SEVERT:   If you could blow that up, Savannah.

24  BY MR. SEVERT

25  Q.   So you say:

1              "I am just making the point that taking out one of

2       your biggest competitors can be game changing, versus

3       doing a bunch of tuck-ins that don't really aggregate

4       meaningful market power/share."

5       Did I read that correctly?

6   A.   You did.

7   Q.   Okay.  Let's go down and take a look at the pros.  And

8   these are pros relating to the acquisition of PowerReviews,

9   right?

10  A.   These are what I thought might be the positives, yes.

11  Q.   Let's start with the first one.  And you write in the

12  first one:

13             "Elimination of our primary competitor in both the

14      U.S. and Europe.  An expected impact of this consolidation

15      is relief from the price erosion that sales experiences in

16      30 to 40% of deals, per Osborne, of up to 15 to 30%.  In

17      addition, the market will place a premium on us having

18      such a dominant market position, which is powerful

19      competitive moat."

20      Did I read that correctly?

21  A.   You did.

22  Q.   And when you used the term "price erosion," that means

23  discounting, right?

24  A.   I was referring primarily, yes, to discounting in some of

25  the sales cycles that were competitive with PowerReviews.

1   Q.   Okay.  And when you give the -- the price erosion or

2   discounting figures you cite to Osborne, right?

3   A.   I do.

4   Q.   And that's, as we talked about, Michael Osborne?

5   A.   Yes, sir.

6   Q.   And he was the chief revenue officer at this time?

7   A.   At the time, yes.

8   Q.   And you cited to him because Mr. Osborne was the person at

9   Bazaarvoice most knowledgeable about discounting, right?

10  A.   Yes, I regarded him as such, yeah.

11  Q.   Okay.  Let's go down to the second bullet.  You write:

12       "Marquee customers."

13       Do you see that?

14  A.   Yes.

15  Q.   And what you meant was that Bazaarvoice -- I'm sorry,

16  PowerReviews had some -- some good customers, customers that

17  Bazaarvoice would like to have?

18  A.   That's right.

19  Q.   And then let's go down to the fourth bullet.  You write:

20       "Low risk of customer attrition."

21       And then you go on to say, in the same bullet.

22       "We will be able to retain an extremely high

23       percentage of PR's customers due to scarce/low-quality

24       alternatives."

25       Did I read that correctly?

1   **A.**    You did.

2   **Q.**    Okay.  And who were the low-quality alternatives to whom

3   you were referring?

4   **A.**    I was referring to alternatives like Pluck at the time;

5   Reevoo in Europe; another smaller company in Europe, Fifo;

6   in-house build, as an alternative.

7          I basically believed that the combination of the companies

8   would give us a very strong product offering.  I felt that we

9   would be able to serve, you know, the combined client base very

10  well.  And I was confident that we would be better than the

11  alternatives.

12  **Q.**    Was Gigya one of the low-quality alternatives to whom you

13  were referring?

14  **A.**    Around this time Gigya was -- they were emerging, so, yes.

15  **Q.**    Was Lithium one of the low-quality alternatives to whom

16  you were referring?

17  **A.**    Lithium was also -- I can't remember exactly the date

18  Lithium released their own ratings and reviews module but,

19  certainly, in this timeframe we considered Lithium to be a

20  competitor primarily on the brand side of our business.

21  **Q.**    And was Viewpoints one of the low-quality alternatives to

22  whom you were referring?

23  **A.**    Viewpoints was still in existence, yes.

24  **Q.**    Was Magento one of the low-quality alternatives to whom

25  you were referring?

1  A.   Magento, yes, Magento was around this time.  I think they

2  were offering something competitive, yes.

3  Q.   Was Facebook one of the low-quality alternatives to whom

4  you were referring?

5  A.   Well, in this -- in this instance, I was referring more

6  specifically to companies that could provide a like-for-like

7  product, a ratings and reviews product or something very

8  similar to it.

9      At this time, I wasn't aware that Facebook had a

10  like-for-like product offering.  But, as I mentioned before, I

11  felt they had alternative products.

12  Q.   Okay.  So, and the low-quality alternatives, we can agree,

13  was referring to other market participants that actually had a

14  ratings and reviews product?

15  A.   That's how I thought of it at the time, yes.

16  Q.   And then let's go down a couple of bullets, where you

17  write:

18          "Their technology doesn't suck."

19      And you believed that, right?

20  A.   I -- I didn't know.  I had not had an opportunity to

21  inspect their technology.  I just wanted to -- I just wanted to

22  invite the debate within our team that we needed to inspect the

23  technology, to know whether it was valuable or not.

24  Q.   And then after you wrote "Their technology doesn't suck"

25  you emphasized, you said:

```
 1                "It doesn't."

 2         Right?  I read that correctly?

 3    A.   You did.

 4    Q.   Let's go down a number of bullets -- Savannah -- to:

 5                "Preemptive defensive strategy that prevents them from

 6         being acquired by a larger competitor that could use their

 7         scale and reach to disrupt us."

 8         And in parenthesis you put:

 9                "Salesforce.com, Adobe, Oracle, Lithium, et cetera."

10         Did I read that correctly?

11    A.   Yes.

12    Q.   And you believed there was, indeed, a defensive reason for

13    Bazaarvoice to acquire PowerReviews, right?

14    A.   I did.

15    Q.   And by "defensive," you meant that if Bazaarvoice acquired

16    PowerReviews before anyone else did, that at least removed the

17    possibility of a large, well-funded company getting into the

18    ratings and reviews business, right?

19    A.   That's how I thought of it.  I -- I considered any of the

20    larger Internet software companies would be interested in a

21    company like PowerReviews if they took interest in the broader

22    social marketing industry.  And I felt that as a very small

23    company that would be very -- very threatening to us as a new

24    competitor.

25    Q.   Okay.  And this defensive reason that you've described was
```

1    a way for Bazaarvoice to protect itself, right?

2    **A.**    Yeah.  We wanted to stay in business.  We wanted to stay,

3    you know, a relevant company for as long as possible against

4    these much larger businesses.

5    **Q.**  Sure.  Okay.

6        And just the last -- the last bullet I want to talk about,

7    briefly, you write:

8            "Network:  They have several lynchpin nodes as

9        clients, including Drugstore.com, Diapers.com, Staples,

10       and REI, that we needed yesterday for clients like P&G,

11       3M, et cetera."

12       And the network you're referring to in this bullet is the

13   PowerReviews network, right?

14   **A.**    Uhm, well, I'm referring to the syndication network that

15   we were still in the process of building out, and the fact that

16   the clients I listed there of PowerReviews -- and there may

17   have been others -- were ones that I thought would be very

18   complementary to our syndication network.

19   **Q.**  Let's take a look in your binders at GX521.

20           **THE COURT:**  Mr. Severt, if we're moving to a new

21   exhibit why don't we take our morning break.

22           **MR. SEVERT:**  Sure.

23           **THE COURT:**  Ten minutes.

24           **MR. SEVERT:**  Sure.

25                   (Recess taken at 9:25 a.m.)

```
 1                  (Proceedings resumed at 9:37 a.m.)

 2            THE COURT:  Go ahead, Mr. Severt.

 3            MR. SEVERT:  Thank you, Your Honor.

 4        Before I proceed, there's one housekeeping thing.  I'd

 5   like to offer GX524 and GX513, which we've used with Mr. Barton

 6   here today, into evidence.

 7            THE COURT:  Any objection?

 8            MR. PAK:  Just one minute, Your Honor.  I'm trying to

 9   figure out which one was 524.

10                      (Pause in proceedings.)

11            MR. PAK:  No objections, Your Honor.

12            THE COURT:  Admitted.

13      (Plaintiff's Exhibits GX513 and GX524 received in evidence)

14   BY MR. SEVERT:

15   Q.   Okay.  So we're on, Mr. Barton, GX521 -- which,

16   Your Honor, it's already in evidence as part of our stipulation

17   between the parties -- and GX521, Mr. Barton, is an email you

18   sent to Brett Hurt in May of 2011 attaching a board

19   presentation; right?

20   A.   Yes.

21   Q.   And let's go to the first page of the presentation.  The

22   native file is probably easier to read.  It's in the middle of

23   the exhibit.

24   A.   (Witness examines document.)

25   Q.   It says, "Board Update M & A."  And "M & A" is mergers and
```

1   acquisitions?

2   **A.**   Yes.

3   **Q.**   And you prepared this presentation, Mr. Barton?

4   **A.**   I did.

5   **Q.**   And this presentation was, indeed -- you presented it to

6   the Board of Directors?

7   **A.**   It was intended to present to them.  It was actually more

8   of a conversation.  I don't -- I actually don't know how many

9   slides we got through, but it was a conversation.

10  **Q.**   Okay.  Now, let's turn to page 14.  That page is actually

11  unnumbered.  It says, "Specific Opportunities."

12  **A.**   (Witness examines document.)

13  **Q.**   And this was the section of the presentation that dealt

14  with particular M & A opportunities; right?

15  **A.**   Yes, sir, two of them.

16  **Q.**   And then if you turn to the next page, it says,

17  "PowerReviews"?

18  **A.**   Correct.

19  **Q.**   And this was a summary page for the PowerReviews M & A

20  opportunity; right?

21  **A.**   Correct.

22  **Q.**   And under "Opportunity Summary," you wrote:  (reading)

23          "Eliminate primary competitor, thereby reducing

24      comparative pricing pressure, and acquire assets valuable

25      to our Marketing, Intelligence & Network strategies."

```
 1          Did I read that correctly, sir?
 2   A.   Yes.
 3          MR. SEVERT:  No further questions, Your Honor.
 4          MR. PAK:  Just one minute, Your Honor.
 5                    (Pause in proceedings.)
 6          MR. PAK:  Your Honor's indulgence to approach the
 7   witness and --
 8          THE COURT:  Please.  Good morning, Mr. Pak.
 9                    (Pause in proceedings.)
10          MR. PAK:  Excuse me.  Your Honor?  Thank you.
11                    CROSS-EXAMINATION
12   BY MR. PAK:
13   Q.   Good morning, Mr. Barton.
14   A.   Hi.  Good morning.
15   Q.   How are you?
16          Mr. Barton, your employment background was discussed
17   during the course of Mr. Severt's examination, but on the
18   screen you'll notice a biography that we put together based
19   upon your deposition testimony.  If you take a quick look
20   through it, does it seem accurate?
21   A.   Yes, sir, it does.
22   Q.   Can you speak up a little bit?
23   A.   Sorry.  Yes, it does.
24   Q.   All right.  One thing I'd like to note, where did you
25   graduate from college?
```

1    **A.**    University of Alabama.

2    **Q.**    Good football team?

3    **A.**    Right now.

4                          (Laughter)

5    **Q.**    There you go.

6          And when did you graduate from Alabama?

7    **A.**    1999.

8    **Q.**    Did you obtain an MBA, sir?

9    **A.**    No, I did not.

10   **Q.**    Did you start work right after 1999?

11   **A.**    I did.

12   **Q.**    And you became a cofounder of the company with Brett Hurt

13   in about 2005; right?

14   **A.**    Correct.

15   **Q.**    And your first job after college was Coremetrics; is that

16   right?

17   **A.**    First job after college was with Sapient Corporation.

18   **Q.**    And then at some point did you join Coremetrics?

19   **A.**    In January of 2003.

20   **Q.**    And that's when you met Mr. Hurt; is that right?

21   **A.**    I met him through a mutual friend prior to that, but that

22   was the beginning of our working relationship.

23   **Q.**    There are two points of your work at Bazaarvoice that I'd

24   like to touch upon.  First, when you were the general manager

25   of Media Solutions, that was approximately June of 2011 to

1  December of 2012; is that right?

2  **A.**    That's correct.

3  **Q.**    Could you please describe, what were your responsibilities

4  there?

5  **A.**    The responsibilities when I started in that role were to

6  begin to build a very bare bones team to start to explore a

7  media opportunity.  By "media," I'm referring to a digital

8  advertising opportunity that we could offer -- or digital

9  advertising product or service that we could offer both to our

10  existing clients, as well as to companies that we didn't

11  currently consider clients.

12      And, so, in mid-2011 we had some ideas for how we might

13  first approach that, and I was the executive on the team that

14  stepped in to provide leadership to that effort.

15  **Q.**    Have you heard of an entity called Longboard?

16  **A.**    I have.

17  **Q.**    And can you tell us what Longboard is and how it fits into

18  the company?

19  **A.**    Longboard Media is a retail or what's called a shopper

20  media network.  They're an advertising network that allows

21  brand advertisers to buy advertising inventory on large retail

22  sites where they can influence purchase decisions of shoppers

23  who are on those retail sites.

24      This is a little bit different than the way digital

25  advertising normally works where brand advertisers buy

1    inventory on news sites, sports sites, editorial sites.

2    Traditionally or historically retailers have not allowed

3    advertisements from other companies on their own Web sites, but

4    Longboard Media has been a pioneer in this space of getting

5    retailers to become comfortable with that.  And we acquired

6    Longboard Media in November of 2012.

7    **Q.**    And how did Longboard fit into the company's overall

8    strategy then?

9    **A.**    Well, as we worked through the second half of 2011 and the

10   first quarter or so of 2012 with our own experiments in media

11   and advertising, we developed a belief or, I guess, a

12   hypothesis about how we envisioned the retail advertising

13   market evolving.

14        We were seeing a lot of very strong signs of what was

15   going on.  For example, Amazon.com had developed their own

16   retail media business, and they had spoken very publicly about

17   how well that was going.

18        And we looked around at the marketplace, and we found a

19   small number of, you know, smaller startup companies doing that

20   sort of thing; and we began to feel that with our knowledge of

21   the retail industry and with our relationships with a large

22   number of brands, that that was the media business that made a

23   lot of sense for us to get into rather than try to organically

24   build it ourselves.

25   **Q.**    Then from 2009 to June or so of 2011, you were the chief

 1    innovation officer; is that right?

 2    **A.**   That's correct.

 3    **Q.**   If I understood you correctly, that required you to start

 4    thinking in terms of how the company would look five to ten

 5    years out and how the industry would shape out; is that

 6    correct?

 7    **A.**   That's correct.

 8    **Q.**   And would it require you also to examine the competitive

 9    landscape?

10    **A.**   It would at a very, you know, both current and long-term

11    level.

12    **Q.**   Okay.  And in that regard, sir, did you give thought to

13    how -- about Amazon?

14    **A.**   I did.

15    **Q.**   And about Amazon Webstore?

16    **A.**   That was one of several things with Amazon that we would

17    think about.

18    **Q.**   Describe for us how you viewed, if at all, Amazon and

19    Amazon Webstore as competition.

20    **A.**   Well, dating as far back as 2005 when we started the

21    company, Amazon was the biggest online retailer that utilized

22    ratings and reviews.  So in many ways when we began to think

23    about the business that we wanted to start, Amazon was an

24    inspiration to us because we were hearing from a lot of

25    retailers that we knew and had worked with in our prior jobs

 1   that they were having a harder and harder time competing with

 2   Amazon's innovation, their technology innovation, and their Web

 3   site feature innovation.

 4        And we felt that ratings and reviews was something that

 5   Amazon had been a pioneer in; and, so, that influenced the

 6   decision to build ratings and reviews as the first product that

 7   we envisioned in this larger social marketing suite or social

 8   commerce suite.

 9        We continued to, you know, monitor Amazon really

10   throughout our entire history.  There were times that Amazon

11   released new features on their site that interested us, that

12   made us think that, you know, we could apply the same logic as

13   we had with ratings and reviews and offer something similar.

14        We thought about Amazon in terms of how they influenced

15   the shopping behaviors of consumers.  We really feel -- I

16   really feel that because Amazon is the largest online retailer,

17   they.  Influence the behaviors and the expectations that

18   consumers have of an online shopping experience.

19        A good example would be how they've changed the

20   expectations around shipping.  You know, any large retailer has

21   had to really figure out how to compete with Amazon's free

22   shipping and prime services.  So that's one example.

23        We really felt that if Amazon continued to add innovative

24   features to their shopping experience, if our own retail and

25   brand customers didn't follow suit, they would be at a

 1   competitive disadvantage, so we needed to stay ahead of that

 2   and help them do that.

 3        And then more directly Amazon is an eCommerce platform and

 4   they offer their eCommerce platform to other retailers who

 5   literally want to run their online store on Amazon's

 6   infrastructure using Amazon technology.

 7        And there were a number of instances where we wanted to

 8   sell our products into a retail account or a brand account that

 9   used Amazon Webstore, and it was very difficult because we

10   believed -- or I believed that Amazon would prefer that that

11   brand or retailer use all of the out-of-the-box functionality

12   that Amazon Webstore offered, which included reviews.

13        So we did manage to sign some of those customers, but they

14   were always very difficult customers to implement because

15   Amazon didn't make it easy for us to implement.

16        And there were many, you know, many phone calls, many

17   meetings, even an in-person meeting that I attended in Seattle

18   at Amazon to try to break through and help our client get

19   implemented on their Webstore platform.

20        So I viewed them as competitive in that sense, that they

21   could -- they were -- you know, they could prevent us from

22   servicing a client that wanted to use us because they were on

23   the Amazon Webstore platform.

24   **Q.**   Did you view them in any context of potentially losing

25   customers to the Amazon Webstore?

1   **A.**   Absolutely.  I -- you know, every brand or retailer has to

2   make a determination of is it worth, you know, the extra

3   expense to use a third-party technology vendor like Bazaarvoice

4   or to just utilize all the functionality that comes built into

5   the Amazon Webstore platform.  So we certainly could lose

6   customers to Amazon Webstore.

7   **Q.**   And did you ever give any thought to the idea of Amazon

8   potentially developing a stand-alone application for ratings

9   and reviews?

10  **A.**   I did, yes.

11  **Q.**   Tell us what your thought process was in that regard.

12  **A.**   Well, I have a lot of respect for Amazon.  Amazon spends a

13  lot of money on technology.  I would estimate that they spend

14  more money on retail technology than any retailer in the world.

15  So they already had the ratings-and-reviews capability.

16      Our innovation as a company in 2005 when we started the

17  company was to take the ratings-and-reviews product and deliver

18  it as a stand-alone software solution in the software-as-a-

19  services model to retailers.

20      It was not a big stretch of the imagination, in my

21  opinion, to think that Amazon, if they wanted to enter that

22  business and directly serve retailers or brands in that way,

23  they would have no problem doing that from a technology

24  perspective.  It would merely be a decision on do they want to

25  be in that business, did they want that business model as a

1   complement to their existing businesses.

2   **Q.**   What about the -- this courtroom has heard a lot about

3   syndication.  How would syndication potentially work with

4   Amazon?

5   **A.**   Well, again, because Amazon has an extremely large

6   audience of consumers and because we not infrequently heard

7   from some large brand and retail -- particularly brand

8   customers of ours who sold their products through Amazon that

9   they wanted to syndicate their content to Amazon.

10       We did make attempts when I was the -- when I was

11  vice president of business development, I made attempts to

12  contact Amazon and to try to determine whether that would be

13  possible.  I was never successful.

14       We looked around at the market to try to understand who,

15  if not us, who was having success at syndicating content into

16  Amazon.  We couldn't find any good example of it, but we did

17  consistently hear from customers that they would like to be

18  able to syndicate to Amazon just because of Amazon's sheer size

19  and consumer reach.

20  **Q.**   Okay.  Let's switch topics a little bit to some of the

21  documents that you were shown during your direct exam.

22       If we could pull up, please, and in front of you also is,

23  or was, GX513.  Do you still have that?  It may be in the

24  bigger binder, Mr. Barton.

25  **A.**   (Witness examines document.)  I have it.

1   **Q.**   It's your email --

2   **A.**   Yes.

3   **Q.**   -- identifying the pros and cons of potentially acquiring

4   PowerReviews?

5   **A.**   Yes.

6   **Q.**   And that's April of 2011; right?

7   **A.**   Yes.

8   **Q.**   So it's about two years ago, two and a half years ago?

9   **A.**   Correct.

10  **Q.**   Okay.  I'd like to point out one specific component.

11  Under the pro, the first pro, under, "The elimination of our

12  primary competitor" -- do you see that?

13  **A.**   Yes.

14  **Q.**   -- there's a reference there to some figures "per

15  Osborne."  Do you see that?

16  **A.**   I do.

17  **Q.**   Did Mr. Osborne actually provide you with any analysis to

18  support those numbers?

19  **A.**   No.

20  **Q.**   How did you come up with those figures?

21  **A.**   It was gut, gut feel.  It was -- I was not directly

22  engaged -- certainly at that point in the company's history, I

23  was not directly engaged in any sales activity, but my office

24  was on the same floor as our Sales Team.  I would hear things.

25  It was anecdotal information that I was aware of.

1    And in writing the email and making that estimate, it was

2  my best guess.  It was something that I expected that as the

3  team, as the Management Team, debated all of these points, we

4  would get clarity on.  We would get some, you know, truth to;

5  but it was my best guess at the time.

6  Q.  Okay.  Now, if you could move further down, please, to the

7  bullet regarding low risk of customer attrition.  Do you see

8  that?

9  A.  Yes.

10  Q.  And you were asked about the phrase there, "the scarce/low

11  quality alternatives."

12  A.  Yes.

13  Q.  Now, this was April of 2011, two and a half years ago, and

14  you identified a number of entities that fit into the category.

15  Do you believe it's still true that those identities -- that

16  those entities that you talked about are, quote/unquote,

17  "scarce/low quality alternatives"?

18         THE COURT:  Mr. Pak, could you break that question

19  down competitor by competitor rather than like that?

20  BY MR. PAK:

21  Q.  If my memory recalls, I think -- or, Mr. Barton, if you

22  can remember -- I know you mentioned Pluck; is that right?

23  A.  Right.

24  Q.  Do you still consider Pluck to be today a

25  "scarce/low-quality alternative" in ratings and reviews?

1    A.    Based on my knowledge and, again, not being in the

2    business day to day since December, I believe that Pluck is

3    still around and I believe that Pluck is still competing

4    against us.  I don't know the -- I don't know how their

5    platform has changed fundamentally; but at the time that I

6    wrote the email, you know, I didn't perceive them as

7    significant of a threat, but they are still around to my

8    knowledge.  They still exist.

9    Q.    Okay.  You mentioned in-house solutions as I recall.

10   A.    Yes.

11   Q.    Do you consider today in-house solutions to be scarce or

12   low quality?

13   A.    Today I consider in-house solutions to be much more viable

14   than I did two, two and a half years ago.

15         MR. PAK:  Your Honor, frankly, those are the only ones

16   that I recall.

17         THE COURT:  I have Reevoo.

18         THE WITNESS:  Reevoo today I think is a much stronger

19   competitor than they were two and a half years ago.  Between

20   the timing of that email and when I actually left the company,

21   I had heard that Reevoo was actively in the U.S. and

22   enclosing -- you know, competing for a lot of the U.S.

23   business; whereas, historically, around the time that I wrote

24   that email, I primarily thought of them as more of a European

25   competitor.

 1          Lithium, again, between the timing of this email and

 2   today, I think that -- I think that they've grown as a company.

 3   If my memory serves me correctly, I think they may have made an

 4   acquisition themselves and may have a broader product offering.

 5   So they're still -- they're still a viable competitor.

 6   **BY MR. PAK:**

 7   **Q.**   What about Gigya?

 8   **A.**   Gigya at the time, as I previously answered the question,

 9   they were beginning to emerge as a potential competitor and I

10   think that they have grown into a much more relevant direct

11   competitor.

12              **MR. PAK:**  Did I miss someone, Your Honor?

13              **THE COURT:**  No.  That's good enough.  Thank you.

14              **MR. PAK:**  Can we please put on the screen DX564.

15   **Q.**   And that's in the binder, not the black binder,

16   Mr. Barton, but the smaller subdocuments that I've handed to

17   you.

18   **A.**   (Witness examines document.)

19   **Q.**   And you'll see that DX564 is an email that you wrote --

20   it's a chain of emails, but you wrote it in August of 2010.  Do

21   you see that?

22   **A.**   Yes.

23   **Q.**   And if I may draw your attention to the email at the

24   bottom, the middle, Brant to you -- I'm sorry, from you to

25   Mr. Hurt dated August 24, 2010.  Do you see that?

1   **A.**   Yes, sir.

2   **Q.**   And in the middle in particular, you wrote:   (reading)

3           "The bottom line is that ratings and review is headed

4       towards commodization as these cheaper/free 'good enough'

5       alternatives like RatePoint and Facebook comments emerge.

6       Yes, we competed effectively against a free PowerReviews,

7       but that was three years ago in much earlier stage

8       market."

9           Can you tell us, what did you mean by that reference to

10  commodization?

11  **A.**   Well, I meant that in 2005 when we first created the

12  ratings-and-reviews product and we first started the company, I

13  considered the -- I considered a hosted, fully managed

14  ratings-and-reviews solution to be pretty novel at the time.

15          By 2010, due to changes in technology, the lowering cost

16  of technology, new -- new technology architectures for

17  developing Web products, it was no longer that novel.

18          In addition, it was much -- it was very easy and --

19                          (Alarm going off.)

20          **THE COURT:**  This was only a test.

21                          (Laughter)

22          **MR. JACOBSON:**  Your Honor, that was not my phone.

23                          (Laughter)

24          **THE COURT:**  You didn't want to bring that up,

25  Mr. Jacobson.

1                        (Laughter)

2            **MR. JACOBSON:**  It persists in my memory.

3            **THE COURT:**  Okay.  I think we're okay.

4            **THE WITNESS:**  So to continue, over that period, I

5    believe that it has just become technically easier, less

6    capital intensive to offer a product exactly like ratings and

7    reviews and similar products.

8    **BY MR. PAK:**

9    **Q.**   Thank you.

10        If you could pull up, please, as well DX441.

11   **A.**   (Witness examines document.)

12   **Q.**   And this, too, Mr. Barton, is a series of emails starting

13   with April 27, 2011, and you're writing to a number of people

14   within the company; and in particular what I'd like to focus

15   upon is the bottom email, the one April 27, 2011 --

16   **A.**   Okay.

17   **Q.**   -- from you to Mr. Collins, ccing Mr. Hurt and Mr. Svatek.

18   And the subject is "Walmart Makes Big Social Commerce

19   Acquisition."  Do you see that?

20   **A.**   Yes.

21   **Q.**   And you write about an acquisition made by Walmart of

22   Kosmix?

23   **A.**   Yes.

24   **Q.**   And you continue to write:  (reading)

25            "They will have to heavily leverage this team to get

1      the ROI on that purchase, and I think we should be

2      concerned about Walmart eventually deciding to develop

3      their own Ratings and Review, Ask & Answer, et cetera,

4      capabilities, through this team."

5      Do you see that?

6  **A.**    Yes.

7  **Q.**    Can you give us -- expand upon what was going on here with

8  Kosmix and Walmart?

9  **A.**    I wasn't -- Kosmix was a technology firm based in this

10  area that was not particularly known for any big product of

11  their own but having a very good technology team.

12      It was my understanding in reading about this acquisition,

13  that Walmart's primary reason for acquiring the company was to

14  acquire that technology talent and maybe some of the

15  intellectual property that they held.

16      And my view, my general view, just on the increasing

17  viability of in-house solutions, was that for large retailers

18  in particular to compete with the innovation of Amazon, their

19  reliance on third-party technology vendors was only going to

20  get them so far; that they had to themselves develop

21  competencies in technology innovation internally.

22      And when I saw this headline, I thought:  Wow.  That's a

23  pretty big move.  That's a lot of money to pay for what I

24  believed to be a fairly small technology company; and I

25  believed that that was a sign that Walmart, who's very

1    innovative themselves but has a shorter history of online

2    innovation than Amazon, I looked at it as that's a leapfrog

3    move for Walmart.

4         And I believed that a consequence, a potential consequence

5    of that would be that Walmart would use that team to begin to

6    develop replacements for the third-party technologies that were

7    powering the Walmart.com shopping experience.

8         That proved to be true because the Kosmix team developed a

9    search engine for Walmart.com that replaced their third-party

10   search technology vendor.  I can't remember the exact time

11   frame of that but, of course, it was after this acquisition.

12        So I was just thinking that there's very good -- very good

13   potential or likelihood that they could seek to replace, you

14   know, our products and services with ones built by themselves.

15   **Q.**   Walmart was a customer of Bazaarvoice at the time; right?

16   **A.**   Yes.  That is correct, yes.

17   **Q.**   And this potential for the development of an internal

18   solution, in your mind was it limited to the uber retailers

19   like Walmart?

20   **A.**   No, I don't think it is.  I don't know how many retailers

21   would spend, you know, $300 million on acquiring a company as

22   Walmart did; but I think that with the lowering cost of

23   technology, with the -- with the innovation or, I guess,

24   evolution of the last seven, eight years in Web architectures

25   making it easier and faster to develop Web applications, I

1    think that any retailer has this capability.

2    **Q.**   The --

3    **A.**   And brand as well.  I'm sorry.

4    **Q.**   The potential for a client or a potential client to move

5    to an internal solution, or at least to have the internal

6    solution as an option out there, what impact, if any, or

7    influence does that have on the Bazaarvoice's pricing

8    strategies?

9    **A.**   Well, I think it -- it sets a threshold, right, for how

10   much value from a third-party technology vendor a client is

11   willing to pay for versus what they can do for themselves.

12        I think, you know, a client is always going to look at the

13   advantages and disadvantages of working with a third-party

14   provider; but I think that the prevalence of in-house build

15   certainly has an impact on what type of price we're able to

16   offer our products at.  Because if it's too high, it's a very,

17   you know, easy alternative for the retailer or the brand to

18   say, "I'm not willing to pay that price because I can do it for

19   far less myself."

20   **Q.**   Could I please ask that DX252 be called up?

21        And it's in front of you, Mr. Barton.

22   **A.**   Yes.

23   **Q.**   Mr. Barton, DX252 is another email written November 18,

24   2011.  Now, to put this in context, November 18th, 2011, the

25   company had also been talking about the possibility of

1    acquiring PowerReviews; is that right?

2    **A.**    Yes.

3    **Q.**    So these were simultaneous discussions going on?

4    **A.**    Correct.

5    **Q.**    And I draw your attention -- it's a series of emails

6    actually.  This one doesn't show -- oh, if you look at the last

7    page, it will show the meta data of the recipients of the

8    document.

9    **A.**    Okay.

10   **Q.**    And Stephen Collins received it, Brett Hurt received it,

11   Heather Brunner received it.  And I'd like to focus just on the

12   very first email, the one that starts on Friday, November 18,

13   2011.  The second bullet specifically.

14   **A.**    Uh-huh.

15   **Q.**    And you're writing to your colleagues; right?

16   **A.**    I am.

17   **Q.**    And you write there:  (reading)

18           "The allure of syndicating to large retailers is

19           leading non-BV brands (see the Hayneedle deal announced

20           today) to pursue direct syndication deals with those

21           retailers.  As a middleman and enabler of that form of

22           nonnative syndication, we can command a small cut, but I

23           believe that we will see savvy brands/retailers pursue

24           direct deals with one another since we have no real

25           ownership of the content."

1      Do you see that?

2  **A.**   Yes.

3  **Q.**   Could you expand upon what you meant there?

4  **A.**   Well, as much as we were, you know, investing in our own

5  syndication ability, the reality was that our clients owned

6  their data, they owned their content; and we were a licensee of

7  that content in order to provide the service that we provided,

8  but they could do whatever they wanted with that content.

9      And, so, in my mind, the real leverage in syndication

10  didn't exist with us.  It existed with the large brands that

11  had desirable content that retailers would want and the large

12  retailers that had desirable shopper audiences that brands

13  would want to reach.

14      And my view was that we should not, as a business, depend

15  or we should not expect long term for syndication to be, you

16  know, a source of significant revenue growth.

17      I felt that there was an upper limit to what we could

18  expect because if we -- again, if we approach that threshold of

19  value in the brand or retailer's mind, they could just elect to

20  go -- enter into a direct agreement with their top retail or

21  brand business partners and they could syndicate the content

22  themselves.

23      So I do believe that our syndication network provided

24  value from a technical integration perspective, but I don't

25  think we had the leverage that -- we didn't have the leverage

1  that the participants in that network had to do what they

2  wanted with their content.

3  **Q.**  Could you please call up DX -- I'm sorry, GX419?

4  **A.**  (Witness examines document.)  Yes.  I'm sorry.

5  **Q.**  GX419 is a series of emails.  It's been shown multiple

6  times in this courtroom already, and it's a series of emails

7  internally relating to -- starting with emails from BMO Capital

8  Markets to the company in September of 2011; and then there are

9  a number of internal emails discussing various topics that's

10 sparked by that initial email from BMO Capital Markets.

11     And the one email that I would like to focus upon is on

12 page 2, and at the bottom it starts with you writing to Stephen

13 Collins, members of the Executive Team, dated September 2011.

14 **A.**  Yes.

15 **Q.**  Do you see that?

16     And then on the next page is actually the substance of

17 your email; right?

18 **A.**  Yes.

19 **Q.**  And what you're doing there is responding to various

20 comments that Stephen Collins had made in the email before

21 that.  Do you see that?

22 **A.**  Yes.

23 **Q.**  And you write:  (reading)

24     "Stephen, great stuff.  Another way to think about

25     this -- and this is what Mike and I were hoping to talk

1           about on Monday at our offsite, but we ran out of time --

2           is that our core business (Content Capture and

3           Display)" --

4           By the way, is "content capture and display" the same

5     thing as ratings and reviews?

6     **A.**   It encompasses more than just ratings and reviews.  It

7     encompasses products like our Ask & Answer product and our

8     Stories product.

9     **Q.**   (reading)

10          -- "to put it simply, is trending towards

11          commodization and we ultimately need to look to new

12          initiatives -- CI" --

13          Is that customer or consumer intelligence?

14    **A.**   Customer intelligence.

15    **Q.**   And what's customer intelligence?

16    **A.**   Customer intelligence was an analytics product that we

17    were developing at the time.

18    **Q.**   Analyzing the data for ratings and reviews?

19    **A.**   Analyzing the data for ratings and reviews and other user

20    data that we captured, as well as content that we could import

21    from our own customers on their sales activity, customer

22    relationship data.

23    **Q.**   (reading)

24          -- "and then there's Network Advertising to completely

25          replace our core business revenue and much more.  It's

1          the lesson of so many B-school case studies.  If we

2          don't figure out how to completely replace our

3          'legacy' business, someone else will beat us to it."

4          Do you see that?

5    A.    Yes.

6    Q.    And, again, this is in September of 2011 contemporaneous

7    with the time that you're thinking about potentially acquiring

8    PowerReviews; is that correct?

9    A.    Yes.

10   Q.    And the reference there to commodization --

11   A.    Yes.

12   Q.    -- what did you mean by that?

13   A.    Again, I felt that with advances in technology, with I

14   think reaching a point of diminishing returns in terms of

15   investing more in ratings and reviews, I felt that while

16   ratings and reviews and our other user-generated content

17   products had been a good foothold for us as a business, it was

18   not something that we should rely on going forward.  It was

19   just going to become too easy for clients to do it themselves,

20   and it was becoming too easy or, you know, certainly the

21   opportunity for new competitors to come into the business was

22   easy.

23         Again, lower cost of technology, easier to build Web

24   applications in 2011 than it was in 2005; and I viewed that

25   our -- really our big opportunity, our future as a company was

1    in building new products on top of the data that we had

2    collected, products like the analytics product, as well as new

3    businesses, like our advertising and media business, that would

4    take advantage of the number of consumers that we were able to

5    reach through our customer base.

6        So that was what I felt the future of the company had to

7    be, and I felt that the longer that we relied or, you know,

8    depended on our -- the business that we started in 2005, the

9    more of a disadvantage we would be at in the future against the

10   competition that I felt was coming.

11       Because from 2005 to 2010 or, sorry, 2011, the timing of

12   this email, it was very clear that the social media, social

13   marketing opportunity was going to be a large one and there

14   were very large companies competing for it, so we had to have a

15   bigger vision.

16   **Q.**  Now, through these various documents, you've articulated a

17   number of macro-forces at play here, such as in-house solutions

18   and the need to move to the social commerce market, expand into

19   the social commerce market, et cetera.

20       At the same time the Government showed you a number of

21   emails and documents where you made these predictions about

22   market power, that acquiring PowerReviews would give you market

23   power, reduce price erosion, create a competitive moat, these

24   contemporaneous documents at the same time you were talking

25   about these macro-forces.

1  **A.**   Yes.

2  **Q.**   How do you square what appear to be conflicting kinds of

3  messages?

4  **A.**   Well, at the time that we were contemplating the

5  acquisition or the idea of acquiring PowerReviews, the way that

6  I thought of it at the time was we needed to buy ourselves

7  time.  I felt that we were behind as a business in developing

8  kind of the next stage of our business.  I was just then

9  beginning to lead the media initiative.  Customer intelligence

10 was a relatively new product.  So in our minds these things

11 hadn't yet taken off, but we had hope that they would, the

12 expectation that they would.

13      And I felt that the acquisition of PowerReviews would --

14 you know, number one, it would be meaningful and it would give

15 us a larger base of customers to go sell these new products

16 into; and I also felt that it would just buy us some time.  You

17 know, I thought of it in terms of if we acquire this company,

18 if we secure a position in the ratings-and-reviews business and

19 have a large amount of customers, hopefully -- I was hopeful

20 that that would discourage a new competitive threat immediately

21 going after that business because I wanted us to have the time

22 and the resources to focus on the bigger opportunity ahead.

23      And that was in spring of 2011, and I believe that I

24 underestimated -- or, excuse me, I overestimated the actual

25 effect on our business that that would have.

1  Q.   Sitting here today two and a half some odd years later, do

2  you believe the acquisition gave you that pricing power or gave

3  you relief from that price erosion?

4  A.   In the time that I was at the company subsequent to the

5  acquisition, I didn't see evidence of that; and since I've left

6  the company, I don't feel that that's the case.

7  Q.   Why is that?

8  A.   Well --

9       MR. SEVERT:  Objection.  Calls for speculation.

10       THE COURT:  You can answer.

11       THE WITNESS:  Well, since I left the company, I've

12  been -- I view myself as just simply an investor in the

13  company.  So I read everything I can read about the company.  I

14  listen to earnings calls.  I read what the investment community

15  thinks of the company's performance.

16       And, you know, my take on that is I don't see evidence in

17  that that the company has the pricing leverage that we might

18  have hoped that we would have back in 2011 when we first

19  contemplated this.  I think that the company is in a very

20  competitive environment.  It's going after a very big market

21  opportunity in social commerce; and just in the span of two

22  years, many more people are now competing in that market.

23  BY MR. PAK:

24  Q.   Earlier we referenced the Amazon Webstore.

25  A.   Yes.

1  Q.   Do you know of specific customers that you've lost out on

2  to the Amazon Webstore?

3  A.   I remember a couple of customers that we initially won

4  that were Webstore customers and that we had a very difficult

5  time implementing, and I'm not sure that they're still

6  customers.  I'm thinking of Timex, Fruit of the Loom.  I don't

7  have a good recollection of who all those specific customer

8  names were, but that's the best I can answer.

9           MR. PAK:  One housekeeping matter, Your Honor.  I

10  neglected to introduce into evidence three DXs that Mr. Barton

11  talked about during the course of his testimony that he

12  authored.  They are DX564, DX441, DX252.  I would like to move

13  them into evidence, Your Honor.

14           THE COURT:  Any objection?

15           MR. SEVERT:  No objection, Your Honor.

16           THE COURT:  They're admitted.

17       (Defendant's Exhibits DX252, DX441 & DX564 received in

18  evidence)

19           MR. PAK:  Thank you, Mr. Barton.

20           THE WITNESS:  Thank you.

21           THE COURT:  Mr. Severt.

22           MR. SEVERT:  Thank you, Your Honor.

23                    __REDIRECT EXAMINATION__

24  BY MR. SEVERT:

25  Q.   Mr. Barton, I wanted to just revisit some of the topic

1    areas that Mr. Pak just walked you through.

2         You talked with Mr. Pak about Amazon Webstore; right?

3    A.   Yes.

4    Q.   And it's true, isn't it, that Amazon Webstore doesn't sell

5    ratings and reviews on a stand-alone basis; right?

6    A.   To my knowledge, that's true.

7    Q.   Okay.

8    A.   I don't know if they do or not today.

9    Q.   And, indeed, Amazon owns the ratings-and-reviews data for

10   its Webstore clients; right?

11   A.   I'm not certain.

12   Q.   Okay.  And, indeed, Bazaarvoice has sold its

13   ratings-and-reviews products to Webstore customers to be

14   integrated into Webstore; right?

15   A.   We have.

16   Q.   And you talked to Mr. Pak about syndication.  Do you

17   remember that?

18   A.   Yes.

19   Q.   And Bazaarvoice is still charging for syndication today;

20   right?

21   A.   I don't know.

22   Q.   Well, as of the time you left Bazaarvoice, was it charging

23   for syndication?

24   A.   At the time I left, we were still charging.  I don't know

25   what that pricing was but, yes.

1    Q.    Okay.  And then Mr. Pak talked to you about Walmart;

2    right?

3    A.    Yes.

4    Q.    And Walmart is still a Bazaarvoice client; right?

5    A.    To the best of my knowledge they are, yes.

6    Q.    And Mr. Pak talked to you about Reevoo's entry into the

7    United States.  Do you remember that?

8    A.    Yes.

9    Q.    And Reevoo hired someone, hired an employee in the

10   United States; right?

11   A.    I seem to recall that being the case.

12   Q.    And you interpreted Reevoo hiring a U.S. employee as

13   Reevoo's entry into the U.S. market; right?

14   A.    I don't recall whether I interpreted it that way.  To me

15   it -- to me it signaled that, one, they valued the knowledge of

16   employee hours and that they would use that, you know, against

17   us in the U.S.

18        We were already competing with them in Europe, but the

19   international lines were blurred because we had multinational

20   customers; right?  So we had customers that we -- were based in

21   the U.S. but we supported them in Europe, and I think the

22   opposite may have been true for Reevoo.

23   Q.    But you put some significance on Reevoo hiring a U.S.

24   employee; right?

25   A.    Yes.

1   Q.   And you talked to Mr. Pak about Bazaarvoice's media

2   business; right?

3   A.   I did.

4   Q.   And you ran Bazaarvoice's media business for a time;

5   right?

6   A.   I did.

7   Q.   You started the business; right?

8   A.   Correct.

9   Q.   And that media business at Bazaarvoice predated the

10  PowerReviews acquisition; right?

11  A.   Yes, it did.

12  Q.   And in running the Bazaarvoice media business, you came to

13  the conclusion that the media business was an independent

14  opportunity from Bazaarvoice's core ratings-and-reviews

15  business; right?

16  A.   Well, it depended upon the assets that we had through our

17  core business.  The ultimate conclusion that we reached and the

18  rationale for acquiring Longboard Media was we already have a

19  large number of retailers and brands as customers.

20  Longboard Media has the infrastructure, the technology

21  infrastructure, some operational process and some human

22  capital, a team, that knows how to operate a retail media

23  network; but what they lacked were a large number of brands,

24  there could be advertisers on that network, and a large number

25  of retailers.

1          So I wouldn't call it independent because it -- our

2    rationale for that acquisition was that our core business

3    provides us this great customer base in which to sell

4    Longboard Media's offering.

5    **Q.**   But we can agree that you viewed the media business as

6    independent from the content generated by the core business?

7    **A.**   I did not feel that our media business had to utilize our

8    content.

9    **Q.**   Okay.

10   **A.**   Our data -- let me make a distinction.  When I say "our

11   content," I mean the user-generated content captured by our

12   ratings and reviews, asked and answered, stories products.

13         Data is different.  The data that we captured through our

14   core products on consumer shopping behavior, where on the site

15   the consumer browses, what products they look at, that was

16   highly relevant to our advertising business.

17   **Q.**   But the user-generated content you viewed as independent

18   from the media business?

19   **A.**   I viewed it as independent.

20   **Q.**   And then with Mr. Pak you discussed a number of other

21   ratings-and-reviews players.  Do you remember that?

22   **A.**   Yes.

23   **Q.**   And one you discussed was Reevoo; right?

24   **A.**   Yes.  Yes.

25   **Q.**   How many ratings-and-reviews clients in the U.S. does

1   Reevoo have, sir?

2   **A.**   I don't know.

3   **Q.**   Okay.  And you discussed Gigya?

4   **A.**   Yes.

5   **Q.**   How many ratings-and-reviews clients does Gigya have?

6   **A.**   I don't know that either.

7   **Q.**   How many ratings-and-reviews clients in the U.S. does

8   Pluck have?

9   **A.**   I don't know.

10  **Q.**   How many ratings-and-reviews clients in the U.S. does

11  Lithium have?

12  **A.**   I don't know.

13  **Q.**   How many ratings-and-reviews clients in the U.S. does

14  Viewpoints have?

15  **A.**   I don't know.

16  **Q.**   But you know that Viewpoints has eggs in the market;

17  right?

18  **A.**   That's not information that I'm aware of.

19  **Q.**   How many U.S. ratings-and-reviews clients does Magento

20  have?

21  **A.**   I'm not certain.

22  **Q.**   And you talked to Mr. Pak about the commodization of

23  ratings and reviews; right?

24  **A.**   Yes.

25  **Q.**   And it's your testimony that ratings and reviews is

1  turning toward commodization; do I have that right?

2  **A.**    I believe it is.

3  **Q.**    And that Bazaarvoice will need to replace its core

4  business; is that your testimony?

5  **A.**    I believe that our core business will continue to provide

6  a foundation for new things that we need to do; but my

7  testimony is that we have to think beyond our core business.

8  We have to leverage the assets that our core business has

9  provided us to go after the bigger market opportunity in social

10 commerce.

11       So if you're asking me do I think we need to terminate our

12 core business, the answer is no.  We need to continue to build

13 upon that business.

14 **Q.**    Okay.  Has Bazaarvoice gone to investors and told them

15 that its ratings-and-reviews product is headed toward

16 commodization?

17 **A.**    I'm not certain.  I haven't communicated with investors.

18 **Q.**    Okay.  And just despite this, Bazaarvoice in its business

19 judgment thought it made sense to spend $168 million to buy

20 PowerReviews, a company that had $11 million annual revenues

21 that sold, in your words, a commodity product that Bazaarvoice

22 already offered?  Do I have that right, sir?

23 **A.**    We did pay that amount.

24            **MR. SEVERT:**  Okay.  No further questions, Your Honor.

25            **THE COURT:**  Mr. Pak, anything else?

1          **MR. PAK:**  One quick question.

2                      **RECROSS-EXAMINATION**

3   **BY MR. PAK:**

4   **Q.**   In acquiring PowerReviews, were you purchasing just a

5   ratings-and-review product?

6   **A.**   No.

7   **Q.**   What were you acquiring?

8   **A.**   If my memory serves me correct, we were acquiring

9   somewhere between 2 and 4,000 customer relationships.  We were

10  acquiring millions of pieces of content that would benefit our

11  business.  In particular, it would benefit an analytics

12  business because it would give the analytics product more

13  content to analyze.

14       I felt that we were acquiring a ratings-and-reviews

15  product that was architected very differently from our own and

16  that would be very useful from a reseller standpoint because it

17  was more self-service and turnkey, and it would help us serve

18  the SMB market in the long tail of retail and brands.

19       So there were numerous things that I felt we acquired.

20          **MR. PAK:**  Thank you.  No further questions,

21  Your Honor.

22          **THE COURT:**  Mr. Severt, anything else?

23          **MR. SEVERT:**  No further questions, Your Honor.

24          **THE COURT:**  Let me ask you one question.

25          **THE WITNESS:**  Sure.

1          **THE COURT:**  A number of witnesses and you have used

2     the term "suite" of eCommerce products.  When did Bazaarvoice

3     start using that term?

4          **THE WITNESS:**  As a way to describe how we fit into

5     that concept?

6          **THE COURT:**  As a -- yes, as a way of -- well, first of

7     all, as a way of marketing your products, when did you start,

8     if you ever did, when did you start using that?

9          **THE WITNESS:**  Well, when we first launched the company

10    in 2005, the concept of an eCommerce suite existed at that

11    time.  It was just there were a bunch of different eCommerce

12    technologies provided by third parties that retailers or brands

13    could use.

14         And I think we didn't apply that label to ourselves

15    because at the time we had a single product.  By the time we

16    developed our Ask & Answer product, we began to think of our

17    own product offering as a social commerce suite.  The year of

18    that I would have to guess.  It was maybe 2007.  Maybe around

19    that time frame.

20         **THE COURT:**  And from 2007 on were you referring to

21    yourself in the marketplace as providing a social commerce

22    suite?

23         **THE WITNESS:**  We more often used -- tried to use the

24    term "platform."  We tried to, I think, dress that concept up

25    as a platform meaning all of the data, the content with

1    applications or products built on top of that platform.

2        So I think it's fair to call those applications a suite,

3    but I think we tended to use the term -- my recollection is

4    that we thought of ourselves as a platform more often.

5            THE COURT:  Is that true through the time that you

6    were working with the company?

7            THE WITNESS:  Yes.  By the last year, I can't recall

8    hearing the word "suite" as much because we were focusing on

9    several different prongs of the business opportunity, from

10   analytics to media to, you know, continuing to build out the

11   core business of user-generated content products; and we were

12   even thinking about, you know, different types of market and

13   research products.

14       So by my last year in the company, it was a much broader

15   concept of what kind of business we thought we would become

16   five years down the road; and I think, my opinion is that at

17   around that time frame, "social commerce suite" may have still

18   been a term in use to simplify for the market what we were

19   trying to do for them, but it was, I think, a limiting term

20   given how we were thinking about growing the business.

21           THE COURT:  Okay.  Thank you very much.

22           THE WITNESS:  Thank you.

23                   (Witness excused.)

24       MR. BONANNO:  Good morning, Your Honor.

25           THE COURT:  Mr. Bonanno.

1           **MR. BONANNO:**  The United States calls Mr. Michael

2    Osborne to the stand.

3                          (Pause in proceedings.)

4                   **MICHAEL ROBERT OSBORNE**,

5    called as a witness for the Plaintiff, having been duly sworn,

6    testified as follows:

7           **THE WITNESS:**  I do.

8           **THE CLERK:**  Be seated.

9        Please state your full name and spell your last name.

10          **THE WITNESS:**  Michael Robert Osborne, O-S-B-O-R-N-E.

11          **MR. BONANNO:**  Your Honor, before I begin, may I

12   approach the witness?

13          **THE COURT:**  Please.

14                          (Pause in proceedings.)

15                   **DIRECT EXAMINATION**

16   BY MR. BONANNO:

17   **Q.**  Good morning, Mr. Osborne.

18   **A.**  Good morning.

19   **Q.**  You worked with Brett Hurt at Coremetrics; right?

20   **A.**  Yes.

21   **Q.**  And you joined Bazaarvoice in 2006?

22   **A.**  Yes.

23   **Q.**  You were brought on at that time to run the Bazaarvoice

24   sales organization; correct?

25   **A.**  That is correct.

OSBORNE - DIRECT / BONANNO

1   Q.   You oversaw the day-to-day operations of Bazaarvoice's

2   U.S. Sales Team from that time until April of 2012; right?

3   A.   Yes.

4   Q.   And you held several titles during your tenure at

5   Bazaarvoice, which included VP of sales?

6   A.   Yes.

7   Q.   Vice president of worldwide sales?

8   A.   Yes.

9   Q.   And chief revenue officer?

10  A.   Correct.

11  Q.   You left Bazaarvoice at the end of 2012; right?

12  A.   That's right.

13  Q.   And at that time you held Bazaarvoice stock; is that

14  right?

15  A.   Yes.

16  Q.   Do you still own any Bazaarvoice stock, sir?

17  A.   I do.

18  Q.   What's the approximate value of your Bazaarvoice holdings?

19  A.   I don't know the monetary value.  I know the share number.

20  Q.   How many shares do you currently hold, sir?

21  A.   Approximately 511,000.

22  Q.   511,000 shares?

23  A.   Correct.

24  Q.   Now, since leaving Bazaarvoice in December of 2012, you

25  started your own company; right?

1  **A.**   Yes, that's correct.

2  **Q.**   The company's called Handshakes?

3  **A.**   Yes.

4  **Q.**   Handshakes provides a customer collaboration tool for the

5  enterprise sales process; is that fair to say?

6  **A.**   That's fair, yes.

7  **Q.**   And since starting Handshakes, your company's been able to

8  raise a venture capital round of financing; correct?

9  **A.**   Yes.

10  **Q.**   You announced the Series A round of financing sometime in

11  early of 2012?

12  **A.**   In early 2013.

13  **Q.**   I'm sorry.  2013.

14  **A.**   Yes.

15  **Q.**   You raised somewhere a little bit over three and a half

16  million dollars?

17  **A.**   That's correct.

18  **Q.**   And of that three and a half million dollars,

19  approximately three million came from a venture capital firm

20  called Austin Ventures; correct?

21  **A.**   Yes.

22  **Q.**   Currently, sir, Austin Ventures, as a result of that

23  investment, holds two of the five seats on the Handshakes Board

24  of Directors; correct?

25  **A.**   That is correct.

1  Q.   And Austin Ventures is also the largest shareholder in

2  Bazaarvoice today; correct?

3  A.   I don't know if they're the largest.  I know that they are

4  a large one.

5  Q.   And a general partner from Austin Ventures, Mr. Chris

6  Pacitti, sits on the Bazaarvoice Board of Directors; correct?

7  A.   I believe so, yes.

8  Q.   I'd like to go back and start during your tenure at

9  Bazaarvoice when you were in charge of the sales operations in

10  the United States.

11       You believed that PowerReviews was Bazaarvoice's closest

12  competitor; correct?

13  A.   I believed they were a competitor in the United States,

14  yes.

15  Q.   But they were Bazaarvoice's closest competitor in the

16  United States; correct?

17  A.   They were one of the major competitors, yes.

18  Q.   I don't think you're answering my question, Mr. Osborne.

19  In the United States, PowerReviews was Bazaarvoice's closest

20  competitor in your opinion; correct?

21  A.   Yes.

22  Q.   Now, with the acquisition of PowerReviews, you personally

23  thought that it was a way for Bazaarvoice to get back all the

24  customers it had lost along the way in the United States;

25  correct?

1   **A.**   I didn't know if we would get all of them back, but I

2   believed we would get some of them.

3   **Q.**   Mr. Osborne, I'd like you to turn, please, to GX222 in

4   your binder.

5   **A.**   (Witness examines document.)

6   **Q.**   And, Savannah, can we please zoom in on the envelope

7   information at the top?

8        Are you there, Mr. Osborne?

9   **A.**   I am.

10  **Q.**   This is an email conversation that you had with Sam Decker

11  in July of 2012; correct?

12  **A.**   Yes.

13  **Q.**   Mr. Decker is the former chief marketing officer at

14  Bazaarvoice; correct?

15  **A.**   That's correct.

16  **Q.**   And he currently is CEO of a company called

17  Mass Relevance; right?

18  **A.**   Yes.

19  **Q.**   And Mr. Decker was reaching out to you and asking for some

20  advice on how to approach a business going enterprise versus

21  focusing on small businesses; right?

22  **A.**   Yes.

23  **Q.**   All right.  Mr. Osborne, I'd like you to turn, please, to

24  I believe it's the third page -- excuse me, the fourth page of

25  this exhibit.  It's a document at the top that says "Why is

 1  going enterprise a better strategy?"

 2  **A.**   (Witness examines document.)   I'm there.

 3  **Q.**   Okay.  Mr. Osborne, this is a document that you created in

 4  response to Mr. Decker's question; correct?

 5  **A.**   Yes.

 6  **Q.**   I'd like to direct your attention, sir, to the very last

 7  bullet point under "Why is going enterprise a better strategy?"

 8  **A.**   (Witness examines document.)

 9  **Q.**   Do you see that, sir?

10  **A.**   Yes.

11  **Q.**   You wrote:   (reading)

12         "Our valuation for the same amount of time in market

13      was literally 12X that of our nearest competitor, and we

14      were able to acquire every customer we lost along the way

15      through the acquisition of PowerReviews."

16      Did I read that correctly?

17  **A.**   Yes.

18  **Q.**   I'd like to start with the section of this sentence that

19  reads, "Our valuation for the same amount of time in market was

20  literally 12X that of our nearest competitor...."

21      When you wrote "nearest competitor," you were referring to

22  PowerReviews; correct?

23  **A.**   Yes.

24  **Q.**   And you wrote this document in July of 2012?

25  **A.**   Yes.

1  Q.   Which was one month after the acquisition?

2  A.   I believe so, yes.

3  Q.   Now, in July of 2012, Bazaarvoice's valuation wasn't 12

4  times larger than Amazon.com's market valuation; was it?

5  A.   Not that I know of.

6  Q.   And in July of 2012, Bazaarvoice's valuation wasn't 12

7  times larger than Facebook; correct?

8  A.   I don't think so.

9  Q.   In July of 2012, was Bazaarvoice's valuation 12 times

10  larger than Google?

11  A.   I don't believe so.

12  Q.   What about Salesforce.com?

13  A.   I don't believe so.

14  Q.   IBM?

15  A.   No.

16  Q.   Oracle?

17  A.   No.

18  Q.   You also wrote that, "We were able to acquire every

19  customer we lost along the way through the acquisition of

20  PowerReviews"; correct?

21  A.   Yes.

22  Q.   Let's shift gears for a moment, Mr. Osborne.  I have a

23  couple questions for you about how Bazaarvoice sets prices or

24  set prices during your tenure when you were in charge of the

25  Bazaarvoice sales organization.

1    During the time that you ran Bazaarvoice's U.S. sales

2  operations, Bazaarvoice used value-based pricing methodology;

3  correct?

4  **A.**   Yes.

5  **Q.**   Okay.  I'd like you, please, sir, to turn to Government

6  Exhibit 203 in your binder.

7  **A.**   (Witness examines document.)

8  **Q.**   Are you there, sir?

9  **A.**   I am.

10 **Q.**   Okay.  Savannah, can we please zoom in on the top, the

11 envelope information?

12    And if you'd like to see the rest of the envelope

13 information, Mr. Osborne, I believe it's on page 4 of the

14 document.

15 **A.**   (Witness examines document.)   Uh-huh.

16 **Q.**   So this is an email that you received from Brett Hurt in

17 February of 2012; right?

18 **A.**   Yes.

19 **Q.**   And at the time Mr. Hurt was Bazaarvoice's CEO; correct?

20 **A.**   Yes.

21 **Q.**   The subject line reads, "Roadshow Questions - Prep for

22 This Weekend."  Did I read that correctly?

23 **A.**   Yes.

24 **Q.**   So Mr. Hurt was preparing for investor road shows for

25 Bazaarvoice's IPO; right?

1  **A.**    That is correct.

2  **Q.**    This is an email that he wrote to several members of the

3  Bazaarvoice Executive Team searching for examples to provide to

4  investors during road shows to explain how Bazaarvoice set the

5  price of its products; correct?

6  **A.**    Yes.

7  **Q.**    Okay.  And in the first line of his email Mr. Hurt writes:

8  (reading)

9          "The write-up that Osborne did for me to create a

10         narrative is even better.  See attached."

11         Do you see that, sir?

12 **A.**    I do.

13 **Q.**    Okay.  I'd like you to please turn to the fifth page of

14 the exhibit.  At the top of the slide -- or, excuse me, at the

15 top of the page it will read "Pricing Examples - Further

16 Narrative."

17 **A.**    (Witness examines document.)  I'm there.

18 **Q.**    Sir, this is the narrative that you prepared for Brett

19 Hurt to use when he explained to investors how Bazaarvoice set

20 the price of its ratings-and-review product; correct?

21 **A.**    Yes.

22 **Q.**    Okay.  I'll direct your attention to the first paragraph

23 under "Retail - Standard Size."  In the middle of the paragraph

24 you wrote:  (reading)

25         "Rarely does the conversation start with an RFP or a

1          current solution that we're replacing."

2          "RFP" stands for request for proposal; correct?

3     A.   Yes.

4     Q.   You go on to write:   (reading)

5          "Once the key benefits have been explained and the

6          prospect asks for pricing, we ask key questions to

7          determine the relative size of the impact to their

8          business."

9          Did I read that correctly?

10    A.   Yes.

11    Q.   And here you're referring to questions that the

12    Bazaarvoice salesperson would ask of a prospective customer to

13    learn more about their business; correct?

14    A.   Yes.

15    Q.   And Bazaarvoice would use that information during the

16    sales process to determine the impact that Bazaarvoice's

17    ratings-and-reviews platform would have on that particular

18    customer's business?

19    A.   Correct.

20    Q.   And the bullet points below you provide a high-level

21    summary of the types of information that Bazaarvoice

22    salespersons would seek to gain during the sales process;

23    correct?

24    A.   Yes.

25    Q.   All right.  Mr. Osborne, I'll direct your attention to

 1    kind of in the middle of the page.  There's a calculation that

 2    I'd like to talk about a little bit.

 3         Is this the kind of ROI calculation that Bazaarvoice would

 4    conduct to develop the price for a particular customer for its

 5    ratings-and-reviews product?

 6    A.    This is an example of an ROI calculation.  It was not done

 7    consistently.

 8    Q.    But this is a high-level example of how Bazaarvoice would

 9    conduct an ROI calculation to develop a pricing range; correct?

10    A.    Yes.

11    Q.    On the left-hand side there's a series of inputs in the

12    calculation.  Do you see that, sir?

13    A.    I do.

14    Q.    So the first line reads "Sales."  That refers to the

15    customer's online sales; correct?

16    A.    Yes.

17    Q.    And this is information that a Bazaarvoice salesperson

18    would obtain from the customer during the sales process;

19    correct?

20    A.    They would ask for it.  It wasn't always given, so it

21    could be estimated.

22    Q.    The next line down is "SKUs."  Do you see that, sir?

23    A.    Yes.

24    Q.    It stands for stock keeping units?

25    A.    Yes.

OSBORNE - DIRECT / BONANNO

1   **Q.**   And this would be the number of products that are on the

2   customer's Web site; correct?

3   **A.**   Yes.

4   **Q.**   This would also be information that Bazaarvoice obtained

5   from the customer during the sales process; correct?

6   **A.**   Again, we would ask for it.  If it wasn't provided, we

7   would estimate.

8   **Q.**   The next line reads "Transactions"?

9   **A.**   Yes.

10  **Q.**   Which is the number of transactions that occurred on a

11  customer's Web site?

12  **A.**   Yes.

13  **Q.**   The next line down is "Average Order Value"?

14  **A.**   That's correct.

15  **Q.**   That's also related to the customer's business?

16  **A.**   Yes.

17  **Q.**   The next line down is "Current Conversion Rate"?

18  **A.**   Yes.

19  **Q.**   This is also information related to the rate at which

20  visitors to a Web site convert the buyers for that particular

21  customer?

22  **A.**   Yes.

23  **Q.**   The next line reads "Current Expected Returns."  Do you

24  see that, sir?

25  **A.**   I do.

1   **Q.**   That is the returns that the customer expected to receive?

2   **A.**   This would be the amount of product returned to them.

3   **Q.**   Oh, the value of the products to be returned?

4   **A.**   Correct.

5   **Q.**   Okay.  The next line down reads "Content Expected."  Do

6   you see that, sir?

7   **A.**   Yes.

8   **Q.**   Now, that's an input into the ROI calculation that

9   Bazaarvoice would provide based on its experience with other

10  customers; correct?

11  **A.**   Yes.

12  **Q.**   And the line below that reads "Returns Reduced."  Do you

13  see that?

14  **A.**   I do.

15  **Q.**   And, again, this would be an item in the ROI calculation

16  that Bazaarvoice would estimate based on its experience with

17  other customers; right?

18  **A.**   Yes.

19  **Q.**   The line below that reads "Conversion Lift"?

20  **A.**   Yes.

21  **Q.**   This is an item that Bazaarvoice would estimate based on

22  its experience with other clients; right?

23  **A.**   Correct.

24  **Q.**   So all these inputs went to this ROI calculation to

25  develop guidance for a salesperson to develop a pricing

1   proposal; correct?

2   **A.**   It could be one of those examples, yes.

3   **Q.**   Okay.  There are also -- strike that.

4        And this is just a high-level summary for investors on how

5   an ROI calculation was performed; correct?

6   **A.**   Yes.

7   **Q.**   There were cases in which the ROI calculation was, in

8   fact, much more detailed; correct?

9   **A.**   There were different examples of it, yes.

10  **Q.**   The item that's labeled "Returns Reduced" in the ROI

11  calculation, this is one of the benefits of the Bazaarvoice

12  ratings-and-reviews product; correct?

13  **A.**   It was one of the benefits we marketed, yes.

14  **Q.**   So Bazaarvoice would market to potential customers that by

15  implementing Bazaarvoice's ratings-and-reviews platform, the

16  customer could expect to receive reduced return rates?

17  **A.**   Yes.

18  **Q.**   And increased conversion was another benefit of ratings

19  and reviews that Bazaarvoice marketed to its customers;

20  correct?

21  **A.**   Correct.

22  **Q.**   So after performing this ROI calculation and coming up

23  with a price, an initial proposal would be made to the

24  customer; correct?

25  **A.**   Yes.

1  Q.   And Bazaarvoice would then negotiate the final price with

2  the customer; right?

3  A.   Correct.

4  Q.   As a result of these individual negotiations, different

5  customers received different prices for Bazaarvoice's

6  ratings-and-review product; correct?

7  A.   Correct.

8  Q.   All right.  Let's shift gears again for a moment,

9  Mr. Osborne.  I'd like to talk about your role in the

10 Bazaarvoice sales organization as the company expanded beyond

11 the United States.

12     You were in charge of Bazaarvoice's sales organization

13 when it expanded first to the U.K.; right?

14 A.   I was.

15 Q.   And the first thing that Bazaarvoice did when it wanted to

16 expand into the U.K. market, was to hire a salesperson based in

17 the U.K.; correct?

18 A.   That's right.

19 Q.   Now, as Bazaarvoice expanded to new geographies, there

20 were times that a Bazaarvoice salesperson in the United States

21 would be selling to a company's U.S. Web site while another

22 Bazaarvoice salesperson in a different geography would be

23 selling to the same company's Web site in a different

24 geographic location; correct?

25 A.   That happened, yes.

1  **Q.**  And during the sales process, Bazaarvoice would know which

2  Web sites the customer had that its ratings-and-reviews

3  products would be used on; right?

4  **A.**  Generally, yes.

5  **Q.**  And Bazaarvoice faced different competitive dynamics in

6  different geographies; right?

7  **A.**  Yes.

8  **Q.**  All right.  I'd like to shift gears again and talk a

9  little bit more about the sales process and how these

10  negotiations worked with customers.

11      The time period in which a prospect was qualified through

12  the close of a sale or the loss of a deal is called a sales

13  cycle; right?

14  **A.**  Generally, yes.

15  **Q.**  And when you were in charge of the Bazaarvoice sales

16  organization in the United States, a typical sales cycle for

17  Bazaarvoice was on average between 90 and 150 days; correct?

18  **A.**  Yes.

19  **Q.**  And I suppose it's been implicit in the questioning, but

20  Bazaarvoice sold its ratings-and-reviews product through a

21  direct sales force; right?

22  **A.**  Yes.

23  **Q.**  When you managed the Bazaarvoice sales organization, you

24  provided training to Bazaarvoice salespersons on how to

25  negotiate a new deal; correct?

1   **A.**   I did.

2   **Q.**   You used the term "BATNA" during those training sessions;

3   correct?

4   **A.**   Later on in our time, yes, not initially.

5   **Q.**   And "BATNA" stands for "best alternative to negotiated

6   agreement"?

7   **A.**   That's right.

8   **Q.**   So you trained Bazaarvoice salespersons to ask questions

9   of a customer to determine what the customer's best alternative

10  to a negotiated agreement with Bazaarvoice was; correct?

11  **A.**   We trained them to ask a lot of questions, yes.

12  **Q.**   I don't think you're quite answering the question.

13      Did you train Bazaarvoice salespersons to ask questions to

14  determine what the customer's best alternative to an agreement

15  with Bazaarvoice was?

16  **A.**   Yes.

17  **Q.**   And it would have been typical during a sales process for

18  a Bazaarvoice salesperson to learn the pricing that

19  PowerReviews had offered to a customer; correct?

20  **A.**    It would have been typical for them to ask for it.

21  Whether they were able to provide it or not, it varied.

22  **Q.**   Bazaarvoice salespersons, though, frequently learned what

23  prices were offered by PowerReviews to a particular customer in

24  a competitive sales opportunity; correct?

25  **A.**   They learned what the prospect would tell them.

1   **Q.**   Mr. Osborne, I'd like you to turn, please, it should be I

2   think the last page of your binder.   It's a transcript from

3   your deposition.

4   **A.**   (Witness examines document.)

5   **Q.**   And you'll remember that you gave your deposition in this

6   case in April of 2013; correct?

7   **A.**   Yes.

8   **Q.**   I'd like you to please turn in your deposition to page 174

9   starting at line 4.

10  **A.**   (Witness examines document.)

11  **Q.**   Are you there, sir?

12  **A.**   I am.

13  **Q.**   You were asked the question:   (reading)

14      **"Q.**  So using that term to mean 'happens with frequency,'

15      would it have been typical for Bazaarvoice to learn the

16      pricing that PowerReviews was offering to a prospective

17      customer?

18      **"A.**  With some frequency, I'm sure it did."

19      Did I read that correctly?

20  **A.**   You did.

21  **Q.**   In fact, Mr. Osborne, most retail clients that Bazaarvoice

22  was pursuing considered PowerReviews at some time; correct?

23  **A.**   It's hard to define "most."  Many did.

24  **Q.**   Mr. Osborne, can you please turn to Government Exhibit 223

25  in your binder?

1    **A.**    Which page?  I'm sorry.

2    **Q.**    Government Exhibit 223.

3    **A.**    (Witness examines document.)

4    **Q.**    Are you there, sir?

5    **A.**    I am.

6    **Q.**    Savannah, can we please zoom in on the envelope

7    information on the top email?

8         Mr. Osborne, this is an email that you wrote to Stephen

9    Collins in December of 2011; correct?

10   **A.**    It is.

11   **Q.**    And, I'm sorry, Savannah, if we can look at the bottom

12   email first, Mr. Collins' email to Mr. Osborne.

13        Mr. Collins wrote to you:  (reading)

14            "Do we have any stats for how many deals are

15        competitive with PowerReviews?"

16        Do you see that, sir?

17   **A.**    I do.

18   **Q.**    And then in response to this question in your email at the

19   top of the page, you wrote:  (reading)

20            "In retail, most of our deals involve consideration of

21        PR at some point."

22        Do you see that, sir?

23   **A.**    Yes.

24   **Q.**    "PR" stands for PowerReviews?

25   **A.**    It does.

1   **Q.**   When you were in charge of the Bazaarvoice sales

2   organization, competition with PowerReviews was a factor that

3   caused Bazaarvoice to discount its prices; correct?

4   **A.**   It did in some circumstances, yes.

5   **Q.**   And in some circumstances Bazaarvoice offered to match the

6   price that PowerReviews offered; correct?

7   **A.**   Yes.

8   **Q.**   And there were also other cases where Bazaarvoice offered

9   a lower price than the price that PowerReviews had offered to

10   the customer; correct?

11   **A.**   I believe there were times, yes.

12   **Q.**   And you would make this lower offer after learning what

13   the PowerReviews price was in some cases; correct?

14   **A.**   We would make the lower offer after figuring out what we

15   thought it would take to win the deal.

16   **Q.**   When you ran the Bazaarvoice sales organization, sir,

17   Bazaarvoice attempted to get existing PowerReviews customers to

18   switch to the Bazaarvoice ratings-and-reviews platform;

19   correct?

20   **A.**   We did.

21   **Q.**   So, for example, let's look at Staples.   PowerReviews won

22   the Staples account sometime within your first year at

23   Bazaarvoice; correct?

24   **A.**   Yes, I believe so.

25   **Q.**   And during your tenure at Bazaarvoice running the sales

1  organization, Bazaarvoice made several attempts to get Staples

2  to switch from the PowerReviews ratings-and-reviews platform to

3  the Bazaarvoice ratings-and-reviews platform; correct?

4  **A.**   Yes.

5  **Q.**   To the best of your understanding, sir, Staples remained a

6  PowerReviews customer from the time that Bazaarvoice lost the

7  initial deal until the time of the acquisition of PowerReviews

8  by Bazaarvoice; correct?

9  **A.**   I believe so, yes.

10  **Q.**   There were also several occasions where Bazaarvoice

11  offered to give its ratings-and-reviews product to a

12  PowerReviews customer for free in order to get that customer to

13  switch from PowerReviews to Bazaarvoice; correct?

14  **A.**   I know there were examples of that, yes.

15  **Q.**   But switching costs made PowerReviews really hard to

16  unseat from its existing customer base; right?

17  **A.**   Inertia, switching costs, yes.

18  **Q.**   In contrast, sir, are you aware that Bazaarvoice recently

19  announced that Target will be switching from Pluck to

20  Bazaarvoice?

21  **A.**   Actually, I hadn't heard that.

22  **Q.**   Mr. Osborne, when you ran the Bazaarvoice sales

23  organization, PowerReviews also attacked Bazaarvoice's largest

24  clients in the *Internet Retailer 500*; correct?

25  **A.**   Yes.

1    Q.    But Bazaarvoice's network effects from syndication

2    prevented many customers from leaving Bazaarvoice; correct?

3    A.    I don't know if that was the only reason.

4    Q.    Let me ask the question again.  I think we've passed one

5    another again.

6         Bazaarvoice's network effect from syndication prevented

7    many customers from leaving Bazaarvoice; correct?

8    A.    I think it was an influence, yes.

9              MR. BONANNO:  Your Honor, may I approach the witness?

10             THE COURT:  Yes.

11             MR. BONANNO:  Your Honor, the document that's just

12   been handed to the witness and to the Court is not currently in

13   evidence.  We're going to label it for purposes of

14   identification right now as GX1220.

15        (Plaintiff's Exhibit GX1220 marked for identification)

16   BY MR. BONANNO:

17   Q.    Mr. Osborne, this is an email conversation that you had

18   with Brett Hurt in January of 2012; correct?

19   A.    Yes.

20             MR. BONANNO:  And before I read your email to

21   Mr. Hurt, I'd like to check with counsel's table to make sure

22   there are no confidentiality concerns.

23             MR. FELDMAN:  Good to go.

24   BY MR. BONANNO:

25   Q.    Mr. Osborne, in January of 2012, you wrote to Mr. Hurt:

1    (reading)

2            "We've seen the network effect already in our

3        renewals.  Customers that are using syndication generally

4        can't leave us and that's a great thing."

5        Did I read that correctly?

6    **A.**   You did.

7            **MR. BONANNO:**  Your Honor, at this time I'd like to

8    offer Government Exhibit 1220 into evidence.

9            **MR. FELDMAN:**  No objection.

10           **THE COURT:**  It's admitted.

11       (Plaintiff's Exhibit GX1220 received in evidence)

12   **BY MR. BONANNO:**

13   **Q.**   Mr. Osborne, when you ran the Bazaarvoice sales

14   organization, at some point you became aware that PowerReviews

15   was approaching Bazaarvoice's clients and offering to syndicate

16   their Bazaarvoice reviews to PowerReviews' retailers; correct?

17   **A.**   Yes.

18   **Q.**   And you told your team at that time that if they received

19   any request from a customer to syndicate their reviews outside

20   the Bazaarvoice network, to tell them that Bazaarvoice would

21   not support that service; correct?

22   **A.**   It came at a cost so, yes, I told them not to do that.

23   **Q.**   And you personally at the time saw this as a new

24   competitive battle coming from PowerReviews; correct?

25   **A.**   I saw it as a potential threat, yes.

1  **Q.**   Mr. Osborne, can you please turn to Government Exhibit 210

2  in your binder?

3  **A.**   (Witness examines document.)

4  **Q.**   And, Savannah, can we please zoom in on the top email?

5       Mr. Osborne, this is an email that you wrote in January --

6  or, excuse me, in June of 2011; correct?

7  **A.**   Yes.

8  **Q.**   I'm going to focus your attention on the second paragraph

9  where you wrote:   (reading)

10       "Please read the thread but tell all of your teams

11       (SDs and MDs) that we do not support syndication outside

12       of our network -- and if we get requests for it, escalate

13       to the top immediately.  There's a new competitive battle

14       coming, and we're about to bring the rain."

15       Did I read that correctly?

16  **A.**   You did.

17  **Q.**   You're referring to a new competitive battle coming with

18  PowerReviews; correct?

19  **A.**   Yes.

20       **MR. BONANNO:**  Your Honor, I don't believe that

21  Government Exhibit 210 has been admitted pursuant to the

22  Court's order and the parties' stipulation.  I'd like to offer

23  it into evidence at this time.

24       **MR. FELDMAN:**  No objection.

25       **THE COURT:**  Admitted.

1          (Plaintiff's Exhibit GX210 received in evidence)

2    BY MR. BONANNO:

3    Q.    Mr. Osborne, when you were chief revenue officer at

4    Bazaarvoice running the Bazaarvoice sales organization,

5    competition with PowerReviews caused price erosion; correct?

6    A.    I believe it was a factor.

7    Q.    Mr. Osborne, when you were chief revenue officer and ran

8    the Bazaarvoice sales organization, competition with

9    PowerReviews caused price erosion; correct?

10   A.    I believe it was a factor, yes.

11   Q.    If you could please turn in your binder to Government

12   Exhibit 513.

13   A.    (Witness examines document.)

14   Q.    And, Savannah, if you could zoom in at the top of the

15   email.

16        Mr. Osborne, this is an email that Brant Barton sent to a

17   number of Bazaarvoice executives in April of 2011; correct?

18   A.    Yes.

19   Q.    Mr. Barton was one of the cofounders of Bazaarvoice?

20   A.    Yes.

21   Q.    Okay.  I'd like to focus your attention, sir, on the first

22   bullet point under "Pros" in which Mr. Barton wrote:  (reading)

23             "Elimination of our primary competitor in both the

24        U.S. and Europe and expected impact of this consolidation

25        is relief from the price erosion that sales experiences in

OSBORNE - DIRECT / BONANNO

1    30 to 40 percent of deals, per Osborne, of up to 15 to

2    30 percent."

3    Do you see that, sir?

4    **A.**    I do.

5    **Q.**    You were chief revenue officer at the time that Mr. Barton

6    wrote this email?

7    **A.**    I believe so, yes.

8    **Q.**    So you were running the U.S. sales organization for

9    Bazaarvoice?

10    **A.**    I was running the global sales organization, yes.

11    **Q.**    So you were in charge of the U.S. sales operations at that

12    time?

13    **A.**    Yes.

14    **Q.**    And you're the Osborne that Mr. Barton refers to?

15    **A.**    Yes.

16    **Q.**    You told Mr. Barton that PowerReviews caused price

17    erosion; correct?

18    **A.**    I believe we had a conversation about it.  I must have.  I

19    don't think that Brant would make that up.

20    **Q.**    And you agreed with Mr. Barton's analysis that he lays out

21    in this email; correct?

22    **A.**    Not all of it, no.

23    **Q.**    Mr. Osborne, I'd like you to turn to Tab 12 in your

24    binder -- excuse me, strike that -- to GX219 in your binder,

25    please.

1   **A.**   (Witness examines document.)

2   **Q.**   Savannah, can you please zoom in on the top email?

3       Mr. Osborne, this is the response that you sent to

4   Mr. Barton after you received his email in Government

5   Exhibit 513; correct?

6   **A.**   Yes.

7   **Q.**   And in response to Mr. Barton's analysis outlining the

8   reasons for considering the acquisition of PowerReviews,

9   including the elimination of price competition, you wrote,

10  "Dude, I love your brain"; correct?

11  **A.**   Yes.

12  **Q.**   I'd like you to please turn to --

13          **MR. BONANNO:**  I'm sorry.  Before I move on,

14  Your Honor, I don't believe that Government Exhibit 219 has

15  been admitted into evidence, and I'd like to offer it at this

16  time.

17          **MR. FELDMAN:**  The redacted version or the native

18  version?

19          **MR. BONANNO:**  Whichever the Court prefers.

20          **MR. FELDMAN:**  No objection.

21          **THE COURT:**  Admitted.  It's admitted.  I think we can

22  use the redacted one.  That's fine.

23      (Plaintiff's Exhibit GX219 received in evidence)

24  **BY MR. BONANNO:**

25  **Q.**   Mr. Osborne, I'd like you to turn to Government

1    Exhibit 220, please, in your binder.

2    **A.**   (Witness examines document.)

3    **Q.**   Are you there, sir?

4    **A.**   I am.

5    **Q.**   This is an email that Brant Barton wrote to Brett Hurt in

6    April of 2011; correct?

7    **A.**   Yes.

8    **Q.**   At the very top of the page?

9    **A.**   Yes.

10   **Q.**   And in his email Mr. Barton wrote:  (reading)

11         "I bounced this idea off of Stephen, Svatek, and

12        Osborne before sending the email and all were similarly

13        supportive."

14        Do you see that, sir?

15   **A.**   I do.

16   **Q.**   You're the Osborne that Mr. Barton was referring to?

17   **A.**   I am.

18        **MR. BONANNO:**  Your Honor, I don't believe that GX220

19   is in evidence, and I'd like to offer it at this time.

20        **MR. FELDMAN:**  No objection.

21        **THE COURT:**  Admitted.

22      (Plaintiff's Exhibit GX220 received in evidence)

23   **BY MR. BONANNO:**

24   **Q.**   Mr. Osborne, can you please turn to Government Exhibit 221

25   in your binder?

1    **A.**    (Witness examines document.)   I'm there.

2    **Q.**    Mr. Osborne, this is an email conversation that you had

3    with Mr. Barton a few days after he had sent you an email in

4    which he outlined the reasons for acquiring PowerReviews,

5    including the elimination of price competition; correct?

6    **A.**    Yes.

7    **Q.**    I'd like to direct your attention, sir, to the email that

8    you sent to Mr. Barton.   I believe it's the third email on the

9    page, and in this email you wrote:   (reading)

10           "If we buy them, it changes everything for our model.

11       I'll have an SMB solution immediately and potentially

12       chunks of the MD team that can immediately go back to all

13       the A1's to talk about BV lite.   Because 10 to 20 percent

14       price erosion will disappear.   Because I'll have some

15       talent to vet immediately, and make a call on consuming or

16       rejecting.   Because this is competitively huge and I have

17       opinions."

18       Did I read that correctly?

19    **A.**    You did.

20    **Q.**    Acquiring PowerReviews would have been competitively huge

21    for Bazaarvoice; correct?

22    **A.**    That's what I believed.

23    **Q.**    Because 10 to 20 percent price erosion would disappears;

24    correct?

25    **A.**    That's what I believed.

1  Q.  And this is what you believed based on your experience and

2  your position as chief revenue officer of Bazaarvoice; correct?

3  A.  That's what I believed based on my estimates.

4  Q.  And you were the chief revenue officer at Bazaarvoice at

5  this time?

6  A.  Yes.

7  Q.  You ran the Bazaarvoice sales organization?

8  A.  Yes.

9  Q.  Mr. Osborne, you're familiar with project Menlogeddon;

10  correct?

11  A.  Yes.

12  Q.  In fact, you came up with the name; right?

13  A.  I did.

14  Q.  And Menlogeddon was an initiative to focus the Bazaarvoice

15  Sales Team on competing more effectively with PowerReviews;

16  correct?

17  A.  Yes.

18  Q.  During your tenure running the sales organization at

19  Bazaarvoice, are you aware of any project that was intended to

20  focus the Bazaarvoice Sales Team on competing more effectively

21  with Facebook?

22  A.  No.

23  Q.  Are you aware of any project during your tenure running

24  the Bazaarvoice sales organization that was intended to focus

25  the Sales Team on competing more effectively with Amazon?

1  **A.**   No.

2  **Q.**   Sir, are you aware of any project that was run during your

3  tenure running the Bazaarvoice sales organization that was

4  intended to focus the Sales Team on competing more effectively

5  with Twitter?

6  **A.**   No.

7  **Q.**   Sir, are you aware of any project that was intended to

8  focus your Sales Team on competing more effectively with Gigya?

9  **A.**   No.

10  **Q.**   And no other initiative like project Menlogeddon arose

11  targeting Lithium either; correct?

12  **A.**   Not like project Menlogeddon, no.

13  **Q.**   Mr. Osborne, in your opinion, sir, Bazaarvoice has won the

14  reviews market; correct?

15  **A.**   I guess it's hard to define a win, but I'm sure I thought

16  that.

17  **Q.**   And by "reviews market," we're referring to the market for

18  Bazaarvoice's ratings-and-reviews software; correct?

19  **A.**   Yes.

20       **MR. BONANNO:**  If I can just have one moment,

21  Your Honor.

22                  (Pause in proceedings.)

23       **MR. BONANNO:**  I have no further questions at this

24  time.

25       **THE COURT:**  Okay.  Why don't we take our ten-minute

1    break here, and then we'll be back.

2                    (Recess taken at 11:11 a.m.)

3              (Proceedings resumed at 11:21 a.m.)

4         **THE COURT:**  Thank you.  Please be seated.

5                    <u>**CROSS EXAMINATION**</u>

6    **BY MR. FELDMAN**

7    **Q.**   Good morning, Mr. Osborne.  I handed you a resume pulled

8    from your deposition, and I handed it up to His Honor.

9              **MR. FELDMAN:**  Do you have it, Judge?

10             **THE COURT:**  I do.

11   **BY MR. FELDMAN**

12   **Q.**   Would you give us just a quick educational summary,

13   please.

14   **A.**   Sure.  I went to high school at Phillips Exeter Academy,

15   followed by college at Carnegie Mellon for electrical computer

16   engineering.

17   **Q.**   And then you started at Bazaarvoice in what year?

18   **A.**   2006.

19   **Q.**   Okay.  Let me establish what the financial periods were.

20   Am I right that the fiscal year at Bazaarvoice ended April 30?

21   **A.**   Yes.

22   **Q.**   So Q1 FY12 ended July 31, 2011?

23   **A.**   Yes.

24   **Q.**   Q2 FY12 ended October 31, 2011?

25   **A.**   Yes.

1   **Q.**   Q3 FY12 ended January 31, 2012?

2   **A.**   Yes.

3   **Q.**   And Q4 FY12 ended April 30, 2012.  Is that right?

4   **A.**   Correct.

5   **Q.**   Did Bazaarvoice miss its internal sales targets for any of

6   those quarters?

7   **A.**   During fiscal year '12, yes, we did.

8   **Q.**   Which one?

9   **A.**   The quarter ending October.

10   **Q.**   So it missed Q2?

11   **A.**   Yes, I believe that's right.

12   **Q.**   Did you make your numbers, your sales numbers for Q3 or

13   Q4?

14   **A.**   I believe we did in Q3 and Q4.

15   **Q.**   Were you still the chief revenue officer for those

16   quarters?

17   **A.**   I was not.

18   **Q.**   What happened?

19   **A.**   After missing in Q2, I was asked to step down as chief

20   revenue officer and take over the American sales operations.

21       Mark Riggs moved to the UK, to take over as GM of Europe.

22   **Q.**   Prior to Q2 of fiscal '12 what was your track record on

23   making or missing your sales targets?

24   **A.**   I had only missed one before that.

25   **Q.**   Of about how many quarters?

1   **A.**   Twenty-four, 25.

2   **Q.**   Okay.  So I'm going to hand you Exhibit GX202.

3        Do you recognize the document?

4   **A.**   I do.

5   **Q.**   What is it?

6   **A.**   It's a summary of the results from Q2 of fiscal year '12.

7   **Q.**   If you turn in to -- it starts to turn to color at some

8   point and says:

9        "BV Q2 FY12 Sales Summary.  Final Results and

10       Analysis."

11       Do you see that page?

12  **A.**   Yes.

13       **MR. FELDMAN:**  It looks like this (indicating).

14  **BY MR. FELDMAN**

15  **Q.**   Did you prepare those PowerPoint slides?

16  **A.**   I contributed to them and reviewed them, but I did not

17  create them.

18       **MR. FELDMAN:**  I move the admission of GX202 into

19  evidence, Your Honor.

20       **MR. BONANNO:**  No objection, Your Honor.

21       **THE COURT:**  Admitted.

22     (Plaintiff's Exhibit GX202 received in evidence)

23  **BY MR. FELDMAN**

24  **Q.**   I'm going to ask you about just one page.  It's slide

25  number 5.

1          **MR. FELDMAN:**  If we could pull that up.  Slide 5.

2  Perfect.  Thank you.

3  **BY MR. FELDMAN**

4  **Q.**   At the top it says:

5          "Q2 Summary - Operational Insights."

6       Can you tell us what that page was about?

7       Was this for the board, by the way?

8  **A.**   This would have been for the board, yes.

9  **Q.**   Okay.  What was slide 5 about?

10  **A.**   A summary of the quarter's performance.

11  **Q.**   So, first, I want you just to take a second and read it to

12  yourself, and see if in giving your operational insights to the

13  board about the October 31 quarter you said anything about

14  PowerReviews' competition.

15  **A.**   No.

16  **Q.**   Okay.  Let me direct your attention, I'm just going to ask

17  you about two bullets.  The second bullet reads, quote:

18          "Average discount rate reduced by about 20% Q2 vs. Q1

19       (39.9% vs. 47.9%)."

20       What does that mean?

21  **A.**   That means that the discount rate fell from Q1 to Q2.  It

22  improved.

23  **Q.**   It improved by -- I don't want to make you take your shoes

24  and socks off -- but about 15 percent?

25  **A.**   Yes.

OSBORNE - CROSS / FELDMAN

1    Q.   And that was during a period of pretty intense competition

2    from PowerReviews?

3    A.   Yes.

4    Q.   Okay.  And then the bullet right after that says, quote:

5         "New business represented largest improvement, average

6    discount reduced to 13.5% vs. 33.5 percent)."

7    What does that mean?

8    A.   That means for new business -- not cross-sell or upsell --

9    the discount rate improved by more than what we saw for the

10   average.

11   Q.   As you eyeball that, does that mean between the July

12   quarter and the October quarter the discounting improved by

13   about two-thirds?

14   A.   Yes.

15   Q.   Okay.  I don't have any other questions for you on that

16   exhibit.  I'm just going to ask you about two that Mr. Bonanno

17   used for you.

18       Let me ask you first, did you ever conduct a quantitative

19   analysis of what impact PowerReviews had on pricing to

20   Bazaarvoice customers?

21   A.   No.

22   Q.   Did you ask anyone else at Bazaarvoice to conduct such an

23   analysis?

24   A.   No.

25   Q.   I'm going to hand you -- I'm going to give it to you.  On

1    mine it's marked GX221, but I think that when Mr. Bonanno used

2    it with you he used a version called GX513.

3         They like it so much, they've given it many different

4    numbers.

5         Did I give you 221 or 218?

6    A.   I have 221.

7    Q.   Okay.  I meant to start with 218.  I misspoke.  But you

8    can just hold that.  They did ask you about 221.

9         218 is the same as 513.  I'm going to ask you first about

10   218, which is also GX513.  And this has the passage that says,

11   quote:

12            "An expected impact of this consolidation is relief

13            from the price erosion that sales experiences in 30 to 40%

14            of deals per Osborne of up to 15 to 30%."

15        Do you recall ever meeting with Mr. Barton to give him

16   that data?

17   A.   No.

18   Q.   At the time of this email, had you seen within the company

19   any quantitative analysis of the impact of PowerReviews on

20   Bazaarvoice's pricing?

21   A.   No.

22   Q.   Okay.  Now, I want you to look at the other document.

23   Sorry, I did them out of order.  Exhibit 221, which Mr. Bonanno

24   gave you.

25   A.   Uh-huh.

1    **Q.**    Do you remember this email?

2    **A.**    I do.

3    **Q.**    What's the context?

4    **A.**    The context was there was a meeting to discuss the

5    acquisition of PowerReviews, and I wanted to be at it.

6    **Q.**    When you said -- let's go back to some of the things that

7    Mr. Bonanno didn't read you, in the middle of the page.

8            "If we buy them it changes everything for our model.

9        I'll have an SMB solution immediately."

10       What did you mean by "I'll have an SMB solution

11   immediately"?

12   **A.**    I would have a way of addressing the SMB market, the

13   smaller retailers, smaller companies.

14   **Q.**    Some of the evidence today -- you weren't here -- talked

15   about a long tail.  Would that be the same thing?

16   **A.**    That would be the same thing.

17   **Q.**    Small customers?

18   **A.**    Correct.

19   **Q.**    Were those customers served primarily by PowerReviews

20   Express?

21   **A.**    They were.

22   **Q.**    And then you said:

23           "And potentially chunks of the MD team that can

24       immediately go back to all the A1's to talk about BV

25       Lite."

OSBORNE - CROSS / FELDMAN

1          Can you explain to me in order what the "MD team" means,

2     who the "A1's" are, and what "BV Lite" is.

3     **A.**   The MD team was our team of market developers.  They were

4     the appointment setters, and the company, the SDs and

5     territories to help them acquire customers.

6          And the A1's were the smallest, by our ranking, so we had

7     ignored them previous to that.

8     **Q.**   And what was BV Lite?

9     **A.**   BV Lite was a concept we had discussed around a solution

10    to address the SMB market, which we never built.

11    **Q.**   Okay.  And then you say, quote:

12         "Because 10 to 20% price erosion will disappear."  Did

13         you believe that at the time?

14    **A.**   I must have.

15    **Q.**   What did you base that on?

16    **A.**   My experience and just general sense.

17    **Q.**   Did you have any data to back it up?

18    **A.**   I did not.

19    **Q.**   I'm going to ask you about one other topic, and then I'll

20    leave you alone.

21         "How The Deal Was Done," those documents.

22    **A.**   Yes.

23    **Q.**   HTDWD.  Are you familiar with those?

24    **A.**   I am.

25    **Q.**   What was their purpose?

1    **A.**    They were advertisements for salespeople to broadcast

2    their wins.

3    **Q.**    Was there a process or a control for checking their

4    accuracy and completeness?

5    **A.**    There was not.

6    **Q.**    On the sales force database that your company used to

7    follow deals, in general, how accurate did you find the

8    competitive information contained in that?

9                **MR. BONANNO:**   Objection.   Foundation.

10               **MR. FELDMAN:**   Fair enough.

11   **BY MR. FELDMAN**

12   **Q.**    Were you familiar with the Salesforce Database?

13   **A.**    Yes.

14   **Q.**    Was there a portion of the Salesforce Database that

15   addressed competitors in the potential deal?

16   **A.**    Yes.

17   **Q.**    Were you familiar with that part of it?

18   **A.**    I was.

19   **Q.**    Did you have a view as to how dependable that was?

20   **A.**    It was not dependable.

21   **Q.**    Why not?

22   **A.**    Because Salesforce hygiene is generally a difficult thing

23   to get a sales team to do.   And ours was particularly bad.

24               **MR. FELDMAN:**   Okay.   I don't have any other questions.

25          Thank you, Your Honor.

1     **THE COURT:**  Mr. Bonanno, anything else?

2     **MR. BONANNO:**  Just a few follow-up questions, Your

3  Honor.

4     **THE COURT:**  Please.

5                 <u>**REDIRECT EXAMINATION**</u>

6  BY MR. BONANNO

7  **Q.**   Mr. Osborne, I'd like you to start with what Mr. Feldman

8  had given you, Government Exhibit 202.  He had asked you a

9  couple of questions.

10  **A.**   I have it.

11  **Q.**   I believe he asked you some questions about page 5,

12  Operational Insights.

13       Are you there, sir?

14  **A.**   I am.

15  **Q.**   There's some lines -- I'll direct your attention to the

16  second bullet point that reads:

17         "Average discount rate reduced by 20%."

18  **A.**   Yes.

19  **Q.**   This refers to the Bazaarvoice discount rate for deals

20  that it had won in that quarter, correct?

21  **A.**   I can't actually say what it refers to.  It may have.

22  **Q.**   You have no idea what that refers to?

23  **A.**   I didn't perform the analysis.

24  **Q.**   Mr. Feldman, I think, just had you discuss whether this

25  represented a drop in discounting during a period in which you

1   were writing about price erosion from PowerReviews, correct?

2   A.   Yes.

3   Q.   But now you're testifying you have no idea what "average

4   discount rate" means on this page at all?

5   A.   No, I do.  I just don't know if it included lost deals or

6   only closed one.

7   Q.   How would you measure an average discount rate in a lost

8   deal?

9   A.   The last amount of discount given before you lost the

10   deal.

11   Q.   And you can't say with certainty whether lost deals were

12   included in this or not?

13   A.   No.  Sales operations created this analysis; I did not.

14   Q.   So you personally didn't create any of the analysis on

15   this page?

16   A.   I did not.

17   Q.   So you weren't involved in the quantitative analysis that

18   appeared on this page, right?

19   A.   I would view these results.

20   Q.   This page also doesn't say anything about any discounts

21   that Bazaarvoice would have offered to its existing customers

22   in response to competitive pressure from PowerReviews; does it?

23   A.   Under the second bullet and the second subbullet it

24   mentions:

25          "Cross-sell/upsell average discount remains similar."

1          That would have been to current customers for cross-sell

2     business or upsell business in that quarter.

3     **Q.**   Okay.  Let's parse that out a little bit so we're clear

4     then.

5          Cross-sell is selling new products within a customer

6     family, correct?

7     **A.**   Cross-sell is selling to new brands under an umbrella;

8     whereas, upsell is selling new product to the same brand.

9     **Q.**   Okay.  What about instances where you're selling a product

10    to a customer and you offer a discount to that customer for the

11    product they're already purchasing in response to PowerReviews?

12    Where does that appear on this page?

13    **A.**   I don't know if it does.  That would have been a renewal

14    discount.

15    **Q.**   So that's not in this analysis on the page that your

16    counsel had asked you questions about, correct?

17    **A.**   I don't see it.

18    **Q.**   All right.  Mr. Osborne, Counsel had also asked you some

19    questions about the Salesforce Database, correct?

20    **A.**   Yes.

21    **Q.**   This was the sales management platform that Bazaarvoice

22    used when you ran the sales organization in the United States,

23    correct?

24    **A.**   It was our CRM system.

25    **Q.**   Right.  So that was the only system that Bazaarvoice used,

1    right?

2    **A.**    We also had NetSuite, which stored other data, so that the

3    sales team interacted with Salesforce.

4    **Q.**    Centralized database where the sales team tracked leads

5    from the time they were identified as a prospect until the

6    opportunity was closed, correct?

7    **A.**    Yes.

8    **Q.**    And during your tenure as managing the Bazaarvoice sales

9    team, you never had any policy in place where the sales team

10   was instructed to only record the presence of PowerReviews in

11   competitive sales opportunities, correct?

12   **A.**    I'm not sure I understand the question.  To record only

13   that as the competitor?

14   **Q.**    Right.

15   **A.**    No, I wouldn't have made that specific policy.

16   **Q.**    And just so we're clear, that's the only centralized

17   database where the sales team tracked information related to

18   sales leads in Bazaarvoice, correct?

19   **A.**    Yes.

20   **Q.**    In fact, sir, you used information gathered from

21   Salesforce when you prepared presentations, such as that

22   depicted in Government Exhibit 202, to provide information to

23   the board of directors about the sales pipeline, correct?

24   **A.**    That was one of the sources, yes.

25   **Q.**    It was accurate enough for those purposes, right?

1    A.    It was part of that analysis, yes.

2    Q.    So you would update management and the board of directors

3    on the performance of the sales organization using information

4    you gathered from the Salesforce Database, correct?

5    A.    Yes.

6    Q.    I'd also like to touch, just briefly, on Counsel's

7    questions regarding "How The Deal Was Done" emails.

8          Do you remember that?

9    A.    I do.

10   Q.    I'll ask you a similar question I asked you about the

11   Salesforce Database.

12         During your tenure as chief revenue officer and overseeing

13   the Bazaarvoice sales organization, was there ever a policy

14   where you instructed the sales organization:  Only mention

15   PowerReviews if we run into them in an account?

16   A.    No.

17             MR. BONANNO:  That's all I have, Your Honor.

18             THE COURT:  Mr. Feldman.

19             MR. FELDMAN:  I'll be very quick, Your Honor, because

20   I think I'm the only thing standing between you and being done.

21                        **RECROSS EXAMINATION**

22   BY MR. FELDMAN

23   Q.    On Government Exhibit 202, Mr. Osborne --

24   A.    Yes.

25   Q.    -- on page 5, Mr. Bonanno was following up with you on the

**PROCEEDINGS**

1  discount data?

2  **A.**   Correct.

3  **Q.**   If the discounting in the U.S. improved -- let me withdraw

4  it and start it again.   It wasn't good.

5      If discounting improved in Q2, why did you miss the

6  quarter and get fired?

7  **A.**   We missed in Europe.

8  **Q.**   Was that the Q2 miss?

9  **A.**   Yes.

10  **Q.**   Was PowerReviews competing with you in any significant way

11  in Europe at the time?

12  **A.**   No.

13          **MR. FELDMAN:**   Thank you.   Nothing further.

14          **MR. BONANNO:**   No further questions, Your Honor.

15          **THE COURT:**   Thank you, Mr. Osborne.

16          **THE WITNESS:**   Thank you.

17       **MR. HUSTON:**   Your Honor, our next witness is going to

18  be Stephen Collins.   My understanding is he's not available

19  here today.   He's still in Texas, and will be here on Monday.

20          **THE COURT:**   Okay.

21       **MR. HUSTON:**   So I think that's it for live witnesses

22  today.

23      And, as I mentioned earlier this morning, that leaves us

24  just with some video to play, and that video is subject to some

25  confidentiality issues.   So what I've got for Your Honor is two

1    discs, one from the representative of Reevoo and one from the

2    representative of Pluck.

3        And if I could hand those up to Your Honor.

4        **THE COURT:**  Certainly.

5        How much watching do I get?

6        **MR. HUSTON:**  On those, for the Reevoo we have 22

7    minutes for our side.  I can't speak for defense.  And the

8    Pluck amounts to 36 minutes, Your Honor.

9        **MR. RUBINSTEIN:**  Your Honor, I have the discs --

10   excuse me, the discs and the exhibits cited for our side.

11       I understand there was an objection to one of our

12   demonstratives that's included.

13       And I don't know if you continue on that objection.

14       **MR. HUSTON:**  We do, Your Honor.

15       And this was not used during the deposition, and my

16   understanding is the defendants would like you to use it while

17   watching the video.

18       We don't think it's proper.  It wasn't a demonstrative at

19   the deposition, and, certainly, the foundation for using it as

20   a demonstrative with the deposition can't be laid.

21       So beyond that, we have some problems with what's

22   supposedly listed on here, so for those reasons we do object.

23       If Your Honor is inclined to use that, we have a counter

24   demonstrative that we would offer, as well, which I can hand

25   up.

1        **THE COURT:**  Why don't we do that.  It's not going to

2   be all that meaningful either way.  Why don't we use both.

3        **MR. HUSTON:**  Sure, Your Honor.

4        **MR. RUBINSTEIN:**  Your Honor, I'm also going to provide

5   you with a replacement binder for that, the one this morning.

6        **THE COURT:**  Okay.

7        **MR. RUBINSTEIN:**  And just for the record, I just want

8   to let you know that the one we played this morning from Gigya

9   was 22 minutes.

10      The one that we just handed you for Pluck was 33 minutes.

11  Well, from Demand Media, also known as Pluck, is 33 minutes.

12      And the video for our side for Reevoo is 19 minutes.

13       **THE COURT:**  Great.  All right.  And as I promised you

14  last Friday, I will watch this before Monday morning.

15       **MR. HUSTON:**  I understand.

16       **THE COURT:**  All right.  Okay.  Thanks.  We're

17  adjourned.  See you Monday morning.

18       **MR. FELDMAN:**  Thank you.

19       **MR. HUSTON:**  Your Honor, before you leave the bench,

20  just one other issue.

21      The confidentiality issue that causes us to have to go

22  through this procedure also could come into play when it comes

23  time to examine the expert witnesses.  And so I just wanted you

24  to be aware of that.

25      It could be that we need to or would want to use some

1  confidential information in our examination of experts or

2  cross-examination of experts.  So I just wanted you to be aware

3  of that issue that's percolating.

4       **THE COURT:**  Okay.  There may be -- you know what

5  questions you need to pose.

6       It would seem possible to me to avoid the confidential

7  information but sort of hit the general notes, which I would

8  much prefer because I really don't -- I'm not intending to

9  close the courtroom and I am intending to protect people's

10 confidential information.

11      So I hope you'll do that.  If you find that that's

12 impossible, then we ought to talk about it before the expert

13 testimony.

14      **MR. HUSTON:**  Thank you, Your Honor.

15      **MR. JACOBSON:**  For our cross of Dr. Shapiro and our

16 direct of our two experts, we are going to finesse the

17 confidentiality issue; in just that matter refer to the

18 numbers, to the extent necessary, in very general form that

19 protects the third-party confidentiality.

20      **THE COURT:**  Okay.

21      **MR. HUSTON:**  Thank you, Your Honor.

22      **MR. FELDMAN:**  Thank you.

23           (Proceedings adjourned at 11:44 a.m.)

24                    ---oOo---

25

1

2

3                          <u>**CERTIFICATE OF REPORTERS**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, September 26, 2013

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15    _____

16          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

17

18

19

20

21

22

23

24

25