**Volume 5**

                           **Pages 739 - 957**

                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,            )
                                 )
   VS.                           )    NO. C 13-00133 WHO
                                 ) (Pages 739-742 not used -
                                 )    nothing omitted)
BAZAARVOICE, INC.,               )
                                 )
            Defendant.           )
_____ )
                        San Francisco, California
                        Monday, September 30, 2013

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff:
                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Golden Gate Avenue - Room 10-0101
                        P. O. Box 36046
                        San Francisco, California  94102
                   BY:  **PETER K. HUSTON, ASSISTANT CHIEF**

                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        450 Fifth Street, NW - Suite 7100
                        Washington, D.C. 20530
                   BY:  **MICHAEL D. BONANNO, TRIAL ATTORNEY**
                        **ADAM T. SEVERT, TRIAL ATTORNEY**
                        **ROBERT A. LEPORE, TRIAL ATTORNEY**
                        **AARON HOAG, TRIAL ATTORNEY**
                        **LISA ANNE SCANLON, TRIAL ATTORNEY**
                   **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

1    **APPEARANCES**:   (CONTINUED)

2    For the Plaintiff:

3                              U.S. DEPARTMENT OF JUSTICE
                              Antitrust Division
                              950 Pennsylvania Avenue, NW - Rm. 3214
4                              Washington, D.C. 20530
                         BY:  **DAVID I. GELFAND, DEPUTY ATTY. GENERAL**
5
     For Defendant:
6                              WILSON, SONSINI, GOODRICH & ROSATI
                              650 Page Mill Road
7                              Palo Alto, California  94304
                         BY:  **BORIS FELDMAN, ATTORNEY AT LAW**
8                              **DOMINIQUE-CHANTALE ALEPIN, ATTORNEY AT
                                 LAW**
9                              **DYLAN J. LIDDIARD, ATTORNEY AT LAW**

10                             WILSON, SONSINI, GOODRICH & ROSATI
                              1700 K Street, NW - 5th Floor
11                             Washington, D.C.  20006
                         BY:  **SCOTT A. SHER, ATTORNEY AT LAW**
12                             **ANDREA A. MURINO, ATTORNEY AT LAW**
                              **FRANKLIN RUBINSTEIN, ATTORNEY AT LAW**
13
                              WILSON, SONSINI, GOODRICH & ROSATI
14                             1301 Avenue of the Americas - 40th Fl.
                              New York, New York 10019
15                        BY:  **CHUL PAK, MEMBER OF FIRM**
                              **JONATHAN M. JACOBSON, MEMBER OF FIRM**
16
                              BAZAARVOICE, INC.
17                             3900 N. Capital of Texas Highway
                                 Suite 300
18                             Austin, Texas  78746
                         BY:  **BRYAN BARKSDALE, GENERAL COUNSEL**
19                             **KIN GILL, DEPUTY GENERAL COUNSEL**

20

21

22

23

24

25

```
 1                       I N D E X

 2   Monday, September 30, 2013

 3   PLAINTIFF'S WITNESSES                    PAGE   VOL.

 4   COLLINS, STEPHEN REED
     (SWORN)                                  748    5
 5   Direct Examination by Mr. Huston         748    5
     Cross-Examination by Mr. Pak             782    5
 6   Redirect Examination by Mr. Huston       866    5
     Recross-Examination by Mr. Pak           892    5
 7
     SHAPIRO, CARL
 8   (SWORN)                                  893    5
     Direct Examination by Mr. Hoag           894    5
 9
                       E X H I B I T S
10
11   PLAINTIFF'S EXHIBITS            IDEN   EVID   VOL.

12     GX302                                865    5

13     GX1216                   869    957    5

14     GX1222                          865    5

15     GX1223                          865    5

16     GX1225                          865    5

17     GX1228                          957    5
                       E X H I B I T S
18   DEFENDANT'S EXHIBITS           IDEN   EVID   VOL.

19     DX649                            866    5

20     DX735                            866    5

21     DX1195                           747    5

22     DX1855                           866    5

23     DX1870                           866    5

24

25
```

746

# I N D E X

## E X H I B I T S

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| DX1880 | | 866 | 5 |
| DX1882 | | 866 | 5 |

1   **Monday - September 30, 2013**                    **8:00 a.m.**

2                      **P R O C E E D I N G S**

3                          ---000---

4       THE COURT:  Please be seated.

5   Good morning, everybody.

6       MR. HUSTON:  Good morning, Your Honor.

7       ALL:  Good morning, Your Honor.

8       THE COURT:  So I'm going to report to you that I did

9   what I promised.  I watched the Crickmer and the Giannoni

10  depositions on Friday; and the time, Mr. Jacobson, was

11  Government 59, Defense 52.  That only relates to minutes.

12                      (Laughter)

13      MR. JACOBSON:  Thank you, Your Honor.

14      THE COURT:  Okay.  So where are we?

15      MR. FELDMAN:  Your Honor, from the Gigya videotape

16  testimony there was one exhibit we wanted to move into

17  evidence.

18  Mr. Rubinstein?

19      MR. RUBINSTEIN:  Yes.  It's DX1195.  It was one of the

20  two documents that was in the binder that we provided as part

21  of the Gigya video presentation.

22      THE COURT:  Is there any objection?

23      MR. HUSTON:  No objection, Your Honor.

24      THE COURT:  It's admitted.

25      (Defendant's Exhibit DX1195 received in evidence)

```
 1              MR. FELDMAN:  Thank you.

 2              MR. HUSTON:  Your Honor, the Government calls Stephen

 3    Collins to the stand.

 4              THE CLERK:  Sir, can you please stand?

 5              THE WITNESS:  Oh, sorry.

 6                      STEPHEN REED COLLINS,

 7    called as a witness for the Plaintiff, having been duly sworn,

 8    testified as follows:

 9              THE WITNESS:  I do.

10              THE CLERK:  Be seated.

11              THE WITNESS:  Thank you.

12              THE CLERK:  Please state your full name and spell your

13    last name.

14              THE WITNESS:  Stephen Reed Collins, C-O-L-L-I-N-S.

15                      DIRECT EXAMINATION

16    BY MR. HUSTON:

17    Q.   Good morning, Mr. Collins.

18    A.   Good morning, Peter.

19    Q.   Good to see you again.

20    A.   Nice to see you.

21    Q.   We met down in Austin at your deposition a couple of

22    months ago; correct?

23    A.   That's right.

24    Q.   Now, you joined Bazaarvoice in September 2010 as its chief

25    financial officer; is that correct?
```

1    **A.**    That is correct.

2    **Q.**    And then you took on the position of chief innovation

3    officer in January of 2012; correct?

4    **A.**    That sounds about right, yes.

5    **Q.**    But you kept the position of chief financial officer, so

6    you had both titles?

7    **A.**    I did.

8    **Q.**    And in the position of chief innovation officer, you were

9    tasked with looking at the opportunities for the company over

10   the next three to five years; correct?

11   **A.**    Yes, that's fair.

12   **Q.**    And then eventually you took over the position of chief

13   executive officer from Mr. Hurt; correct?

14   **A.**    That's right.

15   **Q.**    And that was in November of 2012?

16   **A.**    Correct.

17   **Q.**    And at that time you became a member of the Bazaarvoice

18   board?

19   **A.**    That is correct.

20   **Q.**    Now, in addition to this lawsuit that we're here on today,

21   there's another lawsuit pending down in Texas concerning

22   Bazaarvoice's acquisition of PowerReviews; correct?

23   **A.**    I'm not quite sure if that's exactly the basis for the

24   litigation; but, yes, that is my understanding, is there's a

25   derivative action.

1   **Q.**   Okay.  And you've been sued personally in that action;

2   correct?

3   **A.**   Yes.  As a member of the board, I would think so.

4   **Q.**   And that lawsuit alleges that you knew that the

5   acquisition would lessen competition and create a monopoly, and

6   that you failed to disclose the anticompetitive nature of the

7   acquisition; is that correct?

8   **A.**   I'm not intimately familiar with the details of that

9   complaint, but that sounds like a fair assessment.

10         **MR. HUSTON:**  Okay.  Your Honor, can I approach the

11  bench?

12         **THE COURT:**  Please.

13                    (Pause in proceedings.)

14         **MR. HUSTON:**  Your Honor, I've handed the witness a

15  couple of binders of documents that we may use during the

16  examination today and provided Your Honor with a copy as well

17  and opposing counsel.

18  **Q.**   The lawsuit that we've just been talking about, there is a

19  copy of it in your binder.  I'm not sure you're going to need

20  to refer to it, but I just have a couple of more questions

21  about it.

22         That lawsuit seeks disgorgement of the proceeds of stock

23  that you sold; is that your understanding?

24  **A.**   Again, I'm not familiar with those particular details, so

25  I can't comment on that.

COLLINS - DIRECT / HUSTON

1  **Q.**   Okay.  But bottom line, the Texas lawsuit has some of the

2  same issues involved in it that we're adjudicating here in this

3  courtroom; correct?

4  **A.**   I believe that's correct, yes.

5  **Q.**   Okay.  Now, let me just turn to Bazaarvoice and your

6  duties.

7       When you took over as CEO of Bazaarvoice, you became the

8  primary spokesperson for the company on the company's earnings

9  calls; is that correct?

10 **A.**   That would be correct.

11 **Q.**   And if you could turn to Exhibit 302 in your binder,

12 please.

13 **A.**   (Witness examines document.)  Okay.

14 **Q.**   And that is a transcript of an earnings conference call

15 dated November 26, 2012; correct?

16 **A.**   Uh-huh.

17 **Q.**   Now, that would be the first earnings call that you

18 participated in as the CEO of Bazaarvoice; correct?

19 **A.**   I believe that's correct, yes.

20 **Q.**   And if you look at the second page of the document, down

21 towards the bottom there is a paragraph that starts, "Since."

22 Do you see that paragraph?

23 **A.**   All right.  And this is on page 2?

24 **Q.**   Yes.

25 **A.**   (Witness examines document.)  Yes.

1   Q.    And it reads:  (reading)

2          "Since this is my first call as CEO, I'd like to begin

3      my remarks by focusing on our core value proposition, what

4      we do, and why our clients do business with us.  We have a

5      straightforward business with a simple but compelling

6      value proposition for our clients.  We sell a

7      consumer-facing technology platform to provide ratings and

8      reviews solutions to help consumers make great purchasing

9      decisions."

10     Do you see that?

11  A.    Uh-huh.

12  Q.    And that was accurate at the time you said that during the

13  call; correct?

14  A.    Yes.

15  Q.    And it's accurate as of today; correct?

16  A.    I would agree, yes.

17  Q.    And looking out into the future, it will continue to be

18  important for retailers to have ratings-and-review content on

19  their Web site; would you agree with that?

20  A.    I do agree with that.

21  Q.    And I'd like to turn now to another exhibit in your

22  binder, and it's Exhibit 321.

23  A.    (Witness examines document.)

24  Q.    And if you can turn to the second page of this document,

25  there's an email down at the bottom and it's from Mr. Hurt to

1    yourself.  Do you see that?

2    **A.**    Yes.

3    **Q.**    And Mr. Hurt wrote you this email on November 14th, 2011,

4    and he said:  (reading)

5              "Would you draft a note that I can send to Chris and

6         Neeraj, and cc Tom, about you running with an exploration

7         of the ROI and complexities of acquiring PowerReviews?  I

8         would like them to know that you're running with that and

9         why.  Your top 10 list refined."

10        Do you see that?

11    **A.**    Yes, I do.

12    **Q.**    Now, the people he references in that email, those are

13    board members of Bazaarvoice; correct?

14    **A.**    That is correct.

15    **Q.**    And they actually made up the Transaction Committee of the

16    Bazaarvoice board; correct?

17    **A.**    Yes.

18    **Q.**    And the top 10 list that Mr. Hurt was referring to, that

19    was a list that you had come up with sometime previous about

20    the --

21    **A.**    I don't recall the timing, but it was a list of potential

22    benefits of the acquisition.

23    **Q.**    Okay.  Maybe I can help you out there.  Look at, in your

24    binder, at Exhibit 320 if you would, please.

25    **A.**    (Witness examines document.)  Okay.

1   Q.   Now, Exhibit 320 has got a number of emails on it, so I'd

2   like to turn to the one that's three pages in, an email from

3   yourself to Brant Barton, Brett Hurt, and Mike Svatek.

4        Are you with me?

5   A.   Yes, I am.

6   Q.   Okay.  Now, it's accurate to say that you were one of the

7   main cheerleaders of this transaction, this acquisition of

8   PowerReviews; correct?

9   A.   Yes, that's accurate.

10  Q.   Okay.  And you have this list that you created for the

11  gentlemen that you sent this email to down at the bottom of

12  your email, and the number one on your list is:   (reading)

13            "Literally, no other competitors."

14       Do you see that?

15  A.   I do.

16  Q.   And at the time that you wrote that, that was how you

17  viewed the competitive landscape; correct?

18  A.   Yes.

19  Q.   So, then, turning back now to Exhibit 321, the one we were

20  just looking at, that gives a little context here.  So we

21  looked at the email from Mr. Hurt to yourself asking you to

22  write this memo to the board.

23  A.   Uh-huh.

24  Q.   If you flip to the first page of Exhibit 321, that's

25  actually what you drafted to be passed on to the Board of

1    Directors; correct?

2    **A.**    Yes.

3    **Q.**    And in the third paragraph on this first page --

4    **A.**    Uh-huh.

5    **Q.**    -- kind of beginning at the top there, it says:   (reading)

6            "The target company" --

7         Now, that would be PowerReviews; correct?

8    **A.**    Right.

9    **Q.**    It says:   (reading)

10            "The target company, while considerably smaller than

11       us today in terms of revenue, still has a relatively

12       significant reach and from this base they could mount a

13       significant challenge, especially if acquired by a

14       well-capitalized player in the social commerce or social

15       media marketing solutions space."

16       Do you see that?

17   **A.**    Yes.

18   **Q.**    And you believed that at the time; correct?

19   **A.**    Yes.  I felt they weren't necessarily a going concern and

20   that they would be an attractive acquisition for a number of

21   companies.

22   **Q.**    And you did not want that to happen; correct?

23   **A.**    No, I didn't.

24   **Q.**    Okay.  Let's just expand on that a little bit.

25       If you'd turn to the next exhibit in your binder.  It's

1    Exhibit 326.

2    **A.**   (Witness examines document.)

3    **Q.**   And I'd like to focus you now down at the bottom of this

4    exhibit, which would be the first email in the chain there, and

5    it's an email from yourself to Mitchell Green.

6    **A.**   Uh-huh.

7    **Q.**   Do you see that?

8    **A.**   Yes.

9    **Q.**   And Mitchell Green is a board observer at Bazaarvoice;

10   correct?

11   **A.**   That's correct.

12   **Q.**   And in his email -- or in your email to him, I'm sorry, he

13   says:  (reading)

14        "We would not want a bigger competitor to get this

15        asset."

16        And "this asset" is PowerReviews; right?

17   **A.**   That's right.

18   **Q.**   And he says:  (reading)

19        "Our stock would get crushed if that happened."

20   **A.**   Uh-huh.

21   **Q.**   And then Mr. Green responds in the email above.  He says:

22   (reading)

23        "Exactly.  Your stock is going to be shorted because

24        people are constantly worried about pricing pressure which

25        impacts gross margins."

1       Do you see that?

2   **A.**   Yes, I do.

3   **Q.**   And then he asks a question.  He says:  (reading)

4           "Question:  What percent of deals over the last years

5       has Peloton showed up at?"

6       Do you see that?

7   **A.**   Yes.

8   **Q.**   And "Peloton" is the code name that was given to

9   PowerReviews?

10  **A.**   That's right.

11  **Q.**   And then in your response to that, you say:  (reading)

12          "I suspect 80 percent plus of retail deals."

13  **A.**   Uh-huh.

14  **Q.**   And you believed that at the time you wrote that; correct?

15  **A.**   It was an educated guess based on anecdotal feedback from

16  sales folks, among others at the company.

17  **Q.**   Okay.  And if you can turn back to Exhibit 321 in your

18  binder.  Sorry to jump around here.

19  **A.**   That's okay.

20  **Q.**   But in Exhibit 321 going back down to your top 10 list --

21  **A.**   Uh-huh.

22  **Q.**   -- the number one it says:  (reading)

23          "No meaningful direct competitor."

24      And then it says:  (reading)

25          "Shortened sales cycles less pricing dilution."

COLLINS - DIRECT / HUSTON

1    **A.**    Uh-huh.

2    **Q.**    Do you see that?

3    **A.**    Yes.

4    **Q.**    And having PowerReviews out there as a competitor slowed

5    down sales cycles; correct?

6    **A.**    Yes.  I think in some cases that's true.

7    **Q.**    Okay.  And that's because it's just more things that the

8    buyer has to evaluate; correct?

9    **A.**    That would be among the factors, yes.

10   **Q.**    Okay.  More choice for them; correct?

11   **A.**    Yes, just more information for them to parse through.

12   **Q.**    And as you saw it at the time you wrote this draft email

13   to the board, PowerReviews was the only meaningful competitor

14   to Bazaarvoice?

15   **A.**    In my mind, they were -- they were the primary competitor

16   for ratings and reviews for retailers, yes.

17   **Q.**    And Bazaarvoice considered PowerReviews to be its biggest

18   competitive obstacle right up until the time the merger was

19   announced; correct?

20   **A.**    Yes, they were an important key competitor.

21   **Q.**    Now, Bazaarvoice has now acquired PowerReviews, and you

22   consider now that Pluck is the closest ratings-and-review

23   competitor in the United States; correct?

24   **A.**    They're certainly one of the more formidable competitors.

25   **Q.**    Okay.  And you'd previously told me at your deposition

1   that you felt that they were now the number one competitor to

2   Bazaarvoice; correct?

3   **A.**   Based on my interactions with customers certainly more

4   recently, that's the name that comes up the most.

5   **Q.**   Now, Bazaarvoice recently stole a big customer from Pluck;

6   correct?

7   **A.**   We won a customer from them, yes.

8   **Q.**   Yes.  "Stole" in the competitive sense.  Certainly nothing

9   illegal about it.

10      And that's Target; correct?

11  **A.**   That's right.

12  **Q.**   Okay.  Now, it's also accurate to say that in terms of

13  Pluck, Bazaarvoice did not start identifying Pluck as a

14  competitor in its SEC documents until after the United States

15  filed this action; is that accurate?

16  **A.**   I don't know exactly when we identified them; but if

17  that's the fact, then I would agree with it.

18  **Q.**   Okay.  Now, over the years, it's fair to say that

19  Bazaarvoice and PowerReviews have pushed each other to innovate

20  in ways that help consumers and retailers; correct?

21  **A.**   I think our innovation drive comes from our need to create

22  value for our clients first and foremost, and the marketplace

23  generally is competitive and very dynamic for all things

24  eCommerce and Internet.  So I think we're both pushed by

25  that -- that need to serve our clients.

1    Q.    Okay.  Why don't you turn to Exhibit 838 in your binder.

2    A.    Bear with me.

3          (Witness examines document.)  Okay.

4    Q.    And this is an email with some attachments to it that was

5    drafted about the time that you were about ready to announce

6    the merger; and it's got in there several pages in, I think

7    about six pages in, some frequently asked questions, talking

8    points if you will.  Do you see that?

9    A.    (Witness examines document.)  So let me see --

10   Q.    Sure.

11   A.    -- let me make sure I've got the right one.  Is this the

12   message house?  No.

13   Q.    Yeah.  It's a text document.

14   A.    "Why did we" -- okay.  So this would be, "Why did we buy

15   PowerReviews?" at the top; right?

16   Q.    That's right.

17   A.    Thanks.

18   Q.    And I'd like to focus your attention down on the second

19   bullet point, and it says:  (reading)

20          "Like Bazaarvoice, PowerReviews has been an early

21       pioneer in the ratings-and-reviews space.  We know them

22       well through competing in the marketplace; and over the

23       years, we've pushed each other to innovate in ways that

24       help consumers and retailers."

25       Do you see that?

1    **A.**    Yes.

2    **Q.**    And you agree with that; correct?

3    **A.**    I think that we did push each other; but innovation is

4    critical for success and technology and, so, PowerReviews would

5    have been one of any number of factors that would demand

6    innovation from our company.

7    **Q.**    Okay.  And then skipping down to the fourth bullet point

8    there, it says:  (reading)

9            "Six years into our respective journeys, we are both

10           respected leaders in our space.  Number 1 and Number 2.

11           What's interesting is that if you look at market share --

12           in terms of revenue -- BV is unquestionably Number 1; and

13           if you look at the total number of deployments, PR has a

14           bigger reach."

15           Do you see that?

16   **A.**    Yes.

17   **Q.**    And you believed that at the time that was written;

18   correct?

19   **A.**    If you include what was known as or is known as

20   PowerReviews Express, which is a very small credit card swipe

21   application, the absolute number of clients would have been

22   higher.  I'm not sure that's true in terms of deployments for

23   what I would characterize as our primary solution or enterprise

24   solution.

25   **Q.**    Okay.

1   **A.**   But they had, including Express, they definitely had a

2   larger number of installs.

3   **Q.**   And shifting gears just for a minute, prior to the merger,

4   PowerReviews put pricing pressure on Bazaarvoice; correct?

5   **A.**   I would agree with that statement.

6   **Q.**   Now, Bazaarvoice is a public company; correct?

7   **A.**   Yes, it is now.

8   **Q.**   And after the close of each fiscal quarter, you would

9   compile the financial information for the company and you would

10  report it to the public; correct?

11  **A.**   That's right.

12  **Q.**   And then following that, or simultaneously roughly with

13  that, you would have an earnings call; correct?

14  **A.**   Uh-huh.

15  **Q.**   And on that earnings call would be stock analysts?

16  **A.**   Yes.

17  **Q.**   And those stock analysts basically analyze the market

18  space that Bazaarvoice operates in; correct?

19  **A.**   Yes.

20  **Q.**   And then they would, after hearing what you had to say on

21  the call, they would write reports; correct?

22  **A.**   Yes.  They ask lots of questions and then they write

23  reports.

24  **Q.**   Okay.  And then those reports would get disseminated to

25  their clients?

1   **A.**   Yes.

2   **Q.**   Now, fiscal year 2012 would have closed on April 30th,

3   2012; am I right?

4   **A.**   That's right.

5   **Q.**   Okay.  And then you would have had an earnings call

6   sometime after that, after you've had a chance to compile your

7   financials?

8   **A.**   Typically a month.

9   **Q.**   So the earnings call for the fiscal year 2012 was held on

10  June 6, 2012.  Does that sound about right?

11  **A.**   Sounds about right.

12  **Q.**   And prior to that call, you had actually signed up the

13  merger agreement with PowerReviews?

14  **A.**   I believe so.

15  **Q.**   And, so, at the earnings call, the analysts were on.  They

16  would ask you questions.

17  **A.**   Uh-huh.

18  **Q.**   Prior to that, you would prepare and deliver some sort of

19  scripted remarks?

20  **A.**   Uh-huh.

21  **Q.**   Okay.

22  **A.**   Yes.

23  **Q.**   Now, after the earnings call and after the analysts wrote

24  their reports, Mr. Brian Smith sent around those analyst

25  reports; correct?

1    **A.**    That is his usual protocol.

2    **Q.**    Okay.  And if you look in your binder to Exhibit 687, if

3    you look, there's a couple of emails there.  The top one is

4    from you, but the one right underneath there is from Brian

5    Smith.  Do you see that?

6    **A.**    Yes.

7    **Q.**    And he sends that email to members of the Bazaarvoice

8    board; correct?

9    **A.**    Yes.

10   **Q.**    And then you in your email above that forward it on to

11   your Executive Team --

12   **A.**    Uh-huh.  Yes.

13   **Q.**    -- correct?

14       And this email from Mr. Smith that you went and forwarded

15   on to the Executive Team includes the analyst reports that were

16   written about Bazaarvoice; correct?

17   **A.**    As far as I can tell, yes.

18   **Q.**    And Mr. Smith, he highlights some of those in his email.

19   And I'll ask you to turn to the second page of the exhibit, and

20   I'm just going to talk about a couple of these.

21       The heading "Deutsche Bank," do you see that towards the

22   top of the page there?

23   **A.**    Yes.

24   **Q.**    And he highlights a passage from Deutsche Bank and there's

25   a sentence that says, it's the second sentence in I believe, it

1    says:   (reading)

2              "We believe the acquisition of PowerReviews, which

3         should close by July, creates a dominant force in this

4         early stage market that gives Bazaarvoice a long runway

5         ahead."

6         Do you see that?

7    A.   Yes.

8    Q.   And, so, Mr. Smith felt that was a highlight that he

9    wanted to pass on to the board; correct?

10   A.   Yes.

11   Q.   And then the highlight underneath that for Credit Suisse,

12   I'd like you to focus on the second bullet point there; and

13   there's a sentence in the second bullet point there, actually

14   the second sentence, and it says:   (reading)

15             "However, we view the proposed lateral acquisition of

16        its largest competitor as strategically sound given that

17        it accelerates industry consolidation while at the same

18        time avoids a destructive price war for the incremental

19        eCommerce client."

20        Do you see that?

21   A.   Yes.

22   Q.   And, again, that's a highlight that Mr. Smith took out of

23   the Credit Suisse analyst report and forwarded on to the board?

24   A.   Correct.

25   Q.   Okay.  And then one more, Piper Jaffray is noted at the

1    bottom of this page, but the passage I'd like to draw your

2    attention to is actually on the next page.  So it's the top

3    bullet point on that third page of the exhibit, and it's about

4    halfway down in the bullet point, and it starts with the

5    Number 2, and it says:  (reading)

6         "2.  The transaction could arguably allow Bazaarvoice

7         to have better pricing trends in the market.  PowerReviews

8         was a low-price competitor."

9         Do you see that?

10   **A.**   Yes.

11   **Q.**   Okay.  And then in addition to those highlights, Mr. Smith

12   actually attaches all of the analyst reports and sends them

13   around, and then you went ahead and forwarded that to your

14   Executive Team; correct?

15   **A.**   Correct.

16        **MR. HUSTON:**  Okay.  Your Honor, I offer Government

17   Exhibit 687 into evidence.

18        **THE COURT:**  Any objection?

19        **MR. PAK:**  Your Honor, we object to the admission.  The

20   cover email is fine, but the attachments are the analyst

21   reports and we object to those as being hearsay upon hearsay.

22        **THE COURT:**  I'm going to overrule the objection.  I

23   understand the objection.  I will take it into account as I'm

24   going through the document, but there's an adequate foundation

25   for this document.

1          **MR. PAK:**  Thank you, Your Honor.

2     **BY MR. HUSTON:**

3     **Q.**    Mr. Collins, I'd like you to turn now to Exhibit 1223 in

4     your binder, GX1223.

5     **A.**    (Witness examines document.)

6     **Q.**    Now, this is an email from, focusing kind of towards the

7     bottom of the page on the first page of this exhibit, that's an

8     email from Keith West [sic] of Morgan Stanley to yourself;

9     correct?

10    **A.**    Keith Weiss, just for clarification.

11    **Q.**    Thank you.

12    **A.**    Yes.

13    **Q.**    And he is talking to you or writing you after something

14    that's called a "Nondeal Road Show"; correct?

15    **A.**    Correct.

16    **Q.**    And a "nondeal road show" is just a meeting with

17    investors, but it's not attached to any offering of stock?

18    **A.**    Right.  This is a commonplace practice where you just get

19    out and meet with your investors or prospective investors as

20    part of talking about the company and answering questions.

21    **Q.**    And Mr. Weiss was with you at that nondeal road show?

22    **A.**    Yes.  My recollection this was a luncheon in

23    New York City.

24    **Q.**    Okay.  And he's basically offering you some feedback from

25    that meeting; correct?

1   **A.**   Right.

2   **Q.**   And the email that he writes, it reads -- I'll flip over

3   to the second page and towards the top there it says:

4   (reading)

5       "The feedback around PowerReviews' acquisition was

6       universally positive, which I found a little bit

7       surprising given investors are usually a bit skeptical

8       about M & A in general and consolidation deals in

9       particular."

10      Then he goes on to say:   (reading)

11      "But in this case investors saw a solid opportunity in

12      acquiring a large set of new customers in terms of the

13      upsell potential, the elimination of competitive/pricing

14      risk."

15      Do you see that?

16  **A.**   I do.

17  **Q.**   And those investors that he's referring to were investors

18  that were at this luncheon that you were at?

19  **A.**   That's right.

20  **Q.**   And they would have got the impression that was just

21  expressed in that bullet point from talking to you; correct?

22  **A.**   I recall this luncheon, and I specifically recall

23  answering questions about our strategy with regard to pricing

24  and the acquisition, and emphasizing that the primary -- or one

25  of the primary considerations was to increase the number of

1    consumers that we could aggregate to allow brands to access, to

2    basically syndicate their reviews, for example, which I think

3    has been discussed pursuant to the dialogue in the trial; and

4    pointed out that it was not, in fact, our objective or intent

5    to raise prices on those clients.

6    Q.    Okay.  But from the feedback you got from Mr. Weiss, it

7    sounds like the take-away from the investors was this

8    acquisition is going to lead to less competitive or pricing

9    risk; correct?  At least that's what he says.

10   A.    His feedback implied that that was a conclusion that the

11   investors drew, and I just simply wanted to point out that that

12   was not based on what I told them.

13   Q.    Okay.  Now, investors generally don't like competition

14   because it impairs the company's pricing freedom; correct?

15   A.    I would say investors like less risk versus more as a

16   general rule.

17   Q.    Fair enough.

18        Now, let me shift gears a minute and talk about after this

19   litigation was filed.

20        At that point you sent out a notice to your customers, or

21   at least several of your customers, alerting them to the fact

22   that the Department of Justice had filed a lawsuit; correct?

23   A.    Yes.  Well, is this in the binder?

24   Q.    Yes.  Let's turn to Exhibit 1222.

25   A.    (Witness examines document.)

1   Q.    And if you go to the third page of this exhibit --

2   A.    Okay.

3   Q.    -- this email is actually to Nevin Shalit, but you sent a

4   similar email to many of your customers; correct?

5   A.    I believe we sent it to all our customers.  It was a

6   standard letter that we sent out to inform our entire customer

7   base of the situation.

8   Q.    And basically you're alerting them that you're

9   disappointed that the Department of Justice had filed a

10  lawsuit; correct?

11  A.    Yes.

12  Q.    Now, you didn't ask for a response to that.  It was just,

13  actually just informing them of the situation; correct?

14  A.    True.  We didn't explicitly ask for a response; but, of

15  course, anticipated there would be replies.

16  Q.    Okay.  And, in fact, you get a reply from this gentleman,

17  Mr. Nevin Shalit; correct?

18  A.    Yes.

19  Q.    And the previous page has that response, and I just want

20  to read passages from that.

21      In the second paragraph from Mr. Shalit's email, he says:

22  (reading)

23          "I was actually very happy to hear that the Department

24      of Justice has stepped in to try to prevent the

25      Bazaarvoice from buying PowerReviews.  I felt that the

1          competition between PowerReviews and Bazaarvoice was a

2          very healthy thing.  It drove new features as the two

3          companies battled it out for customers and it kept pricing

4          at appropriate levels.

5               "One of the first things that happened after the

6          acquisition was that I contacted my new sales rep who

7          informed me that the deal I'd struck with PowerReviews

8          wouldn't be honored in the future.  Our costs went way up.

9          And the person on my team who manages our PowerReviews

10         account noticed that shipping-only reviews that previously

11         were suppressed from the site (since they weren't about

12         products themselves) were now being posted without our

13         knowledge.  So it seems that with the acquisition, my

14         costs have gone up and the quality of my product has gone

15         down."

16      Now, that's not the only complaint you got about the

17   acquisition of PowerReviews; correct?

18   **A.**   It's not the only one, but I received very few.

19   **Q.**   Okay.  Shifting gears again, Bazaarvoice has a syndication

20   network of manufacturers and brands on the one hand and

21   retailers on the other; correct?

22   **A.**   That's right.  They work together.

23   **Q.**   And in your SEC filings, you say that that syndication

24   network is a barrier to entry; correct?

25   **A.**   We believe it's a competitive advantage.

1  **Q.**   Okay.  And PowerReviews also had a syndication product;

2  correct?  They called it BrandShare?

3  **A.**   My understanding of the state of that product was that it

4  was either not in market or at the very least extremely new and

5  aspirational; and it was something that they were pursuing, not

6  something they had been doing.

7  **Q.**   Okay.  If you look at Exhibit 4 in your binder.

8  **A.**   Okay.  (Witness examines document.)  All right.  I'm a

9  little bit lost, I admit.  Exhibit 4?

10  **Q.**   It should be right at the beginning.

11  **A.**   Is that GX315, is that the one I should look at it?

12  **Q.**   No.  It should be before that.  It should be the very

13  first one in your binder.

14  **A.**   I've got lots of GXs and --

15  **Q.**   Yeah, it's GX0004.  Is that the first one in your binder?

16  **A.**   My first one is GX0223, and in binder two I have GX081 and

17  083.  So I don't appear -- oh, here it is.  My apologies.  It's

18  down at the bottom.

19  **Q.**   Got it?

20      Okay.  And I just want to point you to the second page --

21  actually the first page of the email, the second email down is

22  from Shawn Gaide.  I'm not sure if I'm pronouncing that right.

23  **A.**   Yes, you are.

24  **Q.**   And it cc's yourself.  Do you see that?

25  **A.**   Uh-huh.  Uh-huh.

1   Q.   And flipping to the second page, it says, in the middle of

2   the page there there's something that says "PR BrandShare."  Do

3   you see that?

4   A.   Uh-huh.

5   Q.   And that's PowerReviews' BrandShare product; right?

6   A.   Yes.

7   Q.   And that's their syndication product?

8   A.   As far as -- according to this, yes.

9   Q.   Okay.  And it says:  (reading)

10         "Ramped up in the last 1.5 years.  Brands, Klipsch,

11      Milwaukee Tools, Altec Lansing, MonsterCable,

12      Roxie/Quicksilver, and American Standard."

13      Do you see that?

14   A.   Yes.

15   Q.   Now, those would have been brands that PowerReviews had

16   and that were participating in PowerReviews' syndication

17   network; correct?

18   A.   Yeah.  If this information is correct, then, yes.

19   Q.   And then flipping to the first page of the exhibit and

20   looking at Ms. Gaide's email to you and the team, it says:

21   (reading)

22         "We have a huge opportunity ahead of us with respect

23      to data volume, variety, and velocity.  While Connections

24      business is slated to be disruptive on all of these

25      fronts, review syndication is even more important for our

1          long-term viability."

2          Do you see that?

3     A.   Yes, I do.

4     Q.   And you agreed with that at the time; correct?

5     A.   Yes, syndication is very important long term.

6     Q.   Now, PowerReviews' prices were generally lower than

7     Bazaarvoice's for ratings and reviews; correct?

8     A.   That's a fair characterization, but it's not necessarily

9     true that the features offered were the same.  So you can't

10    always compare.

11    Q.   Okay.  Now, I'd like you to turn in your binder to

12    Exhibit 332, if you would.

13    A.   (Witness examines document.)  I have it.

14    Q.   Now, Exhibit 332 is a PowerPoint presentation having to do

15    with the acquisition of PowerReviews; correct?

16    A.   Yes.

17    Q.   And those were slides that were presented to the board

18    regarding the acquisition; correct?

19    A.   (Witness examines document.)  I can't definitively say

20    that it was or was not, but it definitely correctly

21    characterizes a presentation about the acquisition.

22    Q.   Okay.  And at your deposition you recall saying you're

23    comfortable saying this was presented to the board; correct?

24    A.   If that's what I said, then I stand by that statement.

25    Q.   Okay.  Let's turn, if you would, to Slide 6, I believe

1   it's Slide 6, of this PowerPoint presentation.

2   **A.**   Okay.  Bear with me.

3        (Witness examines document.)  Okay.

4   **Q.**   And it's titled "Synergistic Revenue Opportunity."  Do you

5   see that?

6   **A.**   Yes.

7   **Q.**   And it says:  (reading)

8        "We believe that the stand-alone Peloton portfolio is

9        undervalued.  Best evidenced by the contrast in ACB per

10       client within North American retail and particularly

11       within the IR500, which represents, arguably, a direct

12       comparison of a subset of each company's large retail

13       client base.  Peloton average ACB/IR500 client is

14       83 percent below BV at 228,000."

15       Do you see that?

16  **A.**   Yes.

17  **Q.**   Now, ACB is?

18  **A.**   It stands for annualized cumulative bookings.  It's

19  another way of saying annual revenue.

20  **Q.**   Okay.  And Peloton we've already established is

21  PowerReviews; correct?

22  **A.**   That's right.

23  **Q.**   So let's just turn to the second bullet point:  (reading)

24       "Provides us with an opportunity to increase revenue

25       from their existing clients via migration to the

1          Bazaarvoice platform a higher price points," I think it's

2          probably a typo, "at higher price points in return for

3          greater features and functionality than those of Peloton,

4          as well as to leverage a much larger client-installed base

5          into which to sell future new product offerings."

6          Do you see that?

7     A.    I do.

8     Q.    And that was a motivation for acquiring PowerReviews?

9     A.    That's right.  The opportunity to sell them additional

10    products and the opportunity to provide incremental

11    capabilities, if they found that attractive, was a motivation.

12    Q.    Okay.  Now, you closed the deal -- announced it in May I

13    believe, but it actually closed in June, June 12th of 2012.

14    Does that sound right?

15    A.    It sounds about right.  I don't recall the exact dates,

16    but there was a time gap between the announcement and closing.

17    Q.    And within a couple of days of that, you learned that the

18    Department of Justice had filed a lawsuit; correct?

19    A.    Something like that, yes.

20    Q.    And then following that in time, you actually did a

21    follow-on offering of your shares; correct?

22    A.    We did.

23    Q.    Okay.  That required another road show?

24    A.    It did.

25    Q.    And if you look at GX1129 in your binder.

COLLINS - DIRECT / HUSTON

1    **A.**   (Witness examines document.)

2    **Q.**   This is actually an email attaching the presentation that

3    you gave on that follow-on road show; correct?

4    **A.**   (Witness examines document.)   Yes.

5    **Q.**   And if you look at Slide 15, there's a slide that has a

6    title very similar to the slide we were just looking at,

7    "Synergistic Revenue and Margin Expansion Opportunity."   Do you

8    see that?

9    **A.**   Uh-huh.   Yes.

10   **Q.**   And in the bullet point, it's a little hard to read

11   because it's not in color; but if you could highlight the

12   bullet point there, Seth.   Thank you.

13        It says:   (reading)

14        "Opportunity to increase revenue from existing

15        PowerReviews clients via migration to the Bazaarvoice

16        platform."

17        Do you see that?

18   **A.**   Yes.

19   **Q.**   And that's along the lines of what we were just talking

20   about; correct?

21   **A.**   That's right.   If they wanted to move, they could; and it

22   was a voluntary opportunity, and that's why it was phrased as

23   "opportunity."

24   **Q.**   Okay.   But, in fact, then you see something else on the

25   slide; right?   It says down below, "Remove?"   Do you see that?

1    **A.**    Uh-huh, yes.

2    **Q.**    Now, that slide was removed because of the Department of

3    Justice litigation; isn't that right?

4    **A.**    I cannot comment on why that remark was there.  I simply

5    don't know.

6    **Q.**    Okay.  Let's turn to another exhibit.  It's GX1225 in your

7    binder.

8    **A.**    (Witness examines document.)

9    **Q.**    And this is an email, at least the second one down is the

10   one I'd like to focus on, and it's from Mike Svatek to

11   yourself.  Who's Mike Svatek?

12   **A.**    Mike has held several different titles.  Most notably he

13   was the chief product officer and the chief strategy officer

14   for the company.

15   **Q.**    Okay.  And in January of this year he wrote you this

16   email, and I'd like to focus your attention on his outline

17   that's kind of towards the bottom of the page there.

18   **A.**    Uh-huh.

19   **Q.**    And he says:  (reading)

20          "Product strategy objectives Fiscal Year '14 to '15."

21       Now, if I've got it right, we're currently about five

22       months into fiscal year '14; correct?

23   **A.**    Sounds about right.

24   **Q.**    Okay.  And he writes:  (reading)

25          "Get all retailers on the same SaaS platform.  Let's

1           get past the DOJ first."

2           Do you see that?

3    A.    Uh-huh.

4    Q.    So he's saying to you, "Let's get everybody on the same

5    platform, but let's wait till the DOJ's out of our hair";

6    correct?

7    A.    That wouldn't be exactly correct.  There are two aspects

8    to our platform.  One is the underlying data layer, the

9    business logic layer; for example, how we moderate content,

10   which all PowerReviews clients benefit from.

11          So in this context when we're talking about data, we're

12   talking about, quote/unquote, back end, you know,

13   behind-the-scenes database technology, not necessarily the

14   front-end experience.  So there is a -- there is a difference,

15   and principally we're talking about back-end migration here.

16   Q.    And why don't you turn to --

17          Actually, let me ask this:  So I always get confused on

18   how Bazaarvoice does its fiscal year because it doesn't line up

19   with calendar years necessarily.

20   A.    I get confused too.

21   Q.    Okay.  So we'll work together through this.

22          Bazaarvoice's first quarter of fiscal year 2013 would have

23   been the three months ending July 31st, 2012?

24   A.    That's right.

25   Q.    And I want to take you back to that time period.  You and

1    your team had made some forecasts about bookings and provided

2    that to the board?

3    **A.**    Yes.

4    **Q.**    And you were not able to meet those forecasts?

5    **A.**    No, we were not.

6    **Q.**    Okay.  And you had to explain that miss to the board in an

7    August 23rd, 2012, board meeting; correct?

8    **A.**    Uh-huh, yes.

9    **Q.**    And I'm going to turn to Exhibit 352.

10        Seth, don't bring it up.  This one's -- actually, you can

11   bring up the redacted one, but make sure it's redacted.

12        And hopefully, Mr. Collins, you've got one in your binder

13   that's not as heavily redacted as this one; is that right?

14   Does yours have a bunch of black boxes or is it --

15   **A.**    And, again, this is 352; correct?

16   **Q.**    Right.

17        Okay.  Now, Exhibit 352 includes a series of emails

18   between you and Heather Brunner and Mr. Hurt; correct?

19   **A.**    Yes.

20   **Q.**    And Heather Brunner was the chief operating officer of

21   Bazaarvoice at time period?

22   **A.**    Heather Brunner.

23   **Q.**    Brunner.  I'm sorry.

24   **A.**    It's okay.  She was the COO, chief operating officer.

25   **Q.**    And you're discussing in these emails the finance

1   presentation that you're going to be making to the board;

2   correct?

3   **A.**   Correct.

4   **Q.**   And you're anticipating some, perhaps, difficult questions

5   from the board because of the underperformance on the bookings;

6   correct?

7   **A.**   Yes.

8   **Q.**   And in your email on the second page of this document down

9   at the bottom I'm going to be a little careful here, but it's

10  fair to say that you're blaming the miss on, at least in part,

11  on the DOJ; correct?

12  **A.**   So to clarify, in recalling this, we never formally, as I

13  recall, added any incremental sales or bookings as a result of

14  the PowerReviews acquisition.

15       My points in this is that ultimately you can acknowledge

16  the fact that this litigation is going on, but we still are

17  obligated to make our business targets and be creative and work

18  as a team to deliver the results that investors and our board

19  expects regardless of the circumstances.

20  **Q.**   Okay.  And if you turn to the first page of this exhibit,

21  and that's the email that's at the top of the page from

22  yourself --

23  **A.**   Uh-huh.

24  **Q.**   -- you'll see again in that email it refers to the

25  Department of Justice when it's talking about the ability or

1    inability to migrate and upsell customers.  It talks about the

2    DOJ again there; correct?

3    **A.**   Uh-huh, yes.

4          **MR. HUSTON:**  Okay.  Nothing further at this time,

5    Your Honor.

6          **THE COURT:**  Thank you, Mr. Huston.

7          **MR. HUSTON:**  There's a few exhibits that were not in

8    evidence.  Let me gather which ones those are, and I'll offer

9    those in a moment if that's all right.

10          **THE COURT:**  Okay.

11                    (Pause in proceedings.)

12          **MR. PAK:**  Just one minute, Your Honor.  I need to find

13    an exhibit that Mr. Huston referred to.

14          **THE COURT:**  Fine.

15                    (Pause in proceedings.)

16          **THE COURT:**  Please proceed, Mr. Pak.

17          **MR. PAK:**  Good morning, Your Honor.  Thank you,

18    Your Honor.

19                    **CROSS-EXAMINATION**

20    **BY MR. PAK:**

21    **Q.**   Good morning, Mr. Collins.

22    **A.**   Good morning.

23          **MR. PAK:**  Your Honor, we have a series of material

24    that I'd like to hand up to Mr. Collins, as well as Your Honor.

25          **THE COURT:**  Go ahead.

1                      (Pause in proceedings.)

2    BY MR. PAK:

3    Q.    Mr. Collins, we're going to put on the screen the first

4    thing a short bio of your work history.

5    A.    Okay.

6    Q.    Call that up, please.

7          Would you take a minute to look at that?  Does it look

8    accurate to describe your employment history?

9    A.    (Witness examines document.)  It appears to be accurate.

10   Q.    There's some things that I want to highlight.  You

11   graduated from the University of Alabama; is that right?

12   A.    I did.

13   Q.    With a B.S. in accounting?

14   A.    Yes.

15   Q.    And at one point you joined the company DoubleClick?

16   A.    That's right.

17   Q.    What was DoubleClick?

18   A.    DoubleClick was one of the very first Internet advertising

19   networks and technology companies.

20   Q.    What did you do at DoubleClick?

21   A.    I joined as controller, corporate controller.  I later

22   took on an operational role and then became chief financial

23   officer, and then added the chief information officer title to

24   my responsibilities.

25   Q.    And did you -- what time period were you at DoubleClick?

1    **A.**    January 1997 through technically the spring of 2002, but I

2    was no longer an active executive by the fall of around 9/11,

3    around fall of 2011 -- or 2001.   Sorry.

4    **Q.**    And did your experience at DoubleClick carry over into

5    your work today at Bazaarvoice?

6    **A.**    Yes.

7    **Q.**    Could you explain how so?

8    **A.**    First and foremost, my experience at DoubleClick and my

9    views of the industry are what attracted me to joining

10   Bazaarvoice as an executive and what attracted me to the

11   investment opportunity.

12        The strategy business plan that Brett Hurt, the founder,

13   and Brant Barton, the cofounder, explained to me was that of a

14   content network, a review network, that would have a very

15   powerful impact on brand marketing and eCommerce, and I found

16   that attractive because of my experience at DoubleClick.

17   **Q.**    Okay.  And then upon leaving DoubleClick, at some point

18   you joined a company called Juris; is that right?

19   **A.**    Juris, right, J-U-R-I-S.

20   **Q.**    And you were a co-owner of Juris; is that right?

21   **A.**    I was a co-owner.  It was a company run by my father.  I

22   was a co-owner and later was the CEO.

23   **Q.**    What was the business of Juris?

24   **A.**    Software, on-premise software.  It was accounting, time

25   and billing for law firms, for lawyers.  So I'm sure you're --

1    many people in this room are familiar with that sort of

2    software.

3    **Q.**   Bane of our existence, sir.  Thank you.

4    **A.**   It's the bane of my existence, too, so....

5    **Q.**   Touchè.

6         And then you joined Bazaarvoice in 2010?

7    **A.**   Yes, September 2010.

8    **Q.**   And then became the CEO roughly in about November of 2012;

9    is that right?

10   **A.**   Correct.

11   **Q.**   You were -- and as CEO, what do you focus upon, sir?

12   **A.**   I believe a CEO's primary responsibility is company

13   strategy, and that's the one job that the CEO can exclusively

14   do.  And I also believe it is the CEO's job to effectively

15   communicate that strategy, to acquire the appropriate talent to

16   manage and run the company and to evaluate that talent, and to

17   determine if the allocation of capital, how we invest our

18   money, is appropriate and matched to the strategy.

19   **Q.**   If I could turn your attention now to lay out for the

20   judge and this courtroom the company's major products.

21   **A.**   Okay.

22   **Q.**   First starting with Conversations, which today is

23   Conversations 2013, can you describe for us what that is?

24   **A.**   Yes.  Conversations, which we've dropped the 2013 at this

25   point for obvious reasons, is our ratings-and-reviews

1   application.  That used to be called Product Ratings and

2   Reviews or internally for short we say PRR.  Conversations is a

3   new consumer-facing what's called API, application provider

4   interface.  So it's a layer that consumers, people who are

5   shopping online, interact with.

6       Behind that consumer-facing layer, Conversations, is all

7   the other aspects of our platform.  It includes moderation

8   software.  It includes our data.  It includes what's called a

9   business logic layer that makes everything work together.

10      That collectively, along with other -- any number of other

11  features that are available, such as Questions & Answers that

12  allow consumers to ask questions and get answers; Stories,

13  which allow our customers to feature particular consumers and

14  how they -- and their reviews and opinions; all those other

15  features come together in the Conversations platform.

16  Q.   You refer to it as platform.  Do some people refer to it

17  as a suite?

18  A.   Our strategy is to build a network, and what that really

19  means is we want to enable brands to reach as many of their

20  consumers while they're shopping as possible.  And to

21  accomplish that, create a network which allows our retail

22  clients and our brand clients to work together and interact

23  with those consumers, you really need a platform technology,

24  not unlike what DoubleClick had, to allow our clients to

25  interact with each other and interact with the consumers.

COLLINS - CROSS / PAK

1   A suite, in my mind, is more of a software-oriented type

2   concept which is built around a certain set of features and a

3   certain set of software modules or applications that are all

4   bundled together and provide some utility to a client.

5   So, in other words, platforms go with networks and suites

6   go with software.

7   **Q.**   Thank you.

8   By the way, do you know what ultimately happened to

9   DoubleClick?

10  **A.**   DoubleClick was acquired by Google ultimately, I believe,

11  in 2007.

12  **Q.**   Thank you.

13  Now, we've talked about Conversations.  Is Syndication

14  another product that the company provides to its customers?

15  **A.**   It is.  It is a unique capability in terms of -- relative

16  to the Conversations platform.  So this is -- I mean that it's

17  separate.  Okay?  It is, in simplest terms, allowing one of our

18  clients to take a review or another piece of content that they

19  collect and own and display that review accurately on another

20  Web site.

21  So, for example, if Tide detergent collects a review about

22  Tide detergent and we can accurately match that piece of

23  content with the correct product ID on Walmart, then we display

24  that review to consumers shopping for that exact Tide detergent

25  SKU, or stock keeping unit, product ID, on Walmart, that's what

1    syndication is.

2        It's moving content from Site A to Site B accurately and

3    displaying that to a consumer to help them make the best

4    purchase decision.

5    **Q.**   Okay.  Does Walmart, in that example, does Walmart pay for

6    that syndication feature?

7    **A.**   They do not.  Retailers do not pay for syndication.

8    **Q.**   Does Tide or Procter & Gamble pay for syndication?

9    **A.**   They do.  In our model, the brands pay to have their

10   content displayed to consumers on retail sites.

11   **Q.**   And Procter & Gamble, in that kind of scenario, you bring

12   on another retailer into the network and make syndication

13   available, does Procter & Gamble pay an additional amount?

14   **A.**   The way we price that today, they do not.  Our standard

15   approach for pricing syndication is essentially all you can

16   eat.  So it's binary.  If it's on, it means wherever we

17   syndicate, we are -- if a retailer accepts syndication, then

18   that content is displayed and Proctor & Gamble pays the same

19   subscription price for doing that.

20   **Q.**   You have another product called Connections; is that

21   right?

22   **A.**   That's right.

23   **Q.**   And what is Connections, sir?

24   **A.**   Connections is a relatively new product initiative.

25   Currently it is marketed at a freemium.  So there's no charge

1    for initially using it.

2        And to try to describe it simply, our product

3    Conversations is applicable if a brand has a Web site that they

4    maintain, the aforementioned Tide.com.  If a brand does not

5    have a Tide.com or Product.com Web site or for any number of

6    reasons they are using -- they have a community or they do

7    something that they don't really care about ratings and reviews

8    or they have some other way of getting them, we don't really

9    have a way of doing business with them.  There's nothing to

10   market to those clients.

11       But we know that for tens of thousands of brands that are

12   out there, that consumers write reviews about their products on

13   retail sites that we serve.  So we only have a very small

14   number of actual brands relative to the number of brands that

15   have reviews with our retail clients.

16       So the intent of Connections is to allow any brand,

17   whether they have a Web site or not or whether they have any

18   need for the Conversations product or not, to see their reviews

19   or reviews about their products on retail clients' Web sites

20   and to answer questions from consumers and to respond to

21   reviews, most notably bad reviews.

22       It's a way to allow brands to talk to their customers,

23   their consumers, directly.  Think of it as having a salesperson

24   in the shopping aisle when you're in a store and that person

25   works for in this case Tide, and they walk up to you in the

1  store and say, "Oh, did you have a question?  Or I see you were

2  buying my competitor's product.  You had a bad experience with

3  ours I understand.  May I respond to you or help you out?"

4  That's what Connections is.

5  **Q.**  And in the scenario of Connections, is it the retailer or

6  the brand or both that pay for this service?

7  **A.**  At present no one pays for it, and it is a product that is

8  oriented ultimately or strategically to provide value to the

9  brands first and foremost.

10     And one of the reasons that we feel this product is

11  important and valuable to retailers is that a big challenge

12  that the retailer has is getting questions answered on their

13  site.  They don't always have the resources and personnel to

14  respond to questions; and, so, often they don't want to have

15  questions on their site and leave them unanswered.

16     And, so, Connections was one of the ways we innovated to

17  help retailers get questions answered by enlisting the brands

18  that sell their products through retailers to do it on their

19  behalf.

20  **Q.**  And are there Legacy PowerReviews retail customers that

21  are now participating in the Connections products?

22  **A.**  I believe there are, but I can't specifically name them.

23  **Q.**  And does the company also offer data analytics kinds of

24  products and services?

25  **A.**  We do.  Our Conversations product has what's called

1   Workbench, which is a way for the customer to look into their

2   data and understanding what consumers are saying.

3       We also have a completely separate product called

4   Bazaarvoice Intelligence, which is another analytics solution

5   for our clients, generally best suited for larger clients, and

6   it allows them to look at how consumer reviews relate to their

7   customers and their customers' preferences, and it helps them

8   make better marketing and merchandising decisions.

9   **Q.**   And then you also have a media advertising business; is

10  that right?

11  **A.**   That's correct.

12  **Q.**   Would you please describe that briefly?

13  **A.**   We -- one way we think about -- one way I think about our

14  strategy is simply to look at what Amazon.com is doing, because

15  our -- at least for our retail clients, their number one

16  competitor in many ways is Amazon.com.  So when we think about

17  strategy and innovation, we want to make sure that we can help

18  provide our retail clients with the same sorts of capabilities

19  that Amazon.com has.

20      And one of the big challenges for our retail clients is

21  that Amazon.com is huge.  They have a huge -- tens of millions,

22  hundreds of millions of visitors.  They have a lot of data.

23  They have a lot of capabilities.  I think most people in the

24  room are aware of some of those capabilities.

25      Our clients, individual clients, are much smaller.  And

1    this is a typical dynamic on the Internet, that the smaller

2    players tend to join forces and combine their efforts to get

3    more data, for example.

4         And, so, Amazon over the last few years has launched a

5    display advertising business.  They've begun to sell

6    advertising on their Web site, and so have other retail sites.

7    Walmart does this as well and they work with a company called

8    Triad to do this.

9         And, so, our clients realize, wow, we also need to think

10   about selling advertising because Amazon is getting all this

11   money and making all this money for advertising.  They can

12   lower their price for the same things that we both sell, and

13   that is a big challenge for our clients.

14        So we believe that by having our clients work together to

15   form a shopper media or an eCommerce advertising network, that

16   we could take all those visitors and provide a competitive

17   product to Amazon.com; whereas, no one individual retailer

18   necessarily could.

19        And, so, we began an internal effort to do that.  We

20   ultimately concluded that we needed to acquire a company to get

21   the people and the competencies and the capabilities to do this

22   well.  We didn't have that in-house.  And, so, we looked for a

23   number of companies that were new companies doing this, and

24   ultimately settled on a company called Longboard Media that was

25   selling advertising on both the former PowerReviews clients and

1    Bazaarvoice clients, and we thought they were the best fit for

2    us to pursue that solution on behalf of our retail and brand

3    clients.

4    **Q.**   You're talking about Amazon's advertising inroads and I'm

5    wondering, did you interpret that to be a competitive threat to

6    the company?

7    **A.**   I consider, as part of my strategic planning and

8    forward-looking efforts, I consider ad technology and

9    advertising around what we call shopper media or retail to be

10   an opportunity for the company, and most opportunities are also

11   competitive challenges.

12       In other words, the fact that Amazon sells advertising and

13   gains that economic edge against our clients is an opportunity

14   for us to provide something of similar value to help them

15   compete with Amazon.

16       In addition, it is my long-held belief and formed

17   principally by my experience at DoubleClick, that the primary

18   economic lifeblood of the Internet is advertising, advertising

19   and selling things; and that the economics, the financial

20   desirability of advertising in data solutions would and will

21   and is bringing any number of companies into the mix in terms

22   of their working with our retail clients for the purpose of

23   creating advertising solutions.

24       And then, in fact, yes, how advertising revolves around

25   retail is what I refer to as an asymmetric or threat or

COLLINS - CROSS / PAK

1   competitive challenge that's not coming from the direction you

2   think it might come from, which would be someone, for example,

3   selling ratings and reviews; but it's coming because the

4   advertising is so interesting and retailers historically have

5   not participated in the advertising economy on the Web, but

6   they are today driven in no small part by Amazon.com's

7   billion-dollar-plus business already.

8   **Q.**   Mr. Collins, what does ratings and review have to do with

9   advertising?

10  **A.**   I would say that ratings and reviews are advertising or is

11  advertising.  Sorry.  I don't know if I got the grammar right

12  so I took both.

13        Here's why I believe that:  When I talked about the

14  example of Tide showing a review that Tide collected on

15  Tide.com to someone shopping on Walmart, in my view that's an

16  advertisement.  Tide wants to favorably influence that

17  consumer's purchasing decision.  They want them to buy Tide;

18  and if the consumer can find more reviews about Tide, then they

19  might just do that.

20        So the content is not an advertisement.  It wasn't created

21  by an advertising agency.  It's authentic.  It's real.  This is

22  referred to as earned media, user-generated content.  There are

23  lots of names for it.  So it's not a -- it's not a banner ad

24  like you would see on the Internet, but its intent is the same.

25  It's to influence that consumer to buy the product.

1          And what consumers say is now a very important element of

2     advertising, marketing, and merchandising for brands and

3     retailers.  And, so, there's a heavy competition to harness

4     this content and to get it anywhere you can get it -- Facebook,

5     Twitter, Yelp, Angie's List, on retail sites, on Amazon -- and

6     then to use that content in as many different ways as possible

7     in your marketing and merchandising efforts, and this is just

8     beginning.

9          So I contend that Bazaarvoice is a marketing, a digital

10    marketing company first and foremost because our purpose, our

11    value proposition, is to influence a consumer purchase

12    decision.

13         And that's why I would say that ratings and reviews are

14    important in the scheme of advertising, is before social media

15    and before mobile devices really accelerated that, the

16    consumer's voice wasn't as important.  It wasn't as

17    influential.

18         But now the tables have turned.  In terms of what

19    consumers say across multiple types of media is actually

20    incredibly important to marketing and advertising now, and the

21    marketing communities and retail communities are just figuring

22    out how to work into this new reality basically.

23    Q.   And when you talk about marketing and advertising, are you

24    talking about for the brands, retailers, or both?

25    A.   It's both.  For example, there's a brand -- that really

1    matters to a brand what their consumers are saying about them,

2    and they're -- there are products called social listening

3    products which go out and look at Twitter and Facebook and

4    probably go onto retail sites, and they pull all this data and

5    aggregate all this data about what consumers are saying and

6    they tell the brand, "Here's what people think of you.  You

7    might think you're doing a really good job for your clients,

8    but that's not what they say."

9        And then they provide tools for them to talk back.  These

10   tools are often called SMMS tools, social media management

11   system tools.  It's just a way to let brands listen and talk

12   back, and there are hundreds of these companies.

13       So I'll just stop there and let you continue with your

14   questions.

15   **Q.**  Getting back to Conversations, you mentioned moderation as

16   being a component of Conversations, the Conversations product.

17   Do all potential clients place the same value on moderation as

18   Bazaarvoice does?

19   **A.**  No, they don't.  This is an interesting point.

20   Bazaarvoice has had a long-standing position around

21   authenticity.  So every review that we collect, we moderate.

22   What that means is we check it to make sure it's authentic and

23   we check it to make sure it's appropriate; for example, no

24   offensive content.  Our brands are very sensitive.  They don't

25   want profane or offensive content appearing on their Web sites.

1        But we haven't allowed clients generally or almost

2   categorically to cherry pick; meaning if it's a bad review, you

3   have to post it.  If it's a good review, you have to post it.

4   Because we believe authenticity is so important.  Not all

5   clients agree.

6        For example, in the email that Peter pointed me to about

7   Warner Bros., when I had a phone call with them, one of the

8   points was that they were removing reviews related to shipping

9   problems that they had, and they didn't want to post those

10  reviews because they were negative about their site.

11       One of the things we talked about is I explained our

12  stance with regard to authenticity and that you should post all

13  your reviews no matter what they say; whereas, they didn't want

14  to do that.

15       So that's a specific example of where a particular client

16  felt that moderation or authenticity was a detriment to them;

17  and, so, many clients will say, "Self-moderation is important

18  to me.  I don't want you to do it."  So, no, they don't all

19  view it equally.

20  **Q.**   I understand they don't want to incur the cost and they're

21  willing to moderate themselves?

22  **A.**   That would be correct, but also they may have other

23  motivations for not wanting to do moderation.  I'm not saying

24  that that's good or bad.  I'm just saying that they may want a

25  different level of control.  They may want to do something

1   that, from a policy point of view, because of our stance on

2   authenticity, that they felt was too stringent and we

3   historically had not really accommodated differences of opinion

4   in that regard.  It's really kind of binary.  Either it's

5   authentic or it's not authentic.

6   **Q.**   Mr. Collins, who provides the -- who's actually conducting

7   the moderation services for Bazaarvoice?

8   **A.**   So this is a really interesting thing about our company

9   that the founders put in.  We have used a part-time labor force

10  from the beginning and our own software and technology, so

11  there's a whole different technology behind it called the

12  Content Management System; but there are today four or 500

13  stay-at-home moms principally in the Austin, Texas, area who do

14  all the moderation.

15       So it's very interesting.  They're part-time, paid-by-the-

16  hour workers that work on the technology that we provide them.

17  They're U.S. -- excuse me, U.S. based and principally in

18  Austin.

19  **Q.**   Can you please describe for us, just in broad terms, the

20  customer mix of the company?

21  **A.**   Yes, and it's changed quite a lot over the last eight or

22  nine years of the company's history.

23       Today we have just under 13 -- 1,300 what we call

24  enterprise clients.  These would be clients who use our

25  Conversations solution.  We've also added several hundred

1    brands on Connections that are not otherwise clients, and then

2    we have what -- our advertising clients and our PowerReviews

3    Express clients that we call network clients, people who don't

4    have the Conversations platform.  That's probably close to

5    about a thousand clients, too.  So somewhere in the

6    neighborhood of 2,200 some odd clients.

7         Now, when you look at our Conversations solution, which

8    would include the Bazaarvoice Conversations solution plus

9    PowerReviews, that client population again is about 1300.

10        In terms of the numbers, roughly two thirds of those

11   clients are online retailers, or something like that or

12   something similar, and the remainder are families of brands.

13   So, for example, Procter & Gamble would count as one, but

14   Procter & Gamble is actually 50 or 60 different brands.

15        But in terms of revenue it's very different.  Today our

16   revenues, the majority of our revenues come from the brand

17   client segment globally; and I would roughly estimate that for

18   our fiscal '14 estimates that we provided to Wall Street, which

19   were forecasting about 100 -- you know, about $185 million in

20   revenue, that roughly a hundred million dollars of that revenue

21   now is associated with what we would characterize as brand

22   clients or other clients, like Open Table, for example, with

23   the difference being retail.  That's flipped.  Retail going

24   back to the beginning was the majority but has been growing

25   much slower and brand has been growing much faster.

1  Q.   Are your clients all located in the United States?

2  A.   No, they're not.  We're a global company.  I would

3  estimate about 25 or so percent of our revenues come from

4  clients outside of the U.S., principally in Europe; but even

5  clients that we would characterize as U.S. clients, like a

6  Procter & Gamble, are truly global.  We have a number of

7  clients in the Asia Pac region but they might be contractually

8  associated with a relationship in the U.S.  So we're a very

9  global company.

10 Q.   Shifting gears just a bit, can you please describe how you

11 price your products for new clients?

12 A.   Okay.

13 Q.   We'll turn to renewals in a minute, but for now new

14 clients.

15 A.   Okay.  And to my knowledge this is consistent with past

16 practice from the inception of the company.  Our pricing model

17 is essentially a ROI, return on investment, or

18 performance-based value proposition, meaning that we take each

19 client and look at them uniquely or individually.  We obtain

20 data from them and we essentially negotiate a price on a

21 client-by-client basis based on any number of factors -- their

22 size, both in terms of customers and revenue; what they want to

23 do with us -- and then we determine a mutually agreeable price

24 with them based on the value exchange.

25 Q.   So is it possible that two companies that look alike may

1   act -- for the same product pay different prices?

2   **A.**    There's a significant degree of pricing disparity.  I

3   mean, there are big differences even with what you would

4   generally call look-alikes.

5   **Q.**    Does the company have any list prices?

6   **A.**    To my knowledge, we have never had a formal price list.

7   **Q.**    And does the company have any formal systematic process

8   whereby salespeople have to get approval to price at a certain

9   level or to discount to a certain amount?

10  **A.**    Within the sales organization, I'm sure there are some

11  sorts of protocols; but from a corporate control perspective,

12  if you think about it from internal accounting control point of

13  view, I'm talking a CFO --

14  **Q.**    Yes, sir.

15  **A.**    -- the company never has any formal or sustained protocols

16  or practices around pricing approval.  There may have been

17  times historically where people discussed it or issues were

18  raised, but there's never been a control process around that.

19      We give the Sales Team the discretion to negotiate both

20  terms and prices on a client-by-client basis, and then to

21  accept those terms and move forward.

22  **Q.**    Now, once you've signed up a client, you agree to a price,

23  what about when it comes time for renewal?  What's the

24  company's practice on renewals?

25  **A.**    Until fairly recently, we did not have a formal process or

1   practice around renewals.  We talk to investors about that

2   often.  And one of the reasons that that was true is we were

3   always engaged with our clients, particularly the brands but

4   also retailers as well, to add additional sites or additional

5   brands or additional countries or additional capabilities, like

6   syndication for example.

7       So we're in a constant sales cycle with them that

8   precluded our need to call them up after a year and say, "Oh,

9   it's been a year.  We want to make sure you're happy and we

10  would like to renew."

11      More recently we have -- we're beginning to formalize that

12  process, particularly with smaller clients.  We use an

13  outsourced partner called ServiceSource to do that work.

14      But principally our focus has been on adding capabilities

15  and features or doing more for a client and growing the

16  relationship over time.  That's really our -- has been our

17  orientation around renewal.

18  Q.  Has there been a general practice with respect to renewal

19  prices when there are no new value-added features, no new

20  geographies, or new brands being added?

21  A.  I would say the most common experience that I'm familiar

22  with, and I can cite some of our large brand clients as an

23  example, is that in exchange for doing more brands or for a

24  retailer, if you're doing more of their dot-com sites, that we

25  tend to lower the price for those sites or brands in exchange

 1   for a larger overall relationship.  So think of that as a

 2   volume discount.

 3        On the Bazaarvoice side, I'm not aware of or familiar with

 4   any common convention about how you would pursue a renewal and

 5   have not observed or aware of any systematic or

 6   across-the-board price increases that are applied.

 7        When I joined the company, I was aware of some contracts

 8   that had volume factors where if you were over a certain

 9   volume, your price might go up; but as a matter of policy, I

10   don't even think we put those in contracts anymore, so there

11   are really no automatic conventions at all for increasing price

12   on renewal.

13        And our strategy is more about increasing the number of

14   brands and increasing the size of the network as opposed to

15   increasing what we call ACB or annual revenues for a client.

16        **THE COURT:**  Can you just tell me, what are the terms

17   of the contracts that you have?  I think I heard one, two, or

18   three years; is that right?

19        **THE WITNESS:**  As I said, it can vary wildly.  On --

20   typically our contracts are a year.  We have very few contracts

21   that extend beyond a year, and I would say this is particularly

22   true for brands but also would be the most common case for

23   retailers.

24        Because we sell to chief marketing officers in the

25   marketing budget, they don't tend to make long-term commitments

1    about anything.  So typically contracts are a year.  There are

2    often outs and termination provisions that allow people to

3    terminate contracts after 30 days.

4        And even more recently on our last conference call we

5    talked about a very large client that had a three-year contract

6    that we worked with them to renegotiate for a variety of

7    reasons; and even though it's middle of contract, the reduction

8    in that fee was significant, about 75 percent.  So even if it's

9    a year, if there's an issue around performance, we would

10   proactively adjust that.

11   **BY MR. PAK:**

12   **Q.**   Was that a brand customer?

13   **A.**   I believe we characterized it as a brand customer, but

14   they do their own direct selling as well, yeah.

15   **Q.**   Can you describe for us what Longboard is, Mr. Collins?

16   **A.**   We discussed it a few minutes ago.  It is a shopper media

17   advertising, online advertising, business.  So we sell

18   advertisements on online retail sites.  They also sell

19   additional inventory on mobile devices and other things, but

20   ultimately it's all associated with what we would call shopper

21   media.  That's what that is.

22   **Q.**   And you acquired Longboard in about November of 2012; is

23   that right?

24   **A.**   That sounds about right, yes.

25   **Q.**   Did the acquisition of Longboard in November of 2012 have

1    any relevance to the acquisition of PowerReviews in June of

2    2012?

3    **A.**    Yes.   I would say that from my perspective they were

4    linked.   It was a one-two combination.

5         Number one, you can see Amazon's capability around

6    advertising.   We believed our clients -- we could see them

7    doing that and wanting to do that even though it's very early.

8         So, simply put, for advertising, in any medium, the more

9    people you can reach, the more viable advertising solution you

10   have.   Advertisers, particularly online, like to buy lots of

11   people at once.   So by combining PowerReviews with Bazaarvoice,

12   we increase the number of consumers in theory that an

13   advertiser could reach working with us.

14        So when you have a really big audience, and we talk about

15   having 400 million plus consumers that we reach, which would

16   include travel and retail and brands as well, that's

17   attractive.

18        We often lose opportunities to Amazon because advertisers

19   tend to choose the path of least resistance.   They'll say, "You

20   know, we're not going to split our ad spend on shopper media

21   between you and Amazon.   We're just going to give it all to

22   Amazon because they're big and it's easy."

23        So by acquiring PowerReviews and creating a bigger

24   audience and then working over time to recruit retailers into

25   our network, we believe we can provide a formidable advertising

1   opportunity that we could not do otherwise unless we had enough

2   consumers to reach.  That's the big challenge on the Web, is

3   everything is so fragmented, the little guys often get squeezed

4   out.

5   **Q.**   Have you ever heard of a concept called co-op advertising

6   dollars?

7   **A.**   Yes.

8   **Q.**   How does that fit into the company's strategy?

9   **A.**   So co-op advertising is, as an example, is really a very

10  old concept and it's something we as consumers would experience

11  in a store.

12      If you walk into a store and you see these, you know, NFL

13  football displays, you know, in the middle of the store,

14  those -- those materials, that collateral, tends to have been

15  put there and paid for by the brand itself that's selling that

16  product.  And brands often pay retailers significant amounts of

17  money to -- for shelf space and to promote their products and

18  get better placement.  That's a multibillion dollar, tens of

19  billion dollars industry.

20      It's sort of the blocking attack on blue-collar world of

21  advertising as compared to television, for example.  And

22  coupons would be included in co-op as well.

23      Online the co-op concept has not really emerged yet, but

24  we believe, I believe, that online retailers are going to begin

25  to develop their own co-op programs and they'll be unique to

1    the online channel, and that will -- that trend will ultimately

2    disrupt the old co-op advertising business, now, which like all

3    businesses, you know, is going to be resistant to that.

4         And then that's an opportunity for the company, that

5    brands are going to seek new ways to influence consumers when

6    they're shopping and when they're thinking about shopping, and

7    a way of thinking about our opportunity is that we would be

8    disruptive to co-op advertising.

9    **Q.**   And in your future vision of the company, do you see

10   PowerReviews' Legacy retailers participating and sharing in the

11   co-op advertising dollars?

12   **A.**   It was fundamental to the strategic analysis around the

13   acquisition that we were forming a network and creating big a

14   audience that would allow brands to talk to their consumers;

15   and, so, we're essentially following the path that has been

16   blazed ahead of us online in terms of how online advertising

17   and marketing models work successfully, and it's around

18   audience.

19        And increasingly it's around data, meaning we all read

20   about big data so that's sort of the raw materials for success

21   online is you have to have a lot of data so you can be

22   efficient, so you can reach the right consumer, and then you

23   have to have a big audience of consumers to reach.  Those two

24   ingredients together create a viable solution.  If you don't

25   have them, there's no amount of software, there's no feature

1    utility you can create that will create value because there's

2    no gasoline in the engine.

3    **Q.**   And, so, PowerReviews' Legacy retailers that you acquired,

4    then, could participate in the space?

5    **A.**   That was the intent.  I'm sorry if I wasn't clear.  That

6    was --

7    **Q.**   Thank you.

8    **A.**   That was the intent, yeah.

9    **Q.**   I'd like to discuss with you how Bazaarvoice measures how

10   much of the marketplace it has, and I would ask you to turn in

11   the binder in front of you to DX1379.

12   **A.**   (Witness examines document.)  Okay.

13   **Q.**   Could you put that on the screen, please?

14        This document, Mr. Collins, is titled "Current TAM and TAM

15   Expansion" authored by Loran Gutt?

16   **A.**   And that stands for total addressable market.

17   **Q.**   Total addressable market?

18   **A.**   Total addressable market.

19   **Q.**   It's dated May 24, 2013.  Did you commission this

20   analysis, sir?

21   **A.**   Yes.  Loran works directly for me as a strategic analyst.

22   **Q.**   And what was the purpose of this analysis?

23   **A.**   Two purposes.  Number one is it informs strategic planning

24   long term.  It helps think about the market and how to create

25   products and create value for the market; but it also was

```
 1   commissioned for a very tactical reason, which is to find new

 2   methodologies to provide sales leads to our sales force and

 3   target their selling efforts by identifying brands that had

 4   reviews on one of our retailer sites that were not doing

 5   business with us.

 6   Q.   If you could turn to page 3.

 7   A.   (Witness examines document.)

 8   Q.   And I think this is the --

 9   A.   Slide 3 or page 3?

10   Q.   It should be Slide 3, sir.

11   A.   This one (indicating); right?

12   Q.   Yes, sir.

13   A.   Okay.

14   Q.   And I think that's the key page that describes the basic

15   analysis and results; is that right?

16   A.   Yes.  Think of this as a map of the marketplace, a heat

17   map or something like that.

18   Q.   So there's a lot of language, there's a lot of color

19   codes.  I happen to be very linear, so I look for the words

20   "Conclusions and Recommendations."  Do you see that?

21   A.   Yes.

22   Q.   And it says:  (reading)

23           "Current account-level customers (2,533) are only

24        8 and a half percent of existing global accounts deemed

25        workable (29,494)."
```

1       Do you see that?

2   A.   Yes.

3   Q.   Can you expand upon what that means?

4   A.   Yes.  So as we discussed a moment ago and as we've

5   communicated to investors consistently, we believe that our

6   largest addressable opportunity is the company.  The way we can

7   make the company the biggest and the most valuable is around

8   garnering marketing dollars from brands.  So -- and we believe

9   that the retailers, that's where everybody shops, so having a

10  big audience of retailers is what will be attractive to the

11  brands.

12      And, so, this work was essentially to inventory the unique

13  brands and companies that we could identify on one of our

14  retailers, in other words, how many brands have reviews in our

15  database, and then compare that list to how many brands we were

16  actually doing business with.

17      This is also a very important justification for the

18  Connections business because many of these brands may not

19  desire Conversations or they have some other solution for

20  communities, for example.

21      And, so, the output of this work is that we can find tens

22  of thousands of brands that are significant in size that are

23  not doing business with us today; and in our view they

24  constitute prospects that we could sell directly to today,

25  whether it's advertising, Conversations, Connections, or all of

1    the above; or if we don't have a solution to match them today,

2    we could get our product teams focused on what could we do for

3    these clients.

4         But they all have, in our view, a connection to, a vested

5    interest in working with the retail channel because their

6    products are being talked about there.  And, so, the point was,

7    we had a very small fraction of that addressable market; and

8    certainly globally looking at our retail footprint, we're not

9    even, you know, in Asia a big way yet in terms of feet on the

10   street.

11        In other words, there's a lot to go after and we have a

12   relatively small share today, and we believe we have a lot of

13   significant long-term opportunity to pursue, and we just have

14   to figure out how to execute it.

15   **Q.**   So this is focusing on brands.  If I read it correctly,

16   that small number you're talking about is the

17   8-and-a-half-percent figure?

18   **A.**   That's right.  So --

19   **Q.**   And does this --

20   **A.**   By any measure, dollar or units, I would say we have

21   sub-10 percent penetration.  We're small.

22   **Q.**   Is this United States or is this global, sir?

23   **A.**   I believe this would be a global look.

24   **Q.**   And this does not include retail opportunities; is that

25   right?

1   A.   No, I don't believe it does.  This was oriented around

2   brand opportunities.  We look at -- again, because we're

3   thinking in a network, we think about supply and demand.  These

4   are all the brands that sell through our retailers and these

5   are all the various retailers around the world; and trying --

6   so we look at retail, we look at the rankings of eCommerce

7   around the world.

8        So, for example, there's somewhere around 6 to

9   $700 billion of eCommerce revenue around the world and a huge

10  chunk of that, for example, is in Asia where we really don't

11  have a huge presence; and in the U.S. Amazon is particularly

12  dominant with a quarter to a third of all U.S. eCommerce sales.

13          THE COURT:  Mr. Pak, why don't we take our first

14  morning break.

15          THE WITNESS:  Thank you.

16          MR. PAK:  Yes, Your Honor.

17              (Recess taken at 9:31 a.m.)

18              (Proceedings resumed at 9:41 a.m.)

19          THE COURT:  Please be seated.

20       Please go ahead, Mr. Pak.

21          MR. PAK:  Thank you, Your Honor.

22  BY MR. PAK

23  Q.   Mr. Collins, I would like to talk to you about syndication

24  a little bit more, please.

25  A.   Okay.

Q.   Do all of your customers syndicate their ratings and
reviews contents?

A.   No, they don't.

Q.   Do you have a sense as to roughly how many, or some
guesstimate as to how many syndicate?

A.   Syndication is complex to do.  Matching the products and
things is hard.  And, also, like many of the things we do, even
getting retailers to adopt reviews, a lot of education.

     So there are many retailers who, for any number of
reasons, don't accept syndication.  So I would say today, you
know, certainly probably less than a third of our retailers
accept syndication.

     Some of our bigger brands syndicate, but that is probably
less than half.  But, more importantly, the amount of content
we can actually match up and move, that's something that will
build and grow over time.  So it's strategically very important
to me, to the company.

     Its current state -- I often say, it's in the dial-up
phase, like AOL.  It's still a very nascent technology and
hasn't received full market adoption, and got a long way to go
there.

Q.   What about PowerReviews, what's your sense as to how much
syndication it did before you acquired them?

A.   My sense, as I stated earlier, was that while that was
something they were certainly looking at us and looking at the

1    opportunity to go into brands, that had not been their

2    strategy.

3         And notwithstanding any capabilities or aspirations, they

4    may have had to do it, they simply, again, didn't have the

5    audience scale, they didn't have the brand client base to make

6    it viable.  Because it takes two -- two to tango,

7    quote-unquote, you have to have the brands and the content and

8    the retailers to make it happen.  You can't just implement it

9    from one side of the equation.

10   **Q.**   Can you prevent one of your customers from syndicating

11   their ratings and reviews content to whomever they want?

12   **A.**   No.  Our contracts, since inception, have been quite

13   favorable to the retailers.  They -- end brands.  They own

14   their content and the associated data.  They can take it with

15   them.

16        We have nominal commercialization rights.  I mean, we have

17   no ability to block them from doing anything or to take their

18   content data and do anything they want with it.  We sometimes

19   import reviews for our clients from other sources outside our

20   client base.

21        And so the answer is, no, we cannot prevent them from

22   doing anything.  And, in fact, reviews on a website are in the

23   public domain.  And I'm sure many companies are out there,

24   quote-unquote, scraping them and taking them off for any number

25   of purposes, like social listening, to ascertain what consumers

1   think about products.

2   Q.   Do you have any incentive to prevent your customers from

3   syndicating their content outside the Bazaarvoice set of

4   customers?

5   A.   So when I think about strategy, and you want to have a

6   marketing -- a positive marketing impact and a network, the

7   implication of that is that you want to get as much content as

8   you can possibly get for your clients, and display that content

9   to as many consumers as you can possibly display it to.

10       So whether that is on a retailer side or on the brand side

11  or on Facebook or on Twitter, or inserted into an ad on Google,

12  we want our clients -- as a fundamental part of our strategy,

13  we want to get as much content as we can for them and to

14  display that to as many consumers.

15       So it is our position and plan to create a collection and

16  distribution network which includes our clients but also

17  includes everywhere their consumers shop.  That is a central

18  element of our long-term strategy.

19  Q.   So, in other words, regardless of whether they are a

20  Bazaarvoice customer or not?

21  A.   Correct.

22  Q.   You've heard of the term "social commerce," sir?

23  A.   I have.

24  Q.   And you have alluded to it a certain amount.

25       Give us a quick description of what social commerce means

1    to you.

2    **A.**    Social commerce means a lot of things to a lot of people.

3    There are any number of ways people describe the market.

4        But the way I would describe social commerce is it's --

5    it's the acknowledgment that consumer feedback, what consumers

6    say -- we've talked about it as user-generated content or media

7    content, reviews, opinions -- this content is an integral part

8    of how businesses sell things and how businesses advertise

9    today.

10       And so social commerce is the sum of all those techniques

11   and technologies that the marketplace is using to listen to

12   what consumers have to say all over the Web and through mobile

13   devices, and then to take that information, both the content,

14   the pictures, the words, and the data about those users and

15   then use that in their merchandising.  Means that's their

16   selling and their eCommerce and their marketing or advertising

17   efforts.  All that taken together is social commerce.  So

18   it's -- again, it's about content data and audience.

19   **Q.**    And I gather Bazaarvoice competes in the social commerce

20   space?

21   **A.**    We would be included in that genre, if you will.  We would

22   be included in that arena.

23   **Q.**    And you talked about user-generated content.  Is ratings

24   and reviews the only way to generate user-generated content?

25   **A.**    Uhm, no.  It's one amongst many.

1          Any content on the Web that an individual puts out would

2     be considered UGC.  As an example, Facebook and Twitter are

3     well-known examples, but so is Instagram photos, and Vine for

4     videos, and Pinterest for product suggestions.

5          But it also includes companies like Tumbler, which is a

6     blog site that Yahoo! acquired for, oh, a billion dollars, or

7     something like that, because in the social Web in social

8     commerce if you don't get user-generated content to drive your

9     marketing, you can't pay an ad agency to get it.

10         That's why it's called earned media.  It means you have to

11    get consumers to advocate for you and you have to ask them to

12    do it.  And that's how it's different and why it's changing

13    marketing.

14         So social commerce is all around us because of how the

15    Internet has changed because of social networking.

16    **Q.**   Now, you joined the company in 2010, and I'm wondering if

17    you've seen an evolution in terms of the types of

18    user-generated content that has evolved since you joined the

19    company, sir.

20    **A.**   Yes, definitely.

21         I think that one of the most notable changes that's going

22    to be really profound is around photos and videos.  The

23    reviews, the way we've dealt with them and PowerReviews

24    historically is a text review.  What someone writes about a

25    product.

1    And to some extent I would say that reviews on Yelp or

2    Angie's List, or any of the other review-type sites it's really

3    about texts.

4    But what's happening both in terms of Internet marketing

5    and advertising, what's really valuable and what's valuable on

6    mobile are photos and video.

7    So websites like Pinterest, which allows people to put

8    photos of things they like, are driving significant amounts of

9    sales for retailers.

10    And right now, for example, our photo and video

11    capabilities are very limited.  And so it's going to be very

12    important for us to innovate or partner for those capabilities.

13    So that's one example.

14    And, also, as companies are trying to grow and create a

15    broader value proposition to gain audience, almost all

16    companies in some way, shape or form are encroaching on the

17    others' business in some way.  And -- an ad agency, for

18    example.  And ad agencies do provide websites for brands.  And

19    they may include review capabilities, and that, that's another

20    example.

21    Q.   Now, all these various forms of user-generated content,

22    like photos and videos and ratings and reviews, would you agree

23    that they're functionally distinct or functionally different?

24    A.   Help me out with the question a little bit more.  Sorry.

25    If you'll just repeat it.

1  Q.   Ratings and reviews, does it operate in the same way as,

2  for example, a photo?

3  A.   No.  I wouldn't say that it does, really.

4  Q.   And ratings and reviews functions differently than

5  questions and answers, for example.  Is that right?

6          MR. HUSTON:  Objection.  Leading, Your Honor.

7          THE COURT:  Overruled.

8          THE WITNESS:  Okay.  Yes.  Questions and answers is

9  different, okay.  Questions and answers is:  I'm a customer; I

10 would like an answer.  And the answerer could be another

11 consumer; it could be the brand or the retailer.

12     So a review is very simple.  I go to a website.  I want to

13 share my opinion about a product.  And there's either a

14 capability of doing it or not doing it.  That's not

15 particularly complicated.

16     For example, moderating a text review even in 40

17 languages, which we do, is not that complicated.  Moderating a

18 video or checking that or a photo is different because you have

19 to look at the photo or watch the video.

20     So I think that's what you're asking.  So there are quite

21 a bit of differences in how content is handled and structured

22 and maintained.

23 BY MR. PAK

24 Q.   Does the fact that these other forms of user-generated

25 content, that they're different than ratings and reviews, from

1    your strategic perspective, mean that they are irrelevant to

2    you in your pricing strategies?

3    **A.**    Uhm, no.  We must develop in our capabilities and evolve

4    with the market.  And what this means is consumers -- as

5    consumers look at photographs or go to sites like Pinterest to

6    find out what they want to buy, we've got to bring those

7    capabilities to our clients, both brands and retailers.

8         We've got to give retailers the ability to use

9    photographs, and we've got to give brands the ability to use

10   photographs as an example.

11        And there are a number of companies out there that might

12   be good partners with us, who are working with our clients on

13   photos, for example.  And, ultimately, photographs may end up

14   being much more influential than text reviews, for example.

15   It's an unknown at this time.

16   **Q.**    Have you heard of the concept the "social wallet"?

17   **A.**    Yes.

18   **Q.**    What does that mean to you, sir?

19   **A.**    Simply put, it's the sum of monies that a chief marketing

20   officer or marketing department may spend on all the things

21   that we just discussed as social commerce.  And it would be the

22   sum of money that a retailer is spending on technologies and

23   services, or whatnot, to change how they run their website, how

24   they sell their products.

25        For example, on the brand side, social listening, finding

1    out what people say about your brand on Facebook.  And on the

2    retail side, product recommendations.  So when you go shop and

3    you say -- you see something that says, "People who bought this

4    also bought that," that's a unique technology that's driven by

5    data and perhaps other types of review content.

6        So all these different tools and solutions would be

7    collectively the social wallet, in my view.

8    Q.   And how does that social wallet concept impact your

9    pricing strategies for ratings and reviews?

10   A.   So, often talk about this with clients and agencies and

11   out in the industry with investors.

12   Q.   By the way, when you say "agencies," who are you --

13   A.   Advertising agencies.  So I'm offering that to explain the

14   source of my opinion that I'm about to express.

15   Q.   Excuse me for interrupting you.

16   A.   That's okay.

17       The general sense, and my sense of the marketplace, is

18   that because social commerce is new, that the techniques and

19   solutions to accomplish or change your marketing because of the

20   changes in consumer behavior -- people are writing reviews;

21   people are using Facebook -- are evolving.  And so -- sorry.

22       And so marketing budgets and IT budgets for retailers are

23   oriented today around trying lots of new things and trying to

24   figure out which things really provide a return, and even

25   trying to figure out what the right price is for any of these

1    particular solutions because they haven't existed before.

2         And, you know, ratings and reviews is still, you know, ten

3    years old, basically, less in many respects, in terms of it

4    being a common capability on a retail site.

5         So there's a limit, there's a practical limit to what any

6    company such as Bazaarvoice can get from the marketplace,

7    because the marketplace wants to experiment with lots of

8    different things.

9         And so I would say there's a collective constraint on

10   companies because they can't move -- they can't take a

11   disproportionate share of a brands's experimental marketing

12   budget for social commerce at this stage.

13        It was very similar in the mid '90s, when Internet

14   advertising started.  Those budgets were experimental then, and

15   they've grown over the last ten to 15 years.  Was a billion

16   dollars in '97.  It's over a hundred-billion dollars globally

17   today.  So that industry has evolved radically, and I expect

18   the same thing here.

19   Q.   Just to close the loop then, how does that impact your

20   pricing strategies?

21   A.   Simply put, there's a pervasive constraint in the

22   marketplace as brands and retailers have other things they want

23   to do.  They don't necessarily have to be the exact same thing

24   that we're providing, but in many cases there's overlap and

25   they want to place as many bets as possible.  So, again, I

 1    would say it's a pervasive constraint on pricing.

 2        The second impact is that if we don't perform or provide a

 3    marketing return or help retailer sites' conversion improve,

 4    then our product has no purpose to them.

 5        And, in fact, clients have left because they're concluded

 6    reviews hurt their conversion and hurt their sales, so they

 7    removed them.

 8    Q.   In your business judgment, sir, do you view internal

 9    solutions as competition to the company?

10    A.   I do.  And I think the term "internal solution" is a

11    misnomer to some degree.  It implies that the internal solution

12    was code or software written by that company, which is not the

13    case.

14        There are any number of third-party tools and

15    applications, probably tools they're already using otherwise

16    from a eCommerce vendor to help run their shopping cart and

17    their website, that have review capabilities.

18        And, so, many of our clients are multi-billion-dollar

19    companies, such as Walmart or Target.  They have formidable

20    technology teams, and -- depending on their preferences, and

21    they could choose to do that.  So I consider that not only a

22    viable alternative, but if you want to look at it as

23    competition I would say that it is.

24    Q.   What about a small company without the budget that has --

25    of Walmart or Target?

824

**A.**   You can still -- you can still use other tools.  There are other companies out there.

And one that's quite notable, or a couple, is you can use Magento, which is an eCommerce suite.  I believe it's open source and free.  That is owned by eBay, if I'm correct.

And I believe you can use the Amazon Webstore, which is a turnkey solution for listing your products online and using Amazon's infrastructure to get all the capabilities for that, including ratings and reviews.

**Q.**   Speaking of Amazon, have you ever given thought about Amazon potentially expanding into ratings and reviews as -- providing a standalone solution for ratings and reviews?

**A.**   They could certainly do it.  They already have the entire technology stack to support it.

It's worth noting that our entire infrastructure runs on Amazon Web Services.  So all the things we do as a network we're leveraging their architecture.

The vast majority of our clients, I suspect, sell their products directly through Amazon, and, of course, are using what's called Marketplaces.  It's like a consignment sale.  If you go to Amazon and search for a product, you'll say, You can buy it from Amazon or you can buy it from some of our clients.

They've already got a huge number of reviews, and so for our brand clients that information is already out there.  So while they haven't done it today, they have every -- all the

1    capabilities, clearly.

2        And our clients have already demonstrated a willingness or

3    even an eagerness to let Amazon sell their products directly on

4    Amazon, and share all their data and content.

5        So they absolutely could do it.  And I don't see that our

6    clients would say no if the economics were attractive.

7    **Q.**    Do you view Google as a threat?

8    **A.**    Uhm, I mean, the standard answer when anybody asks about,

9    Is Google a threat to your business, the answer is yes.

10        And I'm not trying to be cavalier because investors ask us

11   about that.  If Google -- Google leverages the data that we

12   provide and consolidate to them for our clients' benefit.  So

13   when you shop for -- or when you look on Google or do searches

14   for products, you know, review content comes up.  We help

15   facilitate that for our clients.

16        So we're working in a complementary fashion with Google.

17   Google doesn't pay us anything for that.  It's just part of the

18   capability we provide to our client base, you know, when you

19   buy conversation.

20        Google has an important footprint in commerce.  They've

21   changed their strategies around making people pay for certain

22   types of ratings or shopping listings on their site, that's

23   changing all the time.

24        So for now you have to facilitate your technology working

25   with Google.  They aren't providing that capability, meaning a

1    turnkey ratings and reviews solution to our clients today.  But

2    there's nothing stopping them.

3        And, clearly, they want to insert themselves into

4    commerce, and they already are, because Google Analytics and

5    many of their tracking technologies are deployed on our retail

6    sites.  And so they're already doing business with all our

7    clients in one way, shape or form.

8        And the more important advertising becomes on retailer

9    sites, the more attractive it will be to -- for Google to do

10   something more expansive for retailers so they can garner the

11   benefit of the hundreds of millions of visitors to retail sites

12   and they can sell advertising to them.

13   Q.   Would there be a syndication impediment to Google?

14   A.   Uhm, let me consider the question.

15       Syndication as a product for us is, we think, good for

16   everybody because reviews help drive what's called search

17   engine optimization.  Meaning, if you do searches and there's

18   review content, authentic content is prioritized by Google's

19   search algorithms.  So the more content we can get out there,

20   that's good.  But it also means that once that content is out

21   there, Google can inventory all that and structure all that and

22   could derive new types of products to allow people to do

23   comparative shopping or other things.

24       So that's my reaction to the question, is I don't see it

25   as an impediment, but it's all sort of just how the Web is

1    wired.

2    **Q.**   I'm just wondering if, in your estimation, Google has the

3    kinds of relationships that Bazaarvoice has, for example, to

4    create a network?

5    **A.**   Well, Google is already the largest advertising network in

6    the world.  And their cookies and technology are directly

7    deployed in some way, shape or form, most likely, with every

8    single one of our clients.  So there, for example, tracking

9    consumer behavior and click-throughs across all of our clients'

10   websites; whereas, we don't do that.  So we wouldn't be able to

11   match their capabilities when it comes to consumer tracking.

12        We track product I.D.s and content but, historically, have

13   not combined that with consumer I.D.  So we don't even have

14   that capability, at present; whereas, Google does.

15   **Q.**   There are data management companies out there like

16   Salesforce, Oracle, and IBM, sir.  And, I'm wondering, do you

17   ever think of them as competition?

18   **A.**   Yes.  Salesforce in particular has, over the last year,

19   demonstrated a clear intent to move into the CMO wallet, the

20   social wallet that you mentioned.

21        They've acquired three companies:

22        Buddy Media, a company that we had partnered with in the

23   past.  I don't think we're really doing that anymore, but I'm

24   not sure why.

25        Radian6, which is a social listening company.  So it goes

1    out and finds out what people say about brands.  And, more

2    recently, they have purchased ExactTarget.  ExactTarget is an

3    email marketing company.

4        The reason ExactTarget is interesting is we rely on them

5    completely for one of our key capabilities, which is that we

6    send what's called post-interaction emails out to consumers who

7    bought products, to ask them to review a product.  This is

8    probably the number one most essential technique that allows

9    our clients to collect reviews.  It's a best practice.

10        So every time we send an email out through ExactTarget, we

11   pay ExactTarget a fee to do that.  Our clients' prices are

12   fixed, however.  So they get as many emails as they want.  So

13   if ExactTarget or Salesforce, for example, decided that they

14   wanted to compete with us we would -- they could remove that

15   essential capability because we're completely reliant on them

16   for that aspect of what we do.

17        I want to go back to a key concept.  Without the content

18   and data and without the audience access the software has no

19   functional purpose.  And so what we do is much more than the

20   software around capturing ratings and reviews, which is very

21   easy to replicate and is available.  Getting the content,

22   structuring it, moderating it, that's harder and requires a lot

23   of work and cost.

24        So, again, to answer your question, Salesforce has the

25   capabilities that -- and the intent, I think, to expand their

1    business into the marketing budget.   And they've spent over

2    $4 million in acquisitions to do just that.

3    **Q.**   But Salesforce today does not have, literally, a ratings

4    and reviews function.   Is that right?

5    **A.**   They may have it to some degree or another through

6    Buddy Media and what Buddy Media does.   But, to my knowledge,

7    they are not competing with us directly for that one subset of

8    what they might do.

9          And as far as you mentioned IBM and Oracle, they have

10   large Web commerce or eCommerce platforms that are really the

11   nuts and bolts of running an eCommerce site.   Allows you to

12   take payments, manage inventory and do all those things.

13         To my knowledge, those platforms come with some degree or

14   significant degree of options around organizing and building

15   your website, and including reviews.

16         So they would likely be included in what we've referred to

17   as do it yourself or in-house.   You would most certainly be

18   leveraging another platform, like a Demandware or like a --

19   **Q.**   Demandware is Pluck?

20   **A.**   I think Demandware is Pluck.   In any event, Demandware is

21   a different company, that's a eCommerce shopping cart company.

22         So -- or you might work with your agency to integrate that

23   into one of these eCommerce platforms.   Which is what we do.

24   We integrate inside of something bigger.   We're dependent on

25   those large platforms to integrate and deploy our solutions.

1   And if they chose to do so, they could say, we will no longer

2   accept your integration; we're going to do it -- we're going to

3   provide our own capability, and you can't do it anymore.

4   **Q.**   Mr. Collins, can you identify customers that you've lost

5   or face competitive situations with each and every one of these

6   entities' competitors that you've mentioned?

7   **A.**   I don't necessarily go into all the details of who we're

8   losing because that's not where I'm focused.  But, with that

9   being said, particularly with regard to Pluck because it's

10  current, we've -- we've lost significant clients to Pluck.  We

11  lost four to Pluck.  That was a 7-, $800,000 deal.  We didn't

12  get 'em any reviews.  We got a very small number of reviews for

13  them, and they left and went to Pluck.

14      There are other clients that are out there where Pluck is

15  in there and very aggressive right now.  And there's

16  significant -- there's significant energy and competition

17  around that.  And these are including things in my in-box this

18  morning.

19  **Q.**   Prior to the merger, sir, did Bazaarvoice face competition

20  from PowerReviews?

21  **A.**   Yes.

22  **Q.**   Were they your primary competitor in retail?

23  **A.**   I would say that they were, yes.

24  **Q.**   How about in brands?

25  **A.**   Uhm, I didn't see them and -- we did not perceive them as

 1    meaningfully competitive or even focused on that, at least not

 2    historically.  Whereas, we began pursuing the brand opportunity

 3    as far back as 2008.  And that was really centered around the

 4    idea of building a network and developing capabilities such as

 5    syndication, that we've talked about.

 6         I'm not fully familiar with PowerReviews' full history,

 7    but they started from a different place.  They had a --

 8    Buzzillions is a comparative shopping engine for consumers, and

 9    then their business evolved.  But they really came into the

10    market in a different way.

11         So they, you know, they -- we believe our business was

12    much more successful not only because we provided superior

13    features, ability to customize and do things that -- that

14    PowerReviews, really, around their model didn't do, but, very

15    importantly, we understood the importance of having brands and

16    retailers together because both constituents could derive more

17    value by cooperating.  We still belief that, and so we pursued

18    that business model going back to 2008.  And I think that's an

19    important reason we were successful in the marketplace;

20    whereas, PowerReviews wasn't doing that at least for a long

21    time.

22              **THE COURT:**  Prior to the acquisition, who was the

23    biggest competitor in brands?

24              **THE WITNESS:**  Well, we, I would say, made the market

25    for it.

1    I mean, you have to compete for marketing budget for

2   brands.  And that's always a challenge.  And you can take very

3   understandable things.  You can see what's happening with print

4   media versus Internet.  So money is going from one channel to

5   another.

6       Well, the same thing is happening with regard to Internet

7   advertising.  There's an amount of money that goes into that

8   and is allocated in a marketing budget.

9       And so when we win brand business, we have to take

10  something away from somebody.  It's not necessarily new money

11  that comes in to fund what they do with us.  We take it away

12  from co-op, or we might take it away from their display

13  advertising budget, or who knows what.  It can vary by client.

14      So we're an option amongst many for brands; whereas, for

15  retailers it's -- it's different for them.  They have different

16  technologies they can leverage as -- you know, again, the

17  shopping cart software, for example.

18      But for brands, we're just a marketing option.  We think a

19  good one and important one, but just an option, nevertheless.

20  **BY MR. PAK**

21  **Q.**   Internal solution a viable option for brands?

22  **A.**   It is.  First, if they decide that they want to have a

23  website and a community, they have to make that choice.  If

24  they decide to do that, I would guess that they most often work

25  with their advertising agency to design and implement their

1    websites.  And then it's just a matter of creative

2    decision-making as to what type of content.

3         They might use other software applications, community

4    management software, for example, for companies like Lithium,

5    for example.

6    **Q.**   I'd like to turn to -- Mr. Huston showed you some emails

7    about the rationale for the merger, focusing upon the

8    elimination of price competition and whatnot.

9         And I'd like you to look at DX1880, which is in your

10   binder there.

11   **A.**   DX1880?

12   **Q.**   '80, sir.

13   **A.**   All right.  I have it.

14   **Q.**   And what DX1880 does, to start at the bottom, it's

15   Mr. Hurt writing to the board in May of 2011, about possibly

16   acquiring PowerReviews.  And he notes at the bottom:

17            "Potentially taking out our only competitor."

18        Do you see that section?

19   **A.**   Which section, at the very bottom?

20   **Q.**   Yes, sir.

21   **A.**   Okay.  Let me read it.  Okay.

22   **Q.**   So that's Mr. Hurt describing one rationale for the merger

23   in May 2011.  Is that right?

24   **A.**   Yes, as far as I can ascertain, yes.

25   **Q.**   And if you move up the email to the very top, the original

1   email of this chain -- I'm sorry, the latest one, Mr. Pacitti's

2   email, do you see that?

3   **A.**   Yes.

4   **Q.**   And he writes:

5          "Second, I pissed all over this when they brought it

6          up.  Complete waste of time in my view."

7          Do you see that?

8   **A.**   Uh-huh.

9   **Q.**   How did you interpret that statement, sir?

10  **A.**   Well, I have to interpret it now because I don't think I

11  was copied on the reply.

12  **Q.**   But -- you're right.  Did you have communications with

13  Mr. Pacitti as to his views about the mergers rationale in

14  May 2011?

15  **A.**   I'm sure I did, but he -- he -- my recollection is, of

16  course, he challenged the rationale for the idea.  But I don't

17  recall him expressing it in such clear terms.

18  **Q.**   Okay.  Can we look at DX574, please.

19  **A.**   574?

20  **Q.**   Yes, sir.  Should be there, Mr. Collins.  Another series

21  of email chains.  And the one I'm going to focus on is in the

22  middle, dated, now, September 2nd, 2011.  And it's Mr. Barton

23  writing to you.

24         Do you see that?

25  **A.**   Uh-huh, yes.

1   Q.   So in May you had original discussions about the --

2   acquiring PowerReviews.   You received some feedback from the

3   board.

4        Now, we're talking September, 2011.

5   A.   Okay.

6   Q.   And Mr. Barton is writing, and he writes to you:

7             "Stephen, great stuff."

8   Do you see that?

9   A.   Yes.

10  Q.   And then goes on to talk about, there, that:

11            "The core business content capture and display, to put

12       it simply, is trending toward commoditization.   And we

13       ultimately need to look to new initiatives - CI, network,

14       advertising."

15       And then it goes on.   Do you see that?

16  A.   Yes.

17  Q.   And what was your reaction to that, sir?

18  A.   Uhm, my recollection -- and this is, I would say,

19  consistent with my views and understanding of the industry, is

20  that if you have an Internet-based business and it's

21  marketing-based business and you have to perform, you have to

22  constantly innovate to continue to be relevant.

23       And I would say that I agree that our -- the basic

24  capability of ratings and reviews is a commodity and will

25  become a commodity.

1    And one of the reasons that would happen, again, is

2 because the attractiveness of alternative economics -- and what

3 I mean by that is if someone felt that advertising on a retail

4 site was more attractive than selling software for ratings and

5 reviews, they could easily conceive of a way to provide that

6 secondary capability in exchange for the advertising economics,

7 as an example.

8    So I certainly would -- I would say that I agreed with

9 that view of the world.

10 Q.   And did that -- if you would look up to the top, right

11 above your response.

12 A.   Yes.

13 Q.   That's your response to Mr. Barton's email.  And you

14 wrote:

15       "And we should acquire PR."

16    Do you see that?

17 A.   Yes.

18 Q.   What did you mean by that?

19 A.   I think it's pretty clear.  I thought it would be a good

20 acquisition.

21 Q.   Would you please turn to DX735.

22 A.   Okay.

23 Q.   It's a long series of emails.

24 A.   Uh-huh, yes.

25 Q.   It's your email indicated November 2, 2011.  And from the

1    metadata you'll see that you're writing to a number of your

2    colleagues.

3    **A.**    Okay.

4    **Q.**    And the subject line is "Thoughts for Strategy Session."

5    Do you see that?

6    **A.**    Yes.

7    **Q.**    And you should take a minute to refresh your recollection

8    about the document.

9    **A.**    Yes, thank you.

10   **Q.**    I'm mostly interested in the first page.

11   **A.**    All right.  Then I've reviewed it.

12   **Q.**    In the middle, you're talking about various parallel

13   strategies.  Is that right, sir?

14   **A.**    Yes.

15   **Q.**    I'm looking at the first one, which is being highlighted

16   on the screen here.  And you talk:

17           "The first is a land grab high revenue growth

18       strategy."

19       You do you see that?

20   **A.**    Yes.

21   **Q.**    Now, in the middle there's a sentence:

22           "Looking down the road three to five years we should

23       be in a position to give away or even pay retailers to use

24       our platform so we can maximize reach."

25       Do you see that?

1   **A.**    Yes.

2   **Q.**    What did you mean by that, sir?

3   **A.**    So, just for a couple of definitions.  Reach is audience,

4   how many consumers you can connect to, okay.  That's what reach

5   is.

6        What I mean is -- you asked me a question earlier and we

7   talked earlier about why don't all retailers accept

8   syndication, for example?  And why -- you know, why do they own

9   all their data and content; we don't have any rights to do

10  anything?

11       Well, the point is, their audience and their data, it's

12  their asset.  And so they have the right and should have the

13  right to make money from that asset.  It's -- also, we could

14  refer to this as site monetization.  It simply means:  How can

15  retailers make money from the people who visit their site?

16       So this sentiment is to say the most attractive strategy

17  for the company, in my view, again, is to build a large

18  audience that has lots of content data and then provide tools

19  to allow the retailers, our retail clients, to make money from

20  their assets, facilitated by the efficiencies we bring through

21  our technology.

22       Advertising is an example.  If you have a hundred million

23  people who visit your site and we can help you sell ads, you

24  make more money like Amazon.

25       If you aren't participating in syndication -- which is the

1    big reason or a big reason a brand does business with us at

2    all -- and if we can't provide syndication, their incentive to

3    do business with us is diminished, then it would be in our best

4    interest -- if you believe brand opportunity is much bigger;

5    which I state here and I still believe -- to say, "Retailer,

6    we'll pay you or share the revenues we're able to obtain

7    because we have a network from all these brands; we'll share

8    that with you," to encourage their cooperation for their own

9    benefit.

10        And, if necessary, we should go even further and be more

11   aggressive and say:  We would like you to participate in the

12   network.  We'd like you to cooperate.  We'd like you to share

13   your assets and share your audience, and in doing that we'll

14   exchange the economic benefit that we get from selling to

15   brands with you.

16        So we become a profit center for retailers, and that's the

17   sentiment and the -- the strategic sentiment I'm expressing

18   here.  And I --

19   Q.   And in that scenario what would you be charging your

20   retail customer for the ratings and reviews product?

21   A.   Ultimately, this is conceptual.  It's unclear except to

22   say that -- and I've told investors this repeatedly, that, I

23   see a future where retailers get a check from us; that by

24   engaging in benefit or site monetization activities enabled by

25   our network, which gives us the audience size and efficiency to

1    be a viable solution for brands -- otherwise, we can't match up

2    with Amazon -- that it's an opportunity for retailers to make a

3    profit.

4         That's, essentially, it.  And I would say that reflects my

5    current strategic thinking about the ideal path for the

6    company.

7    **Q.**   Could you please look at DX649.

8    **A.**   Okay.

9    **Q.**   And it's an email chain, again.  The first one being from

10   Shawn Gaide, dated August 21, 2012, where you're cc'd.  Do you

11   see that?

12   **A.**   Yes.

13   **Q.**   And then going down to the bottom of that email, the one

14   that originates this, it's from Mike Svatek with a "cc" to you.

15   Do you see that?

16   **A.**   Yes.

17   **Q.**   That's dated August 21, 2012.

18        Now, at this time, the acquisition of PowerReviews has

19   been completed.  Is that right?

20   **A.**   Yes.

21   **Q.**   And Mr. Svatek writes:

22        "I am sitting in the network QBR" --

23   **A.**   That stands for quarterly business review.

24   **Q.**   (Reading:)

25        "-- and learned that 50+ of our brands who have signed

1          up full-network syndication are going to have content

2          pushed to the appropriate PowerReviews retailers."

3          Do you see that?

4     A.   Yes.

5     Q.   (Reading:)

6              "Therefore, many PowerReviews retailers will get the

7          substantial incremental benefit for free from Bazaarvoice,

8          lowering the cost per review that they may pay us while

9          providing greater value at the same time."

10         Do you see that?

11    A.   Yes.

12    Q.   What does that mean, sir?

13    A.   Again, it goes back to the concept of our brands.  The

14    more content we can publish for them, the more consumers that

15    see their reviews, the more value they get, and the more

16    attractive and valuable our solution for them.

17         So what we were able to do here, by combining with

18    PowerReviews, is immediately provide two benefits:

19         Number one, brands had the content that they had already

20    collected, or we'd collected on their behalf, shown to more

21    people.  And that made what we do for them more valuable.

22         And the PowerReviews clients benefited because, as you

23    asked me earlier -- maybe Peter asked me -- retailers don't pay

24    for the receipt or acceptance of syndicated content.  They were

25    able to get more reviews on their website, which we believe

1    improves their -- their business results for their site.

2    **Q.**    Thank you.

3         Shifting gears, now, about the valuation that you applied

4    in acquiring PowerReviews.

5         Did your financial models in acquiring PowerReviews

6    include projections for increased margins because of the

7    elimination of price competition with PowerReviews?

8    **A.**    Uhm, no, they didn't.

9         We took, I would say, a -- a -- first, a very conservative

10   view but also one that was aligned with our integration

11   program, which was focused more on retention than anything else

12   because of the network dynamics that we've been discussing here

13   in this line of questioning.

14        So I would say no, that we did not, in fact, make such

15   provisions in our financial models.

16   **Q.**    And in your financial models to the board, in seeking

17   approval for the merger, did those models include projections

18   for pricing increases absent selling products that added more

19   features or value going forward?

20   **A.**    My recollection is they did not.  They did not.

21   **Q.**    Now, the Department of Justice, sir, says that you

22   acquired your closest competitor and that now Bazaarvoice has

23   market power.

24        Why don't you raise prices to retailers, including the

25   legacy PowerReviews retailers?

1   A.   Strategically, it is my view and, therefore, the company's

2   view that if you want to build a successful marketing network,

3   social commerce network, one of the key assets or capabilities

4   that you have to have is the largest audience that you can

5   bring together because that's how advertisers and marketers and

6   brands think about the value they get.

7        So, in my view, any tactical action that would reduce the

8   size of our audience runs counter to the current and long-term

9   strategy for the company, which is to provide brands the

10  maximum access or the largest audience they can access with

11  regard to shoppers globally.

12       And so any financial gains that we might obtain in the

13  short-term from raising price would be transitory and could

14  result in losing significantly more money on the brand side

15  because that retailer decides to explore an alternative,

16  whatever that alternative might be.

17  Q.   I'd like to look at some of your contemporaneous documents

18  about pricing.

19       If we could, please, put up DX1855.

20  A.   I'm sorry, 1855?

21  Q.   Yes, sir.  DX1855.

22  A.   Have a drink of water real quick.  Okay.

23  Q.   Now, DX1855 is an email from you.  It's an internal email.

24  It's dated April 28, 2012.  Do you see that?

25  A.   Yes.

1   Q.   Now, at this point you have not acquired PowerReviews yet.

2   Is that right?

3   A.   Uhm, that would be correct.

4   Q.   And I'd like you to look at the first paragraph.  And in

5   particular the second sentence.  It says:  "With Peloton" --

6   and that's the code name for acquiring PowerReviews.  Is that

7   right?

8   A.   That's right.

9   Q.   "With Peloton analysts" -- and by "analysts" there, who do

10  you mean?

11  A.   This would be equity analysts, the analysts that the

12  Department of Justice referenced during their questioning.

13  Q.   You wrote:

14       "Peloton analysts might expect pricing impacts but

15       since this is not our strategy or the reason for the deal

16       we need to explain that we are focused on land grab and

17       speed in retail and will focus on international and SMB

18       too, and, in fact, pricing per client may actually come

19       down for retail but longer term revenue will increase from

20       brands because of our reach at scale."

21       Do you see that?

22  A.   Yes, I do.

23  Q.   And you're communicating to your fellow employees?

24  A.   Yes.

25  Q.   Can you explain what you meant by that, sir?

1   A.    Uhm, I think it's fairly -- fairly evident, but -- that,

2   again, the primary rationale for the transaction was that it

3   would increase the amount of content data and audience that we

4   have, which is essential to the value creation equation, if you

5   will, for our company on behalf of our clients.

6        And that the acquisition of PowerReviews was signaling our

7   movement towards building a larger network across all sizes of

8   retail clients because, as we've consistently told investors,

9   we believe the most interesting and exciting business

10  opportunity is to provide brands a new kind of social commerce

11  marketing solution built around retail.  And in doing that, we

12  could create the maximum amount of value for retail clients.

13       And on the Internet -- and this, again, is informed by my

14  experience -- it is about going fast.  It is about -- you know,

15  time is not your friend.  And if you want to build capabilities

16  that create value for the marketplace, you know, one of the

17  essential ingredients on the Internet, again, goes back to

18  having data and audience.  And if you cannot accomplish that

19  then your business, at a minimum, will not be as successful as

20  it could be, and it may not be viable.

21       And I think there are dozens if not hundreds or thousands

22  of examples of companies in the history of the Web that have

23  grown very quickly and then been displaced just as quickly.

24  And that's why I talk about speed and a land grab and winning

25  online retail.

1    **Q.**   Would you now turn, please, to GX840.

2    **A.**   Okay.  Bear with me a second here.  Okay.  I have 753.

3          Probably my fault, again, but the next one I see is 1062,

4    after 753.

5    **Q.**   Well, you can look on the screen.

6    **A.**   I will do that, okay.

7    **Q.**   Exhibit GX840.  This is an email from Mr. Hurt, dated

8    May 25, 2012.

9    **A.**   Okay.

10   **Q.**   And he's attaching the transcript of a conference call.

11   Do you recall that conference call?

12   **A.**   Yes, I do.

13   **Q.**   And if you -- the attachment is the transcript of the

14   conference call.

15           **MR. PAK:**   And if I could ask that the page that is

16   Bates stamped BZ870061 could be called up.

17   **BY MR. PAK**

18   **Q.**   Now, this is a conference call regarding the acquisition

19   of PowerReviews, right?

20   **A.**   As I understand it, yes.

21           **THE COURT:**   Just for the record, let's get the number

22   straight.  It's BZ86 --

23           **MR. PAK:**   I'm sorry.  I have the wrong number.  You're

24   right, Your Honor.  BZ00869938.

25           **THE WITNESS:**   Okay.

1    BY MR. PAK

2    Q.   And Mr. Keirstead is asking a question.  Who is

3    Mr. Keirstead?

4    A.   At the time, he what's called a sell side stock analyst at

5    BMO Capital Markets.  That was his employer.

6         MR. PAK:  I would like to pull up, please, the bottom

7    question.

8    BY MR. PAK

9    Q.   Mr. Keirstead is asking you a question:

10        "Terrific.  And then my second question just has to

11        did with the fact that you're effectively taking out your

12        most significant competitor and one that was consistently

13        underbidding Bazaarvoice in terms of price, at least

14        that's my understanding.  And I'm wondering whether the --

15        that fact will give you a little bit more room maybe to

16        lift up your pricing levels."

17        Do you see that?

18   A.   Yes.

19   Q.   If we could go to the next page, you responded.  And

20   that's the transcript of your response.  Is that right, sir?

21   A.   Appears to be, yes.

22   Q.   Can you just summarize, shortly --

23   A.   If I may take a moment to read through it.

24   Q.   -- your response, sir.

25   A.   Yes.  Give me a moment, please.

1        Simply put, it's another way of talking about the -- the

2   benefit of allowing brands to reach the maximum number of

3   shoppers in any given time, and that that's what's important to

4   our business long-term.

5        It's about the brands, and that retailers essentially

6   provide the supply, the inventory, the audience and the data

7   that's attractive to the brands; and that the two elements have

8   to work together to create the most value and make our business

9   successful.

10  **Q.**   What about with respect to pricing, now that you've

11  eliminated PowerReviews?

12  **A.**   So in the response I am telling Karl that, that's not the

13  reason for the merger.  It's not about -- and this is a

14  long-standing debate both internally and also something that

15  I've had to explain and we've had to explain to analysts.

16  While this may sound like a very simple statement, it's a very

17  complex company.  Are we a software company or are we an

18  Internet company?

19       I contend we are an Internet company.  And what that

20  implies is we are a marketing solution.  Okay.  Our economics,

21  our opportunities are more like the opportunities for

22  nonsoftware companies than they are software companies.  But

23  the answer is:  We are both.

24       So, Karl is a software analyst.  So from his perspective

25  he thinks, oh, you just bought these clients; you raise price

1   and that's how you derive a benefit from the transaction.

2       And my answer is no, the primary benefit of this

3   transaction and the primary reason we did it is to allow us to

4   pursue a much more lucrative opportunity, because, after all,

5   PowerReviews was a company with $12 million in revenue, but we

6   have over a hundred-million dollars or so in business from

7   brands, and that by combining we could do something much more

8   valuable for brands, which was much more attractive as a

9   business opportunity and a strategy than a near term price

10  increase might have been on the PowerReviews clients.

11      And so I'm guiding him to look at the transaction

12  differently for that reason.

13  Q.   Switching gears a bit, Mr. Collins, how would you compare

14  competition since you acquired PowerReviews?

15  A.   Uhm, well, it certainly hasn't abated.  I see and

16  experience the competitive landscape every day, both for brands

17  and retailers, in a variety of ways.

18      We get constant and persistent pressure from clients of

19  all shapes and sizes for lower pricing, particularly and

20  importantly if they feel like the value, the performance of our

21  solution is not up to par.

22      For example, if a brand doesn't feel like it's getting

23  enough content syndication, they're going to challenge the

24  price.

25      If retailers don't feel that the benefit is there relative

1    to what they're paying, or they come under other pricing

2    pressure we're going to hear about that.  And that happens all

3    the time.

4        So this last quarter on our conference call our average

5    price went down for the first time in terms of our average

6    revenue per client.  The data that I look at more recently

7    shows our new client pricing has gone down for all types of

8    clients on average.

9        And so the reality has been that we have not, in fact,

10   been relieved from competition.  But also keeping in mind that

11   our strategy is about maintaining the size of that network.

12       So the dogmatic pursuit of marginal price increases,

13   certainly for retailers, I think, runs counter to the long-term

14   strategy that I'm pursuing as CEO of the company.

15   **Q.**   Since you acquired PowerReviews, in your estimation have

16   the number of ratings and reviews providers increased?

17   **A.**   Uhm, I would say my general perception is yes, that's

18   true.  But it's also true that these capabilities have been and

19   continue to be readily available.  And the ratings and reviews

20   capability itself, just that functionality, is, simply put, not

21   complex.  It's not difficult.

22   **Q.**   Can you please look at GX271.

23   **A.**   Okay.  I've got 269, and then my next tab is 574.  So I'm

24   going to have to look at the screen again.

25   **Q.**   Okay.  GX271 is an email from Nadim Hossain, associated

1   with PowerReviews.  Is that right?

2   **A.**   Yes.  Nadim worked at PowerReviews.

3   **Q.**   And it's dated Thursday, July 7, 2011.  Do you see that?

4   **A.**   Yes.

5   **Q.**   And he's talking about Gartner.  Who's Gartner, sir?

6   **A.**   Gartner is a research group, a research company that I

7   believe independently analyzes any number of issues and trends

8   around technology, and then publishes their independent

9   research to help companies decide what technologies they should

10  buy and what's good in the marketplace.  Think of it as a fancy

11  *Consumer Reports* of sorts.

12  **Q.**   Now, he forwards or attaches a Gartner Report.

13        **MR. PAK:**  And if I could ask you to call up, please,

14  page 10 of the Gartner Report, which bears the Bates stamp BZ,

15  last five digits of 68741.

16  **BY MR. PAK**

17  **Q.**   And I'm going to ask you to focus on the provision at the

18  bottom where it's:

19        "Recommendations, vice president/head of multi channel

20        should."

21        Do you see that?

22  **A.**   Yes.

23  **Q.**   And Gartner writes in there, in the summer of 2011, in the

24  middle:

25        "The market can largely be considered a duopoly, with

1          the market being split between Bazaarvoice and

2          PowerReviews."

3          Do you see that?

4    A.    Yes.

5    Q.    So that's from the summer of 2011, from Gartner, right?

6    A.    Yes.

7    Q.    Now I'm going to ask you to look at DX1882, sir.

8    A.    Okay.  I have it.

9    Q.    And this is another Gartner Report, dated January 4, 2013.

10   Do you see that?

11   A.    I do.

12   Q.    Do you receive Gartner Reports, sir?

13   A.    I do.  They're made available to me.  And our marketing

14   team reviews them and summarizes them and reports those to

15   management, so, yes.

16   Q.    And you review them?

17   A.    I do, yes.

18   Q.    Have you seen this one before, sir?

19   A.    I have.

20   Q.    This is dated January 4, 2013.  And if I could ask you to

21   turn to page 19 of the Gartner Report itself.  It's Table 3,

22   Vendors of Social for eCommerce.

23   A.    Okay.

24   Q.    And it identifies, in the left-hand column, vendors.  Is

25   that correct?

COLLINS - CROSS / PAK

1    A.    Yes.

2    Q.    And then to the right of that it identifies whether that

3    vendor has product reviews.  Is that right?

4    A.    Yes.

5    Q.    And how many Xs do you see, sir?

6    A.    Oh, looks like seven.

7    Q.    So it includes Bazaarvoice, Gigya, Lithium, Myzinga,

8    ReadyPulse, Reevoo and Yotpo.  Is that right?

9    A.    Correct.

10   Q.    As far as you know, do those entities provide ratings and

11   reviews?

12   A.    As far as I know.  I don't see Pluck here, so, you know,

13   the one I've mentioned before isn't listed, so that would make

14   it eight.

15   Q.    Okay.  Now, we're going to wrap it up soon, Mr. Collins.

16        Some of your business documents that the Department of

17   Justice has shown you and focused upon predicted that acquiring

18   PowerReviews will give the combined entity pricing power and

19   create insurmountable barriers to entry.  Do you recall those

20   documents?

21   A.    Yes.

22   Q.    Has the company's performance since the merger been

23   consistent with those predictions?

24   A.    I would say no.  Our company's performance has been quite

25   challenged since the merger.  So any belief or assertions that

1    we would enjoy a benefit, regardless of the source, that has

2    not played out in reality.

3    **Q.**   Has the company in 2013, sir, met your internal sales

4    objectives?

5    **A.**   For fiscal 2013, we did not.

6    **Q.**   What's been happening with growth?  Can you comment

7    without going into highly confidential?

8    **A.**   Yes.  And I can -- you know, our growth rate over the last

9    year has decelerated significantly.  It is roughly half of what

10   it was in the preceding years.

11        This is something I've talked about with investors and

12   would say is one of the reasons that our stock has not

13   performed well, is that our sales growth and revenue growth has

14   been below what they would ultimately consider desirable.

15   That's my perception.

16   **Q.**   What about in terms of profitability, was the company

17   profitable in 2011?

18   **A.**   No.

19   **Q.**   Was the company profitable in 2012?

20   **A.**   No.

21   **Q.**   Has the company been profitable in 2013?

22   **A.**   No.  We continue to spend significant amounts on sales and

23   marketing and research and development.  We've increased that

24   spending significantly over the last two or three years because

25   we think it's a competitive market and we think we have a great

1   opportunity in front of us, and it's all about telling our

2   story to the marketplace and innovating.

3        So we've chosen to make those investments and continue to

4   operate the company at a loss.

5   **Q.**   Has -- does the company have -- utilize a term called

6   churn, c-h-u-r-n?

7   **A.**   We do.  It's also referred to in the positive, meaning

8   retention.

9        So churn is the opposite of retention.  Churn and

10  termination is what you lose.  Retention is what you keep.

11  Another term we use for that is called adjustments.

12  **Q.**   And what does churn in the negative sense, or adjustments,

13  what information does that capture?

14  **A.**   Essentially, the commonly-understood definition is the

15  amount of money or the amount of revenue that you lose over

16  time.

17       So if you didn't sign another new client and you looked at

18  your revenues from your existing clients, and then you measured

19  that a year later if it went down, the difference from point A

20  to point B would be your churn.

21  **Q.**   If you lost a client, would that be captured in the churn

22  dollar amount?

23  **A.**   Yes.

24  **Q.**   If you had to reduce prices of an ongoing contract for

25  various reasons, would that be captured in churn?

1   **A.**    Yes.  All that's captured in churn.

2   **Q.**    And those revenue losses could be attributable to

3   competitive forces like in-house solutions?

4   **A.**    Yes, that would be -- well, obviously, if you have a

5   termination which averages, oh, around, you know, two and a

6   half to more recently a little over three percent of our client

7   base, they have to go somewhere.  Either they have to choose

8   not to have a ratings and reviews solution or they found an

9   alternative.

10  **Q.**    And what could be the alternative?

11  **A.**    Could be in-house.  Could be any of the competitors listed

12  in the Gartner Report we looked at.  It -- or it could be

13  nothing.

14  **Q.**    Did you keep track of churn information prior to the

15  merger?

16  **A.**    That economic metric is a commonly used and important

17  metric so, yes, we've always looked at what we call adjustments

18  or churn.

19  **Q.**    And have you kept track of your churn amounts since the

20  merger?

21  **A.**    Yes.

22  **Q.**    And for the year prior to the merger with PowerReviews,

23  and in the year after the merger with PowerReviews, has the

24  churn dollar amounts changed?

25  **A.**    The dollar amounts have gone up significantly.  And our

1  relative performance, meaning on a percentage basis, has also

2  deteriorated.

3  **Q.**   Could I ask you -- without calling upon the screen because

4  this is highly confidential and I want to keep the courtroom

5  open -- ask you to look, sir, at DX1870.

6  **A.**   Okay.

7  **Q.**   It would be a color graph.  Do you see that?

8  **A.**   Yes.

9  **Q.**   And I don't want you to reveal the dollar amounts because

10  this is highly confidential information, but does that, in your

11  estimation, accurately reflect the churn levels in the year

12  before the merger and the year following the merger?

13  **A.**   I would say that's relatively accurate, yes.  Certainly

14  directionally so.

15  **Q.**   And, again, without revealing the numbers themselves, the

16  top line number, sir, in the two graphs, what does that

17  reflect?  Is that the total amount of the churn?

18  **A.**   The top line in this chart -- and I'm reviewing it now to

19  make sure I accurately reflect it, its content.  The top chart

20  is the total amount of adjustments or churn.

21       The red bucket would be accounts that have left completely

22  and are no longer doing business with us.

23       And the black value would be the amount of revenue or

24  discount, in another way of saying it, or the amount of revenue

25  reductions we incurred related to the accounts we're still

1  doing business with.

2      **MR. HUSTON:**  Your Honor, if I could just interpose an

3  objection to this line of questioning.

4      This demonstrative that we're looking at here was

5  something that was provided to us over the weekend, this

6  version of it, yesterday.  My understanding is that it was

7  produced solely for purposes of this trial.  And we've had some

8  interaction with defense counsel over the weekend.  We do not

9  have the data necessary to replicate this.

10      And so, I guess, in essence, what I'm doing is reserving

11  my right to object to this line of questioning.  I'm happy to

12  have Mr. Pak go ahead and continue his examination, but at the

13  end of it I may be moving to strike.

14      **THE COURT:**  Okay.

15      **MR. PAK:**  Your Honor, I'll represent to Your Honor

16  that the data that is underlying this information is from a

17  software called NetSuite.  We provided the information to --

18  all the NetSuite data to the Department of Justice through

19  March or April of 2013, because that was the timeframe from

20  which they asked for the information.

21      And so what is new is the most recent quarter.  But the

22  underlying data prior to the most recent quarter was produced

23  to the Department of Justice.

24      I'm happy to ask Mr. Collins for some more foundation

25  about this document.

1      **THE COURT:**  And just so that I understand it, this

2   particular document wasn't provided to the government until

3   yesterday?

4      **MR. PAK:**  Because we were using it as a demonstrative,

5   Your Honor, under our rules we're required to give -- share

6   demonstratives 48 hours in advance, and we complied with that.

7      **THE COURT:**  All right.  Well, I want the government to

8   have an opportunity to look at what the underlying data is and

9   to make whatever objection it wants to make with respect to

10  this.

11     Can I ask --

12     **THE WITNESS:**  Yes.

13     **THE COURT:**  -- just a question here?

14     What about the corresponding revenue for Bazaarvoice

15  between the year before the acquisition and the year after?

16  Without giving me something that you don't want to share in

17  public, what's the --

18     **THE WITNESS:**  We share that publicly.

19     So to give you a little perspective, our revenues -- and

20  these are going to be approximate, so may be a couple million

21  off.  Our revenues for fiscal year '13, inclusive of

22  PowerReviews after the acquisition, came up to in the mid

23  one-fifties.

24     We had media revenue that we had just added at the end of

25  the year, so I'm going to compare apples to apples taking media

1    out.  That had grown from approximately 106 million to 155.

2        This year because -- and I will include media in this,

3    because I don't believe we have broken it out for analysts, our

4    forecast for the year is a hundred and eight-five.

5        But just for comparative purposes and easy math, take out,

6    you know, 6- to $8 million from that one-eight-five and assume

7    that's media or something else.

8        So you've -- basically, revenues went up, you know,

9    organically in the prior year 40-plus million.  And then you

10   add PowerReviews and this year that number is roughly half in

11   absolute dollars.

12       So, clearly, not only is the absolute dollar amount

13   declining, but the growth rate is declining as well.  And one

14   of the reasons for that is churn, but another that I've talked

15   about very explicitly and in detail with our investors is that

16   over the last four to six quarters we have not achieved our

17   internal sales targets.  And our salespeople, one of the

18   reasons I focused on that, weren't focused on new clients, and

19   they just weren't doing a good job selling.  And so despite the

20   merger, our actual sales results, in terms of sales

21   performance, dollars revenue gain, pricing churn, has

22   deteriorated quite significantly.

23   **BY MR. PAK**

24   **Q.**   Mr. Collins, who is Brian Smith?

25   **A.**   Brian Smith is the vice president of finances, who

1  reported to me directly while I was CFO.

2  **Q.**    And does Mr. Smith normally prepare churn reports for you?

3  **A.**    He prepares comprehensive economic analyses for me to

4  review in my capacity as then CFO and now CEO.  And he also

5  engages in investor relations and answers questions of

6  investors.

7  **Q.**    And has he provided churn reports to you in the past?

8  **A.**    Yeah.  This is a -- a consistent metric that we look at as

9  a key performance indicator in terms of client retention.

10  That's how we look at that.  But, yes, we look at that as an

11  internal metric, and have always done so.

12  **Q.**    And looking at DX1870, from your business judgment does

13  that look to be accurate?  That's the bar, the churn bar?

14  **A.**    Yeah.

15  **Q.**    Does that look accurate to you?

16  **A.**    As I responded to you, yes, order of a magnitude that

17  appears to be accurate.

18  **Q.**    Mr. Collins, can you describe for us the change, if any,

19  in your research and development budget since you acquired

20  PowerReviews?

21  **A.**    R&D, which I think is essential to our strategy, has

22  continued to increase.  If you -- if you look at it on a gross

23  basis, I don't want to get too technical with accounting, but

24  the total amount we spend some of that is what's called

25  capitalized.  It doesn't go through the income statement.  You

1    amortize it.

2        But that number is getting in the 35- to $40 million range

3    now.  And we've -- over the last two and a half years we've

4    gone from having approximately 29, 30 programmers to around 150

5    today.

6        I believe significant R&D investment is essential to our

7    success and to maintain what we've achieved so far.  So it's,

8    roughly speaking, the number of people have gone up 5X.  And in

9    dollar terms we're spending at least twice as much over the

10   last, you know, two or three years as we were in the past, and

11   it's continuing to increase.

12   Q.   Now, you've implemented Conversations as a new platform.

13   Is that right.

14   A.   Yes.  The technology, Version 1.0, is complete.  We're now

15   embarking on what will be a fairly lengthy process of migrating

16   all our clients onto that new, more modern technology

17   foundation.

18   Q.   For the PowerReviews legacy customers, not all of them are

19   on this Conversations platform.  Isn't is that right?

20   A.   No.  In fact, the vast, vast majority of PowerReviews'

21   clients remain on PowerReviews' technology, PowerReviews'

22   software.

23   Q.   And when you try to migrate them over to the new

24   Conversations platform, will they be required to pay the higher

25   price for the Conversations platform?

A.   Our standing integration plan has been, for the

foreseeable future, we had no plans and to this day have no

plans to force migration.  And we're continuing to maintain

that technology.

That's also true for the Bazaarvoice clients right now.

It is still very much an optional choice to move to the new

platform, and we're not forcing that on anybody.

And for our entire client base this migration is not

intended to be a revenue driver or a price increase.  And

here's why:  The newer platform is designed to manage a

network; to do the things we've been talking about today; to

move content back and forth among retail sites and brand sites;

to measure that and report on that.  So think about analytics

from a hundred sites instead of just one.

And the legacy technology of PowerReviews and the legacy

technology of Bazaarvoice did not have the technological

capabilities to do that and to do it efficiently.

Keep in mind that we're also displaying a larger and

larger number of reviews over time.  So now we display

60 billion reviews a quarter.  And keeping up with that

requires significant R&D investment and modernization of the

underlying technology.

And, you know, both PowerReviews and Bazaarvoice

technology is eight, ten years old and needs, like any software

company, to be modernized.  So we have to do that just to keep

 1   running our network.

 2       And so it's in our best interests to bring our clients to

 3   the new platform because it gives them not only more

 4   capabilities but it enables us to actually serve them.

 5       If we don't do that -- for example, old technology doesn't

 6   fit for mobile devices.  Like one of the new capabilities on

 7   Conversations is -- I forget.  It's, basically, a dynamic

 8   rendering.  It changes its shape and size no matter what device

 9   you look at.  So that's not a capability available on the old

10   platform.  That's just keeping up with the Jones.  And you

11   can't charge for that.

12       So it's better for everybody, and especially us, if

13   clients are on the new platform.  So you wouldn't charge them

14   for it because then it leaves everybody on an inferior

15   technology that costs more and is less capable.

16       So, ideally, everybody moves to the new platform, and we

17   do that as part of what they already pay for.  And that would

18   include the PowerReviews clients.

19   **Q.**   Well, for the PowerReviews legacy client that is willing

20   to switch over to Conversations but doesn't want to pay a

21   higher price for that, what will you do for those customers?

22   **A.**   It's better for our network strategy to have them on the

23   platform and the technology that will allow them to participate

24   in an effective way with syndication and other things.

25       So the bottom line is that we would honor or grandfather

1   their price in, if that's what it came down to.  If we provided

2   no additional features or capabilities, it's better to get

3   everyone on the same platform to pursue our strategy.

4   **Q.**   You would grandfather the old pricing or existing pricing

5   into Conversations 2013?

6   **A.**   Yes.

7           **MR. PAK:**  No further questions, Your Honor.

8           **MR. HUSTON:**  Thank you, Your Honor.

9           **THE COURT:**  Mr. Collins, if you could refer to

10  Mr. Huston as Mr. Huston, I would appreciate it.

11          **THE WITNESS:**  I apologize.  Okay.

12          **MR. HUSTON:**  And, Your Honor, as I mentioned before,

13  there were some exhibits I talked about earlier, that weren't

14  in evidence.  And I don't believe there's any objection, but

15  those are GX302, GX1222, GX1223, and GX1225.  So I would offer

16  those at this time.

17          **MR. PAK:**  Other than hearsay, Your Honor, no

18  objections, Your Honor.

19          **THE COURT:**  All right.  They are admitted.

20      (Plaintiff's Exhibits GX302, GX1222, GX1223, GX1225

21  received in evidence)

22          **MR. PAK:**  I'm sorry, Your Honor, one housekeeping.

23      Mr. Huston, my apologies.

24          **MR. HUSTON:**  Please.

25          **MR. PAK:**  I neglected to introduce certain documents

1  into evidence.  As well.  They are DX1880, DX735, DX649,

2  DX1855, DX1882, and DX1870.

3          **THE COURT:**  Any objection?

4          **MR. HUSTON:**  No objection, Your Honor.

5          **THE COURT:**  All right.  They are admitted.

6          (Defendant's Trial Exhibits DX649, DX735, DX1880, DX1855,

7  DX1870, and DX1882 received in evidence)

8                    <u>**REDIRECT EXAMINATION**</u>

9  **BY MR. HUSTON**

10 **Q.**  Hello again, Mr. Collins.

11 **A.**  Mr. Huston.

12 **Q.**  Let's start with the churn analysis that you were talking

13 to Mr. Pak about.

14 **A.**  Okay.

15 **Q.**  And he handed up a bar chart.  And this is something that

16 was created for purposes of this trial.  Is that right?

17 **A.**  As I understand it, yes.

18 **Q.**  Okay.  And you testified that the red bars on that chart

19 represent business that Bazaarvoice has lost.  Correct?

20 **A.**  Correct.

21 **Q.**  And the black bars represent contractual adjustments where

22 Bazaarvoice offered the customer a lower price in order to

23 retain the business.  Is that right?

24 **A.**  Yes.

25 **Q.**  Now, this -- both of those boxes have nothing to do with

1    new customers, correct?

2    **A.**    That's right.

3    **Q.**    Okay.  So let's start with the black bars, the ones that

4    represent downward adjustments.

5          Now, downward adjustments are made for all sorts of

6    different reasons other than competitive concerns?

7    **A.**    That is correct.

8    **Q.**    For example, there could be a bankruptcy that would cause

9    a downward adjustment, correct?

10   **A.**    That would more likely be in the red box because they

11   wouldn't be able to continue to pay, but yes.

12   **Q.**    Depending on if they went out of business entirely or were

13   restructuring?

14   **A.**    You're right, uh-huh.

15   **Q.**    And another example would be where there was some sort of

16   seasonal or one-time project that got reduced?

17   **A.**    Not very likely.  The vast majority of our revenues are

18   captured under our subscription agreements.  We typically have

19   not charged meaningful amounts for implementation.  That's not

20   what we do.

21         And so our revenues, the vast, vast majority 95 -- I mean,

22   97, 98 percent plus are recurring subscription under contract.

23   So we do not have periodic -- or material periodic project or

24   service revenues.

25   **Q.**    Another example might be if the client downsized because

COLLINS - REDIRECT / HUSTON

1  they got rid of a website or a URL, correct?

2  **A.**    That's right.  If they've concluded that -- and in this

3  case might be a brand side.  If they've concluded that their

4  website or capturing ratings and reviews is not important to

5  their marketing, and something else is better, they might just

6  stop doing it.

7  **Q.**    Or if one client bought another client, that could cause

8  an adjustment as well?

9  **A.**    That could, yes.

10  **Q.**    Now, this chart and the figures that are in this chart,

11  they capture all that stuff, not just reductions that happened

12  because of competitive concerns, correct?

13  **A.**    That's right.

14  **Q.**    Now let's look at the red boxes.

15       And the red boxes also include not just losses from

16  competitive concerns but losses for all sorts of things,

17  correct?

18  **A.**    That's right.

19  **Q.**    Including the bankruptcy issue that you mentioned?

20  **A.**    That's right.  If you went out of business or decided to

21  discontinue using the service for whatever reason, or if you

22  went to a competitor or in-house, all that would be included in

23  that bucket.

24  **Q.**    Or if somebody just breached their agreement, stopped

25  paying?

1    **A.**    Uhm, I look at that the same as decided to abandon.

2    **Q.**    And when a client terminates with Bazaarvoice, Bazaarvoice

3    tracks how the company replaced those services, correct?

4    **A.**    We do the best we can.  Clients don't always volunteer

5    what they did next.

6    **Q.**    And you do your best to figure out where they went, if

7    they went somewhere?

8    **A.**    Yeah.  The service team would endeavor to do that.

9          **MR. HUSTON:**  Your Honor, if I could hand up a document

10   that we're going to mark GX1216.

11        (Plaintiff's Exhibit GX1216 marked for identification)

12        **MR. HUSTON:**  Can I approach, Your Honor?

13        **THE COURT:**  Yes.

14        **THE WITNESS:**  Thank you.

15   **BY MR. HUSTON**

16   **Q.**    Now, the document I've just handed you should look

17   familiar to you.  Do you recognize it?

18   **A.**    Oh, let me flip through it for just one moment.

19        Yes, I would say I'm familiar with the content.

20   **Q.**    And this is a client churn analysis that was prepared in

21   the ordinary course of business at Bazaarvoice, correct?

22   **A.**    Yes.

23   **Q.**    So I'd like to talk about adjustments first, the black

24   box, if you will.

25        And if you look to page 10 or slide 10 of this PowerPoint

1    presentation -- and it's the slide at the top -- it's

2    "Adjustment Reasons, Rolling Six Quarters."  Do you see that?

3    **A.**   Yes.

4    **Q.**   So this refers to the six quarters preceding November of

5    2012, correct?

6    **A.**   Uh-huh, yes.

7    **Q.**   So that would incorporate approximately five months of

8    information following the PowerReviews acquisition, correct?

9    **A.**   Yeah.

10   **Q.**   Now, these pie charts on this exhibit, they both are

11   capturing reasons for an adjustment, correct?

12   **A.**   As best as we could ascertain, yes.

13   **Q.**   And the one on the left is talking about the number of

14   clients that adjusted, and the one on the right is expressed in

15   dollar figures, correct?

16   **A.**   Uh-huh, yes.

17   **Q.**   And the chart lists reasons for the adjustment, and it

18   breaks it down into five categories.  Do you see those five

19   bullet points down at the bottom?

20   **A.**   I do.

21   **Q.**   And the first one is "Services."  And it says:

22            "For example, client perceives the value of the

23        services as low or there's not a demonstrated ROI," or

24        return on investment.

25        Right?

COLLINS - REDIRECT / HUSTON

1   **A.**   Uh-huh, yes.

2   **Q.**   So that's one.  And "Pricing" is another one.  And the

3   example it gives is:

4           "The client needed to adjust pricing."

5   **A.**   Uh-huh.

6   **Q.**   And the third one is "Client Side Constraints."  And it

7   says there, as an example:

8           "They lack the resources or had budget constraints."

9       So that would be another reason, right?

10  **A.**   Right.

11  **Q.**   And then the fourth one is "Product."  And the example

12  given in the parentheses there is that:

13          "The purchased product did not meet the client's

14      expectations."

15      And then the last one is just an "Other."  And an example

16  they give in the parentheses is:

17          "Cleanup or legal issues."

18  **A.**   Okay.

19  **Q.**   So the adjustments to take account of a competitor would

20  be within the pricing slice of the pie, correct?

21  **A.**   Uhm, not necessarily.  For example, two things:

22      This work was commissioned, I think, early on when I

23  became CEO, and is ongoing.  But services, as I just mentioned,

24  the client may perceive that they have services, but we have

25  single subscription contracts.

1          So, really, services, client-side constraints, pricing,

2     all these things are different ways of saying that the value

3     for the solution did not meet their expectations.

4          And, as I believe I've answered a little bit at least,

5     performance, return on investment is essentially the key

6     constraint on pricing.  If we don't perform, even absent

7     competition, it calls into question the need for the service at

8     all.

9          So this isn't really necessarily an analysis of what they

10    did afterward or why they felt this way, other than to say we

11    weren't living up to their return-on-investment expectations.

12         And you'd have to look at it differently to determine

13    whatever happened to the client and what they did as an

14    alternative.

15    **Q.**   Okay.  Well, let's look at the following page because the

16    following page breaks down this pricing slice of the pie.  Do

17    you see that?

18    **A.**   Yeah.

19    **Q.**   And so it breaks it down further.  And the third bar chart

20    is "Competitor."  Do you see that?

21    **A.**   Yeah.

22    **Q.**   And that accounts for nine or 481,000.

23    **A.**   Uh-huh.

24    **Q.**   So nine of the 48 on the previous pie chart is due to a

25    competitor --

1    **A.**    Uh-huh.

2    **Q.**    -- correct?

3    **A.**    Yes.  And that would be -- I believe that would exclude

4    in-house.

5    **Q.**    And then nine -- so that would be nine out of the entire

6    pie chart.  Which if you add up the whole pie chart, it's 213

7    adjustments, nine of those righted to a competitor?

8    **A.**    Okay.

9    **Q.**    And you say you think that excludes in-house?

10   **A.**    That would be my assumption, yes.  I can't definitively

11   say that but, yes, I believe that does.

12   **Q.**    Okay.  Well, let's test that a little bit.

13          We're, again, on slide 11, which is the bar charts?

14   **A.**    Uh-huh.

15   **Q.**    And if you look down at the third bullet point it says,

16   "Competitor."  And so that's referring to the bar chart above,

17   that says, "Competitor"?

18   **A.**    Uh-huh.

19   **Q.**    And in the parentheses it says:

20          "Central point BV switching to an in-house solution."

21   So does that refresh your recollection that perhaps

22   in-house is included in competitor?

23   **A.**    It may be, looking at that.  But, again, this is just one

24   slice, and I know we have other bullets.  So I don't know how

25   accurate that was or was not.

1  Q.   So there are another -- a number of other things that

2  could affect pricing, other than competitor, and it's these

3  other bar charts that are listed here, like enterprise

4  negotiation, URL termination, one-time project, which I was

5  mentioning earlier.  Those are also things that could affect

6  pricing, correct?

7  A.   Yes.  And I believe and have always believed that our

8  performance is the most important determinant of the price that

9  we can charge as opposed to an alternative from a competitor.

10 If we don't perform in a marketing solution, the price must be

11 adjusted or be eliminated.  So it's the more powerful market

12 force.

13 Q.   Okay.  And then let's flip to the next slide, which is

14 page 12.  And on the top it says, "Client Side Constraints

15 Contributing Factors."

16      Do you see that?

17 A.   I do.

18 Q.   And so this lists a number of factors why there might be

19 adjustments, including, for example, bankruptcies or a client

20 breaches?

21 A.   Uh-huh.

22 Q.   Do you see that?

23 A.   I do.

24 Q.   Or budgets.  So sometimes a client would reduce their

25 services because of budget cuts, correct?

COLLINS - REDIRECT / HUSTON

1    **A.**    That's right.

2    **Q.**    Now, all of those factors are unrelated to competition,

3    correct?

4    **A.**    Unrelated to competition, perhaps, with a ratings and

5    reviews provider; but, again, related to competition in terms

6    of how they decide to spend their marketing money.

7    **Q.**    All right.  Let's -- let's turn, now, from the black box

8    to the red box.  And the red box is where people terminate

9    entirely, correct?

10   **A.**    Uh-huh.

11   **Q.**    And if you could turn to slide 14 of this PowerPoint

12   presentation.  And it's titled, at the top, "Client Termination

13   Highlights."

14       Do you see that?

15   **A.**    Yes.

16   **Q.**    And that describes the way that Bazaarvoice tracks the

17   reasons that clients terminate its agreement with Bazaarvoice,

18   correct?

19   **A.**    Uh-huh, yes.

20   **Q.**    And it says:

21       "For clients that do terminate we track several reason

22       codes."

23       And then if you turn to the next -- actually, let's turn

24   to page 17 of the PowerPoint presentation.  And it's titled at

25   the top, "Termination Reasons."

COLLINS - REDIRECT / HUSTON

1          Do you see that?

2    A.    Yes.

3    Q.    And this refers to the quarter that is the quarter that

4    ended October 31st, 2012.  Right?

5    A.    Am I looking at slide 15?

6    Q.    No, slide 17.

7    A.    Oh, I'm sorry.  Yes, that's correct.

8    Q.    That would be the first fall quarter after the acquisition

9    of Bazaarvoice closed -- or the acquisition of PowerReviews

10   closed?

11   A.    Yes.

12   Q.    And looking at the bottom of the slide, the first major

13   bullet point reads:

14          "For Q2 FY2013 projected, termination reasons are

15          roughly in line with historical norms with a few

16          exceptions."

17          Do you see that?

18   A.    Yes.

19   Q.    So, basically, that's saying nothing has really changed?

20   A.    That bullet says that, yes.

21   Q.    And if you turn to the next slide, which is, "Termination

22   Destinations."

23   A.    Uh-huh.

24   Q.    The first bullet point says:

25          "For Q2 fiscal year 2013, termination destinations

1          have shown an interesting shift."

2          Do you see that?

3     A.   Uh-huh, yes.

4     Q.   And it says, underneath that:

5              "Competitive losses have dropped to less than

6          25 percent of client terminations."

7          Do you see that?

8     A.   I do.

9     Q.   So in the first full quarter following the acquisition,

10    Bazaarvoice's competitive losses were down compared to historic

11    rates, correct?

12    A.   According to that, yes.

13    Q.   Okay.  And the second sentence reads:

14             "Further, three of these terminations are clients that

15         are switching to the PowerReviews Enterprise platform."

16         Correct?

17    A.   Yes.

18    Q.   So, in other words, three of the five clients that

19    Bazaarvoice lost to a competitor in that first full quarter

20    were, in fact, customers that switched from Bazaarvoice to

21    PowerReviews?

22    A.   That's possible, but unlikely.  It's probably switching

23    from Express, their low-end, turnkey one that we don't include

24    in our Enterprise, and upgrading to PowerReviews.

25         I can't be certain of that, but that's equally possible if

1    not more likely.

2    **Q.**    In any event, what you're counting there is Bazaarvoice,

3    they're counting losses to itself, essentially?

4    **A.**    In that case, yes.

5    **Q.**    And then looking up at this chart, the pie chart there, I

6    wanted to point one other thing.  It says:

7              "In-house Build 0.0."

8    **A.**    Uh-huh.

9    **Q.**    Correct?  Now, that means that in the first full quarter

10   following the acquisition there wasn't a single Bazaarvoice

11   client that switched to an in-house solution, correct?

12   **A.**    According to the chart, yeah.

13   **Q.**    Now, finally, in the last bullet point on this slide it

14   says:

15             "Nearly 50 percent of clients and dollars can be

16        traced to deferrals and abandoned social strategy.

17        Essentially, these clients are not replacing our services

18        in the short-term or have no plans to replace our services

19        in the long-term."

20        Correct?

21   **A.**    Correct.

22   **Q.**    So at least 50 percent of the client terminations were not

23   clients that went to another or alternative ratings and reviews

24   provider, correct?

25   **A.**    Correct.

1  Q.   So is it fair to say, having kind of walked through this

2  analysis, this churn analysis, that looking back at the chart,

3  this bar chart, is it fair to say that these changes that are

4  in this bar chart are largely unrelated to competition?  That's

5  accurate, correct?

6  A.   I would disagree with that for a couple of reasons.

7       Number one, since this time, our retention has

8  deteriorated further, or churn has increased.  And, second,

9  that there are a multitude of competitive forces acting on

10 price.

11      And it follows to me that regardless of the destination,

12 including when people decide not to do anything, that we have

13 deliberately -- or we have had to accept significant churn and

14 reductions in price for some number of reasons that are

15 actually more significant and more powerful than what

16 PowerReviews ever could have done, and that those forces have

17 accelerated and are continuing to impact us in material ways.

18 Otherwise, the reduction in price would not have otherwise

19 occurred.

20 Q.   But it's fair to say it includes all sorts of different

21 things, including if somebody decides they have to drop ratings

22 and reviews because they are going bankrupt, for example?

23 A.   That is true.

24      That is, by far, not the majority.  But my disagreement

25 was based on the assertion that there are any number of choices

 1    about what our clients do with their money.  And they're making

 2    a deliberate choice to either spend less with us, or leave, or

 3    not spend money with us at all.  And I consider all that to be

 4    competitive.

 5    **Q.**    But, certainly, a small sliver of those pie charts was

 6    based on someone going to an alternative ratings and reviews

 7    SaaS platform provider, correct?

 8    **A.**    That's right.  And I agree with that.  And it's consistent

 9    with our point that competition is quite broad and robust.

10         **THE COURT:**  Mr. Huston, if you're finished with this

11    line, why don't we take ten minutes.

12         **MR. HUSTON:**  Sure.

13                     (Recess taken at 11:18 a.m.)

14              (Proceedings resumed at 11:30 a.m.)

15         **THE COURT:**  Please be seated.

16    Please proceed.

17         **MR. HUSTON:**  Thank you, Your Honor.

18    **Q.**    Mr. Collins, you mentioned during Mr. Pak's examination

19    social commerce.  Do you remember talking about that term

20    "social commerce"?

21    **A.**    Yes.

22    **Q.**    Now, not all social commerce companies are competitive to

23    Bazaarvoice; correct?

24    **A.**    I would say that's a fair statement, yes.

25    **Q.**    And, for example, you personally sit on the Board of

1    Directors of another social commerce company called Moontoast;

2    correct?

3    **A.**    That's correct.

4    **Q.**    And Moontoast is not a competitor to Bazaarvoice; correct?

5    **A.**    I don't see them as a direct competitor, no.

6    **Q.**    Okay.  And you mentioned earlier that the business is

7    segmented into various different segments, including

8    advertising and PowerReviews Express and Connections.  Do you

9    remember that testimony?

10   **A.**    Yes.

11   **Q.**    But ratings and reviews is your biggest product; correct?

12   **A.**    That is right.

13   **Q.**    And by far the most revenue comes from ratings-and-review

14   product?

15   **A.**    That is correct.

16   **Q.**    And virtually all of Bazaarvoice's customers have ratings

17   and reviews; correct?

18   **A.**    That's correct.

19   **Q.**    And ratings and reviews is separate from your

20   Longboard Media project; correct?

21   **A.**    That's correct.

22   **Q.**    And in Longboard Media, the company you acquired, you're

23   talking about paid ads; correct?

24   **A.**    That's right.

25   **Q.**    And it's accurate to say that your ad business can sell

1   ads regardless of who's providing the ratings and reviews on a

2   Web site; correct?

3   A.   That could be true, yes.

4   Q.   And it's possible that PowerReviews, had it not been

5   acquired by Bazaarvoice, could have gone into the display

6   advertising business; correct?

7   A.   They could have, yes.

8   Q.   And then you would have been competing with them on

9   ratings and reviews and advertising; correct?

10  A.   That's correct.

11  Q.   Okay.  And I think you testified that prior to the merger,

12  Longboard Media, the company you bought to get into the ad

13  space, they were serving ads on sites of both Bazaarvoice and

14  PowerReviews clients; correct?

15  A.   I believe, yes, that's correct.

16  Q.   So if Bazaarvoice had purchased Longboard Media but not

17  PowerReviews, they could have served display advertising on Web

18  sites of PowerReviews' retailers; correct?

19  A.   That would be correct, yes.

20  Q.   And you mentioned the Amazon in your testimony, and I just

21  want to be clear here.  Amazon.com is a retailer; correct?

22  A.   That's right.

23  Q.   And they are a direct competitor of Bazaarvoice's retail

24  clients in many respects; correct?

25  A.   That's right.

COLLINS - REDIRECT / HUSTON

1   **Q.**   And Amazon also offers display advertising, they have a

2   display advertising product; correct?

3   **A.**   That's right.

4   **Q.**   And, so, the Amazon ad network is a competitor to

5   Bazaarvoice's Longboard Media arm; correct?

6   **A.**   Yes.

7   **Q.**   Okay.  And let me switch gears to Magento.  You mentioned

8   Magento in your testimony with your counsel, and you testified

9   that you considered Magento's ratings-and-review product a

10  competitor to Bazaarvoice, at least on some level; correct?

11  **A.**   Yes, it's a capability available to eCommerce companies.

12  **Q.**   Okay.  But it's certainly not of the same caliber as

13  Bazaarvoice's ratings-and-review product; correct?

14  **A.**   I would think that we provide significantly different and

15  incremental capabilities, yes.

16  **Q.**   And, in fact, isn't it true that Magento is actually a

17  Bazaarvoice client?

18  **A.**   It may be.

19  **Q.**   And that Bazaarvoice provides a ratings-and-review

20  solution to Magento?

21  **A.**   Yes.  We integrate or offer our clients the ability to

22  integrate in most all eCommerce platforms if they don't want to

23  use the embedded capabilities available to them, in Magento's

24  case, for free.  We would, of course, want to work because we

25  have to work with another platform.  We can't integrate with a

COLLINS - REDIRECT / HUSTON

1    client absent integrating into another technology that they've

2    already deployed to run their Web site.  Magento would be one.

3    It's a comprehensive solution.

4    Q.   Okay.  But you know what the "how the deal was done"

5    document is; correct?

6    A.   Yes, I do.

7    Q.   And this is something that you send out when you have a

8    new client that comes on board --

9    A.   Uh-huh, yes.

10   Q.   -- and it describes how the deal is done?

11        Now, there's one of those for Magento; correct?

12   A.   I don't recall one for Magento, no.

13   Q.   Okay.  You don't recall seeing a ratings and review "how

14   the deal was done" for Magento?

15   A.   No, I don't, not that specific client.

16   Q.   Now, there was some testimony about what Mr. Pacitti

17   thought about this idea of acquiring PowerReviews.  Do you

18   remember that?

19   A.   I do.

20   Q.   And Mr. Pacitti is a board member of Bazaarvoice?

21   A.   He is.

22   Q.   And the document we were looking at kind of had some

23   colorful language.  It said he pissed all over the idea;

24   correct?

25   A.   Uh-huh, yes.

1    **MR. HUSTON:**  Now, Your Honor, can I approach the

2    bench -- or the witness?  I'm sorry.

3            **THE WITNESS:**  Thank you.

4                     (Pause in proceedings.)

5    **BY MR. HUSTON:**

6    **Q.**    The discussion you were having about Mr. Pacitti with your

7    counsel was back in May 2011 time period; correct?

8    **A.**    That sounds right.

9    **Q.**    And this, what I've just handed you, is GX1181, and this

10   is an email from Mr. Pacitti from much later in the year; from

11   December 14th, 2011.  Do you see that?

12   **A.**    I do.

13   **Q.**    And if you look at the first paragraph of the document, it

14   says in the second sentence:  (reading)

15           "We may have the opportunity to acquire our largest

16       competitor, PowerReviews."

17       And then skipping to the next sentence after that, it

18   says:  (reading)

19           "As you'll note in the attached analysis, PowerReviews

20       is about one tenth our size; however, they are the only

21       other credible player in space."

22       Do you see that?

23   **A.**    I do.

24   **Q.**    And then skipping down a little bit, it says:  (reading)

25           "It improves our pricing power.  They are the low-cost

1          alternative and gives us complete ownership of the

2          category and data asset."

3          Do you see that?

4     A.   I do.

5     Q.   And, so, as of December of 2011, you understood that was

6     Mr. Pacitti's view; correct?

7              MR. PAK:  Objection, Your Honor.  Foundation.  There's

8     nothing on the document to indicate that Mr. Collins received

9     this document.

10             MR. HUSTON:  Okay.  Well, let me back -- let me just

11    ask the foundational question.

12             THE WITNESS:  Okay.

13    BY MR. HUSTON:

14    Q.   At the December 2011 time period, did you have a sense

15    that Mr. Pacitti felt about PowerReviews the way that's

16    expressed in this email?

17    A.   My understanding at that time was that we had a lot of

18    convincing to do to convince the board to approve the

19    transaction, and I don't recall seeing this document; but

20    whatever he said then, we did a lot of work and had a lot of

21    discussion along the way before we ultimately got to even

22    deciding to pursue the transaction and then determine what

23    price we wanted to pay.

24    Q.   Okay.  And the memo that's attached to this email is one

25    that you wrote; correct?

1   **A.**   That's right.

2   **Q.**   Okay.  I want to switch gears for a moment.

3        You talked a little bit in your conversation with Mr. Pak

4   about in-house; and if we could turn -- in the binder of

5   materials that I supplied to you, there should be an

6   Exhibit 928.  So perhaps you can turn to 928.

7   **A.**   (Witness examines document.)  All right.  I have it.

8   **Q.**   And 928 --

9            **MR. HUSTON:**  Excuse me, Your Honor.

10                   (Pause in proceedings.)

11  **BY MR. HUSTON:**

12  **Q.**   -- the cover email is from Dorina Carr.  And she was the

13  executive assistant to you and Mr. Barksdale, the general

14  counsel; correct?

15  **A.**   Uh-huh.  Yes.

16  **Q.**   And the packet that she's attaching to this email includes

17  several investor questions and answers; right?

18  **A.**   (Witness examines document.)  Yes, that's what it looks

19  like.

20  **Q.**   And if you skip to the bottom of the page that ends in

21  928.

22        And, Seth, I think that's page 19 for you.

23  **A.**   Okay.  Hold on just a second.

24        (Witness examines document.)  Okay.  Would this be, if I'm

25  looking at the right page -- yes, I'm on the same page.  Okay.

1  Q.   So it would be Number 54 there in the middle of the page.

2  Do you see that?

3  A.   Okay.

4  Q.   And Number 54, again, this is questions that an investor

5  might ask, it says:   (reading)

6          "Give me more detail on your competitive environment."

7       Do you see that?

8  A.   I do.

9  Q.   And then if you see down below in the first paragraph of

10 the response, there's a sentence that says:   (reading)

11         "Certainly, someone else could develop a competing

12      software solution, and many do in the form of in-house

13      solutions, but it is extremely difficult to duplicate the

14      network.  Further, our moderation and analytics

15      capabilities are difficult to duplicate as well."

16      Do you see that?

17 A.   I do.

18 Q.   And that's something you believed as of the time of this

19 email, correct, or this document?

20 A.   I just want to qualify that these sorts of documents are

21 rehearsal documents and not definitive and are well ahead of an

22 IPO.  So I can't definitively say that was my opinion based on

23 how this was compiled by the gentlemen we were working with.

24      With that being said, I would say that I thought that,

25 yes, we have significant competitive advantages around

1    moderation, our network, and analytics capabilities; and, so,

2    those are just that, competitive advantages.  So I would agree

3    with the statement that that's what I believed at the time

4    notwithstanding how this information may have been compiled.

5    **Q.**   All right.  And then the paragraph underneath that it

6    starts:  (reading)

7            "With regard to Google and Facebook, we see ourselves

8        as more a partner than a potential competitor."

9        Do you see that?

10   **A.**   Yes.

11   **Q.**   And then at the very end of that paragraph there's a

12   sentence that reads:  (reading)

13           "Developing a SaaS description-based business model

14       does not seem to be a core competency of either, but we

15       can certainly never rule this out."

16       Correct?

17   **A.**   Yes.

18   **Q.**   And that's also something you believed at the time of this

19   document?

20   **A.**   Yes.  Everybody wants Google and Facebook to be their

21   partner and not their competitor for obvious reasons.

22   **Q.**   Now, you talked about syndication in your discussion with

23   Mr. Pak.  Do you remember that?

24   **A.**   I do.

25   **Q.**   And it's accurate to say that the syndication product or

COLLINS - REDIRECT / HUSTON

1   the syndication service that Bazaarvoice offers is growing

2   exponentially; correct?

3   **A.**   Exponentially wouldn't be correct.  Because if that were

4   true, our revenues would be as well.  The volume of syndication

5   I would say is growing linearly.  Exponentially implies,

6   obviously, very large numbers.

7        So it is growing.  Our volumes grow maybe 30 to 50 percent

8   year over year, and syndication should continue to increase

9   over time.

10  **Q.**   Including the number of clients that are using

11  syndication; correct?

12  **A.**   Yes, including the number of clients and the amount of

13  content we can match successfully, which will take a

14  significant continued amount of R & D and work to accomplish

15  that task.

16  **Q.**   All right.  And then you mentioned also commodity.  Do you

17  remember talking about commodity with Mr. Pak?

18  **A.**   Yes.

19  **Q.**   Seth, can you bring up GX1228?

20                    (Pause in proceedings.)

21        **MR. HUSTON:**  Your Honor, may I approach the bench --

22  or the witness?

23        **THE COURT:**  Yes.

24        **THE WITNESS:**  I don't think I have it in the book.

25

1    BY MR. HUSTON:

2    Q.   Here you go.

3    A.   Thank you.

4    Q.   And Exhibit 1228 is an email from you; correct?

5    A.   Yes.

6    Q.   And it says:  (reading)

7            "Data and network effect should be a buffer against

8        price deflation/commodization as long as we maintain

9        significant market share and lock competitors out of a

10       meaningful data set."

11   A.   Uh-huh.

12   Q.   (reading)

13           "In other words, if we have a high percent of clients

14       in any vertical, competitors cannot build a meaningful

15       competitive offering without a broader data set."

16       Do you see that?

17   A.   Yes.

18   Q.   And you wrote that at the time; correct?

19   A.   Yes.

20   Q.   Okay.  And last but not least, let me just ask a couple of

21   questions about some of the companies you mentioned during your

22   testimony with Mr. Pak.

23       Buddy Media, ExactTarget, Tumblr, you mentioned all those;

24   correct?

25   A.   Right.

1   Q.   And more.  Now, none of those companies have a SaaS

2   ratings-and-review product; correct?

3   A.   Not that I'm aware of, no.

4          **MR. HUSTON:**  No further questions, Your Honor.

5          **THE COURT:**  Thank you.

6   Mr. Pak?

7                    <u>**RECROSS-EXAMINATION**</u>

8   **BY MR. PAK:**

9   Q.   Thank you, Mr. Collins, for your patience.

10   Mr. Huston showed you the churn information for the one

11   quarter following the merger.  Do you recall that?

12   A.   Yes.

13   Q.   Do you -- in your business judgment, has competition

14   continued to intensify since that one quarter?

15   A.   The answer, short answer, is yes.  Our ability to maintain

16   price and deliver value for clients is under constant pressure;

17   and, as a general rule, because of what we've discussed about

18   the importance of retention and maintaining our network to

19   pursue our long-term strategy, it's a fairly easy choice to

20   provide a concession, and we do as a matter of routine.  That's

21   what we do.

22   Q.   When a customer decides to leave you or decides to go a

23   different route, do they necessarily tell you that they're

24   going to, for example, an internal solution or somewhere else?

25   A.   Not necessarily, no.  We would have to ask.

1          **MR. PAK:**  And one point of clarification, Your Honor,

2     I misspoke.  Thank goodness for my colleagues.  We did provide

3     that final quarter of churn information to the Department of

4     Justice over the weekend.

5          **THE COURT:**  Anything further?

6          **MR. HUSTON:**  Nothing further, Your Honor.

7          **THE COURT:**  Mr. Collins, thank you.

8          **THE WITNESS:**  Thank you, Your Honor.

9          **THE COURT:**  You're done.

10         **THE WITNESS:**  All right.  Thank you.

11                    (Witness excused.)

12         **MR. HUSTON:**  Your Honor, as I was going back and

13    looking over my opening statement, I realized that I failed to

14    introduce you to one of our key members of our team, and that's

15    Aaron Hoag, and he is with us today and he's going to be

16    putting on the next witness, which is Dr. Carl Shapiro.

17         **MR. HOAG:**  Good morning, Your Honor.

18         **THE COURT:**  Good morning.

19         **MR. HOAG:**  The Government calls Carl Shapiro to the

20    stand.

21                    **CARL SHAPIRO**,

22    called as a witness for the Plaintiff, having been duly sworn,

23    testified as follows:

24         **THE WITNESS:**  I do.

25         **THE CLERK:**  Be seated.

1              MR. HOAG:  Your Honor, if I may -- excuse me.

2              THE CLERK:  Go ahead.  If you'll state your full name

3    and spell your last name, please.

4              THE WITNESS:  Carl Shapiro, S-H-A-P-I-R-O.

5              MR. HOAG:  Your Honor, if I may approach, we have some

6    documents we're going to use with Professor Shapiro.

7              THE COURT:  Yes, Mr. Hoag.

8                        (Pause in proceedings.)

9                        **DIRECT EXAMINATION**

10   BY MR. HOAG:

11   **Q.**   Good morning, Professor Shapiro.  What is your academic

12   training?

13   **A.**   I earned my Ph.D. in economics from M.I.T. in 1981 after

14   having undergraduate degrees in economics and mathematics.

15   **Q.**   And after obtaining your Doctor in economics, where did

16   you work?

17   **A.**   I went to Princeton University as a professor there for --

18   during the 1980s.  I was there for 10 years.

19   **Q.**   And where did you go after Princeton?

20   **A.**   After Princeton, I came to U.C. Berkeley.  I joined the

21   faculty there in 1990 as a professor in the business school.

22   I'm now the Transamerica Professor of Business Strategy at the

23   Haas School of Business at U.C. Berkeley.  I also have a joint

24   appointment in the Department of Economics there where I'm a

25   professor.

1  Q.   And what is your field of academic research?

2  A.   My field within economics is industrial organization.  The

3  applied side of that includes antitrust and Government

4  regulation of business.

5  Q.   And have you published in this field?

6  A.   Yes.  I've published extensively over the 30 years or so.

7  Q.   And have you published articles regarding the economic

8  analysis of mergers in particular?

9  A.   Yes.  I've been looking at mergers since the late '80s in

10  terms of my academic writing, and since then published a number

11  of papers over the years.

12  Q.   And have you been involved in the publication of academic

13  journals?

14  A.   Yes.  While I was at Princeton, I had the honor of

15  cofounding the *Journal of Economics Prospectus* with Joe

16  Stiglitz and became the editor of that later, and I served on

17  other editorial boards as well.

18  Q.   And, Professor Shapiro, have you had any jobs outside of

19  academia relating to antitrust law and policy?

20  A.   Yes.  I've twice served as the Deputy Assistant Attorney

21  General for Economics in the Antitrust Division of the

22  Department of Justice, the chief economist.

23  Q.   And what were the periods where you served as Deputy

24  Assistant Attorney General for Economics?

25  A.   I served during 1995 and '96 for one year, and then I came

1   back in 2009 at the beginning of the Obama Administration and

2   served in that capacity for two years.

3   **Q.**   And what were your responsibilities as Deputy Assistant

4   Attorney General for Economics?

5   **A.**   Well, there's an Economic Analysis Group there that has

6   about 50 Ph.D. economists, or did before the sequester I

7   gather; and, so, the chief economist supervises that group.  So

8   that means basically keeping an eye on, being involved in all

9   the investigations that have that economic component, which is

10  most all of them, some of the criminal ones not so much, and

11  then working with the Assistant Attorney General, that was

12  Christine Varney when I was there, as part of her team to

13  advise her on making enforcement decisions and other policy

14  decisions.

15          **THE COURT:**  So I should say that as you're talking,

16  I'd walked past you in the halls in the Department of Justice.

17  I don't know Dr. Shapiro, but I did see him in the hall every

18  now and then.

19          **THE WITNESS:**  And likewise.

20              (Laughter)

21  **BY MR. HOAG:**

22  **Q.**   How many merger cases were you involved in at the

23  Department of Justice, Professor Shapiro?

24  **A.**   Well, there's dozens, more than dozens a year, I suppose.

25  It depends to be a smaller number that the deputy would get

1    actively involved in.  So I would say a dozen or so per year

2    that I was really engaged in most actively.

3    **Q.**    And what was your role in particular investigations?

4    **A.**    Well, working with the economists, understanding the data,

5    really reading the memos, legal and economic memos, and then

6    giving advice on the enforcement decision, meeting with parties

7    who would come in, for example.  All range of those type of

8    duties as part of the Department's antitrust enforcement

9    activities.

10   **Q.**    And can you provide the Court with an example of the kind

11   of policy work you're involved in at the Department of Justice?

12   **A.**    Well, the Division also is quite active in what they call

13   competition advocacy, which is apart from enforcement,

14   promoting policy, competition policy generally.  So, for

15   example, at the beginning of the Obama Administration, there

16   was quite a lot of activity around broadband access and

17   broadband policy.  The Department ended up working with the

18   FCC, Federal Communications Commission, and filing comments on

19   how spectrum can be allocated auction assigned to try to

20   promote competition among broadband, wireless broadband in

21   particular.  And, so, that would be one example of competition

22   advocacy.  There were others.

23   **Q.**    And following your second opportunity to serve at the

24   Department of Justice, did you return to Berkeley?

25   **A.**    No.  I had the honor at that time of being appointed to

 1   the President's Council of Economic Advisers.

 2   **Q.**   And what is the Council of Economic Advisers?

 3   **A.**   So the Council of Economic Advisers, CEA, has three

 4   members, a chair and two members, works in the Executive Office

 5   of the President.  As a member, I was appointed by the

 6   President, confirmed by the Senate.

 7        It's basically the President's economists, usually

 8   academic economists, in those positions to give the President

 9   the best objective advice on economic policy across the whole

10   waterfront of such issues.

11   **Q.**   And what were your responsibilities as a member of the

12   Council of Economic Advisers?

13   **A.**   Well, the way we would do it, the two members would tend

14   to split up the duties.  The other member was Katharine

15   Abraham, she's a labor economist.  I'm an industrial

16   organization economist.

17        So the natural -- basically we divide it up by our areas.

18   So everything involving innovation, competition would naturally

19   fall into my zone, but it was so much more than that.  It was

20   quite expanding really to do that.  Housing finance, trade with

21   China, all these issues would come up for the President, energy

22   and environmental issues.  But I was often using my industry

23   economic expertise to do that.

24        And then on those topics we were just part of basically

25   the President's economic team to evaluate policies, work with

1    agencies, work with other folks within the White House and

2    ultimately making recommendations and presentations to the

3    President.

4    **Q.**    And after you completed your term on the Council of

5    Economic Advisers, what did you do then?

6    **A.**    I rested.  I actually took a vacation and I came back to

7    Berkeley.  That was the summer of 2012.

8    **Q.**    And aside from your work as an academic and in government,

9    have you been involved in particular antitrust cases in other

10   roles?

11   **A.**    Yes.  For about 20 years or so or more I've also worked

12   for a number of private clients as an economic expert,

13   sometimes testifying, more often not testifying, with somewhat

14   of a tendency to work more in the technology, tech sector, just

15   because I'm out here in Berkeley and a lot of my writings speak

16   to that, intellectual property issues, technology, network

17   competition.

18         So there's been a number of private clients over the

19   years; for example, General Electric, Honeywell.  That was a

20   big merger.  I worked for General Electric on that.  And a

21   number of the other large firms here in the Bay Area.  Google,

22   Intel, Apple have been clients over the years.  Some cases

23   mergers, in some cases other issues.

24         **MR. HOAG:**  Your Honor, at this point I'd like to offer

25   Professor Shapiro as an expert in economics.

1          **MR. JACOBSON:**  No objection.

2     **BY MR. HOAG:**

3     **Q.**   Professor Shapiro, what was your assignment with regard to

4     Bazaarvoice's acquisition of PowerReviews?

5     **A.**   I was asked to evaluate the likely competitive effects --

6     competitive effects of the acquisition.

7     **Q.**   And as an economist, how do you go about analyzing the

8     likely competitive effects of an acquisition?

9     **A.**   Well, we have a well-developed and established framework

10    to do that.  There are a number of steps that I think we're

11    going to walk through, starting with market definition.  So I

12    undertook the analysis using that framework.

13    **Q.**   And is the framework that you use the same for a

14    consummated merger as it is for a proposed merger?

15    **A.**   It's basically the same.  You're still trying to predict.

16    It's a predictive exercise either way.  What's different, of

17    course, is with a consummated merger, you can see some -- you

18    have some postmerger evidence, so you try to make the most of

19    that and see what you can learn from that.  And, of course, as

20    always, you want to have evidence that is as up-to-date as

21    possible.

22    **Q.**   Now, Professor Shapiro, I want to take each one of the

23    components that you mentioned that make up this framework and

24    talk about them for a couple minutes sort of in turn.

25          The first one that you mentioned is market definition.

1  What are you trying to determine in market definition?

2  **A.**   Okay.  So the market definition step we're trying to

3  identify a group of products such that if that group of

4  products were securely monopolized, a single firm controlled

5  that, that would really represent a competitive problem and a

6  harm to customers.  That grouping then would qualify as a

7  relevant market.  So that's the goal.

8  **Q.**   And what are the elements of market definition?

9  **A.**   We have a product element and a geographic element.

10  **Q.**   And let's talk about the product element first.  As an

11  economist, how do you think about the exercise of testing

12  whether a proposed set of products is a valid product market?

13  **A.**   Well, that's a good way to put it, testing.  Because when

14  you have a merger, you have -- you look at companies, such as

15  here, where they're clearly selling very similar products.  So

16  you start with that product and ask:  Is that a candidate

17  market?  Here it would be ratings-and-reviews software.  But in

18  general you look at a group of products and you're testing is

19  that group broad enough to qualify as a relevant market.

20  **Q.**   And what is the test that you use to actually make that

21  determination?

22  **A.**   So we have something called the hypothetical monopolist

23  test.  You're going to be hearing about that -- sorry -- and

24  that's been used for 30 years.  It's been in the merger

25  guidelines since 1982 when Bill Baxter put it there during the

1    Reagan Administration, and it's much beloved by economists but

2    not so much by other folks.

3         What we're doing is asking if -- so this is where it goes

4    back to the question:  If a single firm controlled all these

5    products, would that lead to significant customer harm in

6    comparison with competition?  We see some competition now.  If

7    that were eliminated, would that make a significant difference?

8         So that's the hypothetical monopolist test.  We want to

9    compare the competition we see to what would happen if a single

10   firm controlled.  So it's that comparison we're trying to

11   gauge.

12        And if that difference is significant, usually measured as

13   5 percent, then those group of products qualifies as a relevant

14   market.  Let me give an example since it's a little bit

15   abstract.

16        So suppose we have two companies who are selling gasoline

17   and they merge.  We want to know is gasoline a relevant product

18   market.  We'd ask, well, there's competition among gasoline

19   suppliers.  If a single firm controlled the supply, would that

20   firm find it profitable to raise the price at least 5 percent?

21        Okay.  Now, immediately when you ask that question, you

22   get into issues of customer substitution, which you've been

23   hearing about and will keep hearing about.  So how will

24   customers substitute from the products in this candidate market

25   to other products?

1          For the gasoline, we'd ask:  Suppose gasoline goes up by,

2     say, 25 cents a gallon, maybe that's roughly 5 percent, what

3     sort of substitution would there be?  And we'll then want to

4     explore that question.

5          If there's a great deal of substitution away from

6     gasoline, that's too narrow a market.  I'm sure that's not the

7     case for gasoline.  Okay.  It's pretty inelastically demanded.

8          There's some elasticity.  There's some substitution.  If

9     the price goes up 25 cents a gallon, some people will say, "You

10    know, I'm going to take BART instead of commuting."  Somebody

11    might bicycle.  Somebody might take the bus.  So those small

12    amounts of substitution to other forms of transportation would

13    not imply that BART should be in the market with gasoline

14    because it's small.

15         So the way we tell what's big or what's small is the

16    hypothetical monopolist test.

17    **Q.**   And, so, why would it be a mistake to include in the

18    product market substitutes where there's sort of a low amount

19    of substitution?

20    **A.**   Well, let's stick with the example.  So if we see gas

21    prices go up, a small number of people start taking BART.  If

22    you were to include BART in the market, first of all, it sounds

23    a little weird in that case obviously, but you could say it's

24    actually all forms of commuting or transportation.  That would

25    be a different way to put it.  And we could talk about the

1    transportation wallet, okay, and people are spending money, how

2    they do that.

3        The trouble with that is, if you then -- where are we

4    going with this, I guess?  We're going with market definition.

5    We're going to measure market shares.  That's the next step.

6    So if you included BART or bus or bike, whatever it would be,

7    then you would -- when you get to measuring market shares let's

8    say, oh, now we need to measure -- we can't measure gallons of

9    gasoline, we need to measure trips, and we'd see the share of

10   gasoline trips, trips fueled by gasoline would be low, we might

11   very well get a misleading answer at that stage.

12       That is to say, controlling the gasoline market could

13   cause a lot of harm to customers, and yet we would see small

14   shares for the gasoline suppliers because there's a lot of

15   people taking BART.  That would be a false negative.  It would

16   be an error.

17       So if you include all these broader substitutes, you're

18   going to end up with artificially low shares, and you're going

19   to miss competitive harm.  That's the danger.

20   Q.   And could you give us an example of the converse of that,

21   where the product market wouldn't satisfy the hypothetical

22   monopolist test?

23   A.   Yes.  So gasoline, I'm sure, is a relevant product market.

24   The FTC looks at these cases.  So -- but suppose you had

25   premium gasoline, so a narrower slice; and you said, "Gee, is

1   premium gasoline a relevant market?"  Well, now you have more

2   of a horse race.

3       If the price of premium gasoline goes up 25 cents a

4   gallon, I bet a lot of people would shift to midgrade or

5   regular, and that might be enough substitution to make that

6   price increase unprofitable for the firm controlling the

7   premium gasoline.  That's what the test would ask us.

8       And if we found, no, it's unprofitable, then we'd say,

9   "Premium gasoline is not a market.  We need to include other

10  grades."  So that's the way the test works.

11  Q.   Professor Shapiro, you said that you also need to define a

12  geographic market.  How do you establish the relevant

13  geographic market for the purposes of analyzing a merger?

14  A.   We -- it's, again, the hypothetical monopolist test.  So

15  now we're asking what's the geographic region in which the

16  extinguishing competition for the product now would be

17  profitable.  Basically we're ultimately where we are going to

18  be concerned about harm to competition; but in terms of the

19  hypothetical monopolist test, what's the zone where the prices

20  would be profitably elevated in comparison with competition.

21  Q.   And how do you go about determining what that region or

22  zone is?

23  A.   Well, from the economist's point of view, it's exactly the

24  same analysis.  It's just geography instead of product.  So we

25  ask -- let's do the gasoline.  Suppose We said -- suppose now

1     we had gas stations merging and we were worried about loss of

2     competition for retail gasoline, and we had two chains who were

3     significant in the East Bay and they merged.  We'd say, "Well,

4     maybe the East Bay is the geographic market for gasoline."

5          Now, substitution here isn't from one product to another.

6     It's from one region to another.  So we'd ask:  Well, if the

7     prices just went up in the East Bay, would people shift and get

8     their gas somewhere else?  Maybe driving up towards Sacramento

9     or down to the South Bay.  And, so, that would be the question

10    geographic substitution.  Same concept but different

11    application.

12    Q.   And in your example you described to find the geographic

13    markets on the basis of the location of the company actually

14    selling the relevant product.  Is that the only way to do it?

15    A.   No, and this is a tricky aspect for most people.  Let's

16    take another example.  Home heating oil.  Not so big in

17    California but very big in the northeast.

18         So there the heating oil companies deliver the home to --

19    the heating oil to your house.  In that case, we might -- we

20    would probably look at the location of the customers; and we

21    might say the concern, again, a merger, two heating oil

22    distributors, the concern might be the heating oil customers in

23    Vermont, for example.  Okay.  And that the hypothetical

24    monopolist could raise prices to customers in Vermont would be

25    an issue.

1    And then we would not be looking at the locations of the

2    suppliers but the location of the customers instead.  That's

3    what we're going to do in this case because it's the location

4    of the customers that really drives things.

5    **Q.**   Now, Professor Shapiro, we're going to go, obviously, into

6    your analysis in more depth, in more detail later, but at this

7    point could you just give the Court a summary of your opinion

8    regarding market definition?

9    **A.**   Yes.  So my opinion is that there's a relevant product

10   market for ratings-and-review platforms for customers in the

11   United States.  Well, product ratings-and-review platforms and

12   the customers in the United States being the geographic market.

13   **Q.**   And once you have defined a relevant market, what is the

14   next step in the analysis?

15   **A.**   So now we go to the market shares, which is one of the key

16   purposes of doing the market definition so we can calculate

17   these shares.

18   **Q.**   And what do you just mean by "market shares" here?

19   **A.**   Some measure of the success of the companies in the market

20   by some metric.

21   **Q.**   And what can you, as an economist, actually learn from

22   market shares?

23   **A.**   Well, the point of market shares is to judge commercial

24   success.  Okay.  I mean, we're going to talk a lot about

25   measurement and it's tricky here, but I always tell folks,

1    "Keep your eye on the ball."  We're trying to assess commercial

2    significance and success; and, so, doing the whole measurement

3    exercise, that's the North Star, if you will.

4    **Q.**   And what types of data do economists use to measure market

5    shares?

6    **A.**   Well, it really depends vastly with the case or situation.

7    Sometimes we have supermarket scanner data.  Sometimes we have

8    Government data.  Basically you take the best data that you

9    can, if you have multiple sources, even better, and you work

10   with that.

11   **Q.**   And is there one best way to measure a firm's market

12   shares?

13   **A.**   No, because it really depends on the market, what's the

14   best -- what's the most informative measure of commercial

15   success.

16       There are two fairly standard types of measures, I would

17   say quantity and revenue.  You think about one is how many

18   units, how many customers, some measure of quantity.  And the

19   other measure would be how much money are the companies taking

20   in in selling the product in the relevant market.  So quantity

21   and revenue.

22   **Q.**   And how do you account for the fact that market shares

23   necessarily measures sales at a particular point in time?

24   **A.**   Well, it is a snapshot, any one measure of market share.

25   You want to look for trends.  If you can measure market shares

1    over time, you want to see if there's trends.  Because, again,

2    the merger analysis is always a predictive or prospective

3    exercise.  And if there's significant trends that you can see

4    in the data or just know are coming, you want to account for

5    that.  Usually that's interpreting the market shares.

6        So, for example, Whirlpool and Maytag merged, what, six or

7    seven years ago.  They sold washing machines/dryers.  One of

8    the issues in that case was smaller firms.  LG, a Korean firm,

9    was entering the U.S. market at that time, had a very small

10   share but it looked like it was growing pretty significantly;

11   and, so, one would want to account for that growth and not just

12   take a snapshot.

13   Q.   And what inferences can you, as an economist, draw from

14   market shares?

15   A.   Well, usually, as I said, if you measure market shares and

16   they reasonably accurately reflect commercial significance, if

17   you see large shares from the merging firms and generally a

18   highly concentrated market, we'll talk about how to measure

19   concentration, but a few firms selling -- covering most of the

20   market, that's a signal that there's likely competitive effects

21   or presumption or you're kind of on the alert, if you will.  As

22   an analyst, it's suggestive of a problem, and then you go from

23   there to explore further.

24   Q.   And as you did with market definition, could you provide

25   the Court with a summary of your conclusions on market shares?

1  **A.**    Of course.  So I've looked at this a number of ways that

2  you'll hear about, Your Honor.  It's very clear that we've got

3  a situation where Bazaarvoice is the number one company

4  ratings-and-review software in the United States.  PowerReviews

5  was number two.  Definitely not -- you know, just behind

6  Bazaarvoice.  No other commercial suppliers come close.  And

7  then in-house is a significant alternative.

8      So we've got number one and number two merging, in-house,

9  and then a number of small players.  We usually call them the

10  fringe just as a shorthand, but basically a number of players

11  with very small market shares.  That's the market structure.

12  I'm highly confident in that no matter which way you look at

13  it.

14  **Q.**    Now, Professor Shapiro, once you have defined a market and

15  measured shares inside that market, what's the next step in

16  your analysis of a merger?

17  **A.**    So the next step we call competitive effects, basically

18  which in some sense is the whole ball game, but we use that

19  term to indicate now we're going to go beyond this somewhat

20  structural approach, market share, market definition shares,

21  and really dig in and look how are the firms competing, what's

22  going on, trying to understand the conduct, the behavior in the

23  market; and see in this case, where we have very high market

24  shares, is the presumption of some harm, is it borne out when

25  we look at what's actually going on.

1    Q.   And what are the types of competitive effects that you

2    would actually look at in analyzing a merger?

3    A.   So, again, for the past 30 years or so we have these two

4    buckets called unilateral and coordinated effects, and we tend

5    to break up the analysis in that way.

6    Q.   Let's break up the analysis that way, then.  What do you

7    mean by unilateral effects?

8    A.   So unilateral effects I think is intuitive.  It's

9    basically the companies were competing before, in this case

10   pretty actively between the two of them.  When they come under

11   common ownership, that will no longer be the case.  You have

12   one owner.

13       The term "unilateral" means, then, that simply by not

14   having each other to compete against, they will have more

15   market power.  Okay.  They won't be forced to discount as much,

16   improve their product, something undesirable from a customer's

17   point of view.

18       The term is "unilateral" because the company, the merged

19   company, can just do that on their own.  They don't need to --

20   they don't need to coordinate with the other competitors, which

21   is getting ahead to the next grouping.

22       So the most clear example of unilateral effects would be a

23   merger to monopoly.  Okay.  There's nobody else in the market.

24   You extinguish the competition, but coordinated effects is the

25   other bucket, though.

1   Q.   And you foreshadowed this a little bit, but what do you

2   mean when you say "coordinated effects"?

3   A.   Right.  So another type of situation is maybe there's four

4   or five major suppliers, an oligopoly, we go from four to three

5   in antitrust language.  And they're still competitors but now

6   if the merger makes it more likely that the remaining firms

7   will coordinate in some way to the disadvantage of customers,

8   then that can be a problem.

9        Coordination could be forming a cartel that itself would

10  be illegal, but it could just be more of a live-and-let-live

11  strategy, more of a leader-follower strategy; and in this area,

12  which is not applicable in this case, maybe if you eliminate a

13  maverick firm who was causing trouble by acquiring them, you

14  get more coordination.

15       Okay.  A lot of the historical cases involving

16  manufacturing industries, coordinated effects was an issue;

17  chemical industries, steel, auto, those sort of things.  In the

18  information economy, it tends to be more unilateral effects.

19  Q.   And in this case in particular did your analysis cover

20  coordinated effects or unilateral effects or both?

21  A.   This is entirely a unilateral effects case in my opinion.

22  Q.   And why is that?

23  A.   Well, for two reasons really.  First, the elimination of

24  competition between Bazaarvoice and PowerReviews, I think, will

25  be bad news for customers.  We'll talk about that.

1        But, furthermore, there's no significant commercial rival

2   in product ratings and reviews that Bazaarvoice needs to

3   coordinate with in order to exert some additional market power

4   as a result of the merger.  So it's clearly unilateral effects

5   here.

6   **Q.**   And what is the key thing that we're looking for when

7   considering possible unilateral effects from a merger?

8   **A.**   Really the head-to-head competition between the two firms.

9   That's the focus.  How much are they discounting to win

10  business from each other, making product improvements to get

11  ahead of the other one?  Just that head-to-head competition.

12  And if that's very significant, then that's going to suggest a

13  problem as a result of the merger.  That's what this stage of

14  the analysis is focusing on.

15  **Q.**   And how does the analysis of unilateral effects relate to

16  the market shares that we were discussing earlier?

17  **A.**   Well, normally we would see some connection.  If we see

18  two firms with large market shares, here I think roughly it's a

19  40 percent plus 20 percent merger.  We'll talk more about the

20  numbers; but Bazaarvoice 40 percent, PowerReviews 20 percent,

21  in-house is the bulk of the rest.  With a 40 percent plus

22  20 percent, you would expect to see the companies bumping up

23  against each other quite a bit, particularly when the in-house

24  is sort of a slightly different creature.

25        And the unilateral effects, when you look at the

1    head-to-head, the bidding competition, trying to steal clients,

2    all that, that usually fits with the market shares pretty well,

3    but it's a check on market shares with actual business records

4    and conduct.

5    **Q.**    And what kinds of evidence are actually helpful to an

6    economist in applying this unilateral effects framework?

7    **A.**    Well, we'd have qualitative and quantitative evidence that

8    runs through most of this.  On the qualitative side we'd see,

9    for example, company documents indicating, "We're running into

10   these guys all the time.  They're a pain.  You know, they're a

11   thorn in our side."

12         We'd see in this case, rather unusually in my experience,

13   "If we acquire them, we think we can eliminate some of the

14   price competition and price erosion."

15         So those are pretty strong indications of unilateral

16   effects.

17         Quantitatively we're able to do this here.  Economists

18   love to look for win-loss records, basically the normal course

19   of business records where the companies are tracking who are

20   they running up against.  Okay.  When they're going for

21   clients, who are they beating, who are they losing out to,

22   competitive steals, that sort of thing.  And a lot of companies

23   keep, in business-to-business transactions, keep those records;

24   and it's a common thing for economists to look at in these

25   cases, and I was able to do that here.

1    **Q.**   And how does the way in which the products are actually

2    sold affect the analysis of competitive effects?

3    **A.**   Well, Your Honor, you've heard, I think, quite a bit,

4    including from Mr. Collins today, about the individualized

5    negotiations, the value pricing that Bazaarvoice uses.

6         Since the prices are individually negotiated, we would

7    expect in this whole competitive effects analysis the effects

8    of the merger would not be uniform across the different

9    customers.  They're going to depend on the customers' choices,

10   their needs, and so forth.

11        So, for example, a customer who's a large in-house user

12   doesn't really turn to Bazaarvoice or PowerReviews, they're in

13   our market.  They're probably not going to be hurt, okay, at

14   least not until some future time when maybe they would consider

15   going to a commercial vendor.

16        On the other hand, a customer who Bazaarvoice and

17   PowerReviews were bidding actively against to win, that

18   customer is likely to be harmed.  So the effects are not

19   uniform across the market.  That's inevitable in this type of

20   market.

21   **Q.**   Now suppose that you see a lot of competitive bidding but

22   you don't see customers switching back and forth between

23   providers very frequently.  Does this theory still apply?

24   **A.**   Yes, it does.  The key active competition is bidding to

25   win customers and fighting with each other.  Sometimes you win,

1    sometimes you don't.

2        In this case we don't see a lot of switching, and the

3    reasons for that we'll talk about customer switching costs and

4    inertia.

5        But in terms of unilateral effects, you're looking for the

6    bidding and the attempts to win customers, and that's -- or

7    from the other point of view, customers who have leverage by

8    being able to play suppliers off each other.  If they're

9    playing off the merging firms, that's a strong indication

10   there's likely to be these unilateral effects that would be

11   unfavorable to customers.

12   Q.   Well, if it's the bidding that's so important, is it

13   enough to protect competition if there are any remaining

14   alternatives out there in the market that can bid for a

15   company's business?

16   A.   So it's really not the number of bidders; it's their

17   quality and attractiveness to customers that matters.

18       Again, I think it's common sense, but this is -- there's a

19   whole development of bidding theory and economics here, which

20   is, it really comes down to how good a threat does the customer

21   have; and if the customer's alternative is to go to a

22   low-quality alternative, they're not going to have as much

23   leverage in the bargaining.  If they have two really good

24   alternatives, maybe, you know, say -- we'll get to that -- then

25   that's more powerful.  So it's not the number of alternatives.

1    It's really their attractiveness or quality in the eyes of the

2    customer.

3    **Q.**    Your explanation so far is focused on customer-by-customer

4    competition between companies that would be lost.  Are there

5    other ways in which a merger could result in a loss of

6    competition other than on this customer-by-customer basis?

7    **A.**    Yes.  The customer-by-customer bidding is really a lot of

8    the pricing is taking place that way, but there's another level

9    at which competition is taking place:  Product improvements,

10   adding features, innovation, which we heard a lot from

11   Mr. Collins actually.

12        And when the companies spur each other to improve their

13   products in order to gain share, that can be lost because of a

14   merger.  That's another unilateral effect.  And that would tend

15   to have, if there is a slowdown of that, that would tend to

16   have an adverse effect across the whole customer group.  That

17   would tend to be more uniform in the sense that the improved

18   products or features are not available or slower to come out.

19   **Q.**    Now, again, we're going to cover this obviously in more

20   detail later in your testimony, but could you summarize any

21   conclusions that you reached regarding the competitive effects

22   in this case?

23   **A.**    Certainly.  This is one of the clearer cases I've seen

24   where there's very strong head-to-head competition between the

25   two merging parties and no other commercial provider comes

1    close, and we'll quantify that.

2         So that's a powerful fact, I think.  It fits with the

3    market shares we talked about, and that would apply both to

4    pricing effects and to innovation or quality effects here.

5         I want to flag actually on the pricing side, the effect

6    that I'm seeing is that there's less aggressive discounting

7    after the merger, and that's what I would predict.  Okay.

8         As Mr. Hurt said, in this industry, prices fall, products

9    improve.  This is tech.  Okay.  So the question is:  Is that

10   happening as fast as it would have?  Okay.  So we always want

11   to compare what the path would have been without the merger

12   compared to what we're seeing with the merger, and it's that

13   gap we're talking about.  And my conclusion is that we're

14   seeing less aggressive discounting because of the merger.

15   Q.   Professor Shapiro, does your analysis of the merger end at

16   this point?

17   A.   I'm afraid it does not.  We need to consider entry and

18   efficiency still.

19   Q.   And why is it necessary to look at entry?

20   A.   Well, this whole analysis, let me emphasize in case it

21   wasn't entirely clear, really has been looking at the

22   competition between the firms and other providers that we saw

23   leading up to the merger for the products that were in the

24   market now.

25        We have to consider that if there's a slowdown in

1    innovation or less discounting, will some new firm come in and

2    save the day effectively for customers.  So that's entry.  We

3    need to consider that.

4    **Q.**  And how do you, as an economist, think about evaluating

5    whether entry is likely to take place?

6    **A.**  Well, the key thing is likely and in this case also

7    sufficient.  Will entry really occur and will it be enough to

8    replace the lost competition?  You know, and fast enough.

9         To do that, we have to think about from the point of view

10   of the entrant.  Okay.  So we're trying to predict whether

11   entry will happen.  So the key for the economist is:  Is entry

12   going to be profitable?  Okay.  And what are the obstacles to

13   entry that naturally come into that analysis?

14        So that's where we're trying to go, to understand what the

15   obstacles are; and, of course, we want to look at what's

16   actually happened in the market in terms of entry.  With a

17   consummated merger, we can look after the merger as well and

18   see whether we're already getting some entry and what we can

19   learn from that.

20   **Q.**  What can looking at the historical evidence of entry tell

21   you about conditions in the marketplace?

22   **A.**  Well, I think, again, hopefully obvious, if you're trying

23   to understand entry, you first want to see what has happened,

24   have people entered, have they not.  So you do that.

25        If you see a lot of entry, and I should say successful

1    entry, which -- by which I mean gaining significant market

2    share, commercial sales, if you see a lot of that, then that's

3    a pretty good indication entry barriers are low.

4         If you see no successful entry, it's suggesting to you

5    entry barriers are high, but then you want to understand why.

6    What are those barriers?  So it leads to the next stage of

7    analysis of entry barriers.

8    **Q.**   Now, Professor Shapiro, what conclusion did you reach on

9    whether entry would protect customers of product

10   ratings-and-review platforms in the event that Bazaarvoice's

11   acquisition of PowerReviews is not unwound?

12   **A.**   Well, I don't think entry here will be sufficient.  As a

13   starting point there, I think of entry having a kind of -- the

14   entry argument, if you will, for the defense as having kind of

15   a heavy lift in a case like this where you've got such strong

16   evidence on market shares and unilateral effects.  So the

17   hurdle, if you will, for sufficient entry is pretty high, I

18   think, in this case.

19        And then to turn to these points, there's been no

20   successful entry into this market in recent years.  Okay.

21   There are a number of small players.  Nobody has gained

22   significant share, okay, into product ratings and review for

23   retailers and manufacturers in the United States.

24        So then why is that?  Okay.  Because you look and say, "It

25   doesn't look that complicated.  Ratings and reviews are stars

1    and it seems pretty simple."  And as you look into it more,

2    then you realize, like I reached the conclusion, that there are

3    significant entry barriers and there are three we're going to

4    talk about.

5         One is switching costs.  It's hard to get customers away

6    from their established providers.  That's a problem for an

7    entrant.

8         Two is reputation, track record, experience.  Customers

9    care about that.

10         And third is syndication, which we actually heard a good

11    bit about from Mr. Collins as a successful Bazaarvoice

12    strategy.  I think it's a great strategy, okay, but it does

13    make things hard for an entrant.

14    Q.   You mentioned a few minutes ago that in addition to entry,

15    we also have to look at any potential efficiencies from a

16    merger.  Can you explain how potential efficiencies are taken

17    into account in merger analysis?

18    A.   Okay.  So I need to recap a little bit.  So if we get to

19    this point in the analysis and we're still going, which we are

20    here, that means we've reached the conclusion that there are

21    significant competitive effects that are harmful to customers.

22    Entry is not going to save the day.

23         So now we have one more thing to check.  Well, maybe the

24    merger will create so many efficiencies to make up for that;

25    and, so, the customers in this market will actually be better

1    off.

2        Okay.  Yes, there's a reduction in competition, but maybe

3    the firm's so much better, costs are so much lower, that the

4    customers will still come out okay, which is our test.  It's a

5    consumer welfare test.  So that's the efficiencies question.

6    Q.   And could you give an example of a type of efficiency that

7    might actually be legitimate?

8    A.   Sure.  So in the home heating oil example, in a lot of

9    cases involving distribution networks, there are scale

10   economies in having a denser network of customers.  It's

11   more -- it's cheaper to serve them.

12       If you had a sparse population, you have a merger, I would

13   expect in that merger the parties would come in and say, "It's

14   going to be cheaper for us to serve folks because our

15   distribution is going to be more efficient."  That would strike

16   me as very a plausible type of efficiency associated with the

17   merger.

18   Q.   And could you provide an example of the type of efficiency

19   that it wouldn't be appropriate to credit or that wouldn't be

20   plausible, as you put it?

21   A.   Well, there's -- I would say take this example.  Another

22   thing one often sees is we're going to merge and, as a result,

23   we're going to -- we have duplicative sales forces.  Okay.

24   We're selling to the same customers.  Maybe it's in the medical

25   area.  We have detailers.  And we're going to save money.  It's

1    definitely a cost savings for the merged firm.  We're going to

2    basically cut the sales force in half.

3        That's not an efficiency that's very likely at all to

4    benefit customers.  Okay.  In fact, that reflects the fact

5    they're not competing against each other.  Maybe they have

6    shorter sales cycles, et cetera.

7        So that would not be a type of efficiency that could be

8    counted towards potentially offsetting what would otherwise be

9    anticompetitive effects.

10   Q.  And how does the competitive structure of the market

11   affect how likely it is that even legitimate efficiencies would

12   actually end up benefiting consumers?

13   A.  Well, if you've got a highly concentrated market, it's

14   less likely the firm will be forced by competition to pass

15   through any efficiencies it does achieve; and, so, that's going

16   to matter.

17   Q.  And did you consider any efficiencies that Bazaarvoice

18   claims may result from its acquisition of PowerReviews?

19   A.  Yes.  I looked at their various filings and what --

20   basically the various papers and evidence on their

21   efficiencies.  I have looked at that, yes.

22   Q.  And what have you concluded?

23   A.  I don't see that any of the efficiencies they've put

24   forward meet the critical tests that I've laid out.  In

25   particular, the big issue is a lot of times companies hope to

1   achieve efficiencies but they may not.  It's more aspirational.

2   So, are they very likely to actually occur and will they be

3   merger specific, you really need the merger to get those

4   efficiencies, and that they'll be passed through to consumers?

5        Those are some pretty tough hurdles; and I don't -- I've

6   reviewed what they've put forward, and none of them have

7   cleared those hurdles in my opinion.

8   **Q.**   Okay.  Thank you.

9        Now that we've reviewed kind of the overall framework for

10  how you analyze a merger, I want to go back and actually do

11  each one of the sections in some detail.

12       I want to turn first to the analysis that you did of the

13  relevant market in this case.  How did you go about analyzing

14  the relevant market?

15  **A.**   Well, now we'll go back and refer to the framework.  So I

16  applied the hypothetical monopolist test to the

17  ratings-and-review platform software that the companies both

18  sell.

19  **Q.**   And what were you looking for as you applied that test?

20  **A.**   So what you're looking -- again, as I reviewed -- I keep

21  wanting to refer back.

22       So we're asking ourselves:  If a single firm controlled

23  all of the ratings-and-reviews software to customers in the

24  United States, would that be a significant harm to customers?

25       Okay.  And let's be clear.  This hypothetical monopolist

1    is going to -- one way to think about it is, put in one firm --

2    PowerReviews, Bazaarvoice, in-house, and all the fringe

3    suppliers -- all under one firm's control.  That's our

4    hypothetical monopolist.  Maybe different divisions.  And would

5    that firm find it profitable to raise price?  That's the

6    question.

7         Or again the less formal version of it:  Would you care if

8    there were only a single supplier of this stuff?

9    **Q.**  And what types of evidence did you consider in assessing

10   whether that would actually be the case here?

11   **A.**  So customer substitution patterns are the key thing to

12   look at, and we've had various qualitative evidence here on

13   those patterns.

14   **Q.**  And can you just describe a little more about what you

15   mean by qualitative evidence?

16   **A.**  So this is a natural place to look for this is the

17   customers since it's a customer -- since it's their pattern.

18   So another way to put this is:  If the price of

19   ratings-and-review software I'll say went up by 5 percent, but

20   you should always think didn't go down as fast, okay, if it's

21   5 percent higher than competition would give it, would the

22   customers just drop in significant numbers?

23        Okay.  Premium gasoline, maybe.  Gasoline, no.

24   Ratings-and-review software, I think not.

25        Okay.  The customers -- so I interviewed a number of

 1    customers -- Home Depot, Staples, BJ's Wholesale who you heard

 2    from, Bed Bath & Beyond -- so we've got a lot of customer

 3    testimony saying, "We need ratings-and-review software.  It's

 4    table stakes.  It's a necessary part of being a major online

 5    retailer these days."

 6        Well, that's directly relevant to this question.  That

 7    suggests -- a lot of these companies we think, based on the

 8    records, maybe they're paying a hundred thousand, 200,000 for

 9    this, 50,000 in some cases.  So if you use a hundred-thousand-

10    dollar figure, if the price went up 5 percent, $5,000, would

11    that cause these retailers to drop it?  And I think the

12    qualitative evidence on this is pretty clearly no or almost

13    none of them would.

14        Another category here is these return-on-investment type

15    of analysis.  I don't know whether you've seen that or not; but

16    the pitches by Bazaarvoice and PowerReviews to clients saying,

17    "Ratings-and-reviews software is a winner if you invest," which

18    is to say buy our product, "it's going to -- the returns will

19    be multiple of what you're paying."

20        And if that's true, and this customer seemed to accept

21    those pitches by and large, that suggests a slight increase in

22    price will not cause customers to drop ratings and review.

23    Again, that supports the conclusion this is a relevant product

24    market.

25    Q.   You mentioned a moment ago that you've seen some evidence

1  that product ratings and reviews have become more or less table

2  stakes for retailers.  Did you do anything to look at that

3  question?

4  **A.**   Well, one thing -- this is a good point to mention the

5  competition among the retailers since that's -- I think that's

6  one that triggers in my mind.

7       From a retailer's point of view, they're concerned if they

8  don't have it, they're disadvantaged compared to other

9  retailers.  The Bazaarvoice has emphasized the role of

10 Amazon.com as a big -- as a huge online retailer and how -- so

11 for a big retailer to drop ratings and review, that seems like

12 it's pretty unwise.

13      Okay.  So that's -- that's kind of one aspect of the table

14 stakes.

15      And the other thing we see is simply more and more of the

16 top retailers use ratings and review over the past few years.

17 Okay.  So we see that trend.

18 **Q.**   Savannah, could you please call up Government

19 Exhibit 1038, which is Shapiro Exhibit 5?

20      It's in the small binder, Professor Shapiro.

21 **A.**   (Witness examines document.)  Okay.  I've got it here.

22 **Q.**   Now, Professor Shapiro, what does this chart show?

23 **A.**   Okay.  So are you there, Your Honor?

24           **THE COURT:**  Yeah, I am.

25           **THE WITNESS:**  Okay.

1          **THE COURT:**  I'm getting there.

2          **THE WITNESS:**  Yeah.

3          **MR. HOAG:**  Your Honor, it's the smaller binder.  That

4    binder has a copy of the reports.

5          **THE WITNESS:**  I've learned not to get out ahead of my

6    students.

7          **THE COURT:**  Thank you, sir.

8          **THE WITNESS:**  Not -- I didn't want that to come out

9    the wrong way.

10         **THE COURT:**  No, no.  I understand what you said,

11   Dr. Shapiro.  That's fine.

12         **THE WITNESS:**  Okay.  So we're looking at the IR500

13   companies.  You've heard about them.

14      The green -- I will first focus on the blue line.  We're

15   going from 2009 to 2013.  So the blue line measures the number

16   of firms not using products ratings and review.  Okay.  So back

17   in 2009, over 300 did not use it, and now by 2013 that's

18   approaching 100.

19      Okay.  So that's the main point here, is simply it's

20   becoming more widely used.  We're also seeing that Bazaarvoice

21   and PowerReviews are picking up a lot of the customers.

22   In-house is pretty flat, but that's a secondary point.

23         **MR. JACOBSON:**  Your Honor, as you know, we had lodged

24   a Rule 702 objection to the use of the IR500 as a substitute

25   for analyzing the market.  I just want to let the Court know

 1   that I'm going to cover it in cross-examination rather than

 2   move to strike or exclude the testimony.

 3            THE COURT:  Thanks, Mr. Jacobson.  You did in your

 4   brief raise three or four substantive --

 5            MR. JACOBSON:  Issues.

 6            THE COURT:  -- issues to Dr. Shapiro's examination.  I

 7   have read those, and I will be considering those as I consider

 8   the evidence in the case.

 9            MR. JACOBSON:  Thank you, Your Honor.

10   BY MR. HOAG:

11   Q.   Thank you, Professor Shapiro.

12        Do the parties' documents discussing competition shed any

13   light on the question of whether product ratings and reviews is

14   a relevant market?

15   A.   Yes.  These deal documents in particular, the several

16   rounds of them, are directly relevant for the market definition

17   exercise.

18   Q.   And how are they relevant?

19   A.   Okay.  I think it's probably obvious that they're relevant

20   for unilateral effects.  They're competing with each other.

21   What's perhaps less clear is how directly relevant they are for

22   market definition, so let me -- that's what I want to go

23   through.

24        So we're asking whether a single firm controlling all

25   ratings-and-reviews software to U.S. manufacturers and

1   retailers would raise price above the competitive levels.

2       If we credit these documents, which indicate that the

3   company executives believed by merging they could avoid

4   significant price erosion, I think it's more than 5 percent

5   they're talking about in those documents, if you believe that,

6   if you believe that, if you accept that, then the merged firm

7   can profitably raise price at least 5 percent above competitive

8   levels.

9       It follows, therefore, that the hypothetical monopolist

10  who controls not only Bazaarvoice and PowerReviews but also

11  controls all in-house and the fringe players, can raise price

12  even more and profitably.

13      So -- which is the question we're asking.  Okay.  So if

14  you I'll say credit those documents on that point, it implies

15  that ratings-and-review software for U.S. retailers and

16  manufacturers is a relevant product market.

17  Q.   Now, in addition to the qualitative evidence that you've

18  just been discussing, did you look at the question of whether

19  product ratings-and-reviews platform satisfies the hypothetical

20  monopolist test using quantitative evidence?

21  A.   Well, I also did the -- there's a standard test to do this

22  in the economics literature, and I went through that and

23  performed that test, a quantitative test.

24  Q.   And could you explain how that test works?

25  A.   Okay.  So the idea is, again, we're asking -- we're

1    comparing this hypothetical monopolist to competition and

2    seeing how the pricing's different in particular.  So I have to

3    take it a step at a time.

4         Imagine the hypothetical monopolist, they control all

5    these sources of supply; and now the headquarters of the

6    hypothetical monopolist calls up the manager of the

7    PowerReviews' division and says, "We're thinking of raising the

8    price," which again means don't discount as heavily, don't push

9    it so much.  Okay.  "We're thinking of raising the price

10   5 percent."

11        PowerReviews manager says, "I'm not in favor of that.  We

12   got it just right.  Before the merger, we were doing the best

13   we could."

14        Headquarters says, "Well, I know that's right for you; but

15   if we raise the price, we think a bunch of the business you

16   lose will go to our other divisions.  We think a lot of the

17   people are going to shift to Bazaarvoice and maybe some will go

18   to in-house, but we control that too.  So we're ordering you to

19   raise the price."

20        Okay.  Well, is it going to pay for headquarters to do

21   that, for the hypothetical monopolist to do that?  Well, what's

22   different between the hypothetical monopolist and the

23   PowerReviews division?  It's this diversion to the other

24   divisions.  That's called the recapture rate.

25        If you raise the price of PowerReviews, some of the sales

1    that are lost will go to other PRR solutions.  The percentage

2    that goes to the other divisions, that's called the recapture

3    rate.  If that's high, then headquarters is, like, "Go for it.

4    Okay.  I'm ready to raise the price because those aren't lost

5    to me.  I recapture those.  I'm only concerned about the people

6    who dropped PRR altogether.  I lose them."

7         So the recapture rate is the first thing to look at, and

8    we want to know what that is.  That's one variable.

9         Then the other variable, and there's only two, is the

10   margin because the headquarters then says, "Well, look, this is

11   really good.  We're recapturing.  We know you don't like it,

12   PowerReviews division, but we're recapturing a bunch of the

13   business."

14        Well, how much does that drop to the bottom line for

15   headquarters?  Well, the business gets diverted, how valuable

16   is that, that depends on the price-cost margin on the diverted

17   business.  So if that's large, this is looking like a better,

18   more attractive deal for headquarters in a way that did not

19   look attractive for the PowerReviews division.

20        So the two numbers that drive the analysis are the

21   recapture rate and the margin, and they interact, they multiply

22   together; but the higher each one -- each of those being higher

23   makes it more likely that the monopolist will raise the price

24   and, therefore, the products in this grouping will satisfy the

25   test.

SHAPIRO - DIRECT / HAOG

1  **Q.**   And how did you go about applying that test in this

2  particular case?

3  **A.**   Well, so we measured the margin and then estimated the

4  recapture rate.

5  **Q.**   And when you measure the margin, what does that imply for

6  what the recapture rate is here?

7  **A.**   Okay.  So here -- well, so the margin -- the recapture

8  rate -- so, as I said, the higher the -- either variable is,

9  the more likely this is going to pass the test.  So we measure

10  the margin.  I'm going to use a 50 percent margin.  I think

11  we'll explain that in a moment.  Given that margin, so long as

12  the recapture rate is at least 17 percent, the test is

13  satisfied.

14     Okay.  The reason I'm doing it this way is the margin is

15  something we can estimate quite accurately given the financial

16  records.  The recapture rate is harder to tell.  I think we

17  have good evidence on it, but I have basically a minimum, this

18  17 percent; and I'm highly confident the actual number's north

19  of that, but that's the way the analysis is structured.

20  **Q.**   And why did you use the 50 percent number for the margins

21  in this case?

22  **A.**   Okay.  So, again, what the margin is, is it's the -- it's

23  a percentage number I should say.  So if you sell a product for

24  a hundred dollars and it costs you $40 to serve that customer,

25  the margin's $60.  We're going to divide that by the

1    hundred-dollar price and get 60 percent margin.

2        So in this case the company's records indicate margins of

3    around 65 percent, in some cases a little higher.  I think

4    those numbers are missing certain costs that should be included

5    just the way they keep their books.  And, so, I think I

6    adjusted that downward to around 55 percent; and then just to

7    be on the conservative side, I just used a round number.  I

8    used 50 percent.  It doesn't matter that much.  The test, it's

9    not a close call in this case, but that's what I did.

10   **Q.**   And how does your analysis of the actual expected

11   recapture rate in the product ratings-and-review market compare

12   to the 17 percent recapture rate that you calculate as the

13   minimum using the test that you just described?

14   **A.**   So, again, let's just make sure we have the concept.  Now

15   we're thinking if you raise the price of PowerReviews or don't

16   discount as much, of the customers that are lost, which might

17   not be that many, what fraction will shift to other product

18   ratings-and-review providers?  That's the number we're asking.

19   That's the recapture rate.

20       All this evidence about retailers especially really

21   needing to have ratings and review and the bidding competition

22   between PowerReviews and Bazaarvoice makes me confident that

23   this recapture rate is really very high.  Okay.  A small

24   fraction of customers who would drop based on a small price

25   increase would -- excuse me, drop PowerReviews based on a small

1    price increase would drop ratings and review altogether.

2        Okay.  Now, I should say, Your Honor, this is not a case

3    where we have extensive time series of data that's recorded and

4    prices.  The prices are kind of a little opaque here and

5    they're customized.  Okay.  So there's some art that goes into

6    this, in my view, but I think overall the scope of the evidence

7    shows quite clearly that this recapture rate is high.  Just the

8    retailers needing the product is what it's going to come down

9    to.

10       But the test allows us to quantify what that recapture

11   rate would need to be; and my conclusion is the true number, if

12   you will, is well above the 17 percent figure.

13          THE COURT:  So on the recapture rate, there's no --

14   you're not basing it on numbers, you're basing it on what you

15   see in the qualitative evidence essentially?

16          THE WITNESS:  Mostly, yes, but I do have one

17   quantitative test here which I think of as a proxy.  It's not

18   directly measuring.

19       But we can look at switches.  Okay.  We can look at when

20   customers switch from -- leave one -- basically the churn, what

21   you were hearing about before.  And I looked over a period of

22   three or four years and saw when customers in the IR500 moved

23   from one -- when they dropped a provider, did they move to

24   another one or did they drop PRR altogether.

25       And I get the proxy, I'll call it again, was around

1   59 percent there for the recapture rate.  I think the actual

2   rate is going to be higher than that because people drop for

3   all sorts of reasons having nothing to do with price.  Like

4   Lexmark dropped because they were going out of the consumer

5   printer business, if I recall right.  Another company, I love

6   this one actually, they dropped because their product ratings

7   were all one and two star and they didn't like it.  Okay.  So

8   that doesn't have anything to do with price.

9        So I have done that one quantitative piece, but I can't

10  represent to you that that's directly based on price changes.

11  I think it overestimates -- excuse me, I think it

12  underestimates the recapture rate.  So it's 59.  I think the

13  real one is north of that, so I'm not close to that 17 percent

14  and that's why I have confidence.

15            **THE COURT:**  Okay.

16  **BY MR. HOAG:**

17  **Q.**   Professor Shapiro, taking into account all of the evidence

18  that you have considered, have you reached an opinion on a

19  relevant antitrust market for assessing the competitive effects

20  of Bazaarvoice's acquisition of PowerReviews?

21  **A.**   So, yes.  The opinion is the relevant market is product

22  ratings-and-review platforms for U.S. retailers and

23  manufacturers.  That's it.  I think I got it right.

24  **Q.**   Now, Professor Shapiro, are you aware that Bazaarvoice's

25  expert, Dr. Shahadeh, contends that the product market is too

1   narrow because it excludes alternative social marketing

2   solutions such as Q & A or testimonials, forums, and other

3   types of social commerce?

4   **A.**   Yes, certainly.

5   **Q.**   And do you agree with his argument?

6   **A.**   No, I do not.

7   **Q.**   And why not?

8   **A.**   Well, I just walked through what I did to reach my

9   conclusion, so why don't I compare with what Dr. Shahadeh did.

10       So, first, I read his extensive two reports he's filed.

11  I'm aware of his deposition.  He did not, so far as I can

12  determine, perform the hypothetical monopolist test.  Okay.  So

13  it's not as though, oh, he did the test and came out with

14  different numbers.  I just don't see that.  Okay.  So that's

15  one piece.

16       Then we really get back to what his opinion implies.

17  Okay.  So if you thought there was no market for product

18  ratings and review and you have to go to this much broader

19  social commerce tools or space, he must be saying that if a

20  single firm controlled Bazaarvoice, PowerReviews, all sorts of

21  in-house supply, all fringe competitors, and, by the way, I

22  haven't mentioned this, blockades any possible entry, okay, the

23  hypothetical monopolist doesn't have to worry about that

24  either, that that entity would not have any market power over

25  ratings and review because people would just switch to other

1   stuff.

2       Okay.  And that -- to put it differently, all the

3   competition we see among all those sources of

4   ratings-and-review software doesn't amount to much of anything

5   because competition from other things is so powerful.  I don't

6   think that fits the evidence, the record.  You know, I've spent

7   awhile on the case, and I don't think that's -- that's -- I

8   think it's kind of extreme.

9   **Q.**   And how does the opinion that the market used to be social

10  commerce tools, how does that compare with the parties' own

11  documents on competition?

12  **A.**   Well, I want to separate two strands.  There's -- the

13  companies are clearly going head to head against each other and

14  all the deal documents, you've seen a lot of that.  That

15  obviously supports a narrower market and unilateral effects,

16  and I think it's pretty plain.

17      At the same time the companies clearly are interested in a

18  bigger game.  Okay.  That's great.  And, so -- but that doesn't

19  mean the market's bigger.  Okay.  When we do the test, we're

20  asking if we extinguish competition for this product, is that

21  going to be a problem?

22      The fact that there's all these other -- they're trying to

23  sell other products, they sell things with their core product,

24  the market's shifting, those don't really directly change the

25  result here.

1        Okay.  We're going to talk about dynamics more when we get

2    to entry; but in terms of market definition, we're still

3    asking, "Look, do people need this product?  People mostly

4    being retailers, of course, brands, too, manufacturers and

5    retailers.

6        So the evidence, I think, is pretty clear that when, you

7    know, you talk to the customers and you hear their testimony,

8    "Well, yeah, I'm interested in Q & A.  I'm interested in

9    forums.  Those things are part of my social media strategy, but

10   they're not a substitute for ratings and review.  I'm not going

11   to drop my ratings and review to have that instead.  I can't

12   drop my ratings and review."  It's table stakes again.

13       So I think, in my way of viewing it, at least, obviously

14   I'm trying to convince you to take the same view, you can have

15   a relevant market that's properly defined even though it's in

16   the context of a quasi-dynamic space around it.  And, so, I'm

17   not fighting that story, as it will.  I get that I think.

18       So ultimately the documents that speak about the broader

19   game are not -- don't contradict or undermine my opinion about

20   the relevant market.

21   **Q.**   And does your analysis mean that a product market of

22   social commerce tools would not be a valid antitrust market?

23   **A.**   Well, no, if we had -- if we had a hypothetical monopolist

24   controlling social commerce tools, that sounds huge to me and

25   that probably is now going to include Google and Facebook and

1    Twitter, that would obviously be a pretty big problem.  So that

2    would be a relevant market, a huge broad, relevant market, just

3    like controlling all sources of transportation would be a

4    problem as well.

5    **Q.**    Professor Shapiro, are you aware that the defendant has

6    criticized your analysis for ignoring the ability of suppliers

7    outside the market to get into the market?

8    **A.**    I am.

9    **Q.**    And how would you respond to that criticism in the context

10   of market definition itself?

11   **A.**    So it's important to consider supply-side substitution as

12   a general concept; and this particular question somebody from

13   outside the market coming in, that's entry.  Okay.  So we're

14   going to talk about that with entry.

15        There's also a species of entrants called rapid entrants

16   who can come into the market very easily with very low

17   investment.  In some cases that comes up.  And those rapid

18   entrants can also -- will also be considered in this framework

19   when we do market shares.

20        So there are two more stages where we're going to -- I'm

21   going to consider supply-side substitution, both when we

22   calculate market shares and when we do entry.

23        Now, one can debate about whether one should include

24   supply-side substitution at this stage with market definition,

25   but the roads are going to converge.  Okay.  The standard way

1    of doing it that I think is cleaner and leads to less -- fewer

2    errors is to handle the rapid entrants later when we get to

3    market shares and keep the market definition exercise just

4    about the demand side.  What do the customers need?  And then

5    later we'll talk about who else could supply it.

6    **Q.**    Professor Shapiro, I want to turn to the geographic aspect

7    of your market definition for a moment.  What does it mean to

8    say that the market is for U.S. Web sites of manufacturers and

9    retailers?

10   **A.**    Okay.  So let's have reference to the heating oil example.

11   Okay.  So in this case the concern here is for the clients, the

12   types of clients the companies were competing directly to get.

13   So that's unilateral effects.  That's our concern.  Those are

14   the U.S. retailers and manufacturers.  So that's the focus

15   group.  That's our area of harm.  So we're going to define the

16   geographic market around them just like the heating oil

17   customers in Vermont.

18        Now, the implication of that, and a good implication, is

19   that if there's a supplier who's serving these customers but

20   they're not from the U.S., they totally count.  It doesn't

21   really matter where the headquarters of the supplier is, where

22   their servers are, that sort of thing.  So we're going to count

23   suppliers wherever they may be, and we're going to count their

24   success in selling to U.S. retailers and manufacturers.  So

25   that's -- that's the geographic market element.

1   **Q.**   What is the difference between your approach and

2   considering a worldwide market?

3   **A.**   So if you took a worldwide market, it really only -- the

4   only difference is going to come when you measure market

5   shares.  Okay.  Because under the way I'm doing it, suppliers

6   all around the world are included; but how are we going to

7   count them?  We're going to count them based on their success

8   in the United States.

9       So Reevoo is going to come in here, I think you've heard

10  about Reevoo some, so they're -- they have success in Europe in

11  this area, in product ratings and review and they've, after the

12  merger, entered the U.S.

13      So now the question's going to arise:  Well, should we

14  count shares?  How do we count Reevoo?  Should we count them

15  based on their actually tiny U.S. share or should we count them

16  based on their worldwide share, say add the European?

17      Okay.  I'm going to argue when we get to market shares,

18  well, it's really -- to count their European share would vastly

19  overstate their significance in the United States.

20      Now, behind that is the notion that, "Well, wait a moment.

21  Can't they just easily transfer their success in Europe to the

22  U.S.?"  If they really could do that and there were no barriers

23  to that, then we might want to count their share in Europe

24  more.  Okay.  But we see barriers.  The obvious one is the

25  syndication network.  They don't have a syndication network

1    here.  It's a problem for them.

2        So this is going to -- the only way this matters, the

3    geographic market here, is when we count market shares.  So we

4    can revisit that, but the key point is we're measuring success

5    in the United States and success elsewhere in the world does

6    not really inform that.

7    **Q.**  Now, in the end, Professor Shapiro, what market did you

8    conclude was appropriate to use to assess the competitive

9    effects of Bazaarvoice's acquisition of PowerReviews?

10   **A.**  So ratings-and-review platforms for U.S. retailers and

11   manufacturers, that's it.

12        **MR. HOAG:**  Your Honor, that ends the part of the

13   questioning I'm in right now.  I can continue going on for a

14   little while if you want to go longer.  I see it's just a

15   couple minutes before 1:00.

16        **THE COURT:**  I am easy.  I've got another 20 minutes if

17   you want to keep going.

18        **MR. HOAG:**  Absolutely.  Happy to do that.

19   **Q.**  Professor Shapiro, how does your conclusion regarding

20   market definition assist you as an economist in analyzing

21   Bazaarvoice's acquisition of PowerReviews?

22   **A.**  Well, we're going to use this for market shares now is the

23   main thing.  We have these high-market -- well, we're going to

24   see the market shares.  So that's the next step.

25   **Q.**  And what did you find when you analyzed market shares in

1    the product ratings-and-review market?

2    **A.**    Well, I previewed that.  No matter which way you look at

3    it, and I've looked at it from several, it's number one and

4    number two merging, in-house is a significant option for

5    people, and no other significant commercial providers.

6    **Q.**    And how did you go about calculating market shares in this

7    case?

8    **A.**    Well, the main way is through using the *Internet Retailer*

9    *500* data, IR500, and to -- what *Internet Retailer 500* does is

10   they have a list of retailers who self-report who provides them

11   various eCommerce services, including ratings and review.

12   **Q.**    And why did you decide to use the *Internet Retailer 500*?

13   **A.**    Well, it's, first of all, by design they're trying to pick

14   up the bulk of U.S. retail, online retail I should say.  So

15   that's good because that's really the lynchpin to the

16   strategies here is to -- is the retail.

17        It doesn't pick up brands generally, so we need to deal

18   with that later, but it's -- and the companies use it

19   regularly.  So it's a -- it's basically the best industry

20   source, and that way I'm not picking the companies.  They've

21   already been picked.

22   **Q.**    Savannah, can you please call up GX1074, which is

23   Exhibit 10 from Professor Shapiro's initial report?

24        Professor Shapiro, could you just explain what this table

25   shows?

1  **A.**    Okay.  So -- let me make sure I have the right one here.

2  I'm sorry.  Something's wrong with my book here.

3  **Q.**    1074?

4  **A.**    The thing that's wrong with my book is I'm looking at the

5  wrong number.

6  **Q.**    They're in numerical order, yes.

7  **A.**    I see.  They're not in chronological order.

8       Okay.  So this is a customer count, Your Honor.  So, for

9  example, the first row shows that -- this is straight from the

10  IR500.  We're going to adjust this in a moment because -- to

11  make it more accurate, but we wanted you to see what the data

12  was coming from them.

13       So it's measuring what IR500 asks people to report, which

14  is ratings and reviews and forums.  They're put together.

15  We're going to have to disentangle that in a moment, but that's

16  what it's measuring from 2012.

17       And from those reports, what this table shows us is that,

18  first row, Bazaarvoice 148.2 customers in the IR500 were

19  listed; 148.2 of the companies, I know that sounds weird, we'll

20  get to that, will report -- reported Bazaarvoice as their

21  provider.

22  **Q.**    What do you make of the fractions that show up in the

23  number of customers there?

24  **A.**    So sometimes more than one provider's listed, so we just

25  split them.

1     Okay.  And then the other companies are listed here, but

2  this is the raw data, and then we did a number of things to

3  adjust this.  I'd rather have you focus on the next chart

4  because it's the adjusted numbers.

5  **Q.**  Savannah, can you please put up GX1062, which is Shapiro

6  Exhibit 14A?

7  **A.**  Okay.  Thank you.  All right.

8  **Q.**  Professor Shapiro, does this show the results of the

9  adjustments that you made?

10  **A.**  Yes, this is it.  That's right.

11  **Q.**  And what were those adjustments?

12  **A.**  Okay.  So the first thing we had to do was these forums,

13  which is a different product, we had to strip those out

14  basically; and we did that by finding some of the suppliers who

15  were listed don't provide ratings-and-review software, so we

16  knew that wasn't appropriate.  So we took those out.

17      The other thing we went and checked companies who didn't

18  list any provider to see did they not have ratings and review

19  or did they just not list one.  So we found a number that

20  actually did have a ratings-and-review provider that hadn't

21  been reported, so we fixed that.

22      Then the other thing we did was check using the

23  Bazaarvoice invoice data to see, we figured that was going to

24  be more accurate, whether it was Bazaarvoice or PowerReviews

25  was listed, did the reports get that right or did that need to

1    be adjusted.  So we made -- we made those adjustments and come

2    up with these numbers.

3    Q.    And could you just walk us through the results that you

4    found when you made those adjustments?

5    A.    Okay.  So, let's see, first at the bottom actually, 423 of

6    the IR500 customers use ratings and review.  Okay.  We're

7    seeing that here.  So that's a good sense of penetration.

8         Okay.  And then in terms of the shares, I guess I would

9    turn your attention to the "Share" column then, we see

10   Bazaarvoice with 40 percent.  So of those customers who use it,

11   Bazaarvoice has 40 percent; 39.6, that's 40, the market leader.

12   Then we see basically even, roughly even.  PowerReviews has

13   28 percent and in-house is another 28 percent.

14        Okay.  And between those three, that's about 97 percent, I

15   think, of the total.  Okay.  We've got 15 companies roughly out

16   of the IR500 who use some of these other fringe suppliers.

17        And that's -- we're going to see that over and over again.

18   Okay.  I'm happy to tell you, I know they're going to

19   cross-examine me on this, there's all sorts of issues with the

20   data, but this is a very robust structure that we're seeing and

21   we're seeing it the first time here, number one and number two

22   and then in-house, and then some very small players.

23   Q.    Professor Shapiro, I see that Amazon is listed somewhere

24   here.  Can you just explain to the Court what that refers to in

25   this context?

1    A.    Well, so Amazon here is one of the IR500.  They're far and

2    away number one in the IR500 because they're huge in online

3    retail.  So they are one customer.  In this account, since

4    we're just counting customers, they count, like, one like

5    everybody else; but it's Amazon.com, okay, and they're

6    in-house.  They do it themselves.  That's what's listed here

7    for Amazon.

8    Q.    And there are a number of smaller firms listed here that

9    you described as the fringe.  What do you make of that fact?

10   A.    Well, this goes back to what I said before about

11   low-quality alternatives versus high-quality alternatives.

12   There are a number of choices.  People can -- you know, an

13   *Internet Retailer*, a large retailer, can look to Pluck, they

14   can look to Gigya, they can look to some of these other

15   players, and we see most of them have one out of the 500.  So

16   normally we think of firms with such small market share as

17   unlikely to be as competitively significant as firms with much

18   bigger market share.  That's why we look at market shares.

19        And, so, there's a good number here, 10 I guess, but none

20   of them gets more than three of the customers out of the 423.

21   Q.    Now, have there been any changes that have taken place

22   since you actually put together this chart?

23   A.    Yes.  I'm -- there's probably more than I've been aware

24   of, but I'm aware of Pluck losing Target to Bazaarvoice.  So

25   that would drop them down from three to two on this chart.

1          I'm aware of Viewpoints has basically exited the market.

2     I believe this .3 they had a share of Sears, that's why it's

3     .3, and that's not true anymore.  So a slight diminished role

4     there.  They were small before.

5          Now Viewpoints is out and Pluck is a little bit smaller by

6     discount.

7     **Q.**    I don't see Reevoo on this chart.  Can you explain that?

8     **A.**    Oh, yes.  So we learned later that -- so Reevoo has

9     none -- has -- we thought had none of the IR500 customers.

10    They have Skype as a customer; and it turns out since Skype is

11    a subsidiary of Microsoft, Microsoft is in the IR500, so by my

12    approach, Reevoo should be included.  And they would then get a

13    half, I believe, of a customer because Skype is a Microsoft

14    subsidiary.

15    **Q.**    Do you understand that the defendants have provided some

16    examples where customers have either chosen or considered

17    alternatives other than PowerReviews or Bazaarvoice?  How does

18    that compare to your analysis and your assessment of

19    competitive alternatives?

20    **A.**    Well, this goes back to a theme in the case, a big theme,

21    which is these are alternatives.  I -- when I look at the

22    market shares at this stage in the analysis, I look and say,

23    "These are not very attractive to most customers.  They're not

24    winning very much business."

25         They are alternatives so the -- Bazaarvoice is emphasizing

1    that they are alternatives and they have some wins, so you can

2    identify the company and say, you know, who the win is.

3        My methodology, I think the standard methodology is to

4    give weight to commercial success; and, so, these alternatives

5    by this measure, we're not done, but by this measure they look

6    to be relatively unattractive because they're not losing much

7    business.

8        You know, we're going to talk about reasons why.

9    Syndication jumps out.  Okay.  It's going to be hard to, you

10   know, build a retail network -- well, it's going to be hard to

11   get the brands, but -- and the scale.  So we'll come to that.

12   But the main point is, they're small in terms of market share.

13   PowerReviews is head and shoulders above the fringe firms.

14   **Q.**   Now, the last column in this chart is titled "Contribution

15   to HHI."  Can you explain to the Court what that is?

16   **A.**   Certainly.  So first off, HHI stands for

17   Herfindahl-Hirschman Index.  So it's the standard index of

18   market concentration.  It runs from zero to 10,000.  10,000

19   would be a monopolist.  We take -- for the monopolist we take

20   the market share of a hundred and square it.  A hundred square

21   is 10,000.  That would give us 10,000.  If we had a large

22   number of firms with very small shares, the index would be zero

23   in the limit as an extreme case; and in between we measure

24   concentration.

25       The merger guidelines put forth by the DOJ and the FTC

1    consider markets highly concentrated if they're above 2500.

2    And here the postmerger index is 4590, so it's far above that.

3        The other thing that the merger guidelines say to look at

4    is the change in the Herfindahl, that's how much more

5    concentrated the market's becoming as a result of the merger.

6    And for mergers leading to highly concentrated markets, the

7    guidelines look to see if there's an increase of more than 200.

8    Okay.  So that would be, like, a 5 percent or 10 -- two

9    10 percent firms merging would actually lead to an increase of

10   200.

11       Here we've got an increase of over 2,000.  Okay.  So I

12   doubt this is where the debate's going to be.  But if you

13   accept this market and these shares, it's very substantially an

14   increase in concentration.  We're just reporting that.

15   Q.    Could you please summarize your overall conclusions based

16   on the market shares presented in this table?

17   A.    So, yes.  So number one and number two are merging.

18   In-house is significant.  You've heard this before.  And there

19   are a number of players, but they're all very small in terms of

20   their ability to win these customers at least, IR500 customers.

21   Q.    And, Professor Shapiro, did you measure market shares in

22   the IR500 in any other way?

23   A.    Yes.  I developed an alternative measure that doesn't

24   count all the customers equally.

25   Q.    And why did you want to do that?

**A.**    So it's a little bit of a long answer, but there's a huge

variation in size between the top and the bottom of the IR500,

and the companies talk about marquee customers near the top,

big retailers.  So it's desirable to measure -- I would like to

do some sort of measure of revenues.

     Let me go back.  I said the two measures generally are

quantity and revenues.  This customer count is a quantity

measure, how many customers you win.  The other measure I would

like to develop is revenues, how much money are the companies

earning in this business.

     I couldn't do that, so I -- I developed something as a I

don't know whether to call it proxy or alternative, a variant

to try to get at that.  The basic idea being, let's see what we

can do with a measure that gives more weight to the bigger

customers and doesn't count them all equally.

**Q.**    And what did you actually do in order to count the

customers not equally?

**A.**    Okay.  So what I did was, since I have the data from the

IR500, they report -- they have an estimate of the

customer's -- the customer's online revenues.  Okay.  So for

Staples, it's something like $10 billion a year, okay, and on

down to much, much smaller groups.

     So that's a measure of size.  Okay.  It's not the ideal

one for me to use because it's too skewed at the top, but I do

know that the larger customers in terms of their own online

1    sales pay more for their ratings-and-review software.  I know

2    that from the invoice records.  So I did a metric using the

3    IR500 data where I count customers based on their online sales,

4    customer revenues.  Okay.  That's what I did with these data.

5    **Q.**   And, Savannah, can you please call up GX1063, which is

6    Shapiro Exhibit 15A?

7         Professor Shapiro, does this reflect your analysis of

8    market shares in the IR500 by customer revenues?

9    **A.**   What's the number again?

10   **Q.**   1063.

11   **A.**   Thank you.

12        (Witness examines document.)  Yes.  So this is it.  So

13   it's the same set of customers.  We're still working within the

14   IR500.  We've just weighted them differently and substantially

15   differently because Amazon goes from being one customer out of

16   500 or 400 something to being 28 percent of the online sales.

17   So they ballooned up here.  Okay.  That's just the way this

18   methodology works.  Again, it's not perfect, but we can learn

19   something from it.

20        So the firms are the same.  The thing that's changed is

21   the share column.  So let's look at that one.

22        Bazaarvoice actually hasn't changed much.  They're still

23   around 40 percent.  In-house has gone up, mostly because of

24   Amazon, okay, to around 40 in total.  That's why we broke out

25   Amazon, because they're so big.  42, I guess.  And then

1   PowerReviews has dropped down to 15.  They were 28 before.

2       The fringe players are still tiny, and actually Pluck --

3   Viewpoints is out.  Pluck is down to .1 percent instead of

4   1 percent because they lost Target.  So basically the fringe is

5   very small.  They get a couple customers, nobody that big.

6       So we're looking at 40 percent for Bazaarvoice, 42 for

7   in-house, and 15 for PowerReviews on this metric.

8           **THE COURT:**  And the 250 customers that aren't

9   reflected here, you didn't have data to support anything?

10          **THE WITNESS:**  I'm not sure what you mean by the 250.

11  We still have 423 customers out of 500.

12          **THE COURT:**  Okay.  So you're looking at the same ones.

13  I was looking at the 171, but I was looking at the --

14          **THE WITNESS:**  Let's see, the 171 is billions of

15  dollars now.

16          **THE COURT:**  Sales and not customers.

17          **THE WITNESS:**  Yeah.  So now we're measuring sales.

18  So, yeah, that, in fact, tells you when you add up all the

19  IR500, it's $171 billion in sales.

20          **THE COURT:**  Okay.

21          **THE WITNESS:**  But it corresponds if you look at the

22  other one 423.

23      Okay.  So the way I think about this is, all right, this

24  is a different metric.  It's got its problems actually because

25  it puts too much weight at the top, you know, but it's

1    informative to compare the two.

2        So Amazon we talked about.  That's Amazon.com.  Why is

3    PowerReviews 15 instead of 28?  That's, I think, worthy of

4    attention.  And the answer to that is that PowerReviews has not

5    done very well in the top 10 or 20 of the IR500 who are getting

6    a lot of the overall sales.  They do well.  I mean, what was

7    it, 119 IR500 customers they have you see on the chart

8    they're -- they are all -- you see them regularly, of course,

9    in Bazaarvoice but not so much in the top 10 or 15 or 20.

10   Staples is their standout.  Staples is their biggest customer.

11   They're number two in the IR500.  But then you don't see them

12   so much near the top and then you see PowerReviews a lot below.

13       So when you look at this metric, they still have a good --

14   obviously way bigger than anybody else other than Bazaarvoice,

15   but not as big as the 28 percent.

16       Okay.  So that's my conclusion here.  And, you know, I

17   expect cross-examination on this measurement because it's a bit

18   tricky, and we first made some mistakes and we had to fix them;

19   but -- but the bottom line, they are clearly number two.

20   Nobody else is close is not in question in my view.

21   BY MR. HOAG:

22   Q.   And what do the HHIs show when you use this market share

23   metric?

24   A.   Well, the postmerger Herfindahl, that's the 3915, that's

25   still well into the highly concentrated zone.  The change in

 1   Herfindahl is still well above the 200 level, but it's 1200,

 2   the previous one was 2200.  That reflects the fact since

 3   Bazaarvoice's share here is only 15 instead of 28, there's less

 4   action in the merger in terms of market shares.

 5       But a 40 percent plus a 15 percent merger is still in the

 6   range where the merger guidelines would say that creates a

 7   presumption of harm to competition.

 8           MR. JACOBSON:  Your Honor, just to correct the record,

 9   I think the witness meant Bazaarvoice -- PowerReviews rather

10   than Bazaarvoice in the answer --

11           THE WITNESS:  Oh, I don't doubt it.

12           MR. JACOBSON:  -- for 15 percent.

13           THE WITNESS:  Oh, PowerReviews was 15 percent.

14           THE COURT:  Right.

15           THE WITNESS:  Thank you.

16           MR. HOAG:  Your Honor, this would actually be a

17   convenient place to stop if that's all right.

18           THE COURT:  Well, for you and me both.

19           MR. HOAG:  Okay.

20           THE COURT:  Thank you, Mr. Hoag.  We'll be in recess

21   until tomorrow morning.

22           THE WITNESS:  See you tomorrow.

23           MR. HOAG:  Thank you, Your Honor.

24           MR. HUSTON:  Your Honor, before the court reporter

25   goes anywhere, there were two exhibits that I used in redirect

SHAPIRO - DIRECT / HAOG

1    of Mr. Collins that I don't think there's any objection to, but

2    I'd like to move them in.  It's GX1228 and GX1216.

3            **MR. FELDMAN:**  Do you have them right here?

4            **MR. HUSTON:**  Yes.  It's these two.

5                    (Pause in proceedings.)

6            **MR. FELDMAN:**  No objection, Your Honor.

7            **THE COURT:**  They're admitted.

8     (Plaintiff's Exhibits GX 1216 and GX1228 received in evidence)

9            **MR. HUSTON:**  Thank you.

10           **MR. FELDMAN:**  Thank you.

11           **THE COURT:**  Thank you.

12                   (Proceedings adjourned at 1:16 p.m.)

13                           ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTERS**

5            I certify that the foregoing is a correct transcript

6   from the record of proceedings in the above-entitled matter.

7

8   DATE:   Monday, September 30, 2013

9

10

11

12   _____

13       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

14

15

16   _____

17      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

18

19

20

21

22

23

24

25