**Volume 6**

**Pages 958 - 1156**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )      NO. C 13-00133 WHO
                                   )
BAZAARVOICE, INC.,                 )
                                   )
            Defendant.             )
_____   )
                            San Francisco, California
                            Tuesday, October 1, 2013

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff:

                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Golden Gate Avenue - Room 10-0101
                    P. O. Box 36046
                    San Francisco, California  94102
               BY:  **PETER K. HUSTON, ASSISTANT CHIEF**


                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Fifth Street, NW - Suite 7100
                    Washington, D.C. 20530
               BY:  **MICHAEL D. BONANNO, TRIAL ATTORNEY**
                    **ADAM T. SEVERT, TRIAL ATTORNEY**
                    **ROBERT A. LEPORE, TRIAL ATTORNEY**
                    **AARON HOAG, TRIAL ATTORNEY**
                    **LISA ANNE SCANLON, TRIAL ATTORNEY**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

```
 1   APPEARANCES:   (CONTINUED)

 2   For the Plaintiff:
                             U.S. DEPARTMENT OF JUSTICE
 3                           Antitrust Division
                             950 Pennsylvania Avenue, NW - Rm. 3214
 4                           Washington, D.C. 20530
                       BY:  DAVID I. GELFAND, DEPUTY ATTY. GENERAL
 5
     For Defendant:
 6                           WILSON, SONSINI, GOODRICH & ROSATI
                             650 Page Mill Road
 7                           Palo Alto, California  94304
                       BY:  BORIS FELDMAN, ATTORNEY AT LAW
 8                           DOMINIQUE-CHANTALE ALEPIN, ATTORNEY AT
                               LAW
 9                           DYLAN J. LIDDIARD, ATTORNEY AT LAW

10                           WILSON, SONSINI, GOODRICH & ROSATI
                             1700 K Street, NW - 5th Floor
11                           Washington, D.C.  20006
                       BY:  SCOTT A. SHER, ATTORNEY AT LAW
12                           ANDREA A. MURINO, ATTORNEY AT LAW
                             FRANKLIN RUBINSTEIN, ATTORNEY AT LAW
13
                             WILSON, SONSINI, GOODRICH & ROSATI
14                           1301 Avenue of the Americas - 40th Fl.
                             New York, New York 10019
15                     BY:  CHUL PAK, MEMBER OF FIRM
                             JONATHAN M. JACOBSON, MEMBER OF FIRM
16                           DANIEL P. WEICK, ATTORNEY AT LAW

17                           BAZAARVOICE, INC.
                             3900 N. Capital of Texas Highway
18                             Suite 300
                             Austin, Texas  78746
19                     BY:  BRYAN BARKSDALE, GENERAL COUNSEL
                             KIN GILL, DEPUTY GENERAL COUNSEL
20

21

22

23

24

25
```

### I N D E X

Tuesday, October 1, 2013

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **SHAPIRO, CARL** | | |
| (SWORN) | 963 | 6 |
| Direct Examination resumed by Mr. Hoag | 963 | 6 |
| Cross-Examination by Mr. Jacobson | 1025 | 6 |
| Redirect Examination by Mr. Hoag | 1098 | 6 |
| Recross Examination by Mr. Jacobson | 1100 | 6 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **GODFREY, CURTIS ALAN** | | |
| (SWORN) | 1104 | 6 |
| Direct Examination by Mr. Pak | 1104 | 6 |
| Cross Examination by Mr. Bonanno | 1137 | 6 |
| Redirect Examination by Mr. Pak | 1154 | 6 |

### E X H I B I T S

| **PLAINTIFF'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| GX222 | | 1103 | 6 |
| GX1038 | | 1025 | 6 |
| GX1044 | | 1025 | 6 |
| GX1047 | | 1025 | 6 |
| GX1052 | | 1025 | 6 |
| GX1053 | | 1025 | 6 |
| GX1057 | | 1025 | 6 |
| GX1059 | | 1025 | 6 |
| GX1062 | | 1025 | 6 |
| GX1063 | | 1025 | 6 |

**I N D E X**

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| GX1064 | | 1025 | 6 |
| GX1074 | | 1025 | 6 |
| GX1078 | | 1025 | 6 |
| GX1148 | | 1103 | 6 |
| GX1231 | 1140 | | 6 |

| | |
|---|---|
1 | **Tuesday - October 1, 2013**                                                   **8:00 a.m.**

2                       **P R O C E E D I N G S**

3                            **---000---**

4     **THE COURT:**  Good morning, everybody.  Please be

5 seated.

6    Mr. Huston.

7     **MR. HUSTON:**  Good morning, Your Honor.

8    Just wanted to point out to the Court that we were

9 compelled to file a motion this morning, due to the government

10 shutdown issue, requesting a stay.  But it also notes that if

11 that motion were to be denied, we would take that as an order

12 to continue trial.

13    We would certainly comply with the Court's order, and the

14 staff on this case would be excepted from the stay, and we

15 would continue on.

16    So I just wanted to point that out to the Court.  And it's

17 certainly not my habit to rush the Court on anything, but this

18 is just something that probably before the end of the day we're

19 going to need some sort of judicial action on.

20     **THE COURT:**  It's denied.

21     **MR. HUSTON:**  Thank you.

22     **THE COURT:**  But thank you very much, Mr. Huston.

23     **MR. HUSTON:**  Thank you, Your Honor.

24     **MR. HOAG:**  Good morning, Your Honor.

25     **THE COURT:**  Mr. Hoag.

1          **MR. HOAG:**  The United States recalls Carl Shapiro to

2     the stand.

3                          **CARL SHAPIRO**,

4     called as a witness for the Plaintiff, having been previously

5     duly sworn, testified further as follows:

6                    **DIRECT EXAMINATION RESUMED**

7     **BY MR. HOAG**

8     **Q.**   Professor Shapiro, before we finished up yesterday

9     afternoon we were talking about the analysis you did about

10    market shares in the IR500.  Can you just recap, very briefly,

11    what you found when you looked at market shares in the IR500.

12    **A.**   Yes.

13          **THE WITNESS:**  Good morning.

14          **THE COURT:**  Good morning.

15          **THE WITNESS:**  So we had done this two ways:  One was

16    the customer count measure.  And then, I think, we were well

17    into the second measure which was, basically, how much online

18    commerce is handled through the platforms of the different

19    providers.  We call that customer revenue.  But it's a

20    measure -- that measure of significance.

21          And what I found there was that PowerReviews' share was

22    somewhat lower, 15 percent rather than 28 percent.

23    Twenty-eight percent in the count, 15 percent on the revenue

24    measure.  It reflected their relative lack of success in

25    comparison with Bazaarvoice at the top end -- I'm sorry -- of

1    the IR500.

2         I know we got to that point.

3    **BY MR. HOAG**

4    **Q.**   Yeah, I think we made it all the way through the actual

5    discussion of the chart.  That's fine.  I wanted to orient

6    everyone where we were.

7         Why was it that you thought that the IR500 was a useful

8    source of market share information?

9    **A.**   Well, this does capture the bulk of online retail

10   revenues.  And so that was the main starting point.  The -- the

11   companies also use it.  I think we did talk about that.

12        And this measure of customer revenues is going to be very

13   important on the brand side because that's what the brands care

14   about is how much commerce is going through the different

15   platforms.

16   **Q.**   Now, Professor Shapiro, I think you mentioned during your

17   testimony yesterday that your market share numbers have changed

18   from your initial report.  Why is that?

19   **A.**   So when -- how did this go?  So when Dr. Shehadeh filed

20   his rebuttal report he pointed out that we had missed a data

21   field in the Bazaarvoice data.  And, as a result, we had

22   used -- to keep track of which kinds were current, we had used

23   the parent company, which is how Bazaarvoice -- what they use

24   to report to the SEC.  Elsewhere in the data was more

25   information about subsidiaries.

1    So we had some splits done incorrectly or out of date,

2  really, because we had not used that field.  So when we -- when

3  I saw that, we filed -- we adjusted the numbers accordingly,

4  after his supplemental report was filed.  Excuse me.  After his

5  rebuttal report was filed, we filed adjusted numbers.

6  **Q.**   Were there other examples of corrections that you needed

7  to make in the data?

8  **A.**   Well, most of it -- most of the corrections were this one

9  I described with the subsidiaries.

10    There were a couple of cases where the Bazaarvoice data we

11  had been given wasn't quite accurate and we had -- so we

12  were -- we discovered that as well.

13    This didn't make much difference at all.  In particular,

14  for PowerReviews' share, in fact, when we made all the

15  corrections it went up slightly from 14 to 15.  The number you

16  saw was 15.  It had actually been 14 before.  Went up slightly.

17  **Q.**   And did this alter your basic methodology in any way?

18  **A.**   So, no, I did not change the methodology.  There was no

19  reason to.  I did make -- it was basically a correction with

20  updated data.  Nor did it have any material effect on my

21  conclusions.  The same market structure is coming through

22  clearly.  The PowerReviews was number two, and nobody close

23  behind.

24  **Q.**   Now, Professor Shapiro, Bazaarvoice argues that these

25  errors show that your market shares are fundamentally

1   unreliable.  How would you respond to that argument?

2   **A.**   Well, I don't think it's true, I guess.

3        I'm not sure -- the -- I think the issue here with this

4   measurement is, as I've said before, since some of the large,

5   the top 10 or 20, excuse me, Internet retailers in the IR500

6   are quite large, if you look at that -- like, Staples would be

7   6 percent of the overall total, okay.  So if -- if there's an

8   adjustment in the assignment of some of those top companies, it

9   will move the percentages around 1 or 2 because they're so big.

10  Apple is also big up there.

11       So I don't -- that doesn't, to me, undermine the basic

12  methodology.  It's still fine.  I think one, in interpreting

13  the numbers, wants to be aware of that sensitivity.

14       And -- and the other piece is splitting -- there's an

15  issue about splitting -- so I split -- when there was a

16  subsidiary used one company and the parent or another

17  subsidiary used the other, I just split it equally.  That's

18  kind of a rough guide.  It won't be accurate in a number of

19  cases, but on -- but I think the possible errors there are

20  limited.

21       So there are a number of issues here, but I'm confident in

22  the methodology.

23  **Q.**   And, Professor Shapiro, do the shares in the IR500

24  indicate competitive significance to the brand customers?

25  **A.**   Well, yes, they do.

1          So, as I mentioned a moment ago, the -- one of the things

2     I like about this measure, while it doesn't measure

3     Bazaarvoice's and PowerReviews' revenues because it's too

4     stilted towards the largest retailers, it does indicate

5     significance to the brands because they care about how much

6     commerce is taking place.

7          So -- and, as well, since the *Internet Retailer 500* does

8     not explicitly include brands, unless they happen to be

9     retailers, as well, we're using -- I see the IR500 as

10    indicating how important the different platforms are to the

11    brands while, admittedly, not actually measuring many of the

12    brands.

13    **Q.**   And have you seen evidence in Bazaarvoice's documents or

14    statements that reflect the importance to them of the retailers

15    in building their brand business?

16    **A.**   Well, it's all over their documents in terms of their

17    strategy.

18         And I think Mr. Hurt and Mr. Collins have emphasized

19    that -- that that was their fundamental network strategy, was

20    to get a large retail presence.  And then they're looking to

21    the brands as their -- their primary or increasing revenue

22    source and customers.  But the retailers are what it's built

23    upon since that's where the transactions are largely taking

24    place.

25    **Q.**   Professor Shapiro, do your market shares measure the share

1    of ratings and reviews providers to firms other than brands and

2    retailers?

3    **A.**    Uhm, what, the IR500 shares?

4    **Q.**    Yes.

5    **A.**    Okay, no.  So it's -- it's just retailers and brands that

6    are appearing in that list.

7    **Q.**    And does that affect the usefulness of your market shares?

8    **A.**    No.  I think it's accurate measure in this market.  The

9    market -- the customers are retailers and manufacturers.

10        I woke up in the middle of the night fearing I may have

11    misspoke once on that yesterday.

12        But it's -- the manufacturers and the retailers are the

13    customers in the United States in this market.  And so it's --

14    it's a good measure for that market.

15    **Q.**    And do the brands and the retailers account for a large

16    portion of Bazaarvoice's sales?

17    **A.**    Yes.

18        I think we heard from -- I'm not sure who it was, maybe

19    Mr. Hurt, saying 88 percent of the Bazaarvoice revenues were

20    coming from those customers.

21        And I think we heard from Mr. Luedtke that was a similar

22    number for PowerReviews.

23    **Q.**    And do your market shares in the IR500 measure sales of

24    product ratings and reviews platforms to smaller retailers?

25    **A.**    So, no.

1    The IR500 goes down, if I remember, to companies that have

2    about $15 million of annual sales.  But below that are not

3    measured in this, in this cut, yeah.

4    **Q.**  And why is that not an issue?

5    **A.**  Well, the -- there is also the IR1000.  I don't know if

6    you've heard about that, but they're the next 500 firms as

7    well.  And that goes down to a much smaller level of sales.  I

8    think something like a couple hundred thousand dollars of

9    sales.  At the bottom of that list.

10   The second 500 make up only 2 percent of the total of all

11   1,000.  Or, to put it differently, the top 500 make up

12   98 percent of the total.  So we're picking up, really, the bulk

13   of the sales here in the top 500.

14   So that just reflects -- there's a very long tail,

15   thousands of very small retailers, online retailers.  But

16   there's not that much commerce going on in total down in that

17   tail.

18   **Q.**  Now, Professor Shapiro, as we discussed before, when we

19   were talking about market definition, the defendant has

20   criticized your analysis for not attributing an accounting for

21   supply side substitutability.

22   Do you attribute market shares in your calculations to

23   firms that do not currently sell product ratings and reviews in

24   the United States?

25   **A.**  No, I do not.

1   **Q.**   And why not?

2   **A.**   Okay.  So, now, I promised Your Honor that we would come

3   back to supply side substitution twice.  This is the first of

4   the two.

5       So, now, at this point, it's appropriate to ask:  Are

6   there companies not selling in the relevant market who could

7   very easily and quickly do so in a way that we could assign

8   some share to them?  If so, we would do that and adjust the

9   shares.

10      Those are, in the merger guidelines, called rapid

11  entrants.  They could get in very quickly and easily, but they

12  are not selling the product right now.  So this is the stage to

13  look for that.

14  **Q.**   Can you give an example of the type of case where it might

15  be actually appropriate to attribute market shares to a rapid

16  entrant?

17  **A.**   Sure.  So in my Vermont heating oil example -- and these

18  do come up.  Not exactly that, but suppose you had a merger,

19  the only two firms delivering heating oil to customers in

20  Vermont, they merge.  It looks like a hundred percent market

21  share.  And that's a relevant market, Vermont customers there.

22      But, now, you look and you say:  Could they really raise

23  price, or would somebody else who's not delivering oil to

24  Vermont come in and do so?

25      So you see another firm that's delivering heating oil to

1    New Hampshire residents, and you look at it and you determine,

2    at no extra cost they could tell the trucks to drive -- turn

3    right instead of left and deliver to Vermont.  They would be

4    rapid entrants.  Okay.  You'd have to check that they had to do

5    marketing and find out customers but, probably, that was --

6    that was going to qualify as a rapid entrant.

7         And then you would look at how much divertible capacity

8    those New Hampshire companies have, and attribute some market

9    share to them.

10        If you thought all their capacity could easily be

11   diverted, you would basically be equivalent to broadening the

12   market to include Vermont and New Hampshire, okay.  But you

13   do -- and then ask the question:  Do they have divertible

14   capacity very easily?

15        So that type of supply side substitution tied to capacity,

16   something measurable, that would be the case where you would do

17   it.

18   Q.   And in the case of product ratings and reviews did you

19   find that that type of divertible capacity exists?

20   A.   So, no, I don't think it applies here, okay.

21        First, we don't really have a notion of capacity.  It

22   doesn't apply in this industry.  So there wouldn't really be a

23   good way to assign shares to somebody who's selling another

24   product that could come in here.

25        We're going to revisit this at the entry as opposed -- the

1    full-scale entry, if you will, that's coming later.  So, no, I

2    didn't think that applied.

3         The other issue is the whole notion here is somebody who

4    could just tell the trucks to turn in a different direction.

5    They don't have to invest very much money or do much of

6    anything.

7         And I just don't think that applies here to somebody who's

8    not in this market.  To develop a product and achieve

9    commercial success it's real entry.  It requires some

10   investment, some risk.

11        And we're going to consider that, but I don't think it's

12   so easy and fast and measurable that it's appropriate to do at

13   this stage.

14   Q.   Now, Professor Shapiro, Counsel for Bazaarvoice, and

15   Dr. Shehadeh, have presented a different way of measuring

16   market shares, and criticized your analysis for failing to

17   include in the market customers who do not actually currently

18   purchase the relevant product but might do so in the future.

19        How do you respond to that criticism?

20   A.   I just don't think that's a valid methodology for

21   measuring market shares.

22   Q.   And why not?

23   A.   So let me give an example, if I may.  I think it's best

24   done that way.

25        So suppose we had a merger of the only two airlines flying

1    people from San Francisco to Los Angeles.  And we checked and

2    we found that airline travel was a relevant market.  If fares

3    went up, some people would shift to driving, but not very many.

4         Now, we go to measure shares and we see they have

5    60 percent and 40 percent shares, measuring actual passengers

6    flown.  That would be the correct way to do it.  Maybe revenues

7    or shares.  Let's just say passengers.  60/40.

8         Now, according to this methodology, you would look at

9    prospective customers who don't buy the product yet but might,

10   are considered prospects, workable accounts.

11        Well, in my example here, the airlines say, well, we

12   consider all the people in San Francisco to be potential

13   customers here.  We advertise to them.  We market in this area.

14   So if we did that, we'd say we should count all the people in

15   San Francisco.

16        Suppose 10 percent of the people in San Francisco actually

17   fly to L.A. in a given year.  If we do that, the market shares

18   would look like 6 percent and 4 percent, okay.  And then you

19   would say, oh, 6 percent and 4 percent, 90 percent of the

20   people don't -- don't fly yet, but they might.  So we deflate

21   the shares to 6 and 4 percent.  Those are small shares.  We

22   check the merger guidelines or whatever, no problem.  Clearly

23   an error.

24        Okay.  So -- and, again, I think it's pretty plain, if you

25   go back to what we're trying to do with market shares, we're

1    trying to measure commercial success.  And 6 and 4 percent

2    don't measure the commercial success there.  Sixty and 40 are

3    the right numbers.

4        It's the same thing here.

5    **Q.**    Have you ever seen this methodology of calculating market

6    shares used in merger analysis before?

7    **A.**    No, I have not.

8    **Q.**    And have you seen it in economic publications in the field

9    about antitrust or competition?

10   **A.**    No, I don't think it would pass the referees in the

11   peer-reviewed journals.

12   **Q.**    Thank you, sir.

13       Now, Professor Shapiro, yesterday afternoon you mentioned,

14   at the outset of your testimony, in discussing market shares

15   that you had performed a number of checks on your IR500 market

16   shares, or a number of tests.

17       Why did you do that?

18   **A.**    Well, I realized the IR500 is not a perfect measure and so

19   I wanted to do robustness.  Basically, see if I'm missing

20   something.

21       And what I'm really looking for is, since I have number

22   one, number two, in-house fringe, I'm looking, is there someone

23   significant, another player that I'm missing?

24       Okay.  It sure doesn't look that way from any -- from all

25   the evidence so far, but let's look.  And, also, let's see

1  whether the market shares we're getting in the IR500, are those

2  roughly right or is there some reason to think they're off.

3  **Q.**   And what did you find when you did those checks?

4  **A.**   Well, several checks all confirmed the same market

5  structure.

6  **Q.**   And what other specific tests did you actually conduct?

7  **A.**   Well, one check was to look at the Fortune 500 set of

8  companies and to see what their product ratings and reviews

9  providers were, who they were using.

10  **Q.**   And why did you think that would be informative?

11  **A.**   So the Fortune 500, again, it's a -- I didn't pick it.

12  It's a standard set of companies, large companies, of course.

13  And it's not restricted to retailers or online retailers, so we

14  can pick up a number of brands this way.

15       Now, we know doing this we're going to pick up a bunch of

16  companies that don't have any interest in online retail, and so

17  don't -- won't use ratings and reviews.  But we'll look at the

18  ones who do, and measure shares.

19       **MR. HOAG:**   Savannah, can you please pull up Government

20  Exhibit 1078.

21  **BY MR. HOAG**

22  **Q.**   Professor Shapiro, does this represent your analysis of

23  market shares in the Fortune 500?

24  **A.**   Yes, that's right.

25  **Q.**   And what did you find?

1   **A.**   So this is the -- we're back to customer counts, and --

2   2012.  So you can see, I would first direct the Court's

3   attention to the total there, 149 out of the 500 are using

4   products ratings and review.  It's not surprising at all that

5   it's a lower share than in the IR500.  As I said, many of these

6   companies have nothing do with -- like ExxonMobil, they don't

7   need ratings and reviews.

8       But among those -- and it's still a good number -- we see

9   the market shares, that's the next column to look at, the share

10  column.  And we see Bazaarvoice 67; PowerReviews 16; in-house

11  4.  And we do have Pluck with 2 and a half customers, so

12  they're showing up.  Lithium, and so forth.  And Viewpoints.

13      So this is clearly confirming the basic structure.  And I

14  think we can understand Bazaarvoice's shares is higher here

15  because they do so well at the high end.

16  **Q.**   Professor Shapiro, a moment ago you mentioned that you

17  also looked at *Internet Retailer 1000* --

18  **A.**   Yes.

19  **Q.**   -- as a test on market shares.  What did you find when you

20  did that?

21  **A.**   So, again, in looking to see am I missing anybody

22  significant, looked at the *Internet Retailer 1000* to see who

23  was providing product ratings and reviews there.  And we found

24  no firm, other than the ones we've already identified, served

25  more than ten of those extra 500.  And several served five or

1    so.

2        So there are a few players that appear for these smaller

3    retailers, but nobody is jumping out as being very large in

4    that category, who would be kind of in the next tier down.  No

5    commercial PRR provider.

6    **Q.**   Now, Professor Shapiro, did you do any analysis to see

7    whether the competitors that you have mentioned so far, how

8    many customers they have as a total outside the IR500?

9    **A.**   Right.  So the other way to look for this was to ask -- as

10   I said at the beginning, we want to have the most up-to-date

11   information.

12       So these data sources are, typically, 2012 here.  I

13   decided, why don't we just look through whatever we can find in

14   the record of the case, to see what other competitors are

15   cropping up and what they're saying about how they're doing,

16   okay.  And so we tabulated or compiled that information as

17   well.

18   **Q.**   Now, Professor Shapiro, can you please turn to GX1064 in

19   your binder.

20       **MR. HOAG:**  And, Your Honor, I'll note, this contains

21   confidential information.  And we aren't going to publish it to

22   the gallery, so we will ask Professor Shapiro to discuss it

23   generally, which I think he will be able to do.

24       **THE COURT:**  Okay.

25       **MR. HOAG:**  It's 1064.

```
 1              THE WITNESS:  Are you there?

 2              THE COURT:  Yes.

 3    BY MR. HOAG

 4    Q.    Professor Shapiro, without disclosing any of the specific

 5    numbers here, what did your analysis of the number of customers

 6    of these other competitors have show?

 7    A.    Okay.  So the middle rows, the middle grouping here are

 8    the other commercial providers that -- that have been

 9    identified and emphasized by Bazaarvoice and their expert.

10          So for each of the companies you can see over in the

11    right-hand columns I've basically repeated the information we

12    have about their IR500 success, or lack thereof mostly.

13          And then the column in the middle counts all of their

14    customers.  So this is now, in response to the question looking

15    outside the IR500, counts all their customers.  And the sources

16    here are generally deposition testimony from the

17    representatives of these companies.

18    Q.    Professor Shapiro, were there any other sources of market

19    share information that you turned to in your analysis in this

20    case?

21    A.    Well, I want to finish on this, if I may.

22    Q.    Apologize.

23              MR. JACOBSON:  Your Honor, I object that the witness

24    is leading the counsel.

25          (Laughter)
```

1      THE COURT:  Overruled, but thank you.

2      THE WITNESS:  So these are relatively small numbers,

3  particularly compared to the merging, to Bazaarvoice and

4  PowerReviews.

5      I would also note that the company there with the largest

6  number -- I won't identify them because I'm told this is

7  confidential -- has in total very low total revenues.  This is

8  really a -- this is more reflective of sales at the lower end

9  of the market, more of the what I think Mr. Collins called the

10 credit card swipe self-serve, more like the PowerReviews

11 Express product, not really directly relevant to the Enterprise

12 customers that we're focusing on.

13 BY MR. HOAG

14 Q.   Would you like to add anything else on this table?

15 A.   No, I don't want to elicit another scathing objection.

16      THE COURT:  Don't go too far, Mr. Hoag.

17      MR. HOAG:  Thank you, Your Honor.

18 BY MR. HOAG

19 Q.   Were there other sources of market share information that

20 you turned to, Professor Shapiro?

21 A.   Yes.  So we also -- I was able to use a sample that was

22 provided by Dr. Shehadeh, Bazaarvoice's economic expert, to

23 calculate market shares using his sample.

24 Q.   And why did you think that would be helpful?

25 A.   So let me first indicate what that was, again.  I think

1    it's come up, but only briefly.

2         So what Dr. Shehadeh did was he looked at some 30,000

3    workable accounts in the Bazaarvoice database.  So this would

4    be actual and prospective customers.  And then he took a sample

5    of 1,000 from those.

6         And of those he then measured -- looked at what those

7    companies were doing.  Actually, for product ratings and

8    reviews and some other social commerce tools.

9         So working with his sample of these customers, I was able

10   to measure, of those customers who were using product ratings

11   and review, who they were using.  The measure of market share.

12        And this, I think, is highly desirable because it's a --

13   it reflects a large group of companies; 30,000.  It's not

14   restricted to brands or manufacture -- to any particular

15   category; large, small, retailer, manufacturer.  And so it's a

16   good additional check on market shares.

17        **MR. HOAG:**  Savannah, can you please call up GX1057.

18   **BY MR. HOAG**

19   **Q.**   Professor Shapiro, does this reflect the results of your

20   analysis of Dr. Shehadeh's sample?

21   **A.**   Yes, that's correct.

22        So let's walk through this one.  Again, I'll start with

23   the total, 119.  Remember this was a sample out of a thousand,

24   but many of these companies don't use products rating and

25   review.

1    So we found 119 did.  And you can see here it says these

2    are prospective and existing accounts in Bazaarvoice's

3    Salesforce.com data, June 2013.  So the other thing I like

4    about this is it's more up to date than some of the other

5    measures.

6         So -- so now we count the customers and we see the shares

7    on the right-hand column.  And in-house is higher here than

8    some of the other measures.  It's 40 percent.  Bazaarvoice, 38.

9    PowerReviews, 21.  Pluck and Gigya around a percent.

10        So very consistent with the picture we're seeing from the

11   other measures.

12   **Q.**   And are these results the same as the results that

13   Dr. Shehadeh reported when analyzing this same universe of

14   firms?

15   **A.**   No.

16        They're very different than the shares -- I'll put that in

17   quotes -- that he calculated using the same data set.

18   **Q.**   And what accounts for those differences?

19   **A.**   Well, it's the difference in methodology that we talked

20   about before, that he is looking at the share of customers

21   using product ratings and review, including many customers who

22   don't use the product.  So, naturally, that lowers the shares

23   of both companies quite substantially in this case.

24        And that's akin to my example with the airlines of

25   deflating their shares improperly.

1  Q.   What was the geographic scope of the customers that you

2  included in your market share calculations?

3  A.   So the -- one of the reasons this was trimmed down from a

4  thousand to 119 is I took out the customers -- well, I

5  restricted attention to manufacturers and retailers in the

6  United States, the customers in the relevant market.  And

7  Dr. Shehadeh did not do that.

8  Q.   And why did you do that?

9  A.   That's the relevant market.  That's what we're trying to

10  measure.  So it's what I did.

11  Q.   Professor Shapiro, what points do you draw from this body

12  of work as a whole, on market shares, that inform your

13  evaluation of the competitive effects of the transaction?

14  A.   So -- I'm sorry.  So we looked at it a number of different

15  ways.

16       The number one, number two merging in-house as a

17  significant -- choice that a significant number of customers

18  make, and then a few -- some small fringe players, that

19  structure is very robust.  And that's why I said at the

20  beginning, I'm highly confident that that is the accurate read

21  in this market.  Then the question is:  What do we make of that

22  at this stage?

23       So I do think that creates a presumption.  Makes me think

24  it likely that there will be some competitive concerns at least

25  before we come to entry.  But just based on the market

SHAPIRO - DIRECT / HOAG

1    structure, it's worrisome to have this merger.

2        Now we've got to go on to the other stages, but at this

3    stage it raises a flag.

4    **Q.**   And what is the next stage in your analysis of the

5    transaction?

6    **A.**   So now we move on to competitive effects.  That is looking

7    at the actual rough and tumble of how the firms compete.

8    We've -- we haven't really gotten into that.  We've just been

9    measuring success so far.

10   **Q.**   And what efforts did you undertake to measure whether the

11   market shares that you've been talking about actually reflect

12   the level of competition in the market itself?

13   **A.**   So back in the introduction I talked about how economists

14   like to look at win/loss data, the way the companies keep track

15   of who they're competing against for accounts.  So we're able

16   to do that here using two different data sources.

17   **Q.**   And what were the two different data sources that you

18   looked at?

19   **A.**   So one is sales opportunities.  I should say both data

20   sources are on the Bazaarvoice side.  One is their sales

21   opportunities, where they're tracking leads and competitors in

22   that context.  The other is these How The Deal Was Done emails.

23       When they land an account, there's an email sent out.  I

24   think Mr. Hurt talked about this as well.  And some of those

25   give information about competitors.

1              **MR. HOAG:**  Savannah, can you please call up GX1044.

2    **BY MR. HOAG**

3    **Q.**   Professor Shapiro, I would like to start with the

4    Salesforce data that you analyzed.

5          Does this table reflect your analysis of the Salesforce

6    Database?

7    **A.**   Yes.

8    **Q.**   And what did you do to drive these figures?

9    **A.**   So we looked over a number of years, actually the scope of

10   seven years.  And we looked at this opportunities database.

11         And then we restricted attention to what it says here,

12   "Core Ratings and Review Products Only."  Okay.  So we're

13   trying to focus on competition in the relevant market.

14         And then we counted -- then we looked at -- some fraction

15   of those opportunities lists competitors.  And it's a

16   relatively small fraction, but we still end up with 480 in

17   total here.  That's the total at the bottom of the chart.

18         So we have 480 sales opportunities where the database

19   indicates one or more competitors for that opportunity.  And

20   that's what we're counting.

21   **Q.**   And what did you find when you counted the competitors

22   that show up in the Salesforce Database?

23   **A.**   So that's what the chart is showing.

24         I should be clear for the Court, the frequencies here that

25   we're about to talk about add up to more than a hundred percent

 1   because in some opportunities more than one competitor is

 2   listed.

 3       Okay.  What we're seeing here then -- so the PowerReviews

 4   75 percent figure, there on the first row, that's saying that

 5   in 75 percent of these opportunities where a competitor was

 6   listed PowerReviews appeared.  Okay.  Far and away the leading

 7   one.

 8       Internal build is 18 percent.  So, again, clearly, the

 9   second alternative or the other main alternative, let's call

10   it.

11       And then we have a relatively small number of appearances

12   for several of these other firms that we've heard about, Pluck,

13   Viewpoints, who's now exited the market, et cetera.

14       There is a group at the bottom, this "other."  So we don't

15   know who that is but it's recorded.

16   Q.  And, Professor Shapiro, you mentioned a moment ago that in

17   the Salesforce Database for every competitive -- that is, every

18   sales opportunity the competitor field isn't always filled out?

19   A.  Yes.

20   Q.  Does that affect the usefulness of this data?

21   A.  So, no, I don't think so.  So, as I said, there's still a

22   good sample here.  480 is plenty to have some confidence.

23       Since there are a lot of opportunities where there's no

24   competitor listed, it's -- it's important to me -- or let me

25   put it differently.  I have no reason to believe there's any

1   bias, that is, any selection bias in terms of the cases where

2   competitors were listed or not listed, okay.  So -- so that --

3   in that case, the fact that there are many, many opportunities

4   that are blank in this respect doesn't really matter.

5   **Q.**   In turning to the How The Deal Was Done emails, can you

6   please explain to the Court what you did to analyze those.

7   **A.**   Certainly.  So -- so we -- we took all these emails and

8   then we looked through them to identify where competitors were

9   mentioned, and we counted them up.

10          **MR. HOAG:**  Savannah, can you please call up GX1047.

11  **BY MR. HOAG**

12  **Q.**   Professor Shapiro, does this reflect the results of your

13  analysis of How The Deal Was Done emails?

14  **A.**   Yes, this is it.

15          So let me walk the Court through this.  So I think I would

16  start with the total competitor count.  So there are 143

17  mentions of competitors in these emails.  PowerReviews is 114

18  so it's, you know, a very large share there, more than

19  75 percent.  In-house is the next sizable slice.  And then

20  we'll get a sprinkling of other players appearing with much

21  lower frequency of the same picture.

22          I will just note, this is covering about a four-year

23  period, 2008 to 2012.  To the middle of 2012, that is.

24          Okay.  The other last thing I'd say, there are 131 total

25  deals here, and there are 143 competitor counts because, again,

1    some of them have more than one competitor listed.

2    **Q.**   Now, Professor Shapiro, you have mentioned a number of the

3    competitors who are listed in these two win/loss data sources,

4    but I haven't heard you mention Amazon Webstore.  Is that

5    right?

6    **A.**   That's true.

7    **Q.**   And why is that?

8    **A.**   So Amazon Webstore is not appearing in either of these

9    databases -- the studies I just did and reported to you.

10   They're not showing up.  And that's consistent with things

11   we've heard and, I think, you've heard.

12       I think Mr. Luedtke said PowerReviews was not running into

13   them, seeing Amazon Webstore.  And I've seen emails on the

14   Bazaarvoice side saying it was very rare.  Or the person wrote,

15   I haven't seen that; if it happens it's very rare.

16       And the reason is that Amazon Webstore, it's an eCommerce

17   solution, but it's for smaller -- it's really for smaller

18   retailers, and that's how it gets used.  And they do have a

19   ratings and reviews capability as part of their Webstore, but

20   it's not something that is used by the large retailers in the

21   IR500.  And these competitive fields we're seeing they're not

22   showing up.

23   **Q.**   Professor Shapiro, what conclusions do you draw from this

24   win/loss data that you analyze, taken as a whole, alongside the

25   market share data that you presented earlier?

1    **A.**   So this is strong confirmation that the two companies were

2    the primary competitors.  We've seen that in the emails.  I

3    don't think it's disputed, in fact.

4         But we can just see that in the data -- and it's exactly

5    what we look for in terms of these competitive effects -- the

6    head-to-head competition between the two.  So it confirms that.

7    **Q.**   Does that mean that we should expect to see customers

8    switching frequently between Bazaarvoice and PowerReviews?

9    **A.**   No, we don't see a lot of switching.  In some markets,

10   customers are switching back and forth a lot, and that's

11   competition plays out that way.

12        In this market, that's not what happens because customers

13   have switching costs.  And so, instead, this competition --

14   first, it's for getting new customers.  So during this period,

15   remember, more and more of the IR500 customers are adopting

16   product ratings and reviews.  We saw that right at the

17   beginning of my testimony.  And then once they've adopted,

18   they're very hard to shift.  They rarely move.  We get small

19   number of switches.

20        But I really want to emphasize for the Court, that's not

21   the good metric of what's going on with competition.  The

22   metric is how often are they trying to win each other's

23   customers, bidding, providing leverage for the customers.

24        So that's kind of a key thing to keep in mind here.  When

25   Bazaarvoice is trying to win a PowerReviews customer, they're

1   giving that customer leverage.  Most of the time the customer

2   will stay with PowerReviews, will get a better deal because

3   they have a hungry competitor trying to win the customer away.

4        So we don't see a lot of switching.  But the unilateral

5   effects analysis does not rely on that, and I wouldn't expect

6   it here.

7   **Q.**   We talked a lot about the quantitative studies that you've

8   done of the degree of competition between PowerReviews and

9   Bazaarvoice.  Did you also look to other sources of information

10  about that level of competition?

11  **A.**   Well, yes.  So we certainly have a lot of documents that

12  the companies -- how they described competition, identifying

13  their primary competitor.  That whole set of documents supports

14  this view.

15       Like I said, I don't think it's disputed -- we're

16  measuring here through the time of the merger, so I think

17  through that period, the several years leading up to the

18  merger, the quantitative and the qualitative evidence, point in

19  the same direction pretty clearly.

20  **Q.**   Now, Bazaarvoice has argued that PowerReviews changed its

21  sales strategy to avoid competing with Bazaarvoice.

22       Did you look into this?

23  **A.**   I did.

24  **Q.**   And what did you find?

25  **A.**   I don't see that happening to a significant degree.  There

1    were some changes in strategy, but none that would call into

2    question the basic analysis and conclusions here.

3        So let me give a few pieces of that.  First, Mr. Luedtke

4    testified that PowerReviews continued to compete against

5    Bazaarvoice right up until the time of the merger.  So we know

6    that.  I also am able to look at the data here.

7        Now, on the PowerReviews side, in the opportunities they

8    were seeking, and I can see that they were continuing to open

9    sales opportunities and seek sales opportunities in the same --

10   among the IR500, and including sales opportunities that were

11   competitive with Bazaarvoice right up through the second

12   quarter of 2012.  Okay.  We just see that activity ongoing.  So

13   that's a second piece that's quantitative.

14       I would say there was a somewhat higher level of that

15   activity at PowerReviews in 2011, and we've heard about that.

16   And so there was a -- some decline in the first half of 2012,

17   compared with the -- middle of 2011, but it was still

18   substantial.

19       That is the PowerReviews competition, as measured through

20   their opportunities against Bazaarvoice, remained quite

21   substantial at all levels of the IR500, all tiers, if you will,

22   right up through the second quarter of 2012.

23       The other thing that I noticed, looking into this was,

24   after the companies merged they -- as you would expect, they're

25   trying to figure out how to handle their sales teams

1    afterwards, and they -- they identified a good number of

2    prospects that they were both pursuing, common prospects.

3         And, in fact, the PowerReviews people, as I recall, said

4    they spent a decent chunk of their time trying to go after

5    Bazaarvoice customers at that time, customers who were also

6    Bazaarvoice customers or prospects.

7         So, yes, there's some shift, but I don't think it's close

8    to the situation where the companies had parted -- you know,

9    had separated and gone off into different spheres, okay.

10        And how could you have that here, really?  They are two

11   competitors in this market, and Bazaarvoice is -- we know they

12   are going after the PowerReviews retailers to continue to build

13   their retailer base.

14        So I think there were some shifts, but they're still their

15   primary competitors right up to the merger.

16   **Q.**   And given the competition and all the evidence you've

17   described of competition between PowerReviews and Bazaarvoice,

18   what conclusions are you able to draw, as an economist, about

19   the likely effect of Bazaarvoice's acquisition of PowerReviews?

20   **A.**   So -- so at this stage, it looks like there's going to be

21   significant unilateral effects.  And that is going to lead to

22   various harms to the customers, okay, because the loss -- the

23   elimination of that direct head-to-head competition.

24        And that's really the next part of the unilateral effects

25   is to try to understand the nature of those harms resulting.

1  Q.   And what sort of harms to competition do you believe will

2  result from Bazaarvoice's acquisition of PowerReviews?

3  A.   So we usually divide this up into price and nonprice

4  effects.

5       I would say there's three here.  There's price, which is

6  going to come in the form of a less aggressive discounting.

7  There's quality.  And there's variety or choice.  So those are

8  the three buckets.

9  Q.   Let's talk about the price effects first.

10      Bazaarvoice claims that there haven't been price increases

11 as a result the merger.  Do we need to see price increases

12 for there to be an anticompetitive effect?

13 A.   Well, I think the Court knows what I'm going to say here

14 now, which is no, because we're seeing a reduction in the

15 discounting.

16      MR. JACOBSON:  Your Honor, this I really have to

17 object to.  The witness was analyzed repeatedly in his

18 deposition as to whether he had examined postmerger price

19 effects.  He repeatedly said he had not, he was not able to do

20 so.

21      Yesterday I thought he misspoke when he said he has seen

22 postmerger effects.  I thought that was just a slip of the

23 tongue.

24      If we're going to get into that here, it's completely

25 improper.  It's not in his report.  He repeatedly denied it in

SHAPIRO - DIRECT / HOAG

 1   his deposition.  I can give you the citations.  But this area

 2   is completely out of bounds and perfectly improper.

 3              THE COURT:  Mr. Hoag.

 4         MR. HOAG:  I think that Dr. Shapiro,

 5   Professor Shapiro, has disclosed his view about the effects of

 6   the merger on competition, and that those effects may have

 7   already started to take place.  I think that's perfectly well

 8   disclosed.

 9      I don't think he's making any claim to have done any

10   study, during his testimony, that was not disclosed.

11              MR. JACOBSON:  Your Honor, we actually prepared,

12   assuming it's not a slip of the tongue, a brief motion to

13   strike.  If I could hand it up to Counsel and the Court.

14              THE COURT:  Certainly.

15         MR. JACOBSON:  And in this connection, Your Honor, I

16   would like to alert you to -- do you have his deposition in

17   front of you, Your Honor?

18              MR. HOAG:  It's not in that binder, Your Honor.

19              THE COURT:  I don't think so, no.

20         MR. JACOBSON:  Can we?  The witness needs a copy as

21   well.

22              MR. WEICK:  Your Honor, may I approach?

23              THE COURT:  Please.

24         MR. JACOBSON:  Your Honor, page 7, lines 2 through 11.

25   Page 7, lines 2 through 11:

1          "Can you name a customer who postmerger contracted to

2     pay higher ASF" -- that's price -- "without a feature

3     upgrade?

4          "Again, that's not something I have looked at in

5     detail.  That's not something that's in my reports, and

6     not sitting here today able to go through those data."

7     Then if we turn to page 8, lines 2 through 9:

8          "What evidence do you have, if any, that Bazaarvoice

9     did anything to manufacture postmerger evidence relevant

10    to this litigation?

11         "I'm not sure what you mean by manufacture, but I

12    would just say I have not looked into any shenanigans, or

13    lack thereof, regarding the manipulation of evidence.

14    That's not part of my analysis."

15    Page 40, line 17:

16         "You never analyzed -- you analyzed historic entry,

17    not what entry would be in response to a price increase,

18    did you?

19         "Well, both.  I mean, it's part of the entry analysis

20    as best as one can do.

21         "And where in your report do you address entry in

22    response to a price increase?  Where do you have data to

23    speak to that issue?

24    **A.**  Well, I just said you do the best you can given the

25    available data.  I don't have data on a well-defined

```
 1        SSNIP" --

 2     Your Honor knows what a SSNIP is?

 3          THE COURT:  Yes.

 4          MR. JACOBSON:  (Reading continues:)

 5        -- "or larger and what happened after that.  That's

 6     typically the case in merger analysis."

 7     Page 47, line 2:

 8          "You haven't observed any postmerger price increases,

 9     correct?

10      "A.  It's difficult to observe prices accurately in this

11     market."

12          MR. JACOBSON:  Page 217 --

13          THE COURT:  Mr. Jacobson, can I stop you just a

14  second?

15          MR. JACOBSON:  Sure.

16          THE COURT:  Some of the things that you're reading

17  have direct relationship to what you were saying with the

18  motion to strike.  Others, the relevance is not absolutely

19  clear to me.

20      I understand the basis of your motion to strike.  I think

21  that what I'm most concerned about is whether you have been

22  given the information from Dr. Shapiro so that you can

23  adequately cross-examine him.  That's what I'm concerned about

24  at the moment.  And if you have anything to say about that

25  right now, we ought to deal with it.
```

1    But as to the remainder of the motion to strike, I think

2    the best way to do it is for -- to hear what Dr. Shapiro has to

3    say, and let me look at any argument that -- written argument

4    that you have, and all the other deposition cites that you want

5    me to take into account when I'm looking at them.  I think

6    that's the way to go.

7         MR. JACOBSON:  Fair to say, Your Honor, that these --

8    some of these questions were precisely on that issue.  Some

9    questions were around it.  But it was -- it's clearly not in

10   his report.

11        I don't think anyone would argue that an analysis of

12   postmerger effects was in his report.  I don't think anyone

13   would argue that an analysis of postmerger price increases was

14   in his rebuttal report.  He provided supplemental exhibits.  It

15   was not disclosed there.

16        So this is -- this is complete surprise, Your Honor, and

17   we can't possibly be prepared.  Since my cross-exam starts

18   today and is limited to, you know, the 25 hours that we have

19   for the whole case, there's simply no way to deal with this,

20   and it's not proper.

21        MR. HOAG:  Your Honor, I would note that

22   Professor Shapiro has not testified that he has noticed price

23   increases that were higher than before the merger.  He's

24   providing testimony about the general pattern of discounting or

25   just the general loss of the discounting competitive pressure

1    between the two, rather than making a claim to have done a

2    systematic study in any respect.  I want to make that clear.

3          **MR. JACOBSON:**  Simply, none of that was ever disclosed

4    to us.

5          **THE COURT:**  I understand the basis of your objection,

6    and it's something that I will take up.  And I want to see from

7    the government, as well as look at any additional information

8    you want to provide me, Mr. Jacobson --

9          **MR. JACOBSON:**  Thank you.

10         **THE COURT:**  -- what the basis is of this testimony.

11   But I will allow it at the moment, subject to the motion.

12         **MR. HOAG:**  Will we have an opportunity to respond to

13   the motion, I assume, Your Honor?

14         **THE COURT:**  Yes.

15         **MR. HOAG:**  Thank you.

16   **BY MR. HOAG**

17   **Q.**   Thank you, Professor Shapiro.

18       Do you expect that the price effects of the merger will be

19   uniform across customers?

20   **A.**   No.  In this situation -- in this market where prices are

21   negotiated individually, as I hope I've made clear, prices

22   really depend on the value provided by the provider and the

23   leverage the customer has to turn to other providers.  That

24   varies a lot across customers.

25       And so the price effects here that we're talking about

1    will also vary across customers.

2    **Q.**   And what information is available to Bazaarvoice that is

3    relevant to targeting particular customers?

4    **A.**   Well, quite a lot.  And Mr. Collins, yesterday, had what I

5    thought was a nice description of some of the information

6    Bazaarvoice learns about a customer when they're in the sales

7    cycle:  They know what business the customer is in.  Their

8    online sales, something like a retailer.  Their average order

9    volume.  They may have information about the conversion rates,

10   experience with other similar customers.  Much of the -- many

11   of the things they use to sell their product.  And this will

12   vary across customers.

13       They also customize the product and so they learn and have

14   a conversation with the customer that gives them more

15   information.

16       So that this -- this is part of what allows them to engage

17   in value pricing.

18   **Q.**   And what types of customers do you think are most

19   vulnerable as a result of Bazaarvoice's acquisition of

20   PowerReviews?

21   **A.**   Uhm, well, I think of three groups of customers that are

22   most likely to be vulnerable and harmed.  Not to say that's

23   everybody, but I think useful buckets.

24       One is the PowerReviews legacy customers.  Two would be

25   the Bazaarvoice customers.  And three would be customers who

SHAPIRO - DIRECT / HOAG

 1  place a high value on syndication.

 2  **Q.**   And why do you think these particular groups of customers

 3  are vulnerable?

 4  **A.**   Well, let me articulate each of these through a little bit

 5  of a story form, I guess.

 6       So if you're a PowerReviews customer, let's say one of

 7  these hundred or so retailers in the IR500, before the merger

 8  what you had when your contract comes up for renewal, you can

 9  go to Bazaarvoice and say, "Make me an offer."  And Bazaarvoice

10  we know is hungry to get more retailers, and they've got -- you

11  know, they're the leader in the market.

12       Now, PowerReviews will fight to keep you if you're this

13  customer, but you've got a good bidding situation there.  That

14  gives you leverage.

15       After the merger, now you're still on -- you're a

16  PowerReviews legacy customer but Bazaarvoice owns you.  I don't

17  mean that in the wrong way.  You're a Bazaarvoice customer.  So

18  now you can't turn to them for that leverage.  Instead of

19  turning to Bazaarvoice, you can either talk about in-house or

20  one of these fringe players.

21       That's a pretty significant reduction in bargaining

22  leverage for a lot of folks, it seems to me, so that hurts

23  those customers in terms of the pricing.  So that's why I would

24  put that group first.

25       And the other aspect of this, and this goes to what I said

1    about when we talked about market definition actually, if --

2    from Bazaarvoice's point of view, PowerReviews was fighting to

3    keep that customer.  Bazaarvoice doesn't have to, basically.

4    So that's a pretty big difference.  So that group is top of my

5    list, actually, in terms of vulnerable.

6    **Q.**    And what about the other two groups?

7    **A.**    So now the Bazaarvoice customers, before the merger they

8    could turn to PowerReviews.  And we see that a lot in the

9    bidding here in competitive documents.  Of course they -- so,

10   again, let's think the contract is up for renewal.  Most of

11   them seem pretty happy with Bazaarvoice.  I don't think we're

12   getting a lot of complaints, okay, but you still want to have

13   some leverage at renewal time.

14        So before the merger, they could turn to PowerReviews.

15   And let's talk about retailers, for example.  PowerReviews

16   serves a lot of big retailers.  We know they're credible.

17   They're good.  They've got a good product.  So that gives you

18   some leverage.

19        After the merger -- and maybe in-house is a threat, more

20   for some people than others.

21        After the merger, that's not possible anymore, so you've

22   got to go to whether it's Reevoo or Pluck or Gigya, one of

23   those other commercial providers, who is an alternative.  And I

24   know you're going to hear from a number of customers that those

25   are alternatives.

1    And the way I'm seeing the market, the market shares, for

2   a lot of customers that's not going to be as -- give them as

3   much bargaining leverage, basically, as PowerReviews did before

4   the merger.  So we'll get some price effects there.

5   **Q.**   And what about the new customers who might be interested

6   in syndication?

7   **A.**   So let's flip over to the brand side for that and for

8   telling this story, if you will.

9        So -- and we heard from Clorox was an example of a brand

10  who was interested in syndication.  In fact, the Clorox witness

11  said syndication was very important to them.

12       So before the merger -- now, most of the brands are

13  picking Bazaarvoice.  They've got the biggest syndication

14  network and they were pioneers with that strategy.  But, again,

15  you want leverage when it's time to renew the contract.

16       So before the merger, PowerReviews was the alternative to

17  turn to.  And they're hungry to get some brands, and they have

18  a good retail network.  Not as big as Bazaarvoice's, but they

19  have 119 in the IR500, some marquee customers there, Staples.

20  They've got -- and others.  Okay.  So that's a credible threat

21  or opportunity.

22       After the merger, this brand who cares about syndication,

23  they've got very little to work with.  Nobody can offer them a

24  syndication network.  That's a big difference.  Okay.  And this

25  is where we're going to the gap between PowerReviews and the

1    fringe.  That translates directly into a loss of bargaining

2    leverage for these customers.  So that group is -- is -- is

3    vulnerable as well.

4        I should add that the other thing because of the merger

5    here, Bazaarvoice has grown their syndication network, which

6    the brand likes; but when it comes time to renew, they're still

7    going to get terms that depend on what their alternative is,

8    called their best alternative to negotiated agreement.  It's a

9    standards term here.

10       So when Bazaarvoice is bigger network, Bazaarvoice will

11   seek to capture that value in the price they charge.  The

12   customers' return will depend on what their bargaining leverage

13   is, and that's been weakened.

14   **Q.**  And in addition to the price effects that we have been

15   discussing, you testified earlier that you expect to see harm

16   in the form of a loss of innovation or product developments.

17       How do the incentives of the merged firm actually change

18   with respect to innovation?

19   **A.**  Well, we see before the merger that the firms -- that

20   Bazaarvoice and PowerReviews are battling each other to improve

21   their products and offerings.  We see back and forth what they

22   call one upmanship in terms of products.

23       For example, we saw that in the SEO, the search engine

24   optimization.  We saw that with some Facebook features.  We saw

25   that with some analytics.  Okay.  And I think there are others.

1003
SHAPIRO - DIRECT / HOAG

1    So that was a natural competitive dynamic.  Your direct

2 competitor, you're trying to get an edge, of course, to sell to

3 clients and pick up share from them.

4    That's eliminated by the merger.  Okay.  And that will

5 tend to lead to less rapid improvements of products because the

6 competitive pressure is not as strong.

7    There are still others.  Okay.  I'm not saying they're

8 going to sit and not improve their products.  They're not doing

9 that.  They're continuing to improve their products.  But the

10 pressures -- one of the key pressures has been removed, and

11 that is worrisome as well.  So that would be a quality or

12 innovation effect adverse to customers that would flow from the

13 combination.

14 Q.  And you also mentioned that customers might face a

15 reduction in product choice due to the merger.  What did you

16 have in mind there?

17 A.  So I'm thinking there about the -- over time the

18 elimination of the PowerReviews platform and migration of

19 customers to the Bazaarvoice platform.

20    The fact is, the PowerReviews platform is something that,

21 you know, a good number of large retailers picked.  It has been

22 the lower-price alternative in the market, and I think there's

23 some pretty clear incentives for Bazaarvoice to move those

24 folks off of that platform in time.

25    And if that -- when and if that happens, that will be

1    what -- they picked that.  That was their top choice.  It's now

2    no longer available.  Let's assume that or if that's happening.

3    And that's also a form of customer harm through loss of variety

4    and loss of choice.

5        We see some indications that Bazaarvoice, right after the

6    merger, was not promoting or trying to attract new customers to

7    this platform.  We see some indications that they would like to

8    migrate people towards the Bazaarvoice platform, which is

9    perfectly normal and common in a tech merger.  Right?  But if

10   it means elimination of a choice that many customers preferred,

11   there is associated customer harm.

12   **Q.**   Does Bazaarvoice have to completely eliminate the

13   availability of the PowerReviews platform for this loss of

14   customer choice to take place?

15   **A.**   So, no.  I think the more likely path would be more of

16   stagnation, not investing in that platform, not seeking new

17   customers, and then that -- people will naturally migrate off

18   of it.

19       And Bazaarvoice, quite understandably, would like to

20   migrate people to the Bazaarvoice platform to sell them more

21   products.  That's in their documents.  And that's all well and

22   good, but the customers have lost a choice.  Okay.  So it

23   doesn't -- these effects don't require immediate elimination of

24   the platform.  It's really more failure to invest in it and

25   keep it moving forward as what was a competitive alternative.

1  **Q.**  Professor Shapiro, based on your consideration of the

2  qualitative and quantitative evidence taken as a whole, do you

3  have an opinion on whether there are likely to be

4  anticompetitive effects as a result of Bazaarvoice's

5  acquisition of PowerReviews?

6  **A.**  So, yes, it's -- the analysis to this stage is quite

7  clearly pointing to significant adverse unilateral effects on

8  customers resulting from the merger, price and nonprice.

9       I should add at this stage that the presence of these

10  fringe suppliers is taken -- has been taken into account at

11  this stage of the analysis.  They are an alternative.  They've

12  been out there.  They don't show up with much frequency in the

13  bidding.  Okay.  And everything I just described in terms of

14  price and nonprice effects recognizes the presence of those

15  fringe suppliers.

16      Okay.  So that is -- one way to think about it is, given

17  the offerings in the market that we saw leading up to the

18  merger and shortly thereafter, and given the competition

19  between the two merging parties, we would -- I conclude at this

20  point that there's significant adverse effects, unilateral

21  effects.  So that should conclude the competitive-effects stage

22  and we're ready to move on.

23  **Q.**  Professor Shapiro, Bazaarvoice has argued that the market

24  is dynamic going forward and that there are dramatic changes

25  underway right now.  Is that the way that you view it?

1    A.    Well, so the question is -- actually the market is

2    dynamic.  Okay.  Let's unpack that.  Let's look at the ratings

3    and review market for U.S. retailers and manufacturers, and

4    then let's place that in the larger context of social commerce.

5    Okay.

6         So the market, the relevant market, is not static.

7    Products are improving like I said, prices tends to come down,

8    but we're not seeing a lot of dynamism in the shares of the

9    structure.  Okay.  All the way up through the merger we have

10   number one, number two, in-house, fringe.  Okay.

11        So in terms of the structure and the unilateral effects in

12   the bidding, that analysis is perfectly sound when viewed in

13   the context of broader forces that are at play in social

14   commerce.

15        So now I think the natural question is to ask:  Well,

16   okay, you look at that kind of what looks sort of narrow in

17   some sense, you know, because there's all these other companies

18   and things going on, how does all that activity, Twitter,

19   Pinterest, Tumbler, Facebook, how does that factor into the

20   analysis?  And the company, Bazaarvoice, is emphasizing that

21   dynamism out there; and I agree with that, there is dynamism

22   out there.

23        So the way it factors in is through entry.  Okay.  That's

24   what we have to turn to next and see whether all that activity

25   is going to lead to entry into the relevant market that will

1   protect customers from the effects that seem likely at this

2   stage in the analysis.

3   **Q.**   And, Professor Shapiro, how do you as an economist go

4   about analyzing entry into the ratings and review market?

5   **A.**   So if we reference back to the framework at the beginning,

6   we're asking:  Will it be profitable for companies to come into

7   this market and sell this product in a timely way that will be

8   sufficient to make up for the lost competition, okay, and,

9   therefore, obviate the competitive effects that we have

10  concluded will occur without entry?

11  **Q.**   And how do you go about actually determining that?

12  **A.**   So the analysis should -- is very much now from the --

13  from the perspective of the entrant.  Okay.  We're trying to

14  figure out whether it's profitable to enter; and then it's not

15  enough to have entry, but they have to be sort of successful

16  and become a competitive force sufficient to replace the lost

17  competition.

18      So now we put ourselves in the shoes of the entrant and

19  ask:  Is this a profitable thing to do?  How hard is this to

20  do?  How much risk?  How long does it take?  So those are the

21  questions we want to turn to.

22  **Q.**   And what evidence informs those questions?

23  **A.**   Well, again, I think we said this in the framework.  The

24  first place is to look at what has actually happened with

25  entry.  Have companies come in?  Has their been exits?  And

1   when they did enter, how long did it take?  Were they

2   successful or not?

3   **Q.**   And what has been the historical record of entry in the

4   product ratings and review market?

5   **A.**   So I think it's quite clear there's been no successful

6   entry in recent years.  Bazaarvoice and PowerReviews, you know,

7   were the pioneers in this market, and we just haven't had

8   successful entry.

9       We see this in all the market shares charts.  We have a

10  number of fringe players.  They're in.  They came in at some

11  point, but I would not count them as successful.  So what I

12  mean by that is, they have not gained significant sales.  Their

13  shares are very small.  And these companies, you know, tend to

14  have their success elsewhere in adjacent markets, more of a

15  communities, forums, something like that.

16      So we don't see -- we have not seen successful entry.

17  We've actually seen exit.  Viewpoints existed, so we do have

18  one exit but no successful entry.

19  **Q.**   And how does the historical record of entry help you

20  evaluate the prospects for entry on a going-forward basis?

21  **A.**   Okay.  So now the fact that there hasn't been successful

22  entry suggests there's probably some barrier or doesn't look

23  profitable anyhow for folks.  But we're trying to predict what

24  will happen if competitive forces are weakened somewhat by the

25  merger.  Will that trigger or reduce entry?  That's the

1    question.

2         So to think about that, we can learn from the historical

3    record what the structural entry barriers are.  Okay.  We're

4    ultimately trying to figure out, are there significant entry

5    barriers?  If there are none, then we're much less concerned.

6         So we really want to understand why entry hasn't happened,

7    why exit did happen perhaps, and what that tells us about

8    structural entry barriers.

9    **Q.**  And what does the evidence from the fringe suppliers,

10   including their deposition testimony, tell you to inform that

11   question?

12        I would just note before you answer that some of that

13   testimony is confidential, so you might want to describe it

14   generally rather than in specifics.

15   **A.**  Okay.  So there's been depositions of a number of these

16   firms.  They acknowledge various difficulties, I guess, with

17   making significant sales in this market.  And it points, to me,

18   to three elements that I would focus on as the structural entry

19   barriers.  Okay.

20        One is switching costs.  It's simply hard to pry away

21   existing customers.  And the market penetration now is high

22   enough that a lot of the online sales retailers have already

23   signed up.  So that makes it harder to enter.

24        The second is track record, experience, reputation; that

25   category of if you haven't proven that you can do it, people

1   see it, there can be a little bit of a risk, you have to prove

2   yourself.  A normal issue.  And that is a factor here where

3   companies are integrating this ratings and review into their

4   online -- their website, and they don't want things to go

5   wrong.

6        Okay.  The third is syndication, which is a very

7   significant barrier, particularly on the brand side.

8   **Q.**   And are these the sorts of barriers to entry that you've

9   come across in your career as an antitrust economist?

10  **A.**   These are pretty standard in the list of entry barriers,

11  particularly for the information economy.

12       So my book on information rules, *Strategic Guide to the*

13  *Network Economy*, there's a couple chapters on switching costs,

14  there's several chapters on network effects; and part of the

15  theme of the book is, it's not the industrial economy anymore.

16  In the industrial age, it was building a large facility.  You

17  know, getting low-cost raw materials, those sort of things.

18       Here, these are very common, all three of these, but

19  particularly the switching costs and the network effects, which

20  is -- the syndication is a form of networks that we'll talk

21  about.

22       So these are both something that I've studied a lot over

23  the years and are pretty common barriers in the information --

24  in tech industries and the information economy.

25  **Q.**   And is the concept of barriers to entry that you described

1   different from what you teach MBA students in your classroom?

2   A.   No.  They're all trying to figure out how to establish

3   firms with entry barriers.

4        No.  This is the standard -- this is in the textbooks.

5   This is what I teach.  This is the normal usage of the notion

6   of entry barriers.

7   Q.   And does the existence of entry barriers indicate that the

8   company and the markets have engaged in some kind of

9   anticompetitive behavior?

10  A.   No, not at all.  And I think -- I think it's an important

11  point.  So let's talk about the syndication network as an

12  example there.

13       I think I said yesterday that's been a great strategy for

14  Bazaarvoice to build this network.  They were the first to

15  really see that and they did that and it served them well.

16  That's great.  That is also an entry barrier.

17       The entry barrier is simply:  Is this something an entrant

18  will think twice or three times about coming into the market

19  because they have to face Bazaarvoice's syndication network?

20       So very often the success of companies goes hand in hand

21  with some entry barrier.  Okay.  And that's fine normally.  I

22  mean, one wouldn't -- wouldn't challenge or criticize a firm

23  for doing that; but when they merge with a competitor,

24  particularly one who has also cleared those barriers already,

25  or some of them, that's when we have a problem.

1  **Q.**  Now, you mentioned that switching costs was one of the

2  obstacles or barriers to entry here.  What makes switching

3  costs a barrier to entry for a new firm?

4  **A.**  Well, so throughout all this, we put ourselves in the

5  shoes of the entrant and ask:  If I'm going to invest the

6  money, develop a product, try to sell it, switching costs are

7  clearly something I have to worry about.  Okay.  Because most

8  of the businesses with potential clients who are already signed

9  up, now it would be with Bazaarvoice, and I have to convince

10  them to switch vendors.

11      So I'm at a natural disadvantage in that Bazaarvoice, they

12  don't have to do anything.  There's no switching costs.  They

13  just stay with them.  Or if it's in-house, they continue what

14  you're doing, and I have to convince them to switch.  So that

15  is an obstacle for the entrant and would discourage entry.

16  **Q.**  Now, the second barrier to entry you mentioned was

17  reputation.  Does that just mean that the firm has a good name

18  as an established firm?

19  **A.**  No.  I wouldn't -- I wouldn't equate it to the firm's

20  name.  I mean, Google has a great name.  Okay.  But it's

21  really -- I would think of it more with track record

22  experience, sort of proven ability to do the job in this

23  particular area.  Okay.

24      I think it was the BJ Wholesale witness -- I'm not sure

25  here now, but one of the customers said, "I want -- I want

1   somebody who has experience in this area and has done this

2   before."

3        And so that's a normal customer's response, particularly

4   if something's an important -- if -- if things go wrong, it

5   causes a lot of trouble, you burn up IT resources or something

6   goes wrong with the website or the moderation is flawed.

7        So those sort of things, particularly when the price of

8   the product is small compared to the risk if it -- if things go

9   badly, that's when you want comfort, if you will, that the

10  supplier has done this for similar customers and things are

11  going well.  Okay.

12       I would put this third in the list of three that I've

13  mentioned.  I would say syndication, switching costs are bigger

14  than this one, but it is a factor and I wanted to include it.

15  Q.   And the last barrier that you mentioned is, in fact,

16  syndication.  Why is syndication a barrier to entry?

17  A.   Well, again, put ourselves in the shoes of the entrant.

18  You're trying to sell -- you're trying to come in and win

19  customers.  So let's do this on the brand side because it's

20  really clear there, I think.

21       We've heard from the executives, the Bazaarvoice

22  executives, how syndication is really important to brands.  You

23  know, there that's critical for many of them.  And so an

24  entrant is going to have a very tough time selling to a brand.

25       This entrant -- we see from the IR500 shares, none of

1  these -- an entrant will start off -- well, this is a problem

2  for fringe firms, but an entrant has no retailer network to

3  point to.

4       So the way you'd have to go after the brands would have to

5  be first get retailers and then get the brands, and that's what

6  Bazaarvoice did and that was their strategy.

7       So that's kind of a bank shot.  You know, it's hard.  And

8  so that's a significant barrier to entry, particularly since so

9  much of the money that Bazaarvoice is now earning is on the

10  brand side.  Okay.

11       Now, it was less true for PowerReviews.  They didn't get

12  as much money from brands, but they already had the retailer

13  network that was sizable, and that's what this entrant is

14  lacking.

15  Q.  Have you analyzed whether syndication has become more or

16  less important over the last few years?

17  A.  It's become significantly more important.  I've been able

18  to look at that using Bazaarvoice's data.

19       MR. HOAG:  Savannah, can we call up GX1052?

20  BY MR. HOAG:

21  Q.  Does this show the results of one of your analyses of this

22  information?

23  A.  Yes, that's right.

24       So this is a customer count, Your Honor.  You can see it

25  starts in 2008.  There's almost no syndication customers.  It

1   goes up dramatically, or at least more than linearly,

2   through -- through May 2012.  So the time of the merger.

3       So this is just counting brands and retailers who are

4   participating in syndication, syndication customers.  A nice

5   healthy growth for Bazaarvoice's syndication network on this

6   measure.

7           MR. HOAG:  And, Savannah, can you please call up

8   GX1053.

9   BY MR. HOAG

10  Q.   Professor Shapiro, does this show another slice of the

11  analysis that you did?

12  A.   Yes.  So this is -- see, it's a similar shape.  This is

13  measuring links.  So a link is a connection between one brand

14  at the parent company level and one retailer.  Okay.  So a

15  link -- a big link, a nice thick link would be Procter & Gamble

16  going to Walmart.  Okay.  A lot going on there.  The links vary

17  in their thickness, if you will.

18      You can see the number of these links has gone up very

19  nicely and kind of taking off, in fact, in the last couple of

20  years leading up to the merger.

21  Q.   And have you analyzed how widespread the use of

22  Bazaarvoice's syndication network is amongst Bazaarvoice's

23  customers?

24  A.   Yes, I have.  I've also done that using Bazaarvoice's

25  data.

1           **MR. HOAG:**  And, Savannah, can you please call up

2  GX1059.

3           **THE WITNESS:**  Okay.  So this one we have to take a

4  little more time on to read.

5       But let me just, before we even look at it, let me say

6  what I'm trying to do here is figure out how important is

7  syndication in this market overall.

8       Not every customer participates in it on either the brand

9  or the retail side.  Bazaarvoice has suggested syndication is

10 not much of an entry barrier because a lot of customers don't

11 care about it.  So we're trying to test that and see how

12 important it is.  That's what this chart's about.

13      Let's start actually in the middle column because that's

14 the brands.  So this is measuring ratings and review revenue

15 that Bazaarvoice earns.  The blue is how much -- from brands in

16 that column.  So 72.7 percent of their ratings and review

17 revenue from brands comes from brands who participate in

18 syndication.  Let's say about three-quarters and about one

19 quarter from brands who don't.

20      So this reflects the fact that a lot of the largest

21 brands, they really care about syndication, they're

22 participating.  So on the brand side most of the money is --

23 that Bazaarvoice is earning is from brands who participate in

24 syndication; three-quarters, roughly.

25      On the left-hand column, we see that it's not -- that's

1    not nearly so much true on the retail side.  It's more like a

2    third of the revenue is coming from retailers who participate

3    in syndication, and two-thirds are retailers who do not.

4        So we do see this asymmetry between the two sides, and

5    that's consistent with the testimony that the brands -- this is

6    very valuable to them.  Some retailers don't need it.  They

7    have their own ratings -- they don't need to get the feed.

8    They're happy to have what their own customers put up there,

9    and that's better for them in terms of not having duplicative

10   content or content that came from somewhere else.  So we see

11   that variety here.

12       The right-hand column looks at -- puts it altogether, the

13   two sides, the brand and the retail.  And you can see, then,

14   that somewhat over half of the overall ratings and review

15   revenue that Bazaarvoice is earning comes from customers who

16   participate in syndication.

17   **BY MR. HOAG**

18   **Q.**   Is it possible for a new entrant to get around this

19   syndication barrier to entry?

20   **A.**   So it's very hard.  I think on the brand side I talked

21   about that, that there are some brands who don't participate in

22   syndication, but then you're already narrowing yourself to a

23   smaller slice of the market.

24       Remember that these entry barriers have to be looked at

25   together.  If you're an entrant like, okay, if only a quarter

1  of the revenue of the brands is really available at first until

2  I build retailers, and I've got to overcome switching costs and

3  reputation, you know, that's a lot of obstacles that are kind

4  of mounting.

5      So for the brand side, I think it's very hard.  Okay.

6  There's just, you know, a thinner slice here to go for.

7      On the retailer side, that would be more of the play, I

8  think, to try to get some retail customers first.

9      But, again, then, you -- you'll have trouble getting the

10  retail customers who care about syndication because you don't

11  have the brands.  And if you get retail customers who don't

12  participate in syndication, that's not going to help you with

13  the brands.

14      So this is the typical chicken-and-egg thing.  These are

15  called two-sided markets where you're trying to get customers

16  who are matched on both sides here, brands, and you can't get

17  one side without the other.

18      It's not to say it's insurmountable.  I mean, people do

19  enter these types of market, but it's an obstacle.  And here,

20  given Bazaarvoice's postmerger dominance, it's a very big

21  obstacle.

22  **Q.**  How can it be that big of an obstacle if PowerReviews had

23  a smaller syndication network before the merger?

24  **A.**  So I think it's good at this stage to compare -- think of

25  PowerReviews in comparison with this entrant.

1    So PowerReviews has a nice installed base of retailers, so

2   they at least can make a run at getting the brands; and they

3   were trying to do that.  Okay.  So on the brand side, they're

4   much better placed than an entrant.

5    And on the retailer side, again, they -- on the retailer

6   side, they already had the base and, again, an entrant would

7   need to build that essentially.

8    So there's a big -- a big gap between PowerReviews and the

9   entrant in terms of their ability to surmount this.

10    This is all perfectly consistent, by the way, with

11   acknowledging that Bazaarvoice had a significant advantage over

12   PowerReviews in syndication.  They were winning.  They were the

13   leader on that.  Okay.  That's not disputed.  But, still, the

14   entrant is in a -- is far behind where PowerReviews was.

15   **Q.**   Let's see how these entry barriers actually play out with

16   a real firm.  Could you talk about how they apply to Reevoo and

17   their efforts to enter the U.S. market?

18   **A.**   Certainly.  We've had deposition testimony from Reevoo.

19   I've been able to track their success or really lack of

20   success.  We had the chart that measured how many customers

21   they picked up and their inability to seriously penetrate the

22   IR500 so far after a year or so.

23    So Reevoo is a good example because -- and this is a

24   situation where we can use postmerger evidence.  We see entry

25   after the merger by Reevoo into the U.S. market.  That was in,

1    I think, the fall of 2012.

2        So we have postmerger entry, but they have run into these

3    obstacles.  So we see that they haven't picked up much

4    business.  And the -- the record shows that syndication was a

5    big obstacle and a factor for them in -- they haven't been able

6    to overcome that yet, and I think it will be very hard for them

7    to do so.

8        So given that, you know, again, if we put ourselves in the

9    shoes of this hypothetical or potential entrant, it doesn't

10   look very promising to come in and spend the resources to try

11   to take on Bazaarvoice.

12   **Q.**   And what conclusion do you reach on whether entry would,

13   therefore, be likely to prevent Bazaarvoice from raising prices

14   or reducing innovation as a result of its acquisition of

15   PowerReviews?

16   **A.**   So I conclude that entry -- we cannot count on entry to

17   save the day here, essentially.  We reached the conclusion

18   about -- about likely unilateral effects before considering

19   entry.  I just don't think entry will be sufficient or likely

20   enough to replace the loss of the number two player.

21   **Q.**   Thank you, Professor Shapiro.

22        Are there any more steps to go through in the analysis?

23   **A.**   Well, we had talked --

24        **THE COURT:**  Before we go to the next step, we can take

25   the 10-minute break.

1          **MR. HOAG:**  That will be fine, Your Honor.  Thank you.

2                    (Recess taken at 9:27 a.m.)

3               (Proceedings resumed at 9:40 a.m.)

4          **MR. HOAG:**  Good morning, Your Honor.

5      We were able to resolve the issue that Mr. Jacobson

6  raised.  We agreed that we would strike three lines from

7  Professor Shapiro's answer yesterday afternoon, page 918,

8  lines 5 through 7, and Mr. Jacobson has agreed to withdraw his

9  motion.

10         **MR. JACOBSON:**  The motion is withdrawn.  Today's

11 testimony was consistent with his report, at least in part, and

12 the rest of it we'll get to later.

13         **THE COURT:**  Okay.  I like that.  Thank you.

14 BY MR. HOAG:

15 **Q.**  Thank you, Professor Shapiro.

16     Are there any more steps to go through in the analysis

17 looking at this merger?

18 **A.**  Well, the last step was considering efficiencies, which we

19 talked about earlier.

20 **Q.**  And what did you find on efficiencies?

21 **A.**  Well, I think I really already recapped that, that I don't

22 see evidence of efficiencies that are likely merger specific

23 and would be passed through to customers to offset the concerns

24 and harms already identified.

25 **Q.**  And since we have covered a lot of ground in your

1    testimony, could you just provide the Court a recap of your

2    conclusions in this matter?

3    **A.**    Sure.   So maybe I can calibrate a little bit as I go here.

4         So we had market definition, I think it's -- using the

5    hypothetical monopolist test, I find it's pretty clear that

6    ratings-and-review software is the relevant market for

7    retailers and manufacturers in the United States, those

8    customers.  It's really something that would not be dropped in

9    significant numbers even if it became a bit more expensive.

10   And if we had a single firm controlling all of the supply of

11   that, it would cause some significant harm.

12        So that's the first step.  I think that's quite clear to

13   me in this case, notwithstanding other social media that's

14   swirling around outside that market, if you will.

15        Then we turn to market shares.  We had a number of

16   different measures.  We could -- it's very clear that we get

17   number one, number two, in-house, fringe, structure, depending

18   on how we measure it, the shares -- we get different --

19   somewhat different numbers; but the essential elements, to me

20   in terms of inferences for market structure, are robust.  There

21   is no commercial supplier who's close to PowerReviews after

22   Bazaarvoice, and in-house is a significant choice for a decent

23   number of customers.

24        So -- and we have a high change in Herfindahl Index in

25   concentration resulting from the merger.

1    So then we moved on to competitive effects, price and

2    nonprice.  Quite consistent in terms of the win-loss,

3    head-to-head competition data, that the Bazaarvoice and

4    PowerReviews are running into each other a lot, and no other

5    commercial supplier comes close.

6        I then outlined a little bit the types of harm that one

7    would expect to come from this loss of the direct competition

8    under those circumstances.

9        Then we considered entry.  So I think so far those

10   elements are, in my experience, very strong in this case for

11   reaching the conclusions I have.  I thought from the beginning

12   entry -- I paid a lot of attention to entry because that

13   would -- if there were -- I thought early on if there were a

14   piece of the case that would lead to a different conclusion, it

15   would be entry, okay, once I learned the basics and got the

16   basic picture.

17       So I looked at that and identified some important entry

18   barriers.  Syndication and switching costs I emphasized.  The

19   lack of successful entry is relevant there, too.

20       And I would also indicate the time frame.  You know, I

21   tend to think we -- particularly in tech and markets, it's

22   really hard to tell what's going to happen 5 to 10 years down

23   the line.  I don't pretend to have that sort of crystal ball.

24   We can do better a year or two out, okay, in terms of what's

25   likely to happen.  So the time frame for entry, I'm thinking

 1    about a year or two, and these entry barriers are just not easy

 2    to surmount.

 3        You know, I think the syndication barrier is going to be

 4    pretty durable.  Switching costs is not going to go away but,

 5    you know, there may be ways somebody could come -- get around

 6    that in time or figure something out.

 7        But -- so I want to emphasize I think my opinion is

 8    completely consistent with all the activity in social commerce;

 9    and entry, like I say, I don't know what's going to happen in

10    5 or 10 years.  I'm just going to say it.  Okay.  But over the

11    next several years, which I think is the sort of foreseeable

12    future for this type of analysis, I don't think entry will come

13    and save the day given the important loss of head-to-head

14    competition.

15        **MR. HOAG:**  Thank you, Professor Shapiro.  I don't have

16    any additional questions at this time.

17        I would like to move into evidence the exhibits that

18    Professor Shapiro has discussed, and I can list them off here.

19        **THE COURT:**  Okay.  Go ahead.

20        **MR. HOAG:**  It's 1038, 1044, 1047, 1052, 1053, 1057,

21    1059, 1062, 1063, 1064, 1074, and 1078.

22        **MR. JACOBSON:**  Actually, I think they're all in

23    evidence already through the economist reports, so no

24    objection, Your Honor.

25        **THE COURT:**  Excellent.  Admitted.

1          (Plaintiff's Exhibits GX1038, GX1044, GX1047, GX1052,

2    GX1053, GX1057, GX1059, GX1062, GX1063, GX1064, GX1074 & GX1078

3    received in evidence)

4          **MR. HOAG:**  Thank you.

5          **MR. JACOBSON:**  Your Honor, can we have a minute or two

6    to set up?

7          **THE COURT:**  Absolutely.

8                    (Pause in proceedings.)

9          **MR. JACOBSON:**  Your Honor, may my colleague approach

10   the witness?

11         **THE COURT:**  Absolutely.

12                   (Pause in proceedings.)

13         **THE COURT:**  Are you ready?

14         **MR. JACOBSON:**  Yes.  Thank you, Your Honor.

15                     **<u>CROSS-EXAMINATION</u>**

16   **BY MR. JACOBSON:**

17   **Q.**   Good morning, Dr. Shapiro.

18   **A.**   Good morning, Mr. Jacobson.

19   **Q.**   So yesterday was your first day at the trial?

20   **A.**   Yes, that's correct.

21   **Q.**   And have you read all of the trial transcripts through

22   today?

23   **A.**   I read all, except I didn't quite get through Mr. Osborne

24   on Thursday -- on Thursday.

25   **Q.**   Do you have any prior experience in evaluating competition

SHAPIRO - CROSS / JACOBSON

1   in ratings and reviews other than this case?

2   A.   No.

3   Q.   Your report lists a very large number of documents you say

4   that you've relied on, but you actually read just a relatively

5   small fraction of those documents; isn't that true?

6   A.   That's true.

7   Q.   And other people also selected the portions of the

8   deposition testimony that you would review; correct?

9   A.   Yes.  Under my supervision, my staff selected portions of

10  the depositions, that's correct.

11  Q.   And of the 110 customers that the Government interviewed

12  before filing the Complaint in the case, you only spoke with

13  three before the suit was filed; true?

14  A.   I thought I spoke with more like 8 or 10 customers.

15  Q.   I'm talking about before the Complaint was filed, sir.

16  A.   Oh, I don't know the timing between the interviews and the

17  Complaint.  I couldn't tell you exactly.

18  Q.   And in all you spoke with about eight customers you say?

19  A.   By direct -- by interview, that's correct, yes.

20  Q.   I think there were 10 but we'll go with 8 or 10.

21       Now, several of the exhibits, particularly the surrebuttal

22  exhibits that were provided to us, came to us in folders

23  labeled "EAG Exhibits."  Are you aware of that?

24  A.   No.

25  Q.   Who was EAG?

1    **A.**   That sounds like Economic Analysis Group.  That's the

2    economics group in the Antitrust Division.

3    **Q.**   Do you know what an EAG exhibit is in the context of this

4    case?

5    **A.**   I'm not sure.  It could very well be that -- I'm just not

6    sure exactly what that label would mean, no.

7    **Q.**   Okay.  In terms of the calculation errors that were

8    disclosed in your surreply exhibits, were those errors that you

9    made yourself or errors made by the EAG staff?

10   **A.**   Well, most -- I think it's a little unclear.  Neither is

11   the answer.  The Charles River Associates is the consulting

12   company I work with.  We have an office in Oakland.  And, so,

13   I'm regularly affiliated with them.  So I have a team of a

14   number of people there who have been supporting me on the case.

15        So we have really CRA people, Charles River Associates.

16   CRA; we have EAG people; economists; and me.  And, so, these

17   errors, while I take responsibility, the actual failure to

18   identify the field in question was done by the CRA staff.

19   **Q.**   Dr. Shapiro, can you turn to what's been marked as DX1875

20   for identification in the binders that we provided to you?

21   **A.**   (Witness examines document.)

22        **THE COURT:**  I'm sorry, what number was that?

23        **MR. JACOBSON:**  1875.  It's up on the screen,

24   Your Honor.

25        **THE WITNESS:**  I'm there.

SHAPIRO - CROSS / JACOBSON

1    BY MR. JACOBSON:

2    **Q.**   And this is an article that you wrote on merger

3    enforcement with a colleague by the name of Jonathan Baker?

4    **A.**   Correct.

5    **Q.**   And you stand by what you said in this joint article;

6    correct?

7    **A.**   Yes, I do.

8    **Q.**   Can you turn to page 240?

9    **A.**   (Witness examines document.)  Okay.  Yes.

10   **Q.**   Are you there?

11        There's a heading "Judicial Decisions With Dubious

12   Economic Reasoning."  Did I read that right?

13   **A.**   Correct.

14   **Q.**   And if you go down to the bottom paragraph on that page,

15   it says:  (reading)

16        "One leading example is the 1990 appellate decision in

17        *Syufy*, upholding a District Court decision declining to

18        enjoin a merger to monopoly in the Las Vegas movie theater

19        market on grounds of ease of entry."

20        Did I read that correctly?

21   **A.**   Yes, sir.

22   **Q.**   And can you turn now to page 241, just its facing?

23   **A.**   (Witness examines document.)

24   **Q.**   And I'll read you a passage from the second paragraph:

25   (reading)

1              "With a single contested example of fringe firm

2       expansion in hand, the Court did not investigate the

3       ability and incentive of other firms to enter by following

4       Roberts's model.  Instead, the Court disclaimed any need

5       to conduct such an analysis.  It dismissed without serious

6       consideration an argument that any serious economist would

7       treat as a legitimate possibility.  The Government's

8       assertion that entry at a scale large enough to achieve

9       low costs would turn out to be unprofitable because it

10      would depress market prices.  The *Syufy* panel rested its

11      entry analysis on consideration of whether new firms could

12      enter the market, without recognizing that it's necessary

13      also to evaluate whether those firms likely would do so."

14      Did I read that correctly?

15 **A.**   Yes, sir.  Yes.

16 **Q.**   And did you testify yesterday that in terms of entry,

17 quote:  (reading)

18              "We're trying to predict whether entry will happen so

19      the key for the economist is, is entry going to be

20      profitable"?

21 **A.**   I stand by that.

22 **Q.**   Do you agree or disagree with the following:  Defining a

23 market on the basis of demand considerations alone is

24 erroneous.  A reasonable market definition must also be based

25 on supply elasticity?

SHAPIRO - CROSS / JACOBSON

1    **A.**   I would disagree with that because, as I testified,

2    supply-side elasticity can very well be accommodated through

3    the rapid-entrants concept; and, so, either way to do it is

4    fine.  You end up at the same place.

5    **Q.**   Yes or no.  You characterize reputation as a barrier to

6    entry in this case; do you not?

7    **A.**   I described reputation and experience as one of the

8    barriers to entry, yes, track record.

9    **Q.**   Okay.  Let's bring up DX1876 in your binder.

10   **A.**   (Witness examines document.)

11   **Q.**   And we've only provided an excerpt.  The full document is

12   available on the Justice Department Web site, which I believe

13   has survived the Government shutdown.

14        And you're familiar with the *Commentary on the Horizontal*

15   *Merger Guidelines*; are you not?

16   **A.**   Yes, I am.

17   **Q.**   And if you could turn to page 9.

18   **A.**   (Witness examines document.)

19   **Q.**   There's a passage we've highlighted:  (reading)

20            "Customers typically are the best source, and in some

21       cases they may be the only source, of critical information

22       on the factors that govern the ability and willingness to

23       substitute in the event of a price increase."

24        Did I read that correctly?

25   **A.**   Yes, that's correct.

SHAPIRO - CROSS / JACOBSON

1  Q.   And do you agree with that?

2  A.   Yes, I do.  This is in the market definition section.

3         MR. JACOBSON:  Your Honor --

4         THE COURT:  I agree.

5         MR. JACOBSON:  -- there will be --

6         THE COURT:  You answered the question.  If Mr. Hoag

7  wants to have you expand, he'll ask you those questions.

8         THE WITNESS:  Okay.

9  BY MR. JACOBSON:

10  Q.   Now, you referred to the testimony of the Clorox witness,

11  Ms. Levin, at trial.  So you've read that?

12  A.   Yes.

13  Q.   And that witness was very keen on syndication; correct?

14  A.   That's what I recall.

15  Q.   Didn't she agree that the expansion of the retailers to

16  which she can syndicate was a plus for her company?

17  A.   I believe so.

18  Q.   And that's a beneficial result to Clorox from the merger;

19  correct?

20  A.   I don't know to what extent she might have to pay for

21  that, either now or in the future.  In and of itself, the

22  answer is yes.

23  Q.   Let's bring up the testimony.  It's transcript 321, line

24  16, through 322:3.

25         Do you have that, Candy?

SHAPIRO - CROSS / JACOBSON

1    She may not.  She may not.  Let me -- ah, there we go.

2    And if you could look at the bottom Q & A:  (reading)

3    **"Q.**  Is it correct that adding those no retailers to the

4    syndication efforts, Clorox does not pay additional

5    amounts to Bazaarvoice; is that correct?

6    **"A.**  As far as I'm aware, no."

7    Did you read that testimony?

8    **A.**  Yes, I did.

9    **Q.**  So you're not aware of any incremental charge to Clorox

10   from adding the retailers acquired through PowerReviews; are

11   you?

12   **A.**  Well, not during their current contract.  I was referring

13   to when they renew and what the renegotiations look like at

14   that time.

15   **Q.**  Okay.  Did Ms. Levin indicate that she lost any leverage

16   for renewal as a result of the merger?

17   **A.**  I think she indicated that PowerReviews was an important

18   option for her before the merger.

19   **Q.**  Did she indicate that she had lost any leverage as a

20   result of the merger?

21   **A.**  I think she does because of what I just said.

22   **Q.**  Do you know why your counsel didn't ask that question?

23   **A.**  No.

24   **Q.**  Don't over a hundred customers say through deposition or

25   declaration that they benefited or were unharmed or unaffected

SHAPIRO - CROSS / JACOBSON

1    by the merger?

2    **A.**    I don't know the number.

3    **Q.**    Where are those other customers discussed in your reports?

4    **A.**    There are many, many customers in this market.  I don't

5    address them all individually.  I'm trying to use market shares

6    as another metrics to capture the systematic patterns.

7    **Q.**    Let's turn to competitive effects.  We'll get to the other

8    issues later.

9         Isn't it true that buying a rival and thereby eliminating

10   the competition between the buyer and the seller is not by

11   itself anticompetitive?

12   **A.**    I agree.

13   **Q.**    And just to clarify the point that we engaged on a bit

14   earlier, you've not examined whether postmerger prices have

15   increased above the premerger level or whether discounting has,

16   in fact, abated postmerger; have you?

17   **A.**    No.  As I said, it's hard to measure -- observe prices in

18   this market.

19   **Q.**    Your counsel raised an email from Mr. Shalit yesterday.

20   Do you recall that?

21   **A.**    Not by that name.  I'm not sure which one that is, no.

22   **Q.**    Do you recall there was one customer email referred to in

23   the course of the testimony that mentioned the merger and the

24   Justice Department investigation?

25              **THE COURT:**  Is this the Warner Bros.?

1    **BY MR. JACOBSON:**

2    **Q.**   If you don't remember it, you don't.

3    **A.**   I'm sorry.  I don't know exactly what that is.  I'm sorry.

4    **Q.**   Okay.  That's fine.

5         So your only theory of competitive effects here is

6    unilateral effects; correct?

7    **A.**   That's true.

8    **Q.**   And you apply a bidding-market approach to unilateral

9    effects in this case; correct?

10   **A.**   You could use that term, or I prefer the term "negotiate

11   -- "individualized negotiations," but part of the economics

12   literature that would be captured by bidding theory.

13   **Q.**   You cite a number of papers on auction markets and bidding

14   markets, correct, as support for your position?

15   **A.**   Yes, I think that framework is good, is applicable.

16   **Q.**   Okay.  Can you turn to page -- excuse me, Exhibit DX1877.

17   **A.**   (Witness examines document.)

18   **Q.**   Do you recognize this exhibit, Dr. Shapiro, as an article

19   that you wrote for the *Antitrust Law Journal*?

20   **A.**   Yes.

21   **Q.**   And can you turn to page 715, Footnote 53?

22   **A.**   (Witness examines document.)

23   **Q.**   And at the end of the footnote you write:  (reading)

24            "There is no good theoretical link between the level

25        of the HHI and unilateral price effects with

SHAPIRO - CROSS / JACOBSON

1        differentiated products."

2        Did I read that correctly?

3   A.   Yes.

4   Q.   And the products in this case are differentiated; are they

5   not?

6   A.   They are.

7   Q.   And you cite in your report a number of Paul Klemperer's

8   papers; correct?

9   A.   Yes.

10  Q.   And one of them is Exhibit 1878?

11  A.   (Witness examines document.)

12  Q.   "Bidding Markets"?

13  A.   Yes.

14  Q.   And, so, you're familiar with that article; are you not?

15  A.   Yes, I am.

16  Q.   Okay.  Can you turn to page 7 of the article?

17  A.   (Witness examines document.)  Yes.

18  Q.   And Dr. Klemperer says:  (reading)

19        "It is straightforward that the existence of two

20        identical firms is indeed sufficient for perfect

21        competition (assuming constant marginal costs and no

22        capacity constraints), and that historic market shares

23        imply neither future success nor market power."

24        Did I read that correctly?

25  A.   Yes.

SHAPIRO - CROSS / JACOBSON

1   **Q.**   Do you agree with that?

2   **A.**   There's a bunch of assumptions built into that.  Professor

3   Klemperer is wonderful and, so, he's been careful here.  We're

4   not going to read through the pages leading up to this; but

5   what he's saying is, if you have two identical firms, they

6   offer exactly the same product and they have constant marginal

7   costs and no capacity constraints and they're bidding against

8   each other, neither of them is going to make any money.  You're

9   going to have zero margins for the suppliers.  They're going to

10  cut price right down to marginal cost.  This is a standard

11  piece of economic theory.

12       And in that case, in that idealized case, if you actually

13  look at the previous page, it says "Ideal Bidding Markets,"

14  there would be no profits and two firms is all you need as a

15  customer.  You've got the two guys, no margins.

16       That doesn't apply with differentiated products, and I'm

17  pretty sure he's setting this up to explain how this does not

18  reflect the real world.

19  **Q.**   Okay.  Well, you agree that the R & R market that you

20  define here is ideal enough to use a bidding-market approach

21  for your competitive-effects analysis; don't you?

22  **A.**   I don't think it's ideal at all like he's using the term,

23  no, it's clearly not, because we have large margins.  We have

24  50, 60 percent margins differentiated products.  We have

25  significant competitive advantages.  That's exactly what's

1  missing in this example, and that's why he's calling it ideal

2  and distinguishing it from the real-world practice.

3       If you look at what I cited the article for, it's in fact

4  attacking and criticizing the very line that you're suggesting

5  as being unreliable.

6  **Q.**   Nevertheless, you use bidding and auction model analysis

7  to support your conclusions of competitive effects here;

8  correct?

9  **A.**   I used it.  I don't know what you mean by "nevertheless."

10 **Q.**   Okay.  And bidding and auction market models are based on

11 something called a Bertrand equilibrium; is that correct?

12 **A.**   No, that's not correct.

13 **Q.**   In your testimony today, you identified three customers

14 that you thought might be adversely affected by the

15 acquisition, and those were renewal customers, as I recall,

16 PowerReviews legacy customers, and syndication customers.  Did

17 I get that right?

18 **A.**   Not exactly.

19 **Q.**   Can you explain briefly why I got that wrong?

20 **A.**   PowerReviews -- I would say PowerReviews Legacy customers,

21 Bazaarvoice legacy customers, and customers who value

22 syndication highly.  You were close.

23 **Q.**   Okay.  Thank you.  That's the best I can do.

24      Can you turn to your rebuttal report, which is GX -- it's

25 a different binder -- GX984?

1    **A.**   (Witness examines document.)

2    **Q.**   And I'm going to read you a passage from page 8.

3    **A.**   I'm sorry.  You said it was the other binder?  What's

4    the --

5    **Q.**   It's GX984.

6    **A.**   Oh.  It's the other binder.  Okay.  I'm getting there.

7         (Witness examines document.)  What page?  I'm sorry.

8    **Q.**   Eight.

9    **A.**   Okay.

10   **Q.**   You say:  (reading)

11        "My overall opinion does not rest on Bazaarvoice's

12        ability to engage in customer-by-customer price

13        discrimination."

14        Did I read that correctly?

15   **A.**   I don't see that part, but --

16   **Q.**   Page 8, middle paragraph beginning "There."

17   **A.**   (Witness examines document.)  Yes.  Okay.  Uh-huh.

18   **Q.**   Did I read that correctly?

19   **A.**   Yes.

20   **Q.**   And can you turn to page 9?

21   **A.**   (Witness examines document.)  Okay.

22   **Q.**   And you talk about two types of group discrimination.  You

23   say one is to raise the price to all renewal customers.  Did I

24   read that correctly?

25   **A.**   (Witness examines document.)  Yes.

SHAPIRO - CROSS / JACOBSON

1   Q.   And then further down in that top paragraph a second form

2   of group price discrimination is to raise the price to all

3   legacy PowerReviews customers.  Did I read that correctly?

4   A.   Yes.

5   Q.   Where in here do you talk about syndication customers?

6   A.   Well, there's an extensive discussion of syndication,

7   really more on the brand side.  It's more in my initial report

8   than in the rebuttal report.  We can turn to that if you want.

9   Q.   Yes, but you don't identify syndication customers as a

10  group susceptible to price discrimination postmerger, do you,

11  anywhere?

12  A.   Yes.  I point that out, that's the whole point of the

13  syndication barrier to entry.  It's discussed at length, as I

14  said, more in the initial report.  The rebuttal report, then,

15  is responding to Dr. Shahadeh on this point.

16  Q.   In this part of your report, you only identify those two

17  categories; correct?

18  A.   That looks right.  Yes.  In this part of the rebuttal

19  report, I think that's right, as far as I -- I won't read the

20  whole thing.  I believe that's true.

21  Q.   Now, one of the competitive effects that you identified

22  was the loss of customer choice; correct?

23  A.   Yes.

24  Q.   Now, loss of customer choice occurs with most mergers;

25  does it not?

SHAPIRO - CROSS / JACOBSON

1   **A.**   I don't think so, no.

2   **Q.**   Most software mergers?

3   **A.**   No, I don't think so.

4   **Q.**   In mergers of rivals, is the consolidation of a product

5   line one of the efficiencies that you frequently hear about?

6   **A.**   That can happen.  It's more often in horizontal mergers

7   than in conglomerate or vertical mergers.

8   **Q.**   And loss of customer choice, though, loss of a single

9   choice for a customer is a frequent occurrence in acquisitions

10  generally; is it not?

11  **A.**   Well, I'm going to again say no.  Very often you have new

12  choices that are developed, particularly for nonhorizontal

13  mergers.

14  **Q.**   You identified PowerReviews as the lowest cost option.

15  That's not true; is it?

16  **A.**   Well, I don't think I said it was the lowest cost.  It was

17  lower cost than Bazaarvoice for the Enterprise customer space.

18  **Q.**   Ah.  But Gigya is also lower cost than Bazaarvoice; isn't

19  it?

20  **A.**   Yes.  That's consistent with what I said, yes.

21  **Q.**   And Pluck is lower cost than Bazaarvoice?

22  **A.**   I haven't -- I think that's true.  It's, again, tricky to

23  know exactly because they're mostly selling other products,

24  but -- and I think that reflects the fact they've got a weaker

25  offering.  So that's true.

SHAPIRO - CROSS / JACOBSON

1   Q.   And they're both -- they were both lower cost than

2   PowerReviews, correct, PowerReviews' Enterprise product?

3   A.   I have not done that specific comparison.

4   Q.   Were you here for the testimony yesterday that Bazaarvoice

5   is approximately 10 times the size of PowerReviews?

6   A.   Well, I know that in terms of the revenues, if that's the

7   metric we're using.   I don't exactly remember that coming up in

8   testimony, but I have seen their top-line numbers.

9   Q.   So PowerReviews' revenues in its last year were

10  11.6 million?

11  A.   That sounds right.

12  Q.   And what were Bazaarvoice's?

13  A.   Well, I did hear Mr. Collins talk about revenue growth up

14  to was it 150 -- in the mid-150, somewhere in that range, but

15  that's in the last year.   So if we're comparing them right

16  before the merger, it was a bit lower.   Maybe more like 10 to 1

17  I think is right.

18  Q.   So shouldn't your market share figures reflect the 10

19  to 1 disparity?

20  A.   I don't see why it would.   Bazaarvoice is selling a range

21  of products, not just ratings and review.

22  Q.   Isn't PowerReviews doing the same thing?

23  A.   I don't think successfully, no.

24  Q.   No, but their product line includes products -- included

25  products other than ratings and reviews; didn't it?

SHAPIRO - CROSS / JACOBSON

1    **A.**    Well, certainly.  Plus, as you just pointed out,

2    PowerReviews' product was quite a lot cheaper.  When we look

3    within the IR500, their earning -- let me put it differently.

4        Bazaarvoice is typically getting maybe three times, three

5    or four times as much on average from the customers as

6    Bazaarvoice [sic] is.  So that reflects their higher end, I'll

7    call it, more expensive product.

8        This is one of the reasons you want to use both quantities

9    and revenues to measure market share because a low-cost

10   competitor would show up low in the revenues measure, but they

11   could be very troublesome because they're low cost; and if

12   they're getting a lot of sales on quantity, they would still

13   have competitive significance.

14   **Q.**    But you didn't use seller revenues to calculate market

15   shares; did you?

16   **A.**    I did not.  I explained that that's not feasible here.

17   **Q.**    Have you read any of the testimony concerning whether the

18   2011 strategy that PowerReviews had of capturing Bazaarvoice's

19   customers was successful?

20   **A.**    I think it was generally not very successful.  It was hard

21   to pry away the Bazaarvoice customers.

22   **Q.**    And Mr. Luedtke said, didn't he, he doesn't recall any --

23   I mean, very, very few, if any, at all?  Do you recall that

24   testimony?

25   **A.**    No.

SHAPIRO - CROSS / JACOBSON

1   Q.   Over the course of 2009 to 2013, don't your own data show

2   that PowerReviews was able to convert just three IR500

3   customers away from Bazaarvoice?

4   A.   Yes.  We have a table showing these conversions.  We can

5   pull it up if you want; but there's very few switches

6   generally, as I said, and including the particular direction

7   you're talking about from Bazaarvoice to PowerReviews within

8   the IR500.

9   Q.   So can you turn to DX1883 in your binder?

10  A.   (Witness examines document.)  Okay.  1883?  Yes, I have

11  it.

12  Q.   1883.

13       Do you recognize this as part of your backup for your

14  report?

15  A.   Yes, I do.

16  Q.   All right.  Now, we have modified it and if you could go

17  to the pages, sadly aren't numbered, but the third page we have

18  Harry and David.  Then if you go down to the page with --

19  starting with the Number 277, we have BikeBandit.  Do you see

20  that?

21  A.   I'm with you.

22  Q.   And then if we go to the next page, we see Timberland.  Do

23  you see that?

24  A.   I do.

25  Q.   And, in fact, those were the only IR500 customers that

1  PowerReviews captured from Bazaarvoice in that entire four-year

2  period; isn't that true?

3  **A.**   Well, I do remember the number three.  If you're telling

4  me it's those three, I can accept that.

5  **Q.**   Okay.  Wasn't this failure to gain Bazaarvoice customers

6  the reason why PowerReviews abandoned its strategy of targeting

7  Bazaarvoice to pursue a broader "blue ocean" strategy?

8  **A.**   I think that the failure to win the larger accounts here

9  did naturally lead to an alteration in strategy of PowerReviews

10  to broaden the focus.  They talked about midmarket as well.

11  So, yes, I think there was an adjustment in the face of those

12  difficulties of getting customers to switch.

13  **Q.**   And wasn't that also the reason that PowerReviews

14  terminated Cathy Halligan as the head of sales?

15  **A.**   I don't know why they terminated her.

16  **Q.**   Isn't it really true that PowerReviews was more

17  significant in providing a basis for customers to use as

18  leverage in negotiating with Bazaarvoice rather than it

19  actually getting customers to switch?

20  **A.**   Well, I think I generally agree with that, and that's why

21  I said the competition is mostly by bidding and trying; but, of

22  course, you don't -- the customer doesn't get leverage unless

23  the stocking orders or the alternative is credible.

24  **Q.**   Right.  We understand that and we'll get to that.

25      You heard about PowerReviews open syndication strategy?

SHAPIRO - CROSS / JACOBSON

1   **A.**   Yes, I have.

2   **Q.**   Did that involve any new technology?

3   **A.**   I'm not sure.

4   **Q.**   Can you bring up the transcript from day two, the

5   testimony of Mr. Luedtke at pages 393 and 394?  And if you can

6   highlight that, yes, those two passages, and bring them up.

7        Do you recall this testimony, Dr. Shapiro?

8   **A.**   (Witness examines document.)  That is familiar now.  I did

9   read that, yes.

10  **Q.**   So open syndication was a press release, not a technology;

11  correct?

12  **A.**   Well, I think it was a press release and an element of

13  strategy, but evidently not a change in technology.

14  **Q.**   Now, in the Government's papers, they talk about

15  PowerReviews' last month being its best month in terms of

16  revenues.  Did you ever read the Government's pretrial brief?

17  **A.**   I did.  I did read it, yes.

18  **Q.**   Did you read that passage?

19  **A.**   The last month before the merger, is that what you said?

20  **Q.**   Yes.

21  **A.**   I don't recall that in particular.

22  **Q.**   And you've reviewed PowerReviews' P & L; have you not?

23  **A.**   I have.

24  **Q.**   All right.  Can we bring up -- and this document is part

25  of the backup from Dr. Shahadeh that we provided to you, so if

1   we could bring up DX1387, which I hope is in the binder.

2   **A.**   (Witness examines document.)

3   **Q.**   1387.0001.

4   **A.**   That's very precise.  I've got it.

5   **Q.**   Okay.  And have you had a chance to look through

6   PowerReviews' P & L?

7   **A.**   Not recently, but I have looked at it.

8   **Q.**   So you've looked at these data?

9   **A.**   I'm not sure.  I don't know that I've looked at this

10  particular version of it.  I think I've looked at more of a

11  summary, maybe quarterly.  This looks monthly but I've seen,

12  you know, something quite similar.

13  **Q.**   So if you turn to page 7 of 8.

14  **A.**   Okay.

15  **Q.**   And we look at the bolded net income line at the bottom.

16  **A.**   (Witness examines document.)

17  **Q.**   Do you see that?

18  **A.**   I do.

19  **Q.**   So generally parentheses are bad in a P & L; would you

20  agree with that?

21  **A.**   If you mean losses --

22          **THE COURT:**  Is that for the Court's benefit,

23  Mr. Jacobson?

24                          (Laughter)

25          **THE WITNESS:**  Losses are generally not as good as

SHAPIRO - CROSS / JACOBSON

1    profits.

2    **BY MR. JACOBSON:**

3    **Q.**    Right.  And, so, by far the largest loss that PowerReviews

4    ever incurred was in its last month, May 2012; correct?

5    **A.**    Yes.  I don't -- this -- I need to look at this.  It's

6    ballooned so much there, there's some accounting thing going

7    on.  I don't know what it is, but that's not just -- that

8    doesn't look to me like normal operations.  There's something

9    else being accounted for I would think.

10   **Q.**    But generally when you talk about your best month, you're

11   talking about profits, aren't you, rather than revenues?

12   **A.**    I think it really depends.  You know, a lot of tech

13   industry they're building revenues and building customers'

14   installed base and they're losing money.  I mean, it was a

15   problem leading up to the tech boom.  It's happening again to

16   some degree.

17       But I think here I look much more at market capitalization

18   and value and assets.

19   **Q.**    And you can get --

20   **A.**    I mean, there's a reason the company was worth

21   $168 million.

22   **Q.**    You can get into that on redirect.

23       **THE COURT:**  But I think he was answering your

24   question.

25       **MR. JACOBSON:**  Okay, Your Honor.

1          **THE WITNESS:**  Okay.  So often losses -- revenues can

2    be important if you're building customers and assets for the

3    future, and often investors understand it's fine to lose money

4    if you're building value.

5    **BY MR. JACOBSON:**

6    **Q.**   At the time of the merger, wasn't PowerReviews running out

7    of cash with just 5.4 million in cash left?  It's not on the

8    P & L.  Do you recall that from Mr. Luedtke's testimony?

9    **A.**   I recall something along those lines.

10   **Q.**   And he also testified that PowerReviews would have run out

11   of cash in the second half of 2012 absent some outside event;

12   correct?

13   **A.**   That sounds roughly right.  I'll take your word for it.

14   **Q.**   Okay.  And your theory of the case is not that

15   PowerReviews should have been acquired by someone else; is it?

16   **A.**   No.  I haven't said anything about that.

17   **Q.**   Now, continuing on with, you know, the competitive

18   significance of PowerReviews, I want to talk about their

19   largest customer.  Who was that?

20   **A.**   That would be Staples.

21   **Q.**   And in calculating market share, you initially assigned

22   half of Staples' share to Bazaarvoice and half to Staples;

23   correct?

24   **A.**   Let me check that.  This will be quick.

25          (Witness examines document.)  So that's correct.

1  Q.   And after correcting that error, we found that Staples

2  accounted fully for 40 percent of PowerReviews' market share

3  and your preferred method, i.e., revenues; correct?

4  A.   In terms -- in that metric, customer revenues, online

5  commerce on the platform, that sounds about right, yes.

6  Q.   Okay.  How do you account for the fact that a portion of

7  Staples' sales are in fact made on the Amazon marketplace?  Are

8  you aware of that?

9  A.   No.  I don't know about that.  I haven't looked at that.

10 Q.   All right.  Let's bring up Slide 14.

11      And this is in your binder of slides.  I don't know that

12 we've given it an exhibit number.

13      And this was a screen shot, I will tell you, I did

14 yesterday, but it's -- you can see that it's the Amazon Web

15 site?

16 A.   You said it's in my binder of -- you mean this slides

17 (indicating)?

18 Q.   Yes.

19 A.   Okay.  I'll look on the screen.

20 Q.   Yeah.

21 A.   So I see this looks like Amazon Web site.  I'm with you.

22 Q.   And the products here are Staples' products?

23 A.   Yes.  That's -- I'm having trouble reading it, to be

24 honest, but I see "Staples" -- I see one big "Staples" there so

25 I'll go with you.

1  **Q.**  All right.  And you were not aware that a portion of

2  Staples' sales are made through Amazon; correct?

3  **A.**  I hadn't thought about it, and I -- no, I hadn't thought

4  about it or accounted for it.

5  **Q.**  So do we know whether these sales would be in the

6  40 percent of PowerReviews' share that you attribute to Staples

7  or whether they'd be attributable to Amazon, or you just don't

8  know?

9  **A.**  Well, we're here relying on what Staples reported to the

10  IR500, self-reported; and, so, it would depend on how they

11  treated it in their report.

12  **Q.**  Do you know if Staples, in fact, self-reported to the

13  IR500 or whether IR500 just estimated their sales?

14  **A.**  Ah, I'm not certain.

15  **Q.**  And let's talk about another customer, Vitamin Shoppe.

16  Vitamin Shoppe was a PowerReviews customer.  In your revenue

17  measure, you assign all of their sales to PowerReviews; do you

18  not?

19  **A.**  I have to go look.

20     (Witness examines document.)  I'm sorry.  I have trouble

21  working with the binder because it keeps opening.

22     (Witness examines document.)  Vitamin Shoppe.  So I have

23  to find them in the IR500 list to answer this.

24     Now I've got the list.  Do you know their number in the

25  IR500?

SHAPIRO - CROSS / JACOBSON

1    Q.   I don't.  While we're getting that, and my colleague will

2    get me that number, let me bring up Slide 15, another screen

3    shot we did yesterday.

4         So are you aware, sir, that Vitamin Shoppe is a vendor on

5    Amazon?

6    A.   No.

7    Q.   And you can see the same product here is being sold, and

8    we've got two screen shots here.  The top one is the Amazon Web

9    site.  The bottom is Vitamin Shoppe's own Web site.

10   A.   I see it.

11   Q.   And they both have ratings and reviews.  Do you see that

12   as well?

13   A.   I see you've blown that up, I think; right?

14   Q.   Yes.  So do you know whether PowerReviews powers the

15   reviews on the Amazon Web site for Vitamin Shoppe or whether

16   they're powered by Amazon?

17   A.   On the Amazon.com Web site it would be Amazon.

18   Q.   And, again, in terms of the sales, let's just go to the

19   next Slide 16, just to verify here the actual vendor on

20   Amazon.com is Vitamin Shoppe.  Do you see that?  I apologize

21   for the legibility.

22   A.   (Witness examines document.)  I don't know what you're

23   referring to honestly.

24   Q.   So -- thank you.

25        I'm referring to that (indicating), what was just

1    highlighted, shipping from the Vitamin Shoppe on Amazon.

2    **A.**   Oh.  Okay.  I see that.

3    **Q.**   Okay.  And just putting Vitamin Shoppe aside, generically

4    when that kind of issue has come up, have you decided where to

5    assign the sales, either to Vitamin Shoppe or some other

6    company doing the same thing or to Amazon?

7    **A.**   I have not adjusted the revenue figures for the IR500.

8    There's -- I don't think that would be feasible with 500

9    companies to do this.  I didn't do it.

10   **Q.**   And in terms of your customer count for Amazon, you give

11   them the value of one; correct?

12   **A.**   Yes.  They're one customer.  They're number one in the

13   IR500.

14   **Q.**   But you give them a value in the count measure of one?

15   **A.**   Yes.

16   **Q.**   All right.  So to the extent that Vitamin Shoppe is using

17   Amazon reviews and selling on Amazon.com, you assign zero to

18   that; correct?

19   **A.**   I don't understand the question.

20   **Q.**   So we've established, I believe, that Vitamin Shoppe is a

21   vendor on Amazon.com.  You are simply treating that as part of

22   the value of one that you give to Amazon.  You're not adding

23   another number there in the customer count for Vitamin Shoppe

24   on Amazon; correct?

25   **A.**   This is the Amazon.com Web site we're talking about?

SHAPIRO - CROSS / JACOBSON

1   Q.   Yes.  Yes.

2   A.   That's what's counted and that's Amazon.com.  That's what

3   it measures.

4   Q.   So you're not adding Vitamin Shoppe or Staples or any of

5   the others?

6   A.   I still -- it's Amazon.com.  That's the customer.  They do

7   in-house.  I don't understand what you're saying.  I'm not

8   following you.

9   Q.   So for the record, Vitamin Shoppe is 201 on the IR500, if

10  you can verify that.

11  A.   (Witness examines document.)  Oh, I'm sorry.  I didn't

12  realize there was a pending question.  I apologize.

13  Q.   That's okay.  We can move on.

14  A.   I see that it's 201.  I did check that.  I didn't realize

15  it was a question.

16  Q.   All right.  Thank you.

17       Now, you rely on Professor DellaRocca in your report;

18  don't you?

19  A.   I don't believe so.

20  Q.   You don't cite Dr. DellaRocca as one of the materials that

21  you've relied on?

22  A.   Well, for the rebuttal report?

23  Q.   No.  For your report.

24  A.   I'm not relying on his opinions, so I'm not sure what

25  you're referring to.

SHAPIRO - CROSS / JACOBSON

1    Q.   So you didn't cite his report in your report?

2    A.   I don't believe so.

3    Q.   Have you read his report?

4    A.   I did, yes.

5    Q.   And have you read his deposition?

6    A.   No.

7                    (Pause in proceedings.)

8            MR. JACOBSON:  Bear with me one second, Your Honor.  I

9    didn't think this would be an issue.

10                   (Pause in proceedings.)

11           MR. JACOBSON:  All right.  We will come back to this.

12   Q.   In terms of innovation, isn't the leader in

13   ratings-and-review innovation Amazon.com?

14   A.   I wouldn't say that.

15   Q.   And why would you not say that?

16   A.   They're not -- they don't do syndication, for example.

17   Q.   Did you read Mr. Hurt's testimony that Amazon was a more

18   important rival to Bazaarvoice in terms of innovation than

19   PowerReviews?

20   A.   I did.

21   Q.   You don't agree with his testimony?

22   A.   I don't see it as one or the other.  I think it's better

23   to have both -- both forces as competitive pressures on

24   Bazaarvoice than just one.

25   Q.   I understand.  But do you agree or disagree with his

1   testimony that Amazon was a greater source of innovation

2   competition than PowerReviews?

3   **A.**    I don't want to contradict his testimony as an informed

4   industry participant; but I would just note from the

5   economist's perspective, the competition to improve products

6   between Bazaarvoice and PowerReviews is a direct competition to

7   win clients.

8        The competition with Amazon is what we call indirect

9   competition; namely, the Bazaarvoice clients are competing with

10  Amazon.com.  That is a factor, but it's indirect.

11       We generally think of that as attenuated.  Amazon's very

12  big, so I wouldn't make -- take it lightly; but if I had to

13  compare, those would be the factors I would consider.  I

14  didn't -- I don't have a comparison or metric to do that, but

15  that's how I think about it.

16  **Q.**    And can Bazaarvoice afford not to keep up with Amazon.com

17  in providing service and innovation to its customers?

18  **A.**    Well, the term "afford" is not the one I would tend to

19  use.  I guess I ask myself what are the incentives to make

20  improvements, and I think I said on direct testimony they

21  continue to have incentives to improve their product.  I just

22  don't think they're as strong as they were when they faced

23  PowerReviews.

24  **Q.**    Turning to entry barriers, is every sunk cost of entry a

25  barrier?

SHAPIRO - CROSS / JACOBSON

1    A.    No.

2    Q.    Where do you draw the line?

3    A.    Well, the barriers, it's a forward-looking concept.  What

4    is the entrant space to get in?  Some costs that may have been

5    incurred by incumbents may be irrelevant if technologies

6    change.  So they wouldn't be entry barriers at all.

7    Q.    Can a company's strong culture and a healthy employee

8    relationship be a competitive advantage?

9    A.    Absolutely.

10   Q.    Can it be a barrier to entry?

11   A.    I wouldn't use that term for it, okay, but let's put it

12   this way:  If an incumbent company is -- has a very skilled

13   workforce, they're good at innovating, they're ahead of the

14   curve, that's great.  Obviously, we applaud that.  But it is

15   something an entrant would factor in whether they want to take

16   those guys on.

17       I wouldn't tend to use "entry barrier" for that particular

18   category of competitive advantage.  I would use the term

19   "competitive advantage."

20   Q.    What's the difference?

21   A.    Just language really.  I mean, I think -- I think partly

22   because it may be another company could have also its own good

23   culture and, so, it might not be a barrier.  It could be just

24   something other companies do and have skilled programmers, for

25   example, experience in the industry.

SHAPIRO - CROSS / JACOBSON

1    Now, if it were -- if you couldn't hire those programmers,

2    if they weren't available, and this company had tied up the

3    key -- tied up -- had in-house the key -- the resident

4    expertise, maybe it's very specialized, then I think it could

5    count as an entry barrier.

6    Q.   Your difference is basically language between the two?

7    A.   Well, I said that and that's some of that.   Language

8    matters, particularly in a legal setting; but I think it's also

9    the question about is it something that's hard to replicate,

10   that is hard for an entrant to do.

11   And, you know, culture, every company has its culture and

12   I don't think of that as something that tends to be hard to

13   replicate.   Sometimes you get a good culture, sometimes you

14   don't.   So I just don't like to use the language "barrier to

15   entry."   It doesn't feel right to me for that.

16   Q.   So in terms of syndication, did Gigya's lack of

17   syndication inhibit it from getting Pacific Sunwear as a

18   client?

19   A.   I don't know.

20   Q.   Did it -- you've heard of Bose Sound Systems; have you

21   not?

22   A.   I have.

23   Q.   And did syndication prevent them from moving to Pluck?

24   A.   Well, I think the answer is built into the question;

25   right?   If you have -- if a customer switched, maybe it was the

SHAPIRO - CROSS / JACOBSON

1  lack of syndication was a disadvantage, but it didn't prevent

2  it.  So I take that as a tautology.

3  Q.  And are you aware that Altoids, Fruit of the Loom,

4  Rite-Aid, and Alternative Apparel have gone to the Amazon

5  Webstore?

6  A.  I knew about Fruit of the Loom.  I don't think I know

7  about the other ones, no, not by name.

8  Q.  If network effects and syndication are a barrier, why is

9  it that Bazaarvoice is seeing Gigya in every new deal and

10  existing clients, too?

11  A.  Clients have to look -- have to try to develop some sort

12  of leverage.  They do the best they can.

13  Q.  Does a competitor actually have to secure an account to

14  provide a competitive constraint for that account?

15  A.  Of course, not.  We've been talking about how PowerReviews

16  provided a competitive constraint in many cases without winning

17  the business away from Bazaarvoice.

18  Q.  Okay.  Now, in your rebuttal report, you criticize

19  Dr. Shahadeh's calculation of 27.1 percent as the percentage of

20  Bazaarvoice customers using syndication.  Do you recall that in

21  your rebuttal report?

22  A.  Yes.

23  Q.  And the number that you come up with is 37.7 percent.

24  Does that sound right?

25  A.  I'd have to check.  I can check.

1    **Q.**    It's Exhibit 984, Exhibit 11.

2    **A.**    Thank you.

3         (Witness examines document.)   I've got it.

4    **Q.**    And, so, you would agree that 62.3 percent of

5    Bazaarvoice's customers do not use syndication?

6    **A.**    That's right.

7         Your Honor, this is a paired exhibit to the one I showed

8    you on direct.   This is customer counts.   The other one that I

9    think is more informative was based on ratings-and-review

10   revenue.

11        So when you look at the counts, you see syndication looks

12   less important.   When you look at the revenues, syndication

13   looks more important because bigger customers are using it,

14   particularly the brands.

15        So, yes, on the customer-count side overall, the

16   37.7 percent number, I would compare that with the 56.6 percent

17   number on the exhibit we showed previously of the total

18   revenues earned from syndication customers, the percent of

19   revenues earned from syndication customers.

20   **Q.**    All right.   So let's turn to that.   I believe it is

21   GX1059.

22   **A.**    (Witness examines document.)   Wait.   Okay.

23        Okay.   So this is the one we showed on direct, I believe.

24   **Q.**    Yes.

25        Now, this is percentage of customers in the left-hand

1  side?

2  **A.**   Well, weighted by ratings-and-review revenue.  That's

3  what -- the subtitle says that.

4  **Q.**   Where is it?  Okay.

5  **A.**   Subtitle.

6  **Q.**   All right.  So based on revenue, it's about 56 --

7  57 percent and based on customer count, it's 37.7 percent?

8  **A.**   That's right, when we're looking at brands and retail

9  together.

10  **Q.**   All right.  Now, you don't challenge, do you, that

11  syndication represents, as Dr. Shahadeh has testified, just

12  3.4 percent of PowerReviews' customers?

13  **A.**   That doesn't sound right.  Oh, if you're including the

14  PowerReviews Express customers.

15  **Q.**   So it's less than 10 percent of PowerReviews' Enterprise

16  customers and just 0.5 percent of its Express customers;

17  correct?

18  **A.**   Well, the Express customers, I don't know the numbers.  I

19  think of them as not syndicating.  That's a much different --

20  completely different grouping.

21      The Enterprise customers you said 10 percent or so?

22  **Q.**   Less than 10 percent.

23  **A.**   Okay.  I don't have that number with me.

24  **Q.**   Let's turn to your deposition, page 72, lines 5 through

25  22.  If we could play clip 13:

1                    (Videotape played as follows:)

2          **Q.**  I'm going to ask you to refer to Exhibit 772,

3      Dr. Shahadeh's rebuttal report.  I direct your attention

4      to page 63.

5          **A.**  Uh-huh.

6          **Q.**  Are you familiar with that chart?

7          **A.**  Yes.  I've seen it.

8          **Q.**  Do you have any basis to disagree with the math?

9          **A.**  No.

10         **Q.**  So according to this math, less than 10 percent of

11     PowerReviews' Enterprise customers use syndication;

12     correct?

13         **A.**  As of June 2012, right, premerger.  Okay.  I see that

14     here.  That's what he's reporting.

15         **Q.**  And in terms of Express, it's 0.5 percent; right?

16         **A.**  That's what he says.

17         **Q.**  So that the total is 3.4 percent.

18         **A.**  I see the same numbers you do.  I agree."

19         Now, you are also aware that doing well in search engine

20     results on Google, Bing, and Yahoo! is important to any Web

21     site; right?

22     **A.**  That's highly desirable, yes.

23     **Q.**  And you also know that when a search engine sees content

24     that is not unique but duplicated, that that's a negative in

25     search engine rankings?

SHAPIRO - CROSS / JACOBSON

1    A.    Given the content, it's better if it's unique than

2    duplicated.

3    Q.    And that is a negative, there are positives, of course,

4    but that's a negative to syndication; isn't it?

5    A.    It can be and that, I think, is why a number of the

6    retailers don't participate in syndication.  They have ratings

7    and -- they're happy with the ratings and review they're

8    getting on their own site, and they don't want more feed.

9    Q.    Is it also possibly a reason -- strike the "possibly."

10    Is it also a reason, based on your analysis, that a large

11    portion of brands don't use syndication?

12    A.    I'm not as sure on the brand side.

13    Q.    You don't have any opinion on the subject?

14    A.    Well, we see that 75, roughly 75 percent of the revenues

15    of brands do participate in syndication.  I guess I'm having

16    trouble seeing why that's a negative for a brand because I

17    guess if the content's somewhere else and they feed it, it's

18    nice to have the customers there see it.  It does duplicate

19    what's on their own Web site.  So, okay, it could be a minus

20    for them, too.

21    Q.    Okay.  Let's turn to switching costs.  Has the acquisition

22    increased switching costs?

23    A.    Not so far as I know.

24    Q.    Do you recall when I asked you in your deposition whether

25    a customer who was changing its eCommerce platform would incur

SHAPIRO - CROSS / JACOBSON

1   switching costs, and I referred to Dr. Goldberg's [sic] report?

2   Do you recall that?

3   A.   I do remember that issue.

4   Q.   You said you'd read that report explaining that there are

5   no incremental switching costs when switching R & R platforms

6   at the same time as switching eCommerce platforms.  Do you

7   recall that?

8   A.   I do recall Dr. -- Mr. Goldberg, is it, making that

9   statement.

10  Q.   He would appreciate the degree, I'm sure, but it hasn't

11  been awarded yet.

12       But at the time of your deposition, you didn't know enough

13  about it and you said you'd look into the issue; right?

14  A.   Okay.

15  Q.   What have you done to look into the issue since then?

16  A.   I don't think I got around to it, no.

17  Q.   So basically you have no basis to disagree with

18  Mr. Goldberg's testimony on that point; do you?

19  A.   I'm skeptical of that as a general principle.  It doesn't

20  seem right to me given my experience in this area.

21  Q.   Even though you haven't looked at it?

22  A.   I have not looked into it other than to look at -- well,

23  the customer testimony speaks to this, and I'm familiar with

24  that.

25  Q.   Now, customers -- well, what customer said that they

1    incurred switching costs when changing eCommerce platforms?

2    A.    I don't know about that particular question.

3    Q.    Was there any?

4    A.    Again, I don't know.  I just don't know what -- whether

5    that question was asked, what people said.  That's not -- I

6    don't have that up here right now.

7    Q.    So that's not a basis for your opinion then?

8    A.    No, it's not that -- answering that specific question.

9    It's really what I know about the nature of the switching

10   costs.  There's IT work involved in switching

11   ratings-and-review providers, and I guess I'm just -- I'll just

12   leave it at that.

13        I'm not an expert.  I'm not a technical expert.  I remain

14   skeptical that there are no switching costs simply because the

15   customer is changing eCommerce platforms.

16        If that were true, I would expect to see in the company's

17   documents a targeting plan:  Okay.  These are the customers to

18   go after.  When they're switching to their eCommerce platforms,

19   it's wide open.  Okay.  That's the time to go after to do the

20   switching.

21        I don't see that in the strategies.  I don't see that in

22   the documents.  So I'm skeptical based on the economic

23   evidence.  I'm not a technical expert.

24   Q.    And Mr. Goldberg is the technical expert on this issue;

25   correct?

1  **A.**   I guess that will be for the Court to decide.

2  **Q.**   Do you have any reason to doubt his expertise on these

3  issues?

4  **A.**   No, not at all.  I probably shouldn't have said that.

5  Let's just say he's put forward as an industry expert, and most

6  of what he said I find it -- his report generally informative.

7  I learned a bunch about the industry from him.

8  **Q.**   Now, one of the things that we saw in the churn that was

9  discussed yesterday is a lot of people just leave ratings and

10  reviews, just abandon ratings and reviews; correct?

11  **A.**   No, I don't think that's true.

12  **Q.**   Okay.  Well, fine.  We may come back to that.

13       But you agree there's competition for customers who do not

14  yet have ratings and reviews?  Wouldn't you agree with that?

15  **A.**   Yes, there's some of that.

16  **Q.**   Okay.  Now, they incur no switching costs, correct, when

17  adopting an R & R platform for the first time?

18  **A.**   By definition, yes.

19  **Q.**   Okay.  Now, in terms of customer count, you assign zero to

20  Yotpo even though it has 1500 or more U.S. ratings-and-reviews

21  customers; correct?

22  **A.**   My measure is the IR500.  They don't have any IR500

23  customers, so they show up as a zero there.

24  **Q.**   All right.  But you did these robustness checks and none

25  of them picked up Yotpo; did they?

SHAPIRO - CROSS / JACOBSON

1   **A.**   No.   It's interesting that using the 30,000 sample, they

2   also didn't appear there either, and that includes not only

3   retailers, manufacturers, all types of prospects.

4        So, yeah, I think that strengthens the point that they're

5   in some other space, I think much smaller customers, and not

6   the ones that Bazaarvoice views in this large quantity of

7   prospects.

8   **Q.**   Now, if you counted Yotpo's 1500 customers and you counted

9   the Amazon Webstore customers in your customer count, the share

10  of PowerReviews and Bazaarvoice would go down; correct?

11  **A.**   Well, as a matter of arithmetic, that would be true.   It

12  would be misleading, but it would be true.

13  **Q.**   Now, if there are barriers to entry that are significant,

14  why would investors during the month of September invest

15  $50 million in Lithium and 25 million in Gigya?

16  **A.**   I think that there's a lot of investors interested in

17  social commerce.   I have not seen evidence that that money

18  is -- was intended to or will be deployed in the

19  ratings-and-review market.

20  **Q.**   Do you agree that a firm that never enters a given market

21  can, nevertheless, exert competitive pressure on that market?

22  **A.**   Certainly.   Rapid entrance would be an example of that.

23  **Q.**   And I don't want to go through the rigmarole we went

24  through earlier, but you've not examined whether postmerger

25  prices have increased, whether discounting has decreased

SHAPIRO - CROSS / JACOBSON

1  postmerger; correct?

2  **A.**    That's correct.

3  **Q.**    Now, let me talk about in-house for a minute.

4        According to your report, your preferred market share

5  measure, revenues, customer revenues, yields a share for

6  in-house of 41 percent; correct?

7  **A.**    Sounds right.

8  **Q.**    And you assign 14.5 percent to PowerReviews; right?

9  **A.**    I thought it was --

10  **Q.**    In the revenue measure.

11  **A.**    -- 15.3, but I'm looking for it.

12  **Q.**    Well, it's changed from time to time, right, as you've

13  made revisions?

14  **A.**    I wouldn't quite put it that way.

15  **Q.**    Well, has it changed?

16  **A.**    It did get adjusted, and I believe it went up from 14.5 to

17  15.3 once we corrected the splits that we talked about.

18  **Q.**    And in-house is what?

19  **A.**    So I think I've got it here.  I believe in-house is

20  42 percent when you do this measure with Amazon 28 -- Amazon

21  two thirds of that.

22  **Q.**    So looking now at GX1063, other in-house, excluding

23  Amazon, is 14.1 percent to PowerReviews' 15.3 percent?

24  **A.**    Correct.

25  **Q.**    And you have a chart here with in-house.  There's some

1    other features on the chart.  It's GX1038, which we don't need

2    to show, but if you could turn to that.

3    A.    (Witness examines document.)

4    Q.    This is -- you're showing in the green line that in-house

5    is basically flat?

6    A.    Yes.  So this is the count of the IR500 companies from

7    2009 to 2013.  Actually it went up a little bit as part of the

8    general adoption of PRR from 2009 to '11, and then it declined

9    slightly after that during which time the commercial providers,

10   Bazaarvoice and PowerReviews, picked up a large number of IR500

11   customers.

12   Q.    Now, you use customer count not your preferred measure of

13   customer revenues for this chart; correct?

14   A.    I don't think the -- I wouldn't use the customer revenues

15   for this purpose.

16   Q.    If you use customer revenues, the growth on an index basis

17   over the last few years has been substantial; hasn't it?

18         Bring up Slide 8.

19         You've seen this chart before?

20   A.    I think I saw this from your opening, Mr. Jacobson.

21   Q.    And it's indexed to 2009.  You're familiar with that

22   method of presenting data; correct?

23   A.    Yes.  I haven't checked the numbers, but I'm familiar with

24   that method.

25   Q.    This trend doesn't look inaccurate to you in terms of

1    revenues; does it?

2    **A.**    Well, I'm -- I'm a little surprised it's gone up tenfold

3    for the in-house.  I think that's -- the bulk of that is

4    Amazon, I believe, or a large fraction of it.  I wouldn't have

5    guessed 10 to 1; but if you did it right, so be it.  So Amazon

6    has really grown like a weed.  It's very impressive.  So I

7    think that's what you're picking up.

8    **Q.**    And you've seen the testimony from companies like Wayfair

9    about how easy it is to go in-house?

10   **A.**    I'm aware of that.  I don't know the details.

11   **Q.**    Let's play the excerpt from Mr. Macri's deposition,

12   pages 16 through 17.  Go ahead.

13                    (Videotape played as follows:)

14        "**Q.**   And how did you do that?

15        "**A.**   We designed the pages.  Our product Management Team

16        designed the pages.  We made the decision, I believe it

17        was around September of 2011, to start building the tool,

18        and it was live before Thanksgiving.  And we had, at most,

19        one engineer working on it, so less than two months with

20        one engineer.

21        "**Q.**   How has the ratings-and-reviews tool that you

22        developed internally performed relative to the

23        PowerReviews tool that you were using before that?

24        "**A.**   We immediately saw an improvement in the percent of

25        reviews captured, so we were very happy with it."

SHAPIRO - CROSS / JACOBSON

1      So isn't two months considered relatively a relatively

2  short time for entry?

3  **A.**   Yes.

4  **Q.**   And did you -- were you made aware of the testimony of

5  Build.Com that in an emergency they could do it in two days?

6  **A.**   I'm not familiar with that example.  I don't know what you

7  mean by "do it."

8  **Q.**   Switch from Bazaarvoice to an in-house platform.

9  **A.**   Okay.

10  **Q.**   Are you aware of that testimony?

11  **A.**   No.  I don't know that example.

12  **Q.**   And you interviewed Systemax, correct, TigerDirect?

13  **A.**   Oh, thank you.  TigerDirect, that's more familiar.  Yes.

14  They were one of my interviewees.

15  **Q.**   And they told you they established their in-house system

16  in just three to four weeks; correct?

17  **A.**   I'd have to check my notes on that.

18  **Q.**   Could you put the notes up on the screen?

19      No, his notes.

20      We can move on.  I'm using more time than I should.

21      You recall they went in-house pretty quickly; correct?

22  **A.**   I'm sorry, I just don't recall the specifics.  There's so

23  many different customers.  I'm not disputing what you said.  I

24  just don't have it in my head.

25  **Q.**   Do you have an opinion whether it's harder or easier to go

SHAPIRO - CROSS / JACOBSON

1    in-house now than it was four years ago?

2    **A.**   I've seen some testimony that it's easier because of other

3    tools out there.  I don't have any technical basis to question

4    that.  As a trend, it sounds plausible to me given the overall

5    advance of technology.

6    **Q.**   Now, in terms of syndication, aren't there commercial

7    suppliers who provide syndication capability beyond

8    Bazaarvoice?

9    **A.**   I have heard of such.

10   **Q.**   Webcollage, are you aware of that?

11   **A.**   That's one of the ones I've heard of.

12   **Q.**   CNET Content, have you heard of them?

13   **A.**   I've heard of these.  I don't think this is the same

14   syndication service that Bazaarvoice is offering in quality;

15   but the term is used for them, I'm aware of that.

16   **Q.**   And SellPoint?

17   **A.**   I don't remember -- that's not a familiar one to me.

18   **Q.**   And the customer owns the data; correct?

19   **A.**   The brand in particular?

20   **Q.**   Yes, or the retailer.

21   **A.**   Okay.  That's my understanding, yes.

22   **Q.**   Okay.  So there's nothing that would prevent anyone from

23   going in-house and using a third-party service to syndicate its

24   data; correct?

25   **A.**   I'm sorry, nothing to prevent who from syndicating?

SHAPIRO - CROSS / JACOBSON

1   Q.   Let's say Clorox decided to go in-house.  Would anything

2   prevent it from using Webcollage to syndicate its data?

3   A.   Oh, lots of things would prevent it.  That's why they

4   don't do it.

5   Q.   What would prevent it from using Webcollage?

6   A.   Well, they'd have to -- the first question is:  How much

7   work is it on their side to deal with it?  Then there's the

8   question:  How broad is your reach in retailers in comparison

9   with what Bazaarvoice offers or PowerReviews used to offer?

10      So there's a lot of issues that, seem to me, make this far

11  inferior for Clorox and any other brands; and, of course,

12  Bazaarvoice knows this.  It's part of their strategy.  It's

13  successful.

14  Q.   So why would these three firms enter into the business of

15  syndication if it was impossible?

16  A.   Because it's -- there's highly heterogeneous needs in this

17  market.  Both the brands and the retailers differ a great deal;

18  and it appears, I would infer that there are customers whose

19  syndication needs -- they don't need what Bazaarvoice is

20  offering.  They have some other set of needs, I don't know the

21  specifics, that are met by these other specialist firms.

22  Perfectly normal.

23  Q.   And you could say the same thing about PowerReviews'

24  syndication customers as well; couldn't you?

25  A.   Say the same thing?  I'm not sure what you mean.

SHAPIRO - CROSS / JACOBSON

1  Q.   That they didn't need Bazaarvoice's network.

2  A.   That's true.  They were using PowerReviews' network.

3  Q.   So a customer trying to negotiate a lower price from

4  Bazaarvoice with PowerReviews gone can use in-house as a threat

5  even if it has no serious interest in going in-house; can't it?

6  A.   It all depends.  For a threat to be effective, it has to

7  be credible, believable, real.  That's going to depend on the

8  customer.  I think Bazaarvoice is going to be aware of some

9  customers who really don't have the appetite for that.  We've

10 heard from some of them in testimony.

11 Q.   But for many customers -- Sears went in-house, correct,

12 from Viewpoints?

13 A.   They did.

14 Q.   So lots of large customers have gone in-house, lots of

15 small customers have gone in-house; correct?

16 A.   No, I don't think that's right.  If you look at the top 20

17 or 25 firms in the IR500, there's very few that are in-house

18 now.  Amazon's one, so they're kind of a special case for sure.

19 Netflix is in there, and they're a little different, too.

20 They're high up in the IR500.  Very little in-house if we look

21 at that list at the top, and that's meaningful.

22 Q.   Sears is a substantial customer; isn't it?

23 A.   Yes, it is.  They're another one in there.

24 Q.   And you left out Apple?

25 A.   Apple doesn't use ratings and review that heavily because

SHAPIRO - CROSS / JACOBSON

```
1    they don't -- they don't, I'm told, do ratings and review for

2    their own Apple products because they're all so awesome.  So --

3    Q.   Where are they on the IR500?

4    A.   I think they're three.

5    Q.   They're two or three; right?

6    A.   I think Staples is two, so I think Apple's three.  So

7    that's -- you know, they're their own special case, actually,

8    as it turns out.  They use ratings and review for accessory

9    products and to rate their consultants.

10        So, no, I would not count -- that's not like a Staples or

11   a Walgreens or Toys R Us.  They don't -- that's not the same

12   type of thing.

13   Q.   Have you been aware of customers that have threatened to

14   go in-house and not been taken seriously?

15   A.   I don't -- you know, I'm not privy to the back and forth

16   in terms of adjudging who's taken seriously or not.  That's --

17   that's the business negotiations that are, you know -- I don't

18   see those.

19   Q.   And you can't identify any objective criteria that

20   separate those that might go in-house from those that might

21   not; correct?

22   A.   Well, for example, one of the reasons -- yes, I can.  I

23   mean, for example, one reason I noted some of the vulnerable

24   customer sets, those are the ones who are less likely to go

25   in-house.
```

1      Customers who've been using PowerReviews or Bazaarvoice

2   and don't have in-house, that's a signal that they want a

3   commercial provider.  It doesn't mean they absolutely can't,

4   but it's a signal that that's not what they want to do, that's

5   not how they want to devote their IT resources' time.

6      And, likewise, the syndication customers, the brands

7   especially, in-house is going to look very unattractive to them

8   because of the syndication.

9      So we have a lot of information about the types of

10  customers that are unlikely to have a credible threat or

11  unlikely to go in-house or it's a weaker threat to do so.

12  **Q.**   There are brands that do syndication and brands that go

13  in-house; isn't that true?

14  **A.**   Certainly, yes.

15  **Q.**   And the point is if -- is your point simply that people

16  who have chosen Bazaarvoice or PowerReviews have revealed their

17  choice in that matter?

18  **A.**   Well, that is one point, that's true.

19  **Q.**   So competition is irrelevant?

20  **A.**   I certainly didn't say that.

21  **Q.**   So in January 2013, Bazaarvoice was facing competition

22  from Reevoo, Pluck, Gigya, Lithium, and a host of competitors,

23  just in its core product, ratings and reviews; correct?

24  **A.**   Those were all market participants so, yes, they were in

25  the market then and all of them, other than Reevoo, were in the

SHAPIRO - CROSS / JACOBSON

1   market prior to the merger.

2   **Q.**   And Bazaarvoice was characterizing that competition as

3   aggressive; correct?

4   **A.**   You could show me the citation.

5   **Q.**   DX1012.

6   **A.**   (Witness examines document.)

7   **Q.**   Can you highlight the first phrase?

8   **A.**   Uh-huh.

9   **Q.**   You recall this document; don't you?

10  **A.**   I see it.  I see the date.  I'm with you.

11  **Q.**   Do you have any reason to believe that Bazaarvoice wasn't

12  facing aggressive competition daily from those firms?

13  **A.**   Well, I'm not going to dispute the author here; but in my

14  experience, basically any competition, you look at who's --

15  who's the best competition out there and you deal with that.

16       Okay.  I have trouble -- well, I guess the word

17  "aggressive" is the cook here.  I don't doubt that Reevoo and

18  Pluck and Gigya and Lithium are aggressive because they're

19  behind the curve.  They've got a problem.  They don't have the

20  syndication network, et cetera.  Switching costs are a problem.

21  So it's one thing to be aggressive.  It's another thing to be

22  successful or effective.

23  **Q.**   But, obviously, they were sufficiently successful that

24  Bazaarvoice was worried about them?

25  **A.**   This is the strongest remaining competitor, so I would

SHAPIRO - CROSS / JACOBSON

1  expect to see it in their documents now that's who they're

2  facing now that they've taken -- acquired PowerReviews.

3  **Q.**   Now, Pluck and Reevoo have a competitive advantage through

4  their partnership with IBM; don't they?  Isn't that a

5  competitive advantage?

6  **A.**   I don't know the details of that, no.

7  **Q.**   Do you know whether Gigya has a partnership with Oracle?

8  **A.**   I'm not certain.

9  **Q.**   Do you know whether Yotpo has a partnership with eBay's

10  Magento?

11  **A.**   No, I don't know about that partnership, if it exists.

12  **Q.**   Is there any evidence that as of 2013, Bazaarvoice doesn't

13  view any one of these customers as a credible threat?

14  **A.**   You said "customers."  I don't think you meant that.

15  **Q.**   You're correct.  These competitors as a competitive

16  threat.

17  **A.**   Well, take Yotpo.  I don't think they're a credible threat

18  in the major brands and retailers.  They have some, as far as I

19  know, basically kind of self-serve, low-end product.  I don't

20  think it's -- I doubt it's a credible threat.  I haven't seen

21  any evidence it's a credible threat to go after a customer like

22  Toys R Us.

23  **Q.**   Is there any document or testimony in the case that

24  Bazaarvoice does not perceive Pluck, Gigya, Lithium, or Reevoo

25  as a credible threat?

SHAPIRO - CROSS / JACOBSON

1    A.   Well, yes.   There's documents from before the merger

2    dismissing these firms as ineffective competitors.   Not Reevoo

3    because they weren't in the market yet.

4    Q.   Postmerger?

5    A.   No.   They're the best competitors left, so I don't see

6    that.

7            MR. JACOBSON:   Your Honor, I'm happy to continue to

8    go.

9            THE COURT:   Do you want --

10           MR. JACOBSON:   I do have some --

11           THE COURT:   Do you want to take 10?

12           MR. JACOBSON:   It's up to you.   I'm moving on to

13   another area, so we can --

14           THE COURT:   Okay.   Let's take ten minutes.

15           MR. JACOBSON:   Okay.   Thank you.

16               (Recess taken at 11:07 a.m.)

17               (Proceedings resumed at 11:18 a.m.)

18   BY MR. JACOBSON

19   Q.   Dr. Shapiro, can you turn to Exhibit 984, GX984, which is

20   your rebuttal report, and go to the first page of Appendix A.

21        Are you there?

22   A.   Yes, I'm there.

23   Q.   Do you see under "Expert Reports" you're relying on your

24   own report, which is good, but the second one is Professor

25   Dellarocca?

SHAPIRO - CROSS / JACOBSON

1   **A.**    I see that.

2   **Q.**    Okay.  So we're going to play a clip from his testimony.

3   I'm going to ask you what you think of it:

4        (Video testimony played as follows:)

5            "I believe that there will be innovation.  There will

6        be new tools introduced.  Some old tools will remain

7        relevant.  Others might prove to be less relevant.  Some

8        of the current market players might persist.  Others might

9        be displaced and new players may come in.  Which is true

10       of any dynamic market.

11       **"Q.**  And you believe that the social commerce market is a

12       dynamic market?

13       **"A.**  By that you mean a market where -- well, how do you

14       define dynamic?

15       **"Q.**  Well, you used the term so ...

16       **"A.**  Yeah.  Dynamic is a market where there is a lot of

17       innovation.  Yeah, I think it's a dynamic market.

18       **"Q.**  What about rating and review technology?

19       **"A.**  There's a lot of innovation there as well.  This

20       technology has been evolving together with a lot of social

21       eCommerce technologies.

22       **"Q.**  Any reason to believe that it won't continue to

23       innovate?

24       **"A.**  No."

25  **Q.**    So I played that, Dr. Shapiro, because you testified on

1  direct that you saw a lot of dynamism in social commerce, but

2  not in ratings and reviews.

3       Did you consider, now, Dr. -- Professor Dellarocca's

4  opinion on that subject?

5  **A.**   Well, I think what he's saying is consistent with what I'm

6  saying.

7       I said on direct that I expected Bazaarvoice to continue

8  to improve its product, its ratings and review product.  And

9  according to Professor Dellarocca, that's dynamic, the way he's

10  using the term.  So that's consistent.

11       And he's also -- well, I'm distinguishing more than he is,

12  I guess, between the social commerce space broadly and ratings

13  and reviews in particular.

14  **Q.**   But you don't disagree with anything he just said, do you?

15  **A.**   In broad brush, no.  I think it's consistent with my

16  opinion.

17  **Q.**   Now, do you know why it is that customers like

18  Vitamin Shoppe, whose deposition is in your materials relied

19  on, and Build.com, whose deposition is in your materials relied

20  on, do you know what they were referring to when they said

21  there are many more options available today than before the

22  acquisition, for them, in terms of ratings and reviews?

23  **A.**   Uhm, I'd have to go look.  I think -- they relied upon --

24  let me just clarify that.

25       Appendix A here is entitled "Documents Considered."  So

SHAPIRO - CROSS / JACOBSON

1    our practice with CRA and myself is to be quite comprehensive
2    in terms of things that we were provided and considered.  But I
3    have a much smaller set of materials that I think of as relying
4    on, that I really used and are important.  And so I'm just
5    making that distinction.  And I think I've answered the
6    previous part of the question.
7    **Q.**   Did you read the testimony of Vitamin Shoppe or Build.com?
8    **A.**   I would have to check.  Again, there are a lot of
9    customers.  I -- what -- I read portions of things that are
10   then cited in my report.  And I'd have to go back and look.
11   **Q.**   And the portions were selected by people other than
12   yourself?
13   **A.**   Well, I gave instructions, what I was looking for in terms
14   of, say, the relevant product piece or how they see the
15   alternatives.  That sort of thing.  And so then those portions
16   were selected with that -- with those instructions by other
17   people.  That's correct.
18   **Q.**   Were these instructions any different than, please, get me
19   a cite for this proposition?
20   **A.**   That's not how I do it, no.  It's -- it's not a
21   proposition, then go prove it.  It's:  Here's a question.  Go
22   find the evidence that says one way or another so we can
23   test -- test -- you know, test the theories and the approach
24   I'm taking.
25   **Q.**   But you don't remember whether in that connection anyone

1    brought to you Vitamin Shoppe or Build.com or Wayfair or any of

2    those depositions, do you?

3    **A.**    Again, at that level of detail I have to go back and look

4    at the report.  It's a long, detailed report, as was

5    Dr. Shehadeh's.  And, no, I can't do that on the stand here,

6    without looking.

7    **Q.**    So I would really love to go through everything on

8    relevant market, but given the time constraints I can't.  But I

9    do have a few questions about who's in it.

10         So in-house R&R builds are in the relevant market,

11   correct?

12   **A.**    Yes.

13   **Q.**    And it's not just retailers, but it's all manufacturers

14   and retailers, correct?

15   **A.**    Those are the customers in the United States.

16   **Q.**    Is Netflix considered a retailer?

17   **A.**    They are listed on the IR500.  I'm counting them.

18   **Q.**    Travelocity?

19   **A.**    Uhm, I think of that as travel.  I would not tend to count

20   them as retail.  We're not including travel, hotels, ticketing.

21   There are a bunch of other online activities that are not

22   generally, quote, considered online retail.

23   **Q.**    EBay?

24   **A.**    EBay is not counted on the IR500, but we do pick them up

25   in the Fortune 500.

SHAPIRO - CROSS / JACOBSON

1    Q.    So were they in the market, as you've defined it, or not?

2    A.    Oh, that's online retail.  I would count eBay.

3    Q.    And includes both customers who use and don't use

4    syndication?

5    A.    Yes.

6    Q.    And customers who use or don't use automation?

7    A.    Automation?

8    Q.    Excuse me.  Moderation.

9    A.    Oh, okay.

10   Q.    You've been extremely helpful in correcting some of my

11   worst mistakes.  Only a few, but thank you.

12   A.    Well, I guess I think of moderation as a pretty

13   fundamental piece of ratings and review.  There are different

14   ways to handle it.  So I'm not sure what you mean by --

15   Q.    All right.  So let me be specific.

16   A.    Okay.

17   Q.    Customers who use automated moderation are in the relevant

18   market, as well as customers who use human moderation, correct?

19   A.    Uhm, if they're otherwise in the market, the customers, I

20   wouldn't exclude them on the basis of that technological

21   choice.

22   Q.    Are consulting services in the relevant market?

23   A.    I would generally say no, that's not, retail or

24   manufacturer.

25   Q.    All right.  Now, you recognize that neither Bazaarvoice or

1  PowerReviews keep or kept revenues or profits or losses for

2  ratings and reviews separately from their other products, don't

3  you?

4  **A.**   I know that's true.

5  **Q.**   Do you know of any R&R supplier who segregates financial

6  information for R&R from its other social commerce products?

7  **A.**   Well, the other suppliers are these fringe players who are

8  mostly in other lines of business.  I don't think they break it

9  out, so far as I know.  But I haven't looked at their P&L

10  statements.

11  **Q.**   So when you're looking at margins, the margins you're

12  looking at are for the full product line, not for -- for

13  Bazaarvoice and PowerReviews, not just for ratings and reviews?

14  **A.**   That's correct.

15  **Q.**   And your analysis is also based on global margins, not

16  U.S. domestic only, correct?

17  **A.**   I think it's not broken out by geography.  I think that's

18  correct.

19  **Q.**   Now, both of your calculations of market share, putting

20  aside your robustness checks for a second, are based on the

21  IR500.  Isn't that true?

22  **A.**   Those two main -- measures are based on the IR500, yes.

23  **Q.**   Now, you said in your first report that the IR500

24  represents 90 percent of North American eCommerce.  Do you

25  recall saying that?

SHAPIRO - CROSS / JACOBSON

1  A.   Uhm, the correct statement would be online --

2  Q.   I'm just asking what you said in your report.

3  A.   I referred to online retail commerce.  I believe there was

4  one instance early in the report where I left out retail, and

5  that was a mistake.

6  Q.   And you admitted in your deposition, in any event, that

7  the 90 percent number is just wrong?

8  A.   Uhm, this is -- again, we had -- we made a correction

9  because -- having to do with Amazon, mostly Amazon's foreign

10  sales.  So I think the 90 percent is too high.  I think

11  80 percent is a better estimate than 90 percent.

12  Q.   All right.  And brands are not included in that

13  80 percent, correct?

14  A.   I'm sorry.  This is -- 80 percent is the IR500 retail --

15  online retail sales as our estimate of total online retail

16  sales in the United States.

17  Q.   Again, would Netflix be included in the denominator?

18  A.   It's in the IR500.

19  Q.   It's in the numerator.  Is it in the denominator?  Where

20  do you get your denominator?

21  A.   Okay.  So these are Commerce Department data measuring --

22  estimating the overall online commerce, retail commerce in the

23  United States.  Plus, we had a Canadian piece to add for

24  comparability purposes.

25       So the answer is the Commerce Department.  And this

1    Canadian source, I'll have to check their name.

2    **Q.**   But you have no idea how they treat Netflix or eBay or

3    Travelocity, or those firms, do you?

4    **A.**   Yes, I know I've looked at how they describe what their

5    methodology is, the Commerce Department.  I could look it up.

6    I believe it's in one of the footnotes.

7         And eBay should be included.  It's basically the same

8    concept we're now trying to talk about, which is online retail

9    commerce in the United States.  They're measuring it at the

10   Commerce Department as part of the overall accounts, flow

11   accounts for the United States.

12   **Q.**   Now, when looking at the IR500, you're excluding

13   Procter & Gamble, right?

14   **A.**   I know they're a big brand.  I think they are not in the

15   IR500.  I'll take your word for that.  Sounds right.

16        **MR. JACOBSON:**  Let's bring up Demonstrative Slide 12.

17   Hopefully, this one will be a little more legible.

18   **BY MR. JACOBSON**

19   **Q.**   And these are all some pretty well-known names.  Wouldn't

20   you agree?

21   **A.**   Yes.

22   **Q.**   And none of them are in the IR500, are they?

23   **A.**   I'll take your representation to that effect.

24   **Q.**   So when -- when you said that the IR500 is important to

25   brands because retailers are important to brands, you weren't

1    implying that the IR500 measures performance in terms of sales

2    of ratings and reviews to brands, were you?

3    **A.**    No, no.  It's not measuring the revenues on the brand side

4    in this market, no.

5    **Q.**    And so focusing on the IR500 necessarily has the effect of

6    making PowerReviews' share look much larger than it would if

7    you include brands.  Isn't that right?

8    **A.**    Well, in terms of revenues, I think that's --

9    PowerReviews' share would be smaller if you included the

10   brands, because they don't do so well with the big brands.  So

11   if that's your point, I agree with what.

12   **Q.**    And it's true on customer count, too, isn't it, because

13   customer count is also IR500?

14   **A.**    Well, the customer count there -- you know, we are at two

15   different levels here, I guess.

16        This is where the bulk of the sales are taking place, and

17   that's why I measured the revenues at the customer level.  So I

18   don't accept your point on that, on the sales side.

19   **Q.**    Well, is -- let's take a brand that PowerReviews

20   represented, Vitamin Shoppe, which is also a retailer.  That

21   would be counted, correct, in the IR500 as one?

22   **A.**    Vitamin Shoppe is counted in the IR500, yes.

23   **Q.**    But if it had any success with a brand that was not also a

24   retailer, that would give a zero in the customer counts, right?

25   **A.**    I'm agreeing the customer count is the IR500.  It's the

SHAPIRO - CROSS / JACOBSON

1    retailers level.  That's what we're counting.

2    **Q.**  Okay.  Now, Dr. Shehadeh found that 75 percent of

3    Bazaarvoice's customers, by revenue, and 34 out of its top 50

4    customers, are not in the IR500.  Don't you recall that?

5    **A.**  I don't recall those numbers.  I thought the numbers were

6    that 80 percent of Bazaarvoice's top 50 customers are either in

7    the IR500 or syndicate to the IR500.

8    **Q.**  Okay.  So let's go to Dr. Shehadeh's rebuttal report,

9    which is in the binder labeled "Bazaarvoice Volume 2 of 2."

10   It's Exhibit 1736.  I'll refer you to page 14 and page 15.

11   **A.**  Okay.

12   **Q.**  And in paragraph 36, do you see that:

13           "Customers listed in the IR500 accounted for just

14       25.9 percent of Bazaarvoice business in 2012."

15       Do you see that?

16   **A.**  Yes.

17   **Q.**  You've no reason to disagree with that number, do you?

18   **A.**  No.  Although, I wonder whether this includes foreign --

19   may be a faction of worldwide, and not just U.S., because most

20   of his work did not isolate to the U.S.

21   **Q.**  I understand that.  But you would have no reason to

22   believe the U.S. number was higher or lower, would you?

23   **A.**  Well, wait a moment.  If he's included a bunch of sales

24   abroad, that's going to pull down the share of the IR500.

25   And -- in comparison with a more accurate measure within the

SHAPIRO - CROSS / JACOBSON

1   U.S.

2   **Q.**   Page 15, second sentence:

3           "Instead, just 16 of Bazaarvoice's top 50 combined

4       postmerger customers appear on the IR500."

5       Do you see that?

6   **A.**   I do.

7   **Q.**   So that means, necessarily, 34 do not?

8   **A.**   That's the arithmetic.

9   **Q.**   And you have no reasons to disagree with that, do you?

10  **A.**   Again, the same point I already made.  Other than that,

11  no.

12  **Q.**   Now, you're also aware that much of the data in the IR500,

13  the dollars data, are estimates.  And the estimates are often

14  wrong, correct?

15  **A.**   Well, estimates wrong -- the estimates are imperfect.

16  That's the nature of the estimates.

17  **Q.**   And you have no reason, do you, to disagree with

18  Mr. Goldberg's critique of the IR500 numeric calculations, do

19  you?

20  **A.**   What are you referring to specifically?

21  **Q.**   His criticism of their revenue measure.

22  **A.**   Well, I don't want to endorse it, I guess, in -- in a

23  broad sweep.  The -- I'm aware that some companies self-report;

24  others don't.  And the IR500 staff then tries to estimate.

25          So, again, I'm not -- there was nothing that I saw from

1  Mr. Goldberg that made me question the overall methodology I'm

2  using, or to think that these estimation errors were biased in

3  some way.

4  Q.   So you -- you read the testimony of Ms. Cunningham from

5  BJ's, correct?  BJ's Wholesale Club.  She appeared as a

6  witness.

7  A.   Oh, I forgot the name.  She's the woman who appeared for

8  BJ's.  Yes, I did.

9  Q.   And she doesn't report her numbers to the IR500, does she?

10  A.   I don't know.

11  Q.   You don't recall that part of her testimony?

12  A.   No, I do not.

13  Q.   Do you recall her testimony that she wasn't harmed by the

14  merger?

15  A.   I do.

16  Q.   You used a method of calculating share here -- I recognize

17  it's one of your methods -- but customer revenues that, to your

18  knowledge, no one has ever used before.  Correct?

19  A.   It's a proxy.  I haven't seen it used before.

20  Q.   And under that method, if Bazaarvoice supplied $10,000

21  worth of ratings and reviews service to a customer with

22  2 billion in Web sales, you'd count the 2 billion, not the

23  10,000.  Correct?

24  A.   Well, you're measuring the customer revenues.  That's the

25  metric, yes.  It's a much larger number, obviously, Web sales,

SHAPIRO - CROSS / JACOBSON

1    than products ratings and reviews.  The scale is different.

2    Q.   Right.  Let's remove this from the hypothetical and take

3    it to the actual.

4        Apple is number 3 on the IR500, with revenues -- Web

5    revenues, as reported by IR500, of $9 billion, correct?

6    A.   I'd have to check the number, but I do remember they're

7    number 3.

8    Q.   Let's just assume, for the sake of time, that the number

9    is 9 billion.  That's not off by orders of magnitude, is it?

10   A.   Uhm, no, not -- not off by orders of magnitude.

11   Q.   So let's just assume it's 9 million.

12       Now, you assigned half of Apple's revenues to Bazaarvoice,

13   correct?

14   A.   That's correct.

15   Q.   So if the number is 9 billion, you assigned 4.5 billion

16   to -- to Bazaarvoice?

17   A.   That's right.  In the universe of the $171 billion that we

18   saw yesterday on that chart, that's the universe.  And so

19   Apple --

20   Q.   You can pooh-pooh this on redirect.  The answer to the

21   question is yes, that's what you did?

22   A.   I don't think I was pooh-poohing it, frankly.  I think I

23   was answering that it's the 4.5 billion, putting that in scale

24   to what we're talking about, was trying to do.  So this --

25   Apple is, I believe, roughly 4 percent in total.  So at issue

1    in giving Bazaarvoice half of them is 2 percentage points in

2    Bazaarvoice's share.  The difference between 40 and 38.

3    **Q.**    Right.

4                **THE COURT:**  Dr. Shapiro, stick with his question.

5                **THE WITNESS:**  Okay.  Fair enough.

6                **MR. JACOBSON:**  Thank you, Your Honor.

7                **THE WITNESS:**  Okay.

8    **BY MR. JACOBSON**

9    **Q.**    And what does Bazaarvoice provide to Apple?

10   **A.**    Well, Apple reported Bazaarvoice as their products ratings

11   and reviews vendor.  And I've now learned, if I have this

12   right, it's for their consultant network.

13   **Q.**    And the consulting business is not something that's in

14   your relevant market?

15   **A.**    Generally, services are not, no.  This is obviously

16   closely tied into a retail context with the sale of Apple

17   products.

18   **Q.**    Okay.  Now, normally, in calculating share -- well,

19   actually, let me go back.

20        So you mentioned that you've now assigned Microsoft sales,

21   half of them to Reevoo because Reevoo is servicing Skype,

22   correct?

23   **A.**    Correct.

24   **Q.**    But you didn't make that calculation in your preferred

25   revenue measure, did you?  Just on your customer count you gave

SHAPIRO - CROSS / JACOBSON

1  them 1?

2  **A.**   Well, that's something I didn't become aware of until the

3  deposition, and so it's not in the tables.  I mentioned it, I

4  believe, in direct.  And that would have an adjustment for

5  Reevoo on both the count and the revenue measure.

6  **Q.**   All right.  But you changed the count yesterday.  You

7  didn't change the revenue measure, correct?

8  **A.**   Well, I -- you mean we only mentioned one and not the

9  other?

10  **Q.**   Yes.

11  **A.**   I can't recall, but now you've got the other.

12  **Q.**   Okay.  And Microsoft has an appreciable amount of Web

13  sales; does it not?

14  **A.**   Uhm, yes.  Yeah, they're in the IR500.  I don't know the

15  exact number.

16  **Q.**   Now, normally, in calculating share the economist will use

17  the revenues or units sold by the supplier, right?

18  **A.**   Well, as I said, either quantity or revenue.  Units or

19  quantity is one metric.

20  **Q.**   And you wouldn't use units, would you, where one unit is

21  so dramatically smaller or larger than the other units?  That's

22  not an appropriate measure, is it?

23  **A.**   Well, that wouldn't be units, I think.  I'm not -- then

24  they wouldn't be the same units.

25  **Q.**   So -- fair enough.

SHAPIRO - CROSS / JACOBSON

1    But your quantity measure counts in Amazon the same as

2   whoever is IR500 number 500, correct?

3   **A.**   The customer count treats all the customers equally, yes.

4   **Q.**   Now, in terms of rapid entrants, you testified on direct

5   that you assigned zero share to any of them.  Correct?

6   **A.**   There are no rapid entrants in this case.

7   **Q.**   So Google is not a rapid entrant, even after its

8   acquisition of Wildfire?

9   **A.**   Correct.

10  **Q.**   And Google, which owns Zagat, is not a rapid entrant into

11  ratings and reviews?

12  **A.**   Correct.

13  **Q.**   And Google, which has relationships with virtually every

14  brand retailer in the world, is not a rapid entrant, correct?

15  **A.**   Agreed.

16  **Q.**   Okay.  And you also assign zero value to Amazon, apart

17  from its in-house capability and its Webstore, correct?  You do

18  not consider Amazon, as an independent merchant supplier, to be

19  a rapid entrant?

20  **A.**   That's true.

21  **Q.**   Even though Amazon is the leader in ratings and reviews?

22  **A.**   Oh, they're in-house.  Amazon.com is an in-house.  Just as

23  the other in-house providers, I don't treat them as rapid

24  entrants.  I count them for their in-house usage.

25  **Q.**   And in terms of the capacity to supply other customers in

1  the world, Amazon's capacity to supply them is infinite, isn't

2  it?

3  **A.**  Well, I generally don't think capacity is a constraint for

4  anybody here.  As I said, the rapid entrant concept works with

5  capacity.  And I don't think that applies to this market,

6  Amazon or others.

7  **Q.**  So the answer to my question is yes?

8  **A.**  I thought I answered it.  I'm not sure.

9  **Q.**  Capacity is not a constraint on expansion by Amazon?

10  **A.**  Okay, yes.

11  **Q.**  And Amazon has relationships with many retailers, correct?

12  **A.**  Certainly, yes.

13  **Q.**  And Amazon has relationships with, essentially, every

14  brand, certainly, in the United States, correct?

15  **A.**  Well, I never say every brand, but, look, they're huge.

16  They have -- many, many companies are selling through them.

17  **Q.**  So you'd agree, virtually every brand is a fair adjective

18  to use, correct?

19  **A.**  I don't know.

20  **Q.**  Now, I just want -- I don't want to spend a lot of time on

21  this, but I want to bring up --

22        **MR. JACOBSON:**  Let's bring up slide 1.

23  **BY MR. JACOBSON**

24  **Q.**  Do you recognize this as one of your surreply exhibits?

25  **A.**  Yes.

SHAPIRO - CROSS / JACOBSON

1   Q.   And it's hard to read on the screen, but these are errors

2   that you reported to us prior to your deposition, correct?

3   A.   The -- we gave you the supplemental exhibits before the

4   deposition.

5   Q.   You provided this document to us?

6   A.   Yes, that's correct.

7   Q.   Without the highlighting?

8   A.   Correct.

9   Q.   So the companies that we've highlighted are Staples,

10  Apple, Walmart, Sears, Sony and Toys R Us.  Correct?

11  A.   Okay.

12  Q.   And those are all very substantial companies, aren't they?

13  A.   Yes.

14  Q.   And for Staples you assigned, initially, half of the

15  revenue to Bazaarvoice, but then you realized that it was a

16  small Canadian operation so you moved it all to PowerReviews?

17  A.   This had to do with the current customer issue I raised

18  before.  That applied to Staples.  So they were no longer

19  current with Bazaarvoice.

20  Q.   And, initially, you assigned all of Apple to Bazaarvoice?

21  A.   That's correct.

22  Q.   And then after the revision you just did half of Apple?

23  A.   Correct.

24  Q.   And then Walmart you assigned to Bazaarvoice after

25  revision?

SHAPIRO - CROSS / JACOBSON

1   **A.**   This was the case where there was, as I recall, an error

2   in the data we were given.  And so we corrected it once we

3   identified that error.

4   **Q.**   Actually, Dr. Shehadeh identified that error, correct?

5   **A.**   Okay.  I don't recall that.

6   **Q.**   Didn't Dr. Shehadeh identify all these errors?

7   **A.**   No, no.  A number of these that once he alerted us to this

8   additional field in the data, we looked more broadly than

9   simply the ones he had identified, and did a complete sweep.

10  **Q.**   Okay.  But the -- the existence of this omission was

11  pointed out to you initially by Dr. Shehadeh, correct?

12  **A.**   Which omission are you referring to?

13  **Q.**   The omission of the field that you referred to in your

14  direct testimony?

15  **A.**   Oh, yes, yes.

16  **Q.**   And that's the reason you gave this to us after you

17  submitted your rebuttal report.  You hadn't caught these errors

18  before your rebuttal report?

19  **A.**   Correct.

20  **Q.**   Now, you testified earlier that the retailers are

21  important to brands, and that's why it's okay to look at the

22  IR500, even though brands are excluded, correct?

23  **A.**   Yes.

24  **Q.**   But the IR500 doesn't measure the performance of any of

25  the R&R rivals in terms of the services they provide to brands,

SHAPIRO - REDIRECT / HOAG

1   does it?

2   **A.**   Well, again, indirectly, because they care about the

3   retailers.  But it's indirect.

4   **Q.**   You wouldn't measure market share for brands by using the

5   IR500, would you?

6   **A.**   If there were markets just for brands and not

7   manufacturers?

8   **Q.**   Yes.

9   **A.**   No.

10          **MR. JACOBSON:**  Your Honor, give me one minute to check

11  with my colleagues on what I've missed --

12          **THE COURT:**  Certainly.

13          **MR. JACOBSON:**  -- and I think I can wrap up.

14      (Pause)

15          **MR. JACOBSON:**  Dr. Shapiro, thank you.

16          **THE WITNESS:**  Thank you, Mr. Jacobson.

17          **MR. JACOBSON:**  Bear with me a second, Your Honor.

18          **THE COURT:**  Mr. Hoag.

19                      <u>**REDIRECT EXAMINATION**</u>

20  **BY MR. HOAG**

21  **Q.**   I have a couple of questions, Professor Shapiro.

22      You were asked a lot of questions about the IR500 and its

23  measurement of retailers.

24      Did you look at any other metrics outside the IR500, to

25  shed light on the question of brands?

 1  **A.**  Well, yes, we did.  The Fortune 500, which picks up brands

 2  as well.  And then the 1,000 sample from Dr. Shehadeh also

 3  picks up -- well, all types of customers, actually,

 4  manufacturers, retailers, any customers that -- that

 5  Bazaarvoice would have in that data set.

 6  **Q.**  And can you turn to Government Exhibit 984.

 7        **MR. HOAG:**  Savannah, can you put this on the screen.

 8  **BY MR. HOAG**

 9  **Q.**  This is your rebuttal report.

10  **A.**  Okay.

11  **Q.**  If you turn to page 9, is where Mr. Jacobson was asking

12  you a number of questions.

13  **A.**  Hold on one second.  Okay.

14  **Q.**  And I see here that in the first full paragraph you state

15  that:

16        "Other forms of group price discrimination may well be

17        possible.  For example, Bazaarvoice could raise prices to

18        customers who make significant use of syndication

19        services."

20  Does that refresh your recollection about whether your

21  report actually does refer to the group of customers that use

22  syndication services as a group that could be harmed by the

23  merger?

24  **A.**  Yes, it does.  There it is.

25        **MR. HOAG:**  Finally, Savannah, could you put up DX1012.

1    BY MR. HOAG

2    **Q.**    This is the email that Mr. Jacobson was showing you,

3    referring to some other competitors mentioned by Bazaarvoice.

4    If you look at the date of that, do you see that the date is

5    January 10th, 2013?

6    **A.**    I see that.

7    **Q.**    And are you aware that that's the date on which the

8    United States filed its lawsuit challenging Bazaarvoice's

9    acquisition of PowerReviews?

10    **A.**    I did not remember that.

11            **MR. HOAG:**  Thank you very much.  I have nothing

12    further, Your Honor.

13            **THE COURT:**  All right.  Anything further,

14    Mr. Jacobson?

15            **MR. JACOBSON:**  Yes, sorry.

16                        <u>**RECROSS EXAMINATION**</u>

17    BY MR. JACOBSON

18    **Q.**    Can you pull up page 9 of your rebuttal report, one more

19    time.

20    **A.**    I have it in front of me.

21    **Q.**    Can you read into the record the last sentence of that

22    paragraph.

23    **A.**    The first full paragraph on page 9?

24    **Q.**    Yes.

25    **A.**    Certainly.

1              "My opinion does not rest on the availability to

2         Bazaarvoice of these additional forms of group price

3         discrimination."

4              **MR. JACOBSON:**  Nothing further, Your Honor.

5              **THE COURT:**  You're done.  Thank you, Dr. Shapiro.

6              **THE WITNESS:**  Thank you, Your Honor.

7         (Witness steps down)

8              **MR. HUSTON:**  Your Honor, Dr. Shapiro is the

9    government's last witness in our case-in-chief.

10        It's possible, after the defense puts on their case, that

11   we may have rebuttal evidence to put on.  But as far as our

12   case-in-chief, he's our last witness.

13        There are a few administrative matters that I would just

14   want to clear up before we, I suppose, formally rest.  One has

15   to do with a couple of exhibits that we need to admit; GX222

16   and GX1148.  And my understanding is there is no objection to

17   those.

18             **MR. FELDMAN:**  Do you have them?

19             **MR. HUSTON:**  I have a description of them.

20        (Government and defense counsel confer off the record.)

21             **MR. FELDMAN:**  I believe Mr. Huston.  I just want to

22   verify.

23             **THE COURT:**  I think that's fine.

24             **MR. HUSTON:**  The other issue, while Counsel is looking

25   at that, Your Honor, there has been deposition testimony that's

PROCEEDINGS

```
1   not been referred to in the court proceedings so far but that

2   has been designated by both parties.

3        And there's a stipulation and order that's already in

4   effect -- it's at 104 of the ECF -- that says that all

5   deposition testimony that would be considered substantive

6   evidence under the federal rule shall be considered as

7   substantive evidence, without having to be read into the

8   record.  And the Court signed that order.

9        And the only thing I would want to make sure is that we

10  didn't need to do anything further before those were in the

11  record.  My assumption is that those are in the record, but I

12  wanted to make sure there wasn't anything additional we needed

13  to do.

14       THE COURT:  That's also my understanding.

15  Is it yours, Mr. Feldman?

16       MR. FELDMAN:  Yes, Your Honor.

17       THE COURT:  Okay.

18       MS. ALEPIN:  Your Honor, to help you out, we've

19  actually put together a chart of all of them, and where they

20  can be found in the record, for you.

21       THE COURT:  Great.  Thank you.

22       MS. ALEPIN:  Then we also have one for all the live

23  and video -- I'm sorry, I forgot to give one to Mr. Huston.

24       MR. FELDMAN:  We're not moving the admission of this

25  into evidence.  It's a cheat sheet for you to be able to take
```

PROCEEDINGS

```
1   notes and track where the testimony is.  These are for the

2   customers.

3         MS. ALEPIN:  And these are for the customers that will

4   testify, including the DOJ's witnesses.

5         MR. FELDMAN:  Again, if you don't find that useful,

6   you can toss it.  We will not move its admission into evidence.

7   It's just there were about a hundred customers, and it's a good

8   way to keep track.

9       It's divided into those who will appear at trial, either

10  live or by video, versus those where they're just in the

11  transcripts that Mr. Huston was just referring to.

12      We have no objection on either of those exhibits.

13        THE COURT:  Okay.

14      (Plaintiff's Exhibits GX222 and GX 1148 received in

15  evidence)

16        THE COURT:  Can I just ask, I've got four copies.  Is

17  it four copies of the same thing, or four different --

18        MS. ALEPIN:  No, there should be one.

19        THE COURT:  One 2-page.

20        MS. ALEPIN:  One 2-page for the live and one -- thank

21  you.

22        THE COURT:  I have one 2-page.

23        MS. ALEPIN:  Perfect.

24        MR. FELDMAN:  There's also a 4-page.

25        MS. ALEPIN:  Thank you.
```

 1              THE COURT:  Thank you.

 2              MR. HUSTON:  That's it, Your Honor.

 3          (Plaintiff rests)

 4              THE COURT:  Okay.

 5              MR. PAK:  Your Honor, at this time, the defense calls

 6      Alan Godfrey.

 7                       **CURTIS ALAN GODFREY**,

 8      called as a witness for the Defendant, having been duly sworn,

 9      testified as follows:

10              THE WITNESS:  I do.

11              THE CLERK:  Be seated.

12          Please state your name and spell both your first and last

13      name.

14              THE WITNESS:  Curtis Alan Godfrey.  C-u-r-t-i-s,

15      G-o-d-f-r-e-y.  Alan, A-l-a-n.

16                       **DIRECT EXAMINATION**

17      BY MR. PAK

18      **Q.**   Good morning, Mr. Godfrey.

19              MR. PAK:  Good morning, Your Honor.

20              THE COURT:  Good morning.

21              MR. PAK:  Permission to approach the witness with

22      exhibits.

23              THE COURT:  Please.

24              MR. PAK:  Your Honor, we only have four exhibits.

25              THE COURT:  Great.

1           **MR. PAK:**  We're cutting back.

2     **BY MR. PAK**

3     Q.    Mr. Godfrey, can you please describe for the Court by whom

4     you are employed today.

5     A.    I'm sorry, I'm having a hard time hearing.

6     Q.    By whom are you employed today?

7     A.    Bazaarvoice.

8     Q.    And what is your position at Bazaarvoice today?

9     A.    I'm currently the executive vice president of business and

10    corporate development.

11    Q.    And what do -- what are your responsibilities in that

12    position, sir?

13    A.    My responsibilities are to evaluate potential partnerships

14    which help us grow the company, as well as evaluate

15    technologies in other companies that we may acquire to also

16    grow the company.

17    Q.    And prior to your promotion as EVP, what position did you

18    have?

19    A.    I was the general manager of North American retail.

20    Q.    North American retail?

21    A.    That's correct.

22    Q.    And until when did you hold that position, sir?

23    A.    Until August 1st of 2013.

24    Q.    And as the general manager for retail, what were your

25    responsibilities?

1    **A.**    I was responsible for the overall growth and retention of

2    retail clients, which included travel, automotive, hospitality

3    in North America, with top-lying growth in the retention of

4    those clients.

5    **Q.**    So would that include obtaining new retail clients as well

6    as holding on to existing retail clients?

7    **A.**    Yes, it would.

8    **Q.**    So when you say "retail," are we talking about retail

9    stores?

10   **A.**    Well, we're talking about any type of company that would

11   sell through a retail type of presence, whether that's online

12   or through stores or perhaps both.

13   **Q.**    And -- but it also happened that in the retail you

14   included travel and automotive?

15   **A.**    That's correct.  Travel meaning online travel agencies,

16   hoteliers, cruise lines.  Many other companies also use ratings

17   and reviews in that industry.

18   **Q.**    How long did you hold that position, sir?

19   **A.**    I was in that position for about nine months.

20   **Q.**    And prior to that what did you do at Bazaarvoice?

21   **A.**    I was responsible for the acquisition and integration of

22   PowerReviews.

23   **Q.**    And then prior to that what were your responsibilities?

24   **A.**    I was the vice president of client services for the retail

25   vertical in North America.

1   Q.   And what responsibilities did you have in that regard?

2   A.   I was focused, primarily, on the retention of clients and

3   the implementation and servicing once they had acquired our

4   solutions.

5   Q.   Again, that was in the retail sector?

6   A.   That's correct.

7   Q.   How long did you hold that position?

8   A.   For approximately nine months.

9   Q.   And prior to that what did you do at Bazaarvoice?

10  A.   That was my first role at Bazaarvoice.

11  Q.   What did you do before joining Bazaarvoice, sir?

12  A.   I was the executive with another software company in

13  Austin, called Lombardi Software.

14  Q.   And can you describe your education since college, sir.

15  A.   Yes.  I have a computer science degree from Texas A&M.

16  Q.   I'd like to focus, principally, on your time in the retail

17  business of Bazaarvoice, and from that perspective, sir,

18  focusing upon the differences that you observed between the

19  Bazaarvoice products and the PowerReviews products.

20       In fact, you mentioned being part of the integration team

21  once the acquisition with PowerReviews occurred.  Did that

22  provide any opportunity for you to look into the PowerReviews

23  products?

24  A.   Yes, it did.

25  Q.   Can you describe how so.

1    **A.**    Well, as part of the initial diligence process, and which

2    I was part of, we actually began to understand the PowerReviews

3    business.  And the first thing we noticed was there was a very

4    different architectural implementation approach between the two

5    companies.

6         So to give an example, if you go to Best Buy today, and

7    you read a review, that review is coming through Bazaarvoice.

8    That content is actually served by us.  It comes from our cloud

9    services at Amazon.  It's called Software as a Service.  And

10   that content is being funneled through our capabilities.

11        So it's, basically, rendered real time, and that gives us

12   a lot of flexibility in terms of how we integrate with clients

13   and customize a solution on their behalf.

14        What we learned about PowerReviews is that they do

15   something very different.  They actually combine all the review

16   content for a client overnight, and they ship them that file

17   every single day, early in the morning.  And that file is then

18   posted directly on that client's servers.

19        For example, if you go to Toys R Us and you read a review,

20   that review is actually posted on their Web servers directly.

21   It's not a third-party service like Bazaarvoice provides.

22        So the limitation of that approach was that it was very

23   hard to customize the PowerReviews implementation process.

24   And, by virtue, every single client at PowerReviews, except for

25   two, has the same exact implementation strategy.

1    Whereas, at Bazaarvoice, with many of our large customers

2   we did a very extensive amount of customizations to fit within

3   their Web page architecture, perhaps make sure the look and

4   feel met their -- met their criteria, and maybe even integrate

5   other services.

6   **Q.**   Did you observe any differences between the Bazaarvoice

7   platform and PowerReviews, with respect to implementation?

8   **A.**   Well, the implementation timeframes for Bazaarvoice were

9   much longer, much more complex.  Typically, they were a

10  one-off.  We had to either acquire new skills or include new

11  types of technologies.

12       And, again, the PowerReviews implementation process was

13  relatively straightforward and the same, essentially, for every

14  client.

15  **Q.**   And how does that impact, if at all, the kinds of clients

16  you can service between Bazaarvoice and PowerReviews?

17  **A.**   Well, as you can imagine, many of the high-end retailers,

18  like a Walmart or a Best Buy, they're very, very concerned

19  about the content showing on their websites.  And so in order

20  to get to comply, there has to be a lot of customizations.

21       And they saw Bazaarvoice as an enterprise class software

22  company that could provide the manpower, the intellectual

23  capabilities, and the tools to provide those customizations.

24  **Q.**   How did that compare with PowerReviews then?

25  **A.**   PowerReviews just didn't have that capability.  I think in

1    many cases for those retailers that had very sophisticated

2    demands they just weren't able to service that type of client.

3    **Q.**    Were there differences between Bazaarvoice and

4    PowerReviews with respect to client success or customer care?

5    **A.**    Very much so.  As a consequence of having many of these

6    unique implementations, we had to hire a very large customer

7    care team.  These are individuals that assist in managing the

8    clients as they go live.  They help implement best practices.

9    They do quarterly business reviews and, generally, drive the

10   health and success of the clients.  We have 80 or 90 of those

11   types of individuals within Bazaarvoice today.  It's a very

12   hands-on type of business model.

13        And PowerReviews essentially had the opposite.  They had

14   very few of those people because, again, their implementations

15   were very straightforward and relatively similar across the

16   board.

17   **Q.**    How many people did PowerReviews actually have for

18   customer care?

19   **A.**    Six.

20   **Q.**    Did you observe any differences, in terms of the breadth

21   of a syndication network, between Bazaarvoice and PowerReviews?

22   **A.**    That was another large difference for us.  We have

23   thousands of brands that syndicate into our retail network.

24        PowerReviews, as a company, had not focused on selling

25   their services to brands; and, therefore, they didn't have the

1  review content that could be sent into -- into the retailers

2  once they signed up as a client.

3  **Q.**   Did you observe any differences between the two companies

4  in terms of authentication and moderation services?

5  **A.**   We had a very different philosophical approach to

6  authentication and moderation.

7       At Bazaarvoice, first of all, we -- we had all our clients

8  adhere to one authentication standard.  I mean, everybody had

9  to display all of their reviews, as long as they were

10 appropriate, irrespective whether they were negative or

11 positive.  We thought that was good for the consumer and good

12 for the overall marketplace.

13      And we built a -- we've built a massive team of human

14 moderators that actually read every single review that comes

15 through Bazaarvoice.  Millions and millions to date.  And they

16 can also do things such as tag content for certain purposes

17 like identifying product flaws or, perhaps, customer service

18 issues and so forth.  So a very rigorous standard.

19      We also do a lot of fraud detection.  We also make sure

20 that the person that's submitting the review is the person who

21 actually bought the product or the service.  We call that

22 authentication.  And it's a big part of our business.

23      For PowerReviews, that was -- although they did some

24 moderation, primarily to filter out things like profanity and

25 things that were inappropriate to be displayed -- the

1    authenticity standards were optional for the client.

2        The client could actually self-moderate.  Meaning, the

3    client could filter out negative reviews.  They could filter

4    out things that they thought might be in some way harmful to

5    their brand.

6        So we had two very different standards and very different

7    cost structures and capabilities for how we dealt with inbound

8    content.

9    **Q.**   In your experience on the retail side, do all potential

10   customers want the level of moderation and authentication that

11   Bazaarvoice offers?

12   **A.**   No, they don't.  For the most part, Enterprise clients --

13   again, such as a Walmart or a Best Buy -- are very sensitive

14   about their brands.  They want to protect their brands at all

15   costs.  So they are very, very self-conscious about anything

16   that would slip through, that would be inappropriate.

17       On the other hand, a lot of smaller retailers, not as

18   concerned.  In fact, self-moderation is an acceptable approach

19   to them, and they feel that it's less of a risk to their

20   business, if you will.

21   **Q.**   Did you observe a difference with respect to pricing for

22   PowerReviews product versus the Bazaarvoice products?

23   **A.**   Absolutely.  Our average prices across the board were much

24   different.  And that was really based on the implementation

25   effort, the size of our customer success teams, and the size

 1   and breadth and depth of the moderation capabilities.  So we

 2   had very different cost structures and, as a result, very

 3   different pricing strategies and clients.

 4   Q.   Did the differences in functionalities contribute to the

 5   differences in your price structures between PowerReviews and

 6   Bazaarvoice?

 7   A.   They did.  Absolutely.  Certainly, the -- and the

 8   customization aspect and the level of moderation and the

 9   syndication were the three main things that were highly

10   different from the PowerReviews offering.

11   Q.   In your view, sir, did you believe that PowerReviews

12   and -- in the retail side, PowerReviews and Bazaarvoice

13   competed in the same -- for the same segments?

14   A.   I'm sorry, repeat the last point there, Mr. Pak.

15   Q.   In your business judgment for retail, did Bazaarvoice and

16   PowerReviews compete for the same segments?

17   A.   In my judgment, no.  We had very different install bases.

18   The client sets across the board were quite different.  Again,

19   we had larger Enterprise clients with a very, very few

20   exceptions.  And they had, mainly, mid-size/smaller clients,

21   again, with very few exceptions.

22   Q.   Were there overlaps in terms of segments between

23   PowerReviews and Bazaarvoice?

24   A.   Not really.  When there was overlap, one of us would

25   typically be selling in the wrong place, so.

GODFREY - DIRECT / PAK

1   Q.   Were there overlaps in the mid-market?

2   A.   Again, mid-market, as we defined it, was anywhere below

3   $250 million in revenues, total revenues for a company.  And,

4   historically, Bazaarvoice did not intend to pursue that market

5   at all.

6        So, again, occasionally we would get a lead, we would

7   pursue something that could be a mid-market lead, and there

8   would be some overlap.  But it certainly wasn't our business

9   strategy to go into the mid-market.

10  Q.   I'd like to turn your attention to the competition between

11  PowerReviews and Bazaarvoice, to the extent it existed prior to

12  the merger, sir.  And I would ask you to look at what we have

13  marked at GX718.  Or, I'm sorry, the government has marked as

14  GX781.

15       Are you with me?

16  A.   Yes.

17  Q.   Now, that's an email that you wrote -- I'm looking at the

18  top -- that you wrote to your colleagues within the company on

19  July 14, 2011.  Is that right?

20  A.   Yes.

21  Q.   And the re line is:

22           "Suffocate PR plan:  PR pricing

23       analysis/recommendation."

24       Do you see that?

25  A.   I do.

```
 1   Q.   And you wrote:
 2            "To add another dimension to this thread, we are also
 3        seeing substantial pressure from PowerReviews on the high
 4        end."
 5        Do you see that?
 6   A.   I do.
 7   Q.   Did you believe in that statement at the time that you
 8   wrote it?
 9   A.   At the time that I wrote it, yes.
10   Q.   And you identify certain instances at retailers and travel
11   verticals where you felt you were seeing pressure from
12   PowerReviews.
13        Is that right?
14   A.   That's correct.
15   Q.   And you identify here Best Buy, right?
16   A.   Yes.
17   Q.   And you identify QVC?
18   A.   Yes.
19   Q.   And you identify Expedia?
20   A.   Yes.
21   Q.   And those were accounts in which PowerReviews was making
22   some noise.  Is that right?
23   A.   That's correct.  I was responsible for those accounts at
24   that time.
25   Q.   Those were Bazaarvoice accounts?
```

1   **A.**   They are.

2   **Q.**   Can you tell us what, ultimately, happened in 2011, with

3   Best Buy?

4   **A.**   Well, the -- my concern at the time was that Best Buy was

5   being convinced that Ms. Halligan -- by Ms. Halligan to

6   evaluate their provider of these services --

7   **Q.**   Who is Ms. Halligan?

8   **A.**   Excuse me?

9   **Q.**   Who is Ms. Halligan?

10  **A.**   Ms. Halligan was the -- I believe her title was Executive

11  Vice President of Sales and Marketing for PowerReviews.

12  **Q.**   So I interrupted you.  Please continue with what happened

13  at Best Buy?

14  **A.**   Best Buy actually issued an informal request for

15  information -- or RFIs we call it -- in order to evaluate the

16  capabilities of their vendors.

17       And we undertook a fairly substantial effort to respond to

18  the RFI, as well as reeducate Best Buy in all the things we'd

19  done in the course of our relationship.

20       And at the end of the day, Best Buy decided to keep us as

21  a vendor.  And there were no changes, whatsoever, to the

22  pricing structures or the contracts we had in place at that

23  time.

24  **Q.**   What about Expedia, what happened there?

25  **A.**   Expedia, we were at the point of negotiating a new type of

1   contract with them.  And this was speculation on my part as to

2   whether PowerReviews would have an impact, but they did not.

3        We actually ended up raising -- we increased our pricing

4   significantly because we added a whole new set of services.

5   Expedia decided to begin using Bazaarvoice to actually display

6   all their reviews on their website.

7   **Q.**   And then in that email you also identified QVC?

8   **A.**   Yes.

9   **Q.**   What ultimately happened at QVC that year?

10  **A.**   QVC was a little bit different situation.  They had a

11  legacy contract that did not really fit the business model at

12  the time.  For example, we were providing services to

13  geographies they didn't find critical.  We had put in place

14  some volume tiers that didn't really make sense based on the

15  actual amount of reviews that they were receiving.

16       So we, essentially, restructured their contract.  And the

17  total value of the contract went down, but so did the scope and

18  depth of the services.

19  **Q.**   I'd like to draw your attention to GX720, as well, sir.

20       **MR. PAK:**  Your Honor, could I just have one second,

21  please?

22       **THE COURT:**  Sure.

23    (Pause)

24       **MR. PAK:**  Can I put that down, please.

25

1    **BY MR. PAK**

2    **Q.**    Do you recall in this same timeframe, July of 2011, that

3    you experienced some pressure with respect to PowerReviews at

4    Walmart?

5    **A.**    We -- we did.  It was somewhat anecdotal, but we knew that

6    they were talking to Walmart about similar capabilities.

7    **Q.**    And Ms. Halligan, the EVP for sales and marketing at

8    PowerReviews, do you recall her prior employer?

9    **A.**    Yes.  She was the CMO of Walmart online.

10   **Q.**    And do you know if PowerReviews made any noise over at

11   Walmart during this time, in July of 2011?

12   **A.**    Again, I believe they were having some discussions with

13   other smaller services within Walmart.  But there was no type

14   of displacement or discussions with us over the core services

15   that we were providing at that time.

16   **Q.**    Did you make any pricing changes at Walmart as a result of

17   PowerReviews?

18   **A.**    Actually, at this time, we were just concluding a contract

19   renewal with Walmart.  It was greatly expanded to cover other

20   geographic markets, as well as to raise their volume tiers, if

21   you will, so they could collect more content as well as add

22   some other services.  So the contract for us actually increased

23   significantly.

24   **Q.**    Now, I'd like to turn your attention, sir, to postmerger.

25        The merger occurred in June or so of 2012, right?

GODFREY - DIRECT / PAK

 1   **A.**   Yes.

 2   **Q.**   Mr. Godfrey, in the retail segment of the business, again,

 3   in your business judgment has the postmerger competitive

 4   pressure on pricing been the same, higher, or lower than before

 5   the merger?

 6   **A.**   I think it's definitely become higher.

 7   **Q.**   And can you explain for us why you believe that.

 8   **A.**   There are a number of factors at work.  The first is

 9   there's been an insurgence of new niche players that have come

10   to the U.S., companies like Reevoo, eKomi, Rating System, that

11   have appeared and become much more aggressive at pursuing our

12   client base.

13       Many of those -- several of those companies have former

14   Bazaarvoice employees in their sales teams, so they know our

15   clients, they know our sales strategies.

16       We've also seen a trend towards more internal build.

17   Clients are feeling like, with the advancement of technologies

18   and with their internal teams, that building these types of

19   capability -- building ratings and reviews type of capabilities

20   is something they can do in-house, at a lower cost.

21   **Q.**   Can I direct your attention, please, to DX1857.  It's also

22   in front of you, sir.

23       Do you have that in front of you, Mr. Godfrey?

24   **A.**   I do, yes.

25   **Q.**   DX1857 begins with an email from you, dated April 25,

 1    2013, just six months ago.  It's addressed to Stephen Collins

 2    and others within the company.  Is that right?

 3    **A.**   That's correct.

 4    **Q.**   Okay.  And you are responding to an email from

 5    Mr. Collins, dated April 23, 2013.  Do you see that?

 6    **A.**   Yes.

 7    **Q.**   And in Mr. Collins' email he talks about Expedia and

 8    L'Oreal.  Do you see that?

 9    **A.**   Yes.

10    **Q.**   And you respond on top, and you say:

11            "I fully agree with Stephen's point, as we will

12        continue to see price compression in our larger clients as

13        they contemplate internal and external alternatives."

14        Do you see that?

15    **A.**   I do.

16    **Q.**   Can you explain to us what you meant by that.

17    **A.**   As I said just a few minutes ago, we're seeing an

18    increasing move towards internal builds, especially with

19    companies like Expedia that have very sophisticated Web

20    development teams.  They make their money off the Internet.

21        And we've been in the process of migrating to a new

22    platform so we could have more advanced technology.  That

23    migration has gone slower than we anticipated; has left us a

24    little vulnerable.

25        So some of our clients were seeing an internal build

1    option as something that was quite viable and more cost

2    effective for them.

3         The other point on this is that the landscape for social

4    commerce tools -- social commerce tools, essentially, help you

5    sell more online -- that landscape is ever changing, has become

6    more complicated.  And there's a whole new set of categories of

7    tools in that space that we compete for the same wallet.

8    **Q.**  Could I direct your attention to DX18186, please.

9         And, Mr. Godfrey, can you just briefly describe, what does

10   DX1866 represent?

11   **A.**  This is a list of clients where we've either lost them as

12   a client, we've lost them as a prospect, or we've taken a

13   significant -- what we call an adjustment or reduction in our

14   contract amount with the client.

15   **Q.**  And were you involved in the preparation of this document?

16   **A.**  Yes, I was.  Myself and my team, of course, are measured

17   on many of those numbers; new sales, client retention, and so

18   forth.  And so my team and I prepared this document.

19   **Q.**  Are these the only examples of postmerger competitive

20   situations that you faced in retail?

21   **A.**  No, not at all.  There are many others.  These are ones

22   that I thought were most relevant for this discussion.

23   **Q.**  Now, because the information that appears after these

24   pages is highly confidential, we're not going to show them on

25   the screen.  But I'd like you to keep them in front of you,

1    Mr. Godfrey, and turn to page 3 of this slide.

2        And the first one there discusses in-house.  Do you see

3    that?

4    **A.**   Yes.

5    **Q.**   And what does that mean to you?

6    **A.**   In-house means, essentially, the capabilities we're

7    providing would be built by a team within the company,

8    typically led by an eCommerce executive or organization.

9    **Q.**   And just so that we understand exactly how to interpret

10   this slide, the in-house portion, at the top four are those the

11   prospective or the lost clients?

12   **A.**   These are clients that are pursuing -- were threatening to

13   pursue an in-house alternative, yes.

14   **Q.**   For example, GameStop, Newegg, Calvin Klein, and Expedia.

15       And below that are a series of dollar amounts, sir.  What

16   do those dollar amounts represent?

17   **A.**   Those dollar amounts represent the lost and contract value

18   to Bazaarvoice.

19   **Q.**   Okay.  Does it also -- I see the reference there to a ASF

20   discount.  What does that mean?

21   **A.**   That, again, is how much we lowered the contract value as

22   a way to keep the client.

23   **Q.**   And below that there is an icon called, "Price Reduction,

24   Lost Prospect, Lost Client."  Can you just quickly tell us what

25   was meant by that.

1  **A.**   Sure.   In the case of a price reduction, the client was

2  staying with us, but we were actually servicing them at a lower

3  price point, if you will, lower revenue.

4      In the case of a lost prospect, this was someone we were

5  pursuing to actually sign them onto the platform.   And for

6  whatever reason they did not become a client.   Either they had

7  an in-house build or took some other alternative.

8  **Q.**   Lost client?

9  **A.**   Lost client was essentially someone who was a client of

10  ours, on our platform, and they terminated their agreement and

11  are no longer a client.

12      **THE COURT:**   Can I just ask.

13      Looking at the in-house example, are you comparing apples

14  to apples?   Is the contract the same for each of these

15  customers, but the price reduced?   Or is it a reduced price and

16  reduced services?

17      **THE WITNESS:**   Your Honor, I'm not sure I follow your

18  question.

19      **THE COURT:**   You gave a discount to, say, the company

20  that's listed on the left.

21      **THE WITNESS:**   Yes, that's correct.

22      **THE COURT:**   So did you also change the services that

23  you were providing to that customer?

24      **THE WITNESS:**   In some cases, yes.   In some cases, no.

25      Each one of these circumstances is just a little bit

1    different.  We have a fairly complex basket of goods and

2    services.

3         Happy to walk you through a couple of these, to give you

4    an idea.  But each one had kind of a different baseline from

5    which we started, and, therefore, where we ended up was a

6    little different.

7    **BY MR. PAK**

8    **Q.**   For example, how about GameStop?

9    **A.**   GameStop is a great example.  GameStop actually had their

10   own in-house internal build several years ago.  They decided to

11   go with Bazaarvoice.  Our initial fees were in the black

12   numbers here, underneath the discount number.  And they

13   determined that the value they're receiving for those fees was

14   not worth it so they, essentially, said we're going to go back

15   to an internal build solution.

16        So we, essentially, negotiated with them to keep us on as

17   their provider.  And they decided not to do the internal build

18   alternative.

19             **THE COURT:**  And services, same?

20             **THE WITNESS:**  Let me rephrase.  Maybe I was confusing.

21   The services, when I refer to services, I really mean providing

22   the Bazaarvoice capabilities.

23             **THE COURT:**  You were providing the same capabilities

24   but at a substantially reduced --

25             **THE WITNESS:**  Yes, sir, that's correct.  In this case,

1    yes, absolutely.

2    **BY MR. PAK**

3    **Q.**    And if I understood Your Honor's question, did you reduce

4    the amount of services or their functionalities and these kind

5    of product offers --

6    **A.**    Yes.

7    **Q.**    -- to GameStop?

8    **A.**    I understand now.

9         In the case of GameStop, we did not.  They had the same

10   baseline of services that they had before we provided the

11   discount.

12   **Q.**    And other examples here, some yes, some no?

13   **A.**    Correct.  For example, Expedia, as I mentioned earlier,

14   several years ago we raised our prices because we took on

15   additional services for them.  They decided to discontinue

16   those services, so we lowered their price point by this amount

17   in the large red, but we also reduced the services and

18   entitlement to be associated with that.

19        **THE COURT:**  Let me ask one more question about this

20   document.  Was this something that you prepared for this

21   discussion or for a discussion internally?  How did this -- how

22   did you prepare this?

23        **THE WITNESS:**  Well, actually, the collection of this

24   data is quite straightforward.  This is something, as a general

25   manager in the retail unit, I was responsible for reporting to

1    and forecasting to my executive team on a quarterly basis.

2         So I would actually be forecasting to them the total

3    amount of discounts and any clients that would be terminated,

4    as well as new clients we had been signed and new services that

5    we would sell.

6              THE COURT:  That part I understand.  But did you

7    prepare this exhibit, 1886, for the trial, or was this

8    something that you had used internally to report to the board

9    or somebody else?

10             THE WITNESS:  I understand.  This specific

11   presentation was prepared for the trial.  The data that went

12   into this is viewed on a very rigorous basis.

13             THE COURT:  Okay.  Thank you.

14   BY MR. PAK

15   Q.   Could you talk about the Newegg opportunity, sir.

16   A.   Sure.  Newegg is a very large online retailer of

17   electronics and computer equipment.

18        They are also a current client of Bazaarvoice Media,

19   meaning that they run display ads on their site for

20   advertising.  And we also wanted them to adopt the Bazaarvoice

21   platform and run our ratings and reviews capabilities in

22   conjunction with the Media, in return for expanding our Media

23   footprint, if you will.

24        So they run display ads.  The advertisers pay us, and we

25   split the revenue with Newegg.  So it's a site monetization

1    strategy, when we talk about Media.

2         And Newegg has been -- they've been notorious for having

3    an in-house solution for many, many years.  And the senior

4    executive responsible for that did not want to change the

5    provider.  And despite our offer to provide it for free, they

6    refused the offer.

7    **Q.**   Could you turn to the next set of slides, next page.

8    There's a reference to more opportunities with respect to Pluck

9    and Monetate.

10        Do you see that?

11   **A.**   I do.

12   **Q.**   Could you talk about the experience at Menards?

13   **A.**   Certainly.  Menards was a --

14   **Q.**   Who is Menards?

15   **A.**   They are a Northeastern department store.  They carry a

16   variety of clothing and some hard goods.

17        And we were selling to them as a potential prospect this

18   summer.  We learned through the selling process that they were

19   also negotiating with Pluck for similar services.  We initially

20   started our pricing in the -- in the area of the black number

21   below the discount amount.  And we heard that Pluck was being

22   much more price competitive.  We lowered our pricing again, to

23   the second number in the black.  And they still decided to go

24   with Pluck as their provider, and we lost Menards as a

25   potential client.

1  **Q.**   Switching over to the right side of this, Monetate, do you

2  see that?

3  **A.**   I do, yes.

4  **Q.**   And the experiences at Pottery Barn and Neiman Marcus, who

5  is Monetate?

6  **A.**   Monetate is another software company.  They're known as

7  the digital advertising and personalization company.

8      Their job is to make your visit to a retail site more

9  engaging and personalized so that you're more apt to buy

10 something, quite frankly.

11     They study your habits understand where else you're been

12 on the Internet.  They look at your post-purchase history.  And

13 they share about things that they think are most compelling for

14 you to buy.

15     Companies likes Pottery Barn and Neiman Marcus have highly

16 curated product assortments.  They believe the products that

17 they are selecting are ones that are perfect for their consumer

18 base.  And, therefore, they came to the conclusion that ratings

19 and reviews are not as relevant for them as it relates to

20 impacting their consumer base.

21     They decided they want to spend much more money on

22 Monetate and personalization and, essentially, attracting

23 people much higher -- what we call the shopping funnel -- on

24 their initial visits, and telling them what they should buy

25 rather than waiting them for to get down to the product pages

1    where they would see Bazaarvoice content.

2        So it's the same executive who would buy both Monetate and

3    Bazaarvoice; the same budget.  And they thought the Monetate

4    approach was a much more effective way to drive sales.

5        In the case of Pottery Barn and Neiman Marcus, they both

6    terminated their relationships with us.

7    Q.   And did those entities, Pottery Barn and Neiman Marcus, as

8    far as you know, do they have ratings and reviews on their Web

9    pages?

10   A.   Not currently.

11   Q.   If you turn to the next page, sir.  There's a reference

12   there to Amazon Webstore.  And the client below that is

13   Alternative Apparel.  Is that right?

14   A.   Yes, that's correct.

15   Q.   Can you tell us what happened there, sir?

16   A.   Yes.  Alternative Apparel was a relatively small

17   PowerReviews client for, I believe, several years.  Last fall

18   they decided to move their business onto the Amazon Webstore

19   platform.  They sell quite a few of their products through

20   Amazon.  And, as a result, they decided to terminate their

21   agreement with us.

22   Q.   And then over in the right, Rating System.  Who are they?

23   A.   Rating System is a very, very small entrant into the

24   market.  It's actually a product that was written by a

25   developer from one of our clients.  So he saw the way that we

1    did it and he's built his own capability.

2    **Q.**    And what happened with this entity ACIS?

3    **A.**    ACIS is a relatively small educational tour operator.

4         As I mentioned, travel is one of the market segments that

5    we've been fairly successful in.  We have quite a few tour

6    operators as clients.  We were pursuing them as a -- as a

7    client.

8         We were competing against Rating System, and Rating System

9    offered a price that we don't exactly know what it was but we

10   could not even get close to competing at that price point.  We

11   lost them as a prospect.

12   **Q.**    For these accounts that you lost or prospects that you

13   lost, Mr. Godfrey, did the BV syndication network change the

14   outcomes in terms of helping you keep the customer or win the

15   account?

16   **A.**    No.  They really didn't.  In some cases, for example, with

17   ACIS there's really not syndication.  We don't have tours that

18   we would syndicate, tour reviews we would syndicate into ACIS.

19   So it was not relative.  And, certainly, in the case of someone

20   like Pottery Barn, that has highly-curated, unique products

21   having reviews was probably unlikely from a syndication

22   perspective.

23   **Q.**    And for -- in the instances where you lowered prices and

24   competed against other vendors like Pluck, Monetate, Amazon,

25   and Rating System, did you view those entities as credible

1    threats?

2              **MR. BONANNO:**  Objection.   Compound.

3              **THE COURT:**  You can answer.

4              **THE WITNESS:**  Yes, I certainly viewed them as

5    competitive threats.

6    **BY MR. PAK**

7    **Q.**   Did you view them as competitive threats as you did

8    PowerReviews?

9    **A.**   Well, we -- I viewed any competitive threat very

10   seriously.

11        One of our goals was to retain all retail clients that we

12   possibly could.  So it just happened that we didn't see

13   PowerReviews in some of these larger clients like a

14   Pottery Barn or a Neiman Marcus.

15   **Q.**   I would like to turn your attention, now, to customer Bed,

16   Bath, and Beyond.  There's no exhibit to talk about.

17        What's your understanding of how the contract with Bed,

18   Bath, and Beyond was structured in terms of content tiers?

19   **A.**   A little historical perspective.  Years ago we structured

20   contracts based on the amount of reviews that somebody would

21   receive.  We had a fixed cost per review because humans would

22   read it.  So we had variable costs, if you will.

23        So in our contracts we wanted to protect ourselves from

24   those costs getting out of hand and, essentially, losing money.

25   So in early contracts we had voluntary tiers.  So if you had a

1  thousand reviews, we charged this much.  If you had 2,000, we

2  would charge more to cover our cost.

3      Over the years, our costs for moderation, we became more

4  efficient.  We used some natural language programming, did some

5  other things to make that more cost effective.

6      We also realized that by having volume tiers in place we

7  disincented our clients to drive more reviews.  And the number

8  of reviews is probably the most important factor with regards

9  to benefiting from our solution.  So we decided to start

10  eliminating volume tiers in most contracts.

11      At Bed, Bath, and Beyond, last fall, they realized that

12  they were beginning to bump up against the top of one of their

13  tiers, and they did not want to pay the next bump to give them

14  the entitlement to drive more reviews.

15  **Q.**   Did you move them into a higher tier, or how did you

16  restructure the contract, if at all?

17  **A.**   So what we were doing with most of these clients and with

18  Bed, Bath, and Beyond is we looked at their historical

19  performance, the number of reviews they had collected.  And

20  then based on their traffic to their website, best practices,

21  we would project how many reviews they should get over the

22  future.  And we had based our pricing on that projection.

23  Somewhat like an actuary.  We were taking a chance, right.

24      So we went back to them with a price increase that -- what

25  we thought reflected both the historical and future

1   performance.  I believe it was $33,000 increase in the

2   contract.

3   **Q.**   $33,000 or 33 --

4   **A.**   Excuse me.  I believe it's 33 percent increase.

5        And we heard back from them that, one, our projections,

6   they thought, were too high; and, two, they felt that that was

7   beyond their budgetary accommodation.  And so we negotiated for

8   a lower price point that allowed them to get into an unlimited

9   content or no tier type of situation.

10  **Q.**   I'd like to turn your attention to customer

11  Vitamin Shoppe.

12  **A.**   Uh-huh.

13  **Q.**   Are you familiar with the contract renegotiations that

14  occurred with Vitamin Shoppe this summer?

15  **A.**   I am, yes.

16  **Q.**   And what happened, without mentioning the dollar amounts?

17  **A.**   Yes.

18  **Q.**   Let's keep this highly confidential.  We can talk about

19  this in terms of percentages.

20       What happened to the price that Vitamin Shoppe received?

21  **A.**   Well, Vitamin Shoppe is a PowerReviews client.  And their

22  renewal is due to come up next January.

23       They came to us just recently, in the last six weeks,

24  indicating that their intent was to leave us as a provider and

25  use ratings and reviews on their new eCommerce platform, which

1    is called ATG.  It's a company that Oracle now owns.

2         And so we view this, of course, as a critical threat to

3    our business.  And we spent some time working with them, to

4    restructure their contract.

5         And through the reduction of some services and through

6    changing their support levels and through some additional

7    discounting, we gave them an overall, I believe it was a

8    33 percent discount in their contract basis.

9    **Q.**   Did they switch from a standard support to basic review

10   service?

11   **A.**   They did, yes.

12   **Q.**   Can you describe what the difference is.

13   **A.**   Sure.  For PowerReviews they've always had different

14   levels of support.  Meaning how -- how quickly do we respond?

15   Do you have a dedicated or a pooled set of individuals?  How

16   often do we talk to you?  Do you get a person on the phone?  Do

17   you get automated support?

18        In this case, going from standard to basic essentially

19   meant you would not have an account manager assigned to you.

20   But we would still respond to you via email in a certain period

21   of time, that would comply with the service-level agreements.

22   And they felt that was adequate for their business needs.

23   **Q.**   Again, without revealing dollar amounts, is there a

24   standard value assigned to moving to basic review service?

25   **A.**   There is, yes.

1    Q.    And was the discount that you provided to Vitamin Shoppe

2    in line with that standard value?

3    A.    No.  It was substantially more than that.

4    Q.    How much greater of a discount did you provide?

5    A.    I believe it was around 50 percent greater discount on

6    that particular entitlement.

7    Q.    Did Vitamin Shoppe eliminate certain Facebook features?

8    A.    They did.  They decided to no longer use what we call our

9    Facebook on-site capabilities.  Although, as part of the

10   contract restructuring we gave them the entitlement to both use

11   Facebook in the future and also a -- what we call a social

12   questions and answers capability, at a greatly reduced price,

13   at their election.

14   Q.    Approximately how much of a discount did you give to

15   Vitamin Shoppe for these added features?

16   A.    About a 50 percent discount.

17   Q.    Fifteen or 50?

18   A.    Fifty, five-zero.

19   Q.    Finally, sir, have there been any technological

20   improvements made to your products and services as a result of

21   the acquisition of PowerReviews?

22   A.    There have.  One of the main areas that PowerReviews

23   had -- had made some strides in was around the area of product

24   matching and universal product catalogs.

25         I don't know if that's been talked about much here in the

 1   trial room.  But one of the problems we have is matching parts

 2   and SKUs from various retailers and manufacturers in the supply

 3   chain because everyone uses different numbers.  That's how we

 4   facilitate syndication, by the way, so it's important that we

 5   can do that very effectively.

 6        PowerReviews had some technology.  We've combined that

 7   with some of the work that we're doing, and now we're in the

 8   process of rolling out what we call Syndication 2.0, which is a

 9   way to more effectively connect brands and retailers so they

10   can all share this information.

11        **MR. PAK:**  No further questions, Your Honor.

12        **THE COURT:**  Thank you.

13      Mr. Bonanno.

14        **MR. BONANNO:**  Good afternoon, Your Honor.

15        **THE COURT:**  Good afternoon.

16        **MR. BONANNO:**  Your Honor, before I begin, may I

17   approach the witness?

18        **THE COURT:**  Please.

19        **MR. BONANNO:**  Your Honor, may I proceed?

20        **THE COURT:**  Not unless you give me a binder myself.

21      (Laughter)

22        **MR. BONANNO:**  Your Honor, I said I wouldn't make the

23   same mistake twice, and I did.  Hopefully, it won't have to get

24   to that.

25

1        <u>**CROSS EXAMINATION**</u>

2   **BY MR. BONANNO**

3   **Q.**   Good afternoon, Mr. Godfrey.

4   **A.**   Hello, Mr. Bonanno.

5   **Q.**   It's been about a year since we last met.  I think we

6   first met at your deposition during the investigation in

7   Austin, in October of 2012.  I don't know if you remember.

8   **A.**   Yes, I do.

9   **Q.**   Okay.  I'd like to talk about a couple of things your

10  counsel walked you through.

11       The first thing I'd like to touch on is I believe you

12  testified, sir, that since the merger you've seen foreign

13  competitors enter the United States, right?

14  **A.**   Yes.

15  **Q.**   And you said eKomi is a company you saw, right?

16  **A.**   Uh-huh.

17  **Q.**   Isn't it true, sir, that you haven't actually seen eKomi

18  in any sales cycles in the United States since the merger

19  closed?

20  **A.**   I believe in my last deposition I mentioned there was one

21  sales situation where eKomi actually did appear.

22  **Q.**   I'd actually like you to turn, Mr. Godfrey, to GX494 in

23  your binder.  This should be the deposition transcript from the

24  30(b)(6) part of your last deposition.  We're going to go to

25  page 91, sir.

1        Are you there?

2   A.   I am, yes.

3   Q.   Okay.  We're going to look at lines 7 through 9:

4        "Q.  Okay.  And have you seen eKomi in any sales cycles

5        since Bazaarvoice acquired PowerReviews?

6        "A.  Not in the U.S., but certainly in Europe."

7        Did I read that correctly?

8   A.   You did, yes.

9   Q.   Okay.  Let's step back a little bit and reorient ourselves

10  to the questioning that you just went through with your

11  counsel.

12       I believe that you had also testified that postmerger

13  you've seen increasing pricing pressure since the acquisition,

14  right?

15  A.   That's correct.

16  Q.   And if we go to -- I believe it was Defense Exhibit 1886.

17  Do you remember this set of slides?

18  A.   Yes.

19  Q.   Do you have that in front of you, sir?

20  A.   I do.

21  Q.   I believe you testified, sir, that you prepared these

22  slides, right?

23  A.   I believe that this was prepared by our counsel in

24  conjunction with people on my team, yes.

25  Q.   Were you personally involved in the preparation of these

GODFREY - CROSS / BONANNO

1    slides?

2    **A.**   I was involved in the review and the providing of the data

3    for these slides, yes.

4    **Q.**   This was not an ordinary course business document, right?

5    **A.**   It was not.

6    **Q.**   And you had said that this slide deck included examples,

7    correct?

8    **A.**   That is correct.

9    **Q.**   But there were other examples you didn't include in here,

10   right?

11   **A.**   That's correct.

12   **Q.**   I believe you testified these were examples, in your view,

13   that were most relevant to discussion today, right?

14   **A.**   I believe so.

15   **Q.**   If we could, I'd like to please turn to the slide that's

16   labeled "In-House."  Are you there, sir?

17   **A.**   I am, yes.

18   **Q.**   And I believe -- correct me if I'm wrong, but I believe

19   during your counsel's examination you testified that postmerger

20   Bazaarvoice was seeing a trend towards more internal build.  Is

21   that right?

22   **A.**   Yes.

23   **Q.**   Let's look at the first example on this page.  It's

24   GameStop, right?

25   **A.**   Yes.

1   Q.   Okay.  And I believe you testified, during your counsel's

2   questioning, that this price reduction was due to increased

3   competitive pressure from an internal build.  Is that right?

4   A.   That's right.

5   Q.   And you had testified, in response to the Court's

6   questioning, that GameStop, after this discount, was receiving

7   the same services at a lower price, correct?

8   A.   Yes.

9   Q.   Mr. Godfrey, when you were overseeing the Bazaarvoice

10  retail organization, you used the company Salesforce Database,

11  correct?

12  A.   We do, yes.

13  Q.   And you used it for forecasting purposes?

14  A.   We do.

15  Q.   You also used it to report to the board on the health of

16  the client base, right?

17  A.   Typically, yes.

18          MR. BONANNO:  Your Honor, may I approach?

19  BY MR. BONANNO

20  Q.   Mr. Godfrey, you're just been marked (sic) what we'll

21  later mark as a government exhibit, that's an excerpt from the

22  company Salesforce Database.  For completeness, the stapled

23  version is the full set of entries for this customer.

24       We'll mark this as Government Exhibit 1231.

25       (Plaintiff's Exhibit GX1231 marked for identification)

BY MR. BONANNO

1

2  Q.   And the top page, we've taken out the fields that are

3  marked GameStop.com and the company Salesforce Database.  Do

4  you see that?

5  A.   I do, yes.

6  Q.   And this is what the company Salesforce Database would

7  look like, correct?

8  A.   In an extracted format, yes.

9  Q.   Okay.  I'd like to focus your attention, if I could, on

10 the third row in this section.  Do you see that, sir, on the

11 top page?

12 A.   Yes.

13 Q.   Okay.  And this is labeled, it has the GameStop website,

14 correct?

15 A.   It does.

16 Q.   Okay.  And there's a column that reads, "Created Date,

17 October 25th, 2012."

18      Do you see that, sir?

19 A.   I do.

20 Q.   And the line next to that has an amount that's negative,

21 which I assume refers to a contractual adjustment, correct?

22 A.   It would, yes.

23 Q.   And this would be a downward adjustment, right?

24 A.   Yes.

25 Q.   And that number aligns with the number in your chart in

1    Defense Exhibit 1882, correct?

2    **A.**    It does.

3    **Q.**    I'd like to go to the next column, sir.  And that column

4    reads "Product Return," correct?

5    **A.**    It does.

6    **Q.**    And the renewal note section -- and I'll read -- this

7    entry reads, quote:

8            "Removed A&A and Stories from agreement.  A&A never

9        went live, and Stories was initially used but removed from

10       scope."

11       So Bazaarvoice removed Ask & Answer and Stories from the

12   scope of the GameStop contract, correct?

13   **A.**    It appears that we did.

14   **Q.**    And I'd also like to focus your attention on the last

15   sentence of this section:

16           "R&R is safe/we are planning for expansion."

17       Do you see that, sir?

18   **A.**    I do.

19   **Q.**    So the contract reduction at GameStop, in fact, had

20   nothing to do with pressure from an internal build, did it?

21   **A.**    I don't know that.

22   **Q.**    Let's look at the next customer that's listed, or

23   prospect, rather, on Defense Exhibit 1882.

24       I believe Mr. Pak had walked you through the Newegg

25   account, correct?  It's the set of slides that you had prepared

1   for --

2   **A.**   Yes, that's correct.

3   **Q.**   Bazaarvoice actually tried to get Newegg's business before

4   the merger, too, right?

5   **A.**   We've been trying for years, yes.

6   **Q.**   Right.  So Newegg already had an internal ratings and

7   reviews solution in place for years before the merger, right?

8   **A.**   I don't know the exact timeframe.

9   **Q.**   Are you aware that as far back as 2008, Bazaarvoice was

10  trying to win Newegg's business from an internal solution?

11  **A.**   That was before I joined Bazaarvoice.  I don't know.

12  **Q.**   But you would agree that Newegg had an internal ratings

13  and reviews solution before the merger, correct?

14  **A.**   I would agree with that, yes.

15  **Q.**   So the Newegg entry in this exhibit actually doesn't

16  really have much to do with a trend towards internal solutions,

17  does it?

18  **A.**   I -- I don't know.

19  **Q.**   Stepping back for a moment, sir, I would like to talk

20  about internal solutions a little bit more broadly.

21      You would agree that clients who build ratings and reviews

22  internally are typically mid-tier clients that are not looking

23  for the kind of sophisticated solution that's provided by

24  either Bazaarvoice or PowerReviews, right**?**

25  **A.**   Repeat the question, please.

1          **MR. BONANNO:**  Sorry.  Could you read it back.

2      (Pending question read)

3          **THE WITNESS:**  Was the question do I agree?

4  BY MR. BONANNO

5  Q.   Yes.

6  A.   I don't agree because several of these clients obviously

7  are very large.

8  Q.   If you can go in your binder, please, sir, I would like

9  you to go to Government Exhibit 87.

10     We're going to start at page 212.  This is the transcript

11  from your October 2012 investigative deposition in this matter?

12  A.   I'm sorry, where is this?

13  Q.   This is Government Exhibit 87.

14  A.   In this binder (indicating)?

15  Q.   Yes.  Should be in the binder.  It might be in the front

16  one.

17  A.   I've got it.

18  Q.   We're going to go to page 212, please.

19     Are you there, sir?

20  A.   I am, yes.

21  Q.   I'd like you to start at line 22, and please follow along.

22  We're going to spill over on page 213.

23     "Q.  How would you -- let me back up.  The clients who

24     elected to build this type of functionality internally for

25     ratings and reviews, were these larger Enterprise

1    customers?"

2    Then on page 213:

3    "A.   Typically not.

4    "Q.   Where do these kinds of customers typically fall?

5    "A.   They're more mid-tier clients where they have a large

6    enough IT staff where they can build it.  But it's not

7    such an expense.  It's not so expansive that it becomes a

8    massive project for them.

9    "Q.   Are they looking for the kind of sophisticated

10   exclusion that PowerReviews or Bazaarvoice was bringing to

11   market?

12   "A.   They are not.  And as you can imagine, the costs of

13   moderation, authenticity, fraud detection is an extremely

14   high barrier to entry on that particular front."

15   Did I read that correctly, sir?

16   A.   You did.

17   Q.   Thank you.

18   I would like to turn -- and I apologize, I've been

19   referring to the defense exhibit by the wrong number.  It's

20   1886.  I think I may have said 1882.  I apologize.

21   I would like to go back to 1886, the set of slides that

22   you prepared today for your testimony.

23   If we could turn to the page that has Monetate on it.  I

24   would like to look at that page.

25   Now, you had testified that Bazaarvoice lost these

1   accounts to Monetate, correct?

2   **A.**   I believe I testified that the -- we lost the social

3   wallet to other vendors.  Monetate being one of them.

4   **Q.**   And you see that as a competitive loss, correct?

5   **A.**   Absolutely.

6   **Q.**   Okay.  And Monetate provides software that allows

7   retailers to test various configurations of their website,

8   correct?

9   **A.**   As it relates to personalization, yes.

10  **Q.**   And that's called AB testing in your industry?

11  **A.**   Yes.

12  **Q.**   So this product serves a completely different purpose than

13  ratings and reviews, right?

14  **A.**   It does.

15  **Q.**   You know Brett Hurt, right.

16  **A.**   I do.

17  **Q.**   Brett Hurt was the former CEO of Bazaarvoice?

18  **A.**   Yes, I know Brett.

19  **Q.**   And he cofounded the company?

20  **A.**   He did.

21  **Q.**   He's currently a member of Bazaarvoice's board of

22  directors?

23  **A.**   I believe he's the vice-chairman, yes.

24  **Q.**   Are you aware that Brett Hurt is an investor in Monetate?

25  **A.**   I was not aware of that.

1   **Q.**   And are you aware, sir, that Brett Hurt helped to

2   introduce Monetate to one of the clients you've listed in

3   Defense Exhibit 1882?

4   **A.**   I'm not aware of that.

5          **MR. BONANNO:**   Your Honor, may I approach?

6          **THE COURT:**   Please.

7   **BY MR. BONANNO**

8   **Q.**   Mr. Godfrey, I've just handed you an email chain that was

9   between Mr. Hurt and the VP of sales at Monetate, in May of

10  2012.

11         I'll direct you to the email -- I believe it's the third

12  from the top -- where Mr. Hurt wrote:

13             "Happy to put in a good word with the president of

14         direct at" the client.  I won't say the name because of

15         confidentiality concerns.  "I know him well."

16         Do you see that, sir?

17  **A.**   I do.

18         **THE COURT:**   Mr. Pak.

19         **MR. PAK:**   Objection, Your Honor.  I don't think it's

20  proper cross-examination to show him a document where he's not

21  even named as a recipient.

22         **THE COURT:**   Okay.  We haven't really gotten to the

23  place where that objection might work.

24         **MR. BONANNO:**   It's not being offered into evidence at

25  this time.

1           **THE COURT:**  Overruled for the moment.

2    **BY MR. BONANNO**

3    **Q.**  Do you see that email, Mr. Godfrey?

4    **A.**  I do, yes.

5    **Q.**  And in response, the VP of sales at Monetate wrote a draft

6    email.  I'll direct you to the second sentence.  This is an

7    email that he would have had sent on to the client from

8    Mr. Hurt that reads:

9           "You may know I'm an investor at Monetate, and they

10          are also a BV partner."

11          Did I read that correctly?

12   **A.**  Yes.

13   **Q.**  And, in your view, sir, would it be improper for a member

14   of the Bazaarvoice board of directors to be making

15   introductions on behalf of a competitor to current clients of

16   Bazaarvoice?

17   **A.**  I have no comment to that.  I don't know.

18   **Q.**  You have no view, based on your experience in business,

19   whether it would be improper for a member of your board of

20   directors to be helping a competitor win business at your

21   expense?

22   **A.**  I don't know the context of this email -- it's the first

23   time I've ever seen it -- or what the context of the exchange

24   was with Mr. Coral, as referenced in here.

25          (Reporter interrupts.)

1    **BY MR. BONANNO**

2    **Q.**   Who were you referring to, sir?

3    **A.**   John Coral, who is the president of Neiman Marcus.

4    **Q.**   You can set the email aside, sir.

5         You would agree, now, that you're aware that Mr. Hurt is

6    an investor in Monetate?

7    **A.**   I do now understand that, yes.

8    **Q.**   Okay.  And based on your understanding and your experience

9    in business, is it improper that Mr. Hurt, as a member of

10   Bazaarvoice's board of directors, is making introductions to

11   Bazaarvoice clients on behalf of a competitor?

12   **A.**   I'm not going to comment on Mr. Brett's -- on Brett's

13   activity.  I don't know.

14   **Q.**   I'm asking you your opinion, sir, based on your experience

15   in business, is this kind of conduct by a member of your board

16   of directors inappropriate, reaching out to a customer on

17   behalf of an alleged competitor, Monetate, to help them win

18   business?

19        **THE COURT:**  Mr. Bonanno, just to be clear in my mind,

20   are you asking a hypothetical question?

21        **MR. BONANNO:**  I'm just asking for the witness's

22   opinion based on his experience.

23        **THE COURT:**  Because I don't think you've established

24   anything with this document, with respect to Mr. Hurt.

25        **MR. BONANNO:**  Okay.  We'll move on then, Your Honor.

1    BY MR. BONANNO

2    Q.   Mr. Godfrey, it's actually true that Monetate is a partner

3    of Bazaarvoice, as well; isn't it?

4    A.   Not a formal one, that I'm aware of.

5    Q.   Are you aware that Monetate was a silver-level sponsor at

6    the Bazaarvoice Social Summit just this past year?

7    A.   I was not aware.  I was not involved in organizing

8    partners for that summit.

9    Q.   Mr. Godfrey, if we can turn to the next page, please, of

10   Defense Exhibit 1882.

11        This is the page with Amazon Webstore and Rating System.

12   A.   Uh-huh.

13   Q.   Mr. Godfrey, Amazon Webstore is an eCommerce platform

14   that's typically used by smaller retailers, correct?

15   A.   That's correct.

16   Q.   And the ratings and reviews functionality provided by

17   Amazon Webstore is very limited compared to Bazaarvoice's

18   Enterprise offering, correct?

19   A.   Yes.

20   Q.   In fact, the functionality offered by Amazon Webstore is

21   more analogous to PowerReviews Express; wouldn't you agree?

22   A.   I don't know the specifics.  I don't know.

23   Q.   But, in your view, you testified that Amazon Webstore is a

24   competitive threat to Bazaarvoice, right?

25   A.   Competitive in the fact that it took small clients from

1    us, yes.

2    **Q.**    Would these be clients that Bazaarvoice didn't typically

3    focus on prior to the acquisition?

4    **A.**    Well, prior to the acquisition that would be true, yes.

5    This occurred post acquisition, I believe.

6    **Q.**    But in the past three years, Bazaarvoice has lost fewer

7    than five customers to Amazon Webstore.  Isn't that right?

8    **A.**    That's correct.

9    **Q.**    Did Bazaarvoice offer the PowerReviews Express product to

10   the customer listed in the Amazon Webstore section of your

11   demonstrative exhibit?

12   **A.**    I don't know the answer to that.  We typically will before

13   we lose a client.  I don't know.

14   **Q.**    But you would have done so rather than lose the customer?

15   **A.**    Typically, yes.

16   **Q.**    Now, you had also testified, during your counsel's

17   examination, that Rating-system.com is a competitive threat to

18   Bazaarvoice.  Is that right?

19   **A.**    That's right.

20   **Q.**    Rating-system.com's product is just like PowerReviews

21   Express, right?

22   **A.**    I don't know the answer to that.

23   **Q.**    Isn't that just a credit card sign-up, limited

24   functionality product?

25   **A.**    I don't know.  I haven't looked at it closely recently.

1   Q.   Do you examine your competitors' products closely?

2   A.   Not on a frequent basis, no.

3   Q.   You've alluded to this in your testimony, but it seems as

4   though you're aware that the person behind Rating-system.com,

5   this is not a full-time endeavor for them.   Is that right?

6   A.   That was my understanding, yes.

7   Q.   This is a part-time operator offering a much more limited

8   down-market product, right?

9   A.   That's what I've heard anecdotally, yes.

10  Q.   I just want to make sure I have your testimony correct.

11        It's your testimony, sir, that Bazaarvoice, a publicly

12  traded company with annual revenues that exceed $150 million a

13  year is actually threatened by a company that's operated by a

14  gentleman working in his own time away from his full-time job.

15  Is that right?

16  A.   Well, my testimony was that we lost a prospect, legitimate

17  prospect to this particular competitor.

18  Q.   Did you offer them PowerReviews Express?

19  A.   I don't know the answer to that.

20        THE COURT:   Mr. Bonanno, is this a good time to break?

21  How much longer do you think you have?

22        MR. HUSTON:   I think I just need to go over my notes,

23  Your Honor, and I might be finished.

24        THE COURT:   Okay.

25        MR. BONANNO:   Actually, I have one more topic I would

GODFREY - CROSS / BONANNO

1    like to touch on, but it might take a few minutes.

2    **BY MR. BONANNO**

3    Q.   Mr. Godfrey, you also alluded to some product enhancements

4    that happened as a result of the merger?

5    **A.**   Yes.

6    Q.   You talked about product matching.  Do you remember that?

7    **A.**   Yes, uh-huh.

8    Q.   And you testified that PowerReviews had some technology

9    here that had helped you as a result of the acquisition?

10   **A.**   That's correct.

11   Q.   But you would agree that Bazaarvoice was actively working

12   to develop the same technology before the merger, right?

13   **A.**   We were working to develop technology.  It wasn't exactly

14   the same.

15   Q.   But you were working to close the gap on the product

16   matching aspect?

17   **A.**   That's correct.

18   Q.   Do you have any reason to believe Bazaarvoice would not

19   have been able to develop this technology without the

20   acquisition?

21   **A.**   I don't know the answer to that.

22   Q.   You had also mentioned the universal catalog as one of the

23   technological benefits of the acquisition?

24   **A.**   That's correct.

25   Q.   And Bazaarvoice was also working to develop the universal

GODFREY - REDIRECT / PAK

1    product catalog before the merger, right?

2    **A.**    That's correct.

3    **Q.**    And Bazaarvoice would have been able to develop and

4    incorporate this technology into its platform without the

5    merger, right?

6    **A.**    I don't know when or what the timing would be on that.

7    **Q.**    But you have no reason to believe that, technologically,

8    your developers couldn't have accomplished the task?

9    **A.**    I don't know.  It hasn't been delivered yet.

10           **MR. BONANNO:**  I have no further questions at this

11   time.

12           **THE COURT:**  Thank you, Mr. Bonanno.

13       Mr. Pak.

14           **THE COURT:**  I'll ask you the same question.  How much

15   do you think you have by way of redirect?

16           **MR. PAK:**  Hopefully, about two minutes.

17           **THE COURT:**  Please, proceed.

18                       <u>**REDIRECT EXAMINATION**</u>

19   BY MR. PAK

20   **Q.**    Mr. Godfrey, Mr. Bonanno showed you Salesforce.com

21   information.  Do you recall that?

22   **A.**    Yes, I do.

23   **Q.**    And it related to the account of GameStop --

24   **A.**    Yes.

25   **Q.**    -- do you recall that?

1          Now, I don't know if you -- I don't know if I heard the

2     question correctly, but there's mention in the Salesforce.com

3     Database about what was happening at GameStop.  Do you recall

4     him showing you those figures?

5     A.    Yes, uh-huh.

6     Q.    And do your salespeople -- how would you characterize the

7     degree to which salespeople put information into

8     Salesforce.com?

9     A.    Unfortunately, it's very erratic.

10    Q.    How did you draw the conclusion that with respect to

11    GameStop the discount that you had to provide was attributable

12    to the internal solution pressure?

13    A.    Repeat the question, please.

14    Q.    With respect to GameStop and the discount that you

15    offered, how did you reach the conclusion that internal -- the

16    competitive pressure from internal solutions at GameStop was --

17    contributed to the discount that you offered them?

18    A.    We were told specifically by the client.

19    Q.    "The client" meaning GameStop?

20    A.    Correct.

21    Q.    During the course of your time before the merger with

22    PowerReviews, do you have a sense as to how many accounts you

23    lost to PowerReviews?

24    A.    Very few.  I believe it was less than five.

25          MR. PAK:  No further questions, Your Honor.

1          **THE COURT:**  Mr. Bonanno?

2          **MR. BONANNO:**  No further questions.

3          **THE COURT:**  Thank you very much.

4          **THE WITNESS:**  Thank you, Your Honor.

5       (Witness steps down)

6          **THE COURT:**  All right.  We will be in recess.  See you

7    tomorrow morning at 8:00.

8          **MR. FELDMAN:**  Thank you, Your Honor.

9              (Proceedings adjourned at 1:07 p.m.)

10                  ---oOo---

11              **CERTIFICATE OF REPORTERS**

12       I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:   Tuesday, October 1, 2013

16

17

18

19    _____

20       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
             U.S. Court Reporter

21

22

23    _____

24       Katherine Powell Sullivan, CSR #5812, RMR, CRR
             U.S. Court Reporter

25