**Volume 7**

**Pages 1157 - 1274**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )    NO. C 13-00133 WHO
                                 )
BAZAARVOICE, INC.,               )
                                 )
          Defendant.             )
_____)
                          San Francisco, California
                          Wednesday, October 2, 2013

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff:

                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Golden Gate Avenue - Room 10-0101
                    P. O. Box 36046
                    San Francisco, California  94102
            **BY:  PETER K. HUSTON, ASSISTANT CHIEF**


                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Fifth Street, NW - Suite 7100
                    Washington, D.C. 20530
            **BY:  MICHAEL D. BONANNO, TRIAL ATTORNEY**
                  **ADAM T. SEVERT, TRIAL ATTORNEY**
                  **ROBERT A. LEPORE, TRIAL ATTORNEY**
                  **AARON HOAG, TRIAL ATTORNEY**
                  **LISA ANNE SCANLON, TRIAL ATTORNEY**
                  **AARON COMENETZ, TRIAL ATTORNEY**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

1  **APPEARANCES**:  (CONTINUED)

2  For the Plaintiff:

3                          U.S. DEPARTMENT OF JUSTICE
                         Antitrust Division
                         950 Pennsylvania Avenue, NW - Rm. 3214
4                        Washington, D.C. 20530
                     BY:  **DAVID I. GELFAND, DEPUTY ATTY. GENERAL**

5
   For Defendant:

6                          WILSON, SONSINI, GOODRICH & ROSATI
                         650 Page Mill Road
7                        Palo Alto, California  94304
                     BY:  **BORIS FELDMAN, ATTORNEY AT LAW**
8                         **DOMINIQUE-CHANTALE ALEPIN, ATTORNEY AT**
                            **LAW**
9                         **DYLAN J. LIDDIARD, ATTORNEY AT LAW**

10                         WILSON, SONSINI, GOODRICH & ROSATI
                         1700 K Street, NW - 5th Floor
11                       Washington, D.C.  20006
                     BY:  **SCOTT A. SHER, ATTORNEY AT LAW**
12                        **ANDREA A. MURINO, ATTORNEY AT LAW**
                         **FRANKLIN RUBINSTEIN, ATTORNEY AT LAW**

13
                         WILSON, SONSINI, GOODRICH & ROSATI
14                       1301 Avenue of the Americas - 40th Fl.
                         New York, New York 10019
15                   BY:  **CHUL PAK, MEMBER OF FIRM**
                         **JONATHAN M. JACOBSON, MEMBER OF FIRM**
16                        **DANIEL P. WEICK, ATTORNEY AT LAW**

17                         BAZAARVOICE, INC.
                         3900 N. Capital of Texas Highway
18                          Suite 300
                         Austin, Texas  78746
19                   BY:  **BRYAN BARKSDALE, GENERAL COUNSEL**
                         **KIN GILL, DEPUTY GENERAL COUNSEL**

20

21

22

23

24

25

```
1                        I N D E X

2    Wednesday, October 2, 2013

3    DEFENDANT'S WITNESSES                    PAGE   VOL.

4    FRIEDLAND, CHRISTIAN
     (SWORN)                                  1161    7
5    Direct Examination by Mr. Feldman        1161    7
     Cross-Examination by Mr. Lepore          1177    7
6
     KATZ, TIMOTHY
7    (SWORN)                                  1196    7
     Direct Examination by Mr. Sher           1196    7
8    Cross-Examination by Mr. Comenetz        1207    7

9    MAKI, SAMUEL JAME
     (SWORN)                                  1210    7
10   Direct Examination by Mr. Sher           1210    7
     Cross-Examination by Ms. Scanlon         1217    7
11
     KREBS, CHRISTOPHER K.
12   (SWORN)                                  1219    7
     Direct Examination by Mr. Liddiard       1220    7
13   Cross-Examination by Ms. Scanlon         1226    7

14   WEBCOLLAGE
     By Videotaped Deposition                 1229    7
15
     SIERRA TRADING POST
16   By Videotaped Deposition                 1244    7

17   ABE'S OF MAINE
     By Videotaped Deposition                 1259    7
18
                        E X H I B I T S
19
     DEFENDANT'S EXHIBITS              IDEN  EVID   VOL.
20
       DX1152                               1269    7
21
       DX1418                               1228    7
22
       DX1644                               1259    7
23
       DX1668                               1259    7
24

25
```

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>DEFENDANT'S EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| DX1724 | | 1244 | 7 |
| DX1746 | | 1244 | 7 |

```
 1   Wednesday - October 2, 2013                      8:00 a.m.

 2                      P R O C E E D I N G S

 3                          ---000---

 4           THE COURT:  Good morning, everybody.  Please be

 5   seated.

 6           ALL:  Good morning, Your Honor.

 7           MR. FELDMAN:  Good morning, Your Honor.

 8           THE COURT:  Mr. Feldman?

 9           MR. FELDMAN:  Bazaarvoice calls as its witness

10   Mr. Christian Friedland.

11           THE CLERK:  Please stand and raise your right hand.

12                   CHRISTIAN FRIEDLAND,

13   called as a witness for the Defendant, having been duly sworn,

14   testified as follows:

15           THE WITNESS:  I do.

16           THE CLERK:  Be seated.

17       And please state your full name and spell your name for

18   the court reporter.

19           THE WITNESS:  Christian Friedland; C-H-R-I-S-T-I-A-N,

20   F-R-I-E-D-L-A-N-D.

21                   DIRECT EXAMINATION

22   BY MR. FELDMAN:

23   Q.   Good morning.  We met a minute ago but, again, I'm Boris

24   Feldman.   I represent Bazaarvoice.

25       Could you tell us your educational background, please?
```

FRIEDLAND - DIRECT / FELDMAN

1   **A.**   Yes.  My undergraduate studies were both in computer

2   science and political science.  My graduate studies were in

3   computer science.  I achieved a Bachelor's degree in political

4   science with a minor in computer science, and I dropped out of

5   the graduate school program for computer science because I

6   started my company.

7   **Q.**   Have you ever done any software engineering?

8   **A.**   Since I was about nine years old, yes, I've been involved

9   in software engineering.

10  **Q.**   So that's about five years?

11                          (Laughter)

12  **A.**   Too kind.

13  **Q.**   What is your current job?

14  **A.**   I'm the president of Build.com, a half-a-billion-dollar

15  online retailer of home improvement products sold on the

16  Internet.  We compete against Home Depot and Lowe's.

17  **Q.**   Is Build.com publicly owned, private, or something else?

18  **A.**   So Build.com, I founded the company back in 2000 and I

19  sold the company to a large British conglomerate called

20  Wolseley PLC out of the U.K. in 2007, and they own a hundred

21  percent of the company and I operate as president of the

22  company and have been since the sale in 2007.

23  **Q.**   Okay.  I'm going to hand you a document.  I'm not marking

24  it as an exhibit.  I just want to use it as a way to illustrate

25  your testimony for the Court, but if the Court wants me to.

1      And I represent to you I actually pulled this product at

2  random on your Web site.  I went on and just hit one.  I didn't

3  try to find one that looked better for us.

4      I would display the actual Web page, but I'd mess it up;

5  but if you look at the bottom of the exhibit, it shows the URL.

6  **A.**   (Witness examines document.)

7  **Q.**   Does that look to you like a representative page of a

8  product on the Build.com Web site?

9  **A.**   It does.

10  **Q.**   And if you look in the lower half of the page, it says

11  "Reviews."  What does the number 10 mean?

12  **A.**   The 10 indicates that there are 10 customer reviews on

13  this product.  So 10 of our customers -- we solicited 10 of our

14  customers to provide feedback on that specific product.

15  **Q.**   And then if you flip through the pages after that, they

16  have the reviews, the stars and reviews.  Do you see that?

17  **A.**   Correct.

18  **Q.**   I'm going to hand up to you a second page from that Web

19  site.

20  **A.**   (Witness examines document.)

21  **Q.**   It's the same page, sir, but on this one I clicked on

22  "Product Q & A," which is in the middle, the tab next to

23  "Reviews."  So that's what that pulled up.

24      Can you tell us what the "Product Q & A" portion is?

25  **A.**   Absolutely.  So the product Q & A is where customers are

 1    allowed on the page to ask a specific question about the

 2    product; and once they ask a question about the product, our

 3    reps will respond to that answer.  And then we post that answer

 4    publicly on the Web site to try to avoid people from calling in

 5    and providing them more data along with a search engine

 6    optimization benefit of having unique content on the Web site.

 7    **Q.**   Do you sell that product, that Kohler single-function

 8    showerhead, on any sites other than just Build.com?

 9    **A.**   We do.

10    **Q.**   Where?

11    **A.**   We sell it on FaucetDirect.com.  We sell it on Faucet.com.

12    We sell it on Amazon.  We sell it on eBay.  We sell it -- and

13    many other sites and locations are we marketing to sell that

14    specific Kohler product.

15    **Q.**   Okay.  I'm going to hand you a document from the

16    Amazon.com Web site.

17    **A.**   (Witness examines document.)

18    **Q.**   This is not your Web site.  As you see at the bottom,

19    there's a URL for the Amazon site.

20         Does that look like a familiar page to you of how some of

21    your products are displayed at Amazon?

22    **A.**   It is.  It is absolutely.  That is how we are displayed on

23    Amazon.

24    **Q.**   Right.  So if you look down, somebody searching on

25    Amazon.com for that showerhead, you're listed fifth down.  It

1    says "Build.com"?

2    **A.**  Correct.

3    **Q.**  And then under "Build.com," it says, "93 percent positive,

4    4,195 total ratings."  Those refer to ratings about your

5    company, not about that product; right?

6    **A.**  Correct.

7    **Q.**  Okay.  I only have two more documents, then I'll leave you

8    alone.

9    **A.**  (Witness examines document.)

10   **Q.**  Mr. Friedland, this is also from the Amazon.com Web site

11   if one searches for that Kohler showerhead there.  This page

12   says something about product ads from external Web sites, ships

13   from and sold by Build.com.  What's that?

14   **A.**  So that is part of Amazon's product called -- their

15   equivalent of a shopping engine in the sense that -- or a

16   comparison shopping engine.

17        So Amazon will actually send customers to our Web site.

18   They will charge us a marketing fee for doing so.  So it's

19   actually a paid-inclusion ad.  So when you click on that, it

20   will actually take you to the Build.com Web site where you can

21   buy that product rather than buy it direct from Amazon.

22   **Q.**  I think you mentioned before, you showed us that on the

23   Build.com Web site for the showerhead there were 10 customer

24   reviews?

25   **A.**  Correct.

FRIEDLAND - DIRECT / FELDMAN

1    **Q.**    Last document, please.

2    **A.**    (Witness examines document.)

3    **Q.**    This is from the Amazon.com Web site.  You can see the URL

4    at the bottom.

5           What does this appear to be to you?

6    **A.**    This would be the customer reviews page of that same

7    Kohler showerhead, but its feature and listing on the

8    Amazon.com Web site.

9    **Q.**    How many reviews for that product where you had 10 reviews

10   does Amazon have?

11   **A.**    138.

12   **Q.**    Okay.

13   **A.**    You're making me feel bad.

14   **Q.**    I'm not trying to.

15          How would you say -- does Amazon affect your business?

16   **A.**    Yes.

17   **Q.**    How?

18   **A.**    Amazon -- Amazon is an incredibly predatory competitor

19   that has built an entire eCommerce ecosystem and is reducing

20   our overall growth and much of the growth of any online

21   retailer that's currently selling commodity that is online.

22   They are a fierce, vicious, cutthroat competitor in retail.

23   **Q.**    So given your view of that, why do you sell your products

24   through Amazon as we saw in one of those slides?

25   **A.**    As an act of contrition, because at this point in the

1  stage of eCommerce over the last number of months, Amazon

2  generates so much key-in retail traffic today.  As for

3  yourself, Boris, when you go to the Internet to shop for

4  products, you go to one of two locations, most people at least,

5  Google or at sometime it was Bing or one of these other Web

6  sites.  Now people go to one of two locations, which is Google

7  or Amazon.

8      So the challenge is that more and more customers are

9  bypassing Google, which is our marketing partner, and going

10  directly to Amazon to begin their shopping experience.  So

11  while Amazon is incredibly predatory, we have no choice but to

12  feed the monster that's trying to eat us.

13  **Q.**    I'm now going to ask you -- I showed you your

14  ratings-and-review platform for that showerhead.  Are you

15  involved in the ratings-and-review features at Build.com?  Is

16  that part of your job?

17  **A.**    Absolutely.

18  **Q.**    Okay.  Who supplies the ratings-and-reviews software for

19  Build.com?

20  **A.**    Well, that's actually a multipart question because --

21  you're saying Build.com the company or this specific Web site?

22  **Q.**    I didn't realize they were different.  Let's start with

23  this Web site and then I'll ask more broadly for the company.

24  **A.**    For this Web site, Bazaarvoice provides the review product

25  for Build.com.

1   Q.   Do you have a different ratings-and-review provider for

2   any other part of your business?

3   A.   Yes.  For our international business in the U.K. and in

4   Canada, Build.ca and Homeoutlet.co.uk, soon to be Build.co.uk,

5   we use a different software product called Magento, and built

6   into the Magento platform is a rating-and-review system.  We

7   use that rating-and-review system.

8        Furthermore, we recently acquired a company in Chicago,

9   Illinois, called Power Equipment Direct.  Power Equipment

10  Direct built their own review system and uses that.

11  Q.   I'm going to come back to Build.com, but I want to follow

12  up on those.

13       On the sites where you use the ratings and review that's

14  built into Magento, do you provide moderation of reviews?

15  A.   Yes.

16  Q.   How?

17  A.   The Magento tool itself automates much of the review

18  process by screening for inappropriate language or content.  So

19  despite the sites reaching some level of scale, we expect the

20  U.K. business to do 30 million pounds this year in revenues, it

21  takes a part-time person today a couple hours a week to do the

22  moderation.

23  Q.   So you do the moderation in-house?

24  A.   In-house.

25  Q.   Okay.  You mentioned that for Build.com you use

1    Bazaarvoice's ratings and reviews.  Did Build.com ever use

2    PowerReviews for its software?

3    **A.**   We did.

4    **Q.**   When?

5    **A.**   2000 -- I don't recall exactly; but if memory serves me

6    right, around 2006 -- 2005-2007, somewhere in that area.

7    **Q.**   Do you remember ballpark how much PowerReviews charged you

8    for their software?

9    **A.**   It was free at the time.

10   **Q.**   Did you ever change from PowerReviews to someone else?

11   **A.**   My VP of marketing did, yes.  He switched us from

12   PowerReviews to Bazaarvoice.

13   **Q.**   About what year?

14   **A.**   '06-'07.

15   **Q.**   And what was your understanding of the rationale for

16   Build.com moving from PowerReviews to Bazaarvoice?

17   **A.**   Well, the problem was, is that I didn't.  I was a little

18   frustrated with the decision, because we had a provider.  It

19   was serving us fine.  It was a -- it was doing all the

20   functionality that we believed we needed for reviews, but

21   Bazaarvoice came in and sold us, I think it was just great

22   salesmanship, a function of this dream of future of social

23   commerce tools, as well as this idea of syndication where we

24   would have all this great content syndicated to us from all of

25   our distribution partners.

FRIEDLAND - DIRECT / FELDMAN

1    So it was against my wishes, we took a free product that

2  was performing fine and put a paid product in its place that we

3  saw no real meaningful impact from.

4  **Q.**   What do you mean that you saw no meaningful impact from?

5  **A.**   The function of having review software is important for

6  all Web sites.  If you're going to be in the eCommerce

7  business, you should have some form of rating and reviews.

8  There's many ways to do that.  In this age with technology

9  where it is, it's -- there's plug-ins and free review software

10  that anybody can install on their own Web site.

11    PowerReviews not only provided us free software, but they

12  also provided us also the moderation piece, which just saved us

13  cost.  So as far as -- as far as a provider goes, it's a

14  commodity product for us and we traditionally look at that how

15  do we derive cost out of that process rather than add cost.

16    Because beyond a certain threshold of reviews, once a

17  product has a certain -- I think the last confidence test we

18  had 13 to 18 reviews.  The conversion rate -- getting the 13 to

19  18 reviews sends the conversion rate up dramatically.

20    After you get to that point, you can add a hundred reviews

21  and the incremental gains from those additional reviews are

22  almost nil.  You might as well turn off reviewing that product

23  because you're not going to get any incremental lift or

24  customer confidence beyond a certain point.

25  **Q.**   So how would you articulate the importance of syndication

FRIEDLAND - DIRECT / FELDMAN

1   of reviews to your business?

2   **A.**   It's not important.

3   **Q.**   Because?

4   **A.**   Well, it never really worked.  The syndication issue --

5   the syndication opportunity was a little bit of stone soup from

6   my perspective when they said, "Well, we're going to syndicate

7   with all your manufacturer partners.  You're going to get this

8   great flow of reviews.  It's a wonderful dream of you're just

9   going to super-populate all of your products with reviews out

10  of the box."  Still today, years into this process, only

11  20 percent of our products have reviews on them to give you an

12  idea of the success of syndication.

13        Syndication, which was most frustrating to me, I ended up

14  having a Bazaarvoice salesperson call me saying, "Can you

15  introduce me to all your manufacturers?"  Screwed up the

16  relationship.

17        Got another call saying, "Could you reintroduce this new

18  salesperson to manufacturers?"  And at that point I said, "I've

19  introduced you to Delta.  I've introduced you to these guys.

20  I'm not going -- I'm not going -- you're bringing me a

21  stone-soup solution where you have this software platform that

22  you're having me go out and do the selling for you.  I refuse

23  to continue to participate."

24  **Q.**   Have you entered into discussions with any companies other

25  than Bazaarvoice about providing ratings-and-reviews software

FRIEDLAND - DIRECT / FELDMAN

1    for your Build.com site?

2    **A.**    Personally, no; but, yes, every year with Bazaarvoice we

3    run a cost-benefit analysis based on what we're being charged

4    currently by Bazaarvoice and what other provider is out there

5    and whether it makes sense to either take it in-house or switch

6    to a lower-cost provider.

7    **Q.**    Do you know if Build.com has talked to Gigya?

8    **A.**    We have spoken with Gigya.

9    **Q.**    How about Reevoo?

10   **A.**    I believe we've spoken with Reevoo as well, too.

11   **Q.**    Okay.  Over time have you observed any trends in the cost

12   of ratings and review to Build.com measured by price per

13   review?

14   **A.**    Our price per review cost continues to fall, which justify

15   our -- which marginally justify us sticking with Bazaarvoice as

16   a provider.

17   **Q.**    Has that changed at all since the acquisition of

18   PowerReviews?

19   **A.**    No.

20   **Q.**    I want to ask you about other user-generated content on

21   your Web site.  I pointed you earlier to Q & A?

22   **A.**    Yes.

23   **Q.**    Do you buy that Q & A software from Bazaarvoice?

24   **A.**    That's actually a funny story.  So, embarrassingly enough,

25   Bazaarvoice brought us the Q & A product.  And Bazaarvoice

1    brings us a lot of products that we don't buy because they're

2    constantly trying to sell us stuff.  But we really liked the

3    Q & A product, and we said, "We want this one.  We'll -- we're

4    interested."

5        And the price was so ridiculously stupid.  They wanted to

6    double our cost.  We said, "You're crazy.  We'll take an

7    incremental lift for it, but what you're doing" -- they can't

8    even moderate the reviews.  They can't moderate the content

9    because it's domain-specific knowledge.

10       So they wanted to just give us a system for some

11   ridiculous price that allowed us to take customer service

12   requests, review them, and post the answers to our own Web

13   site.  So we just said -- you know, we spent two weeks and

14   built it ourselves probably at a cost of about $10,000

15   internally and have been using it ever since.

16   **Q.**   Okay.  Thank you.

17       I want to move from that to the ability to develop

18   ratings-and-review capabilities in-house as distinct from

19   Q & A.

20       If Build.com chose not to use an outside vendor for

21   ratings and reviews, do you think it would be able to develop a

22   ratings-and-reviews capability in-house?

23   **A.**   In how many days?  Yes.

24   **Q.**   I think you said you used to do software engineering.  How

25   long do you think it would take Build.com to build an in-house

FRIEDLAND - DIRECT / FELDMAN

1  ratings-and-reviews platform that you found acceptable?

2  **A.**   I would say, really enterprise Class 1, might take as long

3  as a month if you really want to build it from scratch; but

4  there's so many great plug-ins and software tools out there and

5  open source review tool kits that we could use.  I would say we

6  could probably have something up and running in two weeks at an

7  internal cost of maybe 20 to 30,000 I would imagine for

8  something at our scale of a company.

9  **Q.**   Okay.  I'm almost done.

10      Has Bazaarvoice's acquisition of PowerReviews in your

11 opinion affected Build.com in any way?

12 **A.**   No, not at all.

13 **Q.**   Do you believe that the acquisition significantly reduced

14 Build.com's leverage in negotiating with Bazaarvoice?

15 **A.**   Absolutely not.

16 **Q.**   Why not?

17 **A.**   Because it's all a decision of economics for us.  This is

18 a commodity -- a review system is a commodity product.

19 Reviews -- the reviews are being provided from our customers

20 and we have a constant flow of millions of customers and we own

21 the review content.  So you're really just talking about

22 switching out a forum on the Web site with a little bit of

23 JavaScript that will allow people to do star ratings and submit

24 reviews, and then rebroadcast that information back out to our

25 Web site.  It's very, very simple technology.

1    The reason why we continue to stick with Bazaarvoice is,

2    one, we've refused any price increases because we've told them

3    we'll build it ourselves or go to a competitor; and, two, the

4    moderation is convenient.  The moderation -- the internal cost

5    of doing the moderation at this point, based off the cost of

6    Bazaarvoice today, it makes sense to keep using Bazaarvoice,

7    especially as the review rates continue to go up and we can

8    keep our costs relatively fixed.  It's an economic decision.

9    **Q.**   Do you ever get solicited by third-party moderation

10   services?

11   **A.**   Twice a day, yes.  There's always BPO firms whether --

12   **Q.**   What does VPO [sic] mean?

13   **A.**   BPO, business process outsourcing firms, and usually

14   overseas that want to do our data work.  They offer to moderate

15   our reviews.  They offer to do all of the minutia work that

16   many online retailers leverage these firms for, and review

17   moderation is one of those services that they offer.  And,

18   yeah, I get -- at least company-wide we probably get at least

19   one a day in some department.

20   **Q.**   Do you own any stock in Bazaarvoice?

21   **A.**   No, I do not believe so.

22   **Q.**   Did you ever own any stock in Bazaarvoice?

23   **A.**   I did own stock in Bazaarvoice.

24   **Q.**   How did that come about?

25   **A.**   So we were a Bazaarvoice customer, and a hedge fund

1    manager who I'm friends with named Mitchell Green said, "I'm

2    doing a private placement of Bazaarvoice.  I never owned

3    stock -- I didn't own stock at this time personally.  I'm

4    buying stock from investors or existing investors and employees

5    and would like you to participate in this -- in this vehicle."

6         I told him I didn't think it was going to work.  I said,

7    "The company doesn't make any money."  He explained to me that

8    they're going through this big SaaS boom and there was a huge

9    opportunity to make --

10   **Q.**   SaaS did you say?

11   **A.**   Software as a service, SaaS.

12        And I said, "Well, relative to my net worth, I'll put in a

13   fractional amount into this thing; and if you make me a great

14   return, I'll consider doing more deals with you."

15        And, lo and behold, that was -- that was four or five

16   years -- four years ago, five years ago, the company did go

17   public.  I was issued an allocation of stock where I made about

18   a five-times return on my money; and immediately as I got

19   control of the stock, based off the IPO price, I sold it as

20   fast as I could.

21   **Q.**   So you're not a shareholder today?

22   **A.**   I'm not a shareholder today.

23        **MR. FELDMAN:**  All right.  Thank you.  I don't have

24   anything else.  Thank you.

25        **MR. LEPORE:**  Good morning, Your Honor.  I'm Robert

1    Lepore.

2              **THE COURT:**  Good morning.

3              **MR. LEPORE:**  May I approach the witness, Your Honor?

4              **THE COURT:**  Would you?

5                        (Pause in proceedings.)

6                        **CROSS-EXAMINATION**

7    BY MR. LEPORE:

8    **Q.**   Good morning, Mr. Friedland.  It's good to see you again.

9    We, of course, met a few months ago during your deposition.

10   **A.**   Good to see you as well.

11   **Q.**   Now, before we start talking about Build.com's use of

12   ratings-and-review software, I want to touch a little bit more

13   on your background.

14       You mentioned just a moment ago that you used to be an

15   investor in Bazaarvoice; correct?

16   **A.**   Correct.

17   **Q.**   Now, I believe, just to dive into that a little more,

18   there were two investments in Bazaarvoice; right?  You were

19   part of a hedge fund that was investing in Bazaarvoice?

20   **A.**   Correct.

21   **Q.**   And that was Eastern Advisors; is that right?

22   **A.**   Correct.

23   **Q.**   And then you also invested in this special purpose vehicle

24   that you alluded to; correct?

25   **A.**   Correct.

1   **Q.**   You invested around a hundred thousand dollars in that

2   special purpose vehicle?

3   **A.**   Correct.

4   **Q.**   And at that time Bazaarvoice was still a private company

5   so you couldn't just buy some shares through your broker;

6   right?

7   **A.**   Correct.

8   **Q.**   And, so, you mentioned Mitchell Green?

9   **A.**   Correct.

10  **Q.**   Now, the Court may remember Mitchell Green.  He's been on

11  some emails that have come up earlier in the trial.

12       But for the record, at the time he was on Bazaarvoice's

13  Board of Directors; correct?

14  **A.**   I don't know.

15  **Q.**   But you know he was a large investor in Bazaarvoice?

16  **A.**   No.  I -- what's "large"?  I don't know.

17  **Q.**   Well, Mr. Green and you were on the board of

18  Eastern Advisors together; correct?

19  **A.**   No.  I was not on the board of Eastern Advisors.  I was an

20  investor in Eastern Advisors.

21  **Q.**   Thank you, sir.

22       You were an investor in Eastern Advisors, and

23  Eastern Advisors was a pre-IPO investor in Bazaarvoice?

24  **A.**   Correct.

25  **Q.**   And then you mentioned that after Bazaarvoice went public,

1  you made about a five-times return; right?

2  **A.**   Correct.  Well, only because I sold it when I did,

3  otherwise I would have made no return if I owned the stock as

4  of a few months ago, but....

5  **Q.**   Sure.  So you kind of owe Mr. Green one a little bit?

6  **A.**   I don't think I -- that's like saying I owe any -- I don't

7  think I owe any hedge fund person.  I don't think I owe anybody

8  that does a service for me and takes an investment and makes a

9  return anything personally.

10  **Q.**   Well, sir, didn't you -- after you made that return, you

11  rolled over that profit into another fund being run by

12  Mr. Green; isn't that right?

13  **A.**   That wasn't because I owe him anything.  That's because he

14  gave me a huge return on my investment.  I expect another huge

15  return out of this current fund.  There's no -- he owes me.

16  I'm an investor.  If I invest in your company, you owe me.  I

17  don't you anything.

18  **Q.**   Are you still invested with that fund with Mr. Green, sir?

19  **A.**   I am.

20  **Q.**   Is that fund Lead Edge Capital?

21  **A.**   Correct.

22  **Q.**   And do you know, sir, is Lead Edge Capital an investor in

23  Bazaarvoice?

24  **A.**   I'm not sure.

25  **Q.**   You've never seen their portfolio or you just don't

FRIEDLAND - CROSS / LEPORE

1   remember?

2   **A.**   I -- I know that -- I don't know exactly what their

3   investment -- if they have an investment currently in

4   Bazaarvoice.  I know that Mitchell has, through some of his

5   vehicles, had an investment in Bazaarvoice; but my

6   investment -- my investment in Lead Edge today is nominal

7   portion of my net worth, and any allocation, based off of what

8   I can recall Lead Edge has been investing in recently, would be

9   a fractional allocation, if that.

10  **Q.**   Well, would it help refresh your recollection about

11  Lead Edge's investments if I showed you a screen shot of

12  Lead Edge's Web site that shows some of their portfolio

13  companies?

14  **A.**   I could actually go on my email and dig out my last

15  statement from them and tell you exactly where -- how their

16  portfolio is currently allocated.

17  **Q.**   Well, why don't we move on for now.

18      Through your investment with Mitchell Green's fund, you

19  continued to have a relationship with Mr. Green; right?

20  **A.**   I, like hundreds of other investors, absolutely.  Mitchell

21  has a unique platform where he will often ask his investors for

22  introductions into other companies so his -- part of his hedge

23  fund strategy is, is he partners -- he takes C-level investors

24  who can make introductions to some of these software service

25  companies to help him add customers.

1   Q.   And, in fact, you've spoken with Mr. Green about this

2   litigation; right?

3   A.   I believe so.

4   Q.   And you made jokes with him about the litigation?

5   A.   Yes.  Yes, I have.

6   Q.   Uh-huh.  And you also know Brett Hurt, right, the former

7   founder and CEO of Bazaarvoice?

8   A.   I do.

9   Q.   And you've continued to explore venture capital

10  opportunities with Mr. Hurt since he's left his CEO position?

11  A.   I -- the last conversation that I had with Brett was

12  involved -- it was involving an investment, but it was before

13  this trial and before this event.

14  Q.   Now, Mr. Friedland, from time to time during my

15  questioning today I may be referring back to the deposition you

16  took a few months ago in June.  The transcript is there in

17  front of you.  Do you recall that testimony, sir?

18  A.   I do.

19  Q.   Okay.  Great.  I want to just go over a little

20  housekeeping about that deposition up front.

21       Before that deposition, you had a call with Bazaarvoice's

22  lawyers; right?

23  A.   I did.

24  Q.   And in that conversation you discussed who from Build.com

25  would be the company's representative to the deposition; right?

FRIEDLAND - CROSS / LEPORE

1   **A.**   Correct.

2   **Q.**   And during that call, there was a decision being made

3   about whether it would be you or another individual at your

4   company, Mr. Mario Magliozzi; right?

5   **A.**   Correct.

6   **Q.**   And Mr. Magliozzi is the one in charge of the relationship

7   with Bazaarvoice?

8   **A.**   Correct.

9   **Q.**   And on that call you told Bazaarvoice's lawyers that

10  Mr. Magliozzi would be more familiar with the details of the

11  Bazaarvoice relationship; right?

12  **A.**   Of the current relationship, not the historical

13  relationship.

14  **Q.**   And I believe during direct testimony you mentioned that

15  you personally hadn't been involved in evaluating alternatives

16  to Bazaarvoice; is that correct?

17  **A.**   No, just by instruction of -- we have a process at Build

18  to evaluate every one of our vendors every year to try and

19  extract either costing or price concessions or whether or not

20  we should -- whether the cost-benefit review platform makes

21  sense.

22       We move vendors whenever we can't get the right price.  We

23  get the right price, some vendors we've kept for an extended

24  period of time; but we have best -- but we like to think that

25  we have best-in-market pricing with most of our vendors.

1   Q.   And Mr. Magliozzi, with respect to ratings and reviews,

2   would have been the one who would have evaluated any other

3   alternatives; right?

4   A.   Correct.

5   Q.   Bazaarvoice's counsel said they wanted it to be you at the

6   deposition anyway; right?

7   A.   The discussion with Bazaarvoice's counsel was based off

8   the history of the relationship with me and Bazaarvoice, that

9   it made more sense for me -- and my understanding of software

10  development, which Mario does not understand, that they

11  requested that it would make more sense for me to be part of

12  the hearing as opposed to Mario.

13  Q.   Right.  So it was Bazaarvoice's attorneys who requested it

14  be you and not Mr. Magliozzi?

15  A.   We had a pro-and-cons discussion of who should -- they had

16  a pro-and-con discussions kind of over the phone of who should,

17  and they said, "We would like it to be you, based off of the

18  length of the relationship and your background in software

19  development and your understanding of the technology behind

20  it."

21  Q.   Now, sir, once you got to that deposition, do you recall

22  you were under oath during that deposition, sir?

23  A.   Absolutely.

24  Q.   Just like you are here today?

25  A.   Correct.

1  Q.    Did you tell the truth in that deposition, sir?

2  A.    I did.

3  Q.    Did you take that deposition seriously, sir?

4  A.    Yes.

5        MR. LEPORE:  With Your Honor's permission, we have a

6  short clip to play.

7        Seth?

8                    (Videotape played as follows:)

9        "Will the court reporter please now swear in the

10 witness?

11       THE REPORTER:  Raise your right hand, please.

12       "You solemnly swear that the testimony you're about

13 to give in this matter will be the truth, the whole truth,

14 and nothing but the truth so help you God?

15       THE WITNESS:  I do."

16 Q.    Mr. Friedland, why did you wink there?

17 A.    It was a relatively playful environment.  We were all

18 chatting, and there wasn't any -- there was no deception

19 involved.  I was just winking.  Maybe it was at Dominique.  I

20 don't even remember who specifically, but just being playful.

21       MR. LEPORE:  Okay.  Seth, let's put up DX1391.

22       Your Honor, this document is already in evidence pursuant

23 to the stipulation.

24 Q.    Mr. Friedland, this is the first document that's in the

25 binder in front of you.

FRIEDLAND - CROSS / LEPORE

1    A.   I'm looking at it right now.

2    Q.   Sir, this is the declaration that you signed in connection

3    with this case; right?

4    A.   Correct.

5    Q.   And Bazaarvoice's lawyers sent you this declaration to

6    sign; right?

7    A.   They did.

8    Q.   Now, let's take a closer look at item 8.  In item 8 you

9    write:  (reading)

10          "In the event that Bazaarvoice sought to increase

11       prices by 5, 10, or even 15 percent, I would end my

12       relationship with Bazaarvoice and develop a solution

13       in-house."

14       But, in fact, sir, this signed statement isn't accurate;

15   is it?

16   A.   Well, if they -- here's the way we negotiate with our

17   vendors, is we have to take a very, very hard line.  And the

18   Bazaarvoice solution, as it stands right now, if they're

19   interested in doing a price increase with no added value, where

20   we're not getting additional services or incremental, just

21   we're going to take your platform and charge you more, then we

22   would -- we would force them -- we would -- we wouldn't want to

23   have to do it, but we've walked away from vendor relationships

24   just purely off of principle that you're adding -- you're not

25   adding any additional value and you're just adding costs for no

1   incremental reason.  We would just walk away from the

2   relationship just out of principle.

3   **Q.**   So, sir, it's your testimony sitting here today that if

4   Bazaarvoice increased your prices on ratings and reviews by

5   only 5 percent, you would definitely end your relationship and

6   move in-house?

7   **A.**   The context would have to be whether the increase was part

8   of any additional added value.  If you came -- if somebody came

9   to me and said, "My costs are going down, my cost to serve you

10  has continued to go lower and I'm going to raise your prices,"

11  on principle I would cancel that relationship.  I would say

12  "Your economy -- you're taking your economies of scale and

13  punishing me with them and not adding any additional benefit?"

14  Then I would end the relationship out of principle.

15  **Q.**   So earlier during your direct testimony, I believe you

16  alluded to the fact that Build.com's decision for what to do

17  with ratings and reviews would be an economic decision; is that

18  right?

19  **A.**   Economic decision but vendor negotiations also involve a

20  cat-and-mouse and play.  And today the economic decision that

21  we constantly weigh every single time we go into a contract

22  review with Bazaarvoice is, we do the cost-benefit analysis of

23  actually -- of actually seeing what is the cost-benefit

24  analysis of the Bazaarvoice relationship.

25       And of all the vendors, including Bazaarvoice, as we

FRIEDLAND - CROSS / LEPORE

1  continue to scale our business dramatically, costs have

2  actually been -- went down every single year as a percentage of

3  the amount of volume that they process.

4      So we have been getting economies of scale out of our

5  relationship in the sense of we don't pay -- we're paying less

6  per review today than we were last year, than we were last

7  year, than we were last year.  If prices started to go up on a

8  cost per review, then we would change the relationship because

9  the volumes, we continue -- we continue to add more and more

10  and more and more volumes.

11  Q.  Sir, isn't it true that the reason you wrote that in this

12  signed statement was that you just didn't want Bazaarvoice to

13  know that you might have to accept a 5 percent price increase

14  if they tried?

15  A.  No.  There's -- if Bazaarvoice came with 5 percent more

16  value, then we would pay 5 percent.  If they came with

17  15 percent more value in the relationship or could offer us

18  tools or services that added that incremental value and there

19  was costs associated with those tools and there was development

20  fees associated with those tools, we would take that as a price

21  increase for added value.

22      We're not going to take a price increase for not adding

23  any incremental value.  So that is still a true statement.

24  Would we take a 5 percent increase?  Yes, but they would have

25  to come with something that added value that justified a

1   5 percent increase.  If it was just raising your prices, no, we

2   would move from Bazaarvoice.

3   **Q.**   Sir, if you could turn to page 81 in the deposition in

4   front of you beginning at line 5.

5   **A.**   Is that bookmarked?  No?

6   **Q.**   No.

7           **MR. LEPORE:**  And, actually, Your Honor, I think this

8   comes off better in a clip as well with your permission.

9           **THE COURT:**  Go ahead.

10          **MR. LEPORE:**  Clip Number 7, Seth?

11                  (Videotape played as follows:)

12  "**Q.**  Given those costs, if Bazaarvoice increased price by

13  5 percent, why would you switch to building in-house?

14  "**A.**  Maybe that might be an empty threat, but that was my

15  off-the-cuff when I made the declaration.

16      "It may take more than five.  I wasn't going to

17  publicly state that we would accept 5 percent price

18  increase.

19      "So if the pricing model changed, I guess.  Right

20  now, we're getting -- from what I can ascertain, we're

21  getting leverage to some degree.  As volume goes up,

22  pricing is remaining -- actually, by volume went down.  If

23  pricing started following that trend, maybe increased by

24  5 percent, now that would be a dollar amount worth

25  chasing.

1                "It's not even -- it's not even relative dollars.

2        It's absolute dollars.  If absolute dollars start to rise

3        too much, we would look.  But there's people in-house that

4        have -- on the software development that have been

5        fighting us saying, "We should -- I could build this in a

6        weekend.  Let me do it.  I will save the company money."

7                "So it's a constant battle.  Perhaps not five.  Maybe

8        so.  We would reevaluate it.  If pricing went up

9        5 percent, we would absolutely reevaluate whether we

10       should do it in-house.

11               "I hate that the outcome for this deposition is for

12       Bazaarvoice to feel like they could raise our prices."

13   **Q.**   And, sir, in fact, the reason why you were concerned that

14   it might be an empty threat that you would switch in response

15   to a 5 percent price increase is because it would be costly for

16   Build.com to build an in-house solution; right?

17   **A.**   "Costly" is a relative term.  Bazaarvoice is a fraction of

18   a fraction of our marketing budget overall for the year.  So in

19   examining -- in making that cost-benefit decision, there is a

20   switching cost that's involved in whether or not we would move

21   from Bazaarvoice.

22       So there is a threshold, and I don't have the math in

23   front of me to determine what it is of -- because today there's

24   cheaper alternatives that provide the exact same service,

25   Gigya, other providers that have came in and said, "We will

FRIEDLAND - CROSS / LEPORE

1    provide the service at a much, much lower cost."

2        But there is an opportunity cost of shifting software

3    development resources over to saying, "Okay.  We're going to

4    save 20 -- $10,000 annually in review costs and on the

5    continuum than making the move to save that $10,000."

6        So if it costs me -- it's an opportunity cost.  So today,

7    because the costs are so low relative to per review, it makes

8    sense for us to continue the relationship.

9    **Q.**   Okay.  So let's focus first on in-house and then we'll

10   talk about some of those third-party providers you mentioned.

11       You mentioned that -- you mentioned you don't have the

12   math in front of you, but the company has thought about the

13   math before when it's been evaluating this option; right?

14   **A.**   Correct.

15   **Q.**   And, in fact, the company's last estimate was that --

16   well, let me back up for a second.

17       If Build.com switched to an in-house ratings-and-review

18   solution, you'd also need to provide for moderation; correct?

19   **A.**   Correct.

20   **Q.**   And Build.com's last estimate for what it would cost to

21   provide moderation would be that it would cost 30 to 40,000 per

22   year; isn't that right?

23   **A.**   That's a -- that's a spitball estimate, but....

24   **Q.**   And that was the company's last spitball estimate?

25   **A.**   Correct.

FRIEDLAND - CROSS / LEPORE

1  Q.   And that amount, 30 to 40,000 per year, is roughly what

2  Build.com's paying to Bazaarvoice now anyway; right?

3  A.   Correct.

4  Q.   And that 30- to 40,000-dollar moderation cost per year,

5  that wouldn't even include the cost of building the system

6  itself; right?

7  A.   No.  We would need to build the system in addition to --

8  Q.   Okay.

9  A.   -- or if we moved to the Magento platform, the system

10  would come built in.

11  Q.   So let me make sure I have this right.  In order to switch

12  to in-house, Build.com would first have to either develop a new

13  system or implement some other plug-in; right?

14  A.   Correct.

15  Q.   And then on an ongoing basis you'd have to spend on

16  moderation?

17  A.   Correct.

18  Q.   And that moderation might run roughly what you're paying

19  Bazaarvoice anyway?

20  A.   Correct.

21  Q.   Okay.  Now, you mentioned also the consideration to

22  switching to other third-party vendors, so let's talk about

23  that.

24       You mentioned, I think, in your answer that there are

25  switching costs to moving to a new third-party vendor; is that

1    right?

2    **A.**    Absolutely.

3    **Q.**    And you have evaluated those switching costs before when

4    you've been considering third-party alternatives; right?

5    **A.**    Of course.

6    **Q.**    And I think you concluded that it would take about a

7    hundred man hours of internal Build.com effort to switch to a

8    new vendor?

9    **A.**    I don't recall that, but....

10   **Q.**    Well, sir, why don't you take a look at page 62 of your

11   deposition.   It begins on line 25 and continues to page 63.

12   And just see if that refreshes your recollection about what

13   you've estimated in the past.

14   **A.**    (Witness examines document.)   Ah.   Then a hundred man

15   hours it was.   Thank you for -- thank you for refreshing my

16   memory there.

17   **Q.**    Certainly.

18       And, so, for example, that hundred man hours, that would

19   include things like using IT resources to suck the reviews out

20   of Bazaarvoice; is that right?

21   **A.**    Correct.   Well, the reviews, they don't need to be sucked

22   out.   It's just an XML file, but then we'd need to

23   export/import.   You've used Excel, I imagine, this

24   export/import process.   Because the reviews are actually our

25   content, which was a big part of why we continued the

1   relationship, but we own the review content.

2   **Q.**   Okay.  So there would be that export/import function.

3   You'd also need to move code on your Web site?

4   **A.**   Absolutely.  Yeah.

5   **Q.**   And you'd need to move the code that triggers the email

6   request to the customers to write a review?

7   **A.**   We have email software that already supports that.  We

8   would just need to add a trigger or a form email that would go

9   out that would perform that function.

10  **Q.**   Okay.  So that's what -- that hundred man hours, those

11  sorts of things would be what they would be doing?

12  **A.**   Yeah.  It would be a combination of some software

13  development, some project management, and some data work I

14  would imagine.  So a variety of -- a variety of people that do

15  work on that and make up that rough hundred-hour spitball

16  guesstimate.

17  **Q.**   Well, I think the company also estimated that it might

18  cost 20 or $30,000 to change systems; is that right?

19  **A.**   You would know better than me.  I'm short on memory

20  sometimes.  I apologize.

21  **Q.**   Okay.  Well, I'll point you to something that might

22  refresh your memory again.

23       If you go to page 28 of the deposition in front of you --

24  actually, 29 is where it really starts, starting on line 1 and

25  going through, say, line 10.

1        Let me know when you finish reading that to yourself.

2   **A.**  (Witness examines document.)  Ah.  Thank you.  I

3   appreciate it.

4        Yes.  So 20 to 30,000 to change systems was Brandon --

5   Brandon's estimate, which is my head of marketing.  He's not a

6   software developer; but when it came up, the last conversation

7   was, "Why would we make" -- as any investment in business, you

8   have to amortize that investment over time.

9        So if it was going to cost us, let's just say, $20,000 to

10  save -- or $30,000 to save 10, it would take us a multiyear

11  payback.  There would be no big lift in revenue because it

12  would be like-for-like services.  Why would we spend time on

13  this when we could spend time on things that would provide

14  leverage to the business?

15       That was the -- that was the spirit of the discussion if

16  it didn't come over as clear in the deposition.

17  **Q.**  Uh-huh.  Well, so, for example, I believe on direct

18  examination you mentioned Reevoo, and you've considered Reevoo

19  before; right?

20  **A.**  Correct.

21  **Q.**  And I believe you mentioned -- and I believe at the time

22  you concluded that even if Reevoo offered you half the price

23  that Bazaarvoice was offering you due to those costs, it

24  wouldn't make sense to switch; is that right?

25  **A.**  We would still not switch based off of the costs and the

FRIEDLAND - CROSS / LEPORE

1    decreasing costs per review.

2    **Q.**    Okay.  So there are some costs to switching to in-house,

3    and there are costs to switching to a new third-party vendor;

4    but I'd like to talk just a little bit, to wrap up, about the

5    value of ratings and reviews to your business.

6    **A.**    Absolutely.

7    **Q.**    Sir, I believe you mentioned on direct examination that

8    Build.com believes it's beneficial to have ratings and reviews

9    on its Web site; right?

10   **A.**    It's essential.

11   **Q.**    You'd say it's a core part of any eCommerce business;

12   right?

13   **A.**    There is a 30 percent lift associated with -- that we've

14   measured on our own EB testing if you sell product that has

15   zero reviews versus a product that has a handful of reviews.

16   Even if they're negative, you sell more, oddly enough.

17   **Q.**    And, so, given that, in the event that the price of

18   ratings and reviews went up 5 percent, you wouldn't drop

19   ratings and reviews from your Web site entirely; would you?

20   **A.**    No.

21   **Q.**    And if the price of ratings and reviews went up, you

22   wouldn't close up Build.com's Web site and simply sell through

23   Amazon; would you?

24   **A.**    It's still a question but the answer, of course, is no.

25        **MR. LEPORE:**  Thank you, Your Honor.  I have nothing

 1    further.

 2              THE COURT:  Thank you.  Mr. Feldman?

 3              MR. FELDMAN:  Nothing, Your Honor.

 4              THE COURT:  You're excused.  Thank you.

 5              THE WITNESS:  Thank you.

 6                        (Witness excused.)

 7              MR. SHER:  Good morning, Your Honor.  Scott Sher.

 8              THE COURT:  Mr. Sher.

 9                        (Pause in proceedings.)

10              MR. SHER:  Bazaarvoice would like to call its next

11    witness, Mr. Timothy Katz.

12              THE CLERK:  Please stand and raise your right hand.

13                        <u>TIMOTHY KATZ</u>,

14    called as a witness for the Defendant, having been duly sworn,

15    testified as follows:

16              THE WITNESS:  I do.

17              THE CLERK:  Be seated.

18       Please state your full name and spell your name for the

19    court reporter.

20              THE WITNESS:  Hi.  My name is Timothy Katz; T-I-M.

21    Last name is Katz, K-A-T-Z.

22                        <u>DIRECT EXAMINATION</u>

23    BY MR. SHER:

24    Q.   Good morning, Mr. Katz.

25    A.   Good morning.

1   Q.   Mr. Katz, we talked previously and, obviously, you had

2   your deposition taken several months ago in this matter.

3        Can you tell the Court who your employer is?

4   A.   My employer is Pacific Sunwear of California.

5   Q.   And what's your title at Pacific Sunwear?

6   A.   Director of eCommerce.

7   Q.   And how long have you been the director of eCommerce?

8   A.   I've been the director of eCommerce for one year.

9   Q.   And what do you do as director of eCommerce?

10  A.   I oversee the eCommerce business and the day-to-day

11  operations of the eCommerce team.

12  Q.   What is the eCommerce business?

13  A.   We sell apparel and accessories on PacSun.com.

14  Q.   And PacSun.com is the eCommerce Web site for

15  Pacific Sunwear?

16  A.   That is correct.

17  Q.   And did you have any previous roles at Pacific Sunwear?

18  A.   That is correct.  I started in 2003 as a Web designer and

19  developer, and then as well I was also the senior manager of

20  operations before I was a director of eCommerce.

21  Q.   And what were your responsibilities in those roles?

22  A.   As a Web developer and designer, I was responsible for

23  graphic design and HTML development of the Web site; and then

24  as a senior operations manager, I was responsible for the

25  day-to-day operations of the business.

1   Q.    And just for those of us who are Luddites, what's HTML

2   design?

3   A.    It's a programming in which for the Internet to display

4   content online.

5   Q.    Thanks.

6         And can you just provide me with -- the Court with an

7   overview of Pacific Sunwear's business?

8   A.    Sure.  We sell apparel and accessories to the youth

9   market.  Demographics range from 18 to 24.  We sell brands

10  rooted in surf and action sports, brands like Hurley and Volcom

11  and Nike.

12  Q.    And those are all third-party brands?

13  A.    Those are.

14  Q.    Do you sell any Pacific Sunwear-branded merchandise?

15  A.    We do, however, not under the name Pacific Sunwear.  Our

16  proprietary goods range from several different categories.  Our

17  most prominent one is Bullhead Denim, which is a jeans

18  category; and then we also have several other categories

19  ranging from different apparel as well.

20  Q.    And how do you sell your products?

21  A.    We sell them in our brick-and-mortar stores and on

22  PacSun.com.

23  Q.    And how many brick-and-mortar stores do you have?

24  A.    Approximately 637.

25  Q.    And when you said you also sell them online, is that

1    through the Pacific Sunwear dot-com Web site?

2    **A.**    Correct.

3    **Q.**    Any other Web site?

4    **A.**    No.  That's the only one.

5    **Q.**    And who do you consider to be your primary competitors?

6    **A.**    Primary competitors would be Tilly's and Zumiez as our

7    most core competitors.

8    **Q.**    I'm obviously getting older because I don't know who those

9    are, but that's okay.

10        Are you familiar with the term "ratings and reviews"?

11   **A.**    Yes, I am.

12   **Q.**    And does Pacific Sunwear deploy ratings and reviews on its

13   Web site?

14   **A.**    Yes, we do.

15   **Q.**    And in your role as head of eCommerce, as the eCommerce

16   director, do you have responsibilities regarding the selection

17   of a ratings-and-review vendor at Pacific sun?

18   **A.**    Yes, I do.

19   **Q.**    And does Pacific Sunwear use a third-party vendor for its

20   eCommerce platform?

21   **A.**    For it's eCommerce platform?

22   **Q.**    ECommerce platform, yes.

23   **A.**    Yes, we do.

24   **Q.**    Okay.  And who's that?

25   **A.**    Demandware.

1   **Q.**   And when did you select Demandware to be your eCommerce

2   platform provider?

3   **A.**   Late 2011.

4   **Q.**   And before 2011 did Pacific Sunwear have ratings and

5   reviews on its Web site?

6   **A.**   We did not.

7   **Q.**   And when did you decide to start looking at ratings and

8   reviews vendors?

9   **A.**   Early 2012.

10  **Q.**   And when you started looking for ratings and reviews

11  vendors, Mr. Katz, who were you looking at primarily?

12  **A.**   We primarily looked at Bazaarvoice and PowerReviews.

13  **Q.**   And did you have an opportunity to evaluate the

14  ratings-and-reviews solution offered by Bazaarvoice?

15  **A.**   Yes, I did.

16  **Q.**   And what was the outcome of that evaluation?

17  **A.**   We did not end up selecting Bazaarvoice.

18  **Q.**   Okay.  And did you evaluate the ratings-and-reviews

19  solution offered by PowerReviews?

20  **A.**   Yes, I did.

21  **Q.**   And what was the outcome of that?

22  **A.**   We did not select PowerReviews.

23  **Q.**   Was there a front-runner between PowerReviews and

24  Bazaarvoice?

25  **A.**   Bazaarvoice.

1  Q.  And you said that you ultimately did not choose to go with

2  Bazaarvoice even though they were the front-runner.  What

3  happened?

4  A.  We ended up selecting another vendor that we were going

5  with for several different technologies that also offered a

6  reviews-and-ratings package.

7  Q.  And who was that?

8  A.  Gigya.

9  Q.  And when did you sign the agreement to use Gigya for

10  ratings and reviews?

11  A.  Mid-2012.

12  Q.  So you said that you were looking at Gigya for several

13  services.  Can you explain to me, if you were leaning towards

14  Bazaarvoice, how did you ultimately get to Gigya for ratings

15  and reviews?

16  A.  Sure.  So we were using Gigya or selected Gigya for

17  different social services, so the ability to sign in and

18  register with a social network and also share content with

19  social.

20      So we ultimately were made aware that Gigya provided a

21  reviews-and-ratings technology that was tightly integrated with

22  those two other services.  So that led us to choose Gigya to

23  power our reviews-and-ratings service as it was a more economic

24  and desirable integration for Pacific Sunwear.

25  Q.  And just for the Court's knowledge, what is social sign-in

1  exactly?

2  **A.**  Social sign-in is the ability to log into a Web site with

3  a social network account, such as Facebook.

4  **Q.**  And why is that important to Gigya?

5  **A.**  That --

6  **Q.**  I'm sorry.  And why is that important to Pacific Sunwear?

7  Excuse me.

8  **A.**  Got it.  There's several reasons.  One is it streamlines

9  the process for logging in or registering on a Web site.  So

10  essentially there's fewer steps involved.

11      And, two, because of the nature of our demographic, as I

12  mentioned, 18 to 24, that demographic is very keen and heavy

13  users of social network.  So they're more attracted to that

14  type of option versus having to create an account or log in by

15  themselves on our Web site.

16  **Q.**  So is the value, then, that you believe social sign-in

17  increases conversion and engagement?

18  **A.**  That is correct.

19  **Q.**  And did Bazaarvoice offer social sign-in?

20  **A.**  No, they did not.

21  **Q.**  And how about PowerReviews?

22  **A.**  No, they did not.

23  **Q.**  So you said it's a benefit to Pacific Sunwear to have one

24  vendor for multiple components of your social commerce tools.

25  Can you explain to the Court why it's important?

1203
KATZ - DIRECT / SHER

1  A.   From an operations standpoint, it means that we'd have

2  less of a workload involved.  So we only have one vendor to

3  work with versus multiple.

4      And then as well, from an integration standpoint, it

5  streamlines the amount of time it takes to integrate that

6  technology into our Web site.

7      And then as well from a performance standpoint, by only

8  having one third party to interface with, it will provide

9  better performance and, therefore, as well better conversions

10  because performance does impact conversion on an eCommerce Web

11  site.

12  Q.   How does performance impact conversion?

13  A.   I mean, every second really does matter.  So if a site is

14  going slow, people are going to be more apt to bounce or leave

15  our Web site.  So the quicker service we can provide them, the

16  more likely we're going to be able to convert a sale.

17  Q.   So if you were to purchase different products from

18  different vendors, you think that that might have an impact on

19  speed and performance of the Web site?

20  A.   Yes, I do.

21  Q.   And what's the basis for that belief?

22  A.   Research that I've reviewed and testing that we've done

23  with our own third-party tools.

24  Q.   So getting back to Gigya's ratings-and-review solution,

25  was it your conclusion that the Gigya rating-and-review

1  solution was better for Pacific Sunwear?

2  **A.**   Yes.

3  **Q.**   And what did Gigya charge for ratings and reviews to

4  Pacific Sunwear?

5  **A.**   It was an entire package deal, which was $50,000.

6  **Q.**   And how did that relate to Bazaarvoice's quote for ratings

7  and reviews?

8  **A.**   The Bazaarvoice quote was around $94,000.

9  **Q.**   So it was higher?

10  **A.**   It was almost double.

11  **Q.**   Okay.  Can you tell me, are you familiar with the term

12  "moderation"?

13  **A.**   Yes, I am.

14  **Q.**   And in the context of ratings and reviews, can you tell me

15  what moderation is?

16  **A.**   Moderation is a practice of reviewing reviews and specific

17  content that consumers might leave within a review for the sake

18  of determining the quality and impact to the brand.

19  **Q.**   So moderation would be some sort of a filter to take away

20  undesirable or improper reviews?

21  **A.**   That is correct.

22  **Q.**   And does Gigya provide moderation for Pacific Sunwear?

23  **A.**   Not currently.

24  **Q.**   Did you have the opportunity, when you were considering

25  vendors, whether or not Gigya offered a same or similar service

1   for moderation than Bazaarvoice offered?

2   **A.**   Yes, I did.

3   **Q.**   And what was the conclusion?

4   **A.**   We ended up going with the moderation service when we

5   initially signed.

6   **Q.**   From Gigya?

7   **A.**   From Gigya, that is correct.

8   **Q.**   Okay, great.

9        And was it -- was it, in your -- were there any

10  differences, in your opinion, between the moderation service

11  offered by Gigya and Bazaarvoice?

12  **A.**   No.

13  **Q.**   And how about between Gigya and PowerReviews?

14  **A.**   No.

15  **Q.**   Can you tell me if you're familiar with the term "data

16  analytics"?

17  **A.**   Yes.

18  **Q.**   And in the context of social commerce and ratings and

19  reviews, can you explain to the Court what data analytics are?

20  **A.**   The ability to view very user-level demographic

21  information about interactions with consumers and the different

22  social integrations on our Web site.

23  **Q.**   And does Gigya provide you with data analytics?

24  **A.**   Yes, they do.

25  **Q.**   And did you have the opportunity, when you were

 1  considering vendors, to compare the data analytics software

 2  between Gigya and Bazaarvoice?

 3  **A.**   Yes, I did.

 4  **Q.**   And what was the result of that analysis?

 5  **A.**   They were pretty similar.

 6  **Q.**   And how about a similar comparison -- did you do a similar

 7  comparison between Gigya and PowerReviews for data analytics?

 8  **A.**   Yes, I did.

 9  **Q.**   And what was the result of that analysis?

10  **A.**   It was the same.  They were similar.

11  **Q.**   So stepping back, since you've implemented Gigya as your

12  ratings-and-reviews and social sign-in vendor, are you

13  satisfied with the services that they provided?

14  **A.**   Yes, I am.

15  **Q.**   And specifically with regard to ratings and reviews, does

16  Gigya satisfy the needs of Pacific Sunwear?

17  **A.**   Yes, they do.

18  **Q.**   So, you know, the Department of Justice has brought suit

19  against Bazaarvoice in connection with the acquisition of

20  PowerReviews; and in your role as eCommerce director, have you

21  given any thought to that transaction and how it might affect

22  your business?

23  **A.**   Yes, I have, but I do not feel that it affects our

24  business.

25  **Q.**   And why not?

1   **A.**   Well, number one, we're happy with the service that we

2   have; and, number two, based off of the evaluations that we've

3   done in the past, there wasn't a huge distinction between the

4   services, as I mentioned.  So I don't feel that it really has a

5   material impact to others.

6          **MR. SHER:**  Okay.  Thanks.

7       I don't have any further questions, Your Honor.

8          **THE COURT:**  Thank you.

9          **MR. COMENETZ:**  Good morning, Your Honor.  Aaron

10  Comenetz for the United States.

11         **THE COURT:**  Mr. Comenetz.  Please proceed.

12                        **CROSS-EXAMINATION**

13  **BY MR. COMENETZ:**

14  **Q.**   Good morning, Mr. Katz.

15  **A.**   Good morning.

16  **Q.**   Mr. Katz, PacSun began using Gigya in September of 2012;

17  correct?

18  **A.**   That is correct.

19  **Q.**   And before choosing Gigya, you also considered Bazaarvoice

20  and PowerReviews; correct?

21  **A.**   That is correct.

22  **Q.**   But you did not consider a company called Reevoo; correct?

23  **A.**   No, I did not.

24  **Q.**   And you also did not consider a company called Pluck;

25  correct?

1   **A.**   No, we did not.

2   **Q.**   All right.  And you also did not consider a company called

3   Lithium; correct?

4   **A.**   No, we did not.

5   **Q.**   All right.  And you did not consider a company called

6   Magento; correct?

7   **A.**   Not for reviews and ratings.

8   **Q.**   All right.  And you didn't consider a company called

9   Viewpoints; correct?

10  **A.**   No, I did not.

11  **Q.**   In fact, sir, you weren't even aware of those firms as

12  possible providers of ratings and reviews when you were deposed

13  in this matter a few months ago; correct?

14  **A.**   That is correct.

15  **Q.**   Now, when you chose Gigya over Bazaarvoice and

16  PowerReviews, you were looking for a more simplistic

17  ratings-and-reviews solution than what Bazaarvoice and

18  PowerReviews offered; correct?

19  **A.**   That is correct.

20  **Q.**   And you wanted a more simplistic solution because you

21  wanted a solution that would be easy for your customer

22  demographic to use; correct?

23  **A.**   That is correct.

24  **Q.**   Now, one example of how Gigya is more simplistic than

25  Bazaarvoice is that Bazaarvoice allows consumers to leave

KATZ - CROSS / COMENETZ

1  ratings on specific attributes of a product and Gigya does not;

2  correct?

3  A.  That's correct.

4  Q.  All right.  Another example of how Gigya is more

5  simplistic than Bazaarvoice is that Bazaarvoice offers more

6  extensive customization capabilities than Gigya; correct?

7  A.  That is correct.

8  Q.  All right, sir.  Now, you are PacSun's director of

9  eCommerce; correct?

10  A.  That is correct.

11  Q.  And you're responsible for the day-to-day operations of

12  the PacSun.com Web sites; right?

13  A.  Correct.

14  Q.  But you're not responsible for PacSun's Facebook page;

15  correct?

16  A.  That is correct.

17  Q.  PacSun's Facebook page and all of PacSun's social media is

18  run by PacSun's Marketing Division; correct?

19  A.  Correct.

20  Q.  And within PacSun there's one budget for PacSun's

21  eCommerce Division and there's a separate budget for PacSun's

22  Marketing Division; correct?

23  A.  That is correct.

24       MR. COMENETZ:  No further questions, Your Honor.

25       THE COURT:  Thank you.

1    Any redirect?

2         **MR. SHER:** Nothing further, Your Honor.

3         **THE COURT:** Okay.

4    Thank you very much, Mr. Katz.

5         **THE WITNESS:** Thank you.

6                   (Witness excused.)

7         **MR. SHER:** Hello again.

8         **THE COURT:** Welcome back.

9         **MR. SHER:** Bazaarvoice would like to call its next

10   witness, Mr. Maki from Golfsmith.

11                   **SAMUEL JAME MAKI,**

12   called as a witness for the Defendant, having been duly sworn,

13   testified as follows:

14         **THE WITNESS:** Yes, I do.

15         **THE CLERK:** Be seated.

16    Please state your full name and spell your name for the

17   court reporter.

18         **THE WITNESS:** Samuel Jame Maki; S-A-M-U-E-L, J-A-M-E,

19   and then M-A-K-I the last name.

20                   **DIRECT EXAMINATION**

21   BY MR. SHER:

22   **Q.** Good morning, Mr. Maki.

23   **A.** Good morning.

24   **Q.** Mr. Maki, can you tell the Court, who's your current

25   employer?

1    A.    I'm currently employed by Golfsmith International.

2    Q.    And what's your title at Golfsmith?

3    A.    I'm vice president of direct to consumer.

4    Q.    And how long have you been in that role?

5    A.    About six months.

6    Q.    And what do you do in that role?

7    A.    I drive our eCommerce business, which is our Web site, as

8    well as our call center.

9    Q.    And when you say the eCommerce business, can you explain

10   what that is?

11   A.    Sure.  So that's our Web site Golfsmith.com and

12   Golftown.com which is our Canadian entity; and within there

13   it's, you know, managing the operations of the Web site, the

14   fulfillment piece, the marketing side, and IT development for

15   the Web site.

16   Q.    And prior to that responsibility, did you have other jobs

17   at Golfsmith?

18   A.    Yeah.  I've had increasing -- career path of increasing

19   responsibilities from marketing manager to director of online

20   marketing and to my current role with similar ownership of what

21   I just spoke about just on a lower level.

22   Q.    And you said that Golfsmith makes sales off its eCommerce

23   site.  Can you explain to the Court how Golfsmith makes sales?

24   A.    Sure.  Yeah, we have various online marketing channels,

25   such as paid search, email marketing, social, affiliate

1   marketing, and then direct load, which is just traffic coming

2   to our Web site from someone typing in our URL.  So taking in

3   that traffic and then creating the experience online so that

4   someone could check out and complete a sale.

5   **Q.**   And every afternoon on my way back from here back to the

6   hotel I walk by a store Golfsmith.  Is that also owned by the

7   company that you work for?

8   **A.**   Yeah.  We have over a hundred stores in the U.S. and a

9   little less than a hundred in Canada.

10  **Q.**   Now getting back to the online portion, does Golfsmith use

11  ratings and reviews?

12  **A.**   We do.

13  **Q.**   And who is your ratings-and-review provider?

14  **A.**   It's provided by Bazaarvoice.

15  **Q.**   And when did you sign up with Bazaarvoice?

16  **A.**   It was late 2005, early 2006.

17  **Q.**   And I think you have a special distinction with

18  Bazaarvoice.  You're their first customer; right?

19  **A.**   That's correct.

20  **Q.**   And what's the current status of your relationship with

21  Bazaarvoice?

22  **A.**   We're currently under agreement for their services.

23  **Q.**   And what services do they provide you?

24  **A.**   Right now we're using ratings and reviews, Q & A module,

25  and then Stories.

MAKI - DIRECT / SHER

1   Q.   And how often do you renegotiate a contract with

2   Bazaarvoice?

3   A.   Typically it's every two years.

4   Q.   And before signing -- when was the last time you signed a

5   contract with Bazaarvoice?

6   A.   It was late 2011, early 2012.

7   Q.   And before signing your most recent contract with

8   Bazaarvoice, did you consider any other vendors for ratings and

9   reviews?

10  A.   Yeah.  We actually considered a company called Pluck,

11  which is another Austin-based company.

12  Q.   And can you tell me a little bit about who Pluck is?

13  A.   Yeah.  Pluck is a social commerce company owned by

14  Demand Media, which is a much larger company, and Pluck

15  specifically provides ratings and reviews, Q & A, a forum

16  functionality, and a host of other pieces that all kind of tie

17  together.

18  Q.   You said Q & A.  Can you describe for the Court what Q & A

19  is?

20  A.   I'm sorry.  That's question and answer, which is analogous

21  to the Q & A product that Bazaarvoice offers.

22  Q.   And you also mentioned forums.  What is forums?

23  A.   They have a forum and a blog tool, which is all part of

24  their platform.

25  Q.   And what are forums and blog tools?

1214

1   **A.**   Sure.  Yeah.  A forum would be a message board where a

2   user could go on and ask questions as well as, you know, other

3   folks within the community.

4   **Q.**   And what kind of investigation did you undertake with

5   regard to Pluck's offering?

6   **A.**   We did the full investigation, brought them in multiple

7   times, had numerous calls and on-site visits -- them being in

8   Austin, it was very easy for them to come over -- and went

9   through the whole suite of products, and got all the way down

10  to negotiating a contract.

11  **Q.**   So you got all the way down to negotiating a contract for

12  a price with Pluck?

13  **A.**   That's correct.

14  **Q.**   And when you were doing this analysis, taking it back one

15  step --

16  **A.**   Sure.

17  **Q.**   -- did you compare the ratings-and-review solution offered

18  by Pluck with one offered by Bazaarvoice?

19  **A.**   Yes, we did.

20  **Q.**   Were you impressed with the ratings-and-review solution

21  offered by Pluck?

22  **A.**   Yeah, I was very impressed.  I remember, you know, after

23  the first kind of pass of seeing the presentation of the actual

24  experience and how they tied it all together, I was blown away.

25  My team was blown away as well.

1    Q.   When you say tie it all together, what were they tying

2    together with ratings and reviews?

3    A.   Sure.  So at the time the Bazaarvoice products were

4    somewhat separate, and when you log into one, you couldn't

5    really go across to Q & A from ratings and reviews.

6         And the Pluck platform kind of tied it all together

7    because they built it all together with all the different

8    pieces.  So from a user experience, it was kind of one unified

9    experience.

10   Q.   And from a user experience, it was one unified experience;

11   and what's the benefit of that in your opinion?

12   A.   You know, so it's not disconnected.  So when the user logs

13   on, log into their account, they don't have to go back and log

14   into the Bazaarvoice or the Pluck tools.  Once you log in a

15   site, you're logged into everything.  And, you know, if you

16   jump from ratings and reviews and pull up your profile on

17   Q & A, it kind of all connected.

18   Q.   And at the time Bazaarvoice didn't offer that?

19   A.   No, it didn't.

20   Q.   Did you tell Bazaarvoice that you were considering Pluck?

21   A.   Yes, we did.

22   Q.   And when you told Bazaarvoice that you were considering

23   Pluck, did Bazaarvoice do anything in response?

24   A.   Initially, no; but once they kind of knew the talks were

25   going a little bit further, they renegotiated a lower price.

1   **Q.**   And what was the price differential?

2   **A.**   Prior to the negotiation, they were around $190,000, and

3   the final price that Bazaarvoice offered was around $140,000.

4   **Q.**   And what would have happened if Bazaarvoice didn't lower

5   its price?

6   **A.**   I definitely would have switched.

7   **Q.**   You would have switched to?

8   **A.**   I would have switched, correct.

9   **Q.**   To?

10  **A.**   To Pluck or to, you know, any other provider.

11  **Q.**   Okay.  And did you ever consider PowerReviews as a

12  potential vendor for ratings and reviews?

13  **A.**   Yes, I did.

14  **Q.**   And when was that?

15  **A.**   Initially early on kind of in the industry when ratings

16  and reviews and the process was being developed, I looked at

17  PowerReviews when I was at several different conferences, so

18  going to the trade booth and asking them questions and kind of

19  getting a demo of their product.

20  **Q.**   And what was your impression?

21  **A.**   I wasn't so really impressed.  It looked like they were

22  kind of following what Bazaarvoice was doing.

23  **Q.**   And relative to what you now know about Pluck, how would

24  you compare the solution offered by Pluck and that offered by

25  PowerReviews?

1   **A.**   I would say the Pluck experience and functionality was

2   better or superior to PowerReviews.

3   **Q.**   Thank you.

4         And you're here, obviously, because -- in connection with

5   the DOJ lawsuit against Bazaarvoice in connection with its

6   acquisition of PowerReviews.  And in your role as the head of

7   online commerce at Golfsmith, do you believe that the

8   acquisition has harmed Golfsmith in any way?

9   **A.**   No, I don't.

10  **Q.**   Okay.  And do you believe that if Bazaarvoice were to

11  raise its prices, you would have credible alternatives for

12  ratings and reviews?

13  **A.**   Yes, I do.

14          **MR. SHER:**  No further questions, Your Honor.

15          **THE COURT:**  Thank you.

16          **MS. SCANLON:**  Good morning, Your Honor.

17          **THE COURT:**  Ms. Scanlon, good morning.

18                        <u>**CROSS-EXAMINATION**</u>

19  BY MS. SCANLON:

20  **Q.**   Good morning, Mr. Maki.  My name is Lisa Scanlon.  Just a

21  few questions for you.

22          You talked just a moment ago about looking at Pluck in

23  2011 when you were considering your Bazaarvoice contract; is

24  that correct?

25  **A.**   That's correct.

1218

1  Q.   Okay.  And Pluck offered you a lower price than you

2  currently pay with Bazaarvoice; is that right?

3  A.   That's correct.

4  Q.   But one of the reasons you didn't switch was because of

5  the internal costs of migrating to a new vendor; is that right?

6  A.   That's correct.

7  Q.   Now, I believe Golfsmith has also considered from time to

8  time building in-house its ratings and reviews; is that right?

9  A.   I've looked at it a few times, yes.

10  Q.   Okay.  And you determined that it would be a daunting

11  task; is that right?

12  A.   The cost of having someone maintain and read all the

13  reviews just isn't cost effective.

14  Q.   I want to talk to you a little bit about the value of

15  ratings and reviews to Golfsmith.

16      Golfsmith believes that to be a legitimate eCommerce Web

17  site it needs ratings and reviews; is that right?

18  A.   That's correct.

19  Q.   And having ratings and reviews on a product page increases

20  the ranking of Golfsmith's product pages and search engine

21  results; is that right?

22  A.   That's correct.

23  Q.   Okay.  And it's your opinion that online ratings and

24  reviews have had a positive effect for sales involving

25  Golfsmith's brick-and-mortar stores as well?

1   **A.**   That's correct.

2   **Q.**   And Golfsmith believes overall that ratings and reviews on

3   its Web site provides a positive return on investments; is that

4   right?

5   **A.**   Yes, it does.

6          **MS. SCANLON:**  Can I take one moment, Your Honor?

7          **THE COURT:**  Yes.

8                  (Pause in proceedings.)

9          **MS. SCANLON:**  Nothing further.  Thank you.

10         **THE COURT:**  Thank you.

11                 (Witness excused.)

12         **MR. LIDDIARD:**  Good morning, Your Honor.

13         **THE COURT:**  Mr. Liddiard.

14         **MR. LIDDIARD:**  We would like to call our next witness,

15  Christopher Krebs from Fruit of the Loom.

16         **THE CLERK:**  Please raise your right hand.

17                 **CHRISTOPHER K. KREBS**,

18  called as a witness for the Defendant, having been duly sworn,

19  testified as follows:

20         **THE WITNESS:**  I do.

21         **THE CLERK:**  Be seated.

22    Please state your full name and spell your name for the

23  court reporter.

24         **THE WITNESS:**  My full name is Christopher K. Krebs.

25  My last name is spelled K-R-E-B-S.

## DIRECT EXAMINATION

**BY MR. LIDDIARD:**

**Q.**   Good morning, Mr. Krebs.

**A.**   Good morning.

**Q.**   Who's your current employer?

**A.**   Fruit of the Loom.

**Q.**   And what is your current job title?

**A.**   I'm the chief information officer for Fruit of the Loom.

**Q.**   And how long have you held that title?

**A.**   Since December 2012.

**Q.**   And just in general, what are your areas of responsibility as the CIO?

**A.**   I'm responsible for all information technology at Fruit of the Loom.

**Q.**   And did you have any previous roles or job titles at Fruit of the Loom?

**A.**   Previously I was the senior vice president of business solutions at Fruit of the Loom.  Essentially that's responsible for all business applications.

**Q.**   And how long did you hold that position?

**A.**   Two or three years.  I don't remember the exact.

**Q.**   And how long have you worked for Fruit of the Loom?

**A.**   A little over 10 years.

**Q.**   And if you could just very briefly provide for the Court an overview of what Fruit of the Loom is -- what business it's

KREBS - DIRECT / LIDDIARD

1  in?

2  **A.**    Fruit of the Loom's core business is the manufacturing of

3  basic apparel.

4  **Q.**    And does Fruit of the Loom have a Web site?

5  **A.**    They do.  It's www.fruit.com.

6  **Q.**    Are you familiar with the term "ratings and reviews"?

7  **A.**    I am.

8  **Q.**    And just what are ratings and reviews?

9  **A.**    It's a way to engage with consumers to, you know,

10  understand how they like the product using some kind of

11  rating system.

12  **Q.**    And does Fruit of the Loom use ratings and reviews on it's

13  Fruit.com Web site?

14  **A.**    We do.

15  **Q.**    And when did Fruit of the Loom first employ ratings and

16  reviews on its Web site?

17  **A.**    I think sometime in 2011.

18  **Q.**    And at that time was the Fruit.com Web site an eCommerce

19  site?

20  **A.**    Initially, no.  It was more of a brand site.

21  **Q.**    When you say "a brand site," what do you mean?

22  **A.**    More static site.  Just featuring our basic products.

23  **Q.**    And at that time in 2011 did Fruit of the Loom select a

24  third-party rating-and-review provider?

25  **A.**    We did.

1   Q.   And as the senior vice president of business solutions at

2   that time, were you involved in the selection process?

3   A.   I was.

4   Q.   And as part of that selection process, did Fruit of the

5   Loom also consider building an internal in-house solution for

6   ratings and reviews?

7   A.   Briefly.

8   Q.   You didn't look at it for very long?

9   A.   No, I didn't.

10  Q.   Did you do any estimates to determine how much it would

11  cost Fruit of the Loom to do an internal build?

12  A.   Not really.  We knew we didn't want -- we didn't want to

13  build it.

14  Q.   And who did Fruit of the Loom ultimately select in 2011 as

15  its provider of ratings and reviews?

16  A.   PowerReviews.

17  Q.   And at some point after that, I take it the

18  rating-and-reviews functionality from PowerReviews went onto

19  the Fruit.com Web site; correct?

20  A.   That's correct.

21  Q.   And then at some point after that, did Fruit of the Loom

22  decide to launch an eCommerce Web site?

23  A.   We did.

24  Q.   And was that Web site also Fruit.com?

25  A.   It was, uh-huh.

1   Q.   And when did that happen?

2   A.   That was planned and did launch for the Olympics in 2012.

3   Q.   And when Fruit of the Loom made a decision to start

4   selling its products online, did Fruit of the Loom select an

5   eCommerce platform or vendor?

6   A.   We did.  We selected Amazon.

7   Q.   Amazon Webstore?

8   A.   Amazon Webstore, uh-huh.

9   Q.   And after selecting Amazon Webstore in the summer of 2012,

10  did Fruit of the Loom decide to no longer use PowerReviews as

11  its rating-and-review provider?

12  A.   We did.

13  Q.   And did Amazon Webstore offer a rating-and-review feature

14  on its Amazon Webstore platform?

15  A.   Yes, they do.

16  Q.   And if Amazon had not offered a rating-and-review feature,

17  would you have terminated your agreement with PowerReviews?

18  A.   Probably not.

19  Q.   And were you involved in the decision to terminate your

20  relationship with PowerReviews in connection with the selection

21  of Amazon as its eCommerce provider?

22  A.   I was involved trying to terminate the current contract.

23          MR. LIDDIARD:  Your Honor, if I may approach the

24  witness.

25          THE COURT:  Please.

1                    (Pause in proceedings.)

2          **MR. LIDDIARD:**  Candy, if you can call up DX1418.

3   **Q.**  Mr. Krebs, I've put on the big screen, and you have it in

4   front of you, it's an email.  And do you recognize who Gary

5   Rothman is?

6   **A.**  Yes, I do.

7   **Q.**  And who is he?

8   **A.**  He was one of our directors on our direct consumer

9   business or eCommerce business.

10  **Q.**  And did he send this email out at your direction in August

11  of 2012?

12  **A.**  He did.

13  **Q.**  And does the email reflect Fruit of the Loom's

14  notification to PowerReviews that it no longer needed

15  PowerReviews as a rating-and-review provider?

16  **A.**  It does.

17  **Q.**  And in the email, PowerReviews is informed:  (reading)

18          "We are no longer in need of the service and we would

19      like to end the agreement."

20      Do you see that?

21  **A.**  I do.

22  **Q.**  And it goes on to say that:  (reading)

23          "We are using the services of Amazon Webstore

24      platform for our eCommerce sites, which comes equipped

25      with ratings/review application."

1        Do you see that?

2   A.   I do.

3   Q.   And it goes on to say that:   (reading)

4            "We are happy with the results and will continue to

5        use Amazon's Web platform for the foreseeable future."

6        Do you see that?

7   A.   I do.

8   Q.   And at that particular point in time, in August of 2012,

9   was Fruit of the Loom happy with the rating-and-review

10  functionality that was provided by Amazon's Webstore eCommerce

11  platform?

12  A.   We were.

13  Q.   And as you sit here today as the chief information officer

14  for Fruit of the Loom, are you still satisfied with the

15  rating-and-review functionality that is provided by Amazon

16  Webstore?

17  A.   We are.

18  Q.   As the chief information officer at Fruit of the Loom, do

19  you have any concerns with Bazaarvoice's acquisition of

20  PowerReviews?

21  A.   I didn't.

22  Q.   And in your business judgment as the CIO of Fruit of the

23  Loom, has the acquisition of PowerReviews by Bazaarvoice caused

24  any harm to Fruit of the Loom?

25  A.   It has not.

1    **MR. LIDDIARD:**  I have no further questions.  Thank

2    you.

3                          <u>**CROSS-EXAMINATION**</u>

4    BY MS. SCANLON:

5    **Q.**    Good morning, Mr. Krebs.

6    **A.**    Good morning.

7    **Q.**    You were just asked about the use of Amazon Webstore by

8    Fruit of the Loom.  Is it right that the Amazon Webstore

9    provides the eCommerce functionality for Fruit.com?

10   **A.**    Yes, it does.

11   **Q.**    And does the Amazon Webstore also do product fulfillment

12   for Fruit.com?

13   **A.**    Yes, for some of those sites it does for us.

14   **Q.**    And product fulfillment, in this instance, means that

15   Amazon ships your product to the consumer and receives the

16   payment for the product; is that right?

17   **A.**    Yes.

18   **Q.**    Now, Fruit of the Loom didn't change strategies and launch

19   eCommerce through the Amazon Webstore because of ratings and

20   reviews; correct?

21   **A.**    That's correct.

22   **Q.**    Okay.  And Fruit of the Loom didn't change strategies and

23   launch eCommerce through the Amazon Webstore because of a price

24   increase on ratings and reviews by PowerReviews; is that

25   correct?

1    **A.**    That's correct.

2    **Q.**    Okay.  Without getting into specific numbers, is it fair

3    to say that sales through Fruit.com are a small percentage of

4    Fruit of the Loom's overall business?

5    **A.**    That's safe to say.

6    **Q.**    Mr. Liddiard asked you about in-house during his

7    examination.  Do you recall that?

8    **A.**    Uh-huh.

9    **Q.**    When Fruit of the Loom looked at going in-house, you

10   determined pretty quickly that it didn't make sense for Fruit

11   of the Loom; right?

12   **A.**    That's correct.

13   **Q.**    And this is for ratings and reviews.

14        And it wasn't a good use of Fruit's development time; is

15   that right?

16   **A.**    Uh-huh, that's correct.

17            **MS. SCANLON:**  Just a moment, please.

18                        (Pause in proceedings.)

19            **MS. SCANLON:**  Nothing further, Your Honor.

20            **THE COURT:**  All right.  Mr. Liddiard?

21            **MR. LIDDIARD:**  I have nothing.

22        I just would like to -- I know that DX1418 is not part of

23   the narrowed stipulation of documents that were deemed

24   admissible without use in court.  This particular document was

25   on our initial trial exhibit list, and I'd move it into

PROCEEDINGS

1    evidence at this time if there's no objection.

2         **MS. SCANLON:**  No objection.

3         **THE COURT:**  All right.  Admitted.

4       (Defendant's Exhibit DX1418 received in evidence)

5         **MR. LIDDIARD:**  Thank you.

6         **THE COURT:**  Okay.  Mr. Krebs, thank you very much.

7         **THE WITNESS:**  Yes, sir.

8                        (Witness excused.)

9         **THE COURT:**  And why don't we take our ten-minute

10   break.

11                   (Recess taken at 9:25 a.m.)

12                (Proceedings resumed at 9:35 a.m.)

13        **THE COURT:**  Please, be seated.

14        **MR. RUBINSTEIN:**  Hi, Your Honor.

15        **THE COURT:**  Good morning.

16        **MR. RUBINSTEIN:**  At this time we do not have any

17   further live witnesses.  We have witnesses that are flying in

18   to appear tomorrow.

19      But we would like to present a couple of the video

20   depositions that we've brought.  So let me -- we have a couple.

21   The first is going to be Webcollage.

22      There are a couple of exhibits discussed in the video,

23   that I've handed up to you.

24

25

1    (Videotape was played as follows:)

2    "Q.  So, Mr. Matthews, can you tell me where you currently

3    work.

4    "A.  I'm the CEO of Webcollage.

5    "Q.  And how long have you held the position of CEO of

6    Webcollage?

7    "A.  Just under four years.

8    "Q.  So can you tell me what business Webcollage was

9    engaged in?

10   "A.  Yeah.  We syndicate sales and marketing content on

11   behalf of brands to the retailing websites where those

12   products are sold online.

13   "Q.  Okay.  Can you tell me, you said that you syndicate

14   content.  What does it mean that you syndicate content?

15   "A.  As an example, we would take all of Sony's videos,

16   testimonials, reviews, features, advantages, documents,

17   and put those on Best Buy's product pages so when we, as

18   consumers, are shopping for a Sony product at Best Buy we

19   get the benefit of all the sales and marketing material

20   from the manufacturer integrated to the retailers'

21   websites.  That service is what I provide, is the pipes

22   between Sony and Best Buy, as an example.

23   "Q.  Okay.  And in that example, Sony is a customer of

24   Webcollage?

25   "A.  Sony pays us.  Retailers don't pay us.  There is no

1230

WEBCOLLAGE - VIDEOTAPED TESTIMONY

1    remuneration from a retailer to Webcollage.  They receive

2    the content for free.

3    "Q.  And Sony, then, is not a retailer in that instance.

4    What would you consider Sony to be in that instance?

5    "A.  A brand.

6    "Q.  A brand?

7    "A.  Uh-huh.

8    "Q.  So you went through a number of specific types of

9    items that Webcollage could syndicate from a brand to a

10   retailer such as Best Buy.

11       "Can you describe more generally, what do you

12   consider that type of content to be that you would deliver

13   from a brand to a retailer?

14   "A.  Unstructured sales and marketing content that's

15   additive to what a retailer has on their website.

16   "Q.  And can you tell me, when did Webcollage start

17   syndicating content from brands to retailers?

18   "A.  Approximately nine years ago.

19   "Q.  Approximately nine years ago.

20       "Are you familiar with the term 'products ratings and

21   reviews'?

22   "A.  Sure.

23   "Q.  What is your understanding of the term 'products

24   ratings and reviews'?

25   "A.  My understanding is at Toys R Us, I as a consumer

WEBCOLLAGE - VIDEOTAPED TESTIMONY

1  might look at what people have rendered as an opinion or

2  a -- an opinion on what they felt the product was, did it

3  work, did it not work, and I might look at that as a point

4  of reference before I purchase or even after I purchase.

5  ▮Q.  When you say 'people,' who are you referring to, the

6  people who leave reviews?

7  ▮A.  Customers who are shopping for products or

8  researching products on Toys R Us.

9  ▮Q.  Does Webcollage syndicate product ratings and

10  reviews?

11  ▮A.  We do.

12  ▮Q.  Do you market the syndication services for products

13  ratings and reviews?

14  ▮A.  No.  They're another content type.  Webcollage is

15  agnostic to any content type.  As long as it's legally

16  owned by the brand and the permission is given by the

17  brand, we can't publish -- I don't change the reviews, I

18  just pass the reviews through from a brand who owns them

19  to where those products are sold and associated online.

20  ▮Q.  So can you tell me, for whom do you syndicate

21  content?

22  ▮A.  Approximately 300 companies.  Ones as large as

23  Procter & Gamble, Sony and Samsung, various high-tech

24  companies and lots of smaller once.

25  ▮Q.  And you said approximately how many brands do you

WEBCOLLAGE - VIDEOTAPED TESTIMONY

1    syndicate content for?

2    ▪A.  It's over 700.  It's 778, is probably the exact

3    number.

4    ▪Q.  And for the, you said, approximately 700 brands for

5    whom you have relationships with, where do you syndicate

6    that content to?

7    ▪A.  To more than 330 online retailers that are authorized

8    to sell those brands' products online.

9    ▪Q.  How hard would it be for you to syndicate ratings and

10   reviews?

11   ▪A.  I do it now.

12   ▪Q.  And how about for those customers who you currently

13   don't do it now for?

14   ▪A.  If they had them and legally owned them I could.

15   There's not a technical impediment or a legal impediment

16   for me to do it.

17   ▪Q.  Can you tell me who your retail customers are?

18   ▪A.  I could send you a list, but it's the top hundred

19   online retailers in, you know, various countries around

20   the world.  It's a voluminous list.

21   ▪Q.  Are you familiar with the term 'IR500'?

22   ▪A.  Sure.

23   ▪Q.  I'm going to introduce another exhibit, 332.  So,

24   Mr. Matthews, you've been handed what's just been marked

25   as Defendant's Exhibit 332, which I will represent to you

1    is a report from the IR500 database listings IR500

2    retailers who list you as a vendor.

3        "Can you confirm that you have syndication

4    relationships with the companies that are listed there?

5    "A.  Yes.

6    "Q.  What sort of content do you syndicate for the

7    retailers that are listed there?

8    "A.  I'd have to look at how many vendors we have live.

9    In some cases it may be 30 or 40 different brands that we

10   syndicate content to, and it might be 10- or 12,000 SKUs

11   of different contents and different variants of that

12   content.

13   "Q.  You've now been handed Defendant's Exhibit No. 333,

14   which I'll represent to you is an image of the retailers

15   listed as syndication partners on your website.  Have you

16   seen that page before?

17   "A.  I have.

18   "Q.  And can you verify for me that the information in the

19   document is accurate to the best of your knowledge?

20   "A.  Yes.

21   "Q.  And it was created in the ordinary course?

22   "A.  Yes.

23   "Q.  Can you confirm with me that Webcollage has

24   syndication relationship with the retailers listed in the

25   image?

WEBCOLLAGE - VIDEOTAPED TESTIMONY

1   "A.   Yes.

2   "Q.   What sort of content do you syndicate to these

3   retailers?

4   "A.   A huge variant, to something that might be as small

5   as an image, to might be videos, it might be -- there are

6   literally 14 to 15, probably, different substrates of

7   content types.  It's whatever the manufacturer has that's

8   incremental to the retailer, we'll syndicate that into

9   that retailer.

10  "Q.   Do you syndicate for any of those retailers' products

11  ratings and reviews?

12  "A.   We do.

13  "Q.   And to the extent that you do not currently syndicate

14  ratings and reviews for any of the retailers listed there,

15  would you be able to do so?

16  "A.   Yes.

17  "Q.   Why do customers engage you for syndication?

18  "A.   Because solving the problem of Sony having 3,000

19  products and 14,000 assets, to integrate all of those

20  products and assets content at 200 retailers is not a job

21  that you want to do manually.  You hire me as a service

22  and I take care of managing those assets and the

23  publication and syndication of those assets to authorized

24  retailers for Sony.

25  "Q.   And do retailers, likewise, get benefit from the

1    syndication?

2    "A.  Yeah, absolutely.  So we do AB testing all the time

3    where we -- in Wal-Mart's case we turned all of our

4    content off and then measured the increase in sales solely

5    due to the syndicated content, and we increased sales by

6    more than 10 percent for Walmart based on the content that

7    syndicate from the brands into Walmart.com.  And we've

8    done more than 50 of those tests.

9    "Q.  In order to achieve syndication between a brand and a

10   retailer, what relationships do you need to have in order

11   to do so?

12   "A.  Business or technical?

13   "Q.  Business.

14   "A.  Business relationships, I need a contract from the

15   manufacturer that identifies what products they want to

16   have us syndicate, and then I need a list of authorized

17   retailers that that brand wants that content to go to.

18   And that's, basically, the contract that we would write

19   with a brand.

20   "Q.  And when you build a new connection between a source

21   and a destination, do you have to manually match up the

22   products?

23   "A.  No.  It's a program process that we get feed from the

24   retailers, which builds a massive database of products

25   available.  And then we have algorithms that we've written

1    that go through and do it automatically.

2    "Q.   And just again, I don't think I heard you before, but

3    who owns this content that you're syndicating?

4    "A.   The brands own it.  I do not own the content.

5    "Q.   One of the types of content that we have been talking

6    about are ratings and reviews.  In your understanding,

7    what do customers use products ratings and reviews for?

8    "A.   For reassurance that the purchase that they make has

9    other people's opinion respected.  And I think it's a

10   consideration in someone's decision cycle that you would

11   look at what other people thought of that product.

12   "Q.   And can you tell me, have you ever syndicated content

13   from or to a customer who uses an in-house platform for

14   ratings and reviews?

15   "A.   Yes.

16   "Q.   If a brand customer requests that you syndicate its

17   ratings and reviews to a retailer, could Webcollage do

18   that?

19   "A.   Yes.

20   "Q.   And how long would that take?

21   "A.   Seconds.  It's just inputted into our system and it

22   goes live at a retailer."

23       MR. RUBINSTEIN:  Your Honor, I believe the Department

24   of Justice has some counter-designations to play.

25       THE COURT:  Okay.

1    **MR. BONANNO:**  Your Honor, may I approach?

2    **THE COURT:**  Sure.

3    (Videotape was played as follows:)

4    "Q.  Okay.  You were going to say something.

5    "A.  All I said is that we don't syndicate ratings and

6    reviews for every customer.  If they have them available

7    and if they're legally owned I do it.  But it's not -- I

8    just didn't want to lead you to think we do it for every

9    customer.  It's just a -- we're not specific content type.

10   If they have it we'll syndicate it.

11   "Q.  And can you tell me, have you ever syndicated content

12   from or to a customer who uses an in-house platform for

13   ratings and reviews?

14   "A.  Yes.

15   "Q.  Do you know for how many?

16   "A.  Probably three or four customers we have that we've

17   syndicated ratings and reviews for.

18   "Q.  Have you ever worked directly with an outside ratings

19   and reviews vendor in order to syndicate content?

20   "A.  Yes.

21   "Q.  Can you provide me an example of that?

22   "A.  You mean show you it online, yes.  Expo TV,

23   Bazaarvoice, those would be the two that we've actually

24   syndicated reviews for.

25   "Q.  Can you tell me about your partnership with Expo TV

WEBCOLLAGE - VIDEOTAPED TESTIMONY

1    for video reviews.

2    **A.**  They use our -- Expo TV uses our platform to

3    syndicate video reviews for customers that they have

4    contracts for, and we provide those video reviews at

5    websites that they can't get to.

6    **Q.**  And are you familiar with the syndication services

7    provided by Bazaarvoice?

8    **A.**  Yes.

9    **Q.**  And how would you describe the way those services

10   compare, the ones at Bazaarvoice, to the ones that are

11   provided by Webcollage?

12   **A.**  I actually don't know.  I just know they syndicate

13   ratings and reviews, but I don't know enough to make a

14   declarative statement.

15   **Q.**  Do you know of any instances in which both Webcollage

16   and Bazaarvoice competed to sell syndication services to

17   customers?

18   **A.**  No.

19   **Q.**  Mr. Matthews, I only have a few follow-up questions,

20   and then we'll hopefully be quick and get you out of here.

21       "You talked about the product that your company

22   sells, but we never discussed or you never were asked what

23   the name of it was.  Is the product that you sell called

24   the Webcollage Content Publisher?

25   **A.**  Content Publisher is a product that we use to

WEBCOLLAGE - VIDEOTAPED TESTIMONY

 1    syndicate content.

 2    "Q.  Is it fair to characterize the Content Publisher as a

 3    do-it-yourself application that enables brands to publish

 4    information about their products to retailers?

 5    "A.  Yes.

 6    "Q.  So your company Webcollage doesn't provide the

 7    content, your customers provide their own content; is that

 8    fair to say?

 9    "A.  Yes.  I don't create any content.  I'm just the pipes

10    between a brand and a retailer.

11    "Q.  Is it fair to say that Webcollage is not in the

12    business of providing ratings and reviews software

13    services to customers?

14    "A.  It is not our primary business.

15    "Q.  Do you offer any ratings and reviews system or

16    functionality to your customers?

17    "A.  No.

18    "Q.  If Webcollage had ever competed head to head with

19    Bazaarvoice to offer a customer ratings and review

20    software or related service or syndication, would you be

21    aware of that?

22    "A.  Yes.

23    "Q.  Do you know how many customers use Webcollage to

24    syndicate ratings and reviews content to retailers?

25    "A.  Approximately three or four.

1    "Q.  And do you know roughly how many reviews each of

2    those customers syndicates to their retailers?

3    "A.  Less than 50 per customer.

4    "Q.  On an annual basis?

5    "A.  Or in totality.

6        "UNIDENTIFIED SPEAKER:  Did you say 50 or 15?

7        "THE WITNESS:  Five-oh.

8        "UNIDENTIFIED SPEAKER:  Five-oh.

9    "Q.  Meaning each of those customers for whom you

10   syndicate ratings and reviews have about 50 total ratings

11   and reviews on their websites?

12   "A.  Let me be specific.  So in Procter & Gamble's case

13   they pay Expo TV to build these video reviews.  I'm only

14   given 50 to 75 to syndicate, not the whole library,

15   because most of them exist and live at

16   Procter & Gamble.com.  So I probably have syndicated 50

17   video reviews for Procter & Gamble across their 3,000

18   products that I syndicate content for.

19   "Q.  And for the other customers, do you recall what types

20   of reviews you're syndicating?  Are those also video

21   reviews?

22   "A.  It's mostly video reviews; just a handful of textual

23   reviews.

24   "Q.  Has Webcollage ever competed head to head with

25   PowerReviews to offer ratings and review software or

WEBCOLLAGE - VIDEOTAPED TESTIMONY

1    related service?

2    "A.  No.

3    "Q.  I have a follow-up to his follow-up.

4        "Do you have any -- have any customers asked you to

5    syndicate ratings and reviews in addition to those three

6    to four customers that you've talked about?

7    "A.  No."

8        MR. RUBINSTEIN:  Your Honor, we just have a short

9    counter clip to play.

10       (Videotaped testimony resumed as follows:)

11   "Q.  Can you tell me about your partnership with Expo TV

12   for video reviews.

13   "A.  Expo TV uses our platform to syndicate video reviews

14   for customers they have contracts for.  And we provide

15   those video reviews at websites that they can't get to.

16   "Q.  And what is a video review?

17   "A.  So that might be Scott Matthews giving a testimonial

18   about my Furbee, why it's so fantastic.  And just like a

19   textual review, it's a video review.

20   "Q.  And what benefit do you get from the relationship

21   with Expo TV?

22   "A.  Nothing monetarily.  It's more of a value add for

23   Procter & Gamble, who uses Expo TV, who wants those user

24   reviews at Walmart.  And it's really value to

25   Procter & Gamble, is why I -- to my customers.

1    "Q.  When you say Procter & Gamble, is Procter & Gamble a

2    customer of Webcollage?

3    "A.  And Expo TV.

4    "Q.  Is it fair to say that Webcollage is not in the

5    business of providing ratings and reviews software

6    services to customers?

7    "A.  It is not our primary business.

8    "Q.  Is it any part of your business?

9    "A.  Yes.

10   "Q.  As far as what you've explained before in the

11   deposition?

12   "A.  Yes.

13   "Q.  Do you know how many customers use Webcollage to

14   syndicate ratings and reviews content to retailers?

15   "A.  Approximately three or four.

16   "Q.  Do you know who those customers are?

17   "A.  I could find the names of those customers.

18   "Q.  But you don't know them off the top of your head?

19   "A.  Yeah, I could name a few.  Procter & Gamble, LG.  The

20   other ones I would have to research and get back to you

21   on.  But not more than that; not more than four or five.

22   "Q.  Could you describe, because I'm not sure I completely

23   understand, what you mean by video reviews -- let me just

24   finish or the court reporter will go crazy.

25       "What I'm trying to understand is whether customers

1    actually create videos and post them, or who's -- who's

2    putting these reviews -- who's creating these reviews?

3    "A.   In Procter & Gamble's case, Crest Toothpaste may

4    commission a community of moms and dads to give video

5    testimonials that, I love crest and this is why it's a

6    fantastic toothbrush.

7         "But it's not unlike what I'm doing here.  You

8    videotape it.  And it's a video play of a person giving a

9    review of that toothpaste and why they think it's a

10   fantastic toothpaste.

11        "I take that video from Procter & Gamble and put it

12   on Walmart for that SKU that's sold by Walmart.  So you

13   and I as consumers might look at that video as a point of

14   reference and credibility, that that's a great tube of

15   toothpaste and it's great for our families.

16   "Q.   Mr. Matthews, you had explained that you only have

17   three or four customers who currently syndicate ratings

18   and reviews with you.  Is there anything that is limiting

19   your ability to syndicate ratings and reviews for any

20   additional customers?

21   "A.   No.

22   "Q.   You had also mentioned during Ms. Brody's questions

23   that you syndicate 50 or so reviews for those customers,

24   50 or less reviews for these customers.

25        "Is there anything that is limiting your ability to

 1       syndicate additional ratings and reviews content for these

 2       customers?

 3       "A.  No."

 4          MR. RUBINSTEIN:  Thank you, Your Honor.

 5       I'd like to direct your attention to the couple of

 6    exhibits, DX1724 and DX1746.  I'd like to move these into

 7    evidence, absent any objection.

 8          MR. BONANNO:  No objection, Your Honor.

 9          THE COURT:  All right.  They're admitted.

10       (Defendant's Exhibits DX1724 and DX1746 received in

11    evidence)

12          MR. RUBINSTEIN:  Now we'd like to play a video from

13    the deposition of Sierra Trading Post.  And, again, there are a

14    couple of exhibits mentioned.  Hand this up.  Go ahead.

15       (Videotape was played as follows:)

16       "Q.  Can you tell me where you currently work.

17       "A.  I work at Sierra Trading Post in Cheyenne, Wyoming.

18       "Q.  What is your current title at Sierra Trading Post?

19       "A.  Director of Web and emerging technologies.

20       "Q.  Okay.  And what are your job responsibilities in that

21       role?

22       "A.  I oversee Web operations, Web development, and

23       identify opportunities in the emerging technologies space,

24       and then build them.

25       "Q.  Okay.  When you say 'build them,' what do you mean by

SIERRA TRADING POST - VIDEOTAPED TESTIMONY

1    that?

2    "A.  Well, it's a mix of design and programming.  So I've

3    got a design team that we build the user experience, and

4    then we hand it off to the programming team to -- to do

5    the coding.

6    "Q.  Could you describe Sierra Trading Post's business and

7    its products for me.

8    "A.  Sure.  We are an off-price, multichannel retailer.

9    We sell products that range from outdoor -- outdoor gear,

10   like camping, hiking equipment, shoes, to high-end suits,

11   kids' clothing, women's clothing, water sports.  And --

12   and everything we do is closeouts and seconds.

13   "Q.  Okay.  What are the different channels that you use

14   to sell your products?

15   "A.  We've got a catalog channel.  We've got a small

16   retail store footprint, four stores.  And then the

17   majority of the business is online.  So we've got all the

18   traditional online marking channels, affiliate marketing,

19   paid search advertising, paid shopping.  And all that

20   funnels into our website.

21       "And then we've got the mobile site and a couple of

22   apps out there.

23   "Q.  Are you familiar with the *Internet Retailer 500*?

24   "A.  Yes.

25   "Q.  Could you tell me what it is?

1    "**A.**  It's a guide of -- ranked by -- in revenue, that goes

2    from Amazon, who is always at the top, down to retailers

3    that sell in the range of a million to several million

4    dollars at the bottom.

5    "**Q.**  Okay.

6    "**A.**  It comes out annually with -- with revenue and a

7    handful of other metrics for each one of those retailers.

8    "**Q.**  I'll represent to you that someone in my office went

9    to the Internet Retailers Top 500 Guide and printed out

10   this profile of Sierra Trading Post.  It identifies Sierra

11   Trading Post, as you see on the top, as No. 102.

12       "Is that your understanding of its ranking, if you

13   know?

14   "**A.**  Yes.  This just came out, too.  This is the freshest

15   information that's out there.

16   "**Q.**  So I see down under 'Financial' on the bottom

17   left-hand corner it says '2012 Web sales, 257,240,000.'

18   You mentioned that the actual number is closer to

19   235 million; is that correct?

20   "**A.**  Yes.

21   "**Q.**  Okay.  All right.  Is -- is your ranking on the top

22   500 or IR500, is it sometimes called something that you

23   actively monitor?

24   "**A.**  Yes.  We always know what place we're in every year.

25   "**Q.**  Okay.

1    ▪**A.**  And these guys don't get everything right, either.

2    ▪**Q.**  Could you tell me a little bit about that.

3    ▪**A.**  They provide information based off their own

4    estimates.

5    ▪**Q.**  I see.

6    ▪**A.**  Sometimes companies give -- companies give them

7    actual numbers, but I don't think most -- not all the

8    companies are able to provide that or share that

9    information with them.

10   ▪**Q.**  Does Sierra Trading Post share any information with

11   the people that put together this report?

12   ▪**A.**  Not for 2012.

13   ▪**Q.**  Are you familiar with ratings and reviews on the

14   Sierra Trading Post website?

15   ▪**A.**  Yes.

16   ▪**Q.**  Do you know when ratings and reviews were first put

17   on the website?

18   ▪**A.**  Yes.

19   ▪**Q.**  When was that?

20   ▪**A.**  2007.

21   ▪**Q.**  Okay.  And could you describe for me what Sierra

22   Trading Post did to put ratings and reviews on its website

23   in '07?

24   ▪**A.**  Well, we -- we implemented the PowerReviews product.

25   They had a couple of different options:  An out-of-the-box

SIERRA TRADING POST - VIDEOTAPED TESTIMONY

1    versus a more customized version.  We went with the more

2    customized version.

3    "Q.  Do you recall any of the history of how prices

4    changed under the contract over time?

5    "A.  Yes.

6    "Q.  Could you tell me what you recall.

7    "A.  At first it was -- it was very cheap.  There might

8    have been some contract fees.  But the idea was that they

9    would try to make it free, provided that we shared the

10   content of the reviews that we gathered on our sites with

11   their affiliate marketing portal, Buzzillions.

12   "Q.  Uh-huh.

13   "A.  And so we did that at some point.  I believe they

14   were not able to make that -- that work, and so started

15   charging for reviews.  It was still relatively cheap.  And

16   then we -- we did a pretty good job negotiating throughout

17   the years over a handful of different contracts; kept our

18   pricing pretty low.

19        "At the point where we added on another site, it

20   looked like it was going to become a little bit more

21   expensive, and we started to think about, you know, what

22   we really wanted in a solution and whether it made sense

23   to continue with PowerReviews.

24   "Q.  So over the course of the relationship, what -- what

25   did Sierra Trading Post contract for PowerReviews to do on

SIERRA TRADING POST - VIDEOTAPED TESTIMONY

1    the site?

2    **A.**  At first it was strictly reviews, just the reviews

3    product.  And then eventually we added the Q&A portion.

4    **Q.**  Uh-huh.  Was there an additional fee for the Q&A

5    portion?

6    **A.**  Yes.

7    **Q.**  And so at what point did you begin to think about

8    leaving PowerReviews?

9    **A.**  You know, from the very beginning, we had told them,

10   you know, this doesn't have everything that we want, so at

11   some point we may bring it in-house.  But we didn't

12   seriously consider it until really after -- after we heard

13   that Bazaarvoice had purchased them.

14   **Q.**  Do you know when you -- approximately when you

15   negotiated for the termination of the contract?

16   **A.**  It was in January, I believe, of 2013.  We didn't

17   have a negotiation.  We just had a 30-day out --

18   **Q.**  Okay.

19   **A.**  -- I believe, that we had to put in.

20   **Q.**  So when did you put in your notice to terminate the

21   contract?

22   **A.**  I believe it was in January.

23   **Q.**  Okay.  And when did the contract end?

24   **A.**  The end of February.

25   **Q.**  Let's start at the beginning.  When did you start

SIERRA TRADING POST - VIDEOTAPED TESTIMONY

1   building the in-house solution for ratings and reviews?

2   ▪A.  At some point in the fourth quarter of 2012.

3   ▪Q.  And how many people worked on building the in-house

4   tool?

5   ▪A.  Probably four.

6   ▪Q.  Okay.

7   ▪A.  Not full-time.  I mean, juggling with other projects.

8   But at times some of those four were full-time.

9   ▪Q.  And how long did it take them to complete the

10  project?

11  ▪A.  Several months.

12  ▪Q.  Is it finished today?

13  ▪A.  It's finished in the sense that it's functional.  We

14  have a handful of features that we'd like to add in the

15  future.

16  ▪Q.  Okay.  So when did the in-house ratings and reviews

17  first get put on the website?

18  ▪A.  The same day that we took PowerReviews off.  So it

19  was February 28th, I believe.

20  ▪Q.  Okay.  And so if I go to the Sierra Trading Post

21  website today, what I will see is the in-house ratings and

22  reviews?

23  ▪A.  Correct.

24  ▪Q.  You said that the effort to build in-house ratings

25  and reviews began fourth quarter 2012; is that correct?

SIERRA TRADING POST - VIDEOTAPED TESTIMONY

1  **A.** Yes.

2  **Q.** You had developed a product that you were able to put

3  on the website by February 2013, right?

4  **A.** Right, yeah.

5  **Q.** Do you believe it could have been done in less time?

6  **A.** Had we focused on it with -- with no distractions

7  from other projects, sure.

8  **Q.** You mentioned that you wanted to develop some

9  additional features.  What are those features?

10  **A.** Well, some of them have to do with SEO, search engine

11  optimization, so we can get more of our questions and

12  answers and reviews out there to increase our reach in the

13  search engines.  There's a handful of usability

14  improvements that we can make with the design.

15  **Q.** Were you ever concerned that you would not be able to

16  build in-house what PowerReviews offered you in the past?

17  **A.** No.  We have a history of building almost all of

18  our -- our platform in-house.  Most of what we do is

19  proprietary, so it's just been a matter of when do we want

20  to -- to replace these third-party solutions in most

21  cases.

22      "So we've -- and -- and it wasn't just a copy of what

23  PowerReviews had.  We built our own solution with features

24  that we wanted.

25  **Q.** Does your own solution include features that

1    PowerReviews was not able to offer you?

2    ▪A.  Yes.

3    ▪Q.  Could you give a few examples.

4    ▪A.  Sure.  One of the things that we wanted to do with

5    this was improve customer service with our own in-house

6    solution by allowing for the instantaneous postings of

7    reviews, questions, and answers.  That's not something

8    PowerReviews was able to offer because of the moderation

9    process.  It sometimes took days.  It was held up in the

10   their queue.  And by that time, a customer asks a

11   question, a few days later it gets answered, they're

12   already disinterested.

13       "So that was a big piece of it.  We -- we tied it in

14   to our existing account holders that are in our in-house

15   system versus having a third-party system and having to

16   share accounts.  And we simplified the process.  So in the

17   PowerReviews solution there were a great many more

18   decisions that a customer has to make when submitting a

19   review.  We simplified ours to about four decisions, I

20   believe.

21   ▪Q.  You mentioned ask and answer just now.  Is that

22   something that PowerReviews used to offer that you also

23   built-in house?

24   ▪A.  Yes.

25   ▪Q.  Okay.  And that development took place during the

SIERRA TRADING POST - VIDEOTAPED TESTIMONY

1    same time period we discussed before, from fourth quarter

2    2012 to February --

3    "A.   Correct.

4    "Q.   -- 2013?  Okay.

5         "I'm going to mark as Defendant's Exhibit 190 -- 191,

6    I'm sorry, this document.  You can take a look at it.

7         "So I'll represent to you that I had someone in my

8    office go to the Sierra Trading Post website and print out

9    this page for the North Face Apex Bionic jacket and click

10   on the reviews tab.

11        "Are you familiar with how the Sierra Trading Post

12   website appears?

13   "A.   Yes.

14   "Q.   And does this look to you to be substantially similar

15   to the Sierra Trading Post website, if not the same?

16   "A.   Yes.

17   "Q.   Okay.  And if you look under the reviews tab in the

18   middle of the page, and then down in the center, does this

19   reflect what your team built in-house?

20   "A.   Yes.

21   "Q.   So, again, I'll represent to you that I had someone

22   in my office go to the Sierra Trading Post website and go

23   to this Web page and click on the Q&A tab.  This is for

24   the White Sierra Trabagon rain gear jacket for men.

25        "And let me start by asking you, are you familiar

SIERRA TRADING POST - VIDEOTAPED TESTIMONY

1    with the Sierra Trading Post pages that have Q&A on them?

2    ▪A.  Yes.

3    ▪Q.  And does this document appear to reflect Sierra

4    Trading Post's website as it -- as it displays Q&A?

5    ▪A.  Yes.

6    ▪Q.  You mentioned that PowerReviews was sometimes slow to

7    moderate questions, often taking two or three days; is

8    that correct?

9    ▪A.  Yes.

10    ▪Q.  So how do you turn questions around -- excuse me.

11    How do you respond to questions more quickly using the

12    in-house tool?

13    ▪A.  Well, we only hold ours in moderation if they meet

14    certain criteria that we don't agree with.  So most

15    reviews do not meet this criteria, and they get published

16    to the site instantly.  Which didn't happen that way with

17    PowerReviews because before we ever received the

18    information from PowerReviews, it was held up on their

19    side for several days.

20    ▪Q.  So let me make sure I understand.  You developed your

21    own in-house criteria to determine when questions would

22    automatically be posted to the website?

23    ▪A.  We decided on what criteria would allow reviews and

24    questions and answers to be posted to the site immediately

25    versus what needed to be held -- held back in the

SIERRA TRADING POST - VIDEOTAPED TESTIMONY

1    moderation queue, yes.

2    "Q.  Does the company do moderation for Q&A today?

3    "A.  Yes.

4    "Q.  Does the company do moderation for ratings and

5    reviews?

6    "A.  Yes.

7    "Q.  Okay.  Do you know approximately how many people are

8    in charge of moderating the content for question and

9    answer?

10   "A.  It's mainly one person.  And a couple of other people

11   know how to do it as well.

12   "Q.  And how many people moderate the ratings and reviews

13   on the site?

14   "A.  Same person.

15   "Q.  Okay.  So one person does the moderation for both Q&A

16   and ratings and reviews?

17   "A.  Correct.  And the community helps too.  So in Exhibit

18   191, you can see there's a 'flag as inappropriate' --

19   "Q.  Uh-huh.

20   "A.  -- functionality, and so the community can help to

21   moderate as well.

22   "Q.  And when you say 'the community,' you mean what?

23   "A.  Any visitor to the website.

24   "Q.  Do you recall how much on an annual basis you were

25   paying PowerReviews for the ratings and reviews and answer

1    functionality at the time the contract ended in

2    February 2013?

3    "A.  I don't recall exactly what it was.

4    "Q.  Do you remember a ballpark number?

5    "A.  I believe it was around maybe 7,000 a month for the

6    entire package.

7    "Q.  Have you ever received ratings and reviews from

8    another site and then put them on your site?

9    "A.  No.

10   "Q.  How do you typically decide whether to build

11   something in-house versus go to a third party to acquire

12   the functionality?

13   "A.  If it's -- well, oftentimes nascent technology we

14   will test with a third party to see if it's something that

15   we -- we like and want to keep long-term.  But if we have

16   a new idea, even if there are technologies out there that

17   would power that, if we consider it to be a really core

18   set of functionality, we'd rather build it in-house so

19   that we can own it and customize it to our needs.

20        "If there's something that does not need to be

21   customized, we don't feel like we have to build it

22   in-house.

23   "Q.  How does cost factor into that decision?

24   "A.  Cost is weighed heavily also.  We're a very lean

25   company and we watch our costs.  So we don't really like

1    software-as-a-service fees on a variable-cost basis.

2    "Q.  Was search engine optimization something you received

3    from PowerReviews, if you recall?

4    "A.  Search engine optimization, as I recall it, we really

5    drove -- part of the reason that we didn't use their

6    out-of-the-box solution and we went with the customized is

7    because we wanted SEO.  And from the beginning, we were

8    the first client that -- that pushed for this.  And they

9    ended up eventually developing a SEO product based mainly

10   on the demands that we had.

11        "But we continued to use our own in-house SEO

12   solution even through the period that we were using the

13   PowerReviews service.

14   "Q.  So you developed an in-house SEO tool before

15   PowerReviews did?

16   "A.  Well, we implemented the -- the display of the

17   reviewed data in a way that they could not, from the very

18   beginning, yes.

19   "Q.  So in -- in your view, building an in-house ratings

20   and reviews tool was a better alternative than continuing

21   with PowerReviews?

22   "A.  Yes.

23   "Q.  Was it also a better alternative than going to

24   Bazaarvoice?

25   "A.  Yes.

1    "Q.  Do you believe that Sierra Trading Post has been

2    harmed in any way from the acquisition of PowerReviews by

3    Bazaarvoice?

4    "A.  No.

5    "Q.  When you developed the display format for your

6    ratings and reviews in-house --

7    "A.  Yes.

8    "Q.  -- was PowerReviews offering search engine

9    optimization as a feature?

10   "A.  No.

11   "Q.  Okay.

12   "A.  Not at the very beginning, no.

13   "Q.  One of the things that we talked about earlier was

14   the changes in the pricing that you experienced from the

15   beginning of the relationship with PowerReviews until the

16   end of the relationship.  I'm wondering if you remember

17   the company, whether it's you or your team, telling

18   PowerReviews that you would discontinue them as a

19   provider.

20   "A.  No, not until we gave our -- our final notice.

21   "Q.  Did you ever tell them that you were thinking about

22   developing your own in-house solution?

23   "A.  Yes.

24   "Q.  And was that a negotiating tactic or something else?

25   "A.  No, it was just the truth.

1       "Q.   Okay.

2       "A.   We were -- we were transparent with that from the

3       very beginning."

4            MR. RUBINSTEIN:   Your Honor, we'd like to move into

5   evidence the couple of exhibits that I presented to you, absent

6   any objection.

7            MS. SCANLON:   No objection.

8            THE COURT:   All right.   They're admitted.

9       (Defendant's Exhibits DX1644 and DX1668 received in

10  evidence)

11           MR. RUBINSTEIN:   Thank you.   And we have one final

12  clip today --

13           THE COURT:   There is no cross-designation on this one?

14           MR. RUBINSTEIN:   No.   I'm sorry, there is not, I don't

15  believe.

16           MS. SCANLON:   No, Your Honor.

17           THE COURT:   Okay.

18           MR. RUBINSTEIN:   And we have a company called Abe's of

19  Maine, and I'd like to hand up the transcript and one exhibit.

20       (Videotape was played as follows:)

21       "Q.   So let's get started.   Can you provide me the company

22       that you work with, and your job title.

23       "A.   The company I work for is Abe's of Maine.   My job

24       title is Director of Marketing, of Web marketing

25       specifically.

ABE'S OF MAINE - VIDEOTAPED TESTIMONY

1    **Q.**   And is Abe's of Maine the official corporate name of

2    the entity?

3    **A.**   I believe it's Abe's Electronics, Inc.

4    **Q.**   And how long have you held your current position as

5    the director of Web marketing?

6    **A.**   Almost two years.

7    **Q.**   What are your general responsibilities in that

8    position?

9    **A.**   I oversee all Web marketing, email affiliate, social.

10   **Q.**   Do you have any role with the maintenance or use of

11   ratings and reviews on Abe's of Maine website?

12   **A.**   I do.

13   **Q.**   Could you please provide me with a brief overview of

14   the business of Abe's Electronics.

15   **A.**   Sure.  They are a consumer electronics retailer.

16   They sell mainly on their website.

17   **Q.**   Does Abe's sell products through retail channels

18   other than AbesOfMaine.com?

19   **A.**   Yes, they do.

20   **Q.**   What are those retail channels?

21   **A.**   Third-party marketplaces, such as Amazon and other --

22   eBay, stuff like that.

23   **Q.**   Does Abe's Electronics have a brick and mortar,

24   physical store?

25   **A.**   They do.

1    **"Q.** Are you familiar with the term social commerce?

2    **"A.** I am.

3    **"Q.** Could you give me your own personal definition of

4    that term?

5    **"A.** Commerce that takes place through the use of social

6    media.

7         **"UNIDENTIFIED SPEAKER:** I'm sorry. Could you repeat

8    that.

9         **"THE WITNESS:** Commerce that takes place through the

10   use of social media.

11   **"Q.** And could you give me some examples of what you would

12   consider social commerce.

13   **"A.** Uhm, I guess on a basic level, commerce through

14   social outlets such as Facebook. Also -- there's also --

15   I guess in this instance I should mention commerce that's

16   taking place through, I guess, reviews.

17   **"Q.** Are you familiar with the term products ratings and

18   reviews?

19   **"A.** Yes.

20   **"Q.** Does Abe's Electronics utilize a vendor for product

21   ratings and reviews on AbesOfMaine.com?

22   **"A.** Yes.

23   **"Q.** Do you know who that vendor is?

24   **"A.** Bazaarvoice.

25   **"Q.** Are you familiar with other providers of ratings and

ABE'S OF MAINE - VIDEOTAPED TESTIMONY

1    reviews?

2    "A.   Yes.

3    "Q.   What other ratings and reviews providers are you

4    familiar with?

5    "A.   Reevoo.

6    "Q.   What is your familiarity with Reevoo?

7    "A.   They had contacted me to see if we would use them as

8    a provider.

9    "Q.   When did that communication first occur?

10   "A.   Last year sometime.

11   "Q.   What was the nature of their first communication with

12   you?

13   "A.   I think they wanted to introduce themselves as a --

14   they wanted to introduce themselves.

15   "Q.   Were you ever introduced to people from Reevoo?

16   "A.   Before that?

17   "Q.   No, after the original communication.

18   "A.   Yes.

19   "Q.   Did you have a meeting with people from Reevoo?

20   "A.   Over the phone, yes.

21   "Q.   Do you have any idea when that meeting occurred?

22   "A.   I don't, offhand.

23   "Q.   And what was the nature of that meeting?

24   "A.   We had a walk-through of what the product was capable

25   of.

1    **Q.** Generally, what was the Reevoo product capable of?

2    **A.** It seemed to me it was the same thing as Bazaarvoice.

3    And they also had a syndication, and they would take

4    other -- other -- at the time I didn't know if

5    PowerReviews had it, but they had a product that was able

6    to take other -- other reviews and put them on our site.

7    **Q.** Did you discuss pricing with Reevoo?

8    **A.** I did.

9    **Q.** How did Reevoo's pricing compare to the price you

10   were receiving from Bazaarvoice at that time?

11   **A.** I don't remember exactly what their pricing was, but

12   they had made it clear that they would do everything they

13   can to match Bazaarvoice's price, even to the extent of

14   buying us out of the contract with Bazaarvoice, whatever

15   was left over, if there would have been some sort of

16   penalty for breaking contract.

17   **Q.** Well, do you know if Abe's of Maine ever had an

18   agreement with PowerReviews?

19   **A.** Yes.

20   **Q.** And when was that agreement?

21   **A.** That was our initial agreement.

22   **Q.** When you first joined at Abe's Electronics, was the

23   agreement for ratings and reviews with PowerReviews or

24   Bazaarvoice?

25   **A.** I believe it was with PowerReviews.

1    "Q.  Going back to the line of questions that we were on

2    before that, why was the decision made to stick with

3    PowerReviews/Bazaarvoice?

4    "A.  We were happy with the service that we had.  I knew

5    it was a reputable company, so there was no reason to

6    change.  But there was one caveat, that we were going to

7    renegotiate because the pricing was a lot higher.

8    "Q.  Can you clarify that statement?  Which pricing was a

9    lot higher?

10   "A.  The pricing for -- we were going to see if we could

11   get better pricing for PowerReviews.

12   "Q.  Because the pricing was a lot higher than what?

13   "A.  Than Reevoo was offering us.

14   "Q.  Did you communicate to Bazaarvoice that you were

15   considering using Reevoo?

16   "A.  I did.

17   "Q.  Did you communicate to Bazaarvoice that the price

18   being offered by Reevoo was lower than that which Abe's

19   was receiving from Bazaarvoice?

20   "A.  I believe so, yes.

21   "Q.  Did you indicate to Bazaarvoice that you would want a

22   price decrease to maintain the relationship?

23   "A.  I did.

24   "Q.  Did Bazaarvoice indicate a willingness to lower your

25   price?

1    ▪A.  They had.

2    ▪Q.  Earlier in the deposition you mentioned the term

3    'syndication.'  Are you familiar with the term

4    'syndication'?

5    ▪A.  When I -- when I'm referring to syndication, I mean

6    to say that there were reviews that were posted about a

7    certain product somewhere else, and they were used on our

8    site.  Similarly, if they were used on our site, they

9    would be repurposed somewhere else.

10   ▪Q.  Sure.  And did Reevoo offer syndication?

11   ▪A.  Yes.

12   ▪Q.  Does Bazaarvoice offer syndication?

13   ▪A.  Yes.

14   ▪Q.  Does Abe's Electronics utilize the syndication

15   offering?

16   ▪A.  It's in our current contract.  I don't know if it's

17   been implemented yet.

18   ▪Q.  Was syndication in the contract with

19   PowerReviews/Bazaarvoice prior to the March/April 2013

20   agreement?

21   ▪A.  I don't think so.

22   ▪Q.  So, to your memory, the availability of

23   syndication -- the offering of syndication was first

24   included in the March/April agreement with Bazaarvoice?

25   ▪A.  Yes.

1    **Q.**   And that was the same agreement in which your price

2    was dropped $1,500 over a 3- or 4-month period?

3    **A.**   Yes.

4    **Q.**   Did you mention to Bazaarvoice that Reevoo had

5    offered you syndication?

6    **A.**   I believe so.

7    **Q.**   When you were negotiating with Bazaarvoice in the

8    most recent round of negotiations when you renewed

9    their -- your contract with them this year, did

10   Bazaarvoice tell you about the value of their syndication

11   network?

12   **A.**   The value of it?  They -- they told me about it, and

13   I was interested in it.

14   **Q.**   What was their pitch to you as to why it was -- it

15   would be of value to your company?

16   **A.**   I -- I -- as far as I can recollect, that it was

17   you're getting more reviews for a product.  It's more

18   information for the customer.

19   **Q.**   Did Bazaarvoice tell you how many partners are in

20   their syndication network?

21   **A.**   I don't remember.

22   **Q.**   What selling points did Bazaarvoice use to get you to

23   sign up with them again when you renewed your contract in

24   or about April of 2013?

25   **A.**   It was the price, the fact that they had the

1    syndication like Reevoo had had. They had added the --

2    they had added the -- I forgot what it's called -- the

3    email service to our contract. And I had been happy with

4    them, so.

5    **Q.** Did they provide any sort of comparisons to help you

6    understand whether Bazaarvoice's syndication network was

7    bigger than Reevoo's?

8    **A.** No.

9    **Q.** When do you think your meeting with Reevoo was?

10   **A.** December 10th, 2012.

11   **Q.** Did your price negotiations with Bazaarvoice happen

12   after this discussion with Reevoo?

13   **A.** Yes.

14   **Q.** How much of a price decrease did you seek from

15   Bazaarvoice?

16   **A.** As much as they could offer me.

17   **Q.** Was there -- did you have any specific requests?

18   **A.** I wanted it to be substantially lower. I don't -- I

19   didn't ask for anything specific.

20   **Q.** Did Bazaarvoice ultimately lower -- lower the price

21   of your contract?

22   **A.** They did.

23   **Q.** Do you have a general idea of how much of the price

24   was lowered?

25   **A.** It went from $4,500 for -- I think we were billed at

PROCEEDINGS

```
 1    3- or 4-month increments to $3,000.  And they also give us
 2    extra -- extra services.
 3    "Q.  How did the price which you ultimately received from
 4    Bazaarvoice in the March or April agreement of 2013
 5    compare to that being offered by Reevoo?
 6    "A.  I think it was -- I think it was on par.  I think it
 7    was -- I think it was pretty good.
 8    "Q.  Do you believe that Reevoo's presence in the ratings
 9    and reviews market allowed you to receive a lower price
10    from Bazaarvoice?
11    "A.  Yes.
12    "Q.  Why do you think -- why do you think that's the case?
13    "A.  Because I had mentioned in my renegotiations that we
14    were considering using another company, Reevoo.
15    "Q.  Have you given any thought to the acquisition of
16    PowerReviews by Bazaarvoice?
17    "A.  Uhm, I have not.
18    "Q.  Would it be fair to say that you're not concerned
19    about the merger?
20    "A.  It would be fair to say I'm not concerned about the
21    merger.
22    "Q.  Do you believe the acquisition of PowerReviews by
23    Bazaarvoice has harmed Abe's Electronics?
24    "A.  No."
25    (Videotaped testimony concluded.)
```

1          **MR. RUBINSTEIN:**  Your Honor, I don't believe the

2  Department of Justice has any counter.  Is that correct?

3          **MS. SCANLON:**  That's correct, Your Honor.

4          **THE COURT:**  Okay.

5          **MR. RUBINSTEIN:**  And I'd just like to move into

6  evidence the Exhibit DX1152, that was attached, if there's no

7  objection.

8          **MS. SCANLON:**  No objection.

9          (Defendant's Exhibit DX1152 received in evidence)

10          **MR. RUBINSTEIN:**  And, just for the record, because I

11  don't think I stated it before, Sierra Trading Post exhibits

12  were DX1644 and DX1668.

13      And at this time we're done with these videos.

14          **MR. FELDMAN:**  I'm sorry.  We don't have other live

15  witnesses ready today.  We're flying them in.

16      So tomorrow we have four live witnesses, three customers:

17  World Kitchen, AutoZone and IHG.

18      And then we have a Bazaarvoice employee, Matthew Curtin.

19  And we'll have some more video ready that we'll have designated

20  to the plaintiff.

21          **THE COURT:**  Okay.

22          **MR. FELDMAN:**  But for today we're out of ammo.

23          **THE COURT:**  I hear you.  And this case may be going a

24  little faster than you anticipated, and I understand that.

25      Can you tell me, generally, where we are in the schedule

PROCEEDINGS

1    of -- in my schedule?

2          **MR. FELDMAN:**  Yes.  I think that Ms. Alepin is better

3    qualified to do that than I.

4          **MS. ALEPIN:**  Your Honor, we are scheduled to have

5    customer testimony tomorrow.  The last Bazaarvoice witness will

6    be tomorrow.  And then we have some customers next week who are

7    lined up.  And, also, there will be a Bazaarvoice board member.

8    And our expert will testify on Monday.

9          And then we'll finish with our economist, Dr. Shehadeh, on

10   Wednesday into Thursday.  And then the plaintiff has reserved

11   time for rebuttal.  Oh, sorry, Mr. Comée will also be on that

12   Wednesday.

13         So we had scheduled to have October 9th, which is why

14   we're still -- we still will have customers and Mr. Comée come

15   in on the 9th.  And then we'll start with Dr. Shehadeh on the

16   9th, into the 10th.  And then I think the plaintiff has

17   reserved time for rebuttal.

18         **THE COURT:**  So are we going to go beyond next

19   Thursday, Mr. Huston, do you think?

20         **MR. HUSTON:**  Your Honor, I think, as far as the

21   evidence, my -- I think we can fit the evidence in through

22   Thursday.  Our thought was possibly go beyond with respect to

23   closing.  But with respect to the evidence I think we can fit

24   it in.  There may be some juggling we have to do with respect

25   to the defendants, but I think we can do it.

1    **THE COURT:**  Okay.

2    **MR. JACOBSON:**  Your Honor, I don't think that's

3    necessary.  We previously discussed with the Court possibly

4    using Thursday afternoon, after the plea change.

5    **THE COURT:**  Yes.

6    **MR. JACOBSON:**  So I think there's a strong preference

7    to finish up on Thursday, if we can.

8    **THE COURT:**  Okay.  And are we going to have other

9    gaps, would you guess, just given the way that things are

10   orchestrating?

11   **MR. JACOBSON:**  I think this is the most white space

12   you're going to see.  There might be a tiny bit tomorrow, but

13   we're -- we're endeavoring to eliminate that.  As I mentioned

14   to you last week, I thought there would be some, and I think

15   today was really it.

16   **MR. HUSTON:**  And with respect to the closing issue,

17   Your Honor, the preference we would have would be to have some

18   time to incorporate the expert testimony that the defendants

19   have so that we can prepare our closing.  And so that's why

20   we're trying to build in a little space there.

21   **THE COURT:**  Okay.  Well, you should discuss between

22   yourselves what you think the best schedule is for that.

23   And I've been thinking about this as one of two ways:  One

24   way that might be useful is when the live testimony ends,

25   there's still a lot of documents that I'm going to have to go

1   through, and some depositions, before the evidence is complete

2   for me.  So one thing you might want to do is close shortly

3   after the live testimony and tell me what else I'm going to be

4   seeing.  Sort of do a pre-close.  And then you'll be briefing

5   and providing, I think, amended findings of fact.  And then you

6   wouldn't need to do a final close.

7        Or you might want to take a little more time with the

8   evidence that you've got and do a full-on closing.

9        And I'm willing to go with whichever way you want to do

10  it.  And if you want some time, you know, if you want a week to

11  wait, I'm going to be trying to work through the rest of the

12  evidence on this same sort of 8:00-to-1:00 track, behind closed

13  doors, until I'm finished with it.

14       So talk amongst yourselves, and let's talk again when

15  you're -- when you have an idea of what you want to propose to

16  me.

17       **MR. HUSTON:**  That sounds fine, Your Honor.  We'll talk

18  with defense counsel about that.

19       And on that very subject of the testimony and the

20  documents that you're going to be reviewing, yesterday, at some

21  point, I think it was towards the end of the day, counsel

22  handed you what I think is supposed to be some sort of guide to

23  the deposition testimony.

24       We took a quick look at it.  We did have some problems

25  with it.  Our view is that we don't think you need that to go

 1    through the deposition testimony.

 2        So our preference would be rather than to create a whole

 3    situation and try and figure out what the errors are, that you

 4    just not use it.

 5        But, obviously, if Your Honor thinks something like that

 6    is helpful, we would engage with defense counsel and prepare

 7    something that we could both live with.

 8        **THE COURT:**  At the moment, I have no idea whether it's

 9    useful for not.  So if you want to talk with them and explain

10    what your issues are about it, at the time that I take a look

11    at it then we can talk about it again.

12        **MR. FELDMAN:**  Great.  If there's anything wrong in it

13    we're happy to correct it.

14        **MR. JACOBSON:**  Your Honor, I did have one question.

15        First of all, I would commend to Your Honor yesterday's

16    *Daily News* headline, *New York Daily News*.  You can find it

17    humorous and appropriate given the circumstances we have.

18        But in light of the closure, I know the U.S. Courts'

19    website indicates that there's ten business days that the

20    courts will be opened.

21        Should we view that as a constraint, or should we try to

22    just either be optimistic or fight through it?

23        **THE COURT:**  I think everybody's in uncharted waters.

24    My belief is that I'm going to be holding court for a very long

25    time.  And so I don't see it as a constraint, but I really

PROCEEDINGS

1   don't know what's going to be happening for other people ten

2   days from now.

3           MR. JACOBSON:  It may be hard to get into the

4   building.  And we know, you know, it's a hardship for the

5   people who are not going to be paid.  And so that's one of the

6   reasons that we wanted to really wrap this up on Thursday.

7           THE COURT:  I think for a lot of reasons that's a good

8   idea.

9           MR. JACOBSON:  Okay.  Thank you.

10           MR. FELDMAN:  Thank you, Your Honor.

11           THE COURT:  All right.  We'll see you tomorrow at

12   8:00.

13           MR. FELDMAN:  Thank you.

14               (Proceedings adjourned at 10:41 a.m.)

15

16                       ---oOo---

17

18

19

20

21

22

23

24

25

1
2
3
4                   **CERTIFICATE OF REPORTERS**

5           I certify that the foregoing is a correct transcript

6       from the record of proceedings in the above-entitled matter.

7
8       DATE:    Tuesday, October 2, 2013

9
10
11
12       _____

13             Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                      U.S. Court Reporter
14
15
16       _____

17          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                      U.S. Court Reporter
18
19
20
21
22
23
24
25