**Volume 9**

**Pages 1383 - 1595**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
   VS.                       )    NO. C 13-00133 WHO
                             )
BAZAARVOICE, INC.,           )
                             )
          Defendant.         )
_____)
                             San Francisco, California
                             Monday, October 7, 2013

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff:
                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Golden Gate Avenue - Room 10-0101
                    P. O. Box 36046
                    San Francisco, California  94102
               **BY:  PETER K. HUSTON, ASSISTANT CHIEF**


                    U.S. DEPARTMENT OF JUSTICE
                    Antitrust Division
                    450 Fifth Street, NW - Suite 7100
                    Washington, D.C. 20530
               **BY:  MICHAEL D. BONANNO, TRIAL ATTORNEY**
                    **ADAM T. SEVERT, TRIAL ATTORNEY**
                    **ROBERT A. LEPORE, TRIAL ATTORNEY**
                    **AARON HOAG, TRIAL ATTORNEY**
                    **LISA ANNE SCANLON, TRIAL ATTORNEY**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporters

**APPEARANCES**:  (CONTINUED)

For the Plaintiff:

                        U.S. DEPARTMENT OF JUSTICE
                        Antitrust Division
                        950 Pennsylvania Avenue, NW - Rm. 3214
                        Washington, D.C. 20530
                  BY:   **DAVID I. GELFAND, DEPUTY ATTY. GENERAL**

For Defendant:

                        WILSON, SONSINI, GOODRICH & ROSATI
                        650 Page Mill Road
                        Palo Alto, California  94304
                  BY:   **BORIS FELDMAN, ATTORNEY AT LAW**
                        **DOMINIQUE-CHANTALE ALEPIN, ATTORNEY AT**
                        **   LAW**
                        **DYLAN J. LIDDIARD, ATTORNEY AT LAW**

                        WILSON, SONSINI, GOODRICH & ROSATI
                        1700 K Street, NW - 5th Floor
                        Washington, D.C.  20006
                  BY:   **SCOTT A. SHER, ATTORNEY AT LAW**
                        **ANDREA A. MURINO, ATTORNEY AT LAW**
                        **FRANKLIN RUBINSTEIN, ATTORNEY AT LAW**

                        WILSON, SONSINI, GOODRICH & ROSATI
                        1301 Avenue of the Americas - 40th Fl.
                        New York, New York 10019
                  BY:   **CHUL PAK, MEMBER OF FIRM**
                        **JONATHAN M. JACOBSON, MEMBER OF FIRM**
                        **DANIEL P. WEICK, ATTORNEY AT LAW**

                        BAZAARVOICE, INC.
                        3900 N. Capital of Texas Highway
                          Suite 300
                        Austin, Texas  78746
                  BY:   **BRYAN BARKSDALE, GENERAL COUNSEL**
                        **KIN GILL, DEPUTY GENERAL COUNSEL**

1385

## I N D E X

Monday, October 7, 2013

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **MEREDITH, THOMAS** | | |
| (SWORN) | 1386 | 9 |
| Direct Examination by Mr. Feldman | 1387 | 9 |
| Cross Examination by Mr. Huston | 1401 | 9 |
| Redirect Examination by Mr. Feldman | 1424 | 9 |
| Recross Examination by Mr. Huston | 1427 | 9 |
| Further Redirect Examination by Mr. Feldman | 1428 | 9 |
| **GOLDBERG, JASON** | | |
| (SWORN) | 1431 | 9 |
| Direct Examination by Mr. Sher | 1431 | 9 |
| Cross Examination by Mr. Severt | 1541 | 9 |
| Redirect Examination by Mr. Sher | 1583 | 9 |
| Recross Examination by Mr. Severt | 1593 | 9 |

## E X H I B I T S

| PLAINTIFF'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| GX1202 | | 1403 | 9 |
| GX1247 | 1552 | | 9 |
| GX1248 | | 1593 | 9 |

## E X H I B I T S

| DEFENDANT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| DX1895 | | 1594 | 9 |

```
 1   Monday - October 7, 2013                          8:00 a.m.

 2                       P R O C E E D I N G S

 3                          ---000---

 4          THE COURT:  Please be seated.

 5      Good morning, everybody.

 6      (Counsel greet the Court.)

 7          THE COURT:  Mr. Feldman.

 8          MR. FELDMAN:  Good morning, Your Honor.

 9      There's one lawyer on our team that I think we haven't

10   introduced yet, if I may.  Her name is Roisin Comerford.

11      Roisin, could you stand up, please.

12      She's been helping us throughout.

13          MS. COMERFORD:  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. FELDMAN:  And I think it's spelled R-o-i-s-i-n.

16   It's Irish.  Thank you.

17      Bazaarvoice calls Tom Meredith.

18                     THOMAS MEREDITH,

19   called as a witness for the Defendant, having been duly sworn,

20   testified as follows:

21          THE WITNESS:  I do.

22          MR. FELDMAN:  Good morning, Mr. Meredith.

23          THE CLERK:  Please state your full name and spell your

24   name for the court reporter.

25          THE WITNESS:  Thomas Joseph Meredith, M-e-r-e-d-i-t-h.
```

1                    <u>**DIRECT EXAMINATION**</u>

2    **BY MR. FELDMAN**

3    **Q.**   I've handed you a bio that was extracted from your

4    deposition.  Could you give the Court a summary of your

5    educational background, please.

6    **A.**   I graduated from St. Frances University in Loretto,

7    Pennsylvania, in 1972, with a Bachelor's of Arts in political

8    science and law.

9         I went to Duquesne University School of Law, and graduated

10   there with a J.D. in 1975.  And I attended and graduated from

11   the University of Georgetown School of Law in 1977, with an

12   LLM.

13   **Q.**   In what area?

14   **A.**   Taxation and international securities.

15   **Q.**   Did you ever practice as a lawyer?

16   **A.**   I did briefly.  In my first year I was with a law firm

17   Hedrick & Lane.

18   **Q.**   So do you consider yourself to be a recovering lawyer?

19   **A.**   Yes.

20   **Q.**   Okay.  After you stopped practicing law, could you give me

21   a summary of the jobs you've held up to the time you came to

22   Bazaarvoice.

23   **A.**   After I graduated from law?

24   **Q.**   After you stopped working at a law firm.

25   **A.**   I was employed by Arthur Young, now Ernst & Young, in

1    their national tax office division, which is a group of,

2    largely, lawyers who did not practice law but actually

3    practiced tax and advised multinational clients.  I did that

4    for slightly more than two years.

5        I then moved to California and worked with a company

6    called Castle & Cooke.  Castle & Cooke was an archetypal

7    conglomerate that had its base of operations in Hawaii but

8    headquarters here in San Francisco.  And I was involved in tax

9    planning, international tax consulting, mergers, acquisitions,

10   cash management of the company.  And I did that for about a

11   three-year period.

12   **Q.**   Did they do pineapple?

13   **A.**   Bumble Tuna, Dole Pineapple, Dole Bananas.  Quite an

14   exciting time.

15   **Q.**   After Castle & Cooke?

16   **A.**   I moved to the valley, Silicon Valley that is, and I

17   was -- joined a company called Amdahl Corporation, which was

18   about 300 or so million dollars in revenues at the time.

19   **Q.**   A-m-d-a-h-l?

20   **A.**   Correct.

21   **Q.**   Main frame?

22   **A.**   Swedish.  General purpose large-scale main frame

23   computers.

24       And I was employed there for the better part of nine

25   years.  And during that time I had varying positions from those

1   involving tax and merger and acquisition to treasury and

2   finance.

3   Q.   After Amdahl?

4   A.   I joined Sun Microsystems, where I was the vice president

5   and treasurer.  And I was there for about a 3-plus, almost

6   4-year period.  And I had one job which was all about treasury

7   and finance.

8   Q.   Who acquired Sun?

9   A.   I'm sorry?

10  Q.   Who acquired Sun?

11  A.   Oracle.

12  Q.   And after Sun, did you have another job?

13  A.   I moved from Silicon Valley to Texas in 1992, and I joined

14  Dell, then Computer Company, although today it's called Dell,

15  Inc.  And I was hired as the senior vice president and chief

16  financial officer, also a recovering CFO.

17  Q.   How long were you at Dell?

18  A.   I was at Dell for nine years.

19  Q.   Okay.  Apart from those jobs, have you been on the boards

20  of directors of any public companies?

21  A.   Yes.

22  Q.   Which?

23  A.   To name a few, I would say most -- in reverse order,

24  Bazaarvoice as chairman, Motorola Mobility.  And Motorola

25  Mobility was a company that was spun out of Motorola, Inc.,

1   about two years ago -- three years ago, actually.  At the time

2   it had a market cap of about $7 billion, and was sold to Google

3   for 13.4.

4        I was also on the board of I-cube Technologies, I-cube,

5   which was a IT services company provider out of the East Coast,

6   Free Markets, and a few others that were all more or less

7   prepublic and eventually went public.

8   Q.   Are you on the boards of any noncorporate activities?

9   A.   Currently, I serve on two boards.  One is the Nature

10  Conservancy worldwide board.  A great institution, by the way.

11  And I cofounded a conservancy called Waller Creek Conservancy,

12  which is about an urban landscape renewal project.

13  Q.   Okay.  Thank you.

14       I believe you said you're chairman of the board of

15  Bazaarvoice?

16  A.   Correct.

17  Q.   At the time that Bazaarvoice made the decision to acquire

18  PowerReviews, did you support that decision?

19  A.   Absolutely.

20  Q.   What was your rationale?

21  A.   Uhm, I'm a firm believer that many companies talk about

22  capturing the space between the cloud, social media and big

23  data.  And I see Bazaarvoice, and saw Bazaarvoice at the time I

24  joined the board, as at the intersection of those four spaces.

25  Q.   How did you think that acquiring PowerReviews would affect

1  that?

2  **A.**  I thought that it would add to the potential of the

3  network effect, which is really about building more real estate

4  in the data arena and the opportunity to capitalize and

5  monetize that in media and business intelligence.

6  **Q.**  I'm going to ask you some questions about the competition

7  between Bazaarvoice and PowerReviews before you acquired them.

8  How significant a competitor did you think PowerReviews

9  was in the year prior to the acquisition?

10 **A.**  Uhm, I didn't think much of it at all.

11          **MR. HUSTON:**  Object to lack of foundation, Your Honor.

12          **THE COURT:**  He can answer.  That's fine.  Overruled.

13 **BY MR. FELDMAN**

14 **Q.**  Why was that?

15 **A.**  Uhm, in the scheme of life -- and this is again a personal

16 view not necessarily representative of our board, but my view

17 was at the time, and persists to this day, that the real

18 value-add of a company like Bazaarvoice is in the ability to

19 capitalize on the data that it's collecting.

20          And to give some impression of the amount of data that we

21 collect, we have about 400 million unique impressions a month,

22 which is about six times that of Amazon.  And we have

23 46 billion impressions a quarter.

24          And the more data that we can collapse and connect and

25 eventually syndicate with authenticity and reliability from

1    site to site, the more valuable the company.

2        So, therefore, my view of PowerReviews was it's part of

3    that space, part of that real estate and any opportunity we had

4    to go further into that space would enhance our monetization

5    and commercialization prospects.

6    Q.   In the course of the litigation we've heard about

7    something internal to Bazaarvoice called Operation Menlogeddon.

8    Have you ever heard of that?

9    A.   Yes, I have.

10   Q.   Why do you think that folks at Bazaarvoice were so focused

11   on competition from PowerReviews?

12   A.   Uhm, in some respects I'd be purely speculating, but my

13   suspicion is that salespeople tend to be coin-operated and they

14   saw PowerReviews in their space periodically and, therefore,

15   had anxiety or fear or concern about having to compete with

16   them as opposed to just taking orders.

17   Q.   In the time you were on the board, did management ever

18   provide you with a quantitative analysis of the impact that

19   PowerReviews was having on Bazaarvoice's pricing for its

20   ratings and reviews product?

21   A.   Did not.

22   Q.   Did you ever hear of anything like that being done?

23   A.   No.

24   Q.   I'm going to ask you about the board's consideration of

25   the acquisition.

1          What was the transactions committee of the board?

2     **A.**    Uhm, in preparation for going public, we had formed a

3     transaction committee, which was also a pricing committee.  And

4     there were three members on that committee, including the two

5     largest shareholders, represented by Chris Pacitti of Austin

6     Ventures, and Neeraj Agarwal, who was at Battery, and myself.

7          And the purpose of that committee was actually, initially,

8     more or less about pricing in the IPO.  Eventually became

9     involved in the secondary pricing months later.  But it also

10    was involved in a transaction, actually multiple transactions.

11    PowerReviews being one.

12    **Q.**    So I want to focus on the year before you acquired

13    PowerReviews.

14         So, 2011, 2012, was there a difference of opinion during

15    that time between management on the one hand and the board of

16    directors on the other hand with respect to acquiring

17    PowerReviews?

18    **A.**    Yes, there was marked difference of opinion.

19    **Q.**    What was it?

20    **A.**    Uhm, the management team was pushing hard for board

21    approval to acquire PowerReviews pre-IPO.  And the board was

22    adamant that that was not a wise decision.  And given the

23    experience of the board members individually and collectively,

24    it was our determination that the better tact was to go public

25    first.

1  Q.   Were there any rationales that management presented to the

2  board in favor of the acquisition that resonated with you

3  personally, that made sense to you?

4  A.   Uhm, the actual combination of the two companies made

5  sense.  Beyond that, I can honestly say very little of what

6  management put forward in various documents or in conversation

7  made much sense.

8  Q.   So don't take this the wrong way.  Is that something

9  you're just saying because we're in court now or at the time

10  did you say to members of the management these arguments for

11  the merger don't make sense to me?

12  A.   I think in my deposition I used a phrase that might be

13  cast as earthy and I think I referred to it as "BS."

14  Q.   Expletive deleted?

15  A.   Correct.

16  Q.   Okay.  I'm going to -- by the way, how did you decide how

17  much to pay for PowerReviews?

18  A.   There was a -- as part of the transaction committee,

19  clearly many conversations with the management team about the

20  value of the asset.  There was a bank involved -- actually,

21  multiple banks involved in various conversations we had.

22      Ultimately, it was determined that there was a range of

23  pricing given multiples on revenues.  At the time the revenue

24  of the company was about $11 million, I think analyzing about

25  13.  And at the time Bazaarvoice was about 130 million.

1        We concluded in -- as a board and as a management team

2    that the price, while lofty that was being asked for, was one

3    that was in the range of fairness.

4    Q.    In your mind was any part of that purchase price in order

5    to reduce or eliminate price erosion in the ratings and reviews

6    segment?

7    A.    No.

8    Q.    I'm going to show you two documents.  They're both from

9    the board's consideration and approval of the deal in April of

10   2012.  And they both have been marked by DOJ.

11       So these are in the exhibits, but it's easier if I just

12   hand them up.

13       The first one is GX429.  And I'm only going to show you

14   one page in here.  On the front it says, "M & A Opportunities

15   Board of Directors Meeting April 4, 2012."

16       Does that look like what you went through at the board

17   meeting?

18   A.    Yes.

19   Q.    Turn, please, to slide 1, which says:  "Opportunity:

20   Project Peloton."

21       What was the term "Project Peloton" referring to?

22   A.    That was the code name for PowerReviews.

23   Q.    And on the left, it has "Primary Benefits" and on the

24   right "Primary Challenges & Risks."  I'm not going to make you

25   read the left out loud, but I'm going to ask you to just read

1   it to yourself and tell me whether that reflects, in your mind,

2   the reason to do the deal and if you disagree with any of

3   those.

4   **A.**   I agree with all those bullets.

5   **Q.**   So, correct me if I'm wrong, I didn't see anything there

6   about eliminating price erosion or taking out our only

7   competitor in any language from those other documents.

8        Do you see any language there about eliminating price

9   erosion?

10  **A.**   I do not.

11  **Q.**   Why do you think that is -- do you have any idea as to why

12  that's not there?

13           **MR. HUSTON:**  Objection.  Lacks foundation.

14           **THE COURT:**  He can answer from his knowledge.

15           **THE WITNESS:**  My fervent belief is that management was

16  sufficiently bludgeoned about some of their views on the

17  rationale for the acquisition that they finally realized that

18  these were the real reasons for acquiring the companies, from

19  the board's perspective, and ultimately from the management's

20  perspective, because this is a document they prepared for the

21  board.

22  **BY MR. FELDMAN**

23  **Q.**   Prior to that April 2012 meeting where you were discussing

24  the deal, had there been dialogue at the board level with

25  management before about whether it made sense to do the deal to

1   cut price erosion?

2   **A.**   Uhm, yes.  And I think, again, that was in my deposition.

3   I think I may have actually used the same phrase, BS.

4   **Q.**   And what do you mean by that?

5   **A.**   That the notion that by acquiring PowerReviews, a company

6   with $11 million in revenues in a nascent space would enable

7   us, Bazaarvoice, to control pricing was ludicrous.  And I can

8   think of no other word for it.  I find it staggering that we're

9   even here having this conversation, but I'm willing to go down

10  this path.

11      Think of it in the context of offline commerce is

12  $10 trillion, online commerce is 1 trillion.  We are in a

13  nascent space where behavior data, geo location data,

14  purchasing data and the opportunity to capture that data is

15  replete in any number of players, from eCommerce players to

16  auction houses, to large enterprise players.

17      And the litany of players who were in and around the space

18  talking about the space is endless.  And, most importantly, the

19  biggest competitor is actually not invented here, are built

20  in-house, because most of those players have the capacity and

21  the teams capable of doing that which Bazaarvoice does.  It

22  doesn't mean they'll do it, but they have the ability to do it.

23  **Q.**   And when you --

24  **A.**   If I may?

25  **Q.**   Please.

1    **A.**   Today, just today, as I was getting ready for this trial,

2    I noticed that Walmart and Walgreen's had lowered the price of

3    the two-week-old iPhone, the most dominant iconic product in

4    the face of this country, perhaps, or at least, arguably, one

5    of them, to $50 and $45.  It's a two-week-old phone.  It's

6    technology.  Prices never are controlled by, essentially, a

7    brand, even an Apple.

8    **Q.**   Okay.  I'm going to show you one other document, and then

9    I'm going to turn you over to the DOJ.  This is GX1095.  It

10   looks fatter than it is.

11   **A.**   I'll just take it as a long document.

12   **Q.**   There are different sets in it.  And I'm turning you to

13   the document identifier 9540, Credit Suisse materials for

14   discussion, Peloton April 2012.

15       Does this look like the slide deck that the investment

16   bankers used with the board?

17   **A.**   Yes, it does.

18   **Q.**   Okay.  I'm just going to ask you about three pages.  The

19   first is slide 2, which says at the top "Executive summary."

20   And, again, I'm not going to waste everybody's time reading

21   each of these out loud.

22       Would you just eyeball that and tell me if that reflected

23   your thinking in approving the deal and if there's anything

24   that jumps out at you as wrong.

25   **A.**   I've read it.  I'm sorry, what's the question again?

1  Q.   As you look at that, is that a fair capture -- it's

2  Credit Suisse's executive summary.

3       Is that a fair capture of your thinking on the board in

4  approving the acquisition?

5  A.   Certainly -- it certainly fairly depicts my personal

6  thoughts, and I believe it captures well the perspective of the

7  board overall.

8  Q.   Okay.  If you could turn to slide 8, please, which says,

9  quote:

10          "An acquisition of Peloton could be a key step

11          towards winning the social commerce market and driving

12          value."

13       Do you have an understanding of what that means?

14  A.   Uhm, I have my own interpretation of it, so I think I have

15  a fair --

16  Q.   Could you tell us what you understand it to mean, and as a

17  part of that, whether you agree with it or not.

18  A.   I believe that when it says "a key step towards winning

19  the social commerce market," I'm a believer that compression of

20  time is a real value-add, and the ability to capture data and

21  actually, given Bazaarvoice's position at this intersection of

22  the cloud, social media and, more broadly, just commerce, that

23  Peloton, or PowerReviews, would help facilitate that process.

24  Q.   Okay.

25  A.   It's part of the real estate.  They had a retail presence

1   that was interesting, and they had lots of data.

2   **Q.**   Okay.  Last page, slide 10 says at the top:

3          "Bazaarvoice's customers would benefit from increased

4       network effects via greater syndication."

5       Could you please tell me if you agreed with that or not

6   and why.

7   **A.**   Well, again, yes, I believe customers will benefit to the

8   extent that syndication is ultimately happening from -- from

9   the perspective of Bazaarvoice or any other company that's in

10  the space of social.

11      And by that I mean, if Your Honor is a consumer and he's

12  purchasing a product on your site and your site is being run by

13  Bazaarvoice, but he's also looking at my site, looking at

14  similar products or substantially identical product, your

15  ability at Bazaarvoice to actually have his information floated

16  to you is valuable because it's behavioral, it's geo location,

17  and it's fundamentally an indicator of buying intent.

18      And if I can capture you at the point of purchase, it's

19  really critical.  And that's happening because of, frankly,

20  smart phones.

21  **Q.**   Last question.  So, now, a year after the acquisition, do

22  you think the rationale that you've shown us in the documents

23  and that you've described -- in hindsight, do you still think

24  the acquisition made sense for Bazaarvoice?

25  **A.**   Uhm, yes and no.  Yes, because of all the reasons that

1  were articulated; and no, because we're actually having this

2  conversation.

3      And I still find it hard to believe we're here talking

4  about an antitrust case involving a market that is staggeringly

5  large and in its nascent state.

6          **MR. FELDMAN:**  Okay.  I don't have anything else.

7  Thank you.

8          **MR. HUSTON:**  Your Honor, if I may hand up a binder of

9  documents we may use with this witness.

10         **THE COURT:**  Please.  Thank you.

11         **MR. HUSTON:**  May I approach, Your Honor?

12         **THE COURT:**  Yes.

13     Mr. Huston.

14                    <u>**CROSS EXAMINATION**</u>

15 **BY MR. HUSTON**

16 **Q.**  Good morning, Mr. Meredith.

17 **A.**  Good morning.

18 **Q.**  So we met a couple of months ago in Austin.  I'm sure you

19 recall.

20     You are an outside director of Bazaarvoice, correct?

21 **A.**  Correct.

22 **Q.**  And you joined the board in 2010?

23 **A.**  Correct.

24 **Q.**  And when you joined the board, one of the things you did

25 to get up to speed was to read *Social Commerce for Dummies*,

1    correct --

2    **A.**    Correct.

3    **Q.**    -- among other books?

4         And you are a shareholder of Bazaarvoice, correct?

5    **A.**    Correct.

6    **Q.**    And your family trust owns shares in Bazaarvoice?

7    **A.**    Correct.

8    **Q.**    And you are also a defendant in a lawsuit that's pending

9    down in Texas having to do with the same facts that we're

10   dealing with in this lawsuit, correct?

11   **A.**    Correct.

12   **Q.**    And if you look in your binder, it's labeled GX1202.

13   **A.**    Right.

14   **Q.**    That's the copy of the complaint that we were just talking

15   about, this complaint down in the Texas state court, correct?

16   **A.**    Correct.

17         **MR. HUSTON:**  Your Honor, at this time I would move

18   admission of GX1202 in into evidence.

19         **THE COURT:**  Hearing no objection, it's admitted.

20         **MR. FELDMAN:**  Well --

21         **THE COURT:**  Go ahead, Mr. Feldman.

22         **MR. FELDMAN:**  Given what it is, it's not worth burning

23   fuel over.  There's actually no foundation for it.  It's a

24   pleading.  It's a plaintiff's lawyer's view of the world.

25         **THE COURT:**  We all know what it is, Mr. Feldman.

1403

1          **MR. FELDMAN:**  No objection.

2          **THE COURT:**  Okay.  It's admitted.

3          (Plaintiff's Exhibit GX1202 received in evidence)

4     **BY MR. HUSTON**

5     **Q.**   Now, we mentioned just a moment ago that you're an outside

6     director.  By an outside director, that means you're not

7     employed at all at Bazaarvoice, correct?

8     **A.**   Correct.

9     **Q.**   And you've never been employed at Bazaarvoice?

10    **A.**   Correct.

11    **Q.**   And you don't have any day-to-day responsibilities at

12    Bazaarvoice?

13    **A.**   Uhm, I have day-to-day responsibilities in the context of

14    being a board member, but not as an employee.  And I

15    distinguish between the two.

16    **Q.**   And there are significant differences between being an

17    outside director and being someone in management?

18    **A.**   Correct.

19    **Q.**   Outside director is more an oversight role.  Would you

20    agree?

21    **A.**   Correct.

22    **Q.**   And it's a part-time position?

23    **A.**   Correct.

24    **Q.**   And as an outside board member, you would attend board

25    meetings, I assume?

1404

1   **A.**   Correct.

2   **Q.**   And prepare for those board meetings?

3   **A.**   Correct.

4   **Q.**   But your main job is with your company, Meritage Capital,

5   correct?

6   **A.**   My main job in terms of time allocated to any one

7   activity, yes.

8   **Q.**   Okay.  Now, Meritage Capital is an investment fund, and

9   that fund invests in hedge funds.  Do I have that right?

10  **A.**   Correct.

11  **Q.**   And that takes up the lion's share of your time?

12  **A.**   About 50 percent of my time.

13  **Q.**   All right.  And you mentioned during your examination with

14  Mr. Feldman that you were a member of some other boards,

15  correct?

16  **A.**   Correct.

17  **Q.**   And there were some I think you left out.  You're also the

18  vice-chair of Brightstar?

19  **A.**   Correct.

20  **Q.**   And the chairman of a company called IPX?

21  **A.**   Correct.

22  **Q.**   And you're a board member of a company called Rallyhood?

23  **A.**   Also true.

24  **Q.**   And a board member of a company called Macheen?

25  **A.**   Correct.

1    **Q.**    And also an advisory board member of The Watson Group?

2    **A.**    Yes.

3    **Q.**    And also a board member of the University of Texas LBJ

4    School, correct?

5    **A.**    Advisory board.

6    **Q.**    And all those things take up some of your time as well,

7    correct?

8    **A.**    Yes.

9    **Q.**    Now, Mr. Hurt is a codirector of yours at Bazaarvoice,

10   correct?

11   **A.**    Correct.

12   **Q.**    And he's currently the vice-chair?

13   **A.**    Correct.

14   **Q.**    And he was the cofounder of the company?

15   **A.**    Correct.

16   **Q.**    And he was also the CEO from the time it was founded up

17   until November of 2012?

18   **A.**    Correct.

19   **Q.**    And you're aware that Mr. Hurt has testified in this

20   trial?

21   **A.**    Yes, I am.

22   **Q.**    And is it fair to say that he would know more about the

23   details of Bazaarvoice than you would?

24   **A.**    Yes.

25   **Q.**    And is it fair -- actually, let me switch gears.

1    Mr. Collins, he's also one of your co-board members at

2  Bazaarvoice?

3  **A.**    Correct.

4  **Q.**    And, whereas, you're an outside director, he would be

5  considered an inside director, correct?

6  **A.**    Yes.

7  **Q.**    Because he's currently the CEO?

8  **A.**    Yes.

9  **Q.**    And was formerly the CFO of the company?

10  **A.**    Correct.

11  **Q.**    And is it fair to say that Mr. Collins knows more about

12  the details of the company than yourself?

13  **A.**    Yes.

14  **Q.**    And you understand that Mr. Collins has testified during

15  this trial?

16  **A.**    Yes.

17  **Q.**    Now, generally, the management of Bazaarvoice, which works

18  full-time at the company, would have more detailed information

19  than yourself, who's a part-time outside board member?

20  **A.**    In general, yes.

21  **Q.**    For example, as an outside director, you didn't have

22  access to Bazaarvoice's business documents or sales data?

23  **A.**    On a regular basis, true.

24  **Q.**    And you never set out to do any sort of systematic study

25  or analysis of Bazaarvoice's sales data?

1   **A.**   Uhm, may I clarify that?  Do you want a yes/no answer?

2   **Q.**   A yes or no, and then clarify if you could.

3   **A.**   Okay.  No, never a systematic approach.  But early in my

4   tenure as a board member, when I was not chair, we reported our

5   first public quarterly results -- or, actually, private company

6   results.  And we had missed.

7        And I was invited by the then-CEO and chair, Brett Hurt,

8   to actually meet with the head of sales, Michael Osborne.  And

9   while that was not a systematic study, it was a time period

10   when, in anticipation of going public, it was always important

11   to actually underpromise and overdeliver as a general construct

12   for companies about to go public.

13        And the consequence of a miss was a big deal.  It's like

14   an alarm.  And so myself and other board members were

15   concerned.  Brett invited me, since I was local, to go in and

16   have conversations in a fairly intense period where I became

17   familiar with the players as well as some of what was

18   happening.

19   **Q.**   Okay.  And you know that Bazaarvoice markets some of its

20   services under what it calls a conversations platform, correct?

21   **A.**   Correct.

22   **Q.**   But you don't know the details of what products are within

23   that platform, correct?

24   **A.**   Correct.

25   **Q.**   And you don't know what the new Bazaarvoice ratings and

1   reviews platform is named or how it's being marketed, correct?

2   A.   Correct.

3   Q.   You don't know how the platform that Bazaarvoice acquired

4   from PowerReviews is being marketed, correct?

5   A.   In general, correct.

6   Q.   And with respect to how Bazaarvoice prices its products,

7   people in management would know best about that, correct?

8   A.   True.

9   Q.   And you don't have any visibility into Bazaarvoice's

10  discounting practices, correct?

11  A.   Oh, I definitely have insights into their discounting

12  practices.

13  Q.   Okay.

14      **MR. HUSTON:**   Seth, can you play clip 8 from

15  Mr. Meredith's deposition, please.

16      (Videotaped testimony played as follows:)

17      "Q.   Forgive me if I asked this already, but did you have

18      a visibility into Bazaarvoice's discounting practices?

19      "A.   Not really, no.

20      "Q.   Did you have a sense of whether PowerReviews, or the

21      presence of PowerReviews, was causing Bazaarvoice to have

22      to discount its rating and review product prior to them

23      being acquired by Bazaarvoice?

24      "A.   At least a few salespeople thought that PowerReviews

25      was causing Bazaarvoice to have to discount our product.

1    "Q.  Okay.  And did you believe that as well?

2    "A.  I didn't have an opinion one way or the other.

3    "Q.  Is it accurate to say you just didn't have the data?

4    "A.  That would be why I didn't have an opinion one way or

5    the other.

6    "Q.  Okay."

7         MR. FELDMAN:  Could we have the page identified, Your

8    Honor?

9         MR. HUSTON:  I'm sorry, that was page 138.

10        MR. FELDMAN:  Thank you.

11   BY MR. HUSTON

12   Q.  Now, Bazaarvoice has a network.  Is that fair to say?

13   A.  Yes.  I was going to suggest I'd like to clarify that.

14   But your question?

15   Q.  Bazaarvoice has a network, correct?

16   A.  Correct.

17   Q.  And with respect to the products rating and reviews, you

18   can't really speak to the relationship between the Bazaarvoice

19   network and syndication, correct?

20   A.  A network is the potential to actually connect, if you

21   will, or syndicate data.  And Bazaarvoice has a network and we

22   have syndication capabilities.  But the syndication

23   capabilities are largely in a dial-up stage, not necessarily

24   robustly enabled.  And it's actually a problem with our

25   historic platform, which is why we've spent the last two years

1  rebuilding the platform.

2  **Q.**   Okay.  You'll recall in your deposition I asked you these

3  questions about syndication and you said you could speak to it

4  with respect to media, but with respect to ratings and reviews

5  that wasn't your area of expertise and you couldn't speak to

6  it.  Do you remember that?

7  **A.**   Yes.

8  **Q.**   Now, you would be less qualified than someone in

9  management to discuss Bazaarvoice's business strategy and

10  plans, correct?

11  **A.**   I'm sorry, repeat the question.

12  **Q.**   Sure.  You would be less qualified than someone in

13  management -- for example, Mr. Collins -- to discuss

14  Bazaarvoice's business strategy and plans?

15  **A.**   True.

16  **Q.**   And you're not aware of how Bazaarvoice markets its

17  products or services, correct?

18  **A.**   True.

19  **Q.**   And you'd be less qualified than management to talk about

20  the business conditions that Bazaarvoice faces since the

21  merger, correct?

22  **A.**   True.  Than management.

23  **Q.**   And you'd be less qualified than them to talk about

24  Bazaarvoice's customers.  Is that fair?

25  **A.**    True.

1   **Q.**   And less qualified to talk about the competition that

2   Bazaarvoice faces, correct?

3   **A.**   True.

4   **Q.**   And, for example, you don't have much information about

5   companies like Pluck or Reevoo or Gigya or Viewpoints, correct?

6   **A.**   Not as much as management.

7   **Q.**   Questions about those companies would be better suited for

8   the sales organization, correct?

9   **A.**   Uhm, for management, possibly sales.

10   **Q.**   Okay.  And you don't have a sense of what sort of

11   competitive impact those companies, the ones I just mentioned,

12   are making on Bazaarvoice currently, correct?

13   **A.**   Correct.

14   **Q.**   And before Bazaarvoice acquired PowerReviews, you didn't

15   have a detailed understanding of Bazaarvoice's competitive

16   efforts against PowerReviews, correct?

17   **A.**   Correct.  No detailed understanding.

18   **Q.**   And you were not updated as to the competitive issues that

19   Bazaarvoice was facing as to any specific customers -- or

20   competitors?  I'm sorry.

21   **A.**   I'm sorry, say the question again.

22   **Q.**   Sure.

23        You were not updated as to any competitive issues that

24   Bazaarvoice was facing specific to any competitors?

25   **A.**   Fair.

1412

1   **Q.**   Okay.  And you got your information from Bazaarvoice's

2   salespeople that PowerReviews was a thorn in Bazaarvoice's

3   side, correct?

4   **A.**   Yes.

5   **Q.**   And you had a general understanding that PowerReviews

6   brought Bazaarvoice's prices down, correct?

7   **A.**   That was the assertion by the salespeople.

8   **Q.**   And we talked -- you talked already about Project

9   Menlogeddon with your counsel.  Now, that was a competitive

10  initiative that was focused on PowerReviews, correct?

11  **A.**   Correct.

12  **Q.**   And you're not aware of any similar initiative focused on

13  any other competitor, correct?

14  **A.**   I am not.

15  **Q.**   Now, you mentioned in-house -- in-house or I think you

16  called "not invented here" in your testimony with Mr. Feldman.

17  Do you remember that?

18  **A.**   Uh-huh.

19  **Q.**   Now, it's your position that there's a natural proclivity

20  on the part of chief information officers to think that they

21  can build something that's as good as Bazaarvoice, but they

22  typically find out that's not true, they can't do it as well,

23  correct?

24  **A.**   Well, they may or may not be able to.

25  **Q.**   Okay.  And they can't, if they build it in-house, plug

1   into a network the way a customer at Bazaarvoice can, correct?

2   **A.**   Not necessarily.  So if IBM or Teradata or eBay or Amazon

3   decided they wanted to go into the space in a big way, they

4   would have expansive network capabilities and syndication

5   capabilities, but they'd have to decide to do that.

6   **Q.**   And I'd like to turn to the acquisition of PowerReviews.

7   You talked a little bit about that with Mr. Feldman.

8       There was a serious effort by Bazaarvoice to acquire

9   PowerReviews in the spring of 2011, correct?

10  **A.**   Correct.

11  **Q.**   And if you turn to GX518 in your binder, this is -- if you

12  go down to the bottom of that first page, there's an email from

13  Mr. Hurt to the board.  Do you see that?

14  **A.**   Uh-huh.

15  **Q.**   And in the "To" information you're listed there, correct?

16  **A.**   Yes.

17  **Q.**   And if you flip over to the next page where the text of

18  the email gets tarted, up at the top it says:

19      "This Friday, Brant, Stephen and I are meeting with

20      PowerReviews' CEO and new CFO at Austin Ventures for four

21      hours to explore a potential acquisition of their

22      company."

23      Do you see that?

24  **A.**   Uh-huh.

25  **Q.**   Now, the Brant there, that's Brant Barton, one of the

1414

1  cofounders, correct?

2  **A.**   Correct.

3  **Q.**   And the Stephen, that would be Stephen Collins?

4  **A.**   Correct.

5  **Q.**   And the -- okay.  And then it goes on and it says:

6       "In Brant's role, he advocated for us exploring this

7       option and Stephen and I, along with Osborne and Mike,

8       believe it is an opportunity we need to consider."

9       Now, the Osborne there, that would be Michael Osborne, the

10  chief revenue officer, correct?

11  **A.**   Correct.

12  **Q.**   And the Mike in that sentence would be Mike Svatek?

13  **A.**   Correct.

14  **Q.**   He's the chief product officer, correct?

15  **A.**   At the time.

16  **Q.**   And then it goes on to say:

17       "Potentially taking out our only competitor, who is

18       both suppressing our price points by as much as

19       15 percent, according to Osborne, and also hurting us in

20       France and Germany with a lower competitive win rain as

21       Shopzilla resells them, could be a highly strategic move

22       and pay for itself in a potential valuation lift for our

23       company."

24       So when you received this, did you understand that

25  Mr. Barton and Mr. Collins and Mr. Osborne and Mr. Svatek and

1415

1    Mr. Hurt all believed that PowerReviews was essentially

2    Bazaarvoice's only competitor?

3    **A.**    No.

4         **MR. FELDMAN:**  Objection.  Mischaracterizes the

5    document.

6    **BY MR. HUSTON**

7    **Q.**    You did not believe that?

8    **A.**    No.

9    **Q.**    Okay.  And did you believe any of those gentlemen thought

10   that?

11   **A.**    You'd have to ask them.

12   **Q.**    Okay.  But when they wrote that in this document, you

13   discounted it?

14   **A.**    Yes.

15   **Q.**    Okay.  You didn't believe that they were telling you the

16   truth?

17   **A.**    No.  I discounted the fact that they were young and

18   inexperienced and perhaps this was their, in some respects,

19   first rodeo and that they actually may have believed it.  But I

20   didn't believe it for a minute because -- for the reason,

21   again, I joined the company is because it's at this

22   intersection of a space that I consider to be vibrant, nascent,

23   and likely to continue to explode in terms of the opportunity

24   that it presents.

25   **Q.**    Okay.  And that explosion that you're talking about, being

1  able to connect all these things that you talked about, you've

2  testified that that's two, three, four, five years out in the

3  future, correct?

4  **A.**   It's out in time.

5  **Q.**   Okay.

6          **THE COURT:**  I'm sorry, what did you say?

7          **THE WITNESS:**  It's out in time.  Sorry.

8  BY MR. HUSTON

9  **Q.**   Now, this document goes on to state -- it's a little bit

10  farther down in the paragraph we were just reading, and it

11  says:

12          "And, of course, some big clients like Drugstore.com,

13      Orbitz, Radio Shack, REI, Staples, and Toys 'R Us that

14      have been difficult to dislodge."

15      Do you see that?

16  **A.**   Uh-huh.

17  **Q.**   Now, you don't have any reason to disagree with them

18  saying that those were difficult to dislodge?

19  **A.**   No.

20  **Q.**   Now, Mr. Hurt and Mr. Collins -- actually, strike that.

21      At the time that they wrote this document to you and

22  others on the board, and said that PowerReviews was

23  Bazaarvoice's only competitor, did you tell them at that time

24  that you thought they were wrong?

25  **A.**   Uhm, I don't recall.

1  Q.   Okay.  And Bazaarvoice at this time, back in the spring of

2  2011, didn't buy the company in part because they thought the

3  price was too high, correct?

4  A.   Uhm, are you asserting that Bazaarvoice took the decision

5  not to buy because the price was too high?

6  Q.   I'm asking you whether one of the reasons that the deal

7  didn't go through at that time was that Bazaarvoice thought

8  that PowerReviews was too expensive?

9  A.   Uhm, no, I wouldn't say that at all.

10  Q.   All right.  If you take a look at page 104 of your

11  deposition, and it's the last tab in your binder, GX491.  I'll

12  direct your attention down to the bottom of the page.

13       You see that it says --

14  A.   Which page?  I'm sorry.

15  Q.   Page 104.

16  A.   Sorry.

17  Q.   And starting at line 20, it says:

18           "Okay.  Specifically to the price issue, do you

19       remember back in that 2011 time period what the discussion

20       was about at the board level with respect to a potential

21       price for PowerReviews?

22       "A.   No, other than we thought it was too expensive."

23       Do you see that?

24  A.   That it was expensive.  It doesn't say "too expensive."

25  Q.   I'm sorry.  That it was expensive.

1        And by expensive --

2   **A.**   And it was prepublic.  And that was the real issue.

3        The board was adamant and I personally was adamant that we

4   not actually go down this path prior to going public.

5   **Q.**   All right.  But, also, there was a thought that it was

6   expensive?

7   **A.**   Yes.

8   **Q.**   But Bazaarvoice ended up --

9   **A.**   Not too expensive.

10  **Q.**   All right.  Bazaarvoice ended up paying more than was

11  being discussed back in the spring time period when it

12  ultimately acquired PowerReviews, correct?

13  **A.**   Well, and they'd raised $10 million.  By definition, the

14  value had gone up.

15  **Q.**   And Bazaarvoice paid a premium for PowerReviews, correct?

16  **A.**   Rarely do acquisitions get accomplished without paying a

17  premium.

18  **Q.**   All right.  So the answer to my question is yes?

19  **A.**   Yes.

20  **Q.**   All right.  Now, take a look at Exhibit 1175 in your

21  binder, please.

22  **A.**   I'm sorry, which --

23  **Q.**   It's GX1175.

24  **A.**   Uh-huh.

25  **Q.**   Now, you understood this document to be Mr. Hurt's view on

1   why it made sense to buy PowerReviews, correct?

2   **A.**   I understood this to be Hurt's email to the board, which I

3   assume he and Stephen, and perhaps others, had collaborated in

4   writing.

5   **Q.**   All right.  And if you look down at the bottom, this list

6   of eight things -- actually, eight things down at the bottom,

7   and it says "no meaningful direct competitor."

8        You see that, right?

9   **A.**   Yes.

10   **Q.**   Now, that's the same statement, essentially, as Mr. Hurt

11   had expressed before, correct?

12   **A.**   Correct.

13   **Q.**   So he still believed it as of this time, which was the

14   fall of 2011?

15        **MR. FELDMAN:**  Objection.  Calls for speculation.  No

16   foundation.

17        **THE COURT:**  You can answer as to what you understood

18   Mr. Hurt's opinion to be.

19        **THE WITNESS:**  He may have believed it.

20   **BY MR. HUSTON**

21   **Q.**   Okay.  Now, when I showed you this document at your

22   deposition, you said:

23        "By the way, you'll notice that he is not CEO

24      anymore."

25      Remember that?

1420

1   **A.**   I do.

2   **Q.**   Now, the current CEO is Mr. Collins, correct?

3   **A.**   Correct.

4   **Q.**   And you had something to do with Mr. Collins becoming the

5   CEO, correct?

6   **A.**   The board did, yes, and I was part of the board.

7   **Q.**   Okay.  And Mr. Collins held these same views, correct?

8   **A.**   Correct.

9   **Q.**   Now, Bazaarvoice did not acquire PowerReviews after this

10  memo either, correct?

11  **A.**   Correct.

12  **Q.**   Because of the issue you were expressing earlier,

13  prepublic?

14  **A.**   Correct.

15  **Q.**   All right.  When the acquisition ultimately took place,

16  the strategic rationale for the deal was brought to the board

17  by management, correct?

18  **A.**   Correct.

19  **Q.**   And there was due diligence that had been done, correct?

20  **A.**   Uh-huh.

21  **Q.**   But you, yourself, can't have anything to do with the due

22  diligence?

23  **A.**   Did not.

24  **Q.**   And you learned of the results of that due diligence

25  through management?

1  **A.**  Correct.

2  **Q.**  You didn't take part in any meetings with PowerReviews,

3  did you?

4  **A.**  No.

5  **Q.**  Okay.  And you didn't negotiate the purchase price?

6  **A.**  Correct.

7  **Q.**  It's fair to say that your views about the reasons for the

8  deal were different than other board members' views?

9  **A.**  Employee board members, yes.

10  **Q.**  And even some outside directors, correct?

11  **A.**  Potentially.

12  **Q.**  Okay.  And ratings and reviews, just focusing on that for

13  a minute, is the top moneymaker at Bazaarvoice, correct?

14  **A.**  Correct.

15  **Q.**  And is it your understanding that Bazaarvoice's ratings

16  and review clients generally believe that they have to have

17  that service on their websites?

18  **A.**  I assume so because that's why they presumably bought it.

19  **Q.**  Okay.  They feel like they'd stand out in a negative way

20  if they didn't have it compared to their peers, correct?

21  **A.**  There's a lot of people who haven't actually bought the

22  product yet, so I suspect there may be a view that there are

23  other ways to get to the same result.

24  **Q.**  Now, I think we talked a little bit about the Bazaarvoice

25  network.

```
 1        PowerReviews had its own network correct?

 2   A.   I'm sorry?

 3   Q.   We talked a little bit about the Bazaarvoice network.

 4        PowerReviews had its own network, correct?

 5   A.   Correct.

 6            MR. HUSTON:  Seth, can we play clip 017.

 7        And this is from page 120 of Mr. Meredith's deposition.

 8            MR. FELDMAN:  Is this impeachment, Your Honor?

 9            THE COURT:  They are entitled to play the deposition

10   of the chair of the board.

11        (Videotaped testimony played as follows:)

12        "Q.  Okay.  What were the benefits of competition?

13        "A.  I believe in competition.

14        "Q.  Okay.

15        "A.  Competition breeds innovation.  It breeds time to

16        market.  It actually enhances people's lives.  And the

17        beauty of technology, again, in the space I have spent the

18        better part of my professional career in, is that we are

19        constantly innovating.  And the more open you are, the

20        more competition you'll get, and, frankly, the better

21        everybody all -- and prices always go down.  They don't go

22        up.

23        "Q.  Right.

24        "A.  And if they actually remain stable, they're going up,

25        unless you're giving more feature functionality as part of
```

1   that.  And that's the world in which we live because

2   that's how technology plays out.  And it's as true today

3   as it was 40 years ago when I essentially joined Amdahl.

4   Or 35 years ago, whatever it was."

5 **BY MR. HUSTON**

6 **Q.** Do you still agree with that today?

7 **A.** Yes.

8 **Q.** Okay.  I'd like to speak briefly about the subject of

9 moderation.  You know what moderation is, right?

10 **A.** Uh-huh.

11 **Q.** Now, Bazaarvoice's moderation capability gave it a

12 competitive advantage, correct?

13 **A.** I'm going to take issue with the phrase "competitive

14 advantage," but, yes.

15 **Q.** Okay.

16   **MR. HUSTON:**  Let's -- if we could play clip 20, Seth.

17   **MR. FELDMAN:**  What page?

18   **MR. HUSTON:**  Oh, I'm sorry, this is page 197, starting

19 at line 23.

20   (Videotaped testimony played as follows:)

21   "**Q.**  Then the next thing that's listed here under barriers

22   to entry is 'moderation capabilities.'  Actually, it says

23   'unique content moderation capabilities.'

24    "What's your understanding of how Bazaarvoice's

25   moderation capabilities provide it with a barrier to entry

1        or competitive advantage?

2        "A.   Well, a lot of the wannabe ratings and reviews

3        players have, actually, an inability to determine whether

4        or not you're gaming the system, because you're the

5        manufacturer or brand and you're actually getting us to

6        essentially go in and pound favorable -- five ratings --

7        five-star ratings.  We can sort that out in a heartbeat.

8        And that authenticity is ensured by virtue of being with

9        us as opposed to some of the other places out there."

10   BY MR. HUSTON

11   Q.   And you agree with that, sitting here today?

12   A.   I do.

13   Q.   And sitting here today, is it accurate to say that the

14   majority of Bazaarvoice's revenues comes from the software

15   licensing fees that come from its ratings and review product?

16   A.   Correct.

17          MR. HUSTON:  Nothing further at this time, Your Honor.

18          THE COURT:  Thank you.

19       Mr. Feldman.

20          MR. FELDMAN:  Thank you.

21                    REDIRECT EXAMINATION

22   BY MR. FELDMAN

23   Q.   Just two things, Mr. Meredith.  Government Exhibit 508,

24   which is in that binder.  It's also Government Exhibit 1853 and

25   various others.  This is one of the greatest hits, so it shows

1    up repeatedly.  This was the one from Hurt to the board in May

2    of '11.  And at the top Ed Keller says, quote:

3              "It doesn't really excite me either" -- GX518.

4              "It doesn't really excite me either.  Seems like at

5         best we buy some clients and maybe, just maybe, we reduce

6         some pricing pressure, although I'm skeptical it would be

7         enough to justify the price."

8         Who was Ed Keller?

9    A.   A board member at the time, and still is.

10   Q.   Do you remember him expressing that view around that time?

11   A.   Yes.

12   Q.   Was that your view as well?

13   A.   Yes.

14   Q.   Okay.  Let me turn you -- Mr. Huston read to you from your

15   deposition transcript on page 138.  You recall he asked you, at

16   line 6:

17        "Q.  Did you have a sense of whether PowerReviews or the

18        presence of PowerReviews was causing Bazaarvoice to have

19        to discount its ratings and review product prior to them

20        being acquired by Bazaarvoice?"

21        And you answered:

22             "At least a few salespeople thought that PowerReviews

23        was causing Bazaarvoice to have to discount our product."

24        He didn't read the rest of that page.  Line 21:

25        "Q.  Okay."

1       Twenty-two:

2           "A.  And, again, as a recovering chief financial officer,

3       I'm skeptical about sales guys and their excuses for why

4       [expletive deleted] didn't happen."

5       What did you mean when you said that?

6   A.  Uhm, that my experience of many years as somebody being

7   responsible for financial results of an organization, of which

8   I had a role, has taught me that salespeople will look for any

9   excuse and land on it and hold fervently to that belief.  And

10  they actually believe it because that's the world in which they

11  live.  But if you're above the fray, above the trees, you

12  sometimes have a different perspective.

13          And as I think I may have said somewhere in the

14  deposition, selling begins with the word "no."  And that's when

15  you're selling.  And, frequently, salespeople like to be in a

16  position of taking orders as opposed to selling.

17          And so a new smart phone comes out like an iPhone, and all

18  of a sudden people take orders and sales guys think they're

19  geniuses.  Kind of like the market's hot and I'm an investor,

20  and I make lots of money and I'm a genius, right up until the

21  trend reverses.  So the notion that they had latched onto a

22  player such as PowerReviews is not shocking at all.  And they

23  believed it.

24          I, however, have my Doubting Thomas role as a naysayer,

25  basically, to say, let's really probe on this, which is one of

 1   the reasons why Brett Hurt had invited me to go visit with

 2   Michael Osborne, to see if I could sleuth out what was really

 3   happening with any great degree.

 4           **MR. FELDMAN:**  Okay.  Thank you.  Nothing further.

 5           **THE COURT:**  Mr. Huston.

 6           **MR. HUSTON:**  Just a couple, Your Honor.

 7                        **RECROSS EXAMINATION**

 8   **BY MR. HUSTON**

 9   **Q.**   Mr. Meredith, if you could turn to Exhibit 424 in your

10   binder.  And if you actually start on the -- the second page is

11   where I'd like to start.  There's an email from the board -- or

12   to the board, I'm sorry, from Mr. Hurt.

13          And some of this document is redacted on the public

14   screen, but he basically says:

15              "Okay.  So I'm rounding up by just a hair, but this

16          is a great [blank] win over PowerReviews."

17          Do you see that?

18   **A.**   Uh-huh.

19   **Q.**   And then flipping back a page to the first page of the

20   exhibit, there's a email from Mitchell Green.

21          And Mitchell Green was a board observer at Bazaarvoice,

22   correct?

23   **A.**   Uh-huh.

24   **Q.**   And Mitchell Green writes:

25              "Did PowerReviews being there force us to have to

1      lower pricing?"

2      And then above that Mr. Hurt writes:

3          "There's no doubt that PowerReviews brings our

4      pricing down."

5          Do you see that?

6  **A.**   Yes.

7  **Q.**   Now, Mr. Hurt was above the trees.  He was the CEO of the

8  whole company, correct?

9  **A.**   Correct.

10         **MR. HUSTON:**  Okay.  No further question, Your Honor.

11                   **FURTHER REDIRECT EXAMINATION**

12  **BY MR. FELDMAN**

13  **Q.**   Let's just stay with that document.  Let me read to you

14  the next paragraph, we didn't quite get there yet.  Quote:

15         "PowerReviews has recently tried to steal both

16     Best Buy and Walmart but were unsuccessful.  They are a

17     thorn in our side, no doubt about it.  But it keeps the

18     space interesting.  No major detections to them (or minor

19     ones that I can think of) anytime recently, though.  Our

20     services, breadth of solutions, global reach, large blue

21     chip client base, and network effect (i.e. the BV network

22     of content syndication) all help build defensive barriers

23     to entry."

24     Do you recall management advising you that after this

25  Cathy Halligan campaign, PowerReviews didn't strip away a

1    single customer?

2    **A.**   Yes.

3              **MR. FELDMAN:**   Thank you.

4              **MR. HUSTON:**   Nothing further, Your Honor.

5              **THE COURT:**   Mr. Meredith, before you go, would you

6    just explain to me why you believe that Bazaarvoice lives in

7    this space between the cloud and social media and big data and

8    something else?

9              **THE WITNESS:**   Your Honor, I'd be pleased to do that,

10   or try to.

11             When you think of some of the data I provided earlier, in

12   terms of unique impressions, 400 million unique impressions,

13   Bazaarvoice has roughly 3,000 clients.  Of the 3,000, we have,

14   I don't know, 30, 40 percent of the IR500.  We have, probably,

15   20 percent of the -- or a little bit more of the Fortune 500.

16             And each of those cases, in the case of brands and also

17   the retailers, give us access to their most valuable asset,

18   which is their website, their online presence.

19             And as I mentioned earlier, 10 trillion is offline,

20   1 trillion is online.  The ad revenues that are essentially

21   being expended today online is roughly 10 percent of all ad

22   revenues globally.  That 10 percent pales in comparison to how

23   many people are using online to actually take decisions to buy

24   or take a decision to buy offline or online.  And that's about

25   30 percent.  So there's a mismatch.

```
 1        And what's happening is ad dollars are gravitating,
 2   they're trying to sort out how this is all going to work.  And
 3   the beauty of the Bazaarvoice model and the cloud is that it is
 4   cloud-based; it is SaaS.  So it's software as a service.  It's
 5   pay as you go.
 6        And it's also the ability to gather information and data
 7   about individual consumer behaviors.  So it's your preferences
 8   for X versus Y.  It's your location at any moment in time,
 9   literally any moment in time.
10        And fairly soon you'll have the ability as a consumer, as
11   I will, to actually look at a QR code, actually take a photo of
12   it and as that photo will then tell me exactly where you are,
13   you're in a store, you're in this particular store, and I can
14   provide you with an email saying, hey, if you buy this now,
15   here's a 10 percent discount.
16        I mean, that's where we're headed as a society.  It's
17   powerful.  And the more data I have and the ability I have to
18   syndicate your data from that store to the next store you go to
19   is infinitely valuable.
20        Does that help?
21        THE COURT:  Yes.  Thank you.  And thank you for your
22   testimony.
23        THE WITNESS:  Thank you.
24     (Witness steps down)
25        MR. SHER:  Good morning, Your Honor.
```

1      Bazaarvoice would like to call its next witness, Mr. Jason

2   Goldberg.

3                        **JASON GOLDBERG**,

4   called as a witness for the Defendant, having been duly sworn,

5   testified as follows:

6           **THE WITNESS:**  I do.

7           **THE CLERK:**  Be seated.

8      Please state your full name and spell your name for the

9   court reporter.

10          **THE WITNESS:**  Jason Goldberg.  J-a-s-o-n

11  G-o-l-d-b-e-r-g.

12          **MR. SHER:**  Your Honor, may I approach the bench?

13          **THE COURT:**  Yes.

14                    **DIRECT EXAMINATION**

15  BY MR. SHER

16  **Q.**   Good morning, Mr. Goldberg.

17  **A.**   Good morning, Mr. Sher.

18  **Q.**   Mr. Goldberg, before we start and get into your

19  experience, we handed you a summary in that binder -- it's the

20  second tab -- of your professional experience that we prepared

21  based on your deposition and expert report testimony.

22      If you can just take a moment to look at that.

23  **A.**   Okay.

24  **Q.**   And before we go through your CV in great detail,

25  Mr. Goldberg, can you please provide the Court an overview of

GOLDBERG - DIRECT / SHER

1    your professional experience.

2    **A.**    Sure.  So I'm a shopper marketing consultant.  I work with

3    brands and retailers to help them craft customer experiences

4    that help them achieve their business objectives.  And most of

5    those customer experiences involve a significant digital

6    component; so things like websites and mobile apps and things

7    of that nature.

8         I've been doing it for more than 20 years.  And I was

9    around at the very beginning of the eCommerce industry.  So

10   today I feel like I'm pretty well-known in the space, and

11   recently elected to the board of directors of our trade

12   organization in the industry.

13   **Q.**    Great.  And that's called?

14   **A.**    Shop.org.

15   **Q.**    You prepared a slide that we're going to use, that you

16   mentioned the term "shopper marketing."  And I was wondering if

17   you can explain to the Court what shopping marketing is and

18   what that contains?

19   **A.**    Sure.  So i view shopper marketing as a relatively broad

20   term that talks about all the kinds of communication that we

21   have with shoppers, to help them make better purchase

22   decisions.  And sometimes better means help the customer find

23   what they really want.  Sometimes it helps mean introduce them

24   to new brands they wanted to wear or things like that.

25        And then you're -- you're now showing digital marketing,

1  which I consider to be a substantial subset of shopper

2  marketing.

3       So in 1990, digital marketing was probably not a part of

4  shopper marketing at all.  Today it very often is the lion's

5  share of shopper marketing.

6       And I would just say there are other forms of digital

7  marketing that are unrelated to shopper marketing.  So I'm just

8  talking about the subset that relates to shopper marketing.

9       And then when we talk about eCommerce, eCommerce is a

10  super important and specific sub component of digital marketing

11  that I spend an awful lot of time with.

12       And then what I suspect we're mostly interested in talking

13  about here today is social commerce, which is a newer subset of

14  eCommerce.  And then, most specifically of all, to me, ratings

15  and reviews are a subset of the social commerce space.

16       So does that make sense?

17  Q.   Yes.  Thank you, Mr. Goldberg.

18       And so back to your employment now, in reverse

19  chronological order can you tell the Court where you're

20  currently employed.

21  A.   Sure.  So today I'm the director of commerce strategy for

22  Razorfish.

23  Q.   What is Razorfish?

24  A.   Razorfish is a very large digital marketing agency.  So

25  they were, well before my time, one of the first agencies in

1    the space.  Today they're amongst the largest agencies.

2         So they work with brands and retailers to help get their

3    message out.  They do a awful lot of what the last witness

4    talked about, in terms of helping customers discover ads and

5    make good shopping experiences.

6         And we -- we enjoy a very good reputation in the

7    marketplace, where the -- the publication that follows our

8    industry is called *Ad Age*, and they publish an annual list of

9    agencies.  And we've been the highest-ranked digital agency on

10   that list the last couple of years.  And we're the only agency

11   to be on that list two years in a row.  So that's a distinction

12   we're very proud of.

13   Q.   And how many people are employed at Razorfish?

14   A.   So the number is ever changing, if anyone is looking for a

15   gig.  But we're about, I want to say, between 2,700 and 3,000

16   people today.

17   Q.   And is Razorfish an independent company?

18   A.   We're not.  We're owned by a larger, what I would called

19   holding company called Publicis Group.  And Publicis Group is a

20   French firm that owns a lot of agencies like us and some

21   adjacent agencies.  So they own three or four digital marketing

22   agencies similar to Razorfish, that we would call our sister

23   agencies.

24        And then they also own a lot of traditional advertising

25   firms.  So Publicis Group own Saatchi & Saatchi, and Leo

1    Burnett, and a lot of the guys that are portrayed on Mad Men,

2    for example.

3    Q.   And how many people work at Publicis?

4    A.   I think it's about 60,000 today.

5    Q.   And you mentioned you're presently employed at Razorfish.

6    When were you hired?

7    A.   I think I was hired at the very end of October of 2012.

8    Q.   And what's your position at Razorfish?

9    A.   I'm the vice president of commerce strategy.

10   Q.   Do you have any main areas of responsibilities as the vice

11   president of commerce strategy?

12   A.   I do.

13        So we're what we call a center of expertise practice

14   within Razorfish.  So there are folks that are primarily

15   focused on serving a client with whatever needs that client

16   has; advertising, commerce, social, whatever it is.  And then

17   there are centers of expertise that are the subject matter

18   experts in one of those particular topics.

19        And, so, my practice is responsible for all of the

20   customer experiences that results in purchases as opposed to ad

21   impressions, for example.  And, so, a big part of my job is

22   being a resource and a subject matter expert for our internal

23   teams.  So I do a lot of evangelizing and teaching to our --

24   those account teams I just described, which are spread across,

25   I think, 11 countries today.

1    I also serve in that same capacity for the other Publicis

2    groups.  So the sister agencies are also able to leverage me as

3    a resource.  So we do a lot of internal education with the

4    sister digital agencies and the folks within Razorfish.

5    And, then, a portion of my job is customer facing.  So I'm

6    very frequently brought in during the business development

7    phase to sort of establish some credibility and earn -- earn

8    the trust of clients.

9    And then I try to stay engaged with as many of those

10   clients as I can and do real work and stay grounded to the

11   actual work that we deliver for customers.

12   **Q.**   And did Razorfish actively recruit you?

13   **A.**   They did.

14   **Q.**   Do you have any understanding as to why you were actively

15   recruited by Razorfish?

16   **A.**   I do.  This -- this practice, this particular area of

17   subject matter expertise was a new focus at Publicis Group.  So

18   they decided it was one of the significant growth pillars in

19   our industry, and they asked Razorfish to make a new investment

20   and establish a practice.

21   And my understanding is they went out and identified folks

22   that they thought would help make that practice successful.

23   And, I guess, I was the second person hired.

24   **Q.**   And you mention that you have clients internal and

25   external at Razorfish.  Can you please tell the Court, who are

GOLDBERG - DIRECT / SHER

1  some of your external-facing clients as Razorfish?

2  **A.**    Sure.  So HSN, which is the Home Shopping Network.

3  Express, which is a specialty apparel retailer.  Uniqlo, which

4  is a Japanese retailer owned by a company in Japan called Fast

5  Retailing.  A variety of other clients:  Samsung; T-Mobile;

6  West Marine; Microsoft; Nike; Adidas.  Folks like that, yes.

7  **Q.**    And what topics are you advising these clients on?

8  **A.**    Well, basically, exactly what we just talked about.  I'm

9  mostly focused on their commerce-based experiences.  So

10  experiences that are ultimately going to result in one clicking

11  an add to cart button to buy something.  That's an action we

12  really like.  And then also influencing people to go to stores

13  and buy things.

14  **Q.**    Can you describe, with some specificity, what you would

15  advise clients with regarding to eCommerce?

16  **A.**    Sure.

17        So the kind of advice I give, there's a number of common

18  scenarios.  I'm helping clients design their customer

19  experience.

20        So what the actual customer-facing experience is; what

21  information we give to customers; and when and how they can

22  navigate through the site; and what categories they see; and

23  those sorts of the customer experiences.

24        I frequently am advising customers on the technology and

25  the human resources needed to execute those resources.  So that

1    most often involves selecting what we call an eCommerce

2    platform for the clients.  It involves evaluating all of the

3    what I'll call supplemental vendors that work with that

4    platform.  And ratings and reviews is a very common add-on or

5    supplemental vendor to that platform.

6        More and more, we're talking about a much wider variety of

7    social commerce experiences that might be part of that add-on.

8    And so we talk about the partners and also the people and

9    skills they should have internally and externally to use all

10   those tools, as a frequent topic of conversation.

11       And then some other engagements, I do a lot of

12   presentations for clients to -- either on their behalf or for

13   them to their board of directors, to help justify new

14   investments.

15       We help build a lot of three- and five-year roadmaps to

16   help clients figure out where they're going to take their

17   business and their customer experiences over in the future.

18       So that kind of stuff.

19   Q.  And you mentioned that you've had engagements specifically

20   related to ratings and reviews, among other things.

21       Since this case is, in part, about ratings and reviews can

22   you explain to the Court what types of engagements you've had

23   relating to ratings and reviews.

24   A.  Sure.  So a number of my current clients we've had very

25   explicit conversations about ratings and reviews and what their

1  role is in the customer experience and how they should be

2  implemented.

3     So the kinds of conversations we have take a variety of

4  forms.  Very infrequently, we get asked to do a super formal

5  evaluation with a written recommendation.  So, hey, Jason,

6  figure out exactly what our requirements are; go interview the

7  vendors; figure out which vendors best meet those requirements;

8  and stake your reputation on advocating a particular vendor.

9     For eCommerce platforms, that happens all the time.  For

10 ratings and reviews specifically, that happens considerably

11 less often.

12    So much more often it's a, hey, as part of this whole

13 strategy can you give us some thoughts about the kind of

14 experiences we should have and the vendors that you think, from

15 your previous experience, would best meet that need.

16    I get called a lot to just say, hey, who are some people I

17 should have in the consideration set?  Is there anything new

18 and cool that I don't know about that I should research when

19 I'm thinking about this?

20    I do apologize to the Bazaarvoice folks in the room, but I

21 do get asked frequently for advice on how to negotiate the most

22 favorable pricing terms.

23    And things like that.

24 **Q.**  How often would you say you're engaged with your clients,

25 internally or externally, about ratings and reviews?

1  **A.**    Sure.  So I've given that some thought, and I want to say

2  there's probably some conversation about -- specifically about

3  ratings and reviews about once a week.  And I mean that in

4  aggregate.

5      So there could be a week in a major industry event like

6  there was last week.  I could talk about it ten times last week

7  at Shop.org, and then I may go three or four weeks without

8  having a conversation.

9  **Q.**    You've mentioned Shop.org and attending a trade show with

10  Shop.org.  Could you just describe for the Court what your

11  involvement is with Shop.org?

12  **A.**    Sure.  So we covered a little earlier that I'm a board

13  member there.  So we're an advisory board that helped the

14  professional staff make decisions to serve our membership the

15  best.  And the bulk of our revenue that we use to support our

16  organization comes from some events we host.  And the biggest

17  event is called the Annual Summit.  It was last week.  It's in

18  a different city every year.  This year I got lucky because it

19  was in my hometown of Chicago.

20      And, so, in addition to being on the board, and we

21  participate in a all-day board member during those shows, we

22  have some various dinners and special events that are related

23  to my board responsibilities.

24      I also gave two presentations at the show to attendees, so

25  I had a couple of topics I was talking about with folks.

1    I do a wide variety of press interviews.  So I think there

2  have been a bunch of articles that have come out this week

3  about the show and the direction we're taking the industry.

4    And then I also volunteer to do a thing we call "The

5  Doctor Is In."  So my agency is very expensive.  And I have

6  amongst the highest billing rate in the agency, and so the

7  clients that pay me at Razorfish tend to be pretty big

8  companies.

9    And so The Doctor Is In is a pretty fun thing for me.

10  It's sort of office hours.  And eight retailers, each time I do

11  it, get to sign up for a little mini audit.  And, so, I get to

12  have a meeting with much smaller and more entrepreneurial

13  companies, and talk about their problems and give them some

14  advice.

15    And so it gives me a chance to stretch some different

16  parts of my muscles than I do for my Razorfish clients.

17  **Q.**  And, again, can you just, for clarity, can you describe

18  Shop.org's position in the industry as a trade organization.

19  **A.**  Yes.  I think we're clearly the leading trade organization

20  in the United States, focused on digital retail.

21    We have -- there really isn't a direct competitor, but we

22  certainly have the largest membership and the best-attended

23  events.

24    And we're a subsidiary of the National Retail Federation,

25  which is the largest trade organization for retailers.  So we

1    call ourselves the digital retail arm of the National Retail

2    Federation.

3    **Q.**   And other than Shop.org, are you a member of any other

4    professional organizations?

5    **A.**   Well, depending on how you define professional

6    organizations, I'm a member of the *RetailWire* Brain Trust,

7    which is almost more of a editorial organization.

8         So that's an online site that publish articles that are

9    relevant to digital shopping industry every day.  And they ask

10   the panel members, that are subject-matter experts in various

11   parts of this industry, to weigh in on those topics.  And so

12   I'm a frequent contributor there at the *RetailWire*.

13   **Q.**   Have you published at all relating to eCommerce?

14   **A.**   I have.  I'm a regular contributor to a couple of

15   publications in our industry.  So I occasionally have articles

16   that are published under my own by line.

17        Much more frequently, I'm cited as a subject-matter expert

18   in articles that were written by others.  So I've been quoted

19   in industry in *Wire Magazine* and *Fortune Magazine*, and much

20   more frequently in the trade magazines that cover our industry.

21        So I think I saw from my PR folks that we had four

22   articles this week, so.

23   **Q.**   Have you published anything related to social commerce?

24   **A.**   So a lot of the topics that we talk about are related to

25   social commerce.

1      I neglected to mention, when you asked about other

2  publishing -- I'm never good at self-promoting, apparently -- I

3  publish a blog called retailgeek.com, which is a popular,

4  well-known blog in the industry.  So I write quite a few

5  articles for my own blog.  Retailgeek is a -- is sort of a

6  persona and a brand that I developed.

7      And then I have a Twitter feed called @retailgeek.  And

8  today I think there's 10,000 -- just under 10,000 followers

9  that read my tweets.

10 **Q.**  Probably about 50 or 60 are from the Department of

11 Justice.

12 **A.**  I'm terrified my readership is going to go way down after

13 this case.

14 **Q.**  And what do you do to keep up with the latest trends and

15 practices in eCommerce?

16 **A.**  I do quite a bit.

17      So the -- for that Twitter feed, I actually cite about

18 four interesting articles a day, three or four articles a day.

19 So, I think, on an average week I read 50 to a hundred articles

20 that I curate and decide what would be interesting to my

21 readers.  So reading is a big part of it.

22      I attend a ton of industry events.  Both -- events like

23 Shop.org; events that vendors put on, like IBM or Oracle, or

24 vendors that are in our space.

25      I do monthly briefings with most of the analysts in our

1    space.  So we get on the call and share some thoughts.  And I

2    learn from them.  And they, I like to think, learn from me as

3    well.

4         And then I have regular meetings with a lot of our

5    clients.  And, you know, certainly, they're getting advice that

6    I -- I get their perspective about a lot of things, which is

7    very helpful to me in my job.

8    Q.   And you said you have meetings with analysts in the space.

9         Can you give the Court some examples of analysts in space

10   that you meet with on a regular basis.

11   A.   Sure.

12        So the three firms -- and most of these firms have

13   multiple analysts, so the individual I meet with might vary

14   from appointment to appointment.  But the three firms are

15   Forrester, Gartner Group, and RSR Research, are three that I

16   most frequently use.

17   Q.   And is it normal for an outside consultant like yourself

18   to have regular meetings with Gartner and Forrester on

19   eCommerce?

20   A.   To some extent.  So there are -- you can become a client

21   of Forrester, and then you essentially pay them to meet with

22   you and answer questions that you have.

23        I'm in a slightly different scenario.  It's sort of a quid

24   pro quo thing.  So we're not charged for those briefings.  They

25   get value from me.  They ask my perspective from things I've

1    seen on the clients.  And I get to ask them questions, as well.

2    And it's generally mutually beneficial.

3    Q.   And just for -- by an order of magnitude, can you tell the

4    Court over the course of your career for how many eCommerce

5    sites you have had a significant role in their development?

6    A.   Sure.

7         So I wish I had kept a perfect tally because it would be a

8    cool number to know, but it's in the low hundreds.  So I would

9    imagine 150 to 200.

10   Q.   And how about with respect to social commerce strategy,

11   how many engagements would you say?

12   A.   Sure.

13        So I do consider ratings and reviews to be a component of

14   social commerce strategy.  And that's been around the longest

15   of these tactics.  So including that, probably half my

16   engagements have involved some element of social commerce.

17   Q.   And just to cover, briefly, back to your employment, were

18   you employed prior to the time that you worked at Razorfish?

19   A.   I was.

20   Q.   And where was that?

21   A.   A company called CrossView.

22   Q.   And what did you do at CrossView?

23   A.   A very similar role.  So I was the vice president of

24   strategy at CrossView.

25        CrossView is a much smaller organization, and has a

1  slightly narrower scope than Razorfish.  So CrossView is

2  exclusively focused on eCommerce, not the other aspects of

3  digital marketing.  And they're almost exclusively focused on

4  eCommerce using one particular eCommerce platform vendor, which

5  is called IBM WebSphere Commerce.

6  **Q.**  And did you have any clients at CrossView?

7  **A.**  I did.

8  **Q.**  And can you give us some examples of who those clients

9  were.

10  **A.**  Sure.

11      So Bass Pro Shops; Advanced Auto Parts; David's Bridal;

12  Jos. A. Banks; HermanMiller.  Folks like that.

13  **Q.**  And before CrossView were you employed?

14  **A.**  I was.

15  **Q.**  And where was that?

16  **A.**  A company that we call MTI.  But I think our legal name

17  was Merchandising Technologies Inc.

18  **Q.**  And what did you do at MTI?

19  **A.**  So my title was -- I had several titles.  I was there

20  about seven or eight years.  But my title was, generally, vice

21  president of marketing.

22      And, so, I both helped build the company's reputation in

23  the marketplace, and then I did a lot of client advising very

24  similar to what we've described at the last two firms.

25      And I should say, I was a minority owner of the company so

 1   I had an ownership role in MTI as well.

 2   **Q.**   How long were you at MTI for?

 3   **A.**   So I started at MTI in 2002, and I left in 2010, when I

 4   left CrossView.  So about eight years.

 5   **Q.**   You mentioned that you had clients at MTI as well?

 6   **A.**   I did.

 7   **Q.**   And can you name some of your clients MTI?

 8   **A.**   Yeah.  So Best Buy; Target; Walmart; T-Mobile; Verizon.  A

 9   lot of specialty retailers in consumer electronics.  So back

10   then, CompUSA, Circuit City; sadly, firms that are no longer

11   with us.

12   **Q.**   Before MTI did you have employment?

13   **A.**   I did.

14   **Q.**   And where were you?

15   **A.**   I was with a company that changed names during my tenure

16   there.  So when I started we were called Telescan.  And we

17   later rebranded ourself as Imagicast, I-m-a-g-i-c-a-s-t.

18   **Q.**   And before Imagicast where were you?

19   **A.**   I was with Blockbuster Entertainment.

20   **Q.**   What did you do at Blockbuster?

21   **A.**   Well, my title was, I think, senior director of marketing.

22   I had specific responsibility for our digital investments.  So

23   we -- we had a joint venture with IBM called New Leaf

24   Entertainment, which was two words, N-e-w L-e-a-f.

25        And we were responsible for a lot of the early digital

1    experiences that we put inside of Blockbuster stores.  That

2    started in 1994.

3        So, interestingly, it actually involved collecting ratings

4    and reviews from shoppers in the store, and using those ratings

5    to help recommend movies that a customer could rent when they

6    came in our store.

7        And then I think when I -- shortly after I started, the

8    very first eCommerce site in the U.S. launched, which is here

9    in the Bay Area.  It was actually a Pizza Hut.  And so when we

10   saw, that we recognized that that was the future of retail, or

11   at least a significant component.  And so we started building

12   our first eCommerce site at Blockbuster, and it went live, I

13   think, in 1995.

14   **Q.**   And did you have a role in the development of the

15   eCommerce platform, eCommerce site at Blockbuster?

16   **A.**   I did.

17   **Q.**   And what was your role?

18   **A.**   I was one of the primary stakeholders of the website.

19   **Q.**   So you helped build it from a technological perspective?

20   **A.**   I did.  I wouldn't characterize it as like technical

21   architecture, but the customer experience and selecting some of

22   the tools that we used.

23   **Q.**   Okay.  And as you understand it, when did social commerce

24   first emerge in the United States?

25   **A.**   Well, my personal definition of social commerce has

 1    changed over time.

 2        So the definition that I used today I would characterize

 3    as really starting in 1995, when Amazon first launched.  And

 4    they prominently featured ratings and reviews on their site

 5    back then.

 6    **Q.**  And can you explain how your experience, your professional

 7    experience fits in with the development and the evolution of

 8    social commerce.

 9    **A.**  Sure.

10        So, as I alluded to earlier, I -- I, through happenstance,

11    was involved in a number of ratings and reviews cases predating

12    the Internet.  And so even my job before Blockbuster, we

13    published a software product that we jointly sold with

14    Microsoft called Cinemania.  And one of its main features was

15    the ability for customers to rate movies that they had watched.

16        When I got to Blockbuster, we built an in-store system to

17    let customers rate movies so that we could make

18    recommendations.  And then, of course, when we launched that

19    first website, one of the functions we wanted on that website

20    was to be able to collect more ratings from customers so that

21    we could give them a better experience when they visited our

22    stores.

23        And then I've, essentially, had an unbroken string since

24    then.  When I joined originally Telescan, I mentioned we had

25    clients like Best Buy.  At the time we had another client

1   called the Music Land Group, which was subsequently bought by

2   Best Buy.  And we advised both of those clients in developing

3   their first websites.  I actually did a presentation to the

4   board of directors at Music Land Group, to advocate their first

5   music websites.

6       Then, you know, later, when I joined MTI we also had

7   Best Buy as a client, and I helped them develop what we call

8   their mobile playbook.  So that was all the ways that customers

9   could use, back then, very rudimentary smart phones, but later

10  some pretty darn cool smart phones as part of the shopping

11  experience.  So one of the aspects there was launching

12  Best Buy's first mobile optimized website.

13      I neglected to mention, but at Imagicast I earned a couple

14  of patents in eCommerce.  I was the named inventor on two, I

15  think.

16      And then we helped some other clients at MTI with some --

17  some websites, like some work for T-Mobile and Cellular South,

18  if I'm remembering correctly.

19  **Q.**   For the Court, can you tell the Court what your

20  educational background is.

21  **A.**   Yeah.  It's three years at UC Irvine.

22  **Q.**   And when was that?

23  **A.**   I want to say 1996 to 1999.  I'm sorry '86.  I'm

24  pretending I'm younger.

25  **Q.**   So '86 to '89?

1   A.    '86 to '90.  It probably took me four years to get three

2   years' worth of worth of credit.

3   Q.    Did you complete your B.A.?

4   A.    I did not.

5   Q.    Why didn't you complete your B.A.?

6   A.    Unfortunately, my father had passed away shortly before I

7   started college, and I essentially ran out of money.

8   Q.    So did you take any eCommerce courses while you were at

9   college?

10  A.    As you can imagine, there were not eCommerce courses in

11  1986, so no.  Sorry.

12  Q.    And for the Court, can you please explain what you did to

13  prepare for this case.

14  A.    Sure.

15        So I didn't feel I had to do a ton.  I don't mean that in

16  a negative way, but this is what I do every day for my job.

17  And so I have to be prepared on a moment's notice when a sister

18  agency or a client calls and wants some advice.

19        And so when I first agreed to participate in this case, I

20  imagined I would be using a lot of the insights that I had

21  already collected.

22        I have, over the course of this trial, reviewed a awful

23  lot of the documents of the trial.  So I think I've read quite

24  a few of the depositions.  I've read some of the court

25  testimony from these three weeks, and things like that.

1    Q.   You mentioned a number of materials that you considered to

2    prepare.  Did you consider any of the documents or emails from

3    your present employer at Razorfish?

4    A.   I did not.

5    Q.   And is that the same answer for your former employer at

6    CrossView?

7    A.   Yeah.  I didn't even have access to any documents from

8    CrossView.

9    Q.   Mr. Goldberg, how do you believe you can assist the trier

10    of fact in this case, the Judge?

11    A.   Sure.  So I think a few ways.

12        I do think I can be very helpful in clarifying some of the

13    technical aspects that have come up in this case and

14    understanding how they fit.

15        But I think, of equally important, I can really put the

16    role that ratings and reviews have in the context of this

17    larger of eCommerce echo system and sort of help understand how

18    different customers make the decision to acquire that

19    experience, and how they select vendors and then how they

20    subsequently use those tools to achieve their business goals.

21    Q.   And I know at the deposition you were asked a lot of

22    questions about antitrust economics.

23        Do you consider yourself an expert in antitrust economics?

24    A.   Absolutely not.

25    Q.   And what do you consider your area of expertise, again, to

1   be?

2   **A.**   Shopper marketing.   That would include all the

3   subcategories that we had on the visual here, including ratings

4   and reviews.

5          **MR. SHER:**   So at this time, Your Honor, I would like

6   to offer Mr. Goldberg as an expert in shopper marketing, which

7   includes eCommerce and social commerce tools, including ratings

8   and reviews.   His expertise includes the technology commercial

9   aspects and alternatives available to customers in the

10  industry.

11         **MR. SEVERT:**   Objection, Your Honor.   And pursuant to

12  Federal Rule of Evidence 14(a), I request the opportunity to

13  voir dire Mr. Goldberg before he testifies about his opinions

14  in this case.

15         **THE COURT:**   Your motion is taken under advisement.

16  And the motion in limine that has been previously provided is

17  also going to be taken under advisement.

18      But I think, in the efficient ordering of the trial, we'll

19  just proceed with the trial testimony.   And you'll have your

20  opportunity to cross on all of the issues that you're concerned

21  about, Mr. Severt.

22         **MR. SEVERT:**   Thank you, Your Honor.

23         **THE COURT:**   Why don't we take our 10-minute break.

24         **MR. SHER:**   Great.

25                     (Recess taken at 9:29 a.m.)

1    (Proceedings resumed at 9:40 a.m.)

2        **THE COURT:**  Please be seated.  You don't.

3  **BY MR. SHER:**

4  **Q.**  Welcome back.

5  **A.**  Thank you.

6  **Q.**  So, Mr. Goldberg, do you have an opinion as to whether or

7  not there are alternatives for Bazaarvoice for customers who

8  want ratings-and-review solutions?

9  **A.**  I do.

10  **Q.**  And what is your opinion?

11  **A.**  I believe that there are numerous alternatives to

12  customers that want ratings and reviews to Bazaarvoice, and I

13  believe there's more today than there were in the past and that

14  more of them are credible alternatives.

15  **Q.**  And what's the basis for that opinion?

16  **A.**  Sure.  So a few things.  Based on my own experience and

17  recollection of the various alternatives that we had available

18  to us in 2011 and 2012 and evaluating that versus the

19  alternatives that we have available to us as we sit here today.

20  And I'm aware of more credible alternatives that we consider

21  today than I was in 2011 for sure; and I've evaluated whether I

22  believe that's a trend that will continue, and I believe it's a

23  trend that's only going to continue.

24  **Q.**  And does technology influence that?

25  **A.**  Absolutely.

1  Q.   How?

2  A.   Well, so in a variety of ways, but one of the big ways is

3  that doing all this stuff today is cheaper and easier than it

4  was when Bazaarvoice and PowerReviews were founded back in

5  2005.

6       So back then you would have had to have a lot of money or

7  raise a lot of money and buy a lot of expensive infrastructure

8  before you could even start programming; and then you'd have to

9  hire a bunch of programmers, and you would likely pay them to

10 write every line of code that you used in your product.

11      So today folks have it a lot easier.  You can use your

12 personal credit card at home to rent all the server capacity

13 you could possibly want from Amazon and have it available to

14 you instantly.

15      And there's a huge amount of very high-quality source code

16 that's available on the Internet, much of it for free or

17 available under a very favorable licensing terms.  And, so,

18 almost always when something is developed today, rather than

19 having to write every line of code, we rely on a lot of

20 libraries of code that already exist.

21      And, so, when you ask me does technology play a role,

22 first and foremost, we can build these capabilities today much

23 faster and cheaper than we could back then; and, so, there's

24 just less risk and less investment for someone new to do that.

25 Q.   Okay.  And let's take it up one level, Mr. Goldberg.  And

1  you mentioned that you've done a lot of work with eCommerce Web

2  sites.  Can you just, for the Court, explain what an eCommerce

3  Web site is?

4  **A.**    Sure.  So, you know, usually we think of a Web site as an

5  address or what we call a URL; right?  So BestBuy.com would be

6  an eCommerce Web site.

7        And most eCommerce Web sites have some common components.

8  So they all have a home page, which is the first page you would

9  see when you type "BestBuy.com."

10       They all have a variety of what we'll call multiple

11  product pages.  So if you were to do a search and 10 results

12  came back, that would be a search result page; or if you were

13  to click on a category like digital cameras and saw a variety

14  of digital cameras, that would be a category result page.

15       And from that page you generally would click on a product

16  and get a page that's about a specific product, and that's

17  called the product detail page.

18       And then from my client's perspective, the most important

19  button on that page is usually the add-to-cart button, and

20  someone clicks that to put something in their cart, and then

21  they go through a checkout process.

22       So from a customer experience, those are the main

23  elements.  To deliver that experience, you generally have a

24  server that's running software that creates those pages, and we

25  typically call that software an eCommerce platform or sometimes

1    we call it an eCommerce server, which might be the combination

2    of hardware and software.

3    **Q.**    And I'm going to display an exhibit that you prepared, and

4    it's in the Court's binder and the Government's binder.  It's

5    the first exhibit.  It's part of the slide show.  And you've

6    artfully described the eCommerce platform in a square.

7         Can you please explain exactly what is an eCommerce

8    platform?

9    **A.**    Yeah.  So we just talked about that a little bit.  Like,

10   there are specific utilities that we think of as being in

11   there.  So I mentioned there's a cart.  So that's an element of

12   the experience.

13        I mentioned that there are pages that have product

14   information; and, so, that product information, you know, it

15   could include objective information and it could include the

16   thing that we've been talking about a lot today, ratings and

17   reviews.

18        And there are a variety of other plug-ins that are

19   important to eCommerce sites.  So the owner of the site wants

20   to know how customers are behaving on that site, so we have

21   tools called analytics that are a part of that platform.

22        One of the popular ways people find products is using what

23   we call the on-site search, so the ability to type in names and

24   find results; and, so, that on-site search engine is part of

25   the platform.  And, so, you can sort of see here on the diagram

1    we've shown certainly not a comprehensive list of all the

2    components that go into an eCommerce platform, but some of the

3    common ones.

4    Q.    So who provides eCommerce platforms?

5    A.    So a variety of folks do.  At the very high end for most

6    of the largest sites, it's folks like IBM with WebSphere

7    Commerce.  It's Oracle that purchased a product called ATG,

8    A-T-G the letters.  SAP owns a product called Hybris.  And then

9    there's a wide variety of other platforms that are most suited

10   to various use cases; and, so, those are folks like Demandware,

11   Magento, Shopify, Amazon Webstore, folks like that.

12   Q.    I think you hinted at this, but are all eCommerce

13   platforms the same?

14   A.    Yeah.  Absolutely not.  So I mentioned in my scope that,

15   like, a very common thing that we're asked to do is help

16   evaluate a client's needs against the various platforms out

17   there and help prescribe the proper platform for a client.

18        So these platforms each have very unique strengths and

19   weaknesses, and they're suited to a particular type of use

20   case; and the platforms are the most critical part of the

21   customer experience and they're the most expensive thing and,

22   so, most clients agonize and spend a huge amount of real and

23   human bandwidth to sort of figure out what platform to use.

24   Q.    And if you're an eCommerce Web site, do you have to

25   purchase a third-party eCommerce platform?

1   **A.**   You don't.  There's a lot of various successful eCommerce

2   sites that opted to build their own platform in-house as

3   opposed to buying a commercial one.

4   **Q.**   And why would an eCommerce site decide to build its own

5   platform rather than buy one?

6   **A.**   Sure.  So a variety of reasons.  Some of the sites that

7   are in existence today started very long ago and, so, there

8   weren't commercial platforms, so they originally had to build a

9   platform and they just maintained it.

10      In some cases a client just has a technical orientation or

11  a bias or technical resources and they just, for rational or

12  irrational reasons, want to build their own.

13      But most commonly the reason you want to build your own is

14  because you want a competitive advantage.  You want a distinct

15  capability that all of your competitors can't just go to IBM

16  and buy from them.  And, so, more and more often customers want

17  to build their own platform that provides a competitive

18  advantage.

19  **Q.**   And have you noticed in your experience trends related to

20  how quickly firms have moved to building their own platforms

21  versus buying them?

22  **A.**   Sure.  So a couple things.  Like you can certainly put

23  together the two trends we've talked about today that, hey,

24  it's much easier to build these platforms today than it was

25  back in 1995 at Blockbuster, and the fact that eCommerce is the

1  fastest growing part of the retail industry.

2      So retail stores are growing at, like, 3 to 4 percent a

3  year.  The eCommerce industry is growing at about 16 percent a

4  year.  And, so, almost every CEO of a major retailer has gone

5  to their shareholders and said, "A big part of our strategy is

6  to be awesome in eCommerce and be awesome in the Web."  And,

7  so, there's significant new budgets and there's more pressure

8  to have unique, good competitive advantages.

9      And one of the real visible ways that's manifest itself is

10 it's becoming more and more common for these retailers to

11 establish what we call labs, laboratories.  And, so, they'll

12 very often hire a bunch of people or, equally common, they'll

13 buy a small entrepreneurial company and turn that into a lab.

14     And, so, you know, one of the first good examples was

15 Walmart, which is based in Bentonville, Arkansas, where there

16 originally was not a lot of technology hotbed, bought a social

17 media company here in the Bay Area and rebranded it

18 Walmart Labs; and today I think they have over 400 employees,

19 and they're exclusively focused on building technology that

20 they use for Walmart.com.

21     And, you know, they were the first one I became aware of,

22 but there are now very many.  So we have a client, Staples,

23 that's had a lab on the East Coast for sometime and just this

24 month they opened a new lab in Seattle.  Target just opened a

25 lab here in the Bay Area.  Nordstrom has a well-regarded lab in

 1  the Seattle area.  And Zappos, which is based in Las Vegas, has

 2  a lab here in the Bay Area.  So there's -- a lot of these

 3  retailers are establishing these labs to build cool, unique

 4  stuff just for them.

 5  **Q.**   And where do ratings and reviews fit within this eCommerce

 6  platform?

 7  **A.**   So a couple of ways.  It's a feature that the vast

 8  majority of all eCommerce sites want and should want and, so,

 9  you really have a couple different choices about how to get it.

10      So, historically, like in 1995, you had to custom program

11  that feature, and that's certainly what we did at Blockbuster

12  and that's what Amazon did.

13      The first two vendors that I became aware of that sold a

14  solution that you could buy were originally Bazaarvoice and

15  then later PowerReviews, and those then became what we call

16  plug-ins that you could integrate to or attach to your

17  eCommerce site to create that experience.  And today, as I'm

18  sure we'll talk about, there are numerous other examples of

19  those kinds of plug-ins.

20      And then it is also possible for the eCommerce site

21  itself -- platform itself to build that functionality natively

22  into the platform so that you don't have to use -- excuse me,

23  so that you don't have to use a plug-in.

24      And, so, a number of the very popular eCommerce platforms

25  literally have that functionality built in.  And you just

GOLDBERG - DIRECT / SHER

1    showed a super-cool animation of some of those add-ins moving

2    into the eCommerce platform.

3    **Q.**    So you said that ratings and reviews was a plug-in?

4    **A.**    Again, it can be.  There are some cases today where it's

5    now a native part of a platform, but certainly like all the

6    Bazaarvoice and PowerReviews customers that I imagine you've

7    been talking about for the last few weeks.

8    **Q.**    In your opinion, is there any significant of ratings and

9    reviews as a plug-in?

10   **A.**    There is.  One of the benefits of it being a plug-in is

11   it's intentionally easier to make it work with specific

12   eCommerce platforms.  And, so, the level of effort required to

13   implement one of these vendors, if you don't have them, becomes

14   less when it's a more robust plug-in; and in some cases the

15   ability to switch from one plug-in to another is easier than to

16   buy add-ins that you have to separately integrate.

17   **Q.**    So in this graphic we have a number of what we call

18   plug-ins that have been integrated into eCommerce platforms.

19   Why is it attractive to integrate some of these features into

20   an eCommerce platform?

21   **A.**    Yeah, well, so it potentially saves labor for the

22   eCommerce operator that they can then use to do other valuable

23   things.

24        So if I know I want ratings and reviews and my eCommerce

25   platform has readily available plug-ins from some providers,

1    then the amount of work I have to do to get ratings and reviews

2    is less and the labor I saved or the dollars I saved paying

3    someone like Razorfish to do it for me, I can then use to do

4    other things that potentially would be more profitable.

5         And then from the eCommerce platform perspective, that

6    potentially provides a competitive advantage for the platform.

7    So if you were a customer that felt like on-site search was the

8    most important thing in the customer experience, as some

9    eCommerce sites do, and you knew that your favorite search

10   engine was preintegrated into three platforms but not two other

11   platforms, that knowledge would affect your decision as to

12   which eCommerce platform to buy.

13   Q.   Are there any technological advantages or disadvantages to

14   having ratings and reviews integrated into an eCommerce

15   platform?

16   A.   There are, and this is maybe the first E-technical topic.

17        So most plug-ins for eCommerce platforms use a delivery

18   mechanism that you've heard in the testimony called SaaS or

19   software as a service.  And, so, the ratings-and-review

20   software is running on a server that Bazaarvoice maintains, in

21   their case, rather than on the eCommerce site that Walmart

22   owns.  And, so, the reviews actually live on the Bazaarvoice

23   server.

24        And as I think there's been some testimony in this case

25   already, a super-important aspect of these sites being

1  profitable is for them to get a lot of traffic from, most

2  specifically in the U.S., Google but generically from search

3  engines; and, so, Google wants to go visit those pages, see all

4  the content that's on that page so that when people search,

5  they can give good search results.

6      And it's harder for Google to find the rating-and-review

7  content when it's on the Bazaarvoice server instead of on the

8  Walmart server.  And, so, when these platforms first launched,

9  they were horrible for SEO.  Like, you didn't get a lot of SEO

10  value.  And over time the various vendors have come up with

11  clever tricks to mitigate that problem.  And, so, often you

12  hear those branded as "our SEO-friendly features."  So that's

13  just a way of mitigating that problem.

14      Well, if the functionality is built right into the

15  platform, then the reviews do live on the server; and then it

16  becomes you don't have to jump through all those extra hoops,

17  you don't have to have that potential extra layer of

18  complexity.  It makes it much easier for Google to find all

19  that content and, as a result, the Web site can earn more

20  traffic.

21      It's also the case that every one of these plug-ins is

22  sort of the equivalent of weight on the server, and that has --

23  that's just a metaphor, it's not actually weight -- but it has

24  the potential to slow down the Web site and literally cause the

25  page to load more slowly; and I'm sure we've all experienced

1   that unpleasant effect.  So it turns out there's voluminous

2   data that the slower that page loads, the less financially

3   successful it will be.

4        And, so, a major focus for all eCommerce sites is to make

5   their site faster, and one of the ways we can do that is to use

6   fewer plug-ins.

7   **Q.**   And why is it beneficial to use fewer plug-ins?

8   **A.**   Well, so, the one reason we just hit, fewer-plug-ins, is

9   usually going to equal a faster site, which is going to equal

10  better financial results; but there are other benefits to an

11  eCommerce site operator to use fewer plug-ins.

12       So it's fewer vendors I have to manage, so it's less

13  resources for my staff; and it's fewer technical

14  implementations that I have to manage and, so, it's less

15  complexity and risk.  And you can almost think of complexity as

16  making an eCommerce site potentially more fragile.

17       And, you know, God forbid something happens to cause an

18  eCommerce site to have an interruption in service, it has dire

19  financial implications both for the customers that couldn't buy

20  while it was down and the customers that decide to use that

21  opportunity to find an alternative provider and then never come

22  back.

23       And, so, those are -- reliability and speed are extremely

24  important issues to people that have the P & L responsibility

25  for these sites.

1  Q.   So you mentioned that there were technological advantages

2  to having fewer plug-ins.  Are you aware of any examples of

3  eCommerce platforms that have integrated features that

4  previously were plug-ins?

5  A.   Absolutely.

6  Q.   And can you provide some examples?

7  A.   Sure.  So Hybris is an eCommerce platform owned by SAP and

8  it now has a ratings-and-review feature built into it.

9       Magento is an eCommerce platform owned by eBay, and it has

10 a rating-and-review feature built into it and it has a wide

11 variety of third-party add-ons that have been preconfigured as

12 plug-ins.

13      Amazon has an eCommerce product called Amazon Webstore,

14 and it has ratings and reviews built into the platform.

15      And then there are some close cousins to the eCommerce

16 platform that are often used as eCommerce platforms that I call

17 content management systems; and, so, Adobe is an example of a

18 Content Management System that is used by many eCommerce sites,

19 and it has ratings and reviews built into the platform.

20 Q.   And is it only ratings and reviews that's integrated into

21 the eCommerce platform or are there other plug-ins as well?

22 A.   Absolutely not.  There's a huge amount of functionality

23 that you used to have to get as add-ons that the eCommerce

24 sites have now built into their platforms.

25      And, again, as I mentioned, it's the most expensive piece

1    of software that an eCommerce site typically buys to run their

2    business and, so, it gets the most consideration and, so, it's

3    a hugely competitive situation.

4         And, so, these eCommerce sites are always looking for

5    opportunities to have a permanent or temporary advantage that

6    will cause more people to choose them.  So there's a strong

7    trend to adding more capability to these platforms.

8    **Q.**   So you've now mentioned that there's preintegration into

9    eCommerce platforms and the ability to purchase individual

10   plug-ins.  Is there any other way to purchase a social commerce

11   functionality like ratings and reviews?

12   **A.**   Absolutely.

13   **Q.**   And what is that?

14   **A.**   So you can typically buy the functionality from a

15   provider, so, for example, Bazaarvoice; and even if I had built

16   my own eCommerce platform, so if there were no preintegrated

17   plug-ins for my platform because I built it myself, I can still

18   integrate Bazaarvoice into my platform.  It just generally is

19   more work.

20        The advantage of the preintegration is that it's -- some

21   of the work has already been done, and that same work gets to

22   be leveraged across multiple clients versus if you buy the

23   solution yourself and integrate it, then you have to do all the

24   work yourself.

25        And, so, it can be more expensive; and I would also say

1    there are cases where it can be an advantage because you can

2    integrate it in exactly the way you want instead of the

3    standard way that the plug-in was developed.

4    **Q.**    Are you aware of any vendors that sell multiple plug-ins

5    together?

6    **A.**    Yes.

7    **Q.**    And with regard to features like ratings and reviews and

8    forums and social sign-in that are listed here, are you aware

9    of any vendors that sell them together?

10   **A.**    Yeah.  So you're describing what I would call a suite.

11   And I mentioned earlier that there's some advantage to having

12   fewer vendors so that I have fewer technical implementation on

13   my eCommerce site.  I can get faster.  I can have fewer vendors

14   to manage.

15        But, also, many of these functions are synergistic and,

16   so, when they're built together, they can have a better

17   customer experience or, at the very least, they can have a

18   better customer experience much easier -- much more easily and

19   less expensively than if I take all point solutions and try to

20   plumb them together.

21        So, you know, some examples that I imagine we'll discuss

22   today, there are a lot of suites of social commerce

23   functionality like Pluck and Gigya and Jive, Mass Relevance,

24   Adobe, and others that have over time added more elements to

25   their suite, and not uncommonly one of those elements is

1  ratings and reviews.

2  **Q.**   And why do you think they've added ratings and reviews to

3  the suite?

4  **A.**   Well, so, for a variety of reasons.  The suites are

5  competing aggressively with each other just like the individual

6  plug-ins would.  And, so, the more desirable functionality that

7  they have that a significant number of their clients or

8  prospects want, the more competitive they are in the

9  marketplace, the more business they can win.

10      It's also true that ratings and reviews, to my way of

11  thinking, is one of the oldest, most original forms of social

12  commerce and it's one of the most important.

13      And, so, when you integrate the other elements of the

14  social suite with ratings and reviews, it makes the ratings and

15  reviews more powerful.

16      So that maybe the easiest example for me to think of is,

17  many of these suites have a feature that's on the diagram

18  called social sign-in, and what that essentially means is, hey,

19  you're going to shop at Walmart frequently and so you'd like

20  them to remember you or maybe even remember your credit card

21  and, so, you need to have an account with Walmart.

22      And, so, Walmart's going to ask you to invent a user name

23  and a password, and it turns out that that's a big impediment

24  to customers to create an account on Walmart because that's

25  perceived as a fair amount of work.  More and more often we get

1  these scary emails that Sony was hacked or Adobe was hacked and

2  all the passwords were lost and you have to change them.  So we

3  all have, frankly, a negative perception of having to create a

4  bunch of passwords for all these different Web sites.

5      And there's a vendor in our space that did a very funny

6  survey of consumers, and they found that three out of five

7  consumers would rather clean a toilet than invent a new

8  password.

9      And, so, for those reasons, it's much more appealing to

10  say:  Hey, let's use a password you already have.  You already

11  have a password for Facebook, as do a billion other people.  So

12  if I just let you click a button, you're already signed into

13  Facebook, and I can just let you identify yourself to

14  Walmart.com by clicking on the Facebook sign-in button or

15  generically what we call social sign-in, I can collect a lot

16  more accounts; and when you sign in, I know a lot more about

17  you.  I know all the stuff about yourself that you shared on

18  Facebook, and I can use that to give you a better shopping

19  experience.

20      So social sign-in in and of itself is a really powerful

21  feature; but when you combine it with reviews, you can do cool

22  things.  Number one, you always know more about the reviewer.

23  You can often show a picture of the reviewer from their

24  Facebook profile, and people like reviews best from people that

25  they feel are like them or, even better, that they recognize.

1      And, so, Amazon I think was one of the first to innovate a

2  feature where when you're signing into Facebook, if I have

3  reviews from people that are friends of yours on Facebook, I

4  will show those reviews at the top and that's much more

5  persuasive than reviews from strangers.

6      And, so, there's a wide variety of those kinds of

7  interactions amongst the various social features that are all

8  better enabled when all of those features come together from

9  one vendor and they're all tightly integrated.

10 Q.   You mentioned previously a number of other companies that

11 have integrated into social suites, and in your experience do

12 you have an opportunity to evaluate these vendors?

13 A.   I do.

14 Q.   Okay.  And are you familiar with a market analyst called

15 Gartner?

16 A.   I am, yeah.

17 Q.   And I think we discussed this before, but do you have an

18 opportunity ever to interact with Gartner?

19 A.   I do.  I think we mentioned that I do pretty regular

20 briefings with some of the analysts there.

21 Q.   And do you review their reports?

22 A.   Many of them.  They do reports that aren't very relevant

23 to our industry.  So, like, I would characterize I probably

24 read most of the ones that are related to eCommerce.

25 Q.   And are you familiar with the Gartner 2013 Social Commerce

1    Report from January 2013?

2    **A.**    I am.

3    **Q.**    Okay.  I'm going to ask you to turn to, in your binder,

4    what's labeled DX1882, already been admitted into evidence.

5    **A.**    (Witness examines document.)

6    **Q.**    What would you -- are you familiar with this document?

7    **A.**    Yes, I am.

8    **Q.**    Okay.  And can you please turn to page 19 of that report?

9    **A.**    (Witness examines document.)

10    **Q.**    And it's also displayed on the screen if that helps.

11    **A.**    Yep.

12    **Q.**    What is on this list?

13    **A.**    So this is a list of the subset of vendors that are

14    included in the whole report.  So there's -- I haven't doubled

15    checked, but I remember there being about 70 some odd vendors

16    in this report and this page represents the subset of those.

17        And I haven't actually counted them, but it looks like 21

18    vendors that Gartner has identified as having the narrower

19    scope of social eCommerce.  So they're saying, "Hey, in our

20    social CRM report, we have 70 something vendors.  We've got the

21    20 something here that are part of social commerce."

22        And then it identifies some specific subsets of social

23    commerce, one of which I suspect we care the most about today

24    is product reviews, and it's identifying the seven vendors that

25    they're reporting on in this report that have product-review

 1  capability.

 2  **Q.**   And in your experience, does this represent a complete

 3  list of ratings-and-reviews vendors?

 4  **A.**   It certainly doesn't.

 5  **Q.**   Who's missing?

 6  **A.**   Well, certainly a bunch I don't know about, but the

 7  obvious one that I'm aware of is Pluck; and I would mention

 8  Pluck is in this report, and it appears Mike Mraz, who wrote

 9  the report, wasn't aware that Pluck had a product-review

10  feature.

11  **Q.**   And have you had the opportunity to review prior Gartner

12  reports on social commerce?

13  **A.**   I have.  This is a cool one because it comes out every

14  year.

15  **Q.**   Okay.  Are you familiar with the ones that have been --

16  that have come out previously in 2012?

17  **A.**   Yep.

18  **Q.**   And in 2011?

19  **A.**   I am.

20  **Q.**   And in the 2011 report that the DOJ has offered into

21  evidence, only two vendors were listed as providers of ratings

22  and reviews, Bazaarvoice and PowerReviews.  Is that consistent

23  with your understanding of the primary providers in 2011?

24  **A.**   Well, I think that's consistent with my understanding of

25  the third-party providers.  So certainly, like, I would also

1  categorize in-house, which is something they're not addressing

2  in here; but other than that, absolutely.

3  **Q.**   Do you believe that the number of vendors listed in 2013

4  reflects a more accurate version of the number of vendors for

5  ratings and reviews that are available today?

6  **A.**   So, again, I think it's less than the total, and I don't

7  think that they tried to represent that it was a comprehensive

8  review.   I'm sure there were probably others that none of us

9  were aware of in 2011.

10      But I think, like, directionally it's pretty clear that

11  they featured two companies that had product ratings and

12  reviews in their 2011, and they featured three in their 2012,

13  and then this year they featured seven; and that perfectly

14  correlates with the counts of total social CRM vendors in the

15  entire report has also gone up every year.

16  **Q.**   So let's talk about some of the individual firms that are

17  listed on here, and we'll start with Reevoo that's listed on

18  this report.   Are you familiar with a company called Reevoo?

19  **A.**   I am.

20  **Q.**   And how have you come to become familiar with Reevoo?

21  **A.**   I think I first met them when some representatives asked

22  me to take a meeting at an IBM trade show in 2012.

23  **Q.**   And what happened in that meeting?

24  **A.**   They said that they -- they introduced themselves to me.

25  I wasn't familiar with them.   Again, part of my job -- I was

1  with CrossView at that time, and part of my job was to stay

2  abreast of this industry so I took the meeting.

3      And they pitched me that they were a very successful

4  vendor in Europe -- CrossView didn't do a lot of international

5  work at that time -- and that they were interested in entering

6  the U.S. market, and that they felt like they had some

7  competitive advantage versus the existing companies; and they

8  asked me to look at their product and give them feedback, which

9  I did.

10 Q.  So you had an opportunity at that time to evaluate the

11 product?

12 A.  I did.

13 Q.  And what were your impressions of the product based upon

14 your understanding of ratings and reviews?

15 A.  Well, so I guess I would almost characterize them in sort

16 of three buckets.  Number one, like, it seemed to be a fairly

17 robust, polished solution.  It had a lot of the features that I

18 generally associate with enterprise class solutions.

19      So one subcomponent of ratings and reviews that I imagine

20 we'll talk about later today is the ability to highly customize

21 the look and feel using what we call an API or an application

22 programming interface.  It's less true now, but it used to be

23 the case that enterprise class products had APIs and the

24 lower-end products did not.  And, so, I was pleased to see that

25 the Reevoo product had a robust API, which is something that a

1    lot of my clients are interested in.

2        They had a different -- a slightly different model for

3    ownership and branding of the reviews, and I viewed that as

4    interesting because in my job, it would be slightly useful if

5    there were three identical vendors; right?  Because then we,

6    presumably, could negotiate better prices.

7        But it's even more useful if there's a wide variety of

8    vendors that each have unique strengths and weaknesses, because

9    every one of my clients, every eCommerce site is unique.  And,

10   so, if there's a bunch of different approaches, some of those

11   approaches are going to be more suitable for some clients than

12   others.

13       And, so, one of the things that was interesting to me

14   about Reevoo is most of the platforms I had been familiar with

15   in the past, the client owned the reviews.  And in Reevoo's

16   case, they had sort of joint ownership of the reviews, and that

17   had some potential huge negatives for some clients that I

18   worked with; but it potentially had some intriguing advantages

19   for other clients.  Like most notably, the day you signed up

20   with their service, you could potentially have a large number

21   of reviews, which is less true on other platforms.

22       We also have previously talked about the authenticity of

23   the reviews.  And a fear that we all have is it's well known

24   that a percentage of these reviews are fraudulent, that people

25   that are just paid or have some other interest give reviews

1    that aren't honest, and that's -- that erodes the utility of

2    the reviews, so we want people to think reviews are

3    trustworthy.

4          And Reevoo independently validates the ownership and they

5    brand the review as Reevoo.  So, again, I have some clients

6    that wouldn't like a Reevoo brand on their Web site and, so,

7    that would make these guys not suitable for them; but for other

8    clients, if Reevoo could built a -- could build out a

9    trustworthy brand and be recognized as someone that took

10   greater care to ensure authenticity, then that could be a

11   competitive advantage.

12         So there were things I really liked about Reevoo that I

13   felt like it could potentially be a useful tool in my array of

14   options, but it had at that time what I considered a pretty

15   substantial flaw.

16         So they wanted to install from scratch and be all the

17   reviews that you had, and that would be fine if they were only

18   selling to brand new customers that had never offered ratings

19   and reviews before; but a huge number of sites already have

20   ratings and reviews.  Customers have given them this huge gift

21   of writing a review, and it would be really negative and

22   eroding to then eliminate all those customer reviews that

23   customers already gave you and replace them with exclusively

24   Reevoo-collected reviews.

25         So I told them, from my perspective, I thought they would

1    have a hard time in the United States with that feature, and I

2    suggested you need to figure out a way to import all the

3    reviews from their -- whatever previous platform the client's

4    on that you're selling to.  And they, as I understand it, took

5    that advice because they contacted me close to a year later and

6    said, "Hey, we made some more refinements and one of them is we

7    have this super-cool import tool and we're prepared to import

8    those reviews from clients if they use us."

9    Q.   Thanks.

10         MR. SEVERT:  Objection, Your Honor.  Move to strike

11   that last answer.  That conversation is not in Mr. Goldberg's

12   expert reports.

13         THE COURT:  I'll allow it.

14         THE WITNESS:  If I may, Your Honor, my recollection is

15   it is in my expert report.

16         THE COURT:  No, you may not actually.

17         THE WITNESS:  All right.

18         THE COURT:  Thank you.

19   BY MR. SHER:

20   Q.   Have you had the opportunity to compare Reevoo's

21   functionality to PowerReviews?

22   A.   Yes.  I mean, again, I was previously familiar with

23   PowerReviews' functionality.  Once I became aware of Reevoo's

24   functionality, I made a mental comparison.

25   Q.   And what's your opinion on the comparison between

1   PowerReviews' and Reevoo's technology?

2   **A.**   Well, so they had advantages and disadvantages.  I kind of

3   described, because of this different ownership models of

4   reviews, they could be suitable in cases where PowerReviews

5   would be less suitable, and PowerReviews could be more suitable

6   in cases where Reevoo would be less suitable.

7        But a huge issue with many of my clients and PowerReviews

8   is that lack of an API because it enables our clients to highly

9   customize the look and feel of the reviews to match their

10  brand.

11       And, so, in my evaluation, I found that overall the Reevoo

12  solution was, for certain customers, certainly as or more

13  appealing than the PowerReviews product.

14  **Q.**   And have you had the opportunity to review the videotaped

15  deposition of Reevoo's corporate representative, Gary Giannoni?

16  **A.**   I believe I did.

17  **Q.**   I'm going to play you an excerpt from that testimony.

18                    (Videotape played as follows:)

19       **"Q.**   And you also mentioned that in-house rating-and-

20       review products, you compete with those; correct?

21       **"A.**   Yes.

22       **"Q.**   How is it that you compete with in-house

23       rating-and-review solutions?

24       **"A.**   It's an option that a customer has, you know, that

25       they go with the SaaS provider such as Reevoo,

1      Bazaarvoice, Pluck, et cetera; or if they choose and want

2      to develop it, you know, internally, they can certainly do

3      that as well.

4      "Q.  Did you believe that the PowerReviews rating-and-

5      review platform is very similar to the Reevoo

6      rating-and-review platform?

7      "A.  The PowerReviews and Reevoo technology platforms are

8      more similar than the BV; but to be honest, we use a

9      combination of the PowerReviews technology as well as the

10     BV technology.  So it's kind of a split."

11     Would you agree, in your experience, would you agree with

12  that evaluation of Reevoo's technology?

13  A.   I would.  As I was listening to it, I imagined certain

14  aspects of the architecture I was familiar with and I think it

15  makes sense.

16  Q.   Okay.  And Professor Shapiro previously testified, he's

17  the Government's economic expert, that Reevoo cannot rapidly

18  expand into the United States.  Do you agree with that?

19  A.   I don't.

20  Q.   And why not?

21  A.   Well, I feel like in our industry we have multiple

22  examples of companies coming from international success and

23  rapidly entering the U.S. market, and I'm not aware of any

24  disadvantage that Reevoo would have that those other entrants

25  didn't have.

1    And, so, the one that, you know, I most think of is

2   Hybris, which is owned by SAP.  They only started directly

3   selling in the U.S. two years ago, and today they're at the

4   top -- they're on the top quadrant of the Gartner and Forrester

5   waves and they have all of the buzz and momentum.

6    So every one of my clients, whether they're using them or

7   not, they always want my perspective about what the strengths

8   and weakness of Hybris are relative to their current platform.

9    And, so, Hybris and SAP has been a hugely successful

10  entrant into the U.S. from Germany in two years; and, so, it's

11  certainly not difficult for me to imagine a successful

12  rating-and-review vendor from Europe having similar success.

13  **Q.**   And just for clarity, when Hybris entered into the

14  United States, was it owned by SAP?

15  **A.**   They weren't.  They were recently purchased by SAP.

16  **Q.**   Let's move on to Pluck.  You mentioned them before.  How

17  did you become familiar with Pluck?

18  **A.**   I believe I first became familiar with Pluck when I heard

19  that Target was implementing them on their eCommerce site.

20  **Q.**   And have you had the opportunity to evaluate Pluck's

21  ratings-and-reviews functionality?

22  **A.**   I have.

23  **Q.**   And how would you describe it?

24  **A.**   So it's very robust.  Again, all of these platforms have

25  slightly nuanced strengths and weaknesses.  So, you know, there

1    are certainly things I could talk about any other platform as

2    an advantage over Pluck; but, overall, Pluck is a very

3    compelling solution and, in particular, it has some very

4    generally appealing features.

5        So you can install it under what they call a widget model

6    where essentially all the decisions are made for you and it's

7    very low labor to install.  So, I mean, as an example, like

8    I've installed Pluck on my desk using that widget model in half

9    an hour and it's very easy, which is appealing for some

10   customers.  The look and feel you get is exactly the same as

11   anyone else that does that same thing.

12       So Pluck solves that problem by also offering an API so

13   that you can replace all of the widgets with your own custom

14   look and feel.

15       And, so, today at Razorfish clients pay us hundreds and

16   thousands of dollars to design the look and feel of a single

17   page, and I can assure you that those designers are

18   super-concerned about the exact look and feel of every aspect.

19   And, so, they really like the fact that you can completely

20   customize the Pluck look and feel, so that's a big advantage.

21       And then going back to the conversation we had earlier

22   about social suites, Pluck is already very strong and used by a

23   number of brands for those other social elements.  So social

24   sign-in that we talked about is one of the utilities you get

25   from Pluck.  You get some other utilities that many of my

 1    clients already want.

 2        And, so, the fact that it has a darn good review solution

 3    that's synergistic with these other features meant that it was

 4    a welcome addition to my bag of tools.

 5    **Q.**   And have you had the opportunity to compare PowerReviews

 6    to Pluck functionality?

 7             **MR. SEVERT:**  Objection, Your Honor.  Mr. Goldberg's

 8    report does not, in fact, compare Pluck to PowerReviews.

 9             **MR. SHER:**  With --

10             **THE COURT:**  Mr. Sher?

11             **MR. SHER:**  With all due respect to Mr. Severt,

12    Mr. Goldberg's report extensively discusses the features and

13    functionality of Pluck and discusses the features and

14    functionality of PowerReviews, and I'm just asking him for an

15    analysis of putting those two together.

16             **THE COURT:**  Mr. Severt?

17             **MR. SEVERT:**  Your Honor, it's true he discusses them,

18    but he makes no comparison between the two.

19             **THE COURT:**  Okay.  Well, I've been thinking about your

20    prior objection also, Mr. Severt.  I'm going to allow this

21    testimony at the moment, but your objection is noted.

22        And with respect to the first one, to the extent,

23    Mr. Sher, that you disagree that this testimony was contained

24    in his report, I think you should discuss it; and if there's

25    still a disagreement, I'd like to know where these things are

1    in the report so that I can actually rule on it.

2             **MR. SHER:**  Absolutely.

3             **THE COURT:**  Okay.

4             **MR. SHER:**  We can do that at the next break,

5    Your Honor?

6             **THE COURT:**  That's fine.

7             **MR. SHER:**  Okay.

8             **MR. SEVERT:**  Thank you, Your Honor.

9    **BY MR. SHER:**

10   **Q.**   What was the outcome of that comparison?

11   **A.**   Well, so, I mentioned the kind of two modes of Pluck.  The

12   widget mode of Pluck where it was very out-of-the-box, the one

13   I installed at my desk, was very similar to PowerReviews.

14       So what I -- and PowerReviews also has different

15   configurations.  So it was very similar to

16   PowerReviews Express, which is, I think, the most similar to

17   the Pluck widget.

18       And then, of course, the Pluck API is something that

19   PowerReviews doesn't offer; and, so, that was a significant

20   competitive advantage.

21       And then, of course, Pluck has all of these other elements

22   of the social suite that PowerReviews does not have.  So I

23   consider those significant competitive advantages.

24   **Q.**   Let me ask, are you familiar with customers of Pluck?

25   **A.**   I'm familiar with some.

1   **Q.**   Does Pluck still provide ratings and reviews to

2   Target Corporation?

3   **A.**   My understanding is they don't.

4   **Q.**   And does that change your opinion about the viability of

5   Pluck as a result of not providing ratings and reviews to

6   Target?

7   **A.**   In and of itself --

8         **MR. SEVERT:**   Objection.  Again, this topic, Target not

9   using Pluck, is not anywhere in Mr. Goldberg's report.  In

10  fact, that occurred after he submitted his reports.

11        **MR. SHER:**   That was an announcement that came after

12  Mr. Goldberg's report was submitted, but Mr. Goldberg did talk

13  about in his report the importance of customer references.  I

14  was just -- and he talked about Target specifically in his

15  report, so....

16        **THE COURT:**   I understand your objection, Mr. Severt,

17  but I'm going to allow this testimony.

18        **MR. SEVERT:**   All right.  Thank you, Your Honor.

19        **THE WITNESS:**   I'm sorry.  Can we restate the question?

20  **BY MR. SHER:**

21  **Q.**   Does it change your opinion about Pluck by the fact that

22  it no longer provides ratings and reviews to Target?

23  **A.**   So in and of itself it doesn't.  It was a super-useful

24  tool in evaluating to know that a very credible customer used

25  it, but I'd have to know more about why they chose not to use

1    it, which I'm actually intending to do.

2        And since that time, I've had the opportunity to have a

3    lot of firsthand experience, and we've implemented it on test

4    servers on behalf of a variety of clients.  So we feel like

5    we're very familiar with it ourselves now so that the external

6    references are less important today than they were when I first

7    heard of them.

8    Q.   And in your experience, does Pluck still have external

9    references that are important?

10   A.   I believe they do.

11   Q.   And what are some of those?

12   A.   Well, so, there's -- I struggle with some of the names in

13   this thing but, like, we use them at Razorfish for

14   Ford Corporation, and, so, that certainly is a good reference.

15       But then specifically for direct eCommerce, I would

16   probably have to review my expert report because I'm somewhat

17   trepidatious of transposing names.  I have a few names in my

18   head, but I'm just not certain.

19   Q.   That's all right.

20       Let's move on to Gigya, which was another company that was

21   listed there.  Are you familiar with a company called Gigya?

22   A.   I am.

23   Q.   And how have you come to become familiar with Gigya?

24   A.   We first used them specifically for the social sign-in

25   feature that we talked about earlier for a variety of customers

1  at CrossView.  So I was originally aware of them as an

2  excellent solution for social sign-in, and then I later became

3  aware that they had added a ratings-and-reviews feature.

4  **Q.**   And have you had the opportunity to evaluate Gigya's

5  ratings-and-review feature?

6  **A.**   I have.  That was another one I was able to install

7  myself.

8  **Q.**   And in your opinion, is Gigya's ratings-and-review

9  functionality suitable for your clients?

10 **A.**   For many clients it's very suitable.

11 **Q.**   And have you had the opportunity to compare Gigya's

12 functionality to PowerReviews?

13 **A.**   I have.

14 **Q.**   Understanding the objection from Mr. Severt, what was the

15 outcome of that comparison?

16 **A.**   Well, again, it has a number of very favorable features.

17 So Gigya is another one that's highly customizable so I can

18 change the look and feel to be exactly what I want.  It's very

19 closely tied to their best-in-class social sign-in feature, so

20 that's a super-appealing feature.

21     They had some novel ways of sharing reviews that are more

22 advanced than the social sharing that I'm familiar with from

23 PowerReviews.

24     So it definitely felt, on the aggregate, like there are a

25 bunch of clients that it would be more suitable for than

1    PowerReviews.

2    **Q.**   So, Mr. Goldberg, today Gigya does not have a lot of

3    ratings-and-reviews customers.  Does that change your opinion

4    about the capability of their ratings-and-reviews

5    functionality?

6    **A.**   Again, not in and of itself.  Again, if a client -- if a

7    company came to me and said, "I've got the three best

8    references in the world," that would go a long way to assuaging

9    my concerns.

10       If they don't have good reference clients, we feel like we

11   have to do more due -- of our own due diligence to make sure

12   they're a good solution before we'd advocate them to clients.

13   But certainly sometimes clients appreciate hearing about the

14   latest, newest, most novel solution and, by definition, those

15   don't initially start with a marquee client.

16   **Q.**   Let me skip ahead a couple of slides.

17       I'm going to show you a screen shot that I will represent

18   to the Court was copied from Gigya's Web site on October 4th,

19   2013, and it was under a tab called "Gigya's Customers."

20       Mr. Goldberg, when you look at this list, do you have an

21   opinion as to the nature of Gigya's customers?

22   **A.**   I do.  I mean, two things jump out at me.  Obviously they

23   have a number of marquee brands on this list that are very

24   credible, so that certainly is reassuring.

25       And then I also like to see a nice mix of companies that

1  mostly focus on their image online or are sort of brand-based

2  solutions and companies that make their living selling stuff

3  online.  So there's some good, credible, eCommerce retailers on

4  this list.  So that's my initial reaction.

5  **Q.**    Slightly switching topics, you previously testified about

6  ratings-and-reviews plug-ins that have been integrated into

7  eCommerce platforms; right?  Can you describe some examples of

8  eCommerce platforms that have integrated ratings and reviews

9  into their platform?

10 **A.**    I have.  So, for example, Gigya is preintegrated in

11 Oracle's ATG eCommerce site and it's preintegrated into

12 Demandware.

13 **Q.**    And do you have examples of, and I probably used the

14 incorrect terminology, but eCommerce platforms that have native

15 ratings-and-reviews functionality built in?

16 **A.**    Yeah.  So I thought we talked about that earlier.  But

17 eCommerce platforms with built-in ratings-and-review

18 functionality --

19 **Q.**    Yes.

20 **A.**    -- would be the Magentos, the Hybrises, and the Amazon

21 Webstore, for example.

22 **Q.**    And in your opinion, are the integrated solutions, like

23 the ones from Amazon Webstore, Hybris, and Magento, are those,

24 in your mind, viable alternatives to PowerReviews and

25 Bazaarvoice?

1    **A.**    They certainly can be.  Again, like, there's no perfect

2    generalization here, but very often it's very suitable; and

3    when you select a new eCommerce platform and it has built-in

4    ratings and reviews, we have to actually turn the concept of

5    switching costs on its head.

6        So if I were using ATG and I had selected Bazaarvoice as

7    my plug-in and I had spent my resources to integrate

8    Bazaarvoice into ATG, and then I decided to move to Amazon

9    Webstore, I would get the Amazon Webstore ratings and review

10    for free.  I would have to pay again if I wanted to reintegrate

11    Bazaarvoice into the new Amazon Webstore platform.

12        And, you know, one smart feature that both Pluck and Gigya

13    offer is the ability to import your legacy reviews.  So the

14    cost to -- when you switch to Amazon Webstore, for example, or

15    when you switch to one of these other platforms is often easier

16    to use the native platform than it is to maintain your old

17    plug-in.

18    **Q.**    Talking about one more vendor, let's talk about

19    PowerReviews.  You're familiar with PowerReviews'

20    ratings-and-review solution?

21    **A.**    I am.

22    **Q.**    And how would you characterize it?

23    **A.**    So, again, it's, for the right customer, it's an excellent

24    solution and I've advocated it for several customers.

25        And at CrossView we actually built a product where we

1  predid a lot of the eCommerce work.  So sort of you could think

2  of it as an eCommerce site in a box that you just had to do the

3  final customization on, and we built the PowerReviews Express

4  product into that, what we call that Web starter store.

5  **Q.**   And what's the -- was the only product that PowerReviews

6  offered, by the way, the PowerReviews Express ratings-and-

7  reviews product?

8  **A.**   No.  So they had, and I think the name changed a few

9  times, but they had what I would call a more enterprise class

10  product, which was more configurable than the out-of-the-box;

11  but they still -- in the overall spectrum of rating-and-review

12  solution, all the PowerReviews solution skewed much more to all

13  looking relatively the same and having less capability to

14  highly customize the look and feel.

15      And, so, I've seen some testimony in this case that there

16  were two customers that were allowed to customize the look and

17  feel.  I'm a little bitter because I have other customers that

18  would have liked to; but in general, like, if we needed a

19  really specific look and feel, you needed to move to one of the

20  more configurable platforms or one of the platforms that had an

21  API.

22  **Q.**   I'm going to show you the next -- not that one.

23      And I will represent to the Court that this also was --

24  were three screen shots taken on October 4th, 2013, from

25  customers Jockey, Abe's of Maine, and Forever 21 in their

1  ratings and reviews.

2      Mr. Goldberg, are you familiar with these three Web sites?

3  **A.**  I am.

4  **Q.**  And just highlighting on their ratings-and-reviews portion

5  of the Web page, can you please describe what you see related

6  to the ratings and reviews?

7  **A.**  Sure.  So these are perfect examples of the very classic

8  implementation of PowerReviews; and from my perspective,

9  there's absolutely nothing wrong with this implementation.  The

10  biggest challenge is they're all very much the same, and you're

11  allowed to what we call stylize these.  So I can change the

12  colors and fonts.  I can change the spacing a little bit.  Some

13  of the copy I can change.  Some of the copy I can't change.

14      But basically if you select this product, your ratings and

15  reviews are going to look like this, and they're going to feel

16  very familiar to a lot of other Web sites you've shopped, which

17  for some sites is an advantage that they like.  But, man, if

18  you're super-particular about your brand and you want it all to

19  look a certain way, then that would be a reason you might not

20  want to use PowerReviews.

21  **Q.**  Okay.  And shifting topics slightly, in your experience,

22  do Web site operators ever develop or implement their own

23  ratings-and-review solution without purchasing one from a

24  third-party vendor?

25  **A.**  They do.

1   Q.   And how prevalent would you say that this sort of internal

2   development is in the market?

3   A.   I consider it -- wow, did I just get louder?

4        I consider it very relevant.  I mean, I think it happens

5   very often that a customer either actually does build their own

6   ratings-and-review solution, and we've touched on some of the

7   reasons why that could be an advantage.  I could highlight them

8   if you like.

9        But we just -- also, we just see customers do it a lot.

10  We see customers evaluate doing it a lot, and some of the most

11  successful sites on the Web have done it.

12  Q.   And why would a Web site, just to highlight it, why would

13  they want to build their own internal ratings-and-reviews

14  platform?

15  A.   Yeah.  So one aspect is we talked about the SaaS-versus-

16  native solution; right?  So almost all of the plug-ins are

17  SaaS-based; and if we build our own rating-and-review solution,

18  it lives on our server.  It can be much faster.  It has fewer

19  points of failure, what we sometimes called SPOFs, or single

20  points of failure.  So if you're using PowerReviews or

21  Bazaarvoice, and they were to go down, which generally they

22  don't, but it would be bad.  So if you owned -- if you built

23  your own, it's likely to be as robust as the rest of your

24  eCommerce platform.

25       There are clients that do it because they have their own

1  unique requirements.  I know of clients that have unique

2  moderation requirements they want to do that their party

3  vendors aren't willing to accommodate; and, so, that might be a

4  reason they build it.

5      And, again, there's just this strong trend to more money

6  going into eCommerce, eCommerce becoming a more important part

7  of the enterprise, and these business leaders are being tasked

8  with you can't just be the 87th site on the Web that looks like

9  Amazon.  We have to be a unique site that has compelling

10  reasons for customers to come to our site that they can't

11  have -- for experiences that they can't have elsewhere.  And,

12  so, you are just forced to build some unique functionality in

13  many cases.

14  Q.  I'm going to pull up the next slide, which I will

15  represent, again, are three Web pages that were pulled up

16  October 4th, 2013.

17      Can you, Mr. Goldberg, explain what these three Web pages

18  represent?

19  A.  Sure.  So these are three examples of different

20  rating-and-review implementations that are significantly more

21  customized than what you typically get from out-of-the-box from

22  any vendor that I'm familiar with.

23      So, like, one of my favorite examples is Moosejaw.  Like,

24  number one, instead of stars, they have their antler logo as

25  the icon, which is kind of cool; but, like, probably for more

 1   business value, they collect a bunch of attributes about the

 2   person that left the review.

 3       So they sell, for example, ski equipment.  They collect

 4   attributes about how advanced a skier you are.  And, so, then

 5   when you see reviews, you have the ability to filter the review

 6   by other expert skiers.  So no good skier wants my opinion on

 7   skis, for example.  And, so, that's a useful customization.

 8       At the top of the Moosejaw review you see a "Write a

 9   review to earn a hundred points," which for those who aren't

10   familiar in the courtroom, Moosejaw madness points are their

11   customer affinity currency.  And, so, this is a gamification

12   element that's built that they've done to entice people to

13   write more reviews, which is, you know, amongst the most

14   important success criteria for implementing ratings and reviews

15   is you have to get a bunch of people to write them.  So that's

16   a good example.

17       On the Gamefly, they're using a 10-point scale as opposed

18   to the most common convention, the 5-point scale.  And I don't

19   work with this particular client myself, but it makes perfect

20   sense because in their category, the convention is that you

21   rate games on a 10-point scale.  That's what all the editorial

22   reviews do, so they've adopted that standard convention.

23       I do have some clients that sell wine, for example, and

24   the common convention there is a hundred-point scale.

25   Q.  Do you have an opinion about whether or not it's becoming

1    easier or more difficult to develop ratings-and-reviews

2    functionality internally?

3    **A.**    I do.

4    **Q.**    And what is your opinion?

5            **MR. SEVERT:**  Objection, Your Honor.  Again, this is

6    going beyond the scope of Mr. Goldberg's report.

7            **MR. SHER:**  Your Honor, we disagree, and we will be

8    happy to share with Mr. Severt where in Mr. Goldberg's report

9    he discusses the prevalence of in-house and why it's becoming

10   more prevalent.

11           **THE COURT:**  Okay.  I'll take it under consideration.

12           **THE WITNESS:**  So, I'm sorry, the question was --

13   **BY MR. SHER:**

14   **Q.**    Whether or not it's becoming easier or more difficult.

15   **A.**    Sure.  So we hit on a number of the reasons it's easier.

16   You can get your servers and your infrastructure easier.  You

17   can get all your code from code libraries much easier.  So you

18   have to write less of your own code.  And those are two big

19   advantages.

20       The eCommerce platforms are much better today and, so,

21   they actually have a lot of infrastructure to make it more

22   expedient to develop new experiences.

23       And, so, on a lot of these eCommerce and Content

24   Management Systems, even if they don't have ratings and reviews

25   built in, you get to leverage all their infrastructure to do

1    it.

2        So you have to have a database that stores all the reviews

3    people write.  In the old days you'd have to go buy a database

4    or set up a database, like Oracle or MySQL or something like

5    that, which I guess is now Oracle.

6        But today these eCommerce platforms have a database built

7    in and they just readily let you add fields.  So I can go into

8    IBM WebSphere Commerce and say, "Hey, on my product attribute

9    database I want to add a new field called 'Rating.'  I want to

10   add another new field called 'Reviews.'  And I want to add

11   another new field called 'Reviewer,'" and that is a

12   considerable time and resource saving versus the old way of

13   having to build a rating-and-review platform from the metal up.

14   **Q.**  The Government's economics expert, Dr. Shapiro, submitted

15   a report regarding relative desirability of in-house versus

16   commercially developed ratings-and-review solutions, and this

17   is from page 26 of his report.  His report says that:

18   (reading)

19        "The superiority of commercial PRR," that's product

20        ratings and review platforms, "over most in-house builds

21        is consistent with economic principles relating to 'make

22        versus buy' decisions and vertical integration."

23        As it relates to ratings and reviews in eCommerce, do you

24   agree with this conclusion?

25        **MR. SEVERT:**  Objection, Your Honor.  This question

1    goes directly to economic principles.  Mr. Goldberg is not an

2    expert in economics.  He said he was not.  Mr. Sher just asked

3    him if he agrees with the economic principles in this quote.

4         **THE COURT:**  I have the same questions, Mr. Severt, so

5    I'll be interested in the answer to this.

6         **MR. SHER:**  Sure.  I'm not asking Mr. Goldberg whether

7    or not he agrees with the economic principles relating to "make

8    versus buy," but Dr. Shapiro makes an industry statement, which

9    is, "The superiority of commercial PRR platforms over most

10   in-house builds is consistent," so he is saying that in this

11   particular industry, he would expect to see it; and there is no

12   foundation for him to say that, and we're using -- we're asking

13   Mr. Goldberg if he agrees with whether or not --

14        **THE COURT:**  You know, my guess, Mr. Sher, is that you

15   might be able to ask this question a different way; but the way

16   that that sentence is phrased and your question is phrased, I

17   don't think this witness is competent to answer the question.

18        **MR. SHER:**  Sure.

19   **Q.**   Mr. Goldberg, in your experience, is it more or less

20   common for people to be developing product rating-and-reviews

21   platforms?

22   **A.**   I think as we discussed a little earlier, it's as -- at

23   least as common and probably more common, and certainly some of

24   the very best rating-and-review solutions in the industry are

25   developed in-house by individual retailers.

1        THE COURT:  Is there survey data that you're relying

2   on or is this just your sense of what's going on out there

3   given the experience that you've testified about?

4        THE WITNESS:  Mostly the latter.  Like, there probably

5   are some opinions that are based on some studies, but not --

6   this particular one -- there are certain -- there are surveys

7   about in-house build and there are certainly surveys about the

8   increased budget for eCommerce development.  I don't know if I

9   cited one specifically in my report, but I'm aware of a number

10  of studies that dramatically show that customers are investing

11  more.

12       I'm also drawing on the things like my own conversations

13  with clients, and then the observable things like Walmart

14  saying they're going to invest $450 million in custom

15  development this year or Nordstrom saying they're going to

16  invest a billion dollars over five years in eCommerce

17  development.  Those kinds of things.

18       THE COURT:  Thank you.

19       MR. SHER:  Your Honor, I was going to switch topics.

20  I wondered if that's okay or if you wanted to take a break.

21       THE COURT:  No, I'm happy to have you switch topics.

22       MR. SHER:  Okay.  Great.  I just wanted to make sure

23  you didn't want to take a break yet.

24       THE COURT:  No.

25       MR. SHER:  Okay.

1           **THE COURT:**  I think in another half hour or so.

2           **MR. SHER:**  Okay.  Great.

3     **Q.**   So you previously testified that it's important to

4     understand ratings and reviews in the larger context of

5     eCommerce.  Can you explain how it fits into the larger

6     context?

7     **A.**   Sure.  So I sort of introduced in my report there's some

8     specific advantages you get from rating and reviews that are

9     really appealing for an eCommerce operator.

10          So the first is, and I'm not sure this is in the same

11    order as my report, but the first is the SEO value.  And, so,

12    we call it the long-tail benefit; and what that is is, when

13    you're a manufacturer or retailer, you tend to describe your

14    product in a certain way, and not all of your customers might

15    describe it in exactly the same way.

16          So that one of the easiest examples I have is a client of

17    mine that makes cookware, LeCreuset.  There a famous French

18    company.  They make French cookware, and their best selling

19    product is a product they called a French oven, and the problem

20    is that the rest of the world calls it a Dutch oven.  And

21    apparently there was some period when that was -- when French

22    people would not be satisfied to call it a Dutch oven.

23          And, so, still today the product descriptions on all the

24    products are French oven.  Well, shoot, there's some cook in

25    New Orleans that wants to buy cookware and they type into

1    Google "Dutch oven" or there's like a troquet I think is

2    another -- might be the New Orleans term for it or casserole

3    dish, right, like all these different words.

4        And, so, letting customers add their own content, what we

5    call user-generated content, to talk about the product, things

6    like reviews or things like Q & A, cause the customer's words

7    to show up on that page.  And, so, then when Google looks at

8    all the words on that page, it says, "Oh, I see the title of

9    this page is 'French oven' but here's eight reviews where

10   they're talking about the Dutch oven that they love."  And, so,

11   now when you search in "Dutch oven," LeCreuset can rank well

12   and get traffic even though they stubbornly refuse to use that

13   word themselves.

14       So that's a super-common reason that people like

15   user-generated content on the page.  There are others, but

16   that's a big one related to ratings and reviews.

17       The other really big one is what I call social proof.

18   And, so, that's evidence that other people have made this

19   decision before you and it reassures you that you're not going

20   to have buyer's remorse if you buy this, and that's one of the

21   main reasons that someone might hesitate to make a purchase.

22       It used to be we did studies and brand was, like, the most

23   important thing that was the most credibility that caused

24   people to purchase one item over another.  I love Sony TVs, not

25   Samsung.  Today when those same studies are done, social proof

1  rates above brands.  And, so, that's why ratings and reviews

2  are a particularly useful tool, is they're one of the best ways

3  to add social proof.

4       When you go to Amazon and you see a thousand people wrote

5  a review and the average rating was four and a half stars, you

6  don't even need to read any of the reviews; and, in fact, most

7  people don't.  They just go, "Oh, my God, a thousand people

8  wrote a review.  That must mean a million people bought the

9  product."  And odds are it's a pretty safe decision.

10      And, so, the role of ratings and reviews, there's I guess

11  some supplemental things when people write bad reviews, they

12  can teach the manufacturer to improve their product better.  So

13  sometimes you get feedback that, "Hey, these jeans don't fit

14  like the old ones," and they'll literally go back and evaluate

15  their fit.

16      And it's possible for people to write other helpful things

17  in the review.  It's kind of unstructured, so you can't rely on

18  that, but they might put some super-useful tidbit of

19  information in their review that causes someone else to buy it;

20  right?

21      So those are all reasons you'd use ratings and reviews on

22  a site.  And in 2008-2009, ratings and reviews were really the

23  primary tool that we used, on most sites the only tool we used,

24  to get user-generated content and social proof on the product

25  detail page, which is the money page on the site.  That's the

1  site where someone can click "add to cart" and I can achieve my

2  business goals.

3  **Q.**  And you said in 2008 and 2009 ratings and reviews were the

4  primary way to get user-generated content on a PDP, product

5  display page.  Is that the same case today?

6  **A.**  I would still -- yes, I would say that ratings and reviews

7  are still the primary and are still an excellent way to get it.

8  There are more common alternatives today than there were in the

9  past.

10 **Q.**  And what are some of those alternatives?

11 **A.**  So a super-common one is -- well, "super" is too -- a

12 common one -- sorry.  I apologize.

13     A common one is people that have taken pictures of

14 themselves using a product and uploading those to a social

15 network, like in eCommerce that very commonly is Instagram.

16     So if I can show photos of happy customers wearing that

17 ski jacket on the top of Mount Everest, that's pretty

18 persuasive social proof.

19     The question and answers is another way to get customers

20 to talk about products in their own words; and, so, question

21 and answers is a very good way to get long-tail keywords for

22 SEO on a product detail page.

23     I suspect we'll talk about this more later, but there are

24 most recently a bunch of useful tools that will let me take

25 content people have already created on all these social

1    networks and put that content back on my product detail page.

2        So when the person wrote something nice about my product

3    on Facebook that had some minimal value, but it wasn't next to

4    the add-to-cart button; but when I can take those really nice

5    things they said about my product and put it right next to the

6    add-to-cart button, that becomes a much more powerful form of

7    social proof.

8    Q.   And just for complete clarity, you mentioned social

9    networks.  What's a social network?

10   A.   Well, I think probably the most famous one here in the

11   United States would be Facebook, but in eCommerce Pinterest is

12   another very popular one.  There are other ones that are

13   popping -- very popular in a specific vertical market.  So, you

14   know, ones that just curate women's style or ones that curate

15   cool architectural styles, but interest in Facebook are

16   probably the most prevalent for eCommerce.

17   Q.   And is there anything that's happened over the course of

18   the last year that's made it easier for social networks to

19   integrate with eCommerce pages?

20   A.   There are.

21   Q.   Okay.  Can you explain what they are?

22   A.   Sure.  So I apologize for keep bringing up the API word,

23   the API word is turning out to be super-important, but when

24   Facebook was originally launched, all the content you created

25   on Facebook was in what we call the walled garden.  It was

1  content that lived on Facebook and you had to go to Facebook to

2  see it or consume it.

3      And I imagine there were a variety of reasons Facebook

4  chose to do that, but it diminished how useful that content was

5  on my eCommerce site.  And, in fact, in some ways we'd be

6  competing with Facebook because I want them to put that content

7  on my page where customers will see it while they're shopping

8  and not spend their time putting it on Facebook.

9      So specifically in the case of Facebook, in about 2011 at

10 their annual conference they announced some powerful new APIs

11 that let programmers access content from Facebook and syndicate

12 it to eCommerce sites.

13     And, so, the ability to have those pictures that were

14 posted on Instagram show up on the page, that's a result of

15 these open APIs.  The ability to have comments that are written

16 on Facebook show up on a product detail page on an eCommerce

17 site is a function of these new APIs.

18     And then, similarly, I mentioned Pinterest and a

19 super-brief description of Pinterest for people that might not

20 be familiar, you find pictures of things that you like on the

21 Web and you can pin them and you're sort of making a digital

22 scrapbook of all these pictures of things you like.

23     And that's a helpful thing for curating style, but those

24 pictures aren't directly related to my product detail pages.

25 So if a customer saw something on Pinterest that they had to

 1   have, they would have to go on a treasure hunt to find a place

 2   to buy it.

 3        And, so, in eCommerce we like to make it as easy as we can

 4   for people to buy; and, so, Pinterest earlier this year

 5   launched a new feature called Rich Pins; and what that lets me

 6   do is, when people take pictures from my eCommerce site and put

 7   them on Pinterest, there's now meta data and a link attached to

 8   those pictures.

 9        So when you see that picture on Pinterest, below it it

10   says, "Available from Abercrombie & Fitch.  It's in stock now.

11   It costs $79"; and if Abercrombie & Fitch changes its price

12   later, the price actually changes in Pinterest.  So it makes a

13   much more direct tool that people can discover stuff on

14   Pinterest two clicks and buy it.

15   **Q.**   I'm going to show you a --

16   **A.**   Ta-da.

17   **Q.**   So this is another page that was pulled this weekend.

18   It's pulled from the Web site Threadless.com.

19        Mr. Goldberg, can you explain what's here?

20   **A.**   Yeah.  This is the very famous magic bacon ride T-shirt.

21   And, so, this is a T-shirt that they're selling on the site,

22   and there are pictures below the T-shirt that were taken by the

23   site to illustrate the T-shirt; but then below those are

24   pictures that users have submitted on Instagram.  And using an

25   open API and, in the case of Threadless, a third-party vendor

1   called Olapic, Olapic goes and finds those pictures on

2   Instagram and renders them on this eCommerce page, both serves

3   as an awesome form of social proof.

4        And we talked about SEO.  Another form of SEO that's now

5   becoming more popular is image search.  So people are

6   actually -- when you search on Google, you get some results

7   that are pictures; and, so, these pictures now become valuable

8   forms of image search engine optimization.  So it's a newer

9   technique that a lot of people are considering.

10  Q.   I'm going to show you another page that we pulled.  Can

11  you describe what you see here?

12       Again, I'll represent that this was also pulled in October

13  of 2013.

14       Go ahead.

15  A.   So I think this had to have been pulled fairly recently

16  because this is a newer feature that Facebook launched.  These

17  are certain segments of you might call them products, I might

18  call them services, but they're certain segments where they

19  have now added structured reviews for these services directly

20  on Facebook.  So you can now, if you enjoy the hotel you're

21  staying at this week, you can now write a review and give it

22  three stars right on Facebook.

23  Q.   And some more examples?

24  A.   Exactly.  So, like, a category that's probably closer to a

25  product is the video game category, and you can write reviews

1    of your favorite video games and these can be searched in a

2    structured way.

3    **Q.**   Okay.  This was also pulled very recently from the

4    Internet.  This is a screen shot entitled "Facebook Launches

5    New Mobile Design for Business Pages."  Can you please describe

6    what's here?

7    **A.**   Sure.  So a couple of things are going on.  These are what

8    I would call product detail pages about businesses or store

9    detail pages or business detail pages, and they have a lot of

10   the same elements that you would expect on an eCommerce site.

11        But, again, they're native pages that are coming from

12   Facebook, and equally interesting here is that they're mobile.

13   So these are now giving you the ability to write a review of a

14   hotel while you're standing in the lobby on your mobile device

15   and have that review stored on Facebook.

16   **Q.**   And is mobile important for eCommerce?

17   **A.**   Yes.  It's amongst the most important trends.  It's maybe,

18   depending on the category, between 10 and 15 percent of all

19   eCommerce sales is happening on a mobile device; but the much

20   more forward-looking trend is for retailers about just under

21   50 percent of all the time a consumer spends on the retail site

22   is time spent from a mobile device.

23        And, so, amongst my clients, the smart investment right

24   now is in experiences that are going to manifest on -- well on

25   mobile devices.  We talk a lot about kids being born today are

1   never going to own a computer.

2   **Q.**   And this is another screen shot, one of the last that was

3   pulled from Pinterest a few days ago as well.  You've already

4   talked about Pinterest and Rich Pins, but can you just describe

5   visually what's happening here?

6   **A.**   Yep.  So this is sort of exactly what we described.  These

7   on the Weber grill on the left, you see that it's showing its

8   status as in stock selling for 699 from Home Depot.  That's

9   meta data that Home Depot embedded in the picture.

10       And, so, when I click on that in-stock link, I go to the

11  product detail page for that grill, and I can buy that grill

12  for 699.  I think I mentioned if the price changes, it gets

13  updated here.  Pinterest even has a price watch feature.  So

14  you can say, "Tell me if that grill ever gets below 500 bucks,"

15  and they'll actually notify you.

16       They do also tell you how many other people pinned it and,

17  so, that serves as another form of social proof that's very

18  similar to the star rating.  Again, if a thousand people pin

19  something, that's similar socially to a thousand people who are

20  going to write a review about it.

21  **Q.**   We just talked about Facebook and Pinterest and Q & A, and

22  do you believe that these will completely replace ratings and

23  reviews on a product detail page?

24  **A.**   I hope not, not for most customers.

25  **Q.**   And do you believe that they compete against ratings and

1  reviews?

2  **A.**   I do.

3  **Q.**   And how can they compete but not completely replace

4  ratings and reviews?

5  **A.**   Sure.  So all these things take time to implement and

6  resources to implement; and if a given customer decides that

7  one is hot or trendy or more important and they do that first,

8  they have less budget and resources to do other ones, so that's

9  certainly one place.

10     On the eCommerce site, they all compete for the shopper's

11  attention.  And, so, a super-important thing for us is how much

12  you're willing to engage with that page.  And this is going to

13  seem very intuitive, but people that spend six minutes on a

14  page tend to add products to cart more than people that only

15  spend 20 seconds on a page.  And, so, you have a finite amount

16  of your user's attention, and you want to show them the things

17  that are going to add the most value and cause them to want to

18  buy your product.

19     So question and answer is a great tactic.  I really like

20  it.  Ratings and reviews are a great tactic.  I really like it.

21  There are cases when using both, they both get consumed by that

22  six-minute visitor and it dramatically increases their

23  likelihood to buy.

24     But very often the customer's attention is drawn to one

25  and never sees the other, and they might not be drawn to the

1  one we most want them to be drawn to.

2      When we add five ways to add content to a page, the amount

3  of content we get from each tactic is, like, intuitively less;

4  and, so, you know, for example, I get less reviews when I let

5  people do Q & A and upload pictures and do other activities on

6  the product detail page.  So they compete in that way.

7  **Q.**   And you mentioned Amazon a number of times.  Does Amazon

8  provide ratings and reviews?

9  **A.**   They do.

10  **Q.**   And where do they provide ratings and reviews?

11  **A.**   Well, I mean, there's different contexts but, like I

12  mentioned, you're talking about on Amazon.com they provide a

13  very robust set of ratings and reviews on their product detail

14  pages.

15  **Q.**   Have you had an opportunity to examine the ratings and

16  reviews on Amazon.com?

17  **A.**   Many times.

18  **Q.**   And what's your opinion?

19  **A.**   It's amongst the very best implementations of ratings and

20  reviews.

21  **Q.**   And have you analyzed Amazon's efforts in ratings and

22  reviews over time?

23  **A.**   Yes.  We have to watch them extremely closely.

24  **Q.**   Why?

25  **A.**   Well, they're the most influential and they are the

1    competitor that most of my clients are most concerned about.

2    And, so, many of my clients will want to do something just

3    because they see Amazon doing it or they will at least want to

4    have a dialogue about that.

5        And they get much more traffic than any other eCommerce

6    site, so they're able to address problems and come up with

7    clever solutions before a lot of other sites even have that

8    problem.  So they were getting hundreds or thousands of reviews

9    when other sites were only getting a few reviews.  And, so,

10   quite understandably, they had to figure out better customer

11   experiences to help a customer navigate through hundreds of

12   reviews, and they came up with this clever feature:  Let's let

13   people review the reviews.  So you could rate the individual

14   reviews, and now I'll show the reviews that people said were

15   most useful at the top.

16       Other sites do that now, including Bazaarvoice, but

17   originally Amazon did it and very, you know, obviously, because

18   they were the first one to have this problem of too many

19   reviews for a customer to read them all.

20   **Q.**   If Amazon decided to offer ratings and reviews on a

21   stand-alone basis, would you consider that to be a viable

22   option for your customers?

23       **MR. SEVERT:**  Objection.  This was not in his reports.

24   No foundation to establish this line of questioning.

25       **THE COURT:**  Mr. Sher?

1           **MR. SHER:**  We can show -- we can, again, have a

2    discussion with Mr. Severt about ratings and reviews.

3           **THE COURT:**  Okay.  I'm going to be pretty strict --

4           **MR. SHER:**  Understood.

5           **THE COURT:**  -- being sure that this testimony is

6    contained in the report.

7           **MR. SHER:**  Understood.

8           **THE WITNESS:**  I'm sorry.  Can you repeat the question?

9    **BY MR. SHER:**

10   **Q.**   Amazon.com -- in your opinion, if Amazon.com had ratings

11   and reviews, would that be sufficient for your clients?

12   **A.**   The feature set would be very compelling.  My clients

13   would certainly be interested in the feature set.

14   **Q.**   Are you familiar with Amazon Webstore?

15   **A.**   I am.

16   **Q.**   And are you familiar with -- what is Amazon Webstore?

17   **A.**   Yeah.  So Amazon Webstore is Amazon's product for other

18   retailers to use to host their own eCommerce sites.  So that's

19   essentially their commercial eCommerce platform that they sell

20   to others.

21        So Fruit of the Loom has a Web site, Fruitoftheloom.com.

22   That's -- the eCommerce platform they're using is Amazon

23   Webstore to deliver that experience.

24   **Q.**   You mentioned Q & A also.  What is Q & A?

25   **A.**   So a similar experience to ratings and reviews, Q & A

1   stands for question and answers, and it's a newer tactic that's

2   becoming more prevalent on eCommerce sites than ratings and

3   reviews.

4        This is where a customer that has a specific reason that

5   they're concerned about buying a product or wants to know

6   something that isn't obviously answered on the product detail

7   page can literally ask their own question:  What's the shelf

8   life of that product?  It doesn't say anywhere in the

9   description.  I don't want to buy it if it's going to expire in

10  30 days.

11       And, so, then someone else that has already bought that

12  product can see that question, and they can answer it; and that

13  answer both has the potential to help the original shopper

14  decide to buy it hopefully or at least realize that it's not

15  the right product for them and not buy it.

16       And that question and answer live on that site forever.

17  So if one person has a question, it's very likely that future

18  visitors will have that same question and, so, it builds a very

19  useful database of user-generated content that helps the user

20  self-define the things they want to know about the product that

21  we failed to tell them.

22  **Q.**  Again, you don't believe that question and answer is going

23  to completely replace ratings and reviews; correct?

24  **A.**  In the most common use cases, no.  There are certain cases

25  where it would but most commonly, no.

1   Q.  Let's go back and explore what you called very early on, I

2   believe you called it the path to purchase.  This was back when

3   we were talking about your qualifications.

4       Do retailers pay attention to how consumers purchase

5   products online?

6   A.  They certainly do.

7   Q.  And do you have an opportunity to study these trends?

8   A.  Yes.  It's one of the common tools we use to evaluate

9   customer experiences and improve them.

10  Q.  And are you engaged to analyze these trends?

11  A.  For almost every client that we -- that we have any

12  significant consulting for, part of it is access to their

13  analytics and an evaluation of the customer behaviors on their

14  site.

15  Q.  Okay.  And what, in your experience, do these trends show

16  regarding how customers purchase products and services online?

17  A.  Yeah.  So I prepared an illustration because it's a little

18  complicated.  So for a long time the primary way that people

19  used eCommerce sites is what we call the "Happy Path" and, so,

20  that's the one I've highlighted in yellow on the board there.

21      The customer types "BestBuy.com" into the browser, and

22  they get to Best Buy's home page.  They do a search or click on

23  a menu and get to a product detail page, and they see a TV they

24  want and they add it to cart and hopefully buy it.

25      Sadly, as I think you guys probably all know, a really

1    successful site, two out of a hundred people do that; and an

2    unsuccessful site, one out of a hundred people do that.  But

3    that's sort of the "Happy Path" that we imagined, and

4    originally that's the path customers took and, so, we designed

5    all the pages for that to happen.

6        But today there are a much wider variety of different

7    paths that different customers take, and it's fundamentally

8    changed how we have to design these experiences because we have

9    to accommodate all these customers that do things that weren't

10   contemplated in our "Happy Path."

11       So this chart looks a little complicated.  It's actually

12   even still a gross oversimplification, unfortunately; but going

13   from left to right, there are studies that say that about

14   30 percent of people that know they want information about a

15   product don't start their shopping experience at Google.  They

16   start it on Amazon.  And, so, they type "Amazon" into their

17   browser, they do a search for a TV, and very often they buy the

18   TV from Amazon.  So you can imagine that's bad news for

19   Best Buy.

20       One of the things retailers now do is they throw in the

21   towel and they say, "In addition to selling products on my own

22   site, I'm going to sell products on Amazon.  So when they do

23   that, at least I'll still get some of the profit."

24       And, so, Amazon, in addition to selling their own

25   products, are what we call a marketplace and sell products from

GOLDBERG - DIRECT / SHER

1   other companies.  And, you know, I think probably half of the

2   companies that we've talked about in this case are probably

3   selling products on Amazon marketplace.  So that's the first

4   path.

5       The second path is they use Amazon for product information

6   because they just know that's where people go the most.  They

7   know that's where they're going to find the most reviews.  They

8   know that's where they're going to find the broadest assortment

9   of products.

10      And, so, they sort of use Amazon as their search engine,

11  but they may have some reason they don't like to buy from

12  Amazon.  Maybe they think they'll get better service if they

13  buy directly from the manufacturer Sony than they will from

14  Amazon.

15      So they do their product research on Amazon, then maybe

16  they search for the best price in a comparison shopping engine,

17  and it takes them to Sony or maybe they have an affinity and

18  they go straight to Sony.

19      So the consideration happens on Amazon, the purchase

20  happens on my eCommerce site.  So in that mode, you're very

21  unlikely to consume a lot of the content on my product detail

22  page.  So my ratings and reviews that I spent a bunch of money

23  and worked hard to collect are less influential when you've

24  already seen a thousand reviews on Amazon.  And, so, that's a

25  new case that we have to solve.

1     I talked about early in the report, hey, if you're only

2   there for 20 seconds, you're not likely to buy; if you're there

3   for 6 minutes, you consume a bunch of my content.  That was an

4   oversimplification.  Today that 20-second visitor might be the

5   dude that did all their shopping on another site.

6     So we have to segment the users by how they got to our

7   site, and then evaluate behavior differently, but that's an

8   increasingly common path that users take.

9     Of course, most users still start their search on Google.

10  If they have a specific product in mind, again, they might be

11  more likely to go to Amazon; but if they're starting generally,

12  they do a search on Google.  And as a retailer if I do a great

13  job of SEO, maybe that Google search takes them to my product

14  detail page; but when it does, they skip my home page and my

15  category page.

16    So before where I could have told my social proof story

17  progressively on those three pages, now I have to make sure

18  that everything I want that customer to know lives exclusively

19  on the product detail page, because more than half the traffic

20  on most eCommerce sites enters now on a product detail page.

21  That's what we would call the landing page; whereas, in the old

22  "Happy Path," they all landed on the home page to start.

23    It's still humorous, every CEO argues about the design of

24  the home page and they leave us more autonomy to design the

25  product detail page, which happens to work out well.

1    But when Google does that search, more and more often they

2  can give a different result besides a retailer's product page,

3  and in particular they can give a comparison shopping site

4  write shows a bunch of different people that sell the product

5  and their price.

6    And, so, obviously that creates greater price competition

7  which drives prices down and does a bunch of things that

8  retailers aren't in love with; but even worse, Google has their

9  own comparison shopping site.  So when you do a search on

10  Google, it's very likely that some of the results you see are

11  going to be from Google's comparative shopping site.

12    And they -- to the customer, they call that Google

13  shopping.  The trade name for that feature is called Google

14  Product Ad, Listing Ads, PLAs.

15    And, so, when you land on their PLA, you're seeing a

16  product detail page that Google built, and it has content that

17  they've syndicated from other sites and it has reviews, and it

18  has reviews that Google has collected themselves.  It offers

19  the customer the ability to write their own review, and the

20  customer could likely do all of their consideration and consume

21  all their social proof on that comparative shopping site that

22  Google provided and then only go someplace else to buy it at

23  the very end.

24    So, again, I now as a retailer have to make sure that I

25  show up really well in those comparative shopping ads.  They

1    might be consuming Google's reviews more than mine and, so, the

2    amount of money I'm willing to invest per review might go down

3    a little bit on my site as more of these are getting consumed

4    elsewhere.

5          And then the last use case that I'm going to steal

6    attention for here is those folks that created some interest on

7    a social network.  So we looked at all those Rich Pins.  That

8    was someone that was browsing around on Pinterest and they saw

9    that grill, and they clicked on that grill.  That's now 4 to

10   5 percent of all the traffic that gets to that product detail

11   page; but as you can imagine, it's a rapidly growing percentage

12   of the traffic.

13         And, so, again, the social proof I'm going to share with

14   you when you came from Pinterest and saw the thousand likes and

15   all those things is different than the social proof I needed to

16   show you in my old "Happy Path" world.

17         So it just -- it's a much more complex ecosystem.  We can

18   no longer design anything on the page for one use case and one

19   kind of customer.  We have to be thinking about all these

20   different customer journeys and, frankly, make compromises for

21   all of them.

22               **THE COURT:**  Why don't we take our ten-minute break.

23               **MR. SHER:**  Great.  Thank you.

24                     (Recess taken at 11:15 a.m.)

25                     (Proceedings resumed at 11:25 a.m.)

1              THE COURT:  Please be seated.

2          MR. SHER:  Your Honor, before we get back to

3   Mr. Goldberg, just to address some of the issues that the

4   Department of Justice raised.

5              THE COURT:  Okay.

6          MR. SHER:  I believe it's the case that the DOJ has

7   withdrawn its contention that Mr. Goldberg did not discuss the

8   Reevoo conversation, which he did in his report at page 51.

9          And we will withdraw Mr. Goldberg's opinion regarding

10  Amazon Webstore because that was not mentioned in his report.

11         Where we still have disagreements are in three spots:

12  One, the trend to in-house; two, direct comparisons between

13  PowerReviews and other vendors; and, three, Amazon.

14             THE COURT:  Okay.

15         MR. SHER:  First, related to trends in in-house, at

16  page 65 to 68 of Mr. Goldberg's report, his initial report, he

17  talks about in-house solutions exclusively.  And the

18  penultimate sentence states:

19             "In my opinion, a customer could create its own

20         ratings-and-reviews functionality with little effort.  In

21         my experience, the typical customer, E-customer

22         development team would take two to three sprints, which

23         would equate to four to six weeks to develop a basic

24         ratings and reviews solution, including development,

25         testing, validation, optimization and deployment."

 1          The previous three pages of that report discuss examples

 2     of companies that have gone in-house.

 3          And he also discusses the larger trend towards in-house,

 4     including Walmart's acquisition of a technology company;

 5     Staples' development efforts; and also Best Buy.

 6          In his initial report, he also states at the introduction

 7     of his report that he was asked specifically to offer an

 8     opinion as to alternatives that are available to customers

 9     other than Bazaarvoice and PowerReviews.  And in-house, he

10     describes in his report, is a clear, viable alternative.

11          **THE COURT:**  Okay.

12          **MR. SHER:**  So that's on in-house.

13          **THE COURT:**  Could I just hear from Mr. Severt on that.

14          **MR. SEVERT:**  Your Honor, as Mr. Sher notes,

15     Mr. Goldberg does talk about that it's an opinion on the ease

16     of in-house.  He does not offer an opinion specifically on a

17     trend toward the ease of in-house; and certainly not in the

18     form of any kind of opinion in that report.

19          **MR. SHER:**  And in response to that, he actually does

20     discuss the trend.  And the specific examples that he gives

21     are, in recent times, companies like Walmart, Staples and

22     Best Buy have purchased technology companies specifically to

23     develop in-house solutions, including ratings and reviews.  So

24     he actually does specifically discuss that.

25          **THE COURT:**  Okay.  Well, I'll take a look at that.

1          Do you want to go on to the direct comparisons?

2          MR. SHER:  Sure.  So, Your Honor, there's no doubt

3   that Mr. Goldberg discusses in detail all of the alternatives,

4   including Reevoo, PowerReviews, Bazaarvoice, Pluck.

5          He does not make an express direct comparison in a chart

6   between the two, but he talks about the features and

7   functionalities of one, and then talks about the features and

8   functionality of the next.

9          And we would argue that under Rule 37(c) that's a fairly,

10  you know, small chasm to cross, and that's fairly close to

11  offering an opinion on comparisons.  So he clearly -- he

12  clearly discusses all of them, and discusses the pros and cons

13  of each of them.  So we think that he's more than within his

14  testimony to be able to offer that.

15          THE COURT:  Mr. Severt.

16          MR. SEVERT:  Your Honor, we simply disagree.

17          He does talk about various features of the -- Pluck and

18  Gigya, but he doesn't, in a comparison format, weight those

19  differences in a detailed way so that we could have

20  cross-examined him on the relevant strength of those products.

21          THE COURT:  What's the -- the third is on Amazon.

22          MR. SHER:  On Amazon, Your Honor, he actually calls,

23  in his report, Amazon the gold standard of ratings and reviews.

24  And he talks about in his -- specifically in his introduction

25  to his report, that he was asked to valuate the effect of

 1   companies like eBay and Amazon on eCommerce and ratings and

 2   reviews.

 3              THE COURT:  Mr. Severt.

 4              MR. SEVERT:  The question Mr. Goldberg was asked on

 5   Amazon was a hypothetical question regarding what if Amazon

 6   were to sell its ratings-and-review product separately.  And

 7   that particular hypothetical scenario Mr. Sher asked about is

 8   not contained in his report; though he does talk about Amazon

 9   generally.

10              THE COURT:  Thank you.  I will take a look at the

11   report and those three issues.

12              MR. SEVERT:  Oh, Your Honor, there was one additional

13   that we talked about.

14              MR. SHER:  Yeah.  The last one was to the extent that

15   Mr. Goldberg's testimony states that question and answer is

16   more prevalent than ratings and reviews, and which I honestly

17   didn't hear.  But to the extent he said that, we will strike --

18   we will strike.

19              THE COURT:  All right.  Thank you, Mr. Severt.

20              MR. SEVERT:  Thank you.

21   BY MR. SHER

22   Q.   Mr. Goldberg, let's go back specifically now to

23   ratings-and-reviews functionality.  Are you familiar with the

24   term "syndication"?

25   A.   I am.

1  Q.   And what is syndication in the context of ratings and

2  reviews?

3  A.   Well, so it's one content owner delivering content for use

4  on other sites or to other entities.  So, like, most directly

5  in ratings and reviews it's a brand that collects on reviews

6  and then makes those reviews available to a retailer so that

7  shoppers on that retail site can see.

8  Q.   In your experience, why do websites choose to syndicate

9  ratings and reviews and other content?

10  A.   Uhm, well, the -- I think I mentioned in some earlier

11  testimony that one of the most important things to make ratings

12  and reviews successful is you have to have actual ratings and

13  reviews.  Just having the capacity alone isn't helpful.

14      And so, in fact, going to a bunch of product detail pages

15  that clearly have the ability to have reviews and show none is

16  potentially negative social proof because it demonstrates that

17  there hasn't been a lot of activity on that page.

18      And so syndication is one of the ways that you could

19  potentially get more reviews more quickly.

20  Q.   Okay.  And are there reasons why a website might not want

21  to syndicate content?

22  A.   Yes.

23  Q.   And what are those?

24  A.   Uhm, well, the biggest is we've talked a lot about SEO

25  being one of the primary benefits of ratings and reviews.

1    Google doesn't tell us in -- and in the U.S. Google is

2    overwhelmingly the most important search engine.  Google

3    doesn't tell us their exact rules for how they rank content.

4    They intend to keep that secret so that we can't game the

5    system.  But they generally give us guidelines.

6         And it's very well understood, and they've disclosed in a

7    number of instances, that duplicative content is less

8    persuasive than unique content that only lives on your site.

9         So you take the same news article that appears in 57

10   magazines, and Google isn't very impressed by that content.  If

11   you're the only site in the world with that article, Google is

12   much more impressed.

13        And they actually have said, And if we see too many copies

14   we don't even think it's an accident; we think you're doing it

15   on purpose and we'll penalize you.

16        So we don't know what that threshold is.  Is it the same

17   review can't show up on ten sites, can't show up on a hundred

18   sites?  Google doesn't make that clear.

19        But, generally, if it's the same content that that

20   manufacturer is providing for several other retailers, it

21   likely is not helping you from an SEO standpoint, and

22   potentially could be hurting you.

23        So if you're a retailer that can successfully collect

24   reviews on your own, then, of course, you would like to just

25   have your own unique reviews that you make available to no one

1    else, rather than have those duplicative and potentially

2    penalizing reviews.

3         You also can have different syndication standards or

4    moderation standards, and things like that.  And so in some

5    cases you wouldn't want reviews from a manufacturer that were

6    collected with a different set of structures.

7         So Moose Jaw, we saw that example, they want to know a lot

8    of information about the person that wrote the review.  But if

9    North Face were to collect that review and want to syndicate

10   it, they very well might not have collected that information.

11   So that can be a detriment to syndication.

12   **Q.**   And, in your experience, do many customers choose to

13   syndicate ratings and reviews?

14   **A.**   Uhm, I'm not -- I'm not sure that I'd characterize by

15   "many."  I would certainly say less than half.  But there are,

16   certainly, a significant number that do.

17   **Q.**   And if one of your customers or clients wanted to

18   syndicate, what are its options?

19   **A.**   So we have a wide variety of options.

20        As I suspect was covered in some other testimony,

21   Bazaarvoice certainly has a number of the features to syndicate

22   reviews built right into its product.  And so that would be one

23   easy way to get reviews from one Bazaarvoice customer to

24   another Bazaarvoice customer.

25        But these days, we have -- the problem isn't just ratings

1    and reviews.  We have a huge amount of information, as a

2    manufacturer, that we need to share with all of our retail

3    partners.  So, usually, in our vendor agreement we're obligated

4    to give them pictures of products.  So I have to send pictures,

5    and they have to match up my pictures with their product

6    numbers.

7         I very likely give them product descriptions and weights

8    of products, and all these things that we call attributes of

9    the product.

10        So manufacturers routinely make all of those product

11   attributes available to their resale partners, and so they all

12   have to be syndicated.

13        And the industry has built a number of tools designed to

14   syndicate that content.  So most often we call that product

15   information management.  And there's a number of commercial

16   third parties:  Steebo, and Hyler, Merchant Tree.  I think

17   you -- there was a deposition or some testimony from one which

18   was Webcollage.

19        So there's a host of people that solve that part of the

20   problem, but retailers have to solve that problem more times.

21   So I also want to send all the information I have on my site to

22   Amazon and Google because we talked about I need to show up in

23   that Google product listing ad and I need to show up in the

24   Google -- in the Amazon marketplace.

25        So I actually have to, again, syndicate all the content

1    I've collected to those third parties, and I have to match up

2    my part numbers with their part numbers, and my names for

3    categories with their names for categories, what we call the

4    taxonomy.

5         Then I have a subset of my vendors that actually ship the

6    product for me.  So we call that drop shipping.  That Weber

7    grill is a giant grill.  That might not be sitting in a Home

8    Depot warehouse.  That could be sitting in a Weber warehouse.

9    And Home Depot could send the order back to Weber, and Weber

10   could ship it.

11        So in that case, Weber needs to send information to Home

12   Depot about the product, but also its availability and shipping

13   time, and shipping confirmation number, and a whole host of

14   other things.

15        So, in general, this problem of suppliers having to share

16   a bunch of information with vendors is ubiquitous, and there's

17   tools built into these platforms to do it.

18        There are third parties that do it for you as a service.

19   The biggest retailers in the world all have portals set up.

20   Walmart has a thing called Retail Link, so you can just go

21   right to it and upload all your data.

22        It's a -- it was once a very painful problem in the

23   industry.  And it's still time-consuming, but it's a -- it's

24   the cost of doing business today.

25   Q.   You didn't mention, as one of the alternatives for

1    syndication, PowerReviews.  Is there a reason why you didn't

2    mention PowerReviews for syndication?

3    **A.**    I didn't intentionally exclude them.  In my experience, I

4    wasn't aware of any clients that syndicated with PowerReviews.

5    But I believe they have the ability.

6    **Q.**    Let's move on to another topic, related to ratings and

7    reviews.

8         Do you have an understanding of the term "moderation" in

9    the context of social commerce?

10   **A.**    I do.

11   **Q.**    And what is moderation?

12   **A.**    So moderation is the practice of auditing or reviewing the

13   user-generated content before it goes live on the site.

14        So, obviously, I don't want inappropriate content or

15   content that violates my brand standards.  Or in some cases

16   people sell products that have regulatory restrictions about

17   what can be said about it.  And so all those things need to be

18   checked before I let the content appear on the site.

19   **Q.**    And how would the website go about moderating content?

20   What are the options?

21   **A.**    Yep.  So there's a variety of ways that we moderate

22   user-generated content.  Very often there are automated tools.

23        So computer programs are algorithms that are getting

24   increasingly sophisticated to evaluate natural language and

25   decide, on an automated basis, what should be allowed and what

1    shouldn't be allowed.  My understanding is that's how Amazon

2    moderates all their reviews.

3        There are tool sets for moderation, that enable the

4    clients to do their own human moderation.  So it's a tool set

5    to make it easier for them to do the work themselves.

6        And very commonly in eCommerce sites the customer service

7    team that take phone calls and those kind of things is also the

8    moderation team that moderates that content.

9        And then there's a wide variety of third parties that you

10   can hire to moderate your content for you.

11   Q.   What kind of third parties are you thinking about?

12   A.   Well, my own firm Razorfish does moderation for a variety

13   of our clients.

14       Bazaarvoice has a human moderation service that's an

15   optional component of their service.

16       There are some third parties that specialize in

17   user-generated content, like eModeration.

18       And then there's a bunch of third parties that just

19   generally give you cost-efficient bodies that can be trained to

20   do moderation.  What we'd call, like, business process

21   automation firms or things like that.

22   Q.   You had mentioned in your report that there are a number

23   of ways to conduct moderation.  I was just going to show you

24   some video deposition clips on the topic of moderation, and

25   then I have a question or two for you.

1      (Videotaped testimony played as follows:)

2      "Q.   Does Gigya offer moderation services?

3      "A.   Yes.

4      "Q.   Do many of Gigya's customers request moderation

5      services?

6      "A.   Gigya offers moderation technology.  We do not offer

7      through Gigya human moderation.  We have a partner that

8      provides that service.

9      "Q.   What partner provides that service?

10     "A.   EModeration is the name of the company."

11     (Videotaped testimony played as follows:)

12     "A.   Our platform has moderation tools which can be used

13     by either Demand Media's moderation services team or can

14     be used by the customer.  And then we operate outsourcing

15     of moderation, which we call moderation services.

16          "And so every one of our customers uses the

17     moderation tools.  A select number of our customers have

18     also acquired moderation services from us."

19     (Videotaped testimony played as follows:)

20     "A.   (Unintelligible) our company did a ratings and

21     reviews module on our site, that can be used on our sites

22     to capture user reviews.  It also has a module which

23     allows us to go in, ourselves, manually, see those

24     reviews, review them, and approve or deny them.  So it has

25     a workflow model that allows us to go in and monitor those

 1    ratings and reviews ourselves.

 2    "Q.  I've heard the term moderation --

 3    "A.  Yes.

 4    "Q.  -- before.

 5    "A.  Right.  Moderation.  It allows us to moderate our own

 6    ratings and reviews."

 7    (Videotaped testimony played as follows:)

 8    "Q.  Does Wayfair moderate its own reviews?

 9    "A.  Yes.

10    "Q.  If you know, can you say how much time and effort it

11    takes to moderate the reviews?

12    "A.  I do.  There are costs to moderate a review,

13    factoring all of the engineering time I described.  And

14    compared to what we were paying PowerReviews our costs to

15    moderate a review went down after we switched to the

16    in-house tool."

17    (Videotaped testimony played as follows:)

18    "Q.  Does the company do moderation for Q&A today?

19    "A.  Yes.

20    "Q.  And does it do moderation for ratings and reviews?

21    "A.  Yes.

22    "Q.  So one person does the moderation for both Q&A and

23    ratings and reviews?

24    "A.  Correct.  And the community helps too."

25    (Videotaped testimony played as follows:)

1    "Q.  Could you give me an estimate for how much time

2    Lovesac employees spend moderating reviews on the website

3    each week?

4    "A.  I would say they spent up to between four and five

5    hours per week doing moderation.

6    "Q.  Was that a single employee?

7    "A.  Yes."

8    (Videotaped testimony played as follows:)

9    "Q.  Does iHerb moderate its reviews?

10   "A.  We have maybe half a (unintelligible) who reviews.

11   And they review it for reviews as they get posted.  But,

12   generally speaking, we don't put too much into it.  We

13   usually review it more after the fact."

14   Q.  So, Mr. Goldberg, in your experience, are the examples of

15   the customers that were mentioned in that deposition consistent

16   with your understanding of how customers moderate the options

17   available?

18   A.  They are.

19   Q.  Let's move on to another topic.

20       Are you aware of any instances where a customer has

21   switched ratings-and-reviews providers?

22   A.  A few, yes.

23   Q.  And does that happen often?

24   A.  No, not very often.

25   Q.  And when would a customer potentially switch ratings and

1    reviews vendors?

2    **A.**   Well, they could switch at any time, but there are

3    certainly inflection points when it's easier or more likely, or

4    there are certain points when I would certainly recommend it be

5    considered versus not.

6         So like a clear point is when you're changing that

7    eCommerce platform.  So you were on Oracle and you're moving to

8    IBM.  That's a great, very cost effective time to evaluate your

9    whole echo system of vendors, and that would include ratings

10   and reviews.

11        It's also true that these eCommerce platforms get

12   upgraded.  And it used to be less frequent.  It's becoming more

13   and more frequent.

14        And the -- a significant platform upgrade from IBM

15   WebSphere Commerce Version 6 to IBM WebSphere Commerce Version

16   7 is also like almost an equivalent disruption to

17   re-platforming.  So it's another time when it's very cost

18   effective to evaluate those vendors.

19   **Q.**   And how often does that happen, an upgrade or re-platform?

20   **A.**   It varies wildly depending on the retailer and platform.

21   Increasingly more often.

22        So I think in my expert report I cited a Forrester study

23   where they had asked a bunch of CIOs, and I think 50 percent of

24   them said they plan to re-platform in the next two years.

25        And in the past, I would have expected upgrades to happen

1    less frequently.

2    **Q.**    And it's at that time you believe that's the best

3    opportunity for switching plug-in vendors would happen?

4    **A.**    For the most part, that's the advice I give to my client.

5    If they wanted to switch midstream, I would want to talk with

6    them about what the reasons are.  And they would, like, ideally

7    have to have a good reason because it can be expensive and

8    disruptive.

9    **Q.**    Switching gears one final time.  We're almost done.  Home

10   stretch.

11       Are you familiar with the publication *Internet Retailer*?

12   **A.**    Very familiar.

13   **Q.**    What is the *Internet Retailer*?

14   **A.**    So *Internet Retailer* is a magazine that's published

15   monthly and has an online edition.

16   **Q.**    Are you familiar with something called the *Internet*

17   *Retailer 500*?

18   **A.**    Yes.

19   **Q.**    And what is the *Internet Retailer 500*?

20   **A.**    That's an annual publication from the same company.  And

21   it tries to create a list of what they consider to be the 500

22   largest eCommerce sites.  And it gives some -- some attributes

23   about each of those sites.

24   **Q.**    And have you ever had the opportunity to evaluate the

25   companies listed in the *Internet Retailer 500*?

1   A.   I have.

2   Q.   And what was the outcome of that evaluation?

3   A.   Well, it's certainly a useful list.  I use it because it's

4   a consistent reference.

5        But it's inconsistent, and so we don't find it to be a

6   perfectly accurate list of the 500 biggest sites.  And we

7   certainly don't have very much confidence in the supplemental

8   data, like the traffic or the revenue or those things.

9   Q.   Does it exclude any types of companies?

10  A.   Well, so their editorial policy is yes, they have a

11  specific set of criteria that you need to make to be on the

12  list.  But for almost every one of their criteria that I'm

13  aware of, there's at least one significant exception on the

14  list.

15       And so that like -- the U.S. Department of Commerce has a

16  list and they exclude categories, but they're pretty consistent

17  about it.

18       One of the problems with the IR500 list is we don't have

19  marketplace revenue except when we do.  Or we don't have travel

20  revenue except when we do.  It makes it inconsistent to

21  compare.

22  Q.   Are there any marketplaces missing from the *Internet*

23  *Retailer 500*?

24  A.   I think potentially the biggest.

25  Q.   Who's that?

1  **A.**    EBay.

2  **Q.**    And eBay is a large Internet eCommerce company?

3  **A.**    By most counting methodologies, they would be the second

4  largest eCommerce company in the U.S.

5  **Q.**    You mentioned marketplaces.  Are there any other

6  categories that are not included in the *Internet Retailer 500*?

7  **A.**    There's a number.  So they -- they don't list,

8  intentionally, adult-oriented websites.  They don't

9  intentionally list marketplaces.  They don't intentionally list

10  revenue from outside the U.S.  They don't intentionally list

11  revenue from digitally-downloaded products like apps or music.

12  They don't intentionally list travel and services-type

13  products.  So that would be both like hotels and airlines and

14  event tickets.  And then they don't intentionally list what we

15  call B-to-B revenue.  Or sometimes they're referred to as

16  wholesale revenue on the list.

17      But, again, I'm aware of cases for all of those examples

18  where -- where there are people listed on the site, on the

19  list.

20  **Q.**    And, in your opinion, do those categories of sites that

21  you listed have need for ratings and reviews technology?

22  **A.**    I'm certain we could find sites in every one of those

23  categories that use them.  And in some categories it's

24  ubiquitous.

25  **Q.**    What about manufacturers, are they included in the

 1   *Internet Retailer 500?*

 2   **A.**   That's, again, a very inconsistent one.  So, like, I think

 3   when they started the list the editorial policy was, we don't

 4   want manufacturers; we want retailers.

 5        And when they started it, it was probably pretty uncommon

 6   that a manufacturer also sold direct.  Today the -- some of the

 7   retailers that we think of as the best retailers in the world,

 8   like Apple, are, in fact, a manufacturer.

 9        So that's a distinction that really doesn't make sense

10   anymore.  And it's completely inconsistently enforced on the

11   IR500.

12   **Q.**   With regard to manufacturers, do they have a need for

13   ratings and reviews, in your experience?

14   **A.**   Absolutely.  Both ones that sell products directly; and,

15   of course, manufacturers that don't have a add-to-cart button

16   have a good application for use.

17   **Q.**   In your opinion, does the size of a customer's online

18   sales correlate to the decision as to whether or not to deploy

19   ratings and reviews?

20   **A.**   Not at all.

21   **Q.**   Why not?

22   **A.**   Well, just from my experience there, are very large

23   companies that choose not to deploy ratings and reviews.  And,

24   of course, there are large ones that do.  And there's a

25   voluminous number of tiny companies that rely on ratings and

1    reviews.

2        So I just -- I haven't seen any correlation between the

3    size of the company and their likelihood to have a

4    rating-and-review solution.

5    **Q.**   And then related question, does the size of a company

6    correlate to the amount of money that a company might spend on

7    ratings and reviews, in your experience?

8    **A.**   Uhm, it does not.

9    **Q.**   Why not?

10   **A.**   Well, a variety of reasons.  In my experience, most of the

11   prices paid for ratings and reviews are individually

12   negotiated.  And it's my perception that some negotiators are

13   better than others.  And that's not always correlates to the

14   size of the retailer.

15       But, certainly, some enormous retailers are famous for

16   their quite challenging negotiating skills.  Like we think of

17   Walmart in particular as being a very aggressive negotiator.

18   So I would be somewhat surprised if they paid more than -- than

19   another -- a smaller retailer that got similar services, for

20   example.

21       And we -- we see countless examples of sites of various

22   sizes with rates that don't -- don't correlate to their size.

23   **Q.**   Finally, Mr. Goldberg, based on your experience, do you

24   have an opinion as to whether or not customers have more or

25   less choice today for ratings and reviews vendors than they did

1  two years ago?

2  **A.**    I do.  I believe that there are more choices today for

3  ratings and reviews than there were two years ago.  And I

4  believe more of those choices are credible more often.

5  **Q.**    And in your experience, do you expect the industry to

6  continue to develop and change?

7  **A.**    I do.

8  **Q.**    And sitting here today, do you know who those vendors

9  might be two years from now, who would be offering ratings and

10  reviews or other social commerce technology?

11  **A.**    I doubt it.  I'm sure I've met some today, and I'm sure

12  there's going to be some great new ones that we'll discover

13  along the road.

14          **MR. SHER:**  No further questions, Your Honor.

15          **THE COURT:**  Mr. Severt.

16          **MR. SEVERT:**  Your Honor, may I have a moment?

17          **THE COURT:**  Sure.

18      (Pause)

19              <u>**CROSS EXAMINATION**</u>

20  **BY MR. SEVERT**

21  **Q.**   Good morning, Mr. Goldberg.

22  **A.**   Good morning, Mr. Severt.  Good to see you again.

23  **Q.**   Yes.  So we met about two month ago, at your deposition,

24  right?

25  **A.**    Yeah.

1    Q.    And Mr. Sher asked you about a number of topics in your

2    reports, right?

3    A.    He did.

4    Q.    And there are a number of opinions in your expert reports

5    that you didn't talk about today, right?

6    A.    I imagine so, yep.

7    Q.    Okay.  Let me discuss a couple of those.

8          So why don't we turn -- actually, let me grab the binders.

9                MR. SEVERT:  Your Honor, may I approach the witness?

10               THE COURT:  Yes, please.

11               MR. SEVERT:  Mr. Goldberg, before I get started, I

12   just would like to ask defense counsel:  Mr. Goldberg has

13   opinions in his reports relating to price effects of the

14   merger, innovation effects of the merger, and the suitability

15   of the IR500 for market shares.

16         Are you withdrawing those opinions on his behalf?

17               MR. SHER:  No, we're not, Your Honor.  No, of course

18   not.  In fact, we talked about all of those.

19               MR. SEVERT:  Thank you.

20               MR. SHER:  To be absolutely clear, as he testified,

21   he's not offering antitrust opinions about the antitrust

22   effects of those.  But he's certainly talking about the factual

23   and his opinion predicates for those.

24               MR. SEVERT:  Okay.

25

1    BY MR. SEVERT

2    Q.   So, Mr. Goldberg, let's turn to page 38 of your expert

3    report.

4    A.   Okay.

5    Q.   Okay.  And you write the principal opinion in your report,

6    if we look under V, "Further Understanding of the Role of

7    Ratings and Reviews."  Do you see that section?

8    A.   I do.

9    Q.   And you write:

10        "I do not believe the acquisition of PowerReviews by

11        Bazaarvoice has had or will have had any negative effect

12        on the availability of ratings-and-reviews providers or

13        the price or quality of ratings-and-reviews products."

14        Do you see that, sir?

15   A.   I do, yes.

16   Q.   And do you wish to withdraw that opinion?

17   A.   I don't.

18   Q.   Okay.  We'll come back to this, Mr. Goldberg.

19        You're currently employed by Razorfish?

20   A.   I am.

21   Q.   And Razorfish is a Bazaarvoice partner, right?

22   A.   Uhm, we do business with Bazaarvoice, as we do with many

23   of these other social commerce companies, yes.

24   Q.   You're partners, right?

25   A.   If by that you mean we have some formal business

GOLDBERG - CROSS / SEVERT

1   relationship, no.

2   **Q.**   All right, Mr. Goldberg.  I want to talk about your

3   experience in shopper marketing, for a moment.

4       You're not claiming experience in shopper marketing as a

5   basis for your expertise based on your education, right?

6   **A.**   I'm not, no.

7   **Q.**   So you're claiming to be an expert in shopper marketing

8   based on your work experience and related activities, right?

9   **A.**   Yes.

10  **Q.**   Have you ever been qualified as an expert in shopper

11  marketing before?

12  **A.**   I've never testified before.

13  **Q.**   Do you know anyone in your field who has ever been

14  qualified to testify as an expert in shopper marketing before?

15  **A.**   Not to my knowledge.

16  **Q.**   Why don't we turn to page 4 of your report.  And there's a

17  section captioned "The Assignment."

18      Do you see that, sir?

19  **A.**   I do.

20  **Q.**   And you write in the middle of the paragraph that:

21          "I was asked to provide my opinions on a range of

22      topics, including whether the merger will have a

23      detrimental effect on my clients because of reduction in

24      vendor choice for the provision of ratings-and-reviews

25      services."

1           Do you see that, sir?

2    **A.**   I do.

3    **Q.**   That was your assignment?

4    **A.**   I -- it is.

5    **Q.**   Okay.  And part of that assignment you also offered an

6    opinion as to whether the lists published by the IR500 is a

7    credible way to establish market shares, right?

8    **A.**   Uhm, I did.

9    **Q.**   Okay.  And your report offers opinions on whether the

10   acquisition of PowerReviews by Bazaarvoice has had or will have

11   had an effect on price innovation, right?

12   **A.**   I did, yes.

13   **Q.**   Okay.  And you offer opinions on the suitability of using

14   the IR500 to measure market shares, right?

15   **A.**   I have, yes.

16   **Q.**   And, Mr. Goldberg, you have no experience defining a

17   relevant market in an antitrust case, right?

18   **A.**   Absolutely not.

19   **Q.**   You have no experience calculating market shares in a

20   properly defined, relevant antitrust market, right?

21   **A.**   I don't.

22   **Q.**   You have no experience analyzing the competitive effects

23   of a merger, right?

24   **A.**   In the context of an antitrust case, no.

25   **Q.**   And you have no experience analyzing unilateral effects of

1   a merger, right?

2   A.   No.

3   Q.   And you have no experience evaluating entry in a merger

4   case, right?

5   A.   Correct.

6   Q.   All right.  I'd like to talk about, briefly, about your

7   analysis in this case.

8        You were asked to -- give me a moment.

9        Okay, sir.  So as we discussed, you were asked to offer

10  your opinions on the merger's impact on product

11  ratings-and-reviews platforms, right?

12  A.   Yes.

13  Q.   And at the time you wrote the report, you had been working

14  specifically with product ratings-and-reviews platforms for

15  about two years, nine months?  About right?

16  A.   No.

17  Q.   Sir, isn't it true that you spent the years from 1996 to

18  2010 focused on digital in-store experiences for big-box

19  retailers like Best Buy, Walmart and Target?

20  A.   That was a significant part of my experience, yes.

21  Q.   Okay.  And in preparing your report, you only considered

22  the impact of the merger on your clients at CrossView and

23  Razorfish, right?

24  A.   Not entirely.  Unfortunately, I feel like I used an

25  imprecise word.  I wrote the word "client," and I certainly

1  understand how that would be perceived here.  But I, for what

2  it's worth, I intended that to mean eCommerce site operators.

3  It's a bad habit I have.

4  **Q.**   Mr. Goldberg, if we look at page 4 of your report, you

5  said that you looked at the effect on "my clients," right?

6  **A.**   I did.

7  **Q.**   And we talked about this in your deposition, right?

8  **A.**   Uhm, we did talk about it in the deposition, yes.

9  **Q.**   And you clarified that you intended to include current and

10  former clients, right?

11  **A.**   I felt like I clarified that I intended it to include

12  clients that I was familiar with, some of which haven't paid

13  me.  So I wouldn't -- I feel like, in the sake of accuracy, I

14  should not have called them clients.

15  **Q.**   All right, sir.  And in preparing your report you did not

16  perform any kind of systematic study of customers using product

17  ratings-and-reviews platforms, right?

18  **A.**   Not what I would consider a systematic study, no.

19  **Q.**   So rather than perform a systematic study, your expert

20  report focuses on a few dozen of your former clients, right?

21  **A.**   Yeah, the -- the -- all the clients that I was aware of

22  that had relevant issues.

23  **Q.**   And your reports contain a number of anecdotes related to

24  those clients, right?

25  **A.**   They do.

1   Q.   And the anecdotes you included were anecdotes that came to

2   mind at the time you were writing your report, right?

3   A.   Yes.

4   Q.   And you also wrote your report exclusively from your

5   memory, right?

6   A.   Yes.

7   Q.   And that's because you didn't have access to any CrossView

8   or Razorfish documents when you were writing your report,

9   right?

10   A.   That was my intention, yes.

11   Q.   And you have a less than perfect memory, sir, right?

12   A.   Yes.

13   Q.   So in preparing your report, you could not review

14   Razorfish or CrossView documents to help you recall particular

15   facts, as to their details, right?

16   A.   I could not.

17   Q.   And you couldn't, in preparing your reports, review

18   Razorfish or CrossView documents to refresh your recollection

19   as to your reports, right?

20   A.   I couldn't, no.

21   Q.   So you were unable to fact check all the details in your

22   reports, right?

23   A.   I was unable to fact check many of those details.  There

24   are some that were publicly available, that I tried to fact

25   check.

1   Q.   And the reason why you -- why you did not review Razorfish

2   and CrossView documents is you did this project in your

3   individual capacity, right?

4   A.   Exactly.

5   Q.   And you had to omit what you considered highly-relevant

6   details from your reports because you had concerns about your

7   client's confidentiality, right?

8   A.   That's true.

9   Q.   Okay.  So -- and because you relied on your own personal

10  experience in formulating your opinions, it would be impossible

11  for anybody to replicate your results, right?

12  A.   It would be impossible for anyone to replicate the exact

13  experience I had, yes.

14  Q.   All right, Mr. Goldberg.  Your report is based on your

15  experiences with your current and former clients, right, as we

16  discussed?

17  A.   With the exception that not exclusively people that paid

18  me.  Like we talked about The Doctor Is In session and people

19  in the industry that are -- that use me as an informal

20  resource.

21  Q.   So let's talk about occasions when you recommended that a

22  client buy a particular ratings-and-reviews product, okay.  And

23  let's agree today that when we use the term "recommend" that

24  means that you recommend a particular product to the exclusion

25  of all others, right?  Is that okay?

1   A.   Yes, sure.

2   Q.   Okay.  Now let's talk about your experience.

3        In fact, Mr. Goldberg, with respect to ratings and reviews

4   in particular, there have only been three times when you were

5   involved in recommending that a client purchase a particular

6   ratings and reviews platform, right?

7   A.   At Razorfish, I think I said two to three.  And maybe

8   another two to three at CrossView.

9   Q.   Sir, at CrossView, I asked you the number of clients you

10  had worked with at CrossView, right, in recommending a

11  ratings-and-reviews product, right?

12  A.   I -- I'm sure you did, but I don't specifically remember

13  it.

14  Q.   And you couldn't recall a single one, right?

15  A.   That I made -- as I sit here today, I can't remember one

16  either.

17  Q.   Okay.  Mr. Goldberg, would you please take a look at your

18  deposition.  It should be in your binder there.  I think it's

19  the first tab.

20  A.   Yep.

21  Q.   And if you wouldn't mind reading to yourself pages -- page

22  236 -- let you get there.

23  A.   Got lucky.  I hit it.

24  Q.   All right.  So page 236, line 23, to page 238, line 9.

25  A.   (Witness reading)

GOLDBERG - CROSS / SEVERT

1        Okay.

2   **Q.**   Okay.  And does that refresh your recollection as to

3   whether you -- whether you recommended a particular

4   ratings-and-reviews product to a client while working at

5   CrossView?

6   **A.**   It does.

7   **Q.**   Okay.  And you did not, correct?

8   **A.**   No.  I stand by my original answer.  I felt -- this

9   statement here started with a caveat setting aside CrossView

10  Web.

11       So several times at CrossView I recommended our

12  solution-in-a-box that had a single-review platform built into

13  it.  So I was clearly recommending, when I asked someone to use

14  that platform, for them to use the PowerReviews Express

15  product.

16       But aside from that, I don't remember a single instance

17  where I recommended one -- one provider at the exclusion of all

18  others.

19  **Q.**   Okay.  So that's a useful clarification.

20       So there were a couple of times at CrossView where you

21  worked with a client and, I think, you called it the CrossView

22  starter store.  Is that right, you recommended that product?

23  **A.**   Generically.  Like, I think their brand name for it was

24  called CrossView Web.

25  **Q.**   Okay.  So that's eCommerce-in-a-box, right?

1    **A.**    Yes.

2    **Q.**    And that has PowerReviews Express built into it, right?

3    **A.**    It does or did.

4    **Q.**    So putting that aside, there were no times during your

5    time at CrossView that you recommended a client buy a

6    particular ratings-and-reviews product, right?

7    **A.**    Not exclusively one that I can remember.

8    **Q.**    Okay.  All right.

9            **MR. SEVERT:**  One moment, Your Honor.

10           **THE COURT:**  Take your time.

11           **MR. SEVERT:**   May I approach the witness, Your Honor?

12           **THE COURT:**  Yes.

13        (Plaintiff's Exhibit GX1247 marked for identification)

14   **BY MR. SEVERT**

15   **Q.**    Mr. Goldberg, I've handed you what has been marked for

16   purposes of identification GX1247.

17        What it is, it's a piece of paper with the names of three

18   clients with corresponding letters.  I've done this so that we

19   can talk about them and maintain confidentiality of the

20   clients.

21   **A.**    Thank you.

22   **Q.**    So while we're doing that, we'll just refer to them as

23   Client A, Client B, and Client C.  Is that okay?

24        And these three firms on this piece of paper are Razorfish

25   clients, right?

1    **A.**    They are.

2    **Q.**    Okay.  And those clients on that document are clients for

3    whom you were involved in recommending a particular ratings and

4    reviews vendor while you've been at Razorfish, right?

5    **A.**    Yes.

6    **Q.**    Those are the three?

7    **A.**    Those are three that I remember, yes.

8    **Q.**    Okay.  And with respect to Client A, you were heavily

9    involved with that client, right?

10   **A.**    Very much so, yes.

11   **Q.**    And the same with B?

12   **A.**    Yes.

13   **Q.**    And for Client C you were involved early in the process,

14   but not really later, or not specifically aware of what the

15   recommendation even was, right?

16   **A.**    I think that's good, yes, the perfect characterization.

17   **Q.**    So putting aside this CrossView starter store product we

18   discussed, in your career you've played a significant role in

19   two recommendations to select a product ratings-and-reviews

20   platform, right?

21   **A.**    So, again, with the caveat that recommend exclusively one,

22   that's true.

23   **Q.**    Okay.  All right.  Mr. Goldberg, we'll turn to those

24   clients later.  If you could just put that aside.  But we'll --

25   I'll be careful not to use them -- mention them by name.

1      But I want to talk to you, now, about the various product

2  ratings-and-reviews platform providers that you discussed with

3  Mr. Sher.

4  **A.**   Okay.

5  **Q.**   And in your testimony you identified a number of them,

6  right?

7  **A.**   I did.

8  **Q.**   Okay.  And over the years, you've had clients that use

9  Bazaarvoice for ratings and reviews, right?

10  **A.**   Many, yes.

11  **Q.**   And over the years you've had many clients that use the

12  PowerReviews Enterprise platform for ratings and reviews,

13  right?

14  **A.**   Less, but, yes, several.

15  **Q.**   A number, right?

16  **A.**   Yeah, for sure.

17  **Q.**   Advance Auto Parts was a client of your yours?

18  **A.**   They were.

19  **Q.**   And they used the PowerReviews Enterprise?

20  **A.**   That sounds right.

21  **Q.**   And Staples was a client of yours at one time?

22  **A.**   Yep.

23  **Q.**   And they used PowerReviews Enterprise?

24  **A.**   Yep.

25  **Q.**   Jos. A. Bank?

1    A.    Yes.

2    Q.    Dillard's?

3    A.    Yes.

4    Q.    Radio Shack?

5    A.    Yes.

6    Q.    REI?

7    A.    Yes.

8    Q.    West marine?

9    A.    Yes.

10   Q.    Vineyard Vines?

11   A.    Yes.

12   Q.    Okay.  And prior to the merger, in your opinion,

13   Bazaarvoice and PowerReviews were competitors, right?

14   A.    They often competed, yes.

15   Q.    Well, let's talk about some of the other

16   ratings-and-reviews providers.

17        Isn't it true that in -- when you were evaluating the

18   competitive significance of each of the product

19   ratings-and-reviews providers in preparing your reports, you

20   didn't consider the number of customers each had for its

21   ratings-and-reviews product, right?

22   A.    That's true.  In many cases I didn't know.

23   Q.    In fact, you had no idea how many clients they had, right?

24   A.    That's true.

25   Q.    And you had access to all of the deposition transcripts in

1  this case, right?

2  **A.**    I believe so.

3  **Q.**    And you were aware that many of the vendors you identified

4  in your reports, they were deposed, right?

5  **A.**    Many were, yes.

6  **Q.**    And you chose to ignore the testimony in those

7  depositions, regarding the size of their rating-and-review

8  client base, right?

9  **A.**    I wouldn't characterize it as choosing to ignore.  In many

10  cases, I wrote the report before the deposition happened.  And

11  I definitely didn't read every single deposition.  But where I

12  did read a deposition that had a useful fact, I tried to

13  include in my report.

14  **Q.**    But many of these vendors' depositions were before you

15  wrote your reports, right?

16  **A.**    For sure.

17  **Q.**    And certainly before you wrote your rebuttal report?

18  **A.**    Oh, yes.

19  **Q.**    Okay.  Let's talk about some of the ratings-and-reviews

20  vendors that you identify.

21      Let's start with Pluck, okay.

22  **A.**    Okay.

23  **Q.**    And as I understand it, only one of the clients mentioned

24  in your reports mentions Pluck for ratings and reviews in the

25  United States, right?

1   **A.**   I don't know the exact count.  I'd have to go back

2   through.  But that's the order of magnitude.  We didn't talk

3   about a lot of clients that used Pluck.

4   **Q.**   Okay.  Let's talk about Gigya.  In fact, none of the

5   clients listed in your report use Gigya for ratings and reviews

6   in the United States, right?

7   **A.**   As I sit here, I'm not aware of any that did.

8   **Q.**   Let's take a look at the Gigya demonstrative that Mr. Sher

9   walked you through earlier.

10       **MR. SEVERT:**  Seth, could you put it on the screen,

11   please.

12   **BY MR. SEVERT:**

13   **Q.**   Okay, Mr. Goldberg, you remember this demonstrative that

14   Mr. Sher showed you?

15   **A.**   I do.

16   **Q.**   Okay.  And isn't it true that this is -- this is a list of

17   Gigya customers, right?

18   **A.**   It is.

19   **Q.**   But these are not Gigya ratings-and-reviews customers,

20   right?

21   **A.**   I don't believe that -- many of them, I know, don't use

22   the Gigya ratings and reviews.

23   **Q.**   Well, let's talk about a couple of them.

24       So Microsoft uses Bazaarvoice, right?

25   **A.**   I think Microsoft uses a few, but I'm -- wouldn't surprise

 1    me that they use Bazaarvoice as one of them.

 2    **Q.**    And New Balance uses Bazaarvoice?

 3    **A.**    I don't specifically remember that, but I sure take your

 4    word for it.

 5    **Q.**    This is your demonstrative, sir, right?

 6    **A.**    This isn't my demonstrative.  Well, I don't know.  I

 7    guess -- I didn't prepare this.

 8    **Q.**    Okay.  Fair enough.

 9           And Lush uses PowerReviews, right?

10    **A.**    Again I, don't specifically remember what they use, as I

11    sit here.  But I'll take your word for it.

12    **Q.**    And Lucky Brand uses Bazaarvoice?

13    **A.**    I don't know.

14    **Q.**    And going down the second row, Logitech uses Bazaarvoice?

15    **A.**    That sounds right.

16    **Q.**    Nova uses Bazaarvoice?

17    **A.**    Sorry.  I just want to make sure I'm following along.

18    Which column are you on?

19    **Q.**    I'm in the second row.

20    **A.**    Oh, okay, got you.

21    **Q.**    Lenovo uses Bazaarvoice?

22    **A.**    So, again, I know they use Bazaarvoice.  I think they use

23    some other things in some regions.

24    **Q.**    Cabela's uses Bazaarvoice?

25    **A.**    They do.

1   **Q.**   Kate Spade uses Bazaarvoice?

2   **A.**   I don't know.

3   **Q.**   HP uses Bazaarvoice?

4   **A.**   I don't know.

5   **Q.**   Nike uses Bazaarvoice?

6   **A.**   Again, I think they use a couple, but I know they use

7   Bazaarvoice.

8   **Q.**   RHeart uses Bazaarvoice?

9   **A.**   Don't know.

10   **Q.**   LG uses Bazaarvoice?

11   **A.**   I don't know.

12   **Q.**   Victoria's Secret uses Bazaarvoice?

13   **A.**   Sounds right.

14   **Q.**   Finish Line uses Bazaarvoice?

15   **A.**   I believe so.

16   **Q.**   Chico's uses Bazaarvoice?

17   **A.**   I don't know.

18   **Q.**   GraysOnline uses Bazaarvoice?

19   **A.**   I don't know.

20   **Q.**   Hayneedle uses PowerReviews, right?

21   **A.**   I think they were in the deposition, yes.

22   **Q.**   Clorox uses Bazaarvoice?

23   **A.**   Again, I think Clorox might use a couple, but for sure

24   they use Bazaarvoice.

25   **Q.**   We heard in this case, sir, that Clark's has recently

1    dropped Gigya from its grilling website, right?

2    **A.**   I remember reading that, yes.

3    **Q.**   And Dell uses Bazaarvoice, right?

4    **A.**   I think so, yes.

5    **Q.**   And Verizon Wireless uses Bazaarvoice?

6    **A.**   I don't know.

7    **Q.**   Brookstone uses PowerReviews?

8    **A.**   I don't know.

9    **Q.**   Avery Dennison uses Bazaarvoice?

10   **A.**   They do.

11   **Q.**   And David's Bridal uses Bazaarvoice?

12   **A.**   They do.

13   **Q.**   Okay.  So of the customers identified on this list, it

14   would be fair to say four or five, maybe, use Gigya for ratings

15   and reviews, right?

16   **A.**   That sounds about right to me.

17   **Q.**   Okay.  And the other customers, other than those four,

18   particularly the ones we just discussed as using PowerReviews

19   and Bazaarvoice, they use Gigya for something else, right?

20   **A.**   I presume so.

21   **Q.**   Another social commerce product?

22   **A.**   I know many of them use it for social sign-in

23   specifically.

24   **Q.**   So those customers we just discussed use two distinct

25   vendors for two different parts of their social commerce

1    strategy, right?

2    **A.**    I think that's true, yes.  At least two.

3    **Q.**    Okay.  So those customers today are, indeed, not using a

4    single vendor as a social commerce suite provider, right?

5    **A.**    That's true.

6    **Q.**    Okay.  Let's turn to page 56 of your expert report, sir.

7    And you're at the section on Gigya, right?

8    **A.**    I am.  Section C?

9    **Q.**    Yep.

10           And you write, in the last paragraph, second line:

11                "I recommended that David's Bridal consider migrating

12           its ratings and reviews from Bazaarvoice to Gigya."

13           Do you see that, sir?

14    **A.**    I do.

15    **Q.**    And what you were talking about here was that you had a

16    meeting with two David's Bridal employees during an industry

17    trade show, as part of a CrossView marketing promotion, right?

18    **A.**    Yes.

19    **Q.**    And you're aware that Bazaarvoice obtained a declaration

20    from David's Bridal in this case, right?

21    **A.**    I am, yes.

22    **Q.**    And you understand that David's Bridal uses Bazaarvoice

23    today?

24    **A.**    I do.

25    **Q.**    So they didn't take whatever advice you gave them about

1    Gigya, right?

2    **A.**    I inferred that they both didn't take my advice and didn't

3    share it with the person that gave the deposition.

4    **Q.**    So whatever to make of your -- of your word

5    "recommendation," in the end it wasn't adopted by David's

6    Bridal, right?

7    **A.**    Correct.

8    **Q.**    Okay, sir, let's switch gears and talk about Adobe, okay.

9         None of the clients listed in your reports uses Adobe for

10   ratings and reviews in the United States, right?

11   **A.**    Not that I'm aware of.

12   **Q.**    Okay.  And isn't it true that Bazaarvoice -- sorry,

13   Adobe -- let me start over.

14        Isn't it true that Adobe uses Bazaarvoice for ratings and

15   reviews on its own website?

16   **A.**    I think that is true, yes.

17   **Q.**    Okay.  So Adobe does not use its own product,

18   ratings-and-reviews product on its own website, right?

19   **A.**    That's true.

20   **Q.**    Let's talk about Lithium.

21        None of the clients listed in your reports use Lithium for

22   ratings and reviews in the United States, right?

23   **A.**    None of the ones in my report, that I'm aware of, do.

24   **Q.**    Let's talk about Reevoo.  None of the clients listed in

25   your reports use Reevoo for ratings and reviews in the

1   United States, right?

2   **A.**   Well, my understanding is that Acer and Skype are both in

3   the United States.

4   **Q.**   Okay, sir.  And you've said that -- that Reevoo has a

5   credible ratings and reviews offering in the United States?

6   **A.**   I believe it can be, yes.

7   **Q.**   And you've even said more credible than PowerReviews could

8   ever offer for larger enterprise customers?

9   **A.**   Yes.

10  **Q.**   But you don't even know how many clients Reevoo has in the

11  United States?

12  **A.**   I -- again, I shared the only two I'm aware of.

13  **Q.**   Okay.  Let's turn to page 51 of your report, Mr. Goldberg.

14      All right.  So this is the section on Reevoo, Section A.

15  Do you see that?

16  **A.**   I do, yeah.

17  **Q.**   And I'm going to direct your attention to the fourth

18  paragraph, the fifth line.  You write:

19          "At my current firm we are including Reevoo in the

20      consideration set for a number of current PowerReviews and

21      Bazaarvoice clients."

22      Do you see that, sir?

23  **A.**   I do.

24  **Q.**   And let's go pack to the sheet I handed you with the three

25  companies.

1   **A.**   Okay.

2   **Q.**   Do you have that?

3   **A.**   I do.

4   **Q.**   Okay.  And what you're referring to in this sentence,

5   the -- including Reevoo in the consideration set, you were

6   referring to Clients A and B, right?

7   **A.**   Amongst others, yes.

8   **Q.**   Why don't we take a look at your deposition, page 230.

9        **MR. SEVERT:**  Don't pull it up on the screen because it

10  has the names of the clients in there, Seth.

11       **THE WITNESS:**  Okay.  I'm there, Mr. Severt.

12  **BY MR. SEVERT**

13  **Q.**   Okay.  And I asked you on line 24:

14       "Okay.  What clients are you referring to in this

15       sentence in your report?"

16  Referring to the sentence we just read.

17  **A.**   Yeah.

18  **Q.**   And you answered:

19       "Yep.  As I sit here today, the clients that I

20       specifically remember include" A and B, right?

21  **A.**   Those were two I remembered at the deposition.  I think

22  I've subsequently remembered one or two others.

23  **Q.**   And you wrote your report from memory, right, sir?

24  **A.**   Exactly.

25  **Q.**   Okay.  Okay.  Let's move on to Rating-system.com.  You

1  mentioned them in your report, right?

2  **A.**   I did.

3  **Q.**   And none of the clients you listed in your report use

4  Rating-system.com for ratings and reviews in the United States,

5  right?

6  **A.**   I don't think so, no.

7  **Q.**   And are you aware that the owner of Rating-system.com

8  works full-time at Men's Wearhouse?

9  **A.**   I wasn't aware -- well, I'm not aware of that, no.  But I

10  wasn't aware of who the owner was until I read the transcript

11  here.

12  **Q.**   So given that the owner of Rating-system.com works

13  full-time at Men's Wearhouse, would you recommend to a large

14  client like Best Buy that it select Rating-system.com for its

15  website?

16  **A.**   There would be a very high threshold of due diligence that

17  would have to happen first.

18  **Q.**   Would you recommend that?

19  **A.**   So under certain circumstances -- I could certainly

20  imagine if Best Buy said, hey, Jason, who could we buy to build

21  into a business, him being a small part-time small business

22  owner might be an advantage.

23       But I certainly wouldn't, just based on what I know now,

24  suggest that John Thompson leave Bazaarvoice to go to Rating

25  Systems, no.

1    Q.    So you would consider recommending that a large retailer

2    like Best Buy should consider hiring Rating System -- or using

3    Rating-system.com, a company run by a gentleman that works

4    full-time at another job?

5    A.    Again, I certainly wouldn't suggest that he -- that

6    Best Buy use it in its current form, but I want to hire the guy

7    now.

8    Q.    Okay.  Fair enough.

9          Let's talk about Yotpo.  None of the clients listed in

10   your report uses Yotpo for ratings and reviews in the

11   United States, right?

12   A.    Not to my knowledge.

13   Q.    And how about let's talk about practical data.  None of

14   the clients listed in your reports uses practical data for

15   ratings and reviews in the United States, right?

16   A.    I don't think so.

17   Q.    Okay.  And how about Feefo, you list Feefo in your report,

18   right?

19   A.    It sounds familiar.  To be honest, I don't actually

20   remember that.

21   Q.    So you're not familiar with Feefo?

22   A.    I don't remember them right now.  I would be happy to

23   refresh my memory.

24   Q.    No, we can skip Feefo.

25         Are you familiar with Ektron?

1  **A.**   I am.

2  **Q.**   Okay.  And none of the clients in your reports use Ektron

3  for ratings and reviews in the United States, right?

4  **A.**   Not that I'm aware of.

5  **Q.**   Okay.  And you don't spend much time on Viewpoints in your

6  report, but it's your understanding, sir, that Viewpoints no

7  longer offers a ratings-and-reviews platform, right?

8  **A.**   That is my understanding.

9  **Q.**   Let's go to --

10       **MR. SEVERT:**  One moment, Your Honor.

11  **BY MR. SEVERT**

12  **Q.**   -- DX1882.

13  **A.**   Sorry, is that --

14  **Q.**   It's in the book Mr. Sher gave you.

15  **A.**   Oh, my bad.

16  **Q.**   Apologize.

17  **A.**   I was hoping I was rid of that one.  1882.

18  **Q.**   Yep.  Let's just go to the page Mr. Sher talked to you

19  about.  So it's page 19 of 23.

20  **A.**   Okay.

21  **Q.**   Okay.  And Mr. Sher, on page 19 of -- 19 of this exhibit,

22  asked you about comparing this particular Gartner Report to the

23  2011 Gartner Report, right?

24  **A.**   Yes.

25  **Q.**   And is it your testimony that the vendors identified as

1  present in 2013 did not exist in 2011, sir?

2  **A.**   No.   It's my testimony that they weren't included on this

3  report.

4  **Q.**   I see.   But they existed in 2011?

5  **A.**   I'm not aware of all of them when they emerged.   I imagine

6  some did and some didn't.

7  **Q.**   Okay.   So you don't know whether some of these vendors

8  existed in 2011, or not?

9  **A.**   I absolutely don't.

10  **Q.**   Okay.   You can put aside that exhibit, sir.

11      Now, I want to switch gears a little bit and talk about

12  the various social commerce tools that you talked about with

13  Mr. Sher.

14  **A.**   Okay.

15  **Q.**   And I think you said something like these are all

16  different ways to generate user engagement, something like

17  that.

18  **A.**   I may well have.   I don't remember the specific words.

19  **Q.**   Okay.   Let's talk about some of them.

20  **A.**   Okay.

21  **Q.**   So isn't it true that you've never advised a client to

22  drop a ratings-and-reviews product and replace it with a social

23  network, right?

24  **A.**   I never have.

25  **Q.**   And you're not aware of anyone who has ever dropped a

1    ratings-and-reviews product and replaced it with a social

2    network, right?

3    **A.**    I'm not.

4    **Q.**    And, similarly, you're not aware of anyone who has ever

5    dropped a ratings-and-reviews platform and replaced it with --

6    I think in your report you call it discussions, comments or

7    forums functionality, right?

8    **A.**    Yep.  No, I'm not aware of any.

9    **Q.**    And you're not aware of anyone who has ever dropped

10   ratings and reviews and replaced it with gamification, right?

11   **A.**    Not directly, no.

12   **Q.**    And you talk about badges in your report.  Badges are

13   within, sort of, the umbrella of gamification, right?

14   **A.**    They can be, yeah.

15   **Q.**    And you're not aware of anyone that's dropped ratings and

16   reviews and replaced it with badges, right?

17   **A.**    I'm not, no.

18   **Q.**    And you're not aware of anyone who maintains its own

19   eCommerce site, who has ever dropped ratings and reviews and

20   replaced it with blogs, right?

21   **A.**    I'm not, no.

22   **Q.**    And you're not aware of anyone who has ever dropped

23   ratings and reviews and replaced it with social shares, right?

24   **A.**    Not directly, no.

25   **Q.**    Okay.  And you're not aware of anyone who has ever dropped

1  ratings and reviews and replaced it with testimonials, right?

2  A.   Correct, I'm not.

3  Q.   And you're not aware of anyone who has ever dropped

4  ratings and reviews and replaced it with question and answer,

5  right?

6  A.   I'm not, no.

7  Q.   Okay.  Let's take a look at your rebuttal report,

8  Mr. Goldberg.  If you wouldn't mind turning to page 24 of your

9  rebuttal report.

10      And I want to focus your attention on footnote 106 of your

11  rebuttal report.

12  A.   Okay.

13  Q.   Footnote 106 you write:

14          "One deponent, Karmaloop, abandoned ratings and

15      reviews entirely for Facebook.  Karmaloop is not alone."

16      Do you see that, sir?

17  A.   I do.

18  Q.   Did I read that correctly?

19  A.   You did.

20  Q.   And then after that you cite 15, 16 customer depositions.

21  Do you see that?

22  A.   I do, yeah.

23  Q.   And isn't it true that not one of the people in these

24  depositions is someone who abandoned ratings and reviews for

25  Facebook?

1    **A.**    Uhm, correct.  It's a poorly-written footnote.  I

2    apologize.

3    **Q.**    So this is just wrong, right?

4    **A.**    Yeah the, wording is too imprecise.

5    **Q.**    Oh.  But it's wrong.  It's not imprecise; it's just wrong?

6    **A.**    Yes, yes.

7    **Q.**    And, you know, for example, you list Fruit of the Loom?

8    **A.**    Yep.

9    **Q.**    Okay.  And they testified that they still have ratings and

10   reviews, right?

11   **A.**    The last I heard, yes.

12   **Q.**    Okay.

13   **A.**    I think the intention of that further list was people that

14   had moved off the platform.  But it definitely reads in a

15   misleading way.

16   **Q.**    Okay.  And, Mr. Goldberg, I asked you about this footnote

17   in your deposition, right?

18   **A.**    You did.

19   **Q.**    Okay.  And that was two months ago?

20   **A.**    It was, yeah.

21   **Q.**    And you didn't -- in your deposition, you didn't know

22   whether this was right or wrong, right?

23   **A.**    I -- I hadn't read it in some time, and it confused me

24   when I read it, which is why I certainly owe the Court an

25   apology.

1572

1   **Q.**   And you haven't, in those two months since your

2   deposition, gone back and corrected this, right?

3   **A.**   I have not.

4   **Q.**   Okay.  All right, sir.  Let's switch gears a bit and talk

5   about some of the other potential entrants into ratings and

6   reviews, that you talk about.

7   **A.**   Okay.

8   **Q.**   So let's look at page 63 of your initial report.  And I'm

9   going to focus you on the very top of the page, where you're

10  still talking about TurnTo.  And TurnTo provides a

11  question-and-answer product, right?

12  **A.**   They do.

13  **Q.**   And many Bazaarvoice clients use TurnTo for question and

14  answer, right?

15  **A.**   I think that's true, yeah.

16  **Q.**   So let's see what you wrote about that in your report.  So

17  you wrote, second line:

18        "Though Mr. Eberstadt testified during his deposition

19     that TurnTo could create a marketable product in less than

20     a year, I believe that by carefully curating a feature

21     set, and leveraging an existing social suite or eCommerce

22     solution, a small team of three or four developers could

23     develop a marketable ratings-and-reviews solution in less

24     than six months."

25        Did I read that correctly?

1    A.    I think you did, yeah.

2    Q.    And Mr. Eberstadt, who you referenced, is founder and CEO

3    of TurnTo, right?

4    A.    Yes, he is.

5    Q.    And, as you know, his deposition was taken in this case?

6    A.    I do.

7    Q.    And he said it would take closer to a year?

8    A.    He was describing a different feature set, that he said he

9    could do it in less than a year.  Which, I imagine, could be a

10   week or it could be 364 days.

11   Q.    Okay.  And, Mr. Goldberg, you don't cite any TurnTo

12   development plans or other TurnTo documents to support your

13   opinion that TurnTo could develop a product in six months,

14   right?

15   A.    I don't.

16   Q.    And yet, Mr. Goldberg, it's also your opinion that Oracle

17   could develop a ratings-and-reviews product and sell it

18   commercially in six months, right?

19   A.    Yes.

20   Q.    But you didn't talk to anyone at Oracle in forming that

21   opinion, right?

22   A.    Uhm, I didn't, in forming that opinion, no.

23   Q.    And even though Oracle produced tens of thousands of pages

24   of documents in this matter, you didn't cite any of them in

25   support; did you?

1    **A.**    I don't think so.

2    **Q.**    Okay.  In fact, Mr. Goldberg, you think it's entirely

3    credible to build a ratings-and-reviews product in one day,

4    right?

5    **A.**    Uhm, I have seen it done, yes.

6    **Q.**    And yet you knew that Sears has built its own

7    ratings-and-reviews platform, right?

8    **A.**    I do.

9    **Q.**    And the Sears platform only had to work for Sears, right?

10   **A.**    It did, yes.

11   **Q.**    It didn't need to be designed to work for anyone besides

12   Sears, right?

13   **A.**    Not to my knowledge.  They have several other brands that

14   run sites, but I assume we mean all of Sears.

15   **Q.**    And it took Sears almost a year, and cost $2 million,

16   right?

17   **A.**    That sounds like the right order of magnitude for what I

18   read.

19   **Q.**    Okay.  All right.  I want to switch gears again,

20   Mr. Goldberg.

21       You said that most customers do not want syndication,

22   right?

23   **A.**    I think the majority, yes.

24   **Q.**    Okay.  And you're aware that Bazaarvoice charges brands a

25   fee to syndicate ratings and reviews to retailers, right?

1   **A.**   I am, yes.

2   **Q.**   And you are aware that in just the last year two large

3   retailers -- Sears we just talked about and Target -- have paid

4   Bazaarvoice substantial sums of money to participate in

5   syndication, right?

6   **A.**   I'm not, I guess, directly aware of that, no.

7   **Q.**   So you didn't consider that when you were offering an

8   opinion on the significance of syndication?

9   **A.**   That Sears and Target pay Bazaarvoice for syndication, no,

10  I didn't consider it.

11  **Q.**   So despite your belief that syndication is unattractive,

12  it's a fact, sir, that many brands and retailers find it

13  valuable enough that they pay significant amounts of money to,

14  indeed, syndicate, right?

15  **A.**   Yes, that is.

16  **Q.**   And you had access to the depositions of the

17  ratings-and-reviews vendors taken in this case?

18  **A.**   I did, yes.

19  **Q.**   And you reviewed those depositions?

20  **A.**   I did, yep.

21  **Q.**   And a number of the ratings-and-reviews vendors identified

22  in your reports see their lack of syndication as a significant

23  competitive challenge, right?

24  **A.**   I did see that, yes.

25          **MR. SEVERT:**  One moment, Your Honor.

1          (Pause)

2              **MR. SEVERT:**  Seth, could you please put up trial

3     transcript page 418.

4     **BY MR. SEVERT**

5     **Q.**   This is from Mr. Luedtke.

6          And you're familiar with Mr. Luedtke's testimony,

7     Mr. Goldberg?

8     **A.**   I didn't read it in its entirety, but I did scan it.

9     **Q.**   Okay.  I'm going to read to you what Mr. Luedtke said.  So

10    it's page 418, line 19, to page 419, line 13, okay.

11    **A.**   Okay.

12    **Q.**   So Mr. Luedtke said:

13              "And I also see that eCommerce platforms are listed

14         there?

15         "**A.**  Uh-huh.

16         "**Q.**  Mr. Luedtke, isn't it right that PowerReviews Express

17         offered additional functionality beyond that that's

18         offered by eCommerce platforms with their native

19         ratings-and-reviews functionality?

20         "**A.**  I'm sorry.  Beyond?  I don't understand.  Beyond

21         what?

22         "**Q.**  So some eCommerce platforms have some limited ratings

23         and reviews; is that right?

24         "**A.**  Many eCommerce platforms have a basic sort of stars

25         and text box offering that companies can use as their

1          ratings-and-reviews solution.

2          "Q.   Uh-huh.   Isn't it true that PowerReviews Express

3     offered additional functionality beyond that a customer

4     could get from this native eCommerce platform

5     functionality?

6          "A.   Beyond what the eCommerce platforms offered, yeah.

7     Yes, we did.

8          "Q.   And PowerReviews Enterprise had any more features

9     than PowerReviews Express, right?

10          "A.   Correct."

11          Do you see that, sir?

12   A.   I do.

13   Q.   Do you have any reason to believe Mr. Luedtke wasn't

14   telling the truth when he testified there?

15   A.   I don't have any reason to believe he wasn't telling the

16   truth.

17   Q.   And I think you also talked with Mr. Sher about a number

18   of these ratings-and-reviews vendors have pre-integrated deals,

19   I think you put it, with various eCommerce platforms, right?

20   A.   Yes.

21   Q.   And it's true that Bazaarvoice has the same kinds of

22   arrangements, right?

23   A.   I think Bazaarvoice has many, yes.

24   Q.   Okay.   I want to switch gears and talk about one more

25   topic.

GOLDBERG - CROSS / SEVERT

1    You testified that in the early days of ratings and
2  reviews, reviews were residing on the provider website, and
3  that was harmful to SEO.  I think I have your testimony right.
4  **A.**   No, I don't think so.
5  **Q.**   Okay.  Would you clarify?
6  **A.**   Yeah, sure.
7    So what I was trying to say was, in the early days, when
8  eCommerce operators built their own platforms, they had to
9  build their own ratings and reviews.  And so the ratings and
10 reviews lived on the native server or what we call the origin
11 server, and that that's a significant advantage for SEO.  It
12 means we don't need any of those extra SEO features to try to
13 get Google to see the content that isn't on the native server.
14 **Q.**   Okay.  Fair enough.
15   And to the extent this was a problem, it was eventually
16 solved by Bazaarvoice and PowerReviews?
17 **A.**   I would say that it's -- they're continuously getting
18 better at it.  They're still not as good as the native
19 platform.
20 **Q.**   But they've solved a significant amount of the problem?
21 **A.**   Yes.
22 **Q.**   And you've testified that many brands and retailers find
23 syndication unattractive, right?  We just talked about that.
24 **A.**   I'm sorry, could you repeat the last word.
25 **Q.**   Sure.

1       You've testified that many brands and retailers find

2   syndication unattractive, right?

3   **A.**   Unattractive, yes.

4   **Q.**   And they find syndication unattractive because syndication

5   can have an adverse impact on search engine optimization,

6   right?

7   **A.**   It can, and yes.

8   **Q.**   But you understand that Mr. Collins testified in this

9   case, right?

10  **A.**   I do, yeah.

11  **Q.**   And Mr. Collins is Bazaarvoice's CEO?

12  **A.**   I believe so.

13  **Q.**   And he testified during this trial that syndication is,

14  indeed, good for search engine optimization, right?

15  **A.**   I don't specifically remember that.  I'm sorry.

16  **Q.**   Okay.  Mr. Collins said:

17          "Syndication as a product for us is, we think, good

18          for everybody because reviews help drive what's called

19          search engine optimization."

20      Do you recall that testimony?

21  **A.**   I don't specifically, but I believe you read it correctly.

22          **MR. SEVERT:**  Why don't we pull it up.  It's on page

23  826 of Mr. Collins' testimony, line 15 to 17.

24  **BY MR. SEVERT**

25  **Q.**   Do you see that, sir?

1   A.   I do.

2   Q.   Okay.  But you would disagree with Mr. Collins --

3   A.   I would.

4   Q.   -- because --

5   A.   I'm sorry.

6   Q.   Would you disagree with Mr. Collins?

7   A.   I would disagree with that sentence.

8   Q.   Okay.

9   A.   I'm sorry for interrupting.

10  Q.   Well --

11       MR. SEVERT:  One moment, Your Honor.

12  BY MR. SEVERT

13  Q.   So let's take a look at what Bazaarvoice has to say about

14  duplicative content, okay.

15  A.   Okay.

16       MR. SEVERT:  Your Honor, may I approach?

17       THE COURT:  Yes.

18       THE WITNESS:  Thank you.

19  BY MR. SEVERT

20  Q.   Mr. Goldberg, I've handed you what is a post from

21  Bazaarvoice's engineering blog.

22  A.   Okay.

23  Q.   And -- give me one moment to find it in my binder.

24       Okay.  And this is the official -- it says, "The Official

25  Blog of Bazaarvoice Research and Development."

1       Do you see that, sir?

2   A.   I do, yes.

3   Q.   And the title of this particular entry is, "Review

4   Syndication - Duplicate Content Risk?"

5       Do you see that?

6   A.   I do.

7   Q.   And if we turn to the second page, we can see that this

8   entry was posted October 1st, 2013.

9       Do you see that on the second page, near the bottom?

10  A.   I do, yes.

11  Q.   So just last week, right?

12  A.   Yes.

13  Q.   Uhm, so this was a public statement made by Bazaarvoice in

14  the last week on duplicate content risk, right?

15  A.   It is.

16  Q.   Well, let's take a look at what it says.  So let me read

17  you the first paragraph, Mr. Goldberg.  So Bazaarvoice says:

18          "From time to time, Bazaarvoice clients ask if there

19      is a risk of duplicate content when reviews are syndicated

20      or repurposed.  The quick answer is a simple no.  While it

21      seems logical that there would [sic] be a duplicate

22      content risk, we have never had a client notify us of a

23      duplicate content warning in Google Webmaster Tools

24      because of content syndication to other sites, sharing

25      within product families, or re-purposing review content to

1    be used for another relevant purpose in the same site."

2    Did I read that correctly?

3  **A.**    I think so.

4  **Q.**    Okay.  And let's turn to the second page.

5  **A.**    Okay.

6  **Q.**    And let's just skip down to the last paragraph, to read

7    the conclusion.  So let me read that to you.  So Bazaarvoice

8    writes:

9        "We, therefore, maintain with great confidence that

10        content syndication is a best practice for all brands.

11        Over the past few years that Bazaarvoice has offered

12        content syndication and sharing, there have been no

13        complaints about loss of traffic from search, no mention

14        of duplicate content warnings from clients using the

15        service, and only positive feedback about the impact of

16        syndicated content in retail channels."

17    Did I read that correctly, sir?

18  **A.**    I think you did.

19  **Q.**    And you have no reason to doubt Bazaarvoice's statement

20    that it's never received a complaint about loss of search

21    engine traffic related to syndication, right?

22  **A.**    So I think it's a carefully-parsed statement.  So I

23    believe that it's accurately worded exactly as written.

24        **MR. SEVERT:**  Your Honor, may I have a moment to confer

25    with my colleagues?

1          THE COURT:  Yes.

2          MR. SEVERT:  No further questions, Your Honor.

3          THE COURT:  Mr. Sher.

4          MR. SEVERT:  I have stuff everywhere.

5          MR. SHER:  I apologize for stepping out.  An

6   emergency.

7          THE COURT:  Not a problem.

8                    __REDIRECT EXAMINATION__

9   BY MR. SHER

10  **Q.**   So let's start off with the word "recommended."

11  Mr. Severt asked you how many times you have recommended a

12  particular ratings-and-reviews product to a customer.  Now, the

13  way he defined "recommended" was one product to the exclusion

14  of all others.

15       Is that how your business operates, Mr. Goldberg?

16  **A.**   Not very often, no.

17  **Q.**   Why not?

18  **A.**   Well, so, for different products there's a different level

19  of due diligence and formality.  So we talked a little bit

20  about the eCommerce platform reviews.  And, very commonly,

21  that's a thorough analysis that results in a written

22  recommendation.

23       Even then, frankly, it's most often that the final

24  recommendation is like two platforms, with pros and cons of

25  each.  'Cause most often clients want to get rationales and

GOLDBERG - REDIRECT / SHER

 1   make a decision.  They don't want us to just prescribe

 2   something for them without them understanding why.  But that's

 3   eCommerce platforms.

 4         For review platforms, it's generally considerably less

 5   formal.  And so, certainly, like the most common scenario would

 6   be, tell me a couple of providers I should consider and tell me

 7   what the pros and cons of each would be for me.  And so that's

 8   a -- the most typical recommendation.

 9         It's rare that I would say, oh, you should use company X

10   at the exclusion of all others; don't ask why, just trust me.

11   Q.   So using that definition of the word "recommendation," how

12   many times have you recommended a ratings-and-reviews solution

13   to your clients?

14   A.   Yeah, so I couldn't count, but it would be the like

15   very -- in the majority of cases where we talk about ratings

16   and reviews, it would include me suggesting a list of vendors

17   to consider with some notes about why I would or wouldn't

18   consider certain vendors.

19   Q.   More than ten times?

20   A.   For sure.

21   Q.   More than 20?

22   A.   Definitely.

23   Q.   More than 50?

24   A.   That would be the low end of my guess, but I -- we don't

25   log those sorts of things.  I don't know.

GOLDBERG - REDIRECT / SHER

1  Q.    You also provide advice regarding ratings-and-reviews

2  vendors to your internal clients at Razorfish and Publicis?

3  A.    Frequently.

4  Q.    And how often would you say you do that?

5  A.    Well, so, I have open office hours every two weeks, where

6  people can call in.  And so that happens every two weeks.  And

7  then on an ad hoc basis people put time on my schedules to call

8  me.  And we do, quarterly, these sort of town hall meetings

9  where I go to the individual offices and present on topics.

10       And so all those would include things like, hey, we saw

11  this cool vendor that does X, and it would be useful in these

12  cases; nobody is using them yet; let's talk about it.  Right?

13       And so I have no way to know if the people in those rooms

14  or on those phone calls or on those webinars went to a thousand

15  of our clients or went to none of our clients.

16  Q.    And in the context of those experiences where you're

17  having informal discussions, how many times has ratings and

18  reviews come up?

19  A.    It's like -- so, with the internal group it's not the most

20  frequent thing.  Again, like, it's a super interesting part of

21  this ecosystem.  I definitely don't want to demean it.  But

22  there are 30 things like this that a typical eCommerce site

23  uses.  So it comes up, but it certainly isn't the topic every

24  two weeks in my office hours.

25  Q.    And do you consider the basis of your experience or do

1    your clients -- do your clients go to you based upon the number

2    of recommendations that you have made in the past?

3    **A.**    I don't think so.

4    **Q.**    Why do you think that clients value your advice?

5    **A.**    So, most of my clients know me quite well.  Many of them I

6    have worked with through two or three firms.  And they -- they

7    give me very favorable feedback, so I feel like I've just

8    earned a reputation.  And they continue to pay me what I

9    consider scary rates, that I'm uncomfortable with, and so that

10    makes me feel like they're getting some value from my advice.

11    **Q.**    Now, so, your responses regarding the various vendors of

12    ratings and reviews, Reevoo, Gigya and Pluck, you were asked

13    those specific questions within the number of -- the number of

14    times that you had recommended the way that Mr. Severt defined

15    recommended, which was to the exclusion of all others.

16        If you broaden the definition of the word recommended to,

17    you know, the way you use the word recommended, would your

18    answer change?

19    **A.**    It would.

20    **Q.**    And how would it change?

21    **A.**    Well, it would vary from vendor to vendor, but the -- the

22    numbers would, in most cases, go from zero to -- for some of

23    these newer entrants, to, you know, six, ten, maybe a couple

24    dozen for some of them.  But --

25    **Q.**    Now, with regard to in-house solutions, Mr. Severt pointed

1    out during the deposition of Ms. Judy Massuda, at Sears, it

2    cost $2 million to build an internal ratings-and-reviews

3    solution there.  Do you remember that?

4    **A.**    I do, yes.

5    **Q.**    Does every client need to spend $2 million on a

6    ratings-and-reviews solution to build in-house?

7    **A.**    Absolutely not.

8    **Q.**    Did you review the deposition of Blue Nile?

9    **A.**    I did.

10    **Q.**    And they have an in-house review solution, correct?

11    **A.**    That's my understanding.

12    **Q.**    Do you recall whether or not they testified that it took

13    $2 million to build that solution?

14    **A.**    I think they said it was considerably less.

15    **Q.**    And how about one of your clients, Home Shopping Network,

16    do they have an internal ratings-and-reviews solution?

17    **A.**    They do.

18    **Q.**    And did it take them $2 million to build it?

19    **A.**    It did not.

20    **Q.**    How about iHerb, another company that was deposed in this

21    case, did they testify it took $2 million to build a

22    ratings-and-reviews solution?

23    **A.**    They did not.

24    **Q.**    And how about Overstock.com, do they have a

25    ratings-and-reviews solution that's internal?

1    **A.**    That's my understanding.

2    **Q.**    Did it take $2 million for them to build it?

3    **A.**    I don't think so, no.

4    **Q.**    Sierra Trading Post also testified in this case.  Did they

5    testify that it took $2 million to build a ratings-and-reviews

6    solution?

7          **MR. SEVERT:**  Objection, Your Honor.  He's leading the

8    witness through every one of these questions.

9          **THE COURT:**  I know what Mr. Sher is doing.  And so

10   I'll sustain that objection.  If there's any knowledge that

11   he's got about these things, please solicit it.

12         **MR. SHER:**  Sure, sure.

13   **BY MR. SHER**

14   **Q.**   Mr. Goldberg, is it your experience that different

15   customers require different solutions for ratings and reviews?

16   **A.**   It's both my experience that every client has different

17   requirements that would dramatically affect how extensive or

18   simple their solution is.  It's also my experience that

19   different clients have very different methodologies about how

20   they develop things.

21         And so, you know, some -- some clients are considerably

22   more agile and less costly, and some clients are considerably

23   more careful and measured.

24   **Q.**   Okay.  And one final topic, and it relates to syndication.

25         You testified that syndication diminishes search engine

1    optimization, correct?

2    **A.**    I did.

3    **Q.**    And Bazaarvoice, the government put out an exhibit, which

4    I believe you still have, which is entitled "Bazaarvoice

5    Engineering Review Syndication - Duplicate Content Risk."

6    That's GX1248.

7         Why do you believe Bazaarvoice had to put out a press

8    release to that?

9    **A.**    I'm glad you asked.  Obviously, there's a --

10        **MR. SEVERT:**  Objection.  Mr. Sher referred to this as

11   a press release.  It's not a press release.  It's a blog.

12        **MR. SHER:**  I'm sorry.  It's a blog.  I apologize.

13        **THE COURT:**  And could you give a little bit of

14   foundation as to why he would know why Bazaarvoice put this out

15   on October 1st.

16   **BY MR. SHER:**

17   **Q.**    Do you have any -- did you review this?  Did you review

18   this?

19   **A.**    I hadn't seen this before today, no.

20   **Q.**    Okay.  But you've reviewed it now?

21   **A.**    I have, yes.

22   **Q.**    And are you aware of customers complaining about

23   syndication causing a degradation in SEO?

24   **A.**    I am.

25   **Q.**    Okay.  And given that and your understanding that

 1    customers complain about degradation of SEO from syndication,

 2    can you describe why you think that a company like Bazaarvoice

 3    would need to put out a press -- excuse me, a blog like this?

 4            MR. SEVERT:  Objection.  Still foundation.  I don't

 5    think he's said anything about Bazaarvoice in particular.

 6            THE COURT:  He can answer based on what he said.  Go

 7    ahead.

 8            THE WITNESS:  Yeah, so a couple of things that jumped

 9    out at me.  The -- like, clearly, there's a lot of concern

10    about duplicative content, which is exactly why a company that

11    had some risk of duplicative content would want to put their

12    perspective out there.

13        And there's just a number of things that are carefully

14    crafted in here that, frankly, are disappointing to me.

15        So the whole reason to have SEO is to get traffic, right.

16    And so you want to do good SEO and get traffic.  You don't want

17    to do anything that Google thinks is cheating and get

18    penalized, right.

19        So duplicative content risk is often talking about the

20    penalty.  Hey, too many people are using this; it's probably

21    some computer system that got set up to try to trick us into

22    thinking this is really interesting content.

23        So they talk, at the top of page 2, about some newer meta

24    tags that the search engines agreed on called rel=canonical.

25    And they're citing the use of rel=canonical as a solution to

1    the duplicate content risk.

2         And I believe it's an accurate statement, but the problem

3    is what rel=canonical does, it says, hey, there's times when

4    people legitimately have duplicate content.

5         So I have an article, and I have a button to get the print

6    version of the article, right, where instead of it being two

7    pages it's one page without all the ads.

8         So the way most websites do that, there's two copies of

9    the article on the server.  And Google would find both copies

10   and might consider that duplicative content.

11        So what the rel=canonical tag is, is it's a message you

12   can put on the print version of that page that says:  Don't

13   count this version.  I know it's the same as this other

14   version, but only give me credit for the other version.

15        So that helps duplicate content on one site, but it only

16   gives credit to one of the two pages.

17        They later added cross-domain rel=canonical, which says,

18   hey, I can have the same duplicate content on Clorox's website

19   that I also have on Walgreen's website.

20        And when you use the rel=canonical on Walgreens' website,

21   you are eliminating the risk from getting penalized for

22   duplicate content, because what you're telling Google is

23   anytime someone searches for this, go to Clorox not to

24   Walgreens.  So you're, essentially, eliminating the risk of

25   duplicate content by disavowing yourself of any of the

1    potential benefit from SEO.

2        So it's clearly an issue that they hear about and so

3    they're writing about it, and they're recommending a fair

4    practice.  But I feel like it would be more helpful if they

5    also said and, oh, by the way, you'll no longer get the SEO

6    benefit from that.

7        And then they also talk about, we're not aware of any

8    customers complaining that they got warnings on their Google

9    Webmaster Tools.  And Google Webmaster Tools is an interface

10   that Google gives us to communicate with us about our website.

11   It's kind of like a portal.

12       And in the last year they added a new thing where they

13   literally can send messages.  And it's super helpful because we

14   used to have to guess, Is Google mad at us and are they

15   punishing our site for something we did, and is that why we're

16   not showing up?  And they wouldn't tell you, so you had to sort

17   of speculate.  So now they give you these nice messages.

18       So they're saying that since that message system has been

19   in place, that they're not aware of any customers.  But the

20   message system is relatively new, and I'm aware of multiple

21   customers that explicitly complained about duplicate content

22   problems with Bass Pro.  And I'm aware of articles on the Web

23   that review various rating-and-review implementations for their

24   SEO, and they specifically call out this duplicate content

25   issue.

1   BY MR. SHER

2   **Q.**   So is it fair to say, then, that this blog doesn't change

3   your opinion about the effect on SEO that syndication has?

4   **A.**   It does not.

5          **MR. SHER:**  No further questions, Your Honor.

6          **THE COURT:**  Mr. Severt.

7          **MR. SEVERT:**  Just a few questions, Your Honor.

8                         <u>**RECROSS EXAMINATION**</u>

9   BY MR. SEVERT

10  **Q.**   Mr. Goldberg, just to make sure I have this right, you

11  disagree with Bazaarvoice with respect to the risk duplicate

12  content.  Do I have that right?

13  **A.**   Again, I think they carefully worded this so that it's

14  true; they just omit very pertinent facts.

15  **Q.**   So, in your opinion, is Bazaarvoice misleading the public

16  with respect to duplicative content?

17  **A.**   I think this is misleading, yes.

18  **Q.**   Okay.

19         **MR. SEVERT:**  And, Your Honor, I offer GX1248, which is

20  the blog post, into evidence.

21         **MR. SHER:**  No objection.

22         **THE COURT:**  All right.  Admitted.

23      (Plaintiff's Exhibit GX1248 received in evidence)

24         **MR. SEVERT:**  Your Honor, I would just like to renew

25  the objections we have to this witness, contained in our motion

1    in limine, regarding his methodology, qualifications and, in

2    particular, his opinions relating to what are economic matters.

3         **THE COURT:**  Again, I will be taking those up when I

4    review all of the evidence at the end of the trial, but thank

5    you.

6         **MR. SEVERT:**  Thank you.  No further questions.

7         **MR. SHER:**  Your Honor, very briefly.  We had trial

8    Exhibit DX1895, and I would like to move that into evidence.

9         **MR. SEVERT:**  So there was one in here that I objected

10   to.  I object to this page.

11        **MR. SHER:**  We'll take one page out.

12        **THE COURT:**  Okay.  With that one page, admitted.

13      (Defendant's Exhibit DX1895 received in evidence)

14        **MR. FELDMAN:**  May I give you a preview as to tomorrow?

15        **THE COURT:**  Yes.

16        **MR. FELDMAN:**  Tomorrow we're going to end the day with

17   our economist, Dr. Shehadeh.  Mr. Jacobson will begin his

18   direct.  I don't think we will finish.

19       Before that, it was customer day here.  We're going to

20   have Wayfair.  These are live.  Wayfair, Hayneedle, Southwest

21   Airlines and Big Dot of Happiness.

22       And by video we're going to have Amazon.com, Sears,

23   Princess Cruises and Amazon Webstore.

24       And then after we finish those -- and most of those videos

25   excerpts are going to be short, ten minutes.  The longest is

1  18.

2          **THE COURT:**  Okay.

3          **MR. FELDMAN:**  And then those live ones, then

4  Dr. Shehadeh.

5      And for the day after, we're going to finish with

6  Dr. Shehadeh.  We have Ken Comée, who is the CEO of

7  PowerReviews at the time it was acquired.  And then we have

8  someone flying out from B&H Photo.

9      And that will complete our case.

10          **THE COURT:**  Terrific.

11          **MR. FELDMAN:**  Thank you, Your Honor.

12          **THE COURT:**  Okay.  Thank you.  See you tomorrow at

13  8:00.

14              (Proceedings adjourned at 1:03 p.m.)

15

16                  ---oOo---

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTERS**

5              I certify that the foregoing is a correct transcript

6     from the record of proceedings in the above-entitled matter.

7

8     DATE:    Monday, October 7, 2013

9

10

11

12    _____

13         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
               U.S. Court Reporter

14

15

16    _____

17        Katherine Powell Sullivan, CSR #5812, RMR, CRR
               U.S. Court Reporter

18

19

20

21

22

23

24

25