Peter K. Huston (CA Bar No. 150058)
United States Department of Justice, Antitrust Division
450 Golden Gate Avenue
San Francisco, CA  94102
Telephone:  (415) 436-6660
Facsimile:  (415) 436-6687
E-mail:  peter.huston@usdoj.gov

Michael D. Bonanno (DC Bar No. 998208)
United States Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 7100
Washington, DC  20530
Telephone:  (202) 532-4791
Facsimile:  (202) 616-8544
E-mail:  michael.bonanno@usdoj.gov

Attorneys for Plaintiff United States of America

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>*v.*<br><br>BAZAARVOICE, INC.<br><br>*Defendant*. | Case No. 13-cv-00133 WHO<br><br>**PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENT AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENT**<br><br>**REDACTED VERSION OF DOCUMENTS SOUGHT TO BE FILED UNDER SEAL**<br><br>Judge:          Hon. William H. Orrick<br>Hearing Date:          April 2, 2014<br>Time:                              2 p.m. |

### NOTICE OF MOTION AND MOTION FOR ENTRY OF FINAL JUDGMENT

Having prevailed in the liability phase of this litigation, the United States respectfully moves the Court to enter its proposed Final Judgment, which will fully restore the competition that Bazaarvoice's unlawful purchase of PowerReviews extinguished.  If the Court finds that a hearing is necessary to address this motion, it will be held on April 2, 2014 at 2 p.m., or at a time

that is otherwise convenient for the Court, in accordance with the Court's Order Regarding

Remedy Phase, ECF No. 248 ("Remedy Order").

## RELIEF SOUGHT

Plaintiff United States respectfully requests that the Court enter its proposed Final

Judgment to restore the competition eliminated by Bazaarvoice's unlawful acquisition of

PowerReviews.

Dated:  February 12, 2014                    Respectfully submitted by:


_____ /s/ Peter K. Huston
Peter K. Huston (CA Bar No. 150058)
United States Department of Justice
Antitrust Division
450 Golden Gate Avenue
San Francisco, CA  94102
Telephone:  (415) 436-6660
Facsimile:  (415) 436-6687
E-mail:  peter.huston@usdoj.gov

Michael D. Bonanno (DC Bar No. 998208)
United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 7100
Washington, DC  20530
Telephone:  (202) 532-4791
Facsimile:  (202) 616-8544
E-mail:         michael.bonanno@usdoj.gov

Attorneys for Plaintiff United States of America

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARGUMENT ....................................................................................................... 2

**I.    District Courts Have Broad Discretion To Craft Effective Relief In
       Section 7 Cases.** .................................................................................... 2

**II.   The Final Judgment Must Fully Restore The Competition That
       Bazaarvoice Eliminated By Acquiring PowerReviews.** .......................... 4

    **A.   *Bazaarvoice Must Divest All Assets It Acquired Through Its
       Unlawful Purchase Of PowerReviews.*** ............................................ 4

    **B.   *The Final Judgment Must Contain Provisions To Ensure The Lost
       Competition Will Be Fully Replaced.*** ............................................. 5

        (1)   *Bazaarvoice Must Provide Cross-Network Syndication
             Services To The Divesture Buyer And Its Customers.* ................. 6

        (2)   *Bazaarvoice Must Waive Trade-Secret Restrictions In Its
             Employment Agreements With Respect To The Company's
             R&R Technology.* ..................................................................... 7

        (3)   *Bazaarvoice And The Divestiture Buyer Must Enter Into An IP
             Licensing Arrangement.* ........................................................... 10

        (4)   *Bazaarvoice Must Provide Transitional Services To Allow The
             Buyer To Operate The Divested Assets Effectively.* ................... 10

        (5)   *Customers Must Be Permitted To Terminate Their Existing
             Agreements With Bazaarvoice At Will For A Limited Time
             Following The Divestiture Sale.* ............................................... 11

    **C.   *Bazaarvoice Must License Additional Assets To The Divestiture
       Buyer If The Sale Of The PowerReviews Assets Will Not Transfer A
       Large Number Of Customers To The Buyer.*** ................................ 11

    **D.   *A Special Master Is Necessary To Ensure Bazaarvoice's Compliance
       With The Final Judgment.*** ........................................................ 13

    **E.   *Bazaarvoice Must Notify The United States If It Intends To Enter
       Any Transaction With A Value Exceeding $10 Million.*** ............... 15

CONCLUSION .................................................................................................. 16

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Ash Grove Cement Co. v. FTC*,
   577 F.2d 1368 (9th Cir. 1978) .................................................................................. 3

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*,
   386 U.S. 129 (1967)................................................................................................... 4

*City of New York v. Mickalis Pawn Shop, LLC*,
   645 F.3d 114 (2d Cir. 2011) .................................................................................... 13

*Crown Zellerbach Corp. v. FTC*,
   296 F.2d 800 (9th Cir. 1961) .................................................................................... 9

*F.T.C. v. Whole Foods Mkt., Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008)............................................................................... 13

*Ford Motor Co. v. United States*,
   405 U.S. 562 (1972)....................................................................................... 2, 3, 4, 6

*FTC v. Rhinechem Corp.*,
   459 F. Supp. 785 (N.D. Ill. 1978) ............................................................................ 8

*FTC v. Weyerhaeuser Co.*,
   665 F.2d 1072 (D.C. Cir. 1981)............................................................................. 3, 8

*In re Peterson*,
   253 U.S. 300 (1920).................................................................................................. 13

*Int'l Salt Co. v. United States*,
   332 U.S. 392 (1947)................................................................................................... 3

*Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*,
   478 U.S. 421 (1986).................................................................................................. 14

*Madrid v. Gomez*,
   889 F. Supp. 1146 (N.D. Cal. 1995) ....................................................................... 14

*NORML v. Mullen*,
   828 F.2d 536 (9th Cir. 1987) .................................................................................. 14

*OKC Corp. v. FTC*,
   455 F.2d 1159 (10th Cir. 1972) ................................................................................ 4

*Olin Corp. v. FTC*,
   986 F.2d 1295 (9th Cir. 1993) .................................................................................. 4

*Stone v. San Francisco*,
   968 F.2d 850 (9th Cir. 1992) .................................................................................. 14

*United States v. Alcoa*,
   247 F.Supp. 308 (E.D. Mo. 1962) ............................................................................ 4

*United States v. Coca-Cola Bottling Co. of Los Angeles*,
    575 F.2d 222 (9th Cir. 1978) ............................................................................ 2

*United States v. Crescent Amusement Co.*,
    323 U.S. 173 (1944) ....................................................................................... 13

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961) .......................................................................... 2, 3, 4, 13

*United States v. Hammermill Paper Co.*,
    429 F. Supp. 1271 (W.D. Pa. 1977) ............................................................... 14

*United States v. Joseph Schlitz Brewing Co.*,
    253 F. Supp. 129 (N.D. Cal. 1966) ................................................................... 9

*United States v. National Lead. Co.*,
    332 U.S. 319 (1947) ....................................................................................... 10

*United States v. Yonkers Bd. Of Educ.*,
    29 F.3d 40 (2d Cir. 1994) ............................................................................... 13

**FEDERAL STATUTES**

15 U.S.C. § 18a ................................................................................................... 15

15 U.S.C. § 25 ....................................................................................................... 3

**FEDERAL RULES**

Fed. R. Civ. P. 53 ............................................................................................... 14

**ADMINISTRATIVE DECISIONS**

*Chicago Bridge & Iron Co.*,
    138 F.T.C. 1024 (2004) .................................................................................... 4

*Crown Zellerbach Corp.*,
    54 F.T.C. 769 (1957) ......................................................................................... 9

**OTHER AUTHORITIES**

Kenneth Elzinga, *The Antimerger Law:  Pyrrhic Victories?*,
    12 J.L. & Econ. 43 (1969) ........................................................................... 6, 10

Scott A. Sher, *Closed But Not Forgotten:  Government Review of Consummated Mergers Under
    Section 7 of the Clayton Act*,
    45 Santa Clara L.R. 41 (2004) ..................................................................... 5, 12

Staff of the Bureau of Competition, Fed. Trade Comm'n,
    *A Study of the Commission's Divestiture Process* (1999) ................................. 8

U.S. Dep't  of Justice,
    *Antitrust Division Policy Guide to Merger Remedies* (2011) ......................... 14

**INTRODUCTION**

This Court found that Bazaarvoice violated Section 7 of the Clayton Act when it acquired PowerReviews, its "closest and only serious competitor." Mem. Op. at 141. As the trial record demonstrated, the unlawful transaction entrenched Bazaarvoice's dominance in the market for Ratings and Reviews platforms ("R&R") and insulated the company from meaningful competition. There is no doubt that the acquisition has unlawfully deprived customers of the benefits of competition for nearly twenty months. The only question that remains is how to best remedy the violation.

The remedy in this case must do more than merely restore the pre-merger state of competition. Twenty months have passed, and there is no way to turn back the clock. Since the acquisition, Bazaarvoice has siphoned R&D resources away from the PowerReviews platform and migrated several prominent PowerReviews customers to its own R&R platform. As a result, the PowerReviews assets have stagnated and diminished in value. The remedy must compensate for both the lost time and the deterioration of the PowerReviews assets.

Accordingly, the United States proposes a Final Judgment (the "PFJ") that will create the competitive landscape that would have existed today if Bazaarvoice had not acquired PowerReviews. The PFJ, which is attached as Exhibit A, requires Bazaarvoice to divest the PowerReviews assets and includes additional provisions that are necessary to effectively restore competition in the R&R market. To help the divestiture buyer build a competitive syndication network, the PFJ requires Bazaarvoice to provide cross-network syndication services to the purchaser of the PowerReviews assets. The PFJ also requires Bazaarvoice to waive trade-secret restrictions for any employees that are hired by the divestiture buyer, providing the divestiture buyer access to new features Bazaarvoice developed after the merger. Finally, the PFJ requires Bazaarvoice to license additional assets to the divestiture buyer if the sale of the PowerReviews assets will not transfer a critical mass of customers to the buyer.

Each provision in the PFJ is necessary to place the divestiture buyer in the position that PowerReviews would have occupied today if it had never been acquired by Bazaarvoice. Bazaarvoice, however, has another goal in mind. In an attempt to avoid accountability for the

antitrust violation it committed and to continue to frustrate competition on the merits, the company appears to have embarked on a hurried and unilateral campaign to solicit indications of interest from prospective buyers, advertising an asset package that is clearly inadequate to fully restore competition. The United States has reason to believe that Bazaarvoice has offered prospective buyers only the PowerReviews assets. This unilateral attempt to evade the consequences of its unlawful conduct is a far cry from the relief that is necessary to remedy the violation. Indeed, if Bazaarvoice is permitted to sell a degraded PowerReviews business as the sole remedy in this case, Bazaarvoice will have accomplished its goal of eliminating its only significant competitor.

At this stage of the litigation, whether Bazaarvoice finds a willing buyer for the set of assets it has advertised is irrelevant. There are undoubtedly prospective buyers that may believe they can profitably operate the PowerReviews assets, but the mere existence of these firms does not answer the right question. The sole issue that remains in this case is the scope of the relief that is necessary to fully restore the competitive landscape that was eliminated by the transaction—the same competitive landscape that Bazaarvoice "unabashedly" sought to extinguish. Mem. Op. ¶ 60. Given the passage of time since the merger closed and the lack of post-merger investments in the PowerReviews platform, divestiture of the PowerReviews assets alone is clearly not enough. The PFJ and this Memorandum outline the additional conditions that are necessary to effectively address the harm from the transaction.

## ARGUMENT

## I. District Courts Have Broad Discretion To Craft Effective Relief In Section 7 Cases.

To remedy a Section 7 violation, a district court must craft a Final Judgment that contains "measures effective to restore competition." *United States v. E.I. Du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961). To achieve this goal, courts are empowered to order any relief that is "necessary to eliminate the effects of an acquisition offensive to the statute." *United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222, 229 (9th Cir. 1978); *see also Ford Motor Co. v. United States*, 405 U.S. 562, 577-78 (1972) ("Antitrust relief should unfetter a market from anticompetitive conduct and 'pry open to competition a market that has been closed by

defendants' illegal restraints.'") (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)).  The scope of the relief will vary based on the facts of the case; therefore, district courts are "invested with large discretion to model their judgments to fit the exigencies of the particular case." *Int'l Salt Co.*, 332 U.S at 400-01.

When confronted by a Section 7 violation, a district court may exercise its equitable powers to take appropriate steps to "restrain" the violation.  15 U.S.C. § 25.  It is *not* a court's mission to merely restore the pre-merger status quo.  In *Ford Motor Co.*, the Supreme Court explicitly rejected such a narrow view, holding that relief under Section 7 "is not limited to the [restoration] of the status quo ante."  405 U.S. at 573 n.8.  Instead, "relief must be directed to that which is necessary and appropriate in the public interest to eliminate the effects of the acquisition." *Id.* (internal quotations omitted).  If a Final Judgment falls short of this goal, the United States will have "won a lawsuit and lost a cause." *Int'l Salt Co.*, 332 U.S. at 401.  For this reason, after the government establishes a violation, "all doubts as to the remedy are to be resolved in [the government's] favor." *Du Pont*, 366 U.S. at 334.

In the case of a consummated merger, the first step toward remedying a Section 7 violation is complete divestiture of the acquired firm's assets, which courts typically order "as a matter of course." *Id.* at 330; *see also Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1380 (9th Cir. 1978) ("[T]here is a sound basis in precedent for the application of the remedy of divestiture.") (citing *Du Pont*, 366 U.S. at 328-31).  In many cases, however, divestiture alone will not eliminate a transaction's likely anticompetitive effects. *Cf. FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1085 n.31 (D.C. Cir. 1981) ("In the absence of any preliminary restraint, the prospect of ultimate divestiture may not prevent permanent anticompetitive harm.").

If complete divestiture of the acquired firm's assets will not fully restore the competitive landscape, a district court has broad discretion to order additional relief.  A district court can impose other conditions to allow another competitor to step into the position vacated by the acquired firm and "establish its competitive position." *Ford Motor Co.*, 405 U.S. at 575. Indeed, beyond divestiture of the acquired firm's assets, a court can order a defendant to sell assets that it did not acquire through the unlawful transaction, even if the assets were obtained or

created *after* the merger closed. *See Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 136-37 (1967) (directing the district court to craft a divestiture order that would require the defendant to sell new gas reserves it developed after the merger); *United States v. Alcoa*, 247 F. Supp. 308, 312-13, 316 (E.D. Mo. 1964) (requiring the defendant to sell a plant constructed after the acquisition); *cf. Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 441-42 (5th Cir. 2008) (upholding an FTC order requiring the defendant to reorganize itself into two separate businesses and allocate in-progress contracts between the two firms); *Chicago Bridge & Iron Co.*, 138 F.T.C. 1024 (2004) (underlying FTC order upheld by the Fifth Circuit).

## II.     The Final Judgment Must Fully Restore The Competition That Bazaarvoice Eliminated By Acquiring PowerReviews.

To fully restore competition, the Final Judgment in this case must allow "the forces of competition [to] be nurtured to correct for [the] illegal acquisition." *Ford Motor Co.*, 405 U.S. at 578. Accordingly, as discussed in detail below, the PFJ requires Bazaarvoice to divest the PowerReviews assets and includes other provisions that will allow the divestiture buyer to gain traction in the market.

### A.     *Bazaarvoice Must Divest All Assets It Acquired Through Its Unlawful Purchase Of PowerReviews.*

The Supreme Court has held that "complete divestiture is peculiarly appropriate" when a consummated merger is found to have violated Section 7. *Du Pont*, 366 U.S. at 328; *see also Ford Motor Co.*, 405 U.S. at 573. Paragraph IV.A in the PFJ requires Bazaarvoice to divest all assets it acquired through its purchase of PowerReviews. Complete divestiture of the PowerReviews assets is necessary to effectively restore the competitive landscape.[1]

---

[1] Courts have routinely upheld *total* divestiture as the appropriate remedy for a Section 7 violation, even in cases where the violation does not extend to all of the assets acquired in an unlawful acquisition. *See OKC Corp. v. FTC*, 455 F.2d 1159, 1163 (10th Cir. 1972) ("Total divestiture is not necessarily inappropriate even though the antitrust violation found relates to but one aspect of the company thus acquired, especially where, as here, total divestiture is deemed necessary to restore effective competition."); *Chicago Bridge*, 534 F.3d at 441-42; *Olin Corp. v. FTC*, 986 F.2d 1295, 1307 (9th Cir. 1993). Total divestiture ensures that a viable, ongoing business will be established, maximizing the purchaser's chances of success. In any event, in this case "there is no real dispute that the overwhelming majority of PowerReviews's and Bazaarvoice's business came from R&R." Mem. Op. ¶ 145.

1   As this Court found, "By any measurement, PowerReviews had at least five times the

2   market share of all other commercial competitors combined."  Mem. Op. ¶ 304.  It is critical,

3   therefore, to ensure the divestiture buyer receives an established base of customers.  Total

4   divestiture will transfer all customers using any PowerReviews platform to the divestiture buyer

5   at the time of the asset sale.[2]

6   **B.**   ***The Final Judgment Must Contain Provisions To Ensure The Lost Competition Will***
       ***Be Fully Replaced.***

7

8   It is widely recognized that effective relief in a consummated merger case frequently

9   requires more than a simple divestiture remedy.[3]  In this case, additional relief is necessary to

10  place the divestiture buyer in the competitive position that PowerReviews would have occupied

11  today absent the transaction.  It has been almost twenty months since the acquisition closed, and

12  Bazaarvoice has not invested any resources in improving the PowerReviews platform.

13  Meanwhile, the PowerReviews customer base has declined.  Before the merger, ███ customers

14  were using the PowerReviews Enterprise R&R platform.  Bazaarvoice Response to Remedy

15  Order, Items II.A, B (Exhibit D).  Bazaarvoice has already migrated more than ███ of these

16  customers to its own R&R platform,[4] and ████████████████████████████████████

17  ████████████████████   *Id.*  Only ███ customers continue to use the

18  PowerReviews Enterprise R&R platform today.  *Id.*  During the same time period, Bazaarvoice

19  continued to expand its own customer base—adding more than 300 customers.  Trial Tr. 1765:1-

20  8 (Shehadeh).

21  _____

22  [2] To allow the divestiture buyer to transition these customers away from Bazaarvoice and gain its
    footing as an independent firm, Paragraph V.C of the PFJ prohibits Bazaarvoice from soliciting
23  these customers for six months following the divestiture sale.  Nothing in the PFJ, however,
    restricts any customer's ability to contact Bazaarvoice unilaterally during this time period.

24  [3] *See* Scott A. Sher, *Closed But Not Forgotten:  Government Review of Consummated Mergers
    Under Section 7 of the Clayton Act*, 45 Santa Clara L. Rev. 41, 88-89 (2004) ("[O]ften, in post-
25  close challenges, structural relief must include improvements that the acquiring party made to the
    acquired assets or must include ancillary relief to ensure that the divestiture package represents a
26  viable business.").

27  [4] Of the customers that are no longer using the PowerReviews Enterprise platform,
    approximately ███ have migrated (or are in the process of migrating) from PowerReviews'
28  technology to Bazaarvoice's technology.  Bazaarvoice Response to Remedy Order, Item II.B
    (Exhibit D).

1    As a result, PowerReviews' market share has declined relative to Bazaarvoice's share.

2    Even after purchasing all of the PowerReviews assets, the divestiture buyer will be left with a

3    stagnant platform and a reduced market share.  Facing the formidable barriers to entry and

4    expansion in the market, a divestiture buyer with such a small market share will not be able to

5    replace PowerReviews as an effective competitive constraint.  *Cf.* Mem. Op. at 7 ("When the

6    network effect of syndication and switching costs are combined with reputation and

7    Bazaarvoice's market share, it has a substantial advantage over its smaller competitors and any

8    company that is thinking about entering the market.").

9    To remedy this problem, the PFJ contains several provisions that will help the divestiture

10   buyer overcome barriers to expansion and compensate for the lack of continued innovation

11   related to the PowerReviews platform following the merger.  The Supreme Court upheld similar

12   term-limited provisions in *Ford Motor Co.*, because the divestiture buyer needed time to "obtain

13   a foothold in the industry."  405 U.S. at 575.  The same is true here.  Each provision is necessary

14   to allow the divestiture buyer to gain its footing and establish itself as an effective competitor.

15   *Cf.* Kenneth Elzinga, *The Antimerger Law:  Pyrrhic Victories?*, 12 J.L. & Econ. 43, 45 (1969)

16   ("Along with reestablishing the acquired firm, it is also necessary that this 'new' firm be made

17   viable; a mere shadow of its former self is not acceptable.  Indeed, reestablishing 'new' firms

18   that are unable to stand on their own would make any relief efforts farcical.").

19   (1)    *Bazaarvoice Must Provide Cross-Network Syndication Services To The Divestiture*
20          *Buyer And Its Customers.*

21   This Court found that "Bazaarvoice's syndication network is a barrier to entry in the

22   market for R&R platforms," Mem. Op. ¶ 241, and that "[b]esides PowerReviews, no credible

23   syndication competitor existed,"  Mem. Op. ¶ 252.  As a result of the acquisition, customers

24   valuing syndication "lost significant bargaining leverage" because there is "no alternative R&R

25   platform with a significant syndication network."  Mem. Op. ¶ 279.  The divestiture buyer must

26   be able to quickly build a competitive syndication network to mount an attack on Bazaarvoice's

27   network.  Otherwise, the Final Judgment will not fully restore the competitive landscape that

28   Bazaarvoice sought to destroy.

To put the divestiture buyer in a competitive position, Paragraph V.A of the PFJ requires Bazaarvoice to provide cross-network syndication services to the divestiture buyer's clients on non-discriminatory terms.[5]  As this Court found, "Such syndication was feasible and was occurring for some customers prior to the merger."  Mem. Op. ¶ 316.  After the acquisition closed, the prevalence of cross-network syndication increased as Bazaarvoice offered these services to more legacy PowerReviews customers.  Mem. Op. ¶ 316.  The PFJ requires Bazaarvoice to continue providing these services to customers using the PowerReviews platform and to extend the same services to all of the divestiture buyer's customers.[6]  These provisions ensure that customers will maintain access to syndication connections between the two platforms after the divestiture sale.  Moreover, these provisions provide clients that leave Bazaarvoice a guarantee that they will not lose access to their syndication relationships on the Bazaarvoice network.

The cross-network syndication provisions in the PFJ will provide the buyer time to build its own customer base and establish an independent syndication network to compete with Bazaarvoice.  As this Court found, before the merger Bazaarvoice intentionally "frustrated efforts to enable cross-network syndication with PowerReviews customers."  Mem. Op. ¶ 316.  Paragraph V.A in the PFJ prohibits Bazaarvoice from engaging in the same conduct to prevent the buyer from obtaining the position that would have been held by PowerReviews today absent the merger.

(2)     *Bazaarvoice Must Waive Trade-Secret Restrictions In Its Employment Agreements With Respect To The Company's R&R Technology.*

Bazaarvoice's post-merger allocation of R&D funds has distorted the path of product innovation in the R&R market.  Through an unlawful transaction, Bazaarvoice obtained access to

---

[5] The right to receive these syndication services is an asset that will be included in the divestiture package.  *See* PFJ ¶ II.D.3.  After purchasing the PowerReviews assets, neither the divestiture buyer nor its customers will have any ongoing obligation to pay Bazaarvoice for this service. *Id.*

[6] Bazaarvoice is only obligated to provide these services for four years following the sale of the PowerReviews assets.  PFJ ¶ V.A.

1   its only significant competitor's trade secrets and has used them to improve its own products.[7]

2   Bazaarvoice has also continued to invest in R&D for its own products.[8]  Meanwhile, the

3   PowerReviews R&R platform has atrophied due to a lack of investment.  Mem. Op. ¶ 313

4   ("Bazaarvoice ceased the development of the PowerReviews platform other than ongoing

5   maintenance following the acquisition.").[9]  If Bazaarvoice retains exclusive ownership of its

6   post-merger R&R platform improvements, it will receive an unjust benefit at the expense of the

7   divestiture buyer and the market as a whole.  *Cf.* Staff of the Bureau of Competition, Fed. Trade

8   Comm'n, *A Study of the Commission's Divestiture Process*, at 18 (1999) (recounting examples in

9   which an acquirer used confidential information obtained from the acquired firm to harm the

10   divestiture buyer) [hereinafter "Divestiture Study"].[10]

11       Paragraph IV.C in the PFJ requires Bazaarvoice to waive trade-secret restrictions related

12   to its R&R technology and intellectual property rights for any of its current or former employees

13

14   [7] During the liability phase of this litigation, Bazaarvoice claimed that it had already used
PowerReviews' technology to launch significant architectural improvements.  *See, e.g.*,
15   Bazaarvoice Response to Interrogatory No. 3 ("[T]he acquisition has enabled Bazaarvoice to
conserve investment and development resources and time by leveraging PowerReviews'
16   technology to launch major architectural improvements. This has benefited Bazaarvoice and
PowerReviews customers. For example, using PowerReviews' technology, Bazaarvoice has been
17   able to implement better product matching which has allowed products with different names or
SKUs to be matched across multiple retailers. Bazaarvoice has also been able to take
18   PowerReviews' technology and implement a universal data model . . . .") (Exhibit C).  More
recently, however, Bazaarvoice insisted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* Bazaarvoice Response to Remedy Order,
Item.II.F (Exhibit B).  Even if Bazaarvoice's most recent representation is correct, Bazaarvoice
20   has clearly been able to leverage knowledge possessed by former PowerReviews employees to
improve its own R&R platform.  *See* GX494 (Godfrey 30(b)(6) Dep. 9:25-10:24).

21

22   [8] *See* Bazaarvoice Response to Remedy Order, Item II.K ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Exhibit B)
23

24   [9] *See also* Bazaarvoice Response to Remedy Order, Item II.L ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Exhibit B).

25   [10] Courts have also expressed concern that the transfer of trade secrets may alone constitute harm
to competition.  *See Weyerhaeuser,* 665 F.2d at 1085-86 ("A hold separate order that cordons the
26   acquired assets, even if it preserves the possibility of divestiture, may risk transfer of confidential
information from the acquired, 'held separate' company to the acquiring company."); *FTC v.*
27   *Rhinechem Corp.*, 459 F. Supp. 785, 790 (N.D. Ill. 1978) ("Divestiture would be manifestly
ineffective as a means of remedying this possible adverse effect of this transaction, should that
28   prove necessary.").

who are hired by the divestiture buyer.[11]  Waiving these restrictions for employees who are hired by the divestiture buyer will ensure that the divestiture buyer, like Bazaarvoice, will benefit from the R&D efforts undertaken by the combined firm after the merger closed.[12]  Moreover, the divestiture buyer will be able to leverage the knowledge of former Bazaarvoice employees to develop new features without fear of being sued by Bazaarvoice for misappropriation of trade secrets.  With these restrictions removed, the divestiture buyer will be free to hire any Bazaarvoice employee and leverage his or her technical expertise to close the innovation gap that was created by the transaction.

These provisions are necessary to provide the divestiture buyer with access to the product improvements Bazaarvoice has developed since the transaction closed.  Courts have upheld similar relief in other cases.  *Crown Zellerbach Corp. v. FTC*, 296 F.2d 800 (9th Cir. 1961) (affirming FTC order requiring the defendant to divest assets acquired through the acquisition, along with post-merger improvements); *Crown Zellerbach Corp.*, 54 F.T.C. 769, 806-07 (1957) (FTC opinion and order); *cf. United States v. Joseph Schlitz Brewing Co.*, 253 F. Supp. 129, 183 (N.D. Cal. 1966) (ordering defendant to divest "all additional assets or improvements" to the acquired assets).  As a practical matter, in this case the differences between PowerReviews' technology and Bazaarvoice's technology would make it difficult to require Bazaarvoice to license post-merger improvements to the Bazaarvoice platform to the divestiture buyer.  The provisions in Paragraph IV.C of the PFJ, therefore, are the best way to place the divestiture buyer

---

[11] Paragraph IV.C in the PFJ also requires Bazaarvoice to waive any non-compete provisions in its employment contracts for employees hired by the divestiture buyer.  This waiver ensures that the divestiture buyer has access to personnel with expertise related to the PowerReviews platform and that the trade-secret provision in Paragraph IV.C of the PFJ will be effective.

[12] The PFJ also requires Bazaarvoice to provide the divestiture buyer a list of all features or improvements related to R&R platforms that Bazaarvoice has developed since the merger closed.  PFJ ¶ II.D.6.

1    in a similar position to that PowerReviews would have occupied if it had continued to invest in

2    improving its platform independently.[13]

3              (3)    *Bazaarvoice And The Divestiture Buyer Must Enter Into An IP Licensing*
                      *Arrangement.*
4

5              Paragraph V.D of the PFJ requires Bazaarvoice to enter into a patent licensing

6    arrangement with the divestiture buyer as a part of the divestiture sale.  The license shall be paid

7    at the time of sale (it is not an ongoing royalty), and it will cover all of Bazaarvoice's intellectual

8    property related to R&R platforms.  This arrangement ensures that Bazaarvoice will not engage

9    in strategic behavior to raise its rival's costs through litigation related to IP rights that were

10   commingled through the transaction.  This relief is necessary and appropriate to restore the

11   competitive landscape.  *Cf. United States v. National Lead. Co.*, 332 U.S. 319, 348 (1947)

12   (where appropriate, courts may order mandatory patent licensing when crafting relief in antitrust

13   cases).

14             (4)    *Bazaarvoice Must Provide Transitional Services To Allow The Buyer To Operate*
                      *The Divested Assets Effectively.*
15

16             Paragraph IV.G in the PFJ requires Bazaarvoice to provide transitional support services

17   to the divestiture buyer for up to one year following the divestiture sale.  At the time of the

18   divestiture, the buyer will not have had any experience operating the PowerReviews assets.  The

19   provisions in Paragraph IV.G are necessary to facilitate the seamless transition of the

20   PowerReviews assets from Bazaarvoice to the divestiture buyer.  The transitional services are

21   limited to one year.  These services will ensure that the divestiture buyer is capable of operating

22   the divested assets, and that legacy PowerReviews customers will not experience service

23   disruptions as a result of the divestiture sale.

24

25

26   [13] *Cf.* Elzinga, *supra*, at 59 ("[I]n a dynamic market the reestablishment of [the acquired firm] as
     it existed at the time of the acquisition, some five or ten years later, may not make technological
     sense; restoration to premerger status might dictate an outmoded firm with no chance of survival
27   . . . . [I]t is not illogical to assume that if the [acquired firm] had not been acquired, it would have
     added certain improvements itself; thus restoration of [the acquired firm] in a meaningful
28   premerger sense requires that it be an improved [acquired firm] is reestablished.").

(5)     *Customers Must Be Permitted To Terminate Their Existing Agreements With Bazaarvoice At Will For A Limited Time Following The Divestiture Sale.*

After the sale of the PowerReviews assets, the divestiture buyer will have fewer customers than PowerReviews did before the merger.  The buyer's small market share will place it at a disadvantage relative to where PowerReviews would have been today absent the merger, particularly with regard to its capacity to build a syndication network.  To expand its market share, the buyer needs an opportunity to effectively solicit Bazaarvoice's customers.

To provide the divestiture buyer with that opportunity, Paragraph IV.I in the PFJ requires Bazaarvoice to waive breach of contract claims against its customers if they switch to the divestiture buyer.[14]  As currently structured, Bazaarvoice's contracts could deter its clients switching to the divestiture buyer mid-contract.  Bazaarvoice's typical service contracts last for at least a one-year term.  Trial Tr. 803:19-804:10.  And while the company's former CEO testified at trial that customers typically have a right to terminate their agreements with thirty days notice, *id*. at 804:1-3, that is not always the case.  In December 2013, press reports indicated that the company sued two of its international customers for breach of contract when they switched to a competitor.[15]  Paragraph IV.I in the PFJ will prevent similar conduct by Bazaarvoice that is intended to inhibit expansion by the divestiture buyer after it acquires the PowerReviews assets.

**C.     *Bazaarvoice Must License Additional Assets To The Divestiture Buyer If The Sale Of The PowerReviews Assets Will Not Transfer A Large Number Of Customers To The Buyer.***

It is critical that the Final Judgment re-create the competition Bazaarvoice previously faced from PowerReviews.  As a benchmark for the competitive landscape that would have prevailed absent the unlawful transaction, the PFJ seeks to create a firm with a customer base

---

[14] The waiver is limited in duration to the later of (1) the expiration of a customer's current Bazaarvoice contract; or (2) one year from the date of the letter described in Paragraph IV.J in the PFJ.  *See* PFJ ¶ IV.I.

[15] *See* Robert Grattan, *Bazaarvoice Files Suit Over Alleged Contract Breach*, Austin Business Journal (December 24, 2013) (*available at* http://www.bizjournals.com/austin/news/2013/12/23/bazaarvoice-sues-over-alleged-contract.html).

that approximates the customer base held by PowerReviews before the merger. If the divestiture of the PowerReviews assets falls short of this goal, the value of these assets will have diminished significantly since the transaction closed, and Bazaarvoice should be required to license additional assets to the divestiture buyer. The risk that the acquired firm's assets will decline in value after an anticompetitive acquisition is particularly significant in technology markets.[16] The PFJ, therefore, must contain a provision that will guard against this possibility.

Paragraph IV.H in the PFJ serves this purpose. As described in Paragraph IV.H, the PFJ's goal is to create a firm that is providing R&R services to customers that represent at least 80% of legacy PowerReviews Enterprise customers, according to revenue.[17] This benchmark provides a way to market test whether the sale of the PowerReviews assets, combined with the other provisions in the PFJ, will place the divestiture buyer in the competitive position that PowerReviews would have occupied today absent the transaction. If the benchmark is met at the time that the PowerReviews assets are sold, then the divestiture buyer should have a sufficient customer base from which to begin competing effectively with Bazaarvoice.[18] On the other hand, if this benchmark is not met, additional relief will be necessary to restore competition. Accordingly, if the benchmark is not met, Paragraph IV.H in the PFJ requires Bazaarvoice to provide the divestiture buyer with a perpetual, irrevocable license to the latest version of its R&R platform.

Bazaarvoice's own conduct created the need for this provision. Following the merger, despite its knowledge of the pending antitrust investigation by the United States, it unilaterally

---

[16] *See* Sher, *supra* note 3, at 91 ("Two (or even one) years after a transaction closes, the products and/or assets of the acquired firm may be obsolete with the acquiring party moving the best-of-breed technology of the acquired party's assets to its own product line.")

[17] Based on information produced by Bazaarvoice pursuant to the Court's Order Regarding Remedy Phase, ECF No. 248, the United States estimates that as of January 2014 approximately ▇▇ of legacy PowerReviews Enterprise customers, measured by revenue, are still using the PowerReviews Enterprise platform.

[18] Paragraph IV.H of the PFJ requires Bazaarvoice to file a certification, signed by the company's CEO and CFO, that will specify the percentage of customers (according to revenue) that are still using the PowerReviews Enterprise platform. Bazaarvoice must file the certification with the Court five business days before the divestiture sale is approved by the Court.

1   decided to stop investing in R&D for the PowerReviews platform and began migrating

2   PowerReviews customers to its own technology.  Mem. Op. ¶ 313.  Without ongoing R&D

3   investments, the PowerReviews R&R platform has not been improved for nearly twenty months.

4   As a result, customers have left the platform.  If these investments had been made, the

5   PowerReviews platform would have undoubtedly remained a viable, competitive technology.

6        Bazaarvoice cannot credibly argue that this provision is excessive or unnecessary.  As

7   Judge Brown wrote in *FTC v. Whole Foods Mkt., Inc.*, "Even remedies which 'entail harsh

8   consequences' would be appropriate to ameliorate the harm to competition from an antitrust

9   violation."  548 F.3d 1028, 1033-34 (D.C. Cir. 2008) (citing *Du Pont*, 366 U.S. at 327).  If the

10  customer benchmark is not met, then requiring Bazaarvoice to license a copy of its latest

11  technology platform to the divestiture buyer is the only way to restore the competitive landscape.

12  And when no other remedy exists, a Section 7 defendant cannot escape the consequences of its

13  illegal conduct under the guise of a claim of hardship.  *See United States v. Crescent Amusement

14  Co.*, 323 U.S. 173, 189 (1944) ("Those who violate the Act may not reap the benefits of their

15  violations and avoid an undoing of their unlawful project on the plea of hardship or

16  inconvenience."); *cf. Du Pont*, 366 U.S. at 327 ("Economic hardship can influence choice only

17  as among two or more effective remedies.  If the remedy chosen is not effective, it will not be

18  saved because an effective remedy would entail harsh consequences.").

19  **D.    *A Special Master Is Necessary To Ensure Bazaarvoice's Compliance With The Final

20         Judgment.***

21        Paragraph VI.A in the PFJ asks the Court to appoint a Special Master to monitor the sale

22  of the divestiture assets and oversee Bazaarvoice's ongoing compliance with the Final Judgment.

23  The appointment of the Special Master is within this Court's "inherent power" to appoint persons

24  to assist it in the performance of specific judicial duties.  *In re Peterson*, 253 U.S. 300, 312-13

25  (1920); *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011)

26  ("'The power of the federal courts to appoint special masters to monitor compliance with their

27  remedial orders is well established.'") (*quoting United States v. Yonkers Bd. Of Educ.*, 29 F.3d

28  40, 44 (2d Cir. 1994)).  It is well established that this power extends to the appointment of

persons to monitor compliance with court orders. *See Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 481-82 (1986). In addition to a court's inherent equitable power to appoint the Special Master, under Rule 53 of the Federal Rules of Civil Procedure, it is firmly within a court's power to appoint a master to monitor compliance with a judicial decree and make recommendations to the Court.[19] *See NORML v. Mullen*, 828 F.2d 536, 544-45 (9th Cir. 1987); *see also Stone v. San Francisco*, 968 F.2d 850, 859 n.18 (9th Cir. 1992) ("Federal courts repeatedly have approved the use of special masters to monitor compliance with court orders and consent decrees."). Similar provisions are common in negotiated consent decrees in other merger cases.[20] *See* U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies*, at 26-28 (2011).

The Special Master is a necessary safeguard to negotiate the moral hazard that is inherent in the divestiture process. As the FTC staff found in its study of divestiture remedies in 1999, in many cases the defendant in a Section 7 case has the incentive "to look for marginally acceptable buyers and may engage in strategic conduct to impede the success of the buyer." Divestiture Study, at 8. As outlined in the PFJ, during the first thirty days after the Final Judgment goes into effect, the Special Master will monitor the divestiture sale process, and Bazaarvoice will have the exclusive ability to negotiate a sale of the divestiture assets, subject to Court approval. If Bazaarvoice fails to sell the assets during this time period, the Special Master will take over the sales process and ultimately propose a divestiture sale to the Court. The Court retains the

---

[19] Rule 53 supplements a district court's inherent power at equity to appoint a monitor. *See Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982) ("[R]ule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy. The power of a federal court to appoint an agent to supervise the implementation of its decrees has long been established."); *Madrid v. Gomez*, 889 F. Supp. 1146, 1282 (N.D. Cal. 1995) ("The appointment of a Special Master, with appropriately defined powers, is within both the inherent equitable powers of the court and the provisions of Rule 53 of the Federal Rules of Civil Procedure.").

[20] "While a consent decree may be of weak precedential value it represents an informed determination of the Department of Justice which is a principal agency charged with the enforcement of the antitrust laws." *United States v. Hammermill Paper Co.*, 429 F. Supp. 1271, 1282 (W.D. Pa. 1977).

1   exclusive and final right to approve the transfer of any assets.  The Special Master does not have

2   the power or authority to order Bazaarvoice to take any action with respect to the divestiture sale.

3         The Special Master will also monitor Bazaarvoice's compliance with other conduct

4   remedies in the PFJ, including Paragraph V.A (requiring Bazaarvoice to provide cross-network

5   syndication services) and Paragraph IV.G (requiring Bazaarvoice to provide transitional support

6   services).  Again, the Special Master's role is limited.  The Special Master may only monitor

7   Bazaarvoice's conduct and report potential compliance issues to the Court and the parties.

8   **E.**   ***Bazaarvoice Must Notify The United States If It Intends To Enter Any Transaction***

9        ***With A Value Exceeding $10 Million.***

10        As this Court found, "anticompetitive rationales infused virtually every pre-acquisition

11  document describing the benefits of purchasing PowerReviews."  Mem. Op. ¶ 80.  Put simply,

12  Bazaarvoice executives either lacked even the most rudimentary understanding of the antitrust

13  laws, or acted in conscious disregard of the law when pursuing PowerReviews.  This is

14  problematic, because following the divestiture sale Bazaarvoice will remain the dominant player

15  in the R&R market.

16        Bazaarvoice's unlawful purchase of its only real competitor fell below the statutory

17  reporting thresholds in the HSR Act.  *See* 15 U.S.C. § 18a.  To ensure a similar violation does

18  not occur in the near future, for three years following entry of the Final Judgment, Paragraph

19  XI.A of the PFJ requires Bazaarvoice to report any transaction with a value exceeding $10

20  million to the United States.  Analogous provisions are common in negotiated consent decrees.[21]

21  The Seventh Circuit upheld similar relief in *Hospital Corp. of Am. v. FTC*, finding that this type

22  of reporting provision is a reasonable restriction on a Section 7 violator's conduct.  807 F.2d

23  1381, 1393 (7th Cir. 1986).

---

[21] *See, e.g.*, Final Judgment, *United States v. Anheuser Busch InBEV SA/NV*, 13-CV-00127
(RWR), 2013 WL 7018607, at *11-12 (D.D.C. Oct. 24, 2013).

## CONCLUSION

In order to fully restore the competition that was eliminated by Bazaarvoice's unlawful acquisition of PowerReviews, the United States respectfully requests that the Court enter its proposed Final Judgment.


Dated:  February 12, 2014                    Respectfully submitted by:

                                             _____ /s/ Peter K. Huston
                                             Peter K. Huston (CA Bar No. 150058)
                                             United States Department of Justice
                                             Antitrust Division
                                             450 Golden Gate Avenue
                                             San Francisco, CA  94102
                                             Telephone:  (415) 436-6660
                                             Facsimile:  (415) 436-6687
                                             E-mail:  peter.huston@usdoj.gov

                                             Michael D. Bonanno (DC Bar No. 998208)
                                             United States Department of Justice
                                             Antitrust Division
                                             450 Fifth Street, NW, Suite 7100
                                             Washington, DC  20530
                                             Telephone:  (202) 532-4791
                                             Facsimile:  (202) 616-8544
                                             E-mail:        michael.bonanno@usdoj.gov

                                             Attorneys for Plaintiff United States of America

# EXHIBIT A

1  Peter K. Huston (CA Bar No. 150058)
   United States Department of Justice, Antitrust Division
2  450 Golden Gate Avenue
   San Francisco, CA  94102
3  Telephone:  (415) 436-6660
   Facsimile:  (415) 436-6687
4  E-mail:  peter.huston@usdoj.gov

5  Michael D. Bonanno (DC Bar No. 998208)
   United States Department of Justice, Antitrust Division
6  450 Fifth Street, NW, Suite 7100
   Washington, DC  20530
7  Telephone:  (202) 532-4791
   Facsimile:  (202) 616-8544
8  E-mail:  michael.bonanno@usdoj.gov

9  Attorneys for Plaintiff United States of America

10              **UNITED STATES DISTRICT COURT**

11        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12              **SAN FRANCISCO DIVISION**

13

14  UNITED STATES OF AMERICA,          Case No. 13-cv-00133 WHO

                        *Plaintiff*,
15
                                       **PLAINTIFF'S [PROPOSED]**
16          *v.*                       **FINAL JUDGMENT**

17  BAZAARVOICE, INC.

18                       *Defendant*.   Judge:        Hon. William H. Orrick
                                        Hearing Date:      April 2, 2014
19                                      Time:              2 p.m.

20

21          **PLAINTIFF'S [PROPOSED] FINAL JUDGMENT**

22          Plaintiff United States of America filed its Complaint on January 10, 2013; Defendant

23  Bazaarvoice, Inc., filed its Answer on February 22, 2013, denying the substantive allegations in

24  the Complaint; this Court having conducted a full trial on all issues of liability and issued its

25  findings of fact and conclusions of law on January 8, 2014, holding that the acquisition of

26  PowerReviews by Bazaarvoice violated Section 7 of the Clayton Act, 15 U.S.C. § 18; and having

27  had a further hearing on April 2, 2014, relating to entry of a Final Judgment; and

28

The essence of this Final Judgment is the prompt and certain divestiture of certain assets and rights by Defendant to fully restore the competition eliminated by Bazaarvoice's unlawful acquisition;

It is hereby ORDERED, ADJUDGED AND DECREED:

## I.  Jurisdiction

This Court has personal jurisdiction over Bazaarvoice and subject matter jurisdiction under Section 15 of the Clayton Act, 15 U.S.C. § 15.

## II.  Definitions

As used in this Final Judgment:

A.      "Acquirer" means the entity to whom Defendant divests the Divestiture Assets.

B.      "Bazaarvoice" or "Defendant" means Bazaarvoice, Inc., a Delaware corporation with its headquarters in Austin, Texas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.      "Bazaarvoice Asset" means the non-exclusive right to (1) the technology and all intellectual property rights (excluding Bazaarvoice trademarks) for Defendant's most recent version of its PRR Platform, including all computer programs, source and executable code, documentation, manuals, know-how, instructions, records, data, and technical information; (2) the technology and all intellectual property rights for any technology or feature that can be used with Defendant's most recent version of its PRR Platform (excluding any Bazaarvoice Media product), including all computer programs, source and executable code, documentation, manuals, know-how, instructions, records, data, and technical information; (3) the perpetual right to support, sell, license or modify such copy(ies); and (4) a perpetual, irrevocable license to any patents relating to such copy(ies).

D.      "Divestiture Assets" means

1. All assets of PowerReviews that were acquired by Bazaarvoice pursuant to the Agreement and Plan of Merger by and among PowerReviews, Inc., Bazaarvoice, Inc., Peloton Acquisition Corp., Peloton Acquisition LLC, Shareholder Representative Services LLC, in its

1   capacity as Representative and with respect to Articles X, XI, and XII only, U.S. Bank National

2   Association, in its capacity as Escrow Agent, dated as of May 24, 2012, attached hereto as

3   Appendix A, including:

4          i.  All tangible assets that comprise the PowerReviews business, including

5   research and development activities; all personal property, inventory, materials, supplies, office

6   furniture, computer systems, and other tangible property and all assets used in connection with

7   the PowerReviews business; all licenses, permits and authorizations issued by any governmental

8   organization relating to the PowerReviews business; all contracts, teaming arrangements,

9   agreements, leases, commitments, certifications, and understandings, relating to the

10  PowerReviews business, including supply agreements; all customer lists, contracts, accounts, and

11  credit records; and all repair and performance records and all other records relating to the

12  PowerReviews business; and

13         ii.  All intangible assets used in the development, production, servicing and

14  sale of the PowerReviews assets, including, but not limited to, all patents, licenses and

15  sublicenses, intellectual property, copyrights, trademarks, trade names, service marks, service

16  names, technical information, computer software and related documentation, know-how, trade

17  secrets, drawings, blueprints, designs, design protocols, specifications for materials,

18  specifications for parts and devices, safety procedures for the handling of materials and

19  substances, all research data concerning historic and current research and development relating

20  to the PowerReviews assets, quality assurance and control procedures, design tools and

21  simulation capability, all manuals and technical information Defendant provides to its own

22  employees, customers, suppliers, agents or licensees, and all research data concerning historic

23  and current research and development efforts relating to the PowerReviews assets, including, but

24  not limited to, designs of experiments, and the results of successful and unsuccessful designs and

25  experiments.

26       2.  All tangible and intangible assets, as described above, that were acquired,

27  developed, designed, or produced for use with the PowerReviews assets described in II.D.1 since

28  June 12, 2012.

3.  A fully-paid, royalty free license, for four (4) years, to sell Bazaarvoice's Syndication Services product or service offering to customers of Acquirer as described in Section V.A.  Defendant shall provide Syndication Services to Acquirer's customers at no cost to Acquirer's customers.

4. All technology (whether software, hardware, or both), know-how (including trade secrets), and other intellectual property rights necessary for Acquirer to provide access to Bazaarvoice's Syndication Services to its customers.

5. A list of all of Defendant's customers that either (1) renewed a contract for the provision of a PRR Platform with Defendant since June 12, 2012, or (2) became a new customer of Defendant for a PRR Platform since June 12, 2012.  Such list shall include the name of each such customer and the date on which the customer's contract expires and/or is up for renewal.

6. A list of each feature, improvement, upgrade or any other technology related to PRR Platforms that Defendant developed since June 12, 2012 for use with Bazaarvoice's PRR Platform(s).

7.  The Bazaarvoice Asset in the event that, on the date of the certification required by Section IV.H, less than eighty (80) percent (measured by revenue as of June 11, 2012) of the customers of the PowerReviews Enterprise PRR Platform as of June 11, 2012 are using the PowerReviews Enterprise PRR Platform.  The sale of the Bazaarvoice Asset shall be included in the same purchase agreement that governs the sale of the other assets described in Section II.D.1-6.  Defendant shall transfer the Bazaarvoice Asset to Acquirer if, on the date of the certification required in Section IV.H, less than eighty (80) percent (measured by revenue as of June 11, 2012) of the customers of the PowerReviews Enterprise PRR Platform as of June 11, 2012 are using the PowerReviews Enterprise PRR Platform.

E.      "PowerReviews" means (1) PowerReviews, Inc., the company that was acquired by Bazaarvoice pursuant to the Agreement and Plan of Merger by and among PowerReviews, Inc., Bazaarvoice, Inc., Peloton Acquisition Corp., Peloton Acquisition LLC, Shareholder Representative Services LLC, in its capacity as Representative and with respect to Articles X,

1   XI, and XII only, U.S. Bank National Association, in its capacity as Escrow Agent, dated as of

2   May 24, 2012, and (2) all the assets formerly of PowerReviews, Inc.

3        F.     "PowerReviews Enterprise Platform" means all PowerReviews PRR Platform

4   products except for PowerReviews Express (also referred to as Bazaarvoice Express) products

5   and the Buzzillions web product.

6        G.     "PRR Platform" means the front-end and back-end technologies, including

7   features such as moderation, syndication, and analytics, that enables the collection, organization,

8   storage, use and display of user-generated product ratings and reviews and related content on a

9   website.

10        H.     "Transition Services Agreement" means an agreement between Defendant and

11   Acquirer for Defendant to provide all necessary transition services and support to enable

12   Acquirer to fully operate the Divestiture Assets and compete effectively in the market for

13   providing PRR Platforms in the United States as of the date the Divestiture Assets are sold.

14        I.     "Syndication Services" means the products and services currently provided by

15   Bazaarvoice, and any successor thereto, that provide the ability to share product ratings and

16   reviews and related content between two or more customers.

## III.  Applicability

17

18   This Final Judgment applies to Bazaarvoice as defined above, and all other persons in

19   active concert or participation with it who receive actual notice of this Final Judgment by

20   personal service or otherwise.

## IV.  Divestiture

21

22        A.     Defendant is ordered and directed to divest the Divestiture Assets upon Order of

23   the Court.  Defendant shall, within thirty (30) calendar days after notice of the entry of this Final

24   Judgment by the Court, and under the supervision of the Special Master to be appointed under

25   Section VI of this Final Judgment, to enter into a definitive divestiture agreement for the sale of

26   the Divestiture Assets in a manner consistent with this Final Judgment.  The United States may

27   recommend that the Court grant one or more extensions of this time period not to exceed sixty

28

(60) calendar days in total.  Defendant shall use its best efforts to divest the Divestiture Assets as expeditiously as possible.

B.      In accomplishing the divestiture ordered by this Final Judgment, Defendant shall promptly make known, by usual and customary means, the availability of the Divestiture Assets. Defendant shall inform any person making inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment.  Defendant shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine. Defendant shall make available such information to the United States and the Special Master at the same time that such information is made available to any other person.

C.      Defendant shall provide Acquirer and the United States with information relating to the personnel involved in the production, operation, development and sale of the Divestiture Assets, and all Bazaarvoice PRR Platforms, to enable Acquirer to make offers of employment. Defendant will not interfere with any negotiations by Acquirer to employ any of Defendant's current or former employees.  Interference with respect to this paragraph includes, but is not limited to, enforcement of non-compete clauses with regard to the Acquirer, and offers to increase salary or other benefits apart from those offered company-wide.  In the event any employee(s) of Defendant accepts an offer of employment with Acquirer, Defendant will not seek to enforce any restrictions against or otherwise prohibit such employee(s) from using or disclosing to the Acquirer any of Defendant's trade secrets, know-how or proprietary information related to PowerReviews' or Defendant's PRR Platform technology in connection with the employee(s)'s employment with Acquirer, nor will Defendant seek to impede or prohibit Acquirer's use of such trade secrets, know-how or proprietary information.

D.      Defendant shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities; and access to

1   any and all financial, operational, or other documents and information customarily provided as

2   part of a due diligence process.

3        E.      Defendant shall warrant to Acquirer that each asset will be operational on the date

4   of sale.

5        F.      Defendant shall not take any action that will impede in any way the permitting,

6   operation, or divestiture of the Divestiture Assets.

7        G.      At the election of Acquirer, Defendant and Acquirer shall enter into a Transition

8   Services Agreement for a period up to one (1) year from the date of the divestiture.  The

9   Transition Services Agreement shall enumerate all the duties and services that Acquirer requires

10   of Defendant.  Defendant shall perform all duties and provide any and all services required of

11   Defendant under the Transition Services Agreement.  Any amendments, modifications or

12   extensions of the Transition Services Agreement may only be entered into with the approval of

13   the Court.

14       H.      Five (5) business days prior to any sale of the Divestiture Assets approved by the

15   Court pursuant to the procedures described in Section VII of this Final Judgment, Defendant

16   shall file with the Court a sworn certification, signed by Defendant's Chief Executive Officer

17   and Chief Financial Officer, that states, as of the date of the certification, the percentage

18   (measured by revenue as of June 11, 2012) of PowerReviews Enterprise PRR Platform

19   customers as of June 11, 2012 that are using the PowerReviews Enterprise PRR Platform, and

20   Defendant shall provide documents supporting its calculation of such percentage to the United

21   States.  If the percentage in the certification is less than eighty (80) percent, then the Bazaarvoice

22   Asset shall be transferred to the Acquirer as part of the Divestiture Assets on the date of the sale

23   of the Divestiture Assets.

24       I.      After the sale of the Divestiture Assets until (1) the expiration of the current PRR

25   Platform contract or (2) one year from the date of the letter described in Section IV.J, whichever

26   is later, for any PRR Platform customer of Defendant that wishes to become a PRR Platform

27   customer of Acquirer, Defendant shall waive any potential breach of contract claim related to the

28

transfer of that customer from Defendant to Acquirer, notwithstanding any other agreement to the contrary.

J.      Within three (3) calendar days of the date of the sale of the Divestiture Assets, Defendant shall send a letter to all persons who were customers of Defendant as of the date of the sale of the Divestiture Assets notifying the recipients of the divestiture and providing a copy of this Final Judgment.  The letter shall also specifically inform customers of Defendant's obligations under Section IV.I of this Final Judgment.  Acquirer shall have the option to include its own letter with Defendant's letter.  Defendant shall provide the United States, and the Special Master, a copy of its letter at least three (3) calendar days before it is sent.

K.      Unless otherwise approved by the Court, the divestiture pursuant to Section IV, or by Special Master appointed pursuant to Section VI, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way that the Divestiture Assets can and will be used by Acquirer as part of a viable, ongoing business of providing PRR Platforms in the United States.  The divestiture, whether pursuant to Section IV or Section VI of this Final Judgment,

1.      shall be made to an Acquirer that has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of PRR Platforms; and

2.      shall be accomplished such that none of the terms of any agreement between Acquirer and Defendant gives Defendant the ability unreasonably to raise Acquirer's costs, to lower Acquirer's efficiency, or otherwise to interfere in the ability of Acquirer to compete effectively.

### V.  Other Required Conduct

A.      Defendant shall provide to Acquirer and Acquirer's customers access to Defendant's syndication network for four (4) years following the date of sale of the Divestiture Assets by:

1.      Providing Syndication Services to Acquirer's customers at no additional cost to Acquirer and no cost to Acquirer's customers; and

2.      Providing Syndication Services on non-discriminatory terms with respect to Defendant's and Acquirer's customers.  For the avoidance of doubt, the following is a non-exhaustive list of terms for which Defendant may not discriminate:

      i.      speed of content transmission;

      ii.      server lag time and/or uptime;

      iii.      alignment of product databases;

      iv.      database synchronization;

      v.      content presentation;

      vi.      pricing to Defendant's customers based on syndication partner(s);

      vii.      data fields transmitted or utilized; and

      viii.      integration with Question and Answer products.

Nothing in this paragraph shall be interpreted to permit Acquirer's customers receiving Syndication Services from Defendant to violate any terms of service that are applicable to all of Defendant's customers receiving Syndication Services.

B.      Defendant shall promptly notify the Special Master and the United States of all complaints, whether written or oral, it receives relating to Section V.A of this Final Judgment. The Special Master may conduct an investigation of any complaint and shall submit all findings from any such investigation to the United States and Defendant.

C.      Defendant shall refrain from soliciting the customers acquired by Acquirer as part of the Divestiture Assets for six (6) months following the date of sale of the Divestiture Assets.

D.      Defendant shall provide to Acquirer, at no cost to Acquirer, an irrevocable, fully paid-up perpetual and non-exclusive license to all Bazaarvoice patents and patent applications related to PRR Platforms issued or filed at the time the Divestiture Assets are sold to Acquirer. Defendant shall not sue any PRR Platform customer of Acquirer for infringement of any patent or patent application issued or filed at the time the Divestiture Assets are sold relating to such customer's use of any PRR Platform or other Divestiture Asset provided by Acquirer.

E.      Defendant is prohibited from retaining a copy of or offering for sale any of the Divestiture Assets described in Section II.D.1 and 2 except for the assets that have been

incorporated into the Bazaarvoice PRR Platform as of the time of the entry of this Final Judgment.

## VI.  **Appointment of Special Master**

A.      Within ten (10) days following the entry of this Final Judgment, the United States shall file with the Court a recommendation regarding the appointment of a Special Master.  The United States' recommendation shall summarize the Special Master's credentials and the contractual terms under which the Special Master's work will be conducted.  Once approved by the Court, the Special Master's purpose will be to effect the sale of the Divestiture Assets and monitor Defendant's compliance with the obligations set forth in this Final Judgment.

B.      During the period set forth in Section IV.A, the Special Master shall (1) monitor and oversee Defendant's efforts to sell the Divestiture Assets, and (2) become knowledgeable about the PRR Platform industry and the Divestiture Assets.

C.      If Defendant fails to reach an agreement to sell the divestiture assets during the period set forth in Section IV.A, or if the Court rejects any agreement to sell the Divestiture Assets entered into by Defendant during that period, or if the Court otherwise so orders, only the Special Master shall have the right to sell the Divestiture Assets.  The Special Master shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the Court at such price and on such terms as are then obtainable upon reasonable effort by the Special Master, subject to the provisions of Sections IV, V, VI, and VII of this Final Judgment, and shall have such other powers as this Court deems appropriate.  Subject to Section VI.D of this Final Judgment, the Special Master may hire at the cost and expense of Defendant any investment bankers, attorneys, or other agents, who shall be solely accountable to the Special Master, reasonably necessary in the Special Master's judgment to assist in the divestiture and performance of the other duties required of the Special Master by this Final Judgment.  The Special Master shall provide notice to the United States and Defendant of all persons hired by the Special Master, and the terms of such persons' compensation, within one (1) day of hiring.

D.      The Special Master shall serve at the cost and expense of Defendant, on such terms and conditions as the Court approves, and shall account for all monies derived from the

1   sale of the assets sold by the Special Master and all costs and expenses so incurred.  After

2   approval by the Court of the Special Master's accounting, including any remaining fees for its

3   services and those of any professionals and agents retained by the Special Master, all remaining

4   money shall be paid to Defendant.  The compensation of the Special Master and any

5   professionals and agents retained by the Special Master shall be on reasonable and customary

6   terms.  With respect to work performed pertaining to the divestiture, incentives based on the

7   price and terms of the divestiture and the speed with which it is accomplished may be provided.

8       E.      Defendant shall use its best efforts to assist the Special Master in accomplishing

9   the required divestiture and performing the other duties required of the Special Master by this

10   Final Judgment.  The Special Master and any consultants, accountants, attorneys, and other

11   persons retained by the Special Master shall have full and complete access to the personnel,

12   books, records, and facilities of Defendant, and Defendant shall develop financial and other

13   information from Defendant as the Special Master may reasonably request, subject to reasonable

14   protection for trade secret or other confidential research, development, or commercial

15   information.  Defendant shall take no action to interfere with or to impede the Special Master's

16   accomplishment of the divestiture or any other duties outlined in this Final Judgment.

17       F.      After appointment, the Special Master shall file monthly reports with the United

18   States, Defendant, and the Court setting forth the Special Master's efforts to accomplish the

19   divestiture ordered under this Final Judgment, and Defendant's compliance with the other terms

20   of this Final Judgment.  To the extent such reports contain confidential or highly confidential

21   information under the Protective Order, such reports shall not be filed in the public docket of the

22   Court.  Such reports shall include the name, address, and telephone number of each person who,

23   during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered

24   into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in

25   the Divestiture Assets, and shall describe in detail each contact with any such person.  The

26   Special Master shall maintain full records of all efforts made to divest the Divestiture Assets.

27       G.      If the Special Master has not accomplished the divestiture ordered under this Final

28   Judgment within six (6) months after appointment, the Special Master shall promptly file with

the Court a report setting forth (1) the Special Master's efforts to accomplish the required

divestiture, (2) the reasons, in the Special Master's judgment, why the required divestiture has

not been accomplished, and (3) the Special Master's recommendations.  To the extent such

reports contain confidential or highly confidential information under the Protective Order, such

reports shall not be filed in the public docket of the Court.  The Special Master shall at the same

time furnish such report to the United States which shall have the right to make additional

recommendations consistent with the purpose of the Final Judgment.  The Court thereafter shall

enter such orders as it deems appropriate to carry out the purpose of the Final Judgment.

H.      The Special Master shall serve until four (4) years following the date of sale of

the Divestiture Assets.

## VII.  <u>Notice and Court Approval of Proposed Divestiture</u>

A.      Within one (1) calendar day following execution of a definitive divestiture

agreement, Defendant or the Special Master, whichever is then responsible for effecting the

divestiture required herein, shall notify the United States and the Court of any proposed

divestiture required by Section IV or VI of this Final Judgment.  If the Special Master is

responsible, the Special Master shall similarly notify Defendant; if Defendant is responsible, it

shall similarly notify the Special Master.  The notice shall set forth the details of the proposed

divestiture and list the name, address, and telephone number of each person not previously

identified who offered or expressed an interest in or desire to acquire any ownership interest in

the Divestiture Assets, together with full details of the same.

B.      Within three (3) calendar days of receipt by the United States of such notice, the

United States may request from Defendant, the proposed Acquirer, any other third party, or the

Special Master, if applicable, additional information concerning the proposed divestiture, the

proposed Acquirer, and any other potential Acquirer.  Defendant and the Special Master shall

furnish any additional information requested within five (5) calendar days of the receipt of the

request, unless the parties shall otherwise agree.

C.      Within twenty-one (21) calendar days after receipt of the notice or within fifteen

(15) calendar days after the United States has been provided the additional information requested

1   from Defendant, the proposed Acquirer, any third party, and the Special Master, whichever is

2   later, the United States and Defendant (if the proposed divestiture is pursuant to Section VI) shall

3   file with the Court any objections to the proposed divestiture and the basis for such objections.  If

4   either the United States or Defendant objects to the proposed divestiture, the Court shall establish

5   a procedure to resolve the matter.  In no case may the divestiture be consummated absent order

6   of the Court.

## VIII.  Financing

8       Defendant shall not finance all or any part of any purchase made pursuant to Section IV

9   or VI of this Final Judgment.

## IX.  Affidavits

11      A.      Within twenty (20) calendar days of the entry of this Final Judgment, and every

12   thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or

13   VI, Defendant shall deliver to the United States an affidavit as to the fact and manner of its

14   compliance with Section IV or VI of this Final Judgment.  Each such affidavit shall include the

15   name, address, and telephone number of each person who, during the preceding thirty (30)

16   calendar days, made an offer to acquire, expressed an interest in acquiring, entered into

17   negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the

18   Divestiture Assets, and shall describe in detail each contact with any such person during that

19   period.  Each such affidavit shall also include a description of the efforts Defendant has taken to

20   solicit buyers for the Divestiture Assets, and to provide required information to prospective

21   Acquirers, including the limitations, if any, on such information.

22      B.      Within twenty (20) calendar days of the date of the sale of the Divestiture Assets,

23   Defendant shall deliver to the United States an affidavit that describes in reasonable detail all

24   actions Defendant has taken and all steps Defendant has implemented on an ongoing basis to

25   comply with Section V of this Final Judgment.  Defendant shall deliver to the United States an

26   affidavit describing any changes to the efforts and actions outlined in Defendant's earlier

27   affidavits filed pursuant to this section within fifteen (15) calendar days after the change is

28   implemented.

C.      Defendant shall keep all records of all efforts made to preserve and divest the

Divestiture Assets until one year after such divestiture has been completed.

## X.  Compliance Inspection

A.      For the purposes of determining or securing compliance with this Final Judgment,

or of any related order, or of determining whether the Final Judgment should be modified or

vacated, and subject to any legally recognized privilege, from time to time authorized

representatives of the United States Department of Justice, including consultants and other

persons retained by the United States, shall, upon written request of an authorized representative

of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to

Defendant, be permitted:

1.      Access during Defendant's office hours to inspect and copy, or at the

option of the United States, to require Defendant to provide hard copy or electronic copies of, all

books, ledgers, accounts, records, data, and documents in the possession, custody, or control of

Defendant, relating to any matters contained in this Final Judgment; and

2.      To interview, either informally or on the record, Defendant's officers,

employees, or agents, who may have their individual counsel present, regarding such matters.

The interviews shall be subject to the reasonable convenience of the interviewee and without

restraint or interference by Defendant.

B.      Upon the written request of an authorized representative of the Assistant Attorney

General in charge of the Antitrust Division, Defendant shall submit written reports or respond to

written interrogatories, under oath if requested, relating to any of the matters contained in this

Final Judgment as may be requested.

C.      If at the time information or documents are furnished by Defendant to the United

States, Defendant represents and identifies in writing the material in any such information or

documents to which a claim of protection may be asserted under the Protective Order, then the

United States shall give Defendant ten (10) calendar days notice prior to divulging such material

in any legal proceeding (other than a grand jury proceeding).

# XI.  Notification

A.      Unless such transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Defendant, without providing advance notification to the Antitrust Division, shall not directly or indirectly acquire any assets of or any interest, including any financial, security, loan, equity or management interest, in a person providing PRR Platforms in the United States during the term of this Final Judgment if the purchase price of such assets or interest exceeds $10,000,000.

B.      Such notification shall be provided to the Antitrust Division in the same format as, and per the instructions relating to the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, except that the information requested in Items 5 through 9 of the instructions must be provided only about PRR Platforms. Notification shall be provided at least thirty (30) calendar days prior to acquiring any such interest, and shall include, beyond what may be required by the applicable instructions, the names of the principal representatives of the parties to the agreement who negotiated the agreement, and any management or strategic plans discussing the proposed transaction.  If within the 30-day period after notification, representatives of the Antitrust Division make a written request for additional information, Defendant shall not consummate the proposed transaction or agreement until thirty (30) calendar days after submitting all such additional information.  Early termination of the waiting periods in this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

# XII.  No Reacquisition

Defendant may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

### XIII.  <u>Retention of Jurisdiction</u>

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

### XIV.  <u>Expiration of Final Judgment</u>

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

**IT IS SO ORDERED.**

Dated: _____

_____
HON. WILLIAM H. ORRICK
United States District Judge

# APPENDIX A

**Document Filed Under Seal**

# EXHIBIT B

**Document Filed Under Seal**

# EXHIBIT C

BORIS FELDMAN, State Bar No. 128838
DYLAN J. LIDDIARD, State Bar No. 203055
DOMINIQUE C. ALEPIN, State Bar No. 241648
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:  (650) 565-5100
Email:      Email:   boris.feldman@wsgr.com;
dliddiard@wsgr.com; dalepin@wsgr.com

Attorneys for Defendant Bazaarvoice, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>BAZAARVOICE, INC.,<br><br>*Defendant.* | CASE NO.: 13-cv-00133 WHO<br><br>**DEFENDANT BAZAARVOICE'S AMENDED RESPONSES AND OBJECTIONS TO INTERROGATORIES 3, 5, 6, 13** |

Pursuant to Federal Rules of Civil Procedure 26(b) and 33, Local Rule 33, the parties'

Joint Case Management Statement, Discovery Plan, and [Proposed] Order, ECF No. 26, the

Court's Civil Minutes, ECF No. 28, the Case Management and Pretrial Order for Court Trial,

ECF No. 29, and the Stipulation and Order Regarding Discovery, ECF No. 37, defendant

Bazaarvoice, Inc. ("Defendant" or "Bazaarvoice") hereby provides the following amended

Objections and Responses to Interrogatory Nos. 3, 5, 6 and 13 (the "Interrogatories").

## <u>GENERAL OBJECTIONS</u>

Bazaarvoice makes the following general objections ("General Objections"), whether or

not separately set forth in response to each and every one of the Interrogatories.  Bazaarvoice

hereby incorporates by reference its Objections to Definitions and Objections to Instructions as

set forth herein into each of the following General Objections.

1          1.        Bazaarvoice objects to Plaintiff's Definitions, Instructions, and Interrogatories to

2   the extent they seek information protected by the attorney-client privilege, work product

3   doctrine, or any other applicable law, privilege, protection, or doctrine (collectively "Privileged

4   Information").  Bazaarvoice will not produce any Privileged Information.  The production of any

5   Privileged Information is unintentional, and Bazaarvoice does not intend to waive any applicable

6   objection or privilege through such production.  Bazaarvoice reserves the right to correct the

7   record with regard to any such unintentional production.  Bazaarvoice further objects to the

8   Definitions, Instructions, and Requests to the extent that they purport to impose obligations and

9   require information beyond the requirements set forth in the Federal Rules of Civil Procedure

10  and the Local Rules of the United States District Court for the Northern District of California

11  with respect to information and documents withheld on a ground of privilege.  To the extent that

12  Bazaarvoice declines to provide information in response to any Interrogatory based on a claim of

13  privilege, it will provide a privilege log consistent with applicable federal law and local practice

14  and the parameters set forth in the Stipulation and Order Regarding Discovery, ECF No. 37.

15         2.        Bazaarvoice objects to Plaintiff's Definitions, Instructions, and Interrogatories to

16  the extent they purport to require Bazaarvoice to provide information that is equally available to

17  Plaintiff, on the grounds that to provide such information or documents would be unduly

18  burdensome.  This objection applies, particularly, to information that is publicly available, that

19  are already in Plaintiff's possession or that was provided by Bazaarvoice or any other party

20  during Plaintiff's investigation into the acquisition of PowerReviews by Bazaarvoice.

21         3.        Bazaarvoice objects to Plaintiff's Definitions, Instructions, and Interrogatories to

22  the extent they request the production of information that constitutes or contains confidential,

23  proprietary or competitively sensitive information, trade secrets, or intellectual property.  All

24  information produced by Bazaarvoice shall be governed under the terms of the Stipulated

25  Protective Order, ECF No. 35.

26         4.        Bazaarvoice objects to Plaintiff's Interrogatories to the extent that they request

27  information protected from discovery by any right to privacy or any other applicable privilege,

28

Defendant's Amended Responses and Objections                    -2-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

including the right to privacy of third-parties, or by Bazaarvoice's obligations under applicable law to protect such confidential information.

5.      Bazaarvoice objects to Plaintiff's Definitions, Instructions, and Interrogatories to the extent they request information protected from disclosure by applicable state or federal law, constitutional provisions, or foreign law.

6.      Bazaarvoice objects to Plaintiff's Definitions, Instructions, and Interrogatories to the extent they seek information (1) not currently in Bazaarvoice's possession, custody or control, or (2) that Bazaarvoice cannot locate after a reasonably diligent search.

7.      Bazaarvoice objects to all Definitions, Instructions, and Interrogatories to the extent that they are they are vague, ambiguous, overbroad and unduly burdensome or seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

8.      Bazaarvoice objects to all Definitions, Instructions, and Interrogatories to the extent that they are compound, conjunctive, disjunctive, and/or contain subparts in contravention of the Federal Rules.

9.      Bazaarvoice objects to all Definitions, Instructions, and Interrogatories to the extent they are overly broad, duplicative, cumulative, unduly burdensome, oppressive, or constitute an abuse of process, particularly where the Interrogatories are unduly burdensome in light of the cost necessary to investigate as weighed against Plaintiff's need for and the relevance of requested information.

10.      Bazaarvoice objects to all Definitions, Instructions, and Interrogatories to the extent they lack a reasonably limited temporal scope.

11.      Bazaarvoice objects to all Definitions, Instructions and Interrogatories to the extent they go beyond the parameters agreed to by the parties as reflected in the Letter from Dominique-Chantale Alepin to Michael D. Bonanno dated April 4, 2013 ("April 4, 2013 Letter").

12.      Bazaarvoice objects to the Definitions, Instructions, and Interrogatories to the extent they purport to require Bazaarvoice to draw legal conclusions.

Defendant's Amended Responses and Objections          -3-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

13.     In producing information in response to the Interrogatories, Bazaarvoice does not intend to waive any privilege or objection, including, but not limited to, any objection to the competency, relevance, materiality, or admissibility of any of the Interrogatories, Bazaarvoice's responses thereto, or their subject matter.  Further, no admissions (incidental, implied, or otherwise) are intended by any such responses, including, without limitation, that any statement or characterization in any of the Interrogatories is accurate or complete.  In addition, the fact that Bazaarvoice may respond to any of the Interrogatories should not be taken as an admission that Bazaarvoice accepts or admits the existence of any information, things, or matters presumed by such Interrogatories.  The fact that Bazaarvoice may respond to part or all of the Interrogatories is not intended to be, and shall not be construed to be, a waiver by Bazaarvoice of any part of any objection to the Interrogatories.

14.     In light of the continuing nature of Bazaarvoice's investigation into the facts of this action, Bazaarvoice reserves the right to assert additional objections to Definitions, Instructions, and Interrogatories as appropriate and to supplement these objections and responses if Bazaarvoice deems necessary.  Further, Bazaarvoice reserves the right to rely on or use, at trial or otherwise in the litigation, subsequently discovered facts and information (including, but not limited to, information obtained in discovery), or facts and information omitted from these responses as a result of mistake, error, oversight, or inadvertence.

15.     Bazaarvoice's Responses are made based on its understanding and interpretation of each Interrogatory.  Bazaarvoice reserves the right to supplement its Objections and Responses should Plaintiff subsequently put forth an interpretation of any Interrogatory differing from those of Bazaarvoice.  Bazaarvoice reserves the right to object on any ground at any time to other discovery requests that Plaintiff may propound involving or relating to the same matter of these Interrogatories.

## OBJECTIONS TO DEFINITIONS

1.     Bazaarvoice hereby incorporates by reference its General Objections, and Objections to Instructions as set forth herein into each of the following Objections to Definitions.

Defendant's Amended Responses and Objections          -4-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

2.      Bazaarvoice objects to the definitions of "Defendant," "you," "your," "the company," or "Bazaarvoice" to the extent that they are vague, ambiguous, overbroad and are not reasonably calculated to lead to the production of admissible evidence.  As defined, they contain the terms "representatives," "subsidiary," "affiliate," and "joint venture" which are also vague, ambiguous, overbroad, and not reasonably calculated to lead to the production of admissible evidence.  In particular, the terms "subsidiary," "affiliate," and "joint venture" are defined to include any "person" in which the company holds at least a 25 percent interest.  The arbitrary designation of this interest is not reasonably calculated to lead to the production of admissible evidence.  Moreover, the 25 percent interest is vague, ambiguous, and overbroad to the extent that it is to be measured "regardless of how the company's interest is measured (e.g., number of shares, degree of control, board seats, or votes)."

3.      Bazaarvoice objects to the definition of "PowerReviews," "PowerReviews, Inc." on the same grounds as the objections stated in paragraph 2.

4.      Bazaarvoice objects Bazaarvoice objects to the definition of "Documents" to the extent it purports to enlarge, expand, or alter in any way the plain meaning and scope of Rule 34(a)(1) of the Federal Rules of Civil Procedure.  Bazaarvoice further objects to the extent that the definition of "Documents" includes any items specifically excluded from production requirements under the Joint Case Management Statement, Discovery Plan and [Proposed] Order, ECF No. 26 at 7:9-8:8, and ordered in Minute Entry, ECF No. 28.

5.      Bazaarvoice objects to all of the definitions of the terms "Identify" and "identity" (with respect to natural persons, documents, or otherwise) on the grounds that they: (a) are compound and contain subparts; (b) are unduly burdensome and unreasonable; (c) seek the production of information neither relevant to the subject matter of the underlying action nor reasonably calculated to lead to the discovery of admissible evidence; (d) seek the production of public information equally available to Plaintiff; and (e) seek the production of information outside the possession, custody, or control of Bazaarvoice.  Bazaarvoice objects on the grounds that the applicable paragraphs do not provide definitions, but rather instructions, and the Defendants object to the instructions to the extent that they exceed Bazaarvoice's obligations

1   under the Federal Rules of Civil Procedure.  Bazaarvoice will respond to the Interrogatories with

2   the non-Privileged Information in its possession, custody, and control, and will not provide

3   publicly-available information that is equally available to the Plaintiff.

4         6.      Bazaarvoice objects to the definition of "Person" as "any natural person,

5   corporate entity, partnership, association, joint venture, government entity, or trust."  This

6   definition renders the Interrogatories in which the term is used vague and ambiguous, overly

7   broad, unduly burdensome and oppressive and seeks the production of information neither

8   relevant to the subject matter of the underlying action nor reasonably calculated to lead to the

9   discovery of admissible evidence.  Bazaarvoice further objects to this definition to the extent that

10  it purports to require the provision of information not within Bazaarvoice's possession, custody,

11  or control.

12        7.      Bazaarvoice objects to the definition of "Relating to" insofar as it is vague,

13  ambiguous, and overbroad in that it uses further vague, ambiguous, and overbroad terms in the

14  definition and will be unduly burdensome, and cannot be reasonably calculated to lead to the

15  discovery of admissible evidence when applied to specific Interrogatories.

16  **OBJECTIONS TO INSTRUCTIONS**

17        1.      Bazaarvoice hereby incorporates by reference its General Objections, and

18  Objections to Definitions as set forth herein into each of the following Objections to Instructions.

19        2.      Bazaarvoice objects to Instruction No. 1 to the extent it purports to require duties

20  beyond those imposed by the Federal Rules of Civil Procedure or the Joint Case Management

21  Statement, Discovery Plan, and [Proposed] Order, ECF No. 26, the Court's Civil Minutes, ECF

22  No. 28, the Case Management and Pretrial Order for Court Trial, ECF No. 29, and the

23  Stipulation and Order Regarding Discovery, ECF No. 37.  If, based on ongoing factual

24  investigation, Bazaarvoice determines that supplemental responses to the Interrogatories are

25  necessary, Bazaarvoice shall promptly provide such supplemental responses.

26        3.      Bazaarvoice objects to Instruction No. 2 to the extent it purports to require duties

27  beyond those imposed by the Federal Rules of Civil Procedure or the Joint Case Management

28  Statement, Discovery Plan, and [Proposed] Order, ECF No. 26, the Court's Civil Minutes, ECF

Defendant's Amended Responses and Objections                    -6-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

No. 28, the Case Management and Pretrial Order for Court Trial, ECF No. 29, and the Stipulation and Order Regarding Discovery, ECF No. 37. Bazaarvoice objects to Instruction No. 2 to the extent it purports to require the production of Privileged Information. Bazaarvoice further objects to the extent that Instruction No. 2 renders the Interrogatories vague and ambiguous, overly broad, unduly burdensome, and oppressive. If, based on ongoing factual investigation, Bazaarvoice determines that supplemental responses to the Interrogatories are necessary, Bazaarvoice shall promptly provide such supplemental responses.

4.     Bazaarvoice objects to Instruction No. 4 to the extent that it purports to require Bazaarvoice to identify "all grounds" supporting a claim of privilege including "all persons having knowledge of any facts relating to your claim of privilege" and "the information withheld by description of the topic or subject matter, the date of the communication, and the participants." This Instruction is beyond the scope of Bazaarvoice's obligations under the Federal Rules and Stipulation and Order Regarding Discovery, ECF No. 37. Moreover, Plaintiff's specifications are overly broad, unduly burdensome, vague and ambiguous, and would impose obligations beyond what is adequate and sufficient for Bazaarvoice to properly invoke any such privilege. Bazaarvoice further objects on the ground that such information would require disclosure of Privileged Information. To the extent that Bazaarvoice declines to provide information in response to any Interrogatory based on a claim of privilege, it will provide a privilege log consistent with applicable federal law and local practice, and the parameters set forth in the Stipulation and Order Regarding Discovery, ECF No. 37.

**SPECIFIC RESPONSES AND OBJECTIONS**

Bazaarvoice hereby incorporates by reference each of the foregoing General Objections, Objections to Definitions, and Objections to Instructions into each of the following Specific Responses and Objections.

**INTERROGATORY NO. 3:**

Separately for each efficiency or other pro-competitive benefit claim referenced in the FIRST DEFENSE of the Company's Answer, ECF No. 30:

Defendant's Amended Responses and Objections         -7-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

      a.      identify each efficiency or other pro-competitive benefit, including the amount of cost savings associated with each efficiency or other pro-competitive benefit;

      b.      identify all documents (including all documents that have already been produced to the Department of Justice) relating to the claim or to any cost, input, fact, assumption, model, or calculation that supports or provides a foundation for the claim, including, but not limited to, any cost associated with the claim; and

      c.      describe each analysis, model, or calculation used to establish or derive the figures (and each component and subpart) that quantify the claim.

**RESPONSE TO INTERROGATORY NO. 3:**

Bazaarvoice objects to this Interrogatory as overly broad and unduly burdensome as requiring identification of "all documents."  *See IBP v. Mercantile Bank of Topeka,* 179 F.R.D. 316, 321 (D. Kan. 1998).  Bazaarvoice objects to this Interrogatory to the extent it is vague, ambiguous, indefinite, unintelligible, or otherwise unclear in its use of the terms "efficiency," "pro-competitive benefit," "cost, input, fact, assumption, model, or calculation," "provides a foundation for the claim," and the phrase "analysis, model, or calculation used to establish or derive the figures (and each component and subpart) that quantify the claim."  Further, the incorporation of the Plaintiff's purported definitions of "document," "identify," and "relating to" renders this Interrogatory duplicative, cumulative, compound, overly burdensome, and vastly overbroad in scope.  Bazaarvoice further objects to Interrogatory No. 3 because it includes three distinct subparts that should be the subject of separate interrogatories.  Bazaarvoice objects to Interrogatory No. 3 to the extent it purports to require the production of Privileged Information.  Bazaarvoice objects to this Interrogatory to the extent is required production of information beyond the scope of the parties' agreement as reflected in the April 4, 2013 Letter.

Subject to and without waiver of the foregoing objections, Bazaarvoice responds to Interrogatory No. 3 as follows:

All of Bazaarvoice's interrogatory responses previously provided are incorporated by reference, as is the entirety of the Expert Report of Dr. Ramsey D. Shehadeh, and the forthcoming Rebuttal Report of Dr. Shehadeh.

Defendant's Amended Responses and Objections       -8-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

1   The acquisition of PowerReviews by Bazaarvoice has greatly benefited both Bazaarvoice

2   and PowerReviews customers and thus created several pro-competitive benefits.

3   First, the acquisition has enabled Bazaarvoice to conserve investment and development

4   resources and time by leveraging PowerReviews' technology to launch major architectural

5   improvements.  This has benefited Bazaarvoice and PowerReviews customers.  For example,

6   using PowerReviews' technology, Bazaarvoice has been able to implement better product

7   matching which has allowed products with different names or SKUs to be matched across

8   multiple retailers.  Bazaarvoice has also been able to take PowerReviews' technology and

9   implement a universal data model that allows management of parts and numbers in one cohesive

10  state.

11  Second, PowerReviews and Bazaarvoice customers will benefit from the combined

12  entity's ability to provide better analytics of social commerce data.  The combined entity will be

13  able to compete against big data analytics competitors such as Oracle, Salesforce and IBM.

14  Increased competition in this sector will benefit consumers who are increasingly demanding

15  better analytics as part of their social commerce products and services.

16  Following the merger, both PowerReviews and Bazaarvoice brands and retailers can now

17  benefit from a more powerful syndication offering.  PowerReviews and Bazaarvoice legacy and

18  new customers now have access to a greater number of potential syndication partners.  The

19  syndication capabilities Bazaarvoice and PowerReviews are now able to offer are more robust

20  than those that existed when PowerReviews and Bazaarvoice were stand-alone firms.

21  Bazaarvoice has performed significant work to develop, enhance, and otherwise improve

22  the PowerReviews' ratings and reviews platform.  Indeed, Bazaarvoice's research and

23  development spending has increased post-merger relative to the combined resources devoted by

24  PowerReviews and Bazaarvoice pre-merger.

25  In addition, PowerReviews' legacy customers have uniquely benefited from the

26  transaction, including but not limited the benefits described below.

27  First, prior to the transaction, Bazaarvoice had more rigorous authentication and

28  moderation standards and procedures for reviews than PowerReviews.  PowerReviews' legacy

Defendant's Amended Responses and Objections                          -9-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

1    customers can now take advantage of those standards and procedures.  Many legacy

2    PowerReviews customers favor the higher standards, and have thus profited from the acquisition.

3         PowerReviews legacy customers have access to more advanced and advantageous

4    technology due to the acquisition.  Bazzaarvoice uses a SaaS-based platform, on which

5    Bazaarvoice hosts content, rather than the customers.  This allows for advantages in the storage

6    and usage of the data, not just on e-commerce platforms, but on mobile and other channels.

7    PowerReviews did not offer a SaaS-based platform. The PowerReviews legacy customers can

8    now receive the additional benefits of advanced technology and more engaging, responsive

9    customer service that Bazaarvoice was able to offer its customers.  PowerReviews can also offer

10   its customers better technology including enhanced access to better authenticity; API interface;

11   and Bazaarvoice Intelligence features.  Bazaarvoice is also able to offer legacy PowerReviews

12   customers free access to Bazaarvoice's larger syndication network.

13        Additionally, because PowerReviews faced challenges to its financial condition before

14   the merger with Bazaarvoice, PowerReviews today has a greater chance of long-term viability to

15   continue pre-merger solutions offered by PowerReviews.  PowerReviews was also increasingly

16   moving away from competing in product ratings and reviews.  Thus, the merger has benefited

17   PowerReviews' legacy customers in providing them a stable vendor on whom they will be able

18   rely in the long-term.  Bazaarvoice has committed to continuing the PowerReviews platform into

19   the indefinite future.  And now that PowerReviews is associated with Bazaarvoice and its

20   financial resources, there can be much more investment and development of PowerReviews'

21   functionality and services than if the acquisition had not taken place.

22        Bazaarvoice identifies documents which relate to the pro-competitive benefits and

23   efficiencies from the merger in Exhibit A.  Exhibit A is not an exhaustive list of such documents.

24        Bazaarvoice reserves its right to amend its response to this Interrogatory to include

25   additional documents to support its FIRST DEFENSE.  Bazaarvoice further reserve the right to

26   rely on additional documents at trial to support its FIRST DEFENSE.

27

28

Defendant's Amended Responses and Objections                    -10-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

1    **INTERROGATORY NO. 5:**

2         Identify all facts, documents, and all other materials supporting the SECOND DEFENSE

3    in the Company's Answer, ECF No. 30, including the nature, location, and custodian of all

4    relevant documents.

5    **RESPONSE TO INTERROGATORY NO. 5:**

6         Bazaarvoice objects to this Interrogatory as overly broad and unduly burdensome as

7    requiring identification of "all facts, documents and all other materials."  *See IBP v. Mercantile*

8    *Bank of Topeka,*  179 F.R.D. 316, 321 (D. Kan. 1998).  Bazaarvoice objects to this Interrogatory

9    to the extent that it seeks information not within its possession, custody, or control.  Bazaarvoice

10   objects to this Interrogatory to the extent it purports to seek the production of Privileged

11   Information.  Bazaarvoice further objects to Interrogatory No. 5 on the grounds that it is vague

12   and ambiguous, particularly with respect to the phrase "nature, location, and custodian of all

13   relevant documents."  Bazaarvoice objects to this Interrogatory to the extent is required

14   production of information beyond the scope of the parties' agreement as reflected in the April 4,

15   2013 Letter.

16        Subject to and without waiver of the foregoing objections, and based upon factual

17   investigation to date, Bazaarvoice responds to Interrogatory No. 5 as follows:

18        All of Bazaarvoice's interrogatory responses previously provided are incorporated by

19   reference, as is the entirety of the Expert Report of Dr. Ramsey D. Shehadeh, and the

20   forthcoming Rebuttal Report of Dr. Shehadeh.

21        The relief contemplated by Plaintiff would not be in the public interest for a number of

22   reasons described below.

23        First, the acquisition of PowerReviews by Bazaarvoice did not and will not result in any

24   anticompetitive effects.

25        To the extent there are any anticompetitive effects, the effects likely are diminutive given

26   PowerReviews' annual sales prior to the acquisition of only $12 million and the challenges it

27   faced in the long-term as a viable independent entity.  Had Bazaarvoice not acquired

28   PowerReviews in June 2012, PowerReviews would have needed to receive a major cash infusion

Defendant's Amended Responses and Objections                    -11-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

1   within the year or enter into an agreement to be acquired.  Thus PowerReviews faced significant

2   challenges as a serious long-term competitor.  Under these circumstances, the amount of harm

3   resulting from the loss of PowerReviews as an independent firm, if any, is likely small.

4         In contrast, the benefits to Bazaarvoice from its increased competitiveness and the

5   benefits to PowerReviews and Bazaarvoice customers resulting from the combined entity

6   significantly outweigh the alleged anticompetitive harm resulting from the transaction.  As

7   described in response to Interrogatory No. 3, the acquisition of PowerReviews by Bazaarvoice

8   has greatly benefited both Bazaarvoice and PowerReviews customers and thus created several

9   pro-competitive benefits.

10        In addition, PowerReviews legacy customers would be significantly harmed if the

11  acquisition is undone.  These customers have now been afforded access to better technology and

12  service than previously provided.  In addition, PowerReviews customers now have access to

13  Bazaarvoice's syndication offerings.  Access to Bazaarvoice's syndication partners, better

14  technology and service has provided these legacy PowerReviews customers a more robust and

15  effective ratings and reviews platform.

16        When the judicial resources and litigation costs and expenses to the parties and third-

17  parties are added, the burden imposed on everyone and risk of foregone merger benefits of the

18  acquisition are far outweighed by the public interest benefit of this litigation.

19        Bazaarvoice identifies documents which support its SECOND DEFENSE in Exhibit B.

20  Exhibit B is not an exhaustive list of such documents.

21        Bazaarvoice reserves its right to amend its response to this Interrogatory to include

22  additional documents to support its SECOND DEFENSE.  Bazaarvoice further reserve the right

23  to rely on additional documents at trial to support its SECOND DEFENSE.

24  **INTERROGATORY NO. 6:**

25        Identify all facts, documents, and all other materials supporting the THIRD DEFENSE in

26  the Company's Answer, ECF No. 30, including the nature, location, and custodian of all relevant

27  documents.

28

Defendant's Amended Responses and Objections                    -12-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

1  **RESPONSE TO INTERROGATORY NO. 6:**

2          Bazaarvoice objects to this Interrogatory as overly broad and unduly burdensome as

3  requiring identification of "all facts, documents and all other materials." *See IBP v. Mercantile*

4  *Bank of Topeka,* 179 F.R.D. 316, 321 (D. Kan. 1998). Bazaarvoice objects to this Interrogatory

5  to the extent it purports to seek the production of Privileged Information. Bazaarvoice further

6  objects to Interrogatory No. 6 on the grounds that it is vague and ambiguous, particularly with

7  respect to the phrase "nature, location, and custodian of all relevant documents." Bazaarvoice

8  objects to the extent that this Interrogatory purports to require the production of publicly-

9  available information that is equally accessible to the Plaintiff. Bazaarvoice objects to this

10  Interrogatory to the extent is required production of information beyond the scope of the parties'

11  agreement as reflected in the April 4, 2013 Letter.

12          All of Bazaarvoice's interrogatory responses previously provided are incorporated by

13  reference, as is the entirety of the Expert Report of Dr. Ramsey D. Shehadeh, and the

14  forthcoming Rebuttal Report of Dr. Shehadeh.

15          Subject to and without waiver of the foregoing objections, and based upon factual

16  investigation to date, Bazaarvoice responds to Interrogatory No. 6 as follows:

17          Since it was founded in 2005, PowerReviews, Inc. ("PowerReviews") has struggled both

18  financially and strategically. Numerous facts evidence PowerReviews' position, including, but

19  not limited to:

20          • In its last full year of operations, PowerReviews had less than $12 million in
             annual, worldwide revenue;

21
22          • In 2009, PowerReviews put in place a cost savings plan;

23          • PowerReviews' later platforms such as PowerReviews Express and Essential
             Social Suite lacked a robust product offering that would attract larger customers;
24          and

25          • In March, 2012, PowerReviews hired a new CEO, which represented its third
             CEO since late 2009.

26          Bazaarvoice identifies Bazaarvoice's Response to United States Department of Justice

27  Antitrust Division Civil Investigative Demand Number 27131 (submitted December 5, 2012),

28

Defendant's Amended Responses and Objections          -13-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

1  the Complaint filed in this matter, and the documents listed in Exhibit C as documents that lend

2  support to its THIRD DEFENSE. Exhibit C is not an exhaustive list of such documents.

3       Bazaarvoice reserves its right to amend its response to identify additional documents to

4  support its THIRD DEFENSE. Bazaarvoice further reserve the right to rely on additional

5  documents at trial to support its THIRD DEFENSE.

6  **INTERROGATORY NO. 13:**

7       Describe each valuation model, financial model, or other financial analysis regarding the

8  value of PowerReviews' business that was provided to Bazaarvoice's board of directors before it

9  approved the purchase price for the company's acquisition of PowerReviews.

10  **RESPONSE TO INTERROGATORY NO. 13:**

11       In addition to and without waiving its General Objections, Objections to Definitions, and

12  Objections to Instructions, Bazaarvoice objects to Interrogatory No. 13 on the grounds that it is

13  vague and ambiguous, particularly, but not limited to, the phrase "each valuation model, financial

14  model, or other financial analysis regarding the value of PowerReviews' business."

15       Subject to and without waiver of the foregoing objections, and based upon factual

16  investigation to date, Bazaarvoice responds to Interrogatory No. 13 as follows:

17       Bazaarvoice objects to this Interrogatory as the valuation models, financial models or

18  other financial analyses regarding the value of PowerReviews' business may be ascertained from

19  documents that Bazaarvoice already produced during the investigation and litigation.

20  Bazaarvoice identifies documents listed in Exhibit D as reflecting information responsive to this

21  Interrogatory. Exhibit D is not an exhaustive list of such documents.

22

23  Dated: June 28, 2013              WILSON SONSINI GOODRICH & ROSATI
                                Professional Corporation

24

25                                By: / Dominique-Chantale Alepin
                                  Dominique-Chantale Alepin

26

                              Attorneys for Defendant Bazaarvoice, Inc.

27

28

Defendant's Amended Responses and Objections     -14-
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

1

<u>**CERTIFICATE OF SERVICE**</u>

2

I, Dominique-Chantale Alepin, declare:

3

I am employed in Santa Clara County, State of California.  I am over the age of 18 years

4

and not a party to the within action.  My business address is Wilson Sonsini Goodrich & Rosati,

5

P.C., 650 Page Mill Road, Palo Alto, California 94304.

6

On this date, I served **DEFENDANT'S AMENDED RESPONSES AND**

7

**OBJECTIONS TO PLAINTIFF'S INTERROGATORIES 3, 5, 6 and 13**, by forwarding the

8

document(s) by electronic transmission to the email addresses listed below:

9

***Counsel for Plaintiff***

10

Peter Huston (peter.huston@usdoj.gov)
Michael Bonnano (michael.bonnano@usdoj.gov)

11

Adam Severt (adam.severt@usdoj.gov)

12

13

I declare under penalty of perjury under the laws of the State of California that the

14

foregoing is true and correct.  Executed at Palo Alto, California on June 28, 2013.

15

16

By:  _/s/  Dominique-Chantale Alepin_____
        Dominique-Chantale Alepin

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Amended Responses and Objections
to Interrogatories 3, 5, 6 and 13
Case No.: 13-cv-00133 WHO

-15-

# EXHIBIT D

**Document Filed Under Seal**